# EXHIBIT ONE

10

## BLANKET ACCIDENT POLICY

Policyholder:  Tyco International Ltd.

Part of Policy No. ABL 661690

Schedule Date:  July 1, 2002

Applies To Classes:  1, 2 & 3

### SCHEDULE IV
### HAZARDS INSURED AGAINST

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a)       away from your premises in his city of permanent assignment; and
    b)       on business for you, and in the course of your business.
All such trips must be authorized by you.

This coverage does not include:

    a)       commuting between the covered person's home and place of work; or
    b)       during personal deviations made by the covered person.
"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:

    a)       arrives at his home or place of work, whichever happens first; or
    b)       makes a personal deviation.
If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**--This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.
A covered person will be presumed to have died, for purposes of this coverage, if:

    a)       he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be
             covered by the policy; and
    b)       his body is not found within a year of the accident.

**Aircraft Restrictions**--If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

    a)       he is riding as a passenger only, and not as a pilot or member of the crew; and
    b)       the aircraft has a valid certificate of airworthiness; and
    c)       the aircraft is flown by a pilot with a valid license; and
    d)       the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or
             hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or
             acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does
             not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**--We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates. An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2229]

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 1

AR0002

# EXHIBIT TWO

2. Under the *Claim Provisions* section, the following changes are made.

A. The provision titled Proof of Loss is replaced with the following.

**Proof of Loss**
Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

B. The provision titled Payment of Claims is replaced with the following.

**Payment of Claims**
All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay up to an amount not exceeding $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

3. Under the *General Provisions* section, the following changes are made.

A. The provision titled Incontestability is replaced with the following.

**Incontestability**
1. Of This Policy or Participation Under This Policy
All statements made by the Subscriber to participate under this Policy are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, or to deny the validity of this Policy or of participation under this Policy unless a signed copy of the instrument containing the statement is, or has been, furnished to the Subscriber.

After two years from the Policy Effective Date, no such statement will cause this Policy to be contested except for fraud.

2. Of A Covered Person's Insurance
All statements made by a Covered Person are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a signed copy of the instrument containing the statement is, or has been, furnished to the claimant.

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 2                                    AR0036

EXHIBIT THREE

**Miller, Marcy L 250**

| | |
|---|---|
| **From:** | Johnson, Felicia [feljohnson@adt.com] |
| **Sent:** | Monday, December 06, 2004 8:48 AM |
| **To:** | Miller, Marcy L 250 |
| **Subject:** | RE: New Claim - Roarty |

BTA-$500,000
AD&D-1x annually salary
Personal Accident Insurance

I spoke with the deceased local Human Resources and they will fax me a letter if the team member was on business the date of death. Thank you.


Felicia Johnson
ADT/Tyco
HRSC Benefits Specialist/Life Claims Coordinator
800-600-6641 ext. 3944
Fax 904-620-7952

-----Original Message-----
**From:** Miller, Marcy L 250 [mailto:Marcy.Miller@CIGNA.com]
**Sent:** Wednesday, November 24, 2004 1:06 PM
**To:** Johnson, Felicia
**Subject:** New Claim - Roarty
**Importance:** High


Hello Felicia,

I received a new Accidental Death claim for Daniel Roarty, DOB 4/5/61. The claim shows that you are filing for Basic and Voluntary AD&D along with BTA. Can you please have Mr. Roarty's manager provide me with his itinerary for the day of his death? According to the BTA policy, the Insured has to be on company business or a business trip to be considered for benefits.

Also, you have $50,000 being claimed for the BTA benefit, but our policy shows the BTA under policy ABL 661690 has a flat benefit of $500,000. Can you please double check you policy items?

Thank,
Marcy

**Marcy L. Miller**
Accident Claim Specialist
CIGNA Group Insurance
PH: 800.238.2125 ext. 3224
FX: 412.402.3316
E-Mail: Marcy.Miller@cigna.com


12/08/2004

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 3

AR0139

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute. Use
and distribution limited solely to authorized personnel.*

*(c) Copyright 2004 by CIGNA*

--------------------------------------------------------------CONFIDENTIALITY NOTICE: If you have received
this e-mail in error, please immediately notify the sender by e-mail at the address shown. This e-mail transmission may
contain confidential information. This information is intended only for the use of the individual(s) or entity to whom it
is intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank
you for your compliance. Copyright (c) 2004 CIGNA

12/08/2004

AR0140

EXHIBIT FOUR

Message

## Miller, Marcy L 250

**From:**  Miller, Marcy L 250
**Sent:**  Tuesday, December 14, 2004 10:13 AM
**To:**  'Johnson, Felicia'
**Subject:** RE: BTA - Roarty

Felicia,

Thank you for checking into this.  I paid the AD&D claim today, so just the BTA is pending.


**Marcy L. Miller**
Accident Claim Specialist
CIGNA Group Insurance
PH: 800.238.2125 ext. 3224
FX: 412.402.3316
E-Mail: Marcy.Miller@cigna.com


-----Original Message-----
**From:** Johnson, Felicia [mailto:feljohnson@adt.com]
**Sent:** Tuesday, December 14, 2004 9:51 AM
**To:** Gibian, Nicole
**Cc:** Gallman, Audrey Y
**Subject:** RE: BTA - Roarty

Please have HR Jennifer Napier contact me regarding this account this is one of numerous of times on this one account I have been waiting or requested information. I have not received the fax from Jennifer for Cigna's request.  If there is no proof that the employee was on business travel she needs a letter.  The spouse is very frustrated on the time frame for the status on her claim.

Felicia Johnson
ADT/Tyco
HRSC Benefits Specialist/Life Claims Coordinator
800-600-6641 ext. 3944
Fax 904-620-7952
-----Original Message-----
**From:** Miller, Marcy L 250 [mailto:Marcy.Miller@CIGNA.com]
**Sent:** Tuesday, December 14, 2004 9:05 AM
**To:** Johnson, Felicia
**Subject:** BTA - Roarty


Hi Felicia,

I am just following up on some information for Daniel Roarty's BTA claim.  Has Mr. Roarty's manager or HR Department provided you with confirmation that he was on a work trip at the time of his death?  The last e-mail you sent said the HR Dept was going to fax you something.

Thanks,


12/14/2004

**U.S.D.C. – District of Delaware**
**Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.**
**Docket No.: 06-0195-GMS**
**Exhibit No.: 4**

AR0134

**Marcy L. Miller**
Accident Claim Specialist
CIGNA Group Insurance
PH: 800.238.2125 ext. 3224
FX: 412.402.3316
E-Mail: Marcy.Miller@cigna.com

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute.*
*Use and distribution limited solely to authorized personnel.*

*(c) Copyright 2004 by CIGNA*

---------------------------------------------------------------------------------CONFIDENTIALITY NOTICE: If you have received this e-mail in error, please immediately notify the sender by e-mail at the address shown. This e-mail transmission may contain confidential information. This information is intended only for the use of the individual (s) or entity to whom it is intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank you for your compliance. Copyright (c) 2004 CIGNA

12/14/2004

AR0135

EXHIBIT FIVE



**tyco**

*Fire &*
*Security*

Lyco Fire and Security
One Town Center Road
Boca Raton, FL 33486

Telephone: 561-988-3600
Fax: 561-988-3631

## Interoffice Memorandum

*This correspondence may contain confidential information intended for the use of the individual or entity to whom it is addressed. If the reader is no the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination of copying is strictly prohibited.*

| | |
|---|---|
| **Date** | 12/15/04 |
| **To** | Cigna |
| **From** | Nicole Gibian |
| **Subject** | Daniel Roarty |

Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death.    If you need additional information, please contact Felicia Johnson at the HRSC, 800-924-8518.

