## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY                                   :
                                               :
            Plaintiff,                         :
                                               :
      v.                                       :        C.A. No.  06-195 GMS
                                               :
TYCO INTERNATIONAL LTD. GROUP                  :
BUSINESS TRAVEL ACCIDENT                       :
INSURANCE PLAN, an employee                    :
welfare benefit plan, and                      :
LIFE INSURANCE COMPANY OF                      :
NORTH AMERICA, Plan Administrator,             :
                                               :
            Defendants.                        :

### PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' RE-FILED MOTION FOR PROTECTIVE ORDER TO LIMIT DISCOVERY AND ADMISSIBLE EVIDENCE TO THE ADMINISTRATIVE RECORD

Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

Dated: November 13, 2007

## TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    THE MOTION FOR A PROTECTIVE ORDER IS WITHOUT
        MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    DEFENDANTS MOTION TO PROHIBIT AND LIMIT
             DISCOVERY IS MOOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.    DE NOVO REVIEW IS THE APPROPRIATE STANDARD OF
             REVIEW AND EVIDENCE OUTSIDE THE ADMINISTRATIVE
             RECORD IS RELEVANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    UNDER A HEIGHTENED ARBITRARY AND CAPRICIOUS
             STANDARD DISCOVERY IS PERMITTED . . . . . . . . . . . . . . . . . 14

             1.    Structural Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             2.    Procedural Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# <u>TABLE OF CITATIONS</u>

**Cases**

*Bill Gray Enterprises, Inc. Health and Welfare Plan v. Gourley,*
2001 U.S. App. LEXIS 7922 (3d Cir. April 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dinote v. United of Omaha,* 1991 U.S. Dist. LEXIS 14429
(E.D. Pa. July 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101,115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,14

*Freccia v. Conectiv,* 2004 U.S. Dist. LEXIS 23894
    (D. Del. Nov. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


*Koshiba v. Merck,* 2004 U.S. App. LEXIS 19164 (3d Cir. Sept. 13, 2004) . . . . . . . . . . . . . . 17

*Pinto v. Reliance Standard Life Insurance Company,*
    214 F.3d 377 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,18,19

*Post v. Hartford Insurance Company,*
    2007 U.S. App. LEXIS 21911 *17 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,18

## NATURE AND STAGE OF PROCEEDINGS

This action was filed on March 23, 2006 by Plaintiff, Kelly Roarty, against Defendants Tyco International Limited Group Business Travel Accident Insurance Plan ["Tyco Plan"] and Life Insurance Company of North America [LINA].  (D.I. # 1).  In her Complaint, Plaintiff asserts three causes of action as a result of her husband's accidental death on August 8, 2004 and the Defendants' determination to deny insurance benefits.  Count I alleges that Defendants have wrongly denied her benefits under the Tyco Plan, which is a plan protected by the Employee Retirement Income Security Act of 1974, as amended (hereinafter "ERISA") .  Count II alleges that Defendant LINA breached its fiduciary duties owed to Plaintiff under ERISA.  Count III was dismissed by Oder of the Court on August 2, 2007.

On August 31, 2006, this Court entered an Amended Scheduling Order, which set, inter alia, discovery to be completed by October 18, 2007 and trial to begin on April 21, 2008.

On September 15, 2006, Defendants filed a Motion for Protective Order to Limit Discovery to the Administrative Record.

On October 27, 2006 Plaintiff filed her Answering Brief in opposition to that motion.

On March 8, 2007 Defendants' Motion for Protective Order to Limit Discovery to the Administrative Record was stricken.

At that time the parties began to engage in discovery.  On August 23, 2007, Defendants provided Answers to Plaintiff's Interrogatories and on October 15, 2007 Plaintiff took the deposition of Bob Bierzynski, who is employed by Scott Heath and Safety, for which Tyco is the parent corporation.  There is still an outstanding request for Production of Documents filed by Plaintiff on January 24, 2007.  Although Defendants have provided numerous documents they

1

have not filed any specific responses to Plaintiff's requests.

On October 24, 2007 Defendants re-filed their motion in support of a protective order limiting discovery and admissible evidence to the administrative record.

## SUMMARY OF ARGUMENT

1.   Defendants' Motion to prevent any discovery should be denied because it is moot since the parties have already concluded discovery including information that was outside the administrative record.

2.   Defendants' Motion to prevent discovery should be denied because it erroneously alleges that the standard of review is not de novo.  The standard of review is de novo because the terms of the Plan are ambiguous and LINA delegated its fiduciary responsibilities under the Plan to Tyco to determine eligibility for the Plan benefit. Under the de novo standard, the administrative record may be supplemented.

3.   Defendants' Motion to prevent discovery should be denied because even under a heightened arbitrary and capricious standard discovery is permissible to review and discover the evidence that was available and/or accessible to the Plan Administrator.

4.   Defendants' Motion to prevent discovery should be denied because there are independent claims against Tyco which should allow evidence outside the record.

3

## STATEMENT OF FACTS

Tyco International Ltd. (Tyco) is an international company that provides, *inter alia*, electronic security and fire protection solutions in over 100 countries. Its products and services are used towards safeguarding firefighters, preventing fires, deterring thefts and protecting people and property. Scott Instruments, a subdivision of Tyco, is one of the largest manufacturers of fixed and portable toxic and combustible gas, heat, and flame detectors in the world. (Complaint ¶ 6).

In early 2004, Tyco contracted with a production plant in Pittsburgh, Pennsylvania (the Bacharach Plant) for production of sensor equipment. The sensors were to be delivered to Tyco on April 20, 2004 so that it could distribute them to its customers. (Complaint ¶ 7).

In late June 2004, one of Tyco's customers began complaining that the senors that had been ordered from the Bacharach Plant were overdue. Although Tyco made repeated attempts, it was unable to obtain satisfactory answers from the Bacharach Plant about when the sensors would be available. In July 2004, the situation was brought to the attention of Bob Bierzynski, and it was agreed that Mr. Roarty would attempt to rectify the problem. (Complaint ¶ 8).

By late July 2004, the delay was causing complaints to escalate, and other customers of Tyco, including the City of New York, began threatening to stop using Tyco's services. (Complaint ¶ 9).

On July 30, 2004, Mr. Roarty advised by e-mail, his supervisor and others in senior management that he would "go into the Bacharach Plant and find out why the sensor is taking so long to build." Mr. Roarty made arrangements to visit the Bacharach Plant the following week since he was beginning a vacation on July 30, 2004 and was going to be in Pittsburgh.

(Complaint ¶ 10).

In order to visit the Bacharach Plant, Mr. Roarty altered his vacation plans. Originally, Mr. Roarty was going to drive with his wife and family in one car and leave sometime during the week of August 2, 2004. Instead, Mr. Roarty drove a separate car so that he could spend as much time as necessary at the Bacharach Plant dealing with this important business problem. He departed earlier than planned, departing for Pittsburgh on August 2, 2004 so he would have time to deal with the issues at the Bacharach Plant. Since he was traveling on business, Mr. Roarty brought with him his laptop, briefcase and cell phone. (Complaint ¶ 11). Mr. Bierzynski was aware that Mr. Roarty intended to visit the Bacharach plant and that Mr. Roarty did not need approval for the trip. (Bob Bierzynski Depo[1]. at 29,32)

Mr. Roarty arranged a meeting at the Bacharach Plant for August 3, 2004. This meeting was scheduled for himself, another Tyco employee and the Regional Manager for Scott Instruments, and two members of management at the Bacharach Plant, in order to discuss delivery and production of the sensors. While Mr. Roarty was driving to Pittsburgh, the meeting was rescheduled for August 5, 2004. (Complaint ¶ 12).

After Mr. Roarty arrived in Pittsburgh, an agreement was reached between Tyco and the Bacharach Plant, on August 4, 2004, on production dates, so the meeting was cancelled and Mr. Roarty was advised accordingly. Mr. Roarty, however, continued to make business phone calls. (Complaint ¶ 13).

Mr. Roarty remained in Pittsburgh and continued to conduct business on behalf of Tyco. After attending a wedding, which was on August 7, 2004, he began the journey home to Newark,

---

[1]Excerpts from Bob Bierzynski's Deposition are collectively located at Exhibit 1.

Delaware on August 8, 2004. (Complaint ¶ 14).

On August 8, 2004, in the Commonwealth of Pennsylvania at approximately 3:48 p.m, while traveling home, the driver of a small sport truck failed to stop for a stop sign and collided with Mr. Roarty's vehicle, forcing Mr. Roarty's vehicle about seventy feet from the point of impact. Mr. Roarty was pronounced dead at the scene of the collision. (Complaint ¶ 15).

After Mr. Roarty's death, his wife, Plaintiff made a claim under her husband's insurance coverage that covered Tyco employees who died accidentally while traveling on company business, this was known as the business travel accident or "BTA" plan. Mr. Bierzynski had told Plaintiff that Mr. Roarty would be covered under the companies BTA plan because employees were covered 24 hours/seven days a week. (Bierzynski depo. at 18-19). LINA denied Plaintiff's claim because they were informed by Tyco that Mr. Roarty was not on an authorized business trip. However, through discovery it has become clear that Mr. Roarty was traveling to Pittsburgh on or about August 2, 2004 to conduct business at the Bacharach plant and that he needed no additional authorization. *Id.* at 29,32

## THE ADMINISTRATIVE PROCESS

Defendant Tyco International Ltd. Business Travel Accident Insurance Plan ("The Tyco Plan") is an employee welfare benefit plan within the meaning of ERISA, which is provided by Tyco. As an employee of Tyco, Mr. Roarty was a participant in the Plan, which provided for a $500,000 accidental death benefit for its employees who die accidentally while traveling on business. (Complaint ¶ 4).

Defendant LINA is the Plan Administrator of the Plan, and the underwriting company for the Plan. Claims under the Plan are administered through Cigna Group Insurance. Cigna Group

Insurance claim services are provided exclusively by underwriting subsidiaries, *inter alia*, LINA. (Complaint ¶ 5). Defendants admit that LINA is the underwriting company of the Plan and the Plan's Claims Fiduciary, and further admit that its claim services are provided exclusively through its underwriting subsidiaries, including LINA. (Answer ¶ 5). Moreover, LINA funds the plan, which creates a conflict of interest.