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 5

AR0130

Roarty
319 Palomino Drive
Newark, DE  19711
302-292-8866
deroarty@msn.com
February 12, 2005

CIGNA Group Insurance
PO Box 22328
Pittsburgh, PA  15222-0328
Attn: Lynne George

RE:  Policy Number:            ABL 661690
Underwriting Company:      Life Insurance Company of North America
Insured Name:                    Daniel Roarty
Date of Birth:                     04/05/1961
Date of Death:                    08/08/04
Social Security Number:     189583764

```
PITTSBURGH
FEB 1 5 2005
GROUP LIFE & DISABILITY
BENEFITS OFFICE
```

Dear Ms. George:

Please be advised that this letter is to be considered an appeal to CIGNA's/TYCO's decision dated 12/17/04 denying my claim for the funds from the Business Travel Accident policy for my deceased husband, the insured, Daniel Roarty a TYCO/Scott Instruments employee.

Daniel Roarty was in fact returning from an authorized business trip when his vehicle was struck at an intersection, during which Dan sustained fatal blunt trauma injuries. Objective proof exists that a visit was required and authorized and details of the reason Dan's presence was required in Pittsburgh, also included is information indicating the immediacy of that need.

Please also be advised that efforts to reach Nicole Gibian, the Human Resources person who sent the letter to Cigna denying the claim based on the fact "Mr. Roarty was NOT on business travel," were unsuccessful.  My sister-in-law, Janet Roarty, had hoped to reach her for clarification.  Janet subsequently learned (02/07/05) that Nicole Gibian no longer worked for TYCO.  And Nancy in Boca Raton, fielding Nicole's call, could not answer any of Janet's questions.

The following summarizes the basis for this appeal.

As the policy states, the policy applies if Dan was on a business trip and if that trip was "authorized."  Below is a summary of documentation that describes the reasons Dan needed to travel to Pittsburgh.  It is not clear why TYCO has stated that this was not an "authorized business trip," but it is likely that they were not aware of Dan's efforts at resolving a critical problem with Bacharach's sensor production.

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 6

AR0084

The first e-mail indicating there was a problem was dated June 29th, 2004 from Gabriel Farkas, PMP from AdvanTech Corporation asking Georgia Karagianis where his sensors are. (E-mail 1) (For ease of reference and to help eliminate confusion the e-mails have all been numbered and will be referred to by their number in this appeal).
E-mail (2) also dated June 29th details Georgia Karagianis response to her unhappy customer. E-mails 1 and 2 identify the problem the customer was having and Georgia Karagianis's immediate response. Tyco has an unhappy customer.

E-mail 3 indicates a partial solution to the problem.

E-mail 4 identifies that even though Georgia Karagianis has managed to find 7 sensors instead of the necessary 10, 7 sensors as TYCO customer Gabriel Farkas says in this e-mail "is almost identical to not having any because the job will not be completed and accepted by the owner." Not only has TYCO failed their customer; Advantech Corporation is now failing their customer.

E-mail 5 dated July 1, 2004 indicates that the sensors will not be ready until the end of July. Georgia Karagianis indicates to customer Gabriel Farkas that she is doing everything she can to remedy this problem and expedite shipment of the sensors.

E-mail 6 customer Gabriel Farkas tells Georgia Karagianis that it is nearly the end of July and he has no sensors.

E-mail 7 Lori Levangie tries to reassure both Georgia Karagianis and customer Gabriel Farkas that she is checking on the status of the delivery date for these sensors.

E-mail 8 dated July 28, 2004 indicates that customer George Farkas still has heard nothing and now it is four days later than e-mail 7.

E-mail 9, also dated July 28, 2004 indicates that Georgia Karagianis has been checking the status of these sensors with Lori Levangie daily and nothing has changed. The customer still does not have the sensors.

E-mail 10 customer Gabriel Farkas has reached his limit and suggests that Scott must not want their business or the New York City DEP's business by the poor way they have been treated.

E-mail 11 from Lori Levangie to National Sales Manager Trent Smith and Ron Unruh dated July 28th, 2004 indicates Lori Levangie has had no success in getting the sensors from Bacharach and is frustrated. The problem identified here is clearly with Bacharach.

E-mail 12 dated July 29, 2004 shows that now the National Sales Manager, Trent Smith is involved and he asks for a recap of the problem.

E-mail 13 dated July 29, 2004 recaps the problem with lack of sensors and Georgia Karagianis efforts at reaching the president of Bacharach. She also describes efforts to reach the Purchasing Agent and the Operations Manager. 351 pieces were owed to Scott

Instruments on 04/20/04. It is now July 29th and these sensors, 0051-1861 for CE130 have not arrived.

E-mail 14 dated July 29, 2004 Bob Bierzynski talks about implementing a more permanent but future solution for the spare sensors. He also mentions losing customers to competitors if they cannot offer a solution to the sensors problem. E-mail 14 is also significant because now Dan Roarty has been copied on the problem.

E-mail 15 dated July 29, 2004 from Georgia Karagianis details a request for a quote from a customer requesting 71 CE130 Transmitters

E-mail16 dated July 30, 2004 indicates that Lori Levangie has received yet another call from NYC DEP "threatening to throw us out," because they have not received the sensors.

E-mail 17 dated July 30,2004 shows that now Dan Roarty is involved. Dan has marshaled the forces of Ron Unruh and Bryon Gordon and through pulling the sensors out of other in stock items that use this same sensor and going through the other assemblies has managed to come up with about a dozen sensors. It also indicates that Dan had to make the decision as to where the greatest need for these sensors resided. The e-mail indicates Dan's appreciation for the team effort at temporarily solving this problem. And most importantly, the e-mail states "I will be in Pittsburgh next week on vacation. Regis (Wyse) is going to set up a day for me to go into the Bacharach plant and find out why the sensor is taking so long to build. I will let you know what I find." This all important e-mail was sent to: Lori Levangie, Jim Hampson and copied to Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob; Karagianis, Georgia; DeMeritt, Mary Anne; Franco, John; Levangie, Lori; Cherubin, Chris. Dan states his intention to visit Bacharach in Pittsburgh and has notified 10 people within the Scott Instruments/Scott Health and Safety/TYCO organization of his intent to visit Bacharach on his vacation.

E-mail 18 dated July 30, 2004 at 4:15 PM Dan e-mails Georgia Karagianis, Chris Cherubin and John Franco about his intent to visit Bacharach the following week. In this e-mail Dan is asking the sales reps to prioritize their customers needs. Dan states "We still need to come up with lots more and hopefully I can learn something next week when I go into Bacharach."