On September 3, 2004, as the named primary beneficiary in the Tyco Plan , Mrs. Roarty filed a claim for benefits, and provided the necessary information and documentation, which included, a certified copy of Mr. Roarty's Death Certificate, the police crash report and a newspaper article reporting the crash and death. (Complaint ¶ 16).

On November 18, 2004, Felicia Johnson, the Life Claims Coordinator for Tyco, sent Mrs. Roarty's claim to Cigna Group Insurance, along with the documentation provided by Mrs. Roarty. (Complaint ¶ 17).

On December 17, 2004, Cigna wrongfully denied Mrs. Roarty's claim alleging that Mr. Roarty was not on an authorized business trip at the time of his death. Cigna stated that, Nicole Gibian, an employee in the Human Resources Department of Tyco, in Boca Raton, Florida, provided it with a brief letter stating "Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death." Cigna did no further investigation. (Complaint ¶ 18).

On February 12, 2005, Mrs. Roarty appealed Cigna's decision, and provided documentation, including Mr. Roarty's July 30, 2004 e-mail, that established that his trip to Pittsburgh was an authorized business trip. (Complaint ¶ 19).

After receiving Mrs. Roarty's appeal, Cigna attempted to contact Nicole Gibian, the HR

representative in Tyco's Florida office, who originally had stated that Mr. Roarty was not on an authorized business trip. Ms. Gibian, however, was no longer employed with Tyco. Cigna, therefore, attempted "to reach another representative at the group to verify that they are comfortable with their original statement." (Complaint ¶ 20).

On March 11, 2005, Cigna received a phone call from Felicia Johnson, another employee in the Human Resources Department of Tyco, in Boca Raton, Florida. Ms. Johnson advised Cigna that Mr. Roarty was not on business travel at the time of his death, but she would have Mr. Roarty's office, Tyco, fax a statement confirming that he was on a personal vacation at the time of the accident and that Cigna would receive it the following week. (Complaint ¶ 20). However, through discovery it has been learned that human resources sought confirmation from Mr. Bierzynski, who at the time was not Mr. Roarty's supervisor, that he was not on a business trip. (Bierzynski depo at 33) Moreover, Mr. Bierzynski stated in his deposition that Mr. Roarty would have been able to authorize his own business trip and that he was aware of Mr. Roarty's intended trip to the Bacharach Plant, and that he had no knowledge of what occured during the trip. Id. at 8-9,28-29,32,37.

Cigna, however, never received any such statement. (Complaint ¶ 20).

On March 24, 2005, without any further investigation, and solely relying upon the Florida HR employee's incorrect and uncorroborated claim, LINA, acting through Cigna, denied Mrs. Roarty's appeal. (Complaint ¶ 21).

8

# ARGUMENT

## I. THE MOTION FOR A PROTECTIVE ORDER IS WITHOUT MERIT

### A. DEFENDANTS MOTION TO PROHIBIT AND LIMIT DISCOVERY IS MOOT

The Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan ("Tyco") and Life Insurance Company of North America ("LINA") Motion for a Protective Order seeks to prohibit discovery, is moot as the parties have already concluded discovery. Part of the discovery conducted has been outside the administrative record and further moots Defendants argument. has been concluded. Defendants' Motion is prohibited by Federal Rule of Civil Procedure 26 (c).      The Defendants' claim fails to cite any discovery which it purports to exclude. As stated supra, this Motion is moot because the parties have already engaged in discovery. However, Plaintiff contends that regardless of discovery the standard of review for the trial court is a de novo standard or a heightened arbitrary or capricious standard. Under a de novo standard evidence outside the record is considered by the Court.

### B.    DE NOVO REVIEW IS THE APPROPRIATE STANDARD OF REVIEW AND EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD IS RELEVANT.

Tyco International Ltd. contracted with the Life Insurance Company of North America (LINA) to provide benefits to its employees who were involved in accidents while traveling on business away from the premises of Tyco. *See* Exhibit 2[2] (AR0001, AR0022).

The Plan is ambiguous because it does not define when a trip is "authorized" by Tyco

---

[2]All AR000 records are attached @ Exhibit 2.

which was a qualification for benefits under the Plan. *See* (AR0002).

"The Supreme Court has instructed [Courts] to review the determinations of a plan administrator <u>de novo</u> unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101,115 (1989). Although, LINA as the administrator was given fiduciary discretion in accordance with the <u>Firestone Tire & Rubber Co.</u> standard and therefore the default <u>de novo</u> standard of review should apply.

"Whether terms in an ERISA Plan document are ambiguous is a question of law. A term is 'ambiguous if it is subject to reasonable alternative interpretations.'"*Bill Gray Enterprises, Inc. Health and Welfare Plan v. Gourley,* 2001 U.S. App.. LEXIS 7922, at *26 (3d Cir. 2001). [I]f the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve any ambiguities in the plan document."*Id.*

The Plan covers the employee "for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling... away from your premises and on business for you and in the course of your business. All such trips must be authorized by you." *See* Exhibit B (AR0002). It does not cover "personal deviations"...which "means an activity that is not reasonably related to your business, and not incidental to the business trip." *Id.*

"Authorized" is not defined nor does the definition of "covered accident" or "covered loss" require or state that the business trip must be authorized by the employer, Tyco. *See* (AR0014). The definition of covered accident is ambiguous because it says that the accident "is not otherwise excluded under the terms of this Policy." *Id.*

The Plan provides that "the Plan Administrator...has appointed the Insurance Company as

the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law... The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above." *See* (AR0022).

In this case, LINA delegated its fiduciary responsibilities to Tyco in determining whether the accident which took Daniel Roarty's life was "authorized." In its initial denial of the claim it relied exclusively upon a statement from Tyco. "We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized business trip at the time of his death as required by policy ABL 661690. We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating 'Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death." *See* (AR0116). LINA did not receive any basis for that position and all of the evidence submitted to it on the appeal established that he traveled in his own car for purposes of business. Indeed, LINA failed to follow up on the statement in that December 15, 2004 "Interoffice Memorandum: that "If you need additional information, please contact Felicia Johnson at the HRSC, 800-924-8518." *See* (AR0130). As stated <u>supra</u>, through discovery it has been learned the human resources department sought confirmation from Mr. Bierzynski who at the time was not Mr. Roarty's supervisor, regarding whether or not Mr. Roarty was on a business trip. (Bierzynski depo at 33). Moreover, Mr. Bierzynski stated in his

11

deposition that Mr. Roarty would have been able to authorize his own business trip and that he was aware of Mr. Roarty's intended trip to the Bacharach Plant, and that he had no knowledge of what occured during the trip. Id. at 8-9, 28-29, 32,37.

On February 12, 2005 Plaintiff, the widow of Mr. Roarty and a beneficiary of the Plan (AR0084) et. seq., filed an appeal of the above denial. She was not provided any other basis for the denial other than the position of Tyco that "Mr.Roarty was not on a business travel at the time of the accident that caused his death." See (AR0084). The denial and position of Tyco, did not address the claim and misled the Plaintiff as to what she needed to submit on appeal. The letter from Tyco did not say that the trip was unauthorized. Nor did the letter from Tyco (AR0130) even address the circumstances of the trip or provide any evidence as to whether the initial trip was a business trip- he went out on business in a separate car and had to return from that trip when the accident occurred. See (AR0130). The unsupported statement that he was not on business travel "at the time of the accident that caused his death" did not focus on the business reasons for the initial trip in his own car.   LINA simply took Tyco's ambiguous one line statement as dispositive. Id.

On February 28, 2005 the LINA decision maker in an in-house e-mail (AR0079), stated that "we denied this claim originally as the employer stated that our insured was not on a business trip. However, the person who provided that statement to us is no longer employed with the group. I am attempting to reach another representative at the group to verify that they are comfortable with their original statement:" See (AR0079). [Emphasis].

In response to that e-mail Robert Killmer, who handled the claim on behalf of LINA was told that "the other test for 'travel' is whether or not this trip was eligible for expense

reimbursement from his employer (including miles and lodging)."*Id.* LINA, did not address this issue and never asked Tyco whether Mr. Roarty's trip was eligible for reimbursement.

On March 1, 2005 the LINA representative, Robert Killmer, prepared an intra office telephone log stating that " I called her [Felicia Johnson] to verify that Tyco continues to maintain that Daniel Roarty was not on a company authorized business trip at the time of the claimed accident. I reached her voice mail. She is out of the office until 3/3. I left a message for a return call." *See* (AR0078).[Emphasis].

On March 11, 2005 Mr. Killmer prepared another telephone log stating that "She [Felicia Johnson] called me regarding my request for confirmation that Mr. Roarty was not on an approved business trip at the time of his automobile crash and death. She stated again that Mr. Roarty was not on business travel at that time. However, she stated that she has contacted the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed. accident. She stated that I should expect to receive that letter within the next week or so." *See* (AR0076). [Emphasis].

On that same day, Mr. Killmer wrote to Plaintiff and said that "Currently, I am awaiting some additional information from Tyco International regarding Daniel Roarty's status as of the date of the claimed accident that took his life. Once I have the requested information, I will again review the information in your file and the applicable policy." *See* (AR0075).[Emphasis].

LINA never received any other information from Tyco and did not receive any information from Tyco that was referenced in the March 11, 2205 telephone log or in the March letter to Mrs. Roarty. *Id.*, *See also* (AR0076). LINA never received any information from Tyco

13

as to whether the trip was eligible for reimbursement.

On March 24, 2005 LINA deliberately misled Mrs. Roarty when it denied her appeal. It had advised her that it was waiting for information from Tyco. *See* (AR0065). It did not receive or inquire about that information. It did not receive, as Tyco said it would obtain, "another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident." *See* (AR0076). It did not receive any information from Tyco as to whether the trip was eligible for reimbursement. It denied her claim, falsely stating: "Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel." *See* (AR0066). [Emphasis].

In this case de novo review of LINA's decision is appropriate because although Tyco through the Plan granted LINA discretion to "interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make **any related findings of fact**", it failed to do so and wholly relied on testimony from Tyco without any investigation. The standard of review should be <u>de novo</u> because LINA failed to accept the delegation when they wholly relied on the information from Tryco without any independent investigation and therefore, the <u>Firestone Tire & Rubber Co.</u>, exception regarding discretionary authority should not apply and the proper standard of review should be <u>de novo</u>.

**C.    UNDER A HEIGHTENED ARBITRARY AND CAPRICIOUS STANDARD DISCOVERY IS PERMITTED**

14

Assuming argendo the Court finds that the standard of review is not de novo, the Court must find that LINA abused its discretion and was operating under a conflict of interest at the time it decided Mr. Roarty's claim and therefore LINA's actions should be reviewed under heightened scrutiny.