The purpose of recapping the e-mails in this appeal is to demonstrate:
1) A problem existed for Scott Instruments and they were in jeopardy of losing customers because of the shortage of sensors.
2) This problem had been going on since at least April of 2004 and was just getting worse.
3) Georgia Karagianis and Lori Levangie clearly tried to work this problem and got nowhere.
4) Repeated calls to the President of Bacharach and to the management team running the plant resulted in no satisfaction or resolution of the problem. **Phone calls were producing no results.**

5) When Dan was finally brought into the loop he immediately took action to solve the most critical customers problems first at least temporarily and then went immediately to work on the problem.

6) This problem was brought to Dan's attention by e-mail and at a very inconvenient time – right before Dan was taking a vacation.

7) Dan e-mailed or copied 10 people as to his intent to visit the Bacharach plant while he was in Pittsburgh on vacation. Several of these people, Bob Bierzynski, Ron Unruh and Trent Smith were in positions of authority and at levels higher than Dan's position in the company.

8) Not one of these people in authority who had been notified by Dan of his intent to go on site at Bacharach contacted Dan to indicate that his intended visit was not authorized.

9) Dan was a professional and felt a keen sense of responsibility to Scott Instruments and it's customers. He worked very creatively to temporarily solve the problem of the missing sensors. Ron Unruh, also senior management helped Dan locate additional sensors and knew of Dan's intent to visit Bacharach during his vacation.

10) Dan also took personal responsibility for the boxes of products that now were without sensors and could not be sold. On each box he put a note stating: "Missing sensor 51-1865. See Dan Roarty NYC DEP 07/30/04. Dan now has ownership of this problem.

11) In all this time no one had yet to successfully resolve the source of the problem that has threatened Scott Instruments and their customers. Once again **Phone calls had not been successful. A visit was required and since Dan now had ownership of this problem it was important that Dan visit Bacharach in Pittsburgh, PA.**

As mentioned in Dan's e-mails, he had intended to come to Pittsburgh for his vacation. When Dan left the office July 30, 2004, he went home for the start of his vacation. The intent of part of that vacation was to help me get the house ready to put on the market. TYCO had transferred Dan to Scott Health & Safety in Monroe, NC. We were scheduled to move there in 2 months. We had already purchased a home in Monroe, NC. The days were packed with trying to do house repairs and general maintenance around the house so that when we came back from our family wedding the house would be ready to go on the market. In fact, in our absence, the interior of our house was being painted. Our departure date was originally flexible because we were unclear as to how much time we would need to get the general maintenance done and the house set up for painting. Our plans changed when Dan came home and said he needed to be in Pittsburgh for a meeting with Bacharach. We had to leave for Pittsburgh, Monday, August 2, 2004 so that Dan could meet with Regis Wyse and together they would go to the Bacharach plant and try to resolve this production problem that had not been resolved over the phone or by e-mails. At this time, Dan and I decided to take two vehicles to Pittsburgh. Taking two vehicles would enable Dan to spend as much time as necessary at the Bacharach plant without stranding his family. He wasn't quite sure what would be involved but he wanted to be able to have a certain amount of travel independence so he could respond to Bacharach and Scott Instrument's needs.

A meeting was planned for August 3, 2004 with Dan, Regis Wyse, The Regional Manager for Scott Instruments and Jim Elliott and Jim Flume from Bacharach to discuss delivery and production difficulties.

While Dan was driving out to Pittsburgh, for the meeting, the Bacharach plant had a major shake up and changes in their production personnel so they could not meet Tuesday. Dan and Regis Wyse rescheduled to meet with Bacharach on Thursday 08/04/04. Sometime between August 3, 2004 and August 4th, Regis Wyse had spoken with Bacharach and had reached an agreement on production dates and so the face-to-face meeting was cancelled, but telephone calls between Regis and Dan continued.

As anyone who works in sales knows, there are many times when you present yourself at a client, potential customer's or supplier's door, only to learn that those people had been called away on other business. Your intentions hadn't changed. You would be frustrated at the waste of time the effort expended but nevertheless, the trip would still be considered a business trip. Through no fault of Dan's the face to face portion of the trip was cancelled. The reason for Dan's trip had not changed. And the entire time that Dan was in Pittsburgh he continued to make calls, take calls and answer his e-mails.

As Lanny Tomberlin, HR Manager for Scott Health and Safety, explained to me in a call I made to him in August 04 shortly after Dan's death, Senior Management is on call all the time regardless of vacation. Dan wasn't on a time clock. He would be expected to work what ever hours were required to "take care of business." Dan had in his possession during this "vacation" his laptop, his cell phone and his briefcase. Dan loved Scott Instruments and his work as Senior Product Manager. He was willing to sacrifice his vacation time and time with his family to help solve a production problem that left unresolved could result in a loss of business for Scott Instruments.

In order to make this business trip Dan had to drive from Newark, Delaware to Pittsburgh, PA and back again. He changed his personal plans to accommodate his business needs and he informed his management team and sales staff of his plan. Trent Smith, Bob Bierzynski and Ron Unruh were all aware of Dan's plans to visit Bacharach on his vacation. Dan was on an authorized business trip as proven by the content of the enclosed e-mails, his management team was aware of his plans and Dan was unfortunately killed on his way home from his business trip. He is covered by The Group Business Travel Accident Insurance policy and payment should be made accordingly.

Respectfully submitted,

Kelly J. Roarty
Wife of Daniel R. Roarty

# EXHIBIT SEVEN



CIGNA Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 1, 2005
Time: 8:29 AM

In / Out
 Outgoing: Felicia Johnson                    Relationship to Insured: HR @
ER

  Phone Number: 800-600-6641 ext. 3944

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

I called her to verify that Tyco continues to maintain that Daniel Roarty was not
on a company authorized business trip at the time of the claimed accident. I
reached her voice mail. She is out of the office until 3/3. I left a message for a
return call.

Robert Killmer

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 7

AR0078

# EXHIBIT EIGHT



**CIGNA** Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 11, 2005
Time: 12:44 PM

In / Out
Incoming: Felicia Johnson
    Phone Number: 800-600-6641 ext. 3944    Relationship to Insured: HR @ ER

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

She called me regarding my request for confirmation that Mr. Roarty was not on an approved business trip at the time of his automobile crash and death. She stated again that Mr. Roarty was not on business travel at that time. However, she stated that she has contacted the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident. She stated that I should expect to receive that letter within the next week or so.



Robert Killmer

U.S.D.C. – District of Delaware
Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.
Docket No.: 06-0195-GMS
Exhibit No.: 8    AR0076

EXHIBIT NINE

**Brian Billeter**
**Accident Claims Manager**
**Accident & Specialty Claims Department**

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

March 24, 2005

Kelly Roarty
319 Palomino Drive
Newark, DE 19711

| | |
|---|---|
| **Insured Name:** | **Daniel R. Roarty** |
| **Date of Birth:** | **4/5/61** |
| **Policy Number:** | **ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I am writing to you regarding the appeal of Mr. Roarty's Business Travel Accident benefits under the above captioned Life Insurance Company of North America (LINA) business travel accident insurance policy ("Policy"). I reviewed your letter of appeal of our initial claim denial, which was received in our office on February 15, 2005. After review of the additional information provided, we maintain our initial position that no accidental death benefits are due.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions. A copy of these policy provisions was enclosed with our initial denial letter dated December 17, 2004. In order to be eligible for benefits, you must satisfy the policy provisions as stated below.