Even under an arbitrary and capricious standard "in measuring the degree of scrutiny, courts may take into account the following factors: (1) sophistication of the parties, (2) the information accessible to the parties, (3) the exact financial arrangement between the insurer and the company, and(4) the current financial status of the fiduciary." *Dinote v. United of Omaha,* 2004 U.S. Dist. LEXIS 14429, at *12 ( E.D. Pa. July 29, 2004).

This Court has reviewed discovery in reviewing a decision under the heightened arbitrary and capricious standard., *Freccia v. Conectiv,* 2004 U.S. Dist. LEXIS 23894, at *12 ( D. Del. 2004). That standard applies "where the administrator's decision is potentially clouded by a conflict of interest , such as where a plan administrator also funds the plan it administers," *Id.* at *8. Even under that standard, which is applicable to this case, since LINA had a conflict of interest in that it funded the plan and administered the plan, *Pinto v. Reliance Standard Life Insurance Company,* 2000 U.S. App. LEXIS 11983, at *3 ( 3d Cir. 2000), assuming arguendo that the de novo standard does not apply, " the court...must 'look not only at the result-whether it is supported by reasons- but at the process by which the result was achieved.'" *Freccia,* 2004 U.S. Dist. LEXIS 23894, at *11.

"The court may consider all evidence available to Conectiv during the entire appeals process." *Id.* at *12. [emphasis]. Part of the inquiry is to review what evidence was available that supported the decision and what evidence supported a denial of the decision, *Id* "the court need

not accept the decision if the administrator uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits, but rejects the evidence that supports the granting of benefits."*Id.* "Ultimately, however, the inquiry is fact specific and must be considered under the totality of the circumstances,"*Id.* at *13. "If a term is vague, however, the court may look to evidence that was not before the administrator for assistance in interpreting the plan..." *Id.* at *15. As discussed, the terms of the Plan are ambiguous since "authorized" is not defined and since a different interpretation of a business trip, such as whether it was eligible for reimbursement, was available to the administrator but he failed to consider or inquire into it.

In determining the sliding scale approach the courts will first consider the evidence that the administrator acted with improper motive and second the court will review the merits of the decision and the evidence of impropriety to determine whether the administrator properly exercised its discretion. <u>Post v. Hartford Insurance Company</u>, 2007 U.S. App. LEXIS 21911 *17 (3d Cir.) If the court determines that the administrator acted improperly than it will determine the case on the merits itself. <u>Id.</u> In determining how to apply the heightened standard the court must consider both the structural and procedural factors. <u>Id.</u> "The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant." <u>Id.</u>

### 1.    Structural Factors

When the structure of the plan gives it financial incentives to act against the claimant's interest a court will be reluctant to give the administrator deference. <u>Id.</u> at 18. A structural conflict arises when an administrator has an interest that is adverse to the claimant.  <u>Id.</u> at 19 In

this case LINA was given the discretion to interpret the terms of the Plan documents, to decide questions of eligibility, for coverage or benefits under the Plan and to make any related findings of fact. <u>See</u> AR0036. The problem however is that LINA is also responsible for funding the claim. Therefore, although LINA was delegated certain tasks specifically, to make any related findings of fact, they failed to perform its own investigation and relied solely on Tyco even though it had been given contrary information by Plaintiff. The conflict arises because LINA had an interest in protecting their profit line by relying on the general denial of Tyco without any further investigation. The courts will give more deference to administrators that have claims evaluated by independent sources, which LINA did not. <u>Id.</u> at 20. When a plan "is funded and administered by an outside insurer", such as LINA, there is particular concern. <u>Id.</u> at 21. Defendants contend that this concern does not apply because while LINA underwrote the plan, it did not control the factual process, but LINA did control and was delegated with the authority to make the final determination on the claims benefits and failed to do so because it was in its financial interest to not do its own investigation. <u>See</u> AR0036 of Defendants Memorandum.

In this case LINA's interest in protecting its profit line caused it to solely rely on Tyco's statement that Mr. Roarty was not on a business trip without its own independent investigation because it would not have to pay the claim. However, if LINA had conducted the proper investigation and performed its delegated duties of making findings of fact, it would have concluded that Mr. Roarty was on a business trip at that time and that as senior level management he was able to authorize his own business trip. (Bierzynski depo. at 8-9; AR0090, AR0098. As the administrator of the plan, LINA, had a duty when presented with contrary information from Plaintiff to investigate whether or not Mr. Roarty was on a business trip at the

17

time.

**2.    Procedural Factors**

"The procedural inquiry focuses on how the administrator treated the particular claimant.". <u>Post</u>, 2007 U.S. App. LEXIS 21911 at *17.  When considering procedural factors the Court should focus on whether the administrator has given the Court reason to doubt its fiduciary neutrality.  <u>Id.</u> at 26.  "Evidence that an administrator's decision was incorrect, coupled with evidence it was biased, can add up to a conclusion that its decision was not the product of reasoned discretion, but anti-claimant bias, in which case the decision should be reversed." <u>Pinto,</u> 214 F.3d at 394.  As stated, <u>supra,</u> LINA did not act reasonable when it wholly delegated its fiduciary duty of making factual determinations.  Had LINA questioned Tyco with the information that Plaintiff provided it would have been provided with the information which is before the court that, Mr. Roarty was authorized to take a business trip. (Bierzynski depo. at 29,32)  However, LINA decision not to further investigate was against the claimant's interest and in the best financial interest of LINA, because by wholly relying on the limited information from Tyco, LINA would not have to pay on the $500,000 claim owed to Plaintiff.

In this case, the administrator advised the Plaintiff that he was waiting for additional information from Tyco and Tyco advised him that it would obtain that information.  The administrator not only did not obtain that information, he lied to the Plaintiff about the information he had received.  He advised her that he was waiting for that information and then he went ahead and denied her claim without reviewing that information; falsely stating that he had received information from Tyco that confirmed he was not on a business trip and that the trip was not eligible for reimbursement. The information was "accessible" to him and Plaintiff is entitled

18

to conduct discovery into the circumstances of the business trip and its authorization. The Court's "heightened degree of scrutiny because of the financial conflict... allows [the court] to take notice of discrete factors suggesting that a conflict may have influenced the administrator's decision" such as selectively manipulating or considering the evidence to justify a denial. *Pinto*, 2000 U.S. App. LEXIS 11983, at *5. This demonstrated procedural irregularity, bias or unfairness in the review of this claim provides a basis for heightened review, *Koshiba v. Merck*, 2004 U.S. App. LEXIS 19164, at *1 (3d Cir. Sept. 13, 2004).

Moreover, there is a discrepancy as to whether or not the summary plan description for the business travel accident policy was ever updated. Initially, Mr. Bierzynski told Plaintiff that he was informed by Lannie Tomberlin, the human resources director, that Mr. Roarty would be eligible to receive the BTA benefit because at the time it was his understanding that employees were covered 24 hours/seven days a week. (Bierzynski depo. at 18,19). However, Mr. Bierzynski was later informed that Mr. Roarty would not be covered under the BTA because it had been changed. Id. at 22. Furthermore, Lannie Tomberlin, human resources director for Scott Heath and Safety notified corporate that the BTA was never updated in the summary plan description (SPD). *See* AR0244. Therefore, it does not appear that there was any notification provided to Mr. Roarty that the BTA had changed. Under the 24 hour/seven days a week plan Mr. Roarty was covered regardless of whether it was an "authorized" business trip.

19

## CONCLUSION

For the foregoing reasons and the authorities which support those reasons, Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America's Motion for a Protective Order should be denied.

Respectfully submitted,

**RICHARD R. WIER, JR., P.A.**

_____/s/ Richard R. Wier, Jr._____
Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

November 13, 2007

20

**EXHIBIT 1**

Robert W. Bierzynski

1     Q.    And what about prior to that?

2     A.    Prior to that, I was the sustaining

3 engineering manager.

4     Q.    For?

5     A.    For the same company, Scott Health & Safety.

6     Q.    How long have you worked for Scott Health &

7 Safety?

8     A.    Two months less than 30 years.

9     Q.    Okay.  Do you know when you first began

10 working with Dan Roarty?

11     A.    September of 1999.

12     Q.    And what was your title at that time?

13     A.    I was a product engineer.

14     Q.    And what was Mr. Roarty's title?

15     A.    I don't recall what his title was at that

16 time.

17     Q.    As product project engineer, would you have

18 been above Mr. Roarty?

19     A.    At that time, I believe we were peers to one

20 another.

21     Q.    Did there ever come a time where you were his

22 supervisor or in his chain of command where you were

23 above him?

24     A.    I don't recall that there was ever any

Robert W. Bierzynski

Page 8

1    specific direct line reporting between myself and Dan

2    Roarty where he reported directly to me or me directly to

3    him.

4        Q.    Do you know who Mr. Roarty's reporting line

5    would have been to?

6        A.    The general manager of the location in Exton,

7    Pennsylvania.

8        Q.    And do you know the name of that person?

9        A.    There were various people in that position,

10   the last person being Neal Dovala.

11       Q.    I'm sorry, can you repeat for me when you were

12   named the general manager for Scott Health & Safety

13   products?

14       A.    I believe it was in February of 2000 -- I want

15   to get this right, so I'm thinking.  I believe it was in

16   February of 2006.

17       Q.    Okay.  And in August of 2004, what was your

18   title?

19       A.    Director --  I'm sorry -- yes, it was,

20   director of the R&D engineering group.

21       Q.    And at that time you don't recall having any

22   supervisory role over Dan Roarty?

23       A.    What was that time again, please?

24       Q.    I'm sorry.  August 2004.

Robert W. Bierzynski

Page 9

1      A.    No.  No direct reporting, no.

2      Q.    And he would have reported to the general

3  manager in Exton; is that correct?

4      A.    That's correct.

5      Q.    So in August 2004, you and Dan Roarty were

6  peers?

7      A.    I hold a director position and Dan held a

8  management position.

9      Q.    Okay.

10      A.    I don't know in our corporate structure, you

11  know, where the differences were in those job titles.

12      Q.    In August 2004, there were no formal

13  procedures for business travel with Scott Health &

14  Safety; is that correct?

15      A.    None that I'm aware of.

16      Q.    So you did not have to receive written

17  approval before you went on a business trip?