## **Policy Provision**

The Tyco, International policy states:

*"Scope of Coverage* – In exchange for the payment of premiums, we agree to pay benefits to all eligible persons:

a)  who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
b)  who, as a direct result of the injuries, and from no other cause, suffer a covered loss.

*Schedule IV  Hazards Insured Against*

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

a)  away from your premises in his city of permanent assignment, and
b)  on business for you, and in the course of your business.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

**U.S.D.C. – District of Delaware**
**Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.**
**Docket No.: 06-0195-GMS**
**Exhibit No.: 9**

AR0065

All such trips must be authorized by you."

## Evidence Evaluated

I have reviewed the claim file as a whole, including the following documents, in making this determination:

- Group/Association Proof of Loss form.
- Commonwealth of Pennsylvania Certificate of Death.
- Police Crash Reporting Form.
- Letter from Nicole Gibian, Human Resources, Tyco International.
- Telephone conversation with Felicia Johnson at Tyco International.
- Our initial denial letter dated December 17, 2004.
- Your letter of appeal received in our office February 15, 2005, along with e-mail chains from Tyco.
- Business Travel Accident policy ABL 661690, business travel accident benefits through Tyco International.

## Summary of Evidence

According to the information reviewed, on August 8, 2004, Daniel Roarty died as a result of injuries suffered in a motor vehicle accident. The police incident report indicated that a driver of a truck failed to stop at a stop sign, and struck Mr. Roarty's minivan, causing injuries to Mr. Roarty and his three children, all of whom were in the minivan. Mr. Roarty was not at fault in this accident.

Tyco International has verified on several occasions that Mr. Roarty was not on business travel at the time of his death, through both a letter from Nicole Gibian and our telephone conversations with Felicia Johnson, both of whom are with Tyco International Human Resources. Based upon this assertion, Mr. Roarty's claim for Business Travel Accident Benefits was denied on December 17, 2004.

You have appealed our December 17, 2004 decision, asserting that Mr. Roarty was on business travel at the time of his death. Specifically, you have indicated that Mr. Roarty, as of August 2, 2004, was on his way to Pittsburgh from your home in Delaware for both a family vacation and to visit with a customer, Bacharach, regarding some difficulties that Tyco was having with Bacharach. You have further asserted that you took a separate automobile from Mr. Roarty so that he would have the ability to travel independently once he arrived in Pittsburgh for vacation, because he was unsure as to how much time would be required to resolve business issues with Bacharach.

When Mr. Roarty arrived in Pittsburgh he was unable to meet with Bacharach due to changes in their production personnel. However, issues with Bacharach were resolved during a series of telephone calls on August 3rd or 4th, 2004. During Mr. Roarty's return trip from Pittsburgh back to Delaware, he was involved in a fatal motor vehicle accident on August 8, 2004.

Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

## Summary

Based upon the information provided above, there is not sufficient support for finding that Mr. Roarty was engaged in business travel at the time of his accident. It appears that Mr. Roarty resolved the issues with Bacharach in a series of phone calls during August 3rd and 4th. There is no indication that Mr. Roarty traveled whatsoever with regard to the customer, Bacharach, and every indication that he was engaged in travel as part of his vacation. As the side trip to visit a customer had been cancelled, the only trip Mr. Roarty took related to his vacation, clearly not on the business of his employer. This policy pays benefits for loss which occurs while on an authorized business trip as indicated above. As Mr. Roarty was on vacation, and not on an authorized business trip, at the time of his death, no benefits are payable under policy ABL 661690.

Nothing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein. Please be advised that you have exhausted your administrative remedies under this policy. No further appeals will be considered.

We encourage you to either contact the Tyco International's employee benefits department or review the insurance booklet, certificate or coverage information made available to you, to determine if you are eligible for additional benefits.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3249 from 7:30 a.m. to 4:00 p.m. Eastern Time, Monday through Friday. If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Brian Billeter*

Brian Billeter

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

Mr. Roarty was killed on August 8, 2004 in Lancaster County, Pennsylvania as he drove home from his vacation. Regardless that her husband died after completing the portion of his trip that would have potentially involved Tyco customer contact, in her appeal Plaintiff contended that her husband, on the homeward bound leg of his travel, had been returning from an authorized business trip when he was killed. Plaintiff did not offer evidence from Tyco that confirmed this assertion.

In response to the appeal, LINA again contacted Tyco, who confirmed that "Mr. Roarty was not on an approved business trip at the time of his automobile crash and death." *See* Exhibits Seven (AR0078) and Eight (AR0076). On March 24, 2005, LINA denied Plaintiff's appeal. As part of its basis to do so, LINA stated:

> Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel.

*See* Exhibit Nine (AR0065-AR0067). While characterizing Tyco's information as incorrect, Plaintiff does not contest the facts regarding how LINA handled her claim. *See* Complaint ¶¶ 16 – 21.

In Count I, Plaintiff alleges that LINA's decision to deny her claim for benefits was "the result of a conflict of interest that it inherently has since it both funds and administers the Plan." *Id.* at ¶ 26. Plaintiff cites to no example or instance where this structural conflict affected the outcome of her claim other than LINA's acceptance of Tyco's representation that Mr. Roarty was not engaged in authorized business travel when he died.

# EXHIBIT TEN

Westlaw.

Slip Copy

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents

Only the Westlaw citation is currently available.
United States District Court,M.D. Pennsylvania.
Michael AMITIA, Plaintiff
v.
METROPOLITAN LIFE INS. CO., Defendant.
No. 4:05CV569.

April 25, 2006.

Michael T. Vough, Vough and Associates, Pittston, PA, for Plaintiff.
Veronica Winter Saltz, Saltz Polisher, P.C., Wayne, PA, for Defendant.

### MEMORANDUM AND ORDER

JOHN E. JONES III, District Judge.

### THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

**\*1** Pending before the Court is a Motion for Summary Judgment (doc. 17) filed by Plaintiff Michael Amitia ("Plaintiff" or "Amitia") on January 25, 2006. We also have before us a Motion for Summary Judgment (doc. 19) and a Motion to Strike Exhibits Submitted with Plaintiff's Cross-Motion for Summary Judgment (doc. 20) filed by Defendant Metropolitan Life Insurance Company a/k/a MetLife ("Defendant" or "MetLife") on January 31, 2006 and February 1, 2006 respectively.

For the reasons that follow, Defendant's Motions will be granted and the case closed.