18      A.    No.

19      Q.    No, you did not have to receive written

20  approval?

21      A.    No, I was not aware of any requirement that we

22  receive a written approval before going on a business

23  trip.

24      Q.    So Dan Roarty at that time, August of 2004,

Robert W. Bierzynski

Page 10

1    due to the fact that he was management could have

2    essentially approved his own business travel?

3                    MS. HUGHES:  Objection.  Calls for

4    speculation.  You can answer.

5                    THE WITNESS:  Yes, I believe so.

6    BY MS. ALLEN:

7         Q.    And what about with respect to, again, August

8    2004, Tyco, was there any formal business travel

9    requirements?

10                   MR. STEPHENSON:  Objection.  Irrelevant.

11   Go ahead and answer, sir.

12                   THE WITNESS:  Okay.  I'm not aware of

13   what -- if there was a Tyco policy at that time.

14   BY MS. ALLEN:

15        Q.    And, Mr. Bierzynski, just so I'm clear, even

16   though Tyco was the parent corporation, you would adhere

17   to all of the policies and procedures of Scott Health &

18   Safety; is that correct?

19        A.    Yes.

20                   MR. STEPHENSON:  Objection.  For the

21   future, please wait when you hear an objection,

22   Mr. Bierzynski.

23                   THE WITNESS:  Yes.

24   BY MS. ALLEN:

Robert W. Bierzynski

Page 17

1                      MR. STEPHENSON:  Objection.

2                      MS. HUGHES:  I object to form.

3                      MR. STEPHENSON:  I also join in that, I

4    object to the form of the question.

5                      MS. HUGHES:  You can answer.

6                      THE WITNESS:  I have to have all of my

7    business travel approved by my direct supervisor.

8    BY MS. ALLEN:

9        Q.    And that is different than it was in August

10   2004; correct?

11                     MS. HUGHES:  I object.

12                     THE WITNESS:  Yes.

13   BY MS. ALLEN:

14       Q.    In August 2004, your understanding of the

15   business travel accident policy was that management

16   employees, yourself and Dan Roarty were covered 24

17   hours/seven days a week; is that correct?

18       A.    I had completely had no knowledge of that

19   policy until after Dan's, you know, death, and

20   discussions with human resources.

21       Q.    Do you recall visiting Kelly Roarty in the

22   hospital and telling her that Dan would be covered under

23   the BTA policy?

24       A.    Yes.

Robert W. Bierzynski

Page 18

1        Q.    So you were aware of the business travel

2    accident policy at that time; is that correct?

3        A.    At the time that --

4                  MR. STEPHENSON:   Objection.   Pardon me.

5    Is the question the terms of it or simply its existence?

6    BY MS. ALLEN:

7        Q.    Well, my question was, he said he didn't have

8    any knowledge of it until afterwards, and I'm asking him

9    --  let me actually rephrase.

10                 Mr. Bierzynski, when you went to visit

11   Kelly Roarty at the hospital, you told her that Dan would

12   be covered under the business travel accident policy; is

13   that correct?

14       A.    Yes.

15       Q.    And do you recall when that was?

16       A.    I believe that was the Wednesday after his

17   death, the first Wednesday after.

18       Q.    And when you told her that, it was your

19   understanding that he was covered 24 hours/seven days a

20   week; correct?

21       A.    Yes.

22       Q.    And the reason that you were under that belief

23   is because that's what you understood the policy to say?

24       A.    It's what I was told.

Robert W. Bierzynski

Page 19

1          MR. STEPHENSON:  Objection.  Assumes a
2    fact not in evidence.  Go ahead and answer.

3          THE WITNESS:  Yes.  It's what I was
4    told.

5    BY MS. ALLEN:

6          Q.    And who were you told that by?

7          A.    Lanny Tomberlin.

8          Q.    And when did you talk to Lanny Tomberlin about
9    this?

10         A.    It was earlier that same day.

11         Q.    And why did you have a conversation with Lanny
12    regarding that?

13         A.    I wanted to know what Dan's entitlements were,
14    knowing that I was going to be visiting with Kelly later
15    that day so that I could give that information to her.

16         Q.    And for the record, who is Lanny Tomberlin?

17         A.    At that time he was our human resources
18    director.

19         Q.    So you were informed in the beginning of
20    August 2004, by your HR director, that Mr. Roarty would
21    be covered under the business travel accident plan;
22    correct?

23         A.    Yes.

24         Q.    Okay.  Other than talking with Lanny

Robert W. Bierzynski

Page 20

1    Tomberlin, did you have any independent knowledge of the

2    business travel accident plan in August 2004?

3          A.    No.

4          Q.    When you worked for Scott Health & Safety in

5    August 2004, something, but you travel at all on

6    business?

7          A.    Yes.

8          Q.    And was it your understanding that you would

9    be covered under a business travel accident plan?

10         A.    Yes.

11         Q.    And was it your understanding that you would

12   also be covered, regardless of whether or not you were on

13   business under the business travel accident plan?

14                    MR. STEPHENSON:  Objection.  Could you

15   restate the question.

16   BY MS. ALLEN:

17         Q.    Was it also, in August 2004, your

18   understanding that regardless of whether or not you were

19   on business, you would also be covered under your

20   company's business travel accident plan?

21         A.    I'm sorry, could you repeat that.

22                    (The reporter read from the record as

23   requested.)

24                    THE WITNESS:  No.

Robert W. Bierzynski

Page 21

1    BY MS. ALLEN:

2        Q.    So you had some independent knowledge of the

3    business travel accident plan?

4                MS. HUGHES:    Objection.    Misstating his

5    prior testimony.    You can answer.

6                THE WITNESS:    Not to the specifics of

7    it.    I mean, I knew we had something, but, I mean, I knew

8    we had something, but I didn't know what it was.

9    BY MS. ALLEN:

10       Q.    Okay.    Did there ever come a time when

11   somebody told you that Mr. Roarty would not be covered

12   under the business travel accident plan?

13       A.    Yes.

14       Q.    And when was that?

15       A.    I don't recall the specific day, but it was

16   within -- my best recollection is it was within the next,

17   I would say, two weeks that I heard this.

18       Q.    And who did you hear it from?

19       A.    Lori Pence.

20       Q.    And who is she?

21       A.    Lori was our accounting manager and acting

22   local HR representative in Exton, Pennsylvania.

23       Q.    And Lanny Tomberlin, though, would have been

24   above Lori?

Robert W. Bierzynski

Page 22

1    A.    Yes.

2    Q.    What specifically did Lori tell you when she

3    contacted you with this information?

4    A.    I recall her telling me that a mistake was

5    made and that the plan had changed at a prior period of

6    time.

7    Q.    Did you inform her that the director of HR had

8    told you that Mr. Roarty would be covered?

9    A.    She was part of that conversation.

10    Q.    The initial conversation with Lanny; is that

11    correct?

12    A.    Yes.

13    Q.    Were you aware that there had been a change in

14    the business travel accident plan?

15    A.    At that time, yes.

16    Q.    Okay.  Let me rephrase that.  Before you spoke

17    with Lori Pence, were you aware of any change in the BTA

18    policy?

19    A.    No.

20    Q.    So you had not seen an updated summary plan

21    description referencing the BTA policy?

22    A.    I didn't recall it at that time, but I did

23    receive a notification, yes.

24    Q.    And when did you receive a notification?

Robert W. Bierzynski

Page 28

1              So proceed, and I don't want to give

2    narrative objections but this had to happen now.   I

3    apologize for that.

4    BY MS. ALLEN:

5        Q.   Mr. Bierzynski, you were aware that Mr. Roarty

6    had intentions to visit the Bachrach plant sometime

7    between August the 2nd and August the 4th, 2004, were you

8    not?

9        A.   I was aware of his intentions, yes.

10       Q.   You were aware of the fact that Regis Wyse set

11   up a meeting for Mr. Roarty to visit the Bachrach plant?

12              MS. HUGHES:   I object to form, and I

13   object that I don't believe that was his prior testimony.

14              MS. ALLEN:   He doesn't have to testify

15   to stuff that he already testified to.  That would be an

16   asked and answered objection.  He can testify

17   accordingly.  If he disagrees with the statement, he may

18   do so.

19              (The reporter read from the record as

20   requested.)

21              THE WITNESS:  No, I was never made aware

22   of any meeting being set up.

23   BY MS. ALLEN:

24       Q.   You were aware, though, that he had intentions

Robert W. Bierzynski

1   to visit the Bachrach plant; correct?

2               MR. STEPHENSON:  Asked and answered.
3   Objection.

4               THE WITNESS:  Yes.

5   BY MS. ALLEN:

6       Q.   Can you repeat your answer?

7       A.   Yes, I was aware of the intention to visit.

8       Q.   Okay.  And Mr. Roarty did not require approval
9   to visit the Bachrach plant; correct?

10      A.   Correct.

11      Q.   You were aware that when Mr. Roarty began to
12  travel to Pittsburgh on August the 2nd, 2004, that he
13  took his own vehicle?

14      A.   I did not know what his travel arrangements or
15  his travel plans were.

16      Q.   Okay.

17      A.   I knew he was going there, but I didn't know
18  how.

19      Q.   Did you ever become aware of whether or not
20  Mr. Roarty visited the Bachrach plant?

21      A.   No.

22      Q.   After Mr. Roarty's death, were you contacted
23  by anyone regarding his trip?

24      A.   I mean, I was -- after Dan left to go, I was

Robert W. Bierzynski

Page 30

1    called Sunday evening, the day of the accident, and told

2    about that, yes.

3        Q.    So it was your understanding that when he was

4    leaving he had intentions to visit the Bachrach plant?

5        A.    Yes, he did.

6                MS. HUGHES:    Asked and answered.    You

7    can go ahead.

8                THE WITNESS:    Yes.    He had intentions to

9    visit.

10    BY MS. ALLEN:

11        Q.    And the next thing you know about the trip is

12    that he was in an accident on his way home?

13        A.    Yes.

14        Q.    And once you became aware of the accident, who

15    did you talk to, if anybody, regarding his trip?

16        A.    No one.

17        Q.    Well, you said you had talked to people in HR?

18        A.    Okay.    We have to put this in its time

19    perspective.

20        Q.    Sure.

21        A.    I was told Dan was in an accident on Sunday

22    evening.