### PROCEDURAL HISTORY:

On March 21, 2005, Plaintiff filed a complaint against MetLife in the United States District Court for the Middle District of Pennsylvania arising

under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (See Rec. Doc. 1). Plaintiff's one count complaint alleges that he is entitled to short and long term disability benefits and that Defendant acted in an arbitrary and capricious manner in denying Plaintiff's claim for disability benefits. (Comp.¶¶ 19-23).

On January 25, 2006 and January 31, 2006 respectively, both parties filed Motions for Summary Judgment, which have been fully briefed. The instant Motions are therefore ripe for disposition.

### STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." *Young v. Quinlan,* 960 F.2d 351, 357 (3d Cir.1992). Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323 (1986). This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325.

Federal Rule of Civil Procedure 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.D.C. – District of Delaware**
**Roarty v. Tyco Int'l Ltd., Group BTA Plan, et al.**
**Docket No.: 06-0195-GMS**
**Exhibit No.: 10**

Slip Copy                                                                                                        Page 2

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
**(Cite as: Slip Copy)**

affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *Celotex Corp.*, 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir.1994) (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc .*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*, 507 U.S. 912 (1993) (citations omitted).

*2 Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### STATEMENT OF RELEVANT FACTS:

We initially note that we will, where necessary, view the facts and all inferences to be drawn therefrom, in the light most favorable to the nonmoving party in our analysis of the pending Motions.

On July 3, 2002, Plaintiff was involved in an automobile accident in which he sustained serious injuries. At the time of the accident, Plaintiff was a full time MetLife employee. Plaintiff filed a claim

for disability benefits due to his injuries with disability benefits to commence effective September 15, 2004. Accordingly, Plaintiff worked for MetLife as a Financial Services Representative until September 14, 2004.

MetLife established and maintains an employee welfare benefit plan ("the Plan") for the benefit of its employees, including Plaintiff. (Rec. Doc. 21, bate stamp nos. 1-144). Plaintiff's claim for short-term disability benefits was approved from September 15, 2004 through November 26, 2004. *Id.* at 157, 169, 184. After reviewing all medical information provided to MetLife, MetLife notified Plaintiff on December 13, 2004 that it found he was no longer eligible for benefits under the Plan after November 26, 2004, and that his claim would be terminated. In that regard, MetLife concluded that there was no medical evidence to support any functional impairment in Plaintiff's ability to perform the functions of his own occupation after November 26, 2004. MetLife advised Plaintiff of his right to appeal the decision and to submit any additional comments, documents, records, or other information relating to his claim that he deemed appropriate for MetLife to give his appeal proper consideration.

Plaintiff appealed MetLife's determination to terminate his benefits by letter dated January 10, 2005, enclosing a letter report from Albert D. Janerich, M.D. ("Dr.Janerich") dated December 22, 2004. *Id.* at 190-93. The appeal was referred to MetLife's Appeal Unit for review. In addition to reviewing Plaintiff's complete file, MetLife's Appeal Unit also considered Dr. Janerick's December 22, 2004 letter report. In summary, the medical information made available to MetLife consisted of the following: (1) physical therapy records dated September 22, 2004 through October 26, 2004; (2) Dr. Janerich's office note of November 9, 2004; (3) an unsigned Physician Questionnaire dated November 18, 2004; and (4) a letter from Dr. Janerich to Plaintiff's counsel dated December 22, 2004. *Id.* at 208-211.

*3 By letter of March 3, 2005, MetLife advised Plaintiff's counsel that it decided to uphold its decision to terminate benefits, and provided

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 3

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
(Cite as: Slip Copy)

Plaintiff's counsel with the reasons that the original determination was being upheld on appeal review. *Id.* In support of its denial of benefits to Plaintiff, MetLife explained as follows:

Mr. Armitia is also required to provide evidence that he remains under continuous, appropriate care and treatment throughout his period of claimed disability. Benefits were approved through November 26, 2004 and the last documented treatment that Mr. Armitia received was on November 9, 2004. As such, we have not been provided with evidence of continuous, appropriate care and treatment as required by the Plan.

Based upon the limited medical documentation in the file, we find that sufficient evidence of continued disability as defined by the STD plan has not been produced. Therefore, for the reasons noted above, we find that the original decision to terminate short term disability benefits was appropriate and remains in effect.

*Id.* at 210-11.

### DISCUSSION:

In his Motion, Plaintiff argues that he provided medical documentation in support of his claim for disability benefits confirming that he was not cleared to return to work in any capacity. In support thereof, Plaintiff points to page 173 and pages 190 through 193 of Defendant's administrative record as evidence that he is incapable of working. (Pl.'s Br. Supp. Mot. Summ. J. at 2). Plaintiff asserts that he is entitled to summary judgment as Defendant willfully and capriciously disregarded the injuries and resulting damages he suffered despite medical information which demonstrates the extent to which he is fully disabled from employment. "Moreover, there is no contradictory evidence provided by or cited to by the Defendant which in any manner disputes the medical evidence provided by the Plaintiff which confirms his full disability." *Id.* at 3.

In response, MetLife argues that under an arbitrary and capricious standard of review, its decision to terminate Plaintiff's short-term disability benefits was reasonable, consistent with the language of the Plan, and supported by substantial evidence. In

addition, MetLife asserts in its Motion to Strike Exhibits Submitted with Plaintiff's Motion, that such exhibits should be disregarded as they were not part of the administrative record in connection with MetLife's determination to terminate Plaintiff's short-term disability benefits.

### A. *Applicable Standard of Review*

Under ERISA, a court reviewing an administrator's decision to deny benefits is by default reviewed *de novo,* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U .S. 101, 115 (1989); *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 253 (3d Cir.2004). If a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. *Firestone Tire & Rubber Co.,* 489 U.S. at 111-12, 115; *see Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997). Discretionary authority can be provided for by express or implied language in the benefit plan. *Luby v. Teamsters Health, Welfare, & Pension Trust,* 944 F.2d 1176, 1180 (3d Cir.1991). Whether that arbitrary and capricious review is heightened in any way depends on the presence of potentially conflicted ERISA fiduciaries and is determined on a sliding scale that we will discuss in further detail below. *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 379 (3d Cir.2000).

*4 The scope of discovery depends upon the standard of review. In the Third Circuit, "a district court exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's Administrator." *Luby,* 944 F.2d at 1184-85. In sharp contrast, the record available to a court conducting an arbitrary and capricious review is the record made before the plan administrator, which cannot be supplemented during litigation. *See Kosiba v. Merck & Co.,* 384 F.3d 58, 67 n. 5 (3d Cir.2004)(*citing Mitchell,* 113 F.3d at 440). Nevertheless, when a reviewing court is deciding whether to employ the arbitrary and capricious

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 4

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
(Cite as: Slip Copy)

standard or a more heightened standard of review, it may consider evidence of potential biases and conflicts of interest that are not found in the administrator's record. *Id.*

#### i. *Arbitrary & Capricious Standard of Review*

To determine the proper standard of review, we must begin with the language of the Plan. We initially note that the Plan is funded by a policy of group disability insurance issued by MetLife. MetLife accurately submits that it is vested with discretionary authority pursuant to the Plan to interpret the terms of the Plan and to determine entitlement to Plan benefits. The Plan states, in pertinent part, that:

MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments.