23        Q.    Okay.

24        A.    I spoke to no one after that until we heard

Robert W. Bierzynski

Page 31

1    the next day, on Monday morning, that he had been killed.

2        Q.    Okay.

3        A.    There was never a mention of injury.

4        Q.    I'm sorry.  Can you repeat the last portion?

5        A.    On Sunday evening there was no mention of any

6    injuries in the accident, it was strictly reported to me

7    that he had had an automobile accident.

8        Q.    Okay.  On Monday when you returned to work,

9    did you talk to anybody regarding his trip?

10        A.    Yes.

11        Q.    And who did you talk to?

12        A.    The entire facility.

13        Q.    Okay.

14        A.    I was the one that made the announcement to

15    the entire facility that Dan had passed.

16        Q.    Okay.  Other than that, did you talk to

17    anybody else about the specifics of Mr. Roarty's trip?

18        A.    I don't recall any real specifics other than

19    communicating details of the accident and what had

20    happened.

21        Q.    Were you contacted by anybody in HR regarding

22    the specifics of his trip?

23        A.    Not to discuss specifics of the trip, no.  To

24    discuss his death, yes.

Robert W. Bierzynski

Page 32

1        Q.    And you don't know the exact nature of his

2    trip and what he did and what was accomplished; is that

3    correct?

4        A.    I mean, in what context with the trip?  I knew

5    he had gone to a family reunion and gone to a wedding.

6        Q.    And you had also had information that he

7    intended to visit the Bachrach plant; correct?

8        A.    Yes.

9        Q.    Okay.  And that was an authorized trip to the

10   Bachrach plant?

11                   MS. HUGHES:  I object to form.

12                   MR. STEPHENSON:  Objection.  That again

13   assumes that the trip occurred.  You can answer the

14   question, Mr. Bierzynski.

15                   THE WITNESS:  Yes.  He was authorized to

16   go to Bachrach.  There was no reason that he couldn't.

17   BY MS. ALLEN:

18       Q.    Okay.  And did you ever become aware of any

19   details of his trip, the business part of his trip?

20       A.    No.

21                   MR. STEPHENSON:  Objection.  It assumes

22   there was a business part of his trip.  Go ahead and

23   answer the question.

24                   THE WITNESS:  No.

Robert W. Bierzynski

Page 33

1    BY MS. ALLEN:

2        Q.    Did you ever provide any information to HR as

3    to whether or not, what the specifics of the trip were,

4    other than the -- what the specifics were with respect to

5    the trip to the Bachrach plant?

6                    MS. HUGHES:  I object to form.

7                    THE WITNESS:  HR was told that Dan was

8    on vacation.  It was a wedding and a family reunion was

9    why he went to Pittsburgh with his family.

10    BY MS. ALLEN:

11        Q.    And who told HR that he was on vacation?

12        A.    I don't know specifically who would have told

13    HR.

14        Q.    Did you?

15        A.    I may have, I don't have a direct recollection

16    of making that statement, but I may have.

17        Q.    Do you recall whether or not you told HR that

18    you were aware that Mr. Roarty had intentions to visit

19    the Bachrach plant?

20        A.    Again, yeah, I may have told him that.

21        Q.    And who may you have told that to?

22        A.    Lanny Tomberlin and Lori Pence.

23        Q.    And I apologize if I already asked you this,

24    Mr. Bierzynski, but you were or were not aware that there

Robert W. Bierzynski

Page 34

1   was a meeting scheduled for August the 2nd, 2004 at the

2   Bachrach plant?

3                        MR. STEPHENSON:  Objection.

4                        THE WITNESS:  No.  I didn't know of

5   any --

6                        MR. STEPHENSON:  Objection.  Counsel,

7   would you ask Mr. Bierzynski to leave the room, I don't

8   want to be accused of another narrative objection.

9                        THE WITNESS:  I have to take a bio

10  break, so I will excuse myself for a moment.

11                       MR. STEPHENSON:  Thank you.  There is

12  not a scintilla of evidence in this record to support

13  asking the witness, "and you are aware that there was a

14  meeting scheduled."  I have seen no document evidence.

15  So the witness is now being asked to affirm a fact that

16  is nowhere in this record.

17                       MS. ALLEN:  We have information.

18                       MR. STEPHENSON:  And, in fact, if you

19  look at Mrs. Roarty's letter, it lays out a meeting for

20  the 3rd.

21                       MS. ALLEN:  It lays out a meeting

22  originally for the 2nd that on his way to Pittsburgh was

23  then cancelled and rescheduled for the 3rd and the 4th.

24                       MR. STEPHENSON:  Read it how you want.

Robert W. Bierzynski

Page 37

1          MS. ALLEN:  Mr. Stephenson, I'm going to
2    have the court reporter read back that last question we
3    came to an agreement on.

4          MR. STEPHENSON:  Yes.  Not a problem.

5          (The reporter read from the record as
6    requested.)

7          THE WITNESS:  No, I was not aware that a
8    meeting had been scheduled.

9    BY MS. ALLEN:

10      Q.   Mr. Bierzynski, did you have any conversations
11   with Regis Wyse regarding Dan Roarty's intention to visit
12   the Bachrach plant?

13      A.   Yes.

14      Q.   And what were those discussions?

15      A.   From what I can recall, Regis basically told
16   me the same thing that Dan had told me, that there was an
17   intention to go into Bachrach and have a meeting.

18      Q.   What about after Dan Roarty's death, did you
19   have any conversation with Regis regarding that trip?

20      A.   Yes.

21      Q.   And what were those conversations?

22      A.   I don't know that there was any new
23   information from our conversations, even after Dan's
24   passing talking with Regis, I don't recall anything about

Robert W. Bierzynski

Page 38

1    any specific meetings that anything ever occurred at

2    Bachrach.

3        Q.   Okay.  Do you recall whether or not Regis told

4    you that Mr. Roarty and Regis were able to resolve any

5    issues with the Bachrach plant?

6        A.   I do recall that the issues were resolved, but

7    I don't know that it was necessarily the two of those

8    folks that resolved them.

9        Q.   So you just don't know who resolved the

10   issues?

11       A.   Yeah, I don't know who it was that resolved

12   the specific issue.

13       Q.   I believe, as you stated, Dan Roarty was

14   scheduled to go on vacation to Pittsburgh, I guess

15   sometime in early August for a family vacation; is that

16   correct?

17       A.   Correct.

18       Q.   Were you aware of that?

19       A.   Yes, I was.

20       Q.   And you were also aware that while he was up

21   there he was going to go or had intentions to go to the

22   Bachrach plant?

23       A.   Yes, I knew of those intentions, yes.

24       Q.   Okay.  And were you aware that he took a

**EXHIBIT 2**

1

**LIFE INSURANCE COMPANY**
**OF NORTH AMERICA**
1601 CHESTNUT STREET,
PHILADELPHIA, PENNSYLVANIA, 19192
A STOCK INSURANCE COMPANY

ABL 661690
BLANKET ACCIDENT POLICY

**THIS IS AN ACCIDENT ONLY POLICY.**
**IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS.**
**THIS IS A LIMITED POLICY.**
**READ IT CAREFULLY.**

This is a contract between us, the Life Insurance Company of North America, and you:

**Name, Address And**        Tyco International Ltd.
**Nature of Business of**    One Tyco Park
**Policyholder:**            Exeter, NH 03833

                            Communications Equipment

**Policy Term**—This policy will go into effect on July 1, 2002, and will expire on July 1, 2005, at 12:01 a.m. standard time at your address. The policy anniversary will be July 1. Unless this policy is terminated by you or us (see General Provisions), this policy may be renewed for additional terms at the premium rates in effect at time of renewal.

**Scope Of Coverage**—In exchange for the payment of premiums (as set forth in Schedule III), we agree to pay benefits to all eligible persons (as defined in Schedule I):

    a)    who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and

    b)    who, as a direct result of the injuries, and from no other cause, suffer a covered loss (as defined in Description of Coverage).

This coverage is subject to the exclusions shown on a later page, and to all of the other terms of this policy. This is an accident only policy. It does not pay benefits for loss caused by sickness. Read your policy with care.

This policy shall be governed by the laws of the state in which it is delivered. As used in this policy, "he" and "his" includes "she" and "her."

**IN WITNESS WHEREOF,** we have signed this policy at Philadelphia, Pennsylvania.

Robert J. Upton, Secretary

Michael W. Bell, President

Countersigned_____

**PITTSBURGH**

**OCT 3 0 2002**

Group Life & Disability
Coverage Unit

LM-9359

AR0001

10

**BLANKET ACCIDENT POLICY**

Policyholder: Tyco International Ltd.

Part of Policy No. ABL 661690

Schedule Date: July 1, 2002

Applies To Classes: 1, 2 & 3

### SCHEDULE IV
### HAZARDS INSURED AGAINST

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
   a)     away from your premises in his city of permanent assignment; and
   b)     on business for you, and in the course of your business.
All such trips must be authorized by you.

This coverage does not include:
   a)     commuting between the covered person's home and place of work; or
   b)     during personal deviations made by the covered person.
"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:
   a)     arrives at his home or place of work, whichever happens first; or
   b)     makes a personal deviation.
If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**–This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.
A covered person will be presumed to have died, for purposes of this coverage, if:
   a)     he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be
           covered by the policy; and
   b)     his body is not found within a year of the accident.

**Aircraft Restrictions**–If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:
   a)     he is riding as a passenger only, and not as a pilot or member of the crew; and
   b)     the aircraft has a valid certificate of airworthiness; and
   c)     the aircraft is flown by a pilot with a valid license; and
   d)     the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or
           hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or
           acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does
           not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**–We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates. An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2229]

AR0002

# GENERAL DEFINITIONS

Please note that certain words used in this Policy have specific meanings. The words defined below and capitalized within the text of this Policy have the meanings set forth below.

**Active Service**

An Employee will be considered in Active Service with his employer on any day that is either of the following:
1. one of the Employer's scheduled work days on which the Employee is performing his regular duties on a full-time basis, either at one of the Employer's usual places of business or at some other location to which the Employer's business requires the Employee to travel;
2. a scheduled holiday, vacation day or period of Employer-approved paid leave of absence, other than sick leave, only if the Employee was in Active Service on the preceding scheduled workday.

A person other than an Employee is considered in Active Service if he is none of the following:
1. an Inpatient in a Hospital or receiving Outpatient care for chemotherapy or radiation therapy;
2. confined at home under the care of Physician for Sickness or Injury;
3. Totally Disabled.