Rec. Doc. 21, bate stamp no. 36.

With respect to the definition of disability, the Plan provides as follows:
"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you:
1. are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
are unable to earn more than 80% of your Predisability Earnings at your Own Occupation for any employer in your Local Economy.

*Id.* at 43. In addition, with regard to the receipt of benefits under the Plan, it states that:In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of the following documents ...
Proof of Disability
Evidence of continuing Disability
Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.
Information about Other Income Benefits.
Any other material information related to your Disability which may be requested by us.

*Id.* at 41. Pursuant to the Plan, "appropriate care and treatment" means medical care and treatment

that meet all of the following:1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
it is necessary to meet your basic health needs and is of demonstrable medical value;
3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;
*5 it is consistent with the diagnosis of your condition; and
its purpose is maximizing your medical improvement.

*Id.* at 43-44.

Accordingly, where, as here, the Plan grants discretionary authority to the claim administrator to determine entitlement to benefits, the proper standard of review is a form of arbitrary and capricious review.[FN1] *Firestone Tire & Rubber Co.,* 489 U.S. at 111-12, 115; *see Mitchell,* 113 F.3d 433. As MetLife submits, it both funds and administers the Plan, which creates a conflict of interest. Such conflict warrants a heightened form of arbitrary and capricious review, as we will detail below. *Pinto,* 214 F.3d at 378.

> FN1. We note that Plaintiff appears to concede the applicability of an arbitrary and capricious standard of review as his complaint explicitly references the aforementioned standard of review and his brief in support of his instant Motion indicates that Defendant "willfully and capriciously" disregarded injuries and resulting damage he suffered despite medical information allegedly demonstrating Plaintiff's disability. (Comp. ¶ 23; Pl.s' Br. Supp. Mot. Summ. J. at 3).

#### ii. *Slightly Heightened Arbitrary & Capricious Standard of Review*

The Third Circuit follows a sliding scale approach to applying an arbitrary and capricious standard of review. The sliding scale allows for the court to intensify its scrutiny of the insurer's decision to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
**(Cite as: Slip Copy)**

Page 5

match the degree of conflict present in the insurer's decision making process. *See id.* at 392. In *Pinto*, the Third Circuit Court of Appeals provided four factors for courts to consider in determining the exact degree of scrutiny. *Id.* The factors a court considers in determining the degree of scrutiny to afford the administrator in the determination to terminate benefits include the following: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the 'presumed desire to maintain employee satisfaction.' " *Stratton*, 363 F.3d at 254 (*citing Pinto*, 214 F.3d at 392). The Third Circuit stated in *Pinto* that they "expect arbitrary courts to consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." 214 F.3d at 393.

As to the first factor, Plaintiff clearly has less experience with disability claims when compared to MetLife. The relative sophistication of the parties is only one factor, however, and does not exclusively control the degree of scrutiny we will apply to MetLife's decision. See *Rendulic v. Kaiser Aluminum & Chemical Corp.*, 166 F.Supp.2d 326, 337 n. 5 (W.D.Pa.2001) (stating that disparity among parties along was not a "critical factor"). Moreover, this factor is tempered when a plaintiff, such as Amitia, is represented by counsel during the administrative claims process. See *Schlegel v. Life Ins. Co. of N. America*, 269 F.Supp.2d 612, 617 n. 4 (E.D.Pa.2003) (applying deferential arbitrary and capricious standard where plaintiff was relatively sophisticated and was represented by counsel). Accordingly, although a disparity in the sophistication of the parties exists, that disparity warrants only a slight heightening of our arbitrary and capricious review.

*6 With regard to the second *Pinto* factor, nothing in the record directly concerns the information accessible to the parties or any denial of access to such information which could have potentially warranted further heightening our review of MetLife's decision.

The third factor, the exact financial arrangement between the insurer and the company, is that MetLife as the insurance company both funds and administers the Plan. Because the insurer has not hired a third-party claims administrator and both issued the policy and administered the claims made thereunder, its decision in this case is subject to a heightened review. See, e.g., *Morris v. Paul Revere Ins. Co.*, 986 F.Supp. 872, 881 (D.N.J.1997) (discussion how when an insurer both administers and issues the same plans a conflict of interest is created); *see also Pinto*, 214 F.3d at 389 n. 7 (gathering cases where district courts applied " heightened scrutiny when the insurance company is the insurer and makes determinations"). Notably, although structurally the Plan is both funded and administered by MetLife, the insurance company, which creates an inherent conflict of interest that warrants some form of heightened scrutiny, there is no evidence regarding MetLife's procedures in administering the Plan that warrants any further heightening.

Finally, as to the fourth *Pinto* factor, there is no evidence that MetLife is experiencing financial or structural deterioration. Therefore, we will apply a slightly heightened level of scrutiny in our arbitrary and capricious review of MetLife's decision to terminate Plaintiff's benefits. By applying a slightly heightened standard, the Court provides the Plan administrator deference, but not absolute deference. *Bader v. RHI Refactories America, Inc.*, 111 Fed. Appx. 117, 120 (3d Cir.2004) (citing *Pinto*, 214 F.3d at 393).

### iii. *Application of Slightly Heightened Arbitrary & Capricious Review to MetLife's Decision*

Our inquiry in conducting an arbitrary and capricious review of the insurer's decision is not whether MetLife made the same decision that we would have made; a district court cannot substitute its own judgment for that of the Plan administrator when conducting an arbitrary and capricious review. *Abnathya v. Hoffman-La Roche, Inc .*, 2 F.3d 40, 45 (3d Cir.1993) (quoting *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D.Pa.1984)). A district court conducting an unadulterated arbitrary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 6

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
(Cite as: Slip Copy)

and capricious review may overturn a decision of a
Plan administrator only if it "without reason,
unsupported by substantial evidence or erroneous as
a matter of law." *McLeod v. Hartford Life &
Accident Ins. Co.,* 372 F.3d 618, 623 (3d Cir.2004)
(quotation marks and citations omitted).

Because we have slightly heightened our scrutiny
under *Pinto,* we will give slightly less deference to
MetLife, but our review will not be similar to a *de
novo* review. Under a heightened review, the
administrator is "not afforded complete,
freewheeling discretion," and the reviewing court
must be "especially mindful to ensure that the
administrator's interpretation of the policy language
does not unfairly disadvantage the policy holder."
*Id.* at 624. Applying heightened scrutiny to
MetLife's decision to terminate Plaintiff's benefits
requires us to be certain that a reasonable fact finder
could conclude that there was substantial medical
evidence in the administrative record to support
MetLife's determination that Plaintiff was not
entitled to short-term disability benefits beyond
November 26, 2004 under the terms of the Plan.