**Age**

A Covered Person's Age, for purposes of initial premium calculations, is his Age attained on the date coverage becomes effective for him under this Policy. Thereafter, it is his Age attained on his last birthday.

**Aircraft**

A vehicle which:
1. has a valid certificate of airworthiness; and
2. is being flown by a pilot with a valid license to operate the Aircraft.

**Annual Compensation**

An Employee's annual earnings for normal work established by the Subscriber for his job classification.

**Covered Accident**

A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
1. occurs while the Covered Person is insured under this Policy;
2. is not contributed to by disease, Sickness, mental or bodily infirmity;
3. is not otherwise excluded under the terms of this Policy.

**Covered Injury**

Any bodily harm that results directly and independently of all other causes from a Covered Accident.

**Covered Loss**

A loss that is all of the following:
1. the result, directly and independently of all other causes, of a Covered Accident;
2. one of the Covered Losses specified in the *Schedule of Covered Losses*;
3. suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits*.

**Covered Person**

An eligible person, as defined in the *Schedule of Benefits*, for whom an enrollment form has been accepted by Us and required premium has been paid when due and for whom coverage under this Policy remains in force. The term Covered Person shall include, where this Policy provides coverage, an eligible Spouse and eligible Dependent Children.

GA-00-1200.00

12

AR0014

## CLAIM PROVISIONS

**Notice of Claim**

Written or authorized electronic/telephonic notice of claim must be given to Us within 31 days after a Covered Loss occurs or begins or as soon as reasonably possible. If written or authorized electronic/telephonic notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written or authorized electronic/telephonic notice was given as soon as was reasonably possible. Notice can be given to Us at Our Home Office in Philadelphia, Pennsylvania, such other place as We may designate for the purpose, or to Our authorized agent. Notice should include the Subscriber's name and policy number and the Covered Person's name, address, policy and certificate number.

**Claim Forms**

We will send claim forms for filing proof of loss when We receive notice of a claim. If such forms are not sent within 15 days after We receive notice, the proof requirements will be met by submitting, within the time fixed in this Policy for filing proof of loss, written or authorized electronic proof of the nature and extent of the loss for which the claim is made.

**Claimant Cooperation Provision**

Failure of a claimant to cooperate with Us in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**Proof of Loss**

Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as was reasonably possible. In any case, written or authorized electronic proof must be given not more than one year after the time it is otherwise required, except if proof is not given solely due to the lack of legal capacity.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

**Time of Payment of Claims**

We will pay benefits due under this Policy for any loss other than a loss for which this Policy provides any periodic payment immediately upon receipt of due written or authorized electronic proof of such loss. Subject to due written or authorized electronic proof of loss, all accrued benefits for loss for which this Policy provides periodic payment will be paid monthly unless otherwise specified in the benefits descriptions and any balance remaining unpaid at the termination of liability will be paid immediately upon receipt of proof satisfactory to Us.

**Payment of Claims**

All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

AR0022

2. Under the *Claim Provisions* section, the following changes are made.

   A. The provision titled Proof of Loss is replaced with the following.

**Proof of Loss**
Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

   B. The provision titled Payment of Claims is replaced with the following.

**Payment of Claims**
All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay up to an amount not exceeding $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

3. Under the *General Provisions* section, the following changes are made.

   A. The provision titled Incontestability is replaced with the following.

**Incontestability**
1. Of This Policy or Participation Under This Policy
All statements made by the Subscriber to participate under this Policy are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, or to deny the validity of this Policy or of participation under this Policy unless a signed copy of the instrument containing the statement is, or has been, furnished to the Subscriber.

After two years from the Policy Effective Date, no such statement will cause this Policy to be contested except for fraud.

2. Of A Covered Person's Insurance
All statements made by a Covered Person are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a signed copy of the instrument containing the statement is, or has been, furnished to the claimant.

AR0036

Brian Billeter
Accident Claims Manager
Accident & Specialty Claims Department

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

March 24, 2005

Kelly Roarty
319 Palomino Drive
Newark, DE 19711

**Insured Name:**              **Daniel R. Roarty**
**Date of Birth:**             **4/5/61**
**Policy Number:**             **ABL 661690**
**Underwriting Company:**      **Life Insurance Company of North America**

Dear Mrs. Roarty:

I am writing to you regarding the appeal of Mr. Roarty's Business Travel Accident benefits under the above captioned Life Insurance Company of North America (LINA) business travel accident insurance policy ("Policy"). I reviewed your letter of appeal of our initial claim denial, which was received in our office on February 15, 2005. After review of the additional information provided, we maintain our initial position that no accidental death benefits are due.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions. A copy of these policy provisions was enclosed with our initial denial letter dated December 17, 2004. In order to be eligible for benefits, you must satisfy the policy provisions as stated below.

**Policy Provision**

The Tyco, International policy states:

*"Scope of Coverage* – In exchange for the payment of premiums, we agree to pay benefits to all eligible persons:

   a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
   b) who, as a direct result of the injuries, and from no other cause, suffer a covered loss.

*Schedule IV  Hazards Insured Against*

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

   a) away from your premises in his city of permanent assignment, and
   b) on business for you, and in the course of your business.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

AR0065

All such trips must be authorized by you."

## Evidence Evaluated

I have reviewed the claim file as a whole, including the following documents, in making this determination:

- Group/Association Proof of Loss form.
- Commonwealth of Pennsylvania Certificate of Death.
- Police Crash Reporting Form.
- Letter from Nicole Gibian, Human Resources, Tyco International.
- Telephone conversation with Felicia Johnson at Tyco International.
- Our initial denial letter dated December 17, 2004.
- Your letter of appeal received in our office February 15, 2005, along with e-mail chains from Tyco.
- Business Travel Accident policy ABL 661690, business travel accident benefits through Tyco International.

## Summary of Evidence

According to the information reviewed, on August 8, 2004, Daniel Roarty died as a result of injuries suffered in a motor vehicle accident. The police incident report indicated that a driver of a truck failed to stop at a stop sign, and struck Mr. Roarty's minivan, causing injuries to Mr. Roarty and his three children, all of whom were in the minivan. Mr. Roarty was not at fault in this accident.

Tyco International has verified on several occasions that Mr. Roarty was not on business travel at the time of his death, through both a letter from Nicole Gibian and our telephone conversations with Felicia Johnson, both of whom are with Tyco International Human Resources. Based upon this assertion, Mr. Roarty's claim for Business Travel Accident Benefits was denied on December 17, 2004.

You have appealed our December 17, 2004 decision, asserting that Mr. Roarty was on business travel at the time of his death. Specifically, you have indicated that Mr. Roarty, as of August 2, 2004, was on his way to Pittsburgh from your home in Delaware for both a family vacation and to visit with a customer, Bacharach, regarding some difficulties that Tyco was having with Bacharach. You have further asserted that you took a separate automobile from Mr. Roarty so that he would have the ability to travel independently once he arrived in Pittsburgh for vacation, because he was unsure as to how much time would be required to resolve business issues with Bacharach.

When Mr. Roarty arrived in Pittsburgh he was unable to meet with Bacharach due to changes in their production personnel. However, issues with Bacharach were resolved during a series of telephone calls on August 3rd or 4th, 2004. During Mr. Roarty's return trip from Pittsburgh back to Delaware, he was involved in a fatal motor vehicle accident on August 8, 2004.

Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

Robert Killmer
Technical Specialist
Life & Accident Claims Services



**CIGNA** Group Insurance
Life • Accident • Disability
1600 West Carson St. Suite 300
Pittsburgh, PA 15219-3419
Telephone 1-800-238-2125
Facsimile 412-402-3316

March 11, 2005

Kelly Roarty
319 Palomino Dr.
Newark, DE 19711

**Insured Name:**          **Daniel R. Roarty**
**Date of Birth:**          **4/5/1961**
**Policy Number:**          **ABL 661690**
**Underwriting Company:**   **Life Insurance Company of North America**

Dear Mrs. Roarty:

I am writing in regard to your appeal for Business Travel Accidental Death benefits for Daniel Roarty.

Currently, I am awaiting some additional information from Tyco International regarding Daniel Roarty's status as of the date of the claimed accident that took his life. Once I have the requested information, I will again review the information in your file and the applicable policy. If for any reason I cannot reach a decision on your claim within the next 30 days, I will write to you again to explain the delay.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3219 from 8:30 a.m. to 5:00 p.m. Eastern, Monday, Wednesday and Friday, or 6:30 a.m. to 3:00 p.m. Eastern Time, Tuesday and Thursday or email me at Robert.Killmer@CIGNA.com. If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Robert Killmer*

Robert Killmer

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

**CIGNA** Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 11, 2005
Time: 12:44 PM

In / Out
Incoming: Felicia Johnson
    Phone Number: 800-600-6641 ext. 3944        Relationship to Insured: HR @ ER

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

She called me regarding my request for confirmation that Mr. Roarty was not on an approved business trip at the time of his automobile crash and death. She stated again that Mr. Roarty was not on business travel at that time. However, she stated that she has contacted the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident. She stated that I should expect to receive that letter within the next week or so.



Robert Killmer



CIGNA Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 1, 2005
Time: 8:29 AM

In / Out
Outgoing: Felicia Johnson
ER
                                    Relationship to Insured: HR @
Phone Number: 800-600-6641 ext. 3944

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

I called her to verify that Tyco continues to maintain that Daniel Roarty was not on a company authorized business trip at the time of the claimed accident. I reached her voice mail. She is out of the office until 3/3. I left a message for a return call.



Robert Killmer

AR0078

Killmer, Robert A (Bob)    250

| | |
|---|---|
| From: | Berenbaum, Daniel R (Dan)    TL25D |
| Sent: | Monday, February 28, 2005 9:15 AM |
| To: | Killmer, Robert A (Bob)    250 |
| Cc: | Mitchell, Timothy S (Tim)    TL25D; Billeter, Brian W    250 |
| Subject: | RE: BTA Question  ABL 661690 |

Bob:

I agree with the initial claim decision.  The claim did not occur while the employee was participating in business of the policyholder, rather his return trip from vacation.  If these meetings took place, coverage would have only been extended while traveling to and from these meetings and not the entire course of his vacation.

The other test for "travel" is whether or not this trip was eligible for expense reimbursement from his employer (including miles and lodging).