### B. *Plaintiff's Claim for Long-Term Disability Benefits*

*7 To determine whether Plaintiff carried his
burden, we look to the record as a whole. *See
Mitchell,* 113 F.3d at 440. We initially note that it is
well-established that in reviewing the decision of a
claim administrator under ERISA, the Court is
limited to the administrative record available to the
claim administrator at the time it rendered its final
claim determination, especially where the Plan
affords discretion to the claim administrator. *Id.*
Accordingly, under the arbitrary and capricious
standard of review, the "whole" record consists of
that evidence that was before the administrator
when he made the decision being reviewed. *Id.; see
also Luby,* 944 F.2d at 1184, n. 8. Moreover, the
Third Circuit Court of Appeals has made it clear
that a plaintiff may not expand the record by
submitting additional evidence on summary
judgment. Consider, to illustrate, that in *Abnathya
v. Hoffman-LaRoche, Inc.,* 2 F.3d 40 (3d Cir.1993)
, the Third Circuit refused to permit the plaintiff to

expand the record on judicial review by submitting
the reports of three additional medical evaluations
after the administrator rendered its determination.
The Third Circuit stated as follows:

However, none of these evaluations were submitted
until months after the Committee's final decision to
affirm the discontinuation of Abnathya's benefits.
Thus, these evaluations cannot be considered by the
court in deciding whether the discontinuation of
Abnathya's benefits was arbitrary and capricious.
*See Miller v. Metropolian Life Ins. Co.,* 925 F.2d
979, 986 (6th Cir.1991) (in reviewing a final
decision of a plan administrator, the court may
consider only evidence that was in the
administrative record).

*Abnathya,* 2 F.3d at 48 n. 8. In fact, as MetLife
accurately submits in its Motion to Strike, virtually
every single Circuit Court of Appeal throughout the
country agrees that a district court's review of an
ERISA plan administrator's claim determination is
limited to the well-developed record available at the
time the determination was rendered. (*See* Def.'s Br.
Supp. Mot. Strike at 5, n. 2).

Notwithstanding this well-established rule of law,
Plaintiff, in support of his Motion, included
numerous medical records, as well as his Notice of
Award of monthly social security disability benefits,
as exhibits for the Court's consideration; however,
only two of such medical records were included in
MetLife's administrative record at the time it
rendered its final determination on March 3, 2005.
FN2 In deciding the parties' Cross-Motions for
Summary Judgment, we are bound by the
administrative record before MetLife at the time it
rendered its determination to terminate Plaintiff's
short-term disability benefits. Defendant's Motion to
Strike Exhibits Submitted with Plaintiff's
Cross-Motion for Summary Judgment, to which
Plaintiff failed to respond, is granted such that we
will not consider documents submitted by Plaintiff
that were not part of the administrative record
before MetLife at the time it rendered its
determination to terminate Plaintiff's benefits.

> FN2. As we will discuss in more detail
> below, the only medical records contained

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
(Cite as: Slip Copy)

in Plaintiff's exhibits submitted with his Motion which were a part of the administrative record were the following: Dr. Janerich's clinical note of November 9, 2004 and Dr. Janerich's December 22, 2004 letter. The remaining medical reports and the Social Security Administration Notice of Award were not provided to MetLife during its review and appeal of Plaintiff's claim determination.

*8 We find that Plaintiff has failed to meet his burden of establishing that MetLife's claim determination was arbitrary and capricious as the medical evidence in the record does not support an impairment that would prevent Plaintiff from engaging in his own occupation, for the reasons that follow.

As we previously noted, after reviewing the medical information provided to MetLife, MetLife notified Plaintiff on December 13, 2004, that he was no longer eligible for benefits under the Plan after November 26, 2004, and that his claim would be terminated. In the December 13, 2004 letter, MetLife advised Plaintiff that:

Review of the evidence in the file shows that you have not worked since 9/15/04 due to cervical and lumbar sprains/strains and herniations resulting from a motor vehicle accident that occurred on 7/3/02 ... You were approved through your follow up office visit with Dr. Janerich on 11/9/04, your office visit with pain management, and your completion of physical therapy. Pro Physical Therapy advised us that your evaluation on 10/26/04 showed significant improvement in range of motion and that your strength was within functional limits. They went on to state that you have functionally improved to the point where you can drive. It was recommended that you attend nine additional physical therapy sessions at that time and your claim was approved through adequate time to complete the sessions. Dr. Janerich noted at your 11/9/04 office visit that you were seen by Dr. Hanlon, a pain management specialist who evaluated you and recommended that you undergo nerve blocks. Dr. Janerich advised us that you were fearful of the nerve blocks and would complete physical therapy.

Rec. Doc. 21 at bate stamp nos. 187-88. MetLife further advised Plaintiff that his physician, Dr. Janerich, noted on November 9, 2004 that Plaintiff had limited cervical range of motion but did not note the limitations or effects on his functional abilities other than Plaintiff's cervical and lumbar flexion was near normal. MetLife concluded that "there is no medical evidence to support any functional impairment resulting in [plaintiff's] ability to perform the functions of [his] occupation as a Customer Service Representative after 11/29/04." Id.

Subsequently, Plaintiff was afforded the opportunity on appeal to submit any additional comments, documents, records, or other information relating to his claim that he deemed appropriate for MetLife to give his appeal proper consideration. Notably, along with his appeal letter, the only additional documentation that Plaintiff's counsel submitted to MetLife was a single letter report from Dr. Janerich dated December 22, 2004 and addressed to Plaintiff's counsel. (Rec. Doc. 21 at bate stamp nos. 190-93). Plaintiff places considerable emphasis upon Dr. Janerich's December 22, 2004 letter report and directs the Court's attention to Dr. Janerich's statement that he has a continued disability and is not released to return to work. In that regard, Dr. Janerich specifically noted: "Regrettably, these efforts failed so much so that on September 15 of this year, I advised him against work." Id. at 192; see also Pl.'s Br. Supp. Mot. Summ. J. at 2. A careful review of the record reveals that despite Dr. Janerich's references in the December 22, 2004 letter to various diagnostic tests, none of such tests were provided to MetLife for their review.[FN3] Moreover, MetLife accurately noted that all referenced test results pre-dated Plaintiff ceasing work on September 14, 2004. Id. at 235.

FN3. The diagnostic tests referenced in Dr. Janerich's December 22, 2004 report consisted of the following: (1) an EMG and Nerve Conduction Study of May 7, 2003; (2) a cervical spine MRI on November 22, 2002; and (3) a lumbar spine MRI on April 7, 2003 and May 20, 2004. (Rec. Doc. 21 at bate stamp nos.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
**(Cite as: Slip Copy)**

191-93).

**\*9** Accordingly, the only medical documentation available to MetLife for consideration, in addition to Dr. Janerich's December 22, 2004 letter, considered of: (1) physical therapy records dated September 22, 2004 through October 26, 2004; (2) Dr. Janerich's office note of November 9, 2004; and (3) a Physician Questionnaire, unsigned, dated November 18, 2004. (Rec. Doc. 21 at bate stamp nos. 208-211).