**Dan Berenbaum**
AVP, Accident Underwriting
CIGNA Group Insurance
215-761-4080 (ph)
215-761-5070 (fax)
daniel.berenbaum@cigna.com

-----Original Message-----
**From:** Killmer, Robert A (Bob) 250
**Sent:** Monday, February 28, 2005 9:02 AM
**To:** Berenbaum, Daniel R (Dan) TL25D; Burk, Elizabeth 2134; Mitchell, Timothy S (Tim) TL25D
**Cc:** Billeter, Brian W 250
**Subject:** BTA Question ABL 661690
**Importance:** High

Hello,

I am hoping that one of you can assist me with a clarification on a BTA policy.

The short story of the case is as follows:

Our insured had a planned trip to Pittsburgh from his home in Delaware. However, his company was having difficulty with a supplier in Pittsburgh, so our insured, who was a member of senior management, took it upon himself to make an appointment with the supplier while he was here in Pittsburgh. The information that we have on file indicates that on two separate days while he was here of vacation, he also had appointments with the supplier. Although, I can't see that it would matter, both of the meetings were cancelled on a last minute basis.

The insured was returning home with his sons in his van. As they passed through Lancaster Pa, a truck ran a stop light and killed our insured.

The beneficiary spouse claims that as he had conducted some business on their planned vacation, that he should be covered under the BTA policy. She also maintains that as a senior manager that he always has his laptop and cell phone and is always on call.

We denied this claim originally as the employer stated that our insured was not on a business trip. However, the person who provided that statement to us is no longer employed with the group. I am attempting to reach another representative at the group to verify that they are comfortable with their original statement.

The policy contains the standard BTA Schedule 4. Personal deviations and commuting are not covered.

In my opinion, the fact that the insured attempted to attend two afternoon meetings during a week-long planned vacation, would not render the trip "business travel." Do you agree?

1

Roarty
319 Palomino Drive
Newark, DE 19711
302-292-8866
deroarty@msn.com
February 12, 2005

CIGNA Group Insurance
PO Box 22328
Pittsburgh, PA 15222-0328
Attn: Lynne George

RE: Policy Number:        ABL 661690
Underwriting Company:     Life Insurance Company of North America
Insured Name:             Daniel Roarty
Date of Birth:            04/05/1961
Date of Death:            08/08/04
Social Security Number:    189583764

PITTSBURGH
FEB 1 5 2005
GROUP LIFE & DISABILITY
BENEFITS OFFICE

Dear Ms. George:

Please be advised that this letter is to be considered an appeal to CIGNA's/TYCO's decision dated 12/17/04 denying my claim for the funds from the Business Travel Accident policy for my deceased husband, the insured, Daniel Roarty a TYCO/Scott Instruments employee.

Daniel Roarty was in fact returning from an authorized business trip when his vehicle was struck at an intersection, during which Dan sustained fatal blunt trauma injuries. Objective proof exists that a visit was required and authorized and details of the reason Dan's presence was required in Pittsburgh, also included is information indicating the immediacy of that need.

Please also be advised that efforts to reach Nicole Gibian, the Human Resources person who sent the letter to Cigna denying the claim based on the fact "Mr. Roarty was NOT on business travel," were unsuccessful. My sister-in-law, Janet Roarty, had hoped to reach her for clarification. Janet subsequently learned (02/07/05) that Nicole Gibian no longer worked for TYCO. And Nancy in Boca Raton, fielding Nicole's call, could not answer any of Janet's questions.

The following summarizes the basis for this appeal.

As the policy states, the policy applies if Dan was on a business trip and if that trip was "authorized." Below is a summary of documentation that describes the reasons Dan needed to travel to Pittsburgh. It is not clear why TYCO has stated that this was not an "authorized business trip," but it is likely that they were not aware of Dan's efforts at resolving a critical problem with Bacharach's sensor production.

AR0084

-----Original Message-----
From: Roarty, Daniel
Sent: Friday, July 30, 2004 3:35 PM
To: Levangie, Lori; Jim Hampson (E-mail)
Cc: Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob;
Karagianis, Georgia; DeMeritt, MaryAnne; Franco, John; Levangie, Lori;
Cherubin, Chris
Subject: RE: Hunts Point

Lori:
After receiving this e-mail I called Jim Hampson and determined that the
hottest fire is for NYC DEP to get 3 p/n 51-1861 sensors.  The reason they
were so upset is that they have three existing transmitters that they
couldn't get sensors for.  Getting three sensors is a whole lot easier than
coming up with seventy one (71).



Bacharach is telling us that maybe they will have some unknown qty of
sensors by the end of August.  Ron Unruh had the great idea of seeing if
this sensor is part of another product which we have in stock. Bryon Gordon
pulled up all the assemblies that use this part and I dug into the inventory
and came up with four (4) sensors.  Talk about a team effort! We have at
least another dozen sensors.  But not 71 as requested in your e-mail.
I will be in Pittsburgh next week on vacation.  Regis is going to set up a
day for me to go into the Bacharach plant and find out why the sensor is
taking so long to build.
I will let you know what I find.

Jim Hampson:
I have left you a phone message asking where these sensors should be sent
to.  The sensors are sitting on Chris Cherubin's desk.

Regards,
Dan Roarty

-----Original Message-----
From: Levangie, Lori
Sent: Friday, July 30, 2004 7:23 AM
To: Karagianis, Georgia; Bierzynski, Bob; Smith, Trent
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John;
Roarty, Daniel; Lori Levangie (E-mail)
Subject: RE: Hunts Point



Received another call from NYC DEP with another threat to throw us out of

there. They are now talking about returning our whole system - not that we would do that, but they are serious.

Lori Levangie
Northeast Regional Manager
Fixed Instruments Division
Tyco / Scott Instruments
Cell - 610-662-9477
Fax - 484-214-0137
www.scottinstruments.com

-----Original Message-----
From: Karagianis, Georgia
Sent: Thursday, July 29, 2004 12:47 PM
To: Bierzynski, Bob; Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John; Roarty, Daniel
Subject: RE: Hunts Point

Bob,



I received a call today from Jim at NETS for a quote on delivery time for 71 CE130 Transmitters with stand alone IS barriers.
At this point we have nothing to replace this product. NIC II can not be operated IS.

Thanks
Georgia

-----Original Message-----
From: Bierzynski, Bob
Sent: Thursday, July 29, 2004 12:40 PM
To: Karagianis, Georgia; Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John; Roarty, Daniel
Subject: RE: Hunts Point



The 051-1861 is a 4 volt cat bead sensor for lel detection. Rather than continue to upset customers with late deliveries, etc. let's come up with a plan to upgrade these folks into Nic II's which can be supported for years to come. I suspect we have transmitters in the field that are out of service waiting for spare sensors. These customers will go to a competitor if we don't offer an alternative solution.

The CE130 product line is old and needs to be obsoleted. We have already delisted the equipment with CSA and can't be making margin on what we do sell occasionally.

I suggest our Monroe purchasing group address this part when they visit Pittsburgh in a few weeks to discuss last time buys. This p/n is a candidate for one more buy to cover us during a phase out.

Dan, can you advise EAU on this as a spare part ? And please advise what if any CE130 business is still hanging out there.

And I'll get on that damn engineering manager here to get the blind cat bead transmitter into production as it too is a viable solution to this ongoing problem.

Bob

-----Original Message-----
From: Karagianis, Georgia
Sent: Thursday, July 29, 2004 12:27 PM
To: Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Bierzynski, Bob; Franco, John
Subject: RE: Hunts Point



Trent,
0051-1861 is a sensor for a CE130. These parts are ordered by MaryAnne Demeritt in our purchasing department via Bacharach. The planner at Bacharach is Mike Palumbo, I spoke with Mike yesterday as well as Bob Peters who is the Production Engineer at Bacharach regarding our late deliveries. Bob advised that the earliest we can expect delivery of this part is end of August and could not confirm definite date or quantity. I then placed a call to Hermann Hinderhaeuser the President of Bacharach and left a voice message explaining the severity of the matter and asking him to call me back. He has yet to return my call. I called again this morning, left another message for Hermann and also spoke with Tony Nawrocki who is the Purchasing Manager. Tony assured me that Dave Toman the Operations Manager would return my call today.
They owe us 351 pieces and they were due here at Exton on 4/20/04.
This is just one part number and I deal with this type of situation all day everyday.
Any assistance you can provide would be greatly appreciated.
Thanks
Best Regards,

AR0092

Georgia

-----Original Message-----
From: Smith, Trent
Sent: Thursday, July 29, 2004 10:56 AM
To: Levangie, Lori; Ron Unruh (E-mail); Karagianis, Georgia
Subject: RE: Hunts Point



Please educate me briefly on what Bacharach equipment this is for and who at
Scott places these orders and with whom at Bacharach.

Trent Smith
National Sales Manager
Scott Health & Safety
tresmith@tycoint.com
(p)704-291-8423

www.scotthealthsafety.com


-----Original Message-----
From: Levangie, Lori
Sent: Wednesday, July 28, 2004 9:32 AM
To: Trent Smith (E-mail); Ron Unruh (E-mail)
Subject: FW: Hunts Point
Importance: High


Hi Guys.

Bacharach is getting the best of us.  I have done everything I can, so has
Georgia, Marianne, etc.

Lori Levangie
Northeast Regional Manager
Fixed Instruments Division
Tyco / Scott Instruments
Cell - 610-662-9477
Fax - 484-214-0137
www.scottinstruments.com


-----Original Message-----
From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]

AR0093

Sent: Wednesday, July 28, 2004 10:29 AM
To: Levangie, Lori; Karagianis, Georgia
Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
Subject: RE: Hunts Point
Importance: High

Lori,

I understand that they don't have the units in stock. What I don't
understand that they cannot make a commitment for a date when they will have
them. I also do not understand why this takes so long, this process started
in April, three months ago.



One cannot tell a customer forever to just be patient, eventually the
merchandise will arrive. At least AdvanTech's customers do not accept this.

I assume Scott is interested in doing further business with the New York
City DEP, this kind of customer service is not a very good way of assuring
that.