We are in agreement with MetLife that nothing contained in the above-referenced medical documentation establishes an impairment that would prevent Plaintiff from performing his own occupation. In MetLife's March 3, 2005 denial on appeal of Plaintiff's disability benefits, it noted that in the Physician Questionnaire, upon which Plaintiff relies in his Motion, Plaintiff's physician represented that Plaintiff remained unable to work yet provided no information whatsoever as to why Plaintiff was unable to do so. MetLife also advised Plaintiff's counsel that:
to receive disability benefits, it is your responsibility to submit evidence of disabling impairment. Self-reported, subjective complaints of pain, absent objective findings of functional impairment, do not provide evidence of disability. When seen on November 9, [Plaintiff] reportedly had some limitation of range of motion; however, details of those findings are not noted. Similarly, Dr. Janerich mentions several diagnostic studies in his letter, noting that they were enclosed in his letter ... however, those reports were not provided for our review.
Also, Dr. Janerich notes in his letter that [Plaintiff] was advised 'against work activities that would increase the physical stress on his thoracolumbar spine.' This statement is vague, and provides no information as to what activities Dr. Janerich feels would do so, nor does it provide any objective information concerning [Plaintiff's] ability to perform any activities.

*Id.* at 210. Moreover, in acknowledging the limitations noted by Plaintiff's physician, Dr. Janerich, MetLife advised that:Dr. Janerich does mention that [Plaintiff] should avoid certain activities on a daily basis, such as using his arms at or above shoulder height and lifting, carrying, pushing or pulling in excess of twenty pounds. It is also noted that [Plaintiff] should avoid bending at the waist or sitting for periods of time in excess of 20-30 minutes continuously.
**If, in fact, these were also the activities that Dr. Janerich felt [Plaintiff] should avoid while working, it should be noted that restriction of those activities would not preclude him from performing the duties of his occupation as a Financial Services Representative.**

*Id.* (Emphasis added). In addition, MetLife advised that although Plaintiff was required to provide evidence that he remains under continuous, appropriate care and treatment throughout his period of claimed disability, the last documented treatment that Plaintiff received was on November 9, 2004. *Id.* MetLife accordingly concluded that " [b]ased upon the limited medical documentation in the file, [MetLife found] that sufficient evidence of continued disability as defined by the [short-term disability] plan has not been produced. *Id.* For these reasons, MetLife found its original decision to terminate Plaintiff's short-term disability benefits to be appropriate, thus upholding its decision on appeal. *Id.*

**\*10** We find that MetLife's claim determination was based upon the undisputed fact that the medical evidence in the administrative record was insufficient to support an impairment that prevented Plaintiff from performing his own occupation. Although Plaintiff's physician, Dr. Janerich, noted activities that Plaintiff should avoid, using his arms at or above shoulder height, lifting, carrying, pushing or pulling in excess of twenty pounds, bending at the waist or sitting for periods of time in excess of 20-30 minutes continuously, as MetLife explained, such restrictions do not impact on his ability to perform his responsibilities as a Financial Services Representative. As MetLife submits, in his own occupation, Plaintiff's job required him to travel to meet clients and carry a briefcase and laptop computer. In fact, physical therapy records show that Plaintiff had functionally improved to the point where he could drive.[FN4] *Id.* at 178.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
(Cite as: Slip Copy)

Page 9

FN4. The assessment portion of Plaintiff's Physical Therapy Progress Report reveals that, "Since last re-evaluation, patient notes significant improvement in both cervical rotation and lateral flexion mobility bilaterally. *This has functionally improved patient's ability for driving.* Patient also demonstrates improved strength in the cervical and midback region, improving overall cervical stability. " (Rec. Doc. 21 at bate stamp no. 178) (emphasis added).

Accordingly, a careful review of the medical documentation provided by Plaintiff shows that the only contradictory or inconsistent medical evidence is found in Plaintiff's own medical documentation provided to MetLife. Consider, for example, that although Plaintiff's physician notes that Plaintiff cannot work, Plaintiff's physical therapist notes his improvement and functionality including driving, a job requirement. As previously stated, it is notable that the activities which Plaintiff's physician states that Plaintiff should avoid did not impact upon his ability to perform his own occupation as a Financial Services Representative.

### CONCLUSION:

In summary, we find that MetLife did not act in an arbitrary and capricious manner when it denied Plaintiff's short-term disability benefits beyond November 26, 2004. MetLife's decision to terminate Plaintiff's benefits was not without reason, unsupported by substantial evidence or erroneous as a matter of law. *See McLeod,* 372 F.3d at 623. Affording the terms and provisions of the Plan their plain and ordinary meaning leads to the conclusion that Plaintiff, on the administrative record before MetLife, was not eligible for short-term disability benefits beyond November 26, 2004. It is regretable that plaintiff did not construct a more detailed administrative record for MetLife's review, but we are without authority to rectify that omission by considering extraneous materials. Even with heightened scrutiny placed on MetLife's decision making process, we cannot find that MetLife denied Plaintiff's benefits in an arbitrary and capricious

manner. The medical evidence in the record fails to support an impairment that would prevent Plaintiff from engaging in his own occupation. Therefore, under the terms of the Plan, it was neither arbitrary nor capricious for MetLife to terminate Plaintiff's short-term benefits.

### NOW, THEREFORE, IT IS ORDERED THAT:
1. Defendant's Motion to Strike Exhibits Submitted with Plaintiff's Cross-Motion for Summary Judgment (doc. 20) is GRANTED. Documents submitted by Plaintiff as Exhibits A, B, and C that were not part of the administrative record before MetLife at the time it rendered its determination to terminate Plaintiff's benefits have not been considered by this Court.
*11 2. Defendant's Motion for Summary Judgment (doc. 19) is GRANTED.
3. Plaintiff's Motion for Summary Judgment (doc. 17) is DENIED.

4. The Clerk shall close the file on this case.

M.D.Pa.,2006.
Amitia v. Metropolitan Life Ins. Co.
Slip Copy, 2006 WL 1094586 (M.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 731986 (Trial Motion, Memorandum and Affidavit) Metropolitan Life Insurance Company's Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Feb. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 731987 (Trial Motion, Memorandum and Affidavit) Metropolitan Life Insurance Company's Brief in Support of Its Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Feb. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 731984 (Trial Motion, Memorandum and Affidavit) Metropolitan Life Insurance Company's Brief in Support of Its Motion to Strike Exhibits Submitted with Plaintiff's Cross-Motion for Summary Judgment (Feb. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 403472 (Trial Motion, Memorandum and Affidavit) Cross-Motion for Summary Judgment by Defendant Metropolitan Life

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 10

Slip Copy, 2006 WL 1094586 (M.D.Pa.)
**(Cite as: Slip Copy)**


Insurance Company (Jan. 31, 2006) Original Image
of this Document (PDF)
• 2006 WL 731985 (Trial Motion, Memorandum
and     Affidavit)     Metropolitan     Life     Insurance
Company's Brief in Support of Its Cross-Motion for
Summary Judgment (Jan. 31, 2006) Original Image
of this Document (PDF)
• 2005 WL 3681347 (Trial Pleading) Answer with
Affirmative Defenses (Jul. 5, 2005) Original Image
of this Document (PDF)
• 2005 WL 3681346 (Trial Pleading) Complaint
(Mar. 21, 2005) Original Image of this Document
with Appendix (PDF)
• 3:05cv00569 (Docket) (Mar. 21, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.