Thanks,

Gabriel Farkas, PMP
Project Manager
AdvanTech Corporation
27 Daniel Rd. West
Fairfield, NJ 07004
Phone: 973-808-8550 Extension 21
Fax:  973-808-2923


> -----Original Message-----
> From: Levangie, Lori [mailto:llevangie@tycoint.com]
> Sent: Wednesday, July 28, 2004 10:12 AM
> To: gabriel@advantechcorp.com; Levangie, Lori; Karagianis, Georgia
> Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
> Subject: RE: Hunts Point
>
>
> Hi Gabriel.
>
> I spoke to Georgia who has been inquiring daily.  Bacharach still does not
> have these in stock.  She and I are doing everything we can to
> "push" them.
> We sincerely regret any inconvenience.  We will keep checking.

```
>
>
> Lori Levangie
> Northeast Regional Manager
> Fixed Instruments Division
> Tyco / Scott Instruments
> Cell - 610-662-9477
> Fax - 484-214-0137
> www.scottinstruments.com
>
>
> -----Original Message-----
> From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> Sent: Wednesday, July 28, 2004 9:40 AM
> To: Levangie, Lori; Karagianis, Georgia
> Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
> Subject: RE: Hunts Point
>
>
> OK, four days later still ... checking ...., for how long?
>
> Gabriel Farkas, PMP
> Project Manager
> AdvanTech Corporation
> 27 Daniel Rd. West
> Fairfield, NJ 07004
> Phone: 973-808-8550 Extension 21
> Fax:  973-808-2923
>
>
> > -----Original Message-----
> > From: Levangie, Lori [mailto:llevangie@tycoint.com]
> > Sent: Saturday, July 24, 2004 10:12 AM
> > To: gabriel@advantechcorp.com; Karagianis, Georgia
> > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > Hampson
> > Subject: RE: Hunts Point
> >
> >
> > ....checking.....
> >
> > Lori Levangie
> > Northeast Regional Manager
> > Fixed Instruments Division
> > Tyco / Scott Instruments
> > Cell - 610-662-9477
```

(8)

(7)

```
> > Fax - 484-214-0137
> > www.scottinstruments.com
> >
> >
> > -----Original Message-----
> > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > Sent: Thursday, July 22, 2004 8:03 AM
> > To: Karagianis, Georgia
> > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > Hampson
> > Subject: RE: Hunts Point
> >
> >
> > Georgia,
> >
> > Any news on the last three sensors? July is almost over...
> >
> > Thank you,
> >
> > Gabriel Farkas, PMP
> > Project Manager
> > AdvanTech Corporation
> > 27 Daniel Rd. West
> > Fairfield, NJ 07004
> > Phone: 973-808-8550 Extension 21
> > Fax:  973-808-2923
> >
> >
> > > -----Original Message-----
> > > From: Karagianis, Georgia [mailto:GKaragianis@tycoint.com]
> > > Sent: Thursday, July 01, 2004 10:12 AM
> > > To: gabriel@advantechcorp.com; Karagianis, Georgia
> > > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > > Hampson
> > > Subject: RE: Hunts Point
> > >
> > >
> > > Gabriel,
> > > Last I heard, end of July.
> > > I am doing everything possible to obtain a better date.
> > > Thanks
> > > Georgia
> > >
> > > -----Original Message-----
> > > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > > Sent: Thursday, July 01, 2004 9:37 AM
```

(6)

(5)

AR0096

> > > To: Karagianis, Georgia
> > > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > > Hampson
> > > Subject: RE: Hunts Point
> > > Importance: High
> > >
> > >
> > > Georgia,
> > >
> > > Thank you for your help. However, if we don't have all the
> > > required sensors,
> > > the situation is almost identical to not having any, because
> > the job will
> > > not be completed and accepted by the owner.
> > >
> > > When do you expect to have the other three units?
> > >
> > > Thank you,
> > >
> > > Gabriel Farkas, PMP
> > > Project Manager
> > > AdvanTech Corporation
> > > 27 Daniel Rd. West
> > > Fairfield, NJ 07004
> > > Phone: 973-808-8550 Extension 21
> > > Fax:  973-808-2923
> > >
> > >
> > > > -----Original Message-----
> > > > From: Karagianis, Georgia [mailto:GKaragianis@tycoint.com]
> > > > Sent: Wednesday, June 30, 2004 5:51 PM
> > > > To: Karagianis, Georgia; 'gabriel@advantechcorp.com'
> > > > Cc: 'Gabe Hauer'; Levangie, Lori
> > > > Subject: RE: Hunts Point
> > > >
> > > >
> > > > Gabriel
> > > > I just received word that I will receive 7 on Friday, which I will
> > > > immediately ship.
> > > > The remaining 3 are still on back order and I will do my best to
> > > > expedite.
> > > > I apologize for any inconvenience this has caused.
> > > > Your patience is greatly appreciated.
> > > > Thanks
> > > > Best Regards
> > > > Georgia

```
> > > >
> > > >
> > > > -----Original Message-----
> > > > From: Karagianis, Georgia
> > > > Sent: Tuesday, June 29, 2004 6:46 PM
> > > > To: 'gabriel@advantechcorp.com'
> > > > Cc: Gabe Hauer; Levangie, Lori
> > > > Subject: RE: Hunts Point
> > > >
> > > >
> > > > Gabriel,
> > > > I just spoke with our vendor, they are making every effort to
> > > > expedite your
> > > > request.
> > > > They will advise me of a delivery date tomorrow afternoon.
> > > > I will contact you as soon as I have a response.
> > > > I apologize for the delay and any inconvenience this has caused.
> > > > Your understanding is greatly appreciated.
> > > > Thank you,
> > > > Georgia
> > > >
> > > > -----Original Message-----
> > > > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > > > Sent: Tuesday, June 29, 2004 3:24 PM
> > > > To: Georgia Karagianis
> > > > Cc: Gabe Hauer
> > > > Subject: Hunts Point
> > > >
> > > >
> > > > Georgia,
> > > >
> > > > Any news on the sensor delivery?
> > > >
> > > > Thanks,
> > > >
> > > > Gabriel Farkas, PMP
> > > > Project Manager
> > > > AdvanTech Corporation
> > > > 27 Daniel Rd. West
> > > > Fairfield, NJ 07004
> > > > Phone: 973-808-8550 Extension 21
> > > > Fax:   973-808-2923
> > > >
> > >
> >
>
```

②

①

## Evidence Evaluated

I have reviewed the following documents and the file as a whole in making this determination:
- Group Business Travel Accident insurance policy, ABL 661690
- Proof of Loss claim form signed by Kelly Roarty on 09/03/04.
- Commonwealth of Pennsylvania Certificate of Death
- Police Crash Reporting Form
- Letter from Tyco Fire and Safety Human Resources dated 12/15/04.

## Summary

According to the death certificate, Daniel Roarty died on 08/08/04 due to blunt force injuries sustained in a motor vehicle accident.   On the Proof of Loss claim form, you indicated that "Vehicle accident at intersection of Rt. 896 and Bartville Rd.  Driver of truck ran a stop sign and hit our van on L front side.  Dan died and our 3 boys have broken bones."

The police incident report submitted with the claim confirms that the driver of a blue truck failed to stop at a stop sign and struck your minivan causing the injuries to Mr. Roarty and your children.

We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized business trip at the time of his death as required by policy ABL 661690.  We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating "Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death."

Mrs. Roarty, I extend my condolences to you for the loss of your husband.  Please understand that I must evaluate this claim based upon the information available in the file and the stipulations of the policy.

This is a Business Travel Accident insurance policy that provides benefits for losses which occur during the course of authorized business trips.   Mr. Roarty's employer has clearly stated that he was not on an authorized trip at the time of the car accident and therefore, no benefits can be issued under policy ABL 661690.

## Appeal Rights

This action is based on the information in our file.  If you are not satisfied or do not agree with the reason(s) for the denial of your claim, you may appeal the decision to:

> CIGNA Group Insurance
> PO Box 22328
> Pittsburgh, PA  15222-0328
> Attn: Lynne George

The appeal must be in writing, submitted within 60 days of the date you receive this letter and must contain the following information:

- the reason for the appeal and/or disagreement,
- the insured's name and social security number, and

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.



**Fire &**
**Security**

Tyco Fire and Security
One Town Center Road
Boca Raton, FL 33486

Telephone: 561-988-3600
Fax: 561-988-3631

## Interoffice Memorandum

*This correspondence may contain confidential information intended for the use of the individual or entity to whom it is addressed. If the reader is no the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination of copying is strictly prohibited.*

*Date*          12/15/04

To               Cigna

From            Nicole Gibian

Subject        Daniel Roarty

Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death.    If you need additional information, please contact Felicia Johnson at the HRSC, 800-924-8518.

AR0130

4/11/2005 1:05:07 PM fjohnson
Felicia,

Please contact the employee's local HR and their manager to find out if Mr.
Roarty was traveling for the company at the time of his death. If he was, we
need proof in the way of documentation from his manager and an account of
his activity.

Was his death before the change to the BTA policy?:

The following change applies to the Business Travel Accident plan only.
Effective for accidents on or after July 1, 2002, for any non-business
activity, including personal travel, and for accidents which are the result of
the employee being under the influence of alcohol or illegal drugs will no
longer be covered.

Please keep me posted on this.

Thanks! Christina

To C.Olson:

I have spoken to Lannie Tobelin w/ Scott Health and Safety last week he
was the manger at the time (704-291-8352) he would like to speak to
someone in corp. because of this issue regarding the spouse and the changes
that were made in the policy. He stated this employee was not on BTA at
the time of the accident and the changes for the BTA was never updated in
the SPD but just to make a written correction after the employee died.
Nicole Gibian contacted me and sent me the e-mail I will forward to you.

FJohnson

4728257.1

38

AR0244

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY                                    :

        Plaintiff,                         :
                         :

      v.                                      :     C.A. No.  06-195 GMS
                         :

TYCO INTERNATIONAL LTD. GROUP     :
BUSINESS TRAVEL ACCIDENT          :
INSURANCE PLAN, an employee       :
welfare benefit plan, and         :
LIFE INSURANCE COMPANY OF         :
NORTH AMERICA, Plan Administrator, :
                         :

        Defendants.                        :

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 13th day of November, 2007 that I caused the attached to be filed with the Clerk of the Court by CM/ECF, which will send a copy to:

and that a copy was sent to:

Mark Stephenson, Esq.
Nelson Levine de Luca.& Horst LLC
Four Sentry Parkway, Suite 300
Blue Bell, PA 19422

Herbert Mondros, Esq.
Margolis Edelstein
750 South Madison Street
Suite 102
Wilmington, DE 19801

### RICHARD R. WIER, JR., P.A.

_____/s/  Richard R. Wier, Jr._____
Richard R. Wier, Jr. (#716)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

21