## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**KELLY ROARTY,**

        Plaintiff(s)

    v.

**TYCO INTERNATIONAL, LTD.**
**GROUP BUSINESS TRAVEL**
**ACCIDENT INSURANCE PLAN and**
**LIFE INSURANCE COMPANY OF**
**NORTH AMERICA,**

        Defendants.

Civil Action No:

06-0195-GMS

## DEFENDANT TYCO INTERNATIONAL, LTD. GROUP BUSINESS TRAVEL ACCIDENT PLAN AND LIFE INSURANCE COMPANY OF NORTH AMERICA'S OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**MARGOLIS EDELSTEIN**
HERBERT MONDROS, Esquire (DE Id. 3308)
Margolis Edelsten
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Dated: November 19, 2006

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS ii - iii

NATURE AND STATE OF THE PROCEEDINGS.............................. 1

SUMMARY OF ARGUMENT................................................... 2

STATEMENT OF FACTS................................................... 3

I. ARGUMENT................................................... 11

    A. The Summary Judgment Standard..................... 11

    B. Standard of Review in ERISA Benefit Claim Case ................. 13

    C. LINA's decision that Plaintiff was not eligible for BTA............ 16
        Benefits were reasonable and supported by substantial evidence.

    D. Defendants met their fiduciary duties in regard of Plaintiff's....... 22
        claim such that she is not entitled to other equitable relief.

II. CONCLUSION................................................... 27

## TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); | 11 |
| *Celotex Corp. v. Catrett*, 477 U.S. 316, 106 S.Ct. 2548, 2552 (1986) | 11 |
| *Cord v. Reliance Standard Life Ins. Co.*, 362 F. Supp. 2d 480, 484 (D. Del. 2005) | 13 |
| *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F. 3d 226, 237 (3d Cir. 1994) | 22 |
| *Dinote v. United of Omaha Life Ins. Co.*, 331 F. Supp.2d 341, 345, n. 2 (E.D. Pa. 2004) | 14 |
| *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12, 115 (1989) | 13 |
| *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)) | 12 |
| *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993); | 22 |
| *Freccia v. Conectiv*, 379 F. Supp. 620, 626 (D.Del. 2004). | 14 |
| *Garber v. Provident Life Ins. Co.*, 181 F.3d 100 (6th Cir. 1999) (TABLE) | 16 |
| *Int'l Union, United Auto, Aerospace & Agric. Implement. Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999). | 22 |
| *Jackson v. Chevron Corp. Long-Term Disability Org., Inc.*, 2006 WL 231595, at *2 (D.N.J. Jan.30, 2006) | 22 |
| *Lifson v. INA Life Insurance Co. of New York*, 333 F.3d 349 (2d Cir. 2003) | 20 |
| *Ligo v. Continental Casualty Co.*, 338 F. Supp. 519 (W.D. Pa. 1972) | 17 |
| *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 268 (3d Cir.2006) | 14 |
| *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) | 11, 13 |
| *McNeilly v. Lumbermens Mutual Casualty Co.*, 647 F. Supp. 1567 (E.D. Mich. 1986) | 17 |
| *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.1988) | 11 |
| *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997) | 13 |

*Morningstar v. Insurance Company of North America*, 295 F. Supp. 1342 (S.D.N.Y. 1969)    **17**

*O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F. Supp. 2d 392, 309(D.N.J. 2000)    **14**

*Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 379 (3d Cir. 2000)    **14**

*Roarty v. Tyco Int'l Group Business Travel Accident Insurance Plan*, 2007 WL 2248086, *2 (D. Del. 2007).    **22, 26**

*Schlegel v. Life Ins. Co. of N. Am.*, 269 F.Supp.2d 612, 617 (E.D.Pa.2003)    **14**

*Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 173-4 (3d Cir.2001)    **13**

*Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)    **22, 26**

**Statutes and Rules of Procedure**
29 U.S.C. §§1132(a)(1)(B), (a)(3)    **1, 12, 22, 27**

Fed.R.Civ.P. 56(c)    **11**

## NATURE AND STATE OF THE PROCEEDINGS

On March 23, 2006, Plaintiff Kelly Roarty ("Plaintiff") filed a complaint under the Employee Retirement Income Security Act of 1974 ("ERISA") against Defendants Tyco International, Ltd. Group Insurance Plan and Life Insurance Company of North America (collectively "Defendants;" separately the "Plan" or "LINA") pursuant to 29 U.S.C. §§1132(a)(1)(B), (a)(3) and Delaware law.

On May 10, 2006, Defendants filed an answer with affirmative defenses to the Complaint, denying Plaintiff's allegations.

On August 2, 2007, the Court denied Defendants' motion to dismiss Count II of the Complaint, which alleged a breach of fiduciary duty under §1132(a)(3), and dismissed Count III of the Complaint, which alleged a breach of contract under Delaware law. The parties have exchanged limited discovery.

On October 24, 2007, Defendants moved for a protective order to limit discovery to the administrative record compiled during the handling of Plaintiff's claim. Their motion is pending before the Court.

This is Defendants' Opening Brief in support of their motion for summary judgment.

## SUMMARY OF ARGUMENT

Defendants are entitled to summary judgment because the decision to deny Plaintiff benefits was neither arbitrary nor capricious but was a reasonable one.

The claim decision was reasonable because:

1.    The decision was made by a non-conflicted insurer who relied on a non-conflicted employer to determine the crucial facts of the claim.

2.    The decision itself was supported by substantial evidence in the administrative record, including a written letter by the employer and telephone conversations noted in the administrative record that the employer determined that Plaintiff's spouse had not been engaged in business travel on its behalf when he died in an accident.

3.    The substantial decision is not outweighed by admissible contradictory evidence; and

4.    There is no evidence that LINA, as claim fiduciary, acted other than reasonably to rely on the employer's information to deny the claim.

## STATEMENT OF FACTS

On August 8, 2004, Daniel Roarty died in a car accident while driving home after a week of vacation that included a family wedding. *See* AR0104-13.[1]  At the time, Mr. Roarty was employed by Scott Health & Safety, a subsidiary of Tyco, and participated in employee benefit plans sponsored by Tyco International (US), Inc. (collectively "Tyco"). *See* AR0144-45. Among the benefits that Tyco sponsored and maintained for its employees were life insurance benefits for accidental death ("AD&D") and a separate insurance that covered employees who died accidentally while traveling on company business, commonly known as business travel accident or "BTA" coverage. *See* AR0001-0047.

The BTA Plan provides in relevant part that:

> [The Plan] will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
> a) away from your premises in his city of permanent assignment; and
> b) on business for you, and in the course of your business.
> All trips must be authorized by you.
>
> This coverage does not include:
> a) commuting between the person's home and place of work; or
> b) during personal deviations made by the covered person. Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

---

[1] References to "AR__" are to the administrative record and the pages cited thereto are contained in the Defendants' Appendix of Exhibits, filed with their Brief, as Exhibit "B."

> This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of business, or other place. The coverage will end when the covered person:
> a) arrives at his home or place of work, which ever happens first; or
> b) makes a personal deviation.

*See* AR0002. The Plan identifies "you" to mean Tyco. *See* AR0001.

The parties agree that the BTA Plan delegates discretion to LINA to interpret the Plan's terms, decide questions of eligibility for Plan benefits and make any related findings of fact in deciding a claim made to the Plan.

> The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims, In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of the Plan to the full extent permitted by law.

> The Insurance Company has no fiduciary responsibility with respect to the administration of the Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to the Participants and Beneficiaries under the Plan shall be for the payment of benefits provided under this Policy.

*See* AR0036; *see also* <u>Plaintiff's Answering Brief in Opposition to Defendants' Re-Filed Motion for Protective Order to Limit Discovery to the Administrative Record</u>, filed on November 13, 2007 (Doc. No. 46) at p. 10-11. (Exhibit "C")(internal exhibits to Plaintiff's motion omitted).

4

Eligibility for BTA benefits is premised on several mandatory elements. The insured must have been a Tyco employee and covered under the Plan. Second, the insured must have been engaged in a trip or short stay away from Tyco's premises in his city of permanent assignment. Third, the insured must have been traveling on business for Tyco and in the course of Tyco's business. Fourth, Tyco must have approved the trip. Finally, the insured must be involved in an accident while engaged in the business travel that Tyco had approved, which accident results in death. It is undisputed that Mr. Roarty died during his travels. At issue here is whether Mr. Roarty was engaged in business travel during his vacation and whether he died during business travel, rather than his vacation.

The Tyco benefits center first began to deal with Plaintiff's claim on August 10, 2004. *See* AR0207.[2]    On September 15, 2004, Tyco benefits representative Felicia Johnson called Plaintiff to discuss questions that Plaintiff had with regard to her life insurance claim. *See* AR0216. Plaintiff requested a copy of the BTA insurance policy and a claim form. Johnson advised Plaintiff that she was not eligible for BTA benefits. *Id.*

On September 16, 2004, Plaintiff spoke with Tyco benefits administrator Nicole Gibian. *See* AR0217. As Johnson had done the day before, Gibian told Plaintiff that the circumstances of her husband's death did not warrant BTA benefits. After the call, Gibian related her conversation with Plaintiff to Johnson and asked that Johnson note Gibian's conversation in the Tyco record that Johnson maintained. *Id.* Regardless of Tyco's view of Plaintiff's BTA claim, Tyco forwarded to Plaintiff necessary claims forms. *Id.*

---

[2] AR0207 through AR0244 are notes prepared by Felicia Johnson as a Tyco benefits representative with regard to this claim. These notes were produced by Tyco International (US), Inc. in response to Plaintiff's discovery requests.

On November 18, 2004, after her receipt of the police report and newspaper clippings of the accident, Johnson followed up by calling Tyco human resources representative Jennifer Napier to request a statement of whether Mr. Roarty had been engaged in business travel at his death. *See* AR0224. On November 19, 2004, Johnson sent the claim materials that she had compiled to LINA for its claim determination. *See* AR0226. On November 22, 2004, Johnson followed up again with another request for information by Tyco Human Resources regarding Mr. Roarty's status as a Tyco business traveler. *See* AR0220.

The same day, LINA received Plaintiff's claim and LINA Claim Accident Specialist Marcy Miller advised Tyco benefits representative Felicia Johnson that she, Miller, was handling the claim. Miller requested a copy of Mr. Roarty's business travel itinerary. In addition, Miller advised that the claim should be made for $500,000, not the $50,000 in demanded in error. *See* AR0143. Also that day, Miller followed up with an introductory letter to Plaintiff. *See* AR0142.

Thereafter, a series of telephone conversations, emails and faxes between Miller and Johnson tied down issues related to Plaintiff's claim. For example, on November 29, Miller called to follow up on her November 24, 2004 email and left a message to forward Mr. Roarty's benefit election form. *See* AR0141. On December 6, 2004, Johnson replied by email to advise that she had spoken with Mr. Roarty's human resources representative, who was to fax a letter to state whether he had been engaged in business travel when he died. *See* AR0139-40. On December 14, 2004, Miller wrote to Plaintiff to advise that her claim for accidental death benefits and a smaller seatbelt benefit had been approved, an accidental

death benefit of $92,400. *See* AR0137-38. In total, LINA paid Plaintiff the sum of $168,000 in various AD&D benefits.

Also on December 14, 2004, Miller pursued Johnson again with a follow-up email to inquire if there was information to confirm that Mr. Roarty had been engaged in business travel. *See* AR0136. Johnson immediately referred the question to Tyco benefits administrator Nicole Gibian, explaining the urgency in confirming Mr. Roarty's business travel at the time of his death. *See* AR0134-35. The next day, on December 15, 2004, Gibian wrote to advise of Mr. Roarty's status as a Tyco business traveler.

> Please take this letter as clarification that Mr. Roarty was NOT engaged on business travel at the time of the accident that caused his death.

*See* AR0130. To investigate the issue, Ms. Gibian had spoken with either Bob Bierzynski, Mr. Roarty's co-worker, or Lanny Tomberlin, the human resources person responsible for Mr. Roarty's worksite to confirm that Mr. Roarty had not been engaged in business travel when he died. *See* Answers and Objections of Defendants Tyco International, Ltd. Group Business Travel Accident Plan and Life Insurance Company of North America to Plaintiff's First Set of Interrogatories ("Answers"), at p. 3 (Exhibit "D"). This was the same information that Gibian had provided to Plaintiff on September 16, almost 90 days before.

On December 17, 2004, Miller wrote to Plaintiff to explain that her claim for BTA benefits had been denied and why. *See* AR0115-20. Miller explained that Tyco had stated that Mr. Roarty had not been engaged in business travel on its behalf at the time of the accident that caused his death.

On February 12, 2005, Plaintiff submitted an appeal to LINA that relied on a series of related, internal Tyco emails among, at various stages, Mr. Roarty, his co-workers and a

Tyco customer, which described a supplier problem that Tyco had been having. *See* AR0084 -98. Beginning in June 2004, Tyco had received orders for an obsolete sensor that by July 2004 had become a significant problem for Tyco when it failed to supply a customer order after significant delays. *See* AR0093-98. On Thursday, July 29, 2004, Bob Bierzynski, the Tyco plant "lead" manager, became involved in Tyco's inability to fill the customer order. *See* AR0091. In doing so, Bierzynski asked Mr. Roarty to become involved to see if sensors could be located. In the process of locating sensors, Mr. Roarty volunteered to visit the sensor manufacturer, while he was nearby on vacation. *See* AR0090.

When Mr. Roarty left work on Friday, July 30, 2004, he began a pre-planned vacation. *See* AR0087. In the days before August 2, 2004, the Roartys had been in the process of moving from Newark, Delaware to Monroe, North Carolina as part of his worksite's relocation. At the same time, the Roartys had planned to travel by car to the Pittsburgh area for a vacation and a family wedding. *Id.* The Roartys returned home on Sunday, August 8, 2004.

In her appeal, Plaintiff explained that her husband had decided that they would leave for Pittsburgh on Monday, August 2, 2004, in case a meeting with the Tyco supplier for the next day occurred. *Id.* Tyco employee Regis Wyse was making arrangements. *See* AR0086, 87. If a meeting did occur, Mr. Roarty did not want to inconvenience his family and they traveled in separate cars. In fact, it did not. The proposed Tuesday, August 3, 2004 meeting was cancelled while Mr. Roarty was still en route. *See* AR0088. An attempt to reschedule failed and the proposed meeting cancelled, never to be rescheduled, after Regis Wyse resolved the problem on his own. *Id.* A fair reading of Plaintiff's appeal makes clear that at

no time did Mr. Roarty divert himself from his vacation to travel to the supplier site and that whatever efforts were made to attend a meeting with the supplier were only preparatory.

LINA addressed the additional information that Plaintiff had provided in support of her appeal by contacting Tyco for a response. LINA Technical Specialist Robert Killmer contacted Johnson on March 1, 2005 to if she would confirm again that Mr. Roarty had not been traveling on business for Tyco when he died. *See* AR0078, 237. Ms. Johnson returned Mr. Killmer's call on March 11, 2005. *See* AR0076. She confirmed that Mr. Roarty had not been traveling on business for Tyco when he died. Johnson volunteered a second confirmation, prepared by Mr. Roarty's local management, which LINA could expect in a week.

Internally, Killmer sought the advice of LINA in-house counsel with regard to Plaintiff's appeal. Considering the Plan provisions at issue and applicable law, LINA in-house counsel concluded that Mr. Roarty primarily had traveled for the purposes of a family wedding and vacation, and had been available to take a business trip if one occurred. *See* AR0068-71. When Tyco solved its parts problem, any need for Mr. Roarty to travel to the supplier ended. Considering all of the circumstances, LINA found Tyco's conclusion that Mr. Roarty had not been engaged in business travel on its behalf a reasonable one. *See* AR0071.

On March 24, 2005, having considered and investigated again Plaintiff's information, having repeatedly confirmed Tyco's statement that Mr. Roarty was not traveling on business for it when he died, Group Claims Specialist Brian Billeter elected not to delay the claim further only to wait for receipt of a second written confirmation of Tyco's information and

wrote to Plaintiff to advise that LINA had denied her appeal. *See* AR0065-67. LINA explained the basis for its decision to Plaintiff:

> Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel.

*See* AR0066.

Johnson continued to pursue her investigation and reached Tomberlin some time on or after April 11, 2005. Tomberlin re-confirmed to Johnson that Mr. Roarty was not on business travel when he died. *See* AR0244. Before suit commenced, Tyco representatives confirmed to Plaintiff and/or LINA on five separate occasions that Mr. Roarty had not been engaged in business travel on its behalf when he died. Tyco has consistently maintained its position after this action commenced.

## I.    ARGUMENT

### A.    The Summary Judgment Standard

The Court should grant summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986); Fed.R.Civ.P. 56(c). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). A fact is material if it may affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable fact finder can return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248 (1986).

Summary judgment should be granted in this case because Plaintiff cannot make a sufficient showing of elements essential to her case for which that she bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 316, 106 S.Ct. 2548, 2552 (1986). Defendants submit that they have met their initial burden at summary judgment by showing that Plaintiff cannot establish that Mr. Roarty was engaged in business travel when he died within the terms of the BTA Plan. *Id.* at 322-23. The burden must now shift to Plaintiff to demonstrate facts supporting this crucial element for which she bears the burden, and she must establish the existence of "genuine issue[s] of material fact" justifying a trial. *Miller*, 843 F.2d at 143. Plaintiff "must do more than simply show that there is some metaphysical doubt as to material facts" to meet her burden. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Count I of the Complaint is a demand for benefits under 29 U.S.C. § 1132 (a) (1), and alleges that Defendants wrongfully failed to pay Plaintiff business travel accident benefits that she claims are due to her. Plaintiff's own exhibits to her Complaint and the Administrative Record in this case demonstrate that when her husband was killed in a motor vehicle accident, he was not engaged in business travel for his employer. This lack of evidence is fatal to Plaintiff's claim and summary judgment should be entered upon it.

Count II asserts under 29 U.S.C. §1132(a)(3) that LINA breached duties that it allegedly owed her as an ERISA fiduciary by summarily denying her claim without adequate investigation and as the result of an inherent conflict of interest.[3] Plaintiff cannot establish that LINA acted or was even able to act in conflict with Plaintiff's interests in her claim. The record evidence makes clear that LINA investigated Plaintiff's claim fully, based its decision on the facts developed in that investigation and was bound by information supplied to it by Tyco as Mr. Roarty's employer that he had not been traveling on its business when he died.

As a matter of law, Plaintiff's § 1132(a)(3) claim fails because her claim is not for "other equitable relief;" instead, Plaintiff seeks money damages to compensate her for denied business travel accident benefits for which 29 U.S.C. § 1132(a)(1)(B) provides an

---

[3] On August 2, 2007, the Court dismissed Count III of the Complaint, which alleged a breach of contract under Delaware law, as preempted by 29 U.S.C. 1144(a).

adequate remedy. Plaintiff cannot establish a breach of fiduciary duty that would lead to damages over and above an award of benefits under §1132(a)(1)(B), and Count II is properly seen as a routine §1132(a)(1)(B) claim to recover denied benefits that is dressed up in fiduciary duty clothes.

Defendants respectfully suggest therefore that they are entitled to summary judgment in their favor and that the Complaint should be dismissed.

### B.    Standard of Review in ERISA Benefit Claim Cases

In ERISA benefit claim cases, the scope of discovery depends on the standard of review. If a plan provides discretionary authority to its claim fiduciary, as the Plan does here, a court reviews the fiduciary's decisions by applying an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12, 115 (1989); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir.1997).

In this context, the arbitrary and capricious standard is essentially the same as an abuse of discretion standard. *Cord v. Reliance Standard Life Ins. Co.*, 362 F. Supp. 2d 480, 484 (D. Del. 2005) (*quoting Matsushita*, 475 U.S. at 586-87). The arbitrary and capricious standard is highly deferential and "the court is not free to substitute its own judgment for that of the [claim fiduciary]'s in determining eligibility for benefits." *Id.* Under the "arbitrary and capricious" standard, a reviewing court must defer to the Plan's claim fiduciary unless its decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law. *Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 173-4 (3d Cir.2001).

The BTA Plan clearly grants LINA claims discretion in language held by the Third Circuit to be sufficient for that purpose. *See, e.g., Mitchell v. Eastman Kodak Company*, 113 F.3d

13

433, 438 (3d Cir. 1997)("In reviewing the claim of any participant, the Plan Administrator shall have full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan. In all such cases, the Plan Administrator's decision shall be final and binding on all parties.") *See also Dinote v. United of Omaha Life Ins. Co.,* 331 F. Supp.2d 341, 345, n. 2 (E.D. Pa. 2004).

The Court's deference is converted to scrutiny only where the claim fiduciary is an insurer that decides claims and pays benefits from its own assets; then, arbitrary and capricious review is heightened and determined on a sliding scale. *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 379 (3d. Cir. 2000). This heightened scrutiny derives from the Third Circuit's concern that an insurer lacks the "strong incentives" that the employer company would have to keep its employees satisfied by granting meritorious claims. *Id.* at 388. Plaintiff bears the burden of proof to demonstrate that a plan administrator's actions warrant this heightened standard of review. *Marciniak v. Prudential Fin. Ins. Co. of Am,* 184 F. App'x 266, 268 (3d Cir. 2006) (*citing Schlegel v. Life Ins. Co. of N. Am,* 269 F.Supp.2d 612, 617 (E.D.Pa. 2003). In conducting its assessment of the reasonableness of the administrator's decision, the Court is limited to the evidence that was before the administrator when it made the decision being reviewed, either under standard or heightened scrutiny, *Freccia v. Conectiv,* 379 F. Supp. 620, 626 (D.Del. 2004). (citing *O'Sullivan v. Metropolitan Life Ins. Co.,* 114 F. Supp. 2d 392, 309 (D.N.J. 2000). Plaintiff however has not and can not show conduct by LINA that warrants the Court to lessen its deference to LINA's claim decision.

The undisputed record shows that LINA responded promptly to Tyco's claim. LINA immediately sought Tyco's confirmation of whether Mr. Roarty had been traveling on

14

its business when he did. It pursued that information without delay and obtained Tyco's written statement within thirty days that Mr. Roarty was not traveling on business. In the mean time, LINA paid all other benefits that Plaintiff was due. But for Tyco's information, LINA would have paid BTA benefits as well. LINA necessarily had to rely on Plaintiff and Tyco with regard to the nature of Mr. Roarty's vacation travel. LINA accepted Plaintiff's information as well as that of Tyco, reconciling the accounts of each, which were on analysis not in conflict on their facts.

Looking to the record before it, LINA concluded reasonably that Mr. Roarty had pre-planned a vacation trip beginning shortly after Friday, July 30, his last working day. Aware of the supplier problem, Mr. Roarty had volunteered to abandon one day of his vacation to go to the supplier site. However, the purpose of Mr. Roarty's trip was to attend a family wedding in the Pittsburgh area and take some vacation with family before moving to Monroe, North Carolina. Mr. Roarty drove to Pittsburgh on August 2, anticipating a possible meeting the day after he arrived. It was cancelled en route, and even the possibility of a meeting was cancelled soon after. With that, any potential chance for a business trip from Mr. Roarty's vacation residence to the supplier site and back ended. LINA reconciled these facts with Tyco's repeated confirmations that Mr. Roarty had not been engaged in business travel when he died, and concluded that that result was correct, reasonable and supported by substantial evidence.

Plaintiff has no record evidence to suggest otherwise. Plaintiff may argue that LINA had indicated it was awaiting a fifth and final confirmation from Tyco. Rather than delay an ultimate disposition of the claim and with four prior confirmations in hand, LINA denied

Plaintiff's appeal. Plaintiff cannot demonstrate this as a meaningful irregularity in the claim process as not long after the appeal denial had been sent, Tyco reached its fifth confirmation that Mr. Roarty had not been traveling on its business when he died.

As a result, the concerns that might otherwise urge the Court to apply a heightened scrutiny do not exist in this case and the Court should defer to LINA's claim decision as a reasonable one, supported by substantial evidence, and sustainable as a matter of law.

### C. LINA's decision that Plaintiff was not eligible for BTA benefits was reasonable and supported by substantial evidence.

The basis for LINA's denial of BTA benefits was its conclusion that Mr. Roarty never actually began a business trip. Rather, he had made himself available if one was to occur. LINA concluded, based on all the facts, that Mr. Roarty had traveled to Pittsburgh for personal reasons and would have made the trip in any case as a purpose was to attend a family wedding. He would have engaged in business travel when he abandoned his vacation to visit the supplier, and ended business travel when he returned to his vacation. Considering that the meeting never occurred, obviating Mr. Roarty's need to travel, possible business travel never became a reality.

A number of federal courts have considered claims under BTA policies and uniformly those that have upheld eligibility for benefits have concluded that at some point business travel began and ended. For example, in *Garber v. Provident Life Ins. Co.*, 181 F.3d 100 (6th Cir. 1999) (Table), the Court upheld benefits where the insured routed his return flight from a business conference to see his parents briefly, finding that the short interruption did not substantially disrupt his business trip. By way of comparison, the court suggested a week's vacation skiing as an example of a personal trip. *Id.* at *4.

16

In *Ligo v. Continental Casualty Co.*, 338 F. Supp. 519 (W.D. Pa. 1972), a bank directed one of its officers to change his route to work in order to stop at a branch to pick up bank items and bring them to the main office. In affirming benefits, the court held that the bank's direction to the insured to alter his route for its benefit made his travel to work, otherwise excluded as commutation, a trip on its business and covered. In *McNeilly v. Lumbermens Mutual Casualty Co.*, 647 F. Supp. 1567 (E.D. Mich. 1986), the court upheld benefits where the employer directed the insured to come to work on Saturday, normally a day off, finding the trip to be a business trip outside excluded travel from home to work. In *Morningstar v. Insurance Company of North America*, 295 F. Supp. 1342 (S.D.N.Y. 1969), a pre-ERISA case, the insured had expressed a clear intention to attend a business meeting at a customer's offices. His trip to the meeting overlapped his ordinary route to his offices, during which time it appears he was killed. The court looked to the clear expression of the insured's immediate interest to attend the meeting to conclude that his trip was not excluded commutation and instead was a business trip to his customer.

Plaintiff cannot demonstrate Mr. Roarty's actual departure for the Tyco supplier meeting as was the case in *Morningstar*. Neither can Plaintiff show that Tyco directed Mr. Roarty to change his route as he traveled to Pittsburgh in order to visit the Tyco supplier as in *Ligo*. Nor can Plaintiff establish that Mr. Roarty departed from his home primarily to visit the Tyco supplier as in *Garver*. Plaintiff stated in her appeal that she and her husband made the trip for a family vacation and wedding, and not for a business purpose. Put another way, had the Tyco supplier issue never arisen, Plaintiff and her husband were still going to Pittsburgh.

Plaintiff's case rests not on what Mr. Roarty did but on what she claims he planned to do. Plaintiff and her husband planned to drive to Pittsburgh and did. Mr. Roarty planned to visit the Tyco supplier one day later in the week and did not. Plaintiff argues that Mr. Roarty's intention to travel is the same has having traveled, an extreme conclusion that no court appears willing to go so far to reach.

As Plaintiff would re-write the BTA plan, an intention to take a day's business trip during a week-long vacation converts the entire trip to business purposes. Were a court to adopt this revision, the effect would be to change the Plan into one simply for accidental death benefits. Under Plaintiff's argument, almost any nebulous relationship to the employee's business would be enough to imply and impose a business purpose where none existed. Does a vacation become a business trip when the insured brings a cell phone so that he can be reached by his office? What if he brings a laptop in case someone from work calls? What if the insured answers some calls from the office but not others? What if the insured plans to visit a local plant while on vacation? Is the entire trip now for business purposes? What if, as here, the insured plans to attend a one day meeting during a week's vacation? Does his one-day business meeting trump his six days of vacation? Would a reasonable employer reimburse the insured's travel expenses for the week? When the insured goes to a family party on Saturday night before driving home Sunday, is he still traveling on business? Defendants submit that the only reasonable answer is no.

Plaintiff ignores that fact that under the clear Plan terms a business trip ends when the covered employee either returns home or to work or makes a personal deviation. See AR0002. Certainly at least by the time Mr. Roarty attended the family wedding on Saturday,

18

August 7, 2004, he had made a deviation from his business trip to personal purposes. Under the clear Plan terms, any business trip that he might have been taking ended at that point, and Mr. Roarty's death the next day was after his alleged business trip had concluded.

Tyco had no interest in Mr. Roarty's trip to Pittsburgh to attend his family wedding or what he did during his vacation. Tyco did have an interest in Mr. Roarty visiting the supplier site for a meeting, if needed. Such a trip was tentatively scheduled for Tuesday, August 3, 2004 when Mr. Roarty *already was in Pittsburgh*. Tyco necessarily understood that Mr. Roarty would leave his Pittsburgh vacation residence to go on the business trip, if it happened, and return to his vacation rather than work. Plaintiff has never suggested otherwise.

LINA considered all of the information gathered during its investigation of Plaintiff's claim and appeal, including the police report, newspaper clippings, Plaintiff's explanation of the events leading up to her husband's death, the internal Tyco emails and the repeated confirmations from Tyco benefits and human resources personnel that Tyco did not consider Mr. Roarty to have been engaged in business travel on its behalf when he died. This evidence was substantial and LINA's conclusion was reasonable that under all of the circumstances Plaintiff was not eligible for BTA benefits because her husband had not been traveling on Tyco business at the time of his death.

This result is consistent with the understanding of Mr. Roarty's coworker, some of whom were part of the email chain on which Plaintiff relies. In response to interrogatories directed to Tyco with regard to its handling of the claim, Tyco Regional Sales Manager Lori Levangie answered that "insofar as Mr. Roarty traveled to Pittsburgh to attend a wedding

and for vacation, his travel to Pittsburgh was not related to Tyco's business and would have been reimbursable." *See* Answers, p.4.

Tyco Human Resource Manager Lanny Tomberlin, the person Tyco benefits administrator Nicole Gibian and benefits representative Felicia Johnson had consulted, agreed that under the circumstances of his trip, Mr. Roarty had not been engaged in business travel when he died. See Answers, p. 5

Tyco Lead Manager Bob Bierzynski agreed that insofar as Mr. Roarty traveled to Pittsburgh to attend a wedding and for vacation, his travel to Pittsburgh was not related to Tyco's business and would not have been reimbursable. *See* Answers, p. 2; Deposition of Robert W. Bierzynski ("Bierzynski Dep."), p. 42, L. 9 – 13 (Exhibit "E"). After Mr. Roarty's death, Mr. Bierzynski was responsible to submit expenses accounts for Mr. Roarty's reimbursable business travel, and submitted one for what Bierzynski recalled was a trade show. *See* Bierzynski Dep., p. 47. He did not submit an expense report for business travel related to the Pittsburgh trip, consistent with his statement that Mr. Roarty's trip was a personal one.

Defendants expect that Plaintiff will argue that Mr. Roarty was a professional who was always on call, that he brought his cell phone and a laptop on his vacation so that he could stay in touch with the office. There is no testimony that Tyco required this and the record evidence makes clear that he was a volunteer to the extent that he did so. In *Lifson v INA Life Insurance Co. of New York*, 333 F.3d 349 (2d Cir. 2003), the insured was a software engineer who worked in her employers offices and also was responsible to be on call and respond to technical support issues from her home within 30 minutes of the call. She was

killed while crossing the street on her way home. The Second Circuit concluded that the insured's trip home had been for the business of her employer because her job duties required her to be available to callers, that she was required to respond to a call within 30 minutes, that she was required to carry a pager for this purpose, that her computer from which she could assist callers was at home, that on the night of travel technical issues suggested that there might be high caller volume.

There is no evidence that Tyco required Mr. Roarty to carry a cell phone and be available for business calls, or to have his laptop with him on vacation. As Tyco lead manager Bierzynski explained, while he, Bierzynski, had received work related calls on his cell phone after business hours, Bierzynski answered the calls or not as he saw fit. *See* Bierzynski Dep., p. 12. While Mr. Roarty may have brought his laptop and cell phone, the only evidence of record is that he did so for his convenience.

LINA's conclusion that Mr. Roarty had not been engaged in business travel when he died is consistent with all of the facts. Its investigation was thorough and addressed the principle issue in the claim squarely. LINA's interpretation of the facts squares exactly with and was informed by Tyco's conclusion that Mr. Roarty had not been traveling on its business at the time of his death. In light of the utter absence of evidence to the contrary, LINA would have been unreasonable if it had reached any result other than the one it did.

Defendants respectfully submit that the Court should conclude that LINA's claim decision was a reasonable one, supported by reasonable evidence, and without evidence of taint of self-interest. As such, the Court should defer to LINA's decision as reasonable and grant Defendants summary judgment with regard to Plaintiff's claim.

**D.    Defendants met their fiduciary duties in regard of Plaintiff's claim such that she is not entitled to other equitable relief.**

On August 2, 2007, the Court allowed Plaintiff to maintain her action under 29 U.S.C. §1132(a)(3) for other equitable relief as a potential alternative to her claim for denied benefits under 29 U.S.C. §1132(a)(1)(B). *Roarty v. Tyco Int'l Group Business Travel Accident Insurance Plan*, 2007 WL 2248086, *2 (D. Del. 2007). Citing *Jackson v. Chevron Corp. Long-Term Disability Org., Inc.*, 2006 WL 231595, at *2 (D.N.J. Jan.30, 2006), the Court observed that "[A] beneficiary who is denied benefits under an ERISA plan may seek equitable restitution under § 1132(a)(3)(B) for a breach of fiduciary duty." The Court allowed the Plaintiff an opportunity to prove that the Defendants had breached fiduciary duties owed her, such as the duty of loyalty that would lead to a recovery beyond that which Plaintiff seeks for the wrongful denial of benefits. *Roarty*, supra at *3.

In the context of ERISA, a fiduciary's duty of loyalty requires that the fiduciary deal fairly and honestly with beneficiaries. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). To make out a claim of breach of fiduciary duty under ERISA, a plaintiff must show:

> that the [insurer] was acting in a fiduciary capacity, (2) a misrepresentation or failure to adequately inform plan participants and beneficiaries; (3) that the misrepresentation was material; (4) resulting harm to or detrimental reliance by the [Plaintiff]."

*Int'l Union, United Auto, Aerospace & Agric. Implement. Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999). An alleged misrepresentation is material only "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993); *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F. 3d 226, 237 (3d Cir. 1994).

22

The record makes clear that Defendants dealt with Plaintiff honestly at all times and fairly in handling her claim. LINA investigated her claim thorough and repeatedly returned to critical facts. LINA considered all facts disclosed in its investigation and informed Plaintiff of them. In an attempt to salvage her claim, Defendants expect that Plaintiff will say that LINA failed to investigate her claim, failed to consider the evidence that she provided and misinformed her as to the basis for its decision. As the undisputed record evidence makes clear, none of this is correct.

Plaintiff has attempted to mischaracterize LINA's queries to Tyco with regard to Mr. Roarty's travel was a delegation of claim authority. Plaintiff offers no fact for this bare assertion. Plaintiff suggests this almost as an abdication of duty but fails to account for the facts. LINA sought information from Tyco and Plaintiff in to inform itself. On appeal, it considered the added information that Plaintiff provided as well as that of Tyco. While it is the critical fact in the claim, the nature of the trip was one of many facts whose correctness LINA verified. For example, LINA verified the BTA benefit that Plaintiff sought in her claim form as supplied by Tyco, and confirmed to Plaintiff's benefit that the benefit was $500,000, not $50,000. As well, Tyco advised LINA in the claim form that Mr. Roarty had been its employee and was covered under the BTA plan. *See* AR0144. All are critical elements of Plaintiff's BTA claim. Later, in response to LINA claim specialist Marcy Miller's December 17th request, Tyco benefits representative Felicia Johnson confirmed certain benefit codes that Tyco used and provided detailed computer screens for LINA's guidance.

Coming to the nature of Mr. Roarty's trip, on its own initiative immediately after the claim was first filed, LINA made inquiries of Tyco to verify whether Mr. Roarty had been traveling on its behalf when he died. Over the course of Plaintiff's claim and appeal, it would ask Tyco four more times to verify its prior statements. Each time, Tyco representatives reaffirmed that given the circumstances, Mr. Roarty had not been traveling on its business when he died.

Plaintiff has not and cannot identify any material fact which LINA failed to seek, ignored or concealed from her in its investigation. Plaintiff identifies no material witness whom LINA should have consulted but did not, no person with knowledge who, if they were interviewed, would have lead to a change result. Plaintiff has cited Nicole Gibian, the former Tyco benefits coordinator who advised on December 15th that Mr. Roarty had not been traveling on Tyco business when he died as an example of a failure to investigate. When LINA looked at Plaintiff's appeal, Ms. Gibian was no longer a Tyco employee and LINA sought to confirm the prior information through Ms. Johnson. In response to Plaintiff's interrogatories, Ms. Gibian has affirmed her December 15 statement that Mr. Roarty was not engaged in business travel for Tyco when he died and explained that she consulted either with Tyco lead manager Bob Bierzynski or human resources manager Lanny Tomberlin to gain that information. *See* Answers, p. 3. Tomberlin in his answer to Plaintiff's interrogatories corroborates Ms. Gibian's statement. *Id.* at p. 5.

Plaintiff asserts that LINA was less than candid when technical specialist Robert Killmer advised her that he was waiting for what was Tyco's fifth statement regarding Mr.

Roarty's travel. While a fiduciary can be held liable under ERISA for its affirmative misrepresentations, Plaintiff must demonstrate that the alleged misrepresentation is material.

Plaintiff does not explain what about the change in timing of LINA's appeal denial was materially false. The result that LINA reached based on Tyco's information was exactly the same result it had reached before – based on Tyco's consistent position. LINA's technical specialist Robert Killmer had promised Plaintiff that he would contact Tyco one more time to ask Tyco if it would confirm again the nature of Mr. Roarty's trip. Killmer did exactly as he had promised. *See* AR0078. Plaintiff is absolutely silent in the face of the undisputed facts that followed. On March 11, Johnson confirmed Tyco's prior information to Killmer for the fourth time and offered a second written confirmation. *See* AR0076. Faced with what was now pointless delay, Killmer's supervisor determined that LINA should deny Plaintiff's appeal and explained to Plaintiff the basis for LINA's decision. That basis was entirely consistent with LINA's claim denial and all of the information developed during its investigation. Moreover, Plaintiff has nothing to say to the fact that on April 11th, Johnson confirmed for a fifth and final time on Tyco's behalf that Mr. Roarty had not been traveling on its business when he died. *See* AR0244.

At all times, LINA informed Plaintiff of the facts of her claim as LINA learned of them and Plaintiff has identified no material fact that was kept from her or misrepresented to her. LINA repeatedly went back to Tyco and asked again for it to state the nature of Mr. Roarty's trip in the context of Plaintiff's BTA claim. This diligent effort clearly discharged Defendants' duty of loyalty. In response, Tyco's position was entirely consistent and reasonable in light of the facts of Mr. Roarty's travel. Every Tyco person who has

25

responded to the issue of Mr. Roarty's travel as indicated that he was not engaged in business travel for Tyco under all of the facts.

Plaintiff offers no explanation why Tyco would falsely characterize her husband's travel in the context of her benefit claim. Nor does Plaintiff explain why Mr. Roarty's co-workers uniformly reject her inaccurate characterization of Mr. Roarty's trip as business travel. Plaintiff argues that the entire week's trip was for business because business was tentatively scheduled for one day during the week, and would occupy Mr. Roarty on that day, if such came to pass. Because it might have happened, Plaintiff argues that effectively the business trip did occur. Plaintiff's complaint against Defendants is not that they breached a duty to her; it's that, reasonably and based on substantial evidence, they view the nature of Mr. Roarty's travel differently.

Previously, Defendants have cited *Varity Corporation v. Howe*, where, as this Court noted in its August 2, 2007 Order,[4] the Supreme Court stated that it is generally not appropriate for a court to grant further equitable relief "where Congress elsewhere provided adequate relief for a beneficiary's injury." 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). As Defendants have previously noted, other district courts of this Circuit have concluded that under circumstances as exist in this case, where Plaintiff can show no other alleged breach of fiduciary that the denial of her benefit claim, her sole remedy is a claim to recover denied benefits under §1132(a)(1)(B). *Ranke v. Sanofi-Synthelabo, Inc.*, No. 04-1618, 2004 WL 2473282 (E.D. Pa. 2004) (included in Exhibit "A").

---

[4] *Roarty v. Tyco Intern. Ltd. Group Business Travel Acc. Ins. Plan*, No. 06-195 (GMS), 2007 WL 2248086 (D. Del. 2007). (Included in Exhibit "A").

Defendants respectfully submit that Plaintiff cannot identify any breach of fiduciary duty that would allow her to show damages beyond those available under her claim in Count II to recover denied benefits under 29 U.S.C. §1132(a)(10(B).  As a result, Plaintiff's claim under 29 U.S.C. §1132(a)(3) should be dismissed.

## II.    CONCLUSION

Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America respectfully submit that the Court should grant them summary judgment as to all claims that Plaintiff has asserted in the Complaint and dismiss the Complaint with prejudice.

**MARGOLIS EDELSTEIN**

**BY:**      */s/ Herbert W. Mondros*
HERBERT W. MONDROS (DE Id. 3308)
Margolis Edelsten
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Attorneys for Deendants Tyco International, Ltd.
Group Business Travel Accident Insurance Plan
and Life Insurance Company of North America

Dated: November 19, 2006

27

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KELLY ROARTY,

        Plaintiff(s)

    v.

TYCO INTERNATIONAL, LTD.
GROUP BUSINESS TRAVEL
ACCIDENT INSURANCE PLAN and
LIFE INSURANCE COMPANY OF
NORTH AMERICA,

        Defendants.

Civil Action No:

06-0195-GMS

---

**DEFENDANT TYCO INTERNATIONAL, LTD. GROUP BUSINESS TRAVEL
ACCIDENT PLAN AND LIFE INSURANCE COMPANY OF NORTH
AMERICA'S APPENDIX OF EXHIBITS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

**MARGOLIS EDELSTEIN**
HERBERT MONDROS, Esquire (DE Id 3308)
Margolis Edelsten
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Dated: November 19, 2006

# EXHIBIT "A"

2

Westlaw.

181 F.3d 100                                                                                                    Page 1
181 F.3d 100, 1999 WL 357812 (C.A.6 (Ohio)), 23 Employee Benefits Cas. 1090
**(Cite as: 181 F.3d 100, 181 F.3d 100 (Table))**

**C**Garber v. **Provident**Life and Acc. Ins. Co.
C.A.6 (Ohio),1999.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA6 Rule
28 and FI CTA6 IOP 206 for rules regarding the
citation of unpublished opinions.)
    United States Court of Appeals, Sixth Circuit.
    Donovan L. GARBER, Plaintiff-Appellee/Cross-
Appellant,
                    v.
    PROVIDENT LIFE AND ACCIDENT
    INSURANCE COMPANY, Defendant-
            Appellant/Cross-Appellee.
            **Nos. 98-3043, 98-3046.**

                May 27, 1999.

On Appeal from the United States District Court for
the Northern District of Ohio.

Before: BOGGS, CLAY, and GODBOLD,[FN*] Circuit
Judges.

        FN* The Honorable John C. Godbold,
        United States Circuit Judge for the Eleventh
        Circuit, sitting by designation.

PER CURIAM.
*1 Plaintiff's son, Dr. David **Garber**, an engineer for
Northrop Grumman Corporation in California, flew
to Chicago on **business**. With Northrop's permission,
he scheduled his return flight to California through
Pittsburgh and Akron-Canton, to allow a surprise
weekend visit with his parents in Canton, Ohio. He
was insured for $300,000 against accidental death
while **travelling on business** under Northrop's group
**travel** accident insurance, issued by **Provident**Life
and Accident Insurance Company. **Garber** was killed
when his flight from Chicago to Pittsburgh crashed
near the Pittsburgh airport. A.C. Newman and
Company, the claims administrator for **Provident**,
declined to pay **Garber's** accidental death benefits.
Plaintiff, the named beneficiary under the **travel**
insurance policy, appealed the decision. **Provident**,
as claims review fiduciary, reviewed the decision and
again denied payment. Plaintiff sued **Provident** in
district court under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001*et seq.*
Following a bench trial, the district court held that
**Provident** acted arbitrarily and capriciously in
reading the policy to exclude coverage, and entered a
$300,000 judgment for Plaintiff. **Provident** appeals
the judgment of the district court. Plaintiff cross-
appeals the denial of attorney's fees and pre-judgment
interest. We affirm the judgment for Plaintiff and the
denial of attorney's fees, and reverse the denial of
prejudgment interest.

                        I

Garber was covered by "Hazard 12" of the Provident
policy, "24-Hour All Risk Accident Protection-
Business Only," which provides in pertinent part that:
Coverage will apply to any injury sustained by an
Employee when on Business for the Policyholder
during any bonafide trip.
Coverage for such trip begins on the later of when an
Employee leaves his or her place of residence or
place of regular employment for the purpose of going
on such trip.
Coverage ends on the earlier of when an Employee
returns to his or her place of residence or place of
regular employment.
....
Definition
The term "when on Business for the Policyholder"
means furthering the business of the policyholder.
This does not include an injury sustained during the
course of travel to and from work, leave of absence
or vacation.

On Wednesday, September 7, 1994, Garber and
several other Northrop employees flew from
California to Chicago to attend a business conference
scheduled for Thursday, September 8. Northrop
arranged for two nights of lodging in Chicago,
September 7 and 8. The group was scheduled to fly
back to California on Friday, September 9. Before
leaving California, Garber arranged instead to fly
from Chicago to Ohio on Friday, visit his parents
over the weekend, and return to California on
Sunday, September 11. Northrop approved Garber's
plan, which actually saved the company $107.40 in
air fare. Knowing that Garber was going to depart
Chicago for Ohio at 7:44 a.m. on Friday, September
9, Northrop intended to charge him only one-half day

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

181 F.3d 100                                                                                                                    Page 2
181 F.3d 100, 1999 WL 357812 (C.A.6 (Ohio)), 23 Employee Benefits Cas. 1090
**(Cite as: 181 F.3d 100, 181 F.3d 100 (Table))**

of vacation on Friday.

**\*2** The conference ended earlier than expected on Thursday, so, rather than stay overnight in Chicago, Garber arranged to fly through Pittsburgh to Akron-Canton on Thursday evening, September 8. Garber's flight to Pittsburgh, USAir flight 427, crashed near the Pittsburgh airport at approximately 7:00 p.m. that evening. Affidavits from Northrop headquarters employees one year later state that (1) "[f]rom the point he left the conference meetings in Chicago, [Garber] was on personal time," not company time; (2) because the conference ended early, the employees "were expected to fly back to Los Angeles Thursday night after work hours and to be back at their desks Friday morning," and (3) having left Chicago on Thursday evening, **Garber** would have been charged for a full day of vacation on Friday, September 9. The record does not indicate whether **Garber's** colleagues in fact returned to California on Thursday or waited for their scheduled flights on Friday.

As the claims administrators for **Provident**, Newman received a series of documents from Northrop concerning **Garber**, the **travel** insurance policy, and a separate employer-related life insurance policy (not at issue in this case). The proof-of-death form submitted by Northrop for the **life** insurance policy stated that **Garber** had died "off duty." The district court found as a matter of fact that the "distinction between whether Dr. **Garber** was on duty or off duty at the time of his death has no relevance" to the **travel** policy.

II

We review the findings of fact made after a bench trial for clear error, and the court's legal conclusions *de novo. Davies v. Centennial Life Ins. Co.,* 128 F.3d 934, 938 (6 <sup>th</sup> Cir.1997)."[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms, in which cases a deferential standard of review is appropriate."*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 1201, 102 (1989). If the plan does give the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms, courts review the denial of benefits under the "abuse of discretion" or "arbitrary and

capricious" standard. *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983 (6 <sup>th</sup> Cir.1991). A plan administrator's decision is not arbitrary or capricious if it is rational in light of the plan's provisions. *See id.* at 984,*Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6 <sup>th</sup> Cir1988).

A. Insurance Coverage

The travel policy provides that "[t]he party hearing the appeal has the discretionary authority to interpret the Plan and the Policy and to determine eligibility for benefits."The district court was correct that this clear grant of discretionary authority requires that the decision of the fiduciary be reviewed under the deferential "abuse of discretion" standard. Reduced deference may be appropriate where the fiduciary or administrator has a conflict of interest-among other situations, where "claims decisions are made by an insurer who is paying claims out of its own assets."JAMES F. JORDEN, ET AL., HANDBOOK ON ERISA LITIGATION § 4.04[C] at 4-44 (1992); *see Brown v. Blue Cross and Blue Shield of Alabama,* 898 F.2d 1556 (11 <sup>th</sup> Cir.1990); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984-85 (6's Cir.1991) (considering the insurance company's conflict of interest in its analysis). In such cases, a "heightened" abuse-of-discretion standard is appropriate, which can amount to a "reasonable and correct" or "reasonable and made in good faith" standard. *See*JORDEN,*supra, ibid.*

**\*3** The district court rejected Plaintiff's argument that a "heightened" abuse-of-discretion standard should be used, on the ground that Newman, the plan administrator, had no conflict of interest. The district court, therefore, reached its decision to overturn the decision of the plan fiduciary even though it applied the most deferential standard available.

Full deference may not be appropriate in the case before this court. According to the record on appeal, Plaintiff first heard from Newman, the plan administrator, in a letter from Charles Beach, executive vice president of Newman, dated November 30, 1994. This letter indicates that "[s]hould *the Provident* need more time to conduct its investigation and/or to arrive at its claims decision, we will certainly keep you informed."<sup>FN1</sup>(Emphasis added). The initial denial of payment was communicated in Beach's next letter, dated December 14, 1994. Beach's third communication, dated March 9, 1995, "acknowledge[d Plaintiff's] appeal of

181 F.3d 100
181 F.3d 100, 1999 WL 357812 (C.A.6 (Ohio)), 23 Employee Benefits Cas. 1090
(Cite as: 181 F.3d 100, 181 F.3d 100 (Table))

Page 3

*Provident's* initial decision to deny this claim."(Emphasis added). The appeal was denied in a letter from Beach dated April 11, 1995, which stated: "you appealed *Provident's* initial decision.... The claims review fiduciary [i.e., Provident] has now thoroughly reviewed the matter on appeal....*Provident* renders its decision after appeal as follows."(Emphasis added). According to Beach's letters, it appears that Provident made both decisions. If so, a "heightened abuse-of-discretion" standard of review would be appropriate. We need not decide which standard to apply because we agree with the district court that, even giving Provident the full benefit of the deferential standard, its decision must be reversed.

> FN1. The logo on A.C. Newman's stationery identifies the company as "insurance correspondents."

Provident invited the problem at issue here with poor draftsmanship. Hazard 12 is written as broad, portal-to-portal business-trip accident coverage with restrictions that appear to be afterthoughts tacked on at the end. Plainly, the drafters did not contemplate (certainly, they did not clearly articulate) the possibility of side trips during a business trip. Provident would have this court interpret the "when on business" clause very restrictively.

This type of interpretation has some support in the text of the policy. The opening paragraph of Hazard 12 states that "[c]overage will apply to any injury sustained by an Employee *when* on Business for the Policyholder *during* any bonafide trip."(Emphasis added). Hazard 12 defines "when on Business for the Policyholder" to mean "[while] furthering the business of the policyholder," and excludes injuries sustained during the course of travel to and from work, leave of absence or vacation. "*When* on business *during* a trip" seems to allow for the possibility that there are times when one is *not* "on business" during a bonafide business trip. "Furthering the business of the policyholder" is not difficult to understand, nor is it facially ambiguous. An employee is "furthering the business" of the policyholder when he is doing what his employer sent him to do.

**\*4** Presumably, however, any interpretation that parses a workday into time "on business" and time "not on business" must make allowances for certain digressions-daydreaming during a conference

presentation, visiting the restroom, running out to the parking lot to roll the windows of the rental car up, a brief personal phone call in the middle of the afternoon, stopping at a bookstore after lunch, eating supper, and sleeping, to name just a few. The question is whether the language in Hazard 12, together with common intuition, can make a distinction between these digressions and Garber's flight to Pittsburgh. The difficulty is the fineness of the line that must be drawn. What if, for example, instead of travelling away from California and returning two or three days later than his colleagues, Garber simply scheduled a layover flight rather than a direct flight to give himself an hour to meet a friend for drinks at the Denver airport? We hold that any interpretation of the policy that requires such a fine line to be drawn is not a reasonable interpretation. On any reasonable interpretation of the language in Northrop's policy, an employee is generally "on **business**" if he started a **business** trip and has not returned to his home or workplace-just as the "coverage ... begins" and "coverage ends" language of the policy clearly states.

Alternatively, **Provident** argues that **Garber** is specifically excluded from coverage if he was on vacation or leave at the time of the crash. **Provident** did not define either of these terms in the policy, so this court is left to interpret the terms of the policy "according to their plain meaning, in an ordinary and popular sense ."*Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 556 (6 th Cir.1998) (*en banc* ). The district court properly found that the ordinary and popular sense of "vacation" does not include **Garber's** Thursday-evening flight. Further, the district court correctly concluded that neither the **travel** authority form nor the statements that **Garber** was "off duty" are relevant to the determination of whether he was on vacation.

An employee might abandon a **business** trip before returning home-for example, to spend a week skiing in Europe-in which case the vacation exclusion would cancel the **business**travel coverage, at least until the employee resumed his **travel** home from the location at which he abandoned the **business** trip. But that is not this case. Had he reached Canton, **Garber** might have abandoned the **business** trip for the day or two that he would have been visiting his parents, and he might have been on vacation. But his vacation could not have started until his official time off began on Friday morning. **Garber** had not abandoned the **business** trip at 7:00 Thursday evening.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



181 F.3d 100
181 F.3d 100, 1999 WL 357812 (C.A.6 (Ohio)), 23 Employee Benefits Cas. 1090
(Cite as: 181 F.3d 100, 181 F.3d 100 (Table))

Page 4

Because (1) the language of the policy cannot credibly draw the fine distinction necessary between an employee's "on **business**" and "not on **business**" time while he is on a **business** trip, (2) the plain meaning of "vacation" does not cover the **travel** portion **Garber's** side trip, certainly not until his official time off began on Friday morning, and (3) the vague and ambiguous language used by **Provident** is not a reasonable way to restrict a broad, portal-to-portal **business**travel provision, the district court was correct to conclude that **Provident's** determination denying coverage was unreasonable. Even by the very deferential standard employed by the district court, Plaintiff is entitled to prevail. The judgment of the district court in favor of Plaintiff is AFFIRMED.

### B. Attorney's Fees

*5 In an action to recover ERISA benefits by a participant, beneficiary, or fiduciary, "the court in its discretion may allow a reasonable attorney's fee ... to either party."29 U.S.C. § 1132(g)(1). This Circuit requires the district court to consider five factors in deciding whether to award attorney's fees: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions. *Schwartz v. Gregori*, 160 F.3d 1116, 1119 (6 th Cir.1998) (citing *Secretary of Dep't of Labor v. King*, 775 F.2d 666, 669 (6 th Cir.1985)). No single factor is determinative. *Ibid.* (citing *Wells v. United States Steel*, 76 F.3d 731, 736 (6 th Cir.1996).

Plaintiff argues that the district court abused its discretion by not recognizing Provident's bad faith in denying the claim. However, the district court held merely that Provident's interpretation of the contract was *unreasonable*, not that Provident acted in bad faith. The court specifically stated that "there is an absence of bad faith" and refused to declare that there was no basis for Provident's position. We agree with the district court that Provident's claims were neither frivolous nor pursued in bad faith.

Second, Plaintiff argues that awarding attorney's fees

will send a message to insurance companies and their designated claims administrators that just because courts have interpreted ERISA to permit the drafters of ERISA plans to claim for themselves broad interpretative discretion does not mean that they can draft mystifying policy language then conveniently construe it to involve hidden limitations nowhere expressed on the policy's face.

Br. of Plaintiff-Appellee/Cross-Appellant at 35. That may be so, although there seem to be other, market forces that are better suited to ensure this.FN2 There is no evidence that Provident intentionally drafted the Hazard 12 coverage in such a way that it could later capitalize on its obfuscation. The district court was correct that this case is unique and that no general deterrence would be served by awarding attorney's fees.

> FN2. In the words of Sam Goldwyn, "If you want to send a message, use Western Union."

Finally, Plaintiff argues that this case resolves a significant legal question involving ERISA, holding that side trips are not vacations. But this is not a legal issue involving ERISA-it is simply a decision interpreting specific, badly-drafted policy language. Again, Plaintiff has not shown that the district court abused its discretion.

The district court's decision denying attorney's fees is AFFIRMED.

### C. Prejudgment Interest

Plaintiff argues that he should receive prejudgment interest because, under *Wells v. United States Steel & Carnegie Pension Fund*, 76 F.3d 731, 737 (6 th Cir.1996), the claim was liquidated and Provident wrongfully withheld payment. The district court held that Provident did not act in bad faith and was, therefore, not liable for prejudgment interest.

*6 Plaintiff's claim involves a fixed and agreed insurance benefit, a paradigm of liquidated damages. "Generally, the beneficiaries of pension plans have a right to prejudgment interest on benefits wrongly withheld."*Wells, 76 F.3d at 737*. To be "wrongful" under *Wells*, payments need not have been withheld in bad faith. It is sufficient that they were *incorrectly* withheld."Awards of prejudgment interest are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

181 F.3d 100
181 F.3d 100, 1999 WL 357812 (C.A.6 (Ohio)), 23 Employee Benefits Cas. 1090
**(Cite as: 181 F.3d 100, 181 F.3d 100 (Table))**

compensatory, not punitive, and a finding of wrongdoing by the defendant is not a prerequisite to such an award."*Id.* at 738 (quoting *Tiemeyer v. Community Mut. Ins. Co.,* 8 F.3d 1094, 1102 (6 th Cir.), *cert. denied,*511 U.S. 1005 (1993) (quoting *Drennan v. General Motors Corp.,* 977 F.2d 246, 253 (6 th Cir.1992), *cert. denied,*508 U.S. 940 (1993))). Because of the "general ERISA policy favoring awards of prejudgment interest to plaintiffs when a pension fund wrongfully withholds benefits,"*Id.* at 737, and the fact that bad faith is not a prerequisite to the recovery of prejudgment interest, we hold that the district court applied incorrect law to Plaintiff's prejudgment interest claim and, therefore, abused its discretion. We REVERSE the decision of the district court in this respect.

### III

The judgment of the district court in favor of Plaintiff and the denial of Plaintiff's attorney's fees are affirmed. The denial of prejudgment interest is reversed. The case is remanded to the district court for an order consistent with this opinion.

C.A.6 (Ohio),1999.
Garber v. Provident Life and Acc. Ins. Co.
181 F.3d 100, 1999 WL 357812 (C.A.6 (Ohio)), 23 Employee Benefits Cas. 1090

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy

Page 1

Slip Copy, 2007 WL 2248086 (D.Del.), 41 Employee Benefits Cas. 2848
**(Cite as: Slip Copy)**

Roarty v. Tyco Intern. Ltd. Group Business Travel
Acc. Ins. Plan
D.Del.,2007.

United States District Court,D. Delaware.
Kelly ROARTY, Plaintiff,
v.
TYCO INTERNATIONAL LTD. GROUP
BUSINESS TRAVEL ACCIDENT INSURANCE
PLAN, and Life Insurance Company of North
America, Defendants.
**Civil Action No. 06-195 GMS.**

Aug. 2, 2007.

Richard R. Wier, Jr., Law Offices of Richard R.
Wier, Jr., P.A., Wilmington, DE, for Plaintiff.
Jeffrey K. Martin, Martin & Wilson, P.A.,
Wilmington, DE, Herbert Weiswasser Mondros,
Margolis Edelstein, Wilmington, DE, for
Defendants.

*MEMORANDUM*
GREGORY M. SLEET, Chief United States
District Judge.

**I. INTRODUCTION**

\*1 On March 23, 2006, plaintiff Kelly Roarty ("
Mrs.Roarty") filed the present action against Tyco
International, Ltd Group Business Travel Accident
Insurance Company of North America ("LICNA")
(collectively, the "defendants"). In Count I, Mrs.
Roarty alleges that the defendants wrongfully
denied benefits owed to her in violation of the
Employee Retirement Income Security Act ("
ERISA). In Count II, Mrs. Roarty alleges that the
defendants breached fiduciary duties owed to her
under ERISA. In Count III, Mrs. Roarty alleges
that the defendants' actions constituted a breach of
contract in violation of state law.

The defendants answered Mrs. **Roarty's** complaint
with respect to Count I on May 10, 2006. (D.I.4.)
On the same day, the defendants filed a motion to
dismiss Counts II and III for failure to state a claim
upon which relief can be granted, pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure.
(D.I.5.) For the reasons discussed below, the court
will deny the motion with respect to Count II, and
grant the motion with respect to Count III.

**II. BACKGROUND**

The following facts are taken from Mrs. Roarty's
complaint. Mrs. Roarty is the widow of Daniel
Roarty ("Mr.Roarty"), who was a Senior Product
Manager for Scott Instruments (D.I. 1 ¶ 3.) Scott
Instruments is a subdivision of Tyco International
Ltd. (*Id.* ¶ 6.) Mr. Roarty was a participant in the
Tyco Plan, an employee welfare benefit plan which
provided for an accidental death benefit for Tyco
employees who die accidentally while traveling on
business. (*Id.* ¶ 4.) LICNA is the Administrator of
the Tyco Plan, and is an underwriting subsidiary of
Cigna Group Insurance ("Cigna").(*Id.* ¶ 5.)

Tragically, on August 8, 2004, Mr. **Roarty** was
struck and killed by a negligent driver while
returning home to Newark, Delaware from
Pittsburgh, Pennsylvania.(*Id.* ¶ 3.) Mrs. Roarty
alleges that Mr. Roarty was on a business trip at
the time of his death. Tyco had a production
contract with a plant located near Pittsburgh, and
Tyco and the plant had been having supply chain
issues in the weeks before Mr. **Roarty's** death. Mrs.
Roarty claims that Mr. Roarty had traveled to
Pittsburgh in part to meet with another Tyco
employee and two members of management of the
plant about the supply chain problem. (*Id.* ¶
12.)Mrs. **Roarty** also admits that the purpose of the
trip was partially non-business related, stating that
Mr. Roarty left for a vacation in Pittsburgh early in
order to attend the meeting and address the supply
chain problem that had necessitated the meeting. (*Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2248086 (D.Del.), 41 Employee Benefits Cas. 2848
**(Cite as: Slip Copy)**

¶ 11.)Though the meeting was ultimately cancelled, Mrs. **Roarty** alleges that Mr. **Roarty** continued to make business phone calls during his time in Pittsburgh. (*Id.* ¶ 13.)The fatal car accident occurred during Mr. **Roarty's** drive back from Pittsburgh. (*Id.* ¶¶ 14-15.)

As the named primary beneficiary of the Plan, Mrs. **Roarty** filed a claim for benefits. (*Id.* ¶ 16.)Cigna denied **Roarty's** claim, alleging that Mr. **Roarty** was not on an authorized business trip at the time of his death. (*Id.* ¶ 18.)Mrs. **Roarty** appealed Cigna's denial of her claim, but her appeal was ultimately denied on March 24, 2005. (*Id.* ¶¶ 19-21.)Mrs. **Roarty** filed the complaint in this action on March 23, 2006.

### III. STANDARD OF REVIEW

**\*2** The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, the court must accept the factual allegations of the complaint as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer."*Colburn v. Upper Darby Twp.,* 838 F.2d 663, 666 (3d Cir.1988). In performing this task, however, the court need not "credit a complaint's ' bald assertions' or 'legal conclusions' when deciding a motion to dismiss."*Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). On the other hand, a court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*See Graves,* 117 F.3d at 726;*Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### IV. DISCUSSION

### A. Count II: Breach of Fiduciary Duty

The defendants contend that Count II of the complaint should be dismissed because Mrs. Roarty cannot seek equitable relief under 29 U.S.C. § 1132(a)(3) when she also seeks legal relief under § 1132(a)(1)(B). Defendants cite to *Varity Corp. v. Howe,* where the Supreme Court stated that it is generally not appropriate for a court to grant further equitable relief "where Congress elsewhere provided adequate relief for a beneficiary's injury." 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Were Mrs. Roarty seeking a remedy for wrongful denial of benefits under § 1132(a)(3), thus duplicating her claim under § 1132(a)(1)(B), the language from *Varity* cited by the defendants would be apposite to this case. The court is not aware of any authority, however, that would support a categorical exclusion of § 1132(a)(3) claims in cases where the claim stated under § 1132(a)(3) is different in kind from the § 1132(a)(1)(B) claim, and could result in a different remedy. As the Third Circuit acknowledged in *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund,*"a fiduciary's duties, and a beneficiary's corresponding remedies, are not limited to the terms of § 502(a)(1)(B)."12 F.3d 1292, 1301 (3d Cir.1993).

In *Jackson v. Chevron Corp. Long-Term Disability Org., Inc.,* the district court held that:
[A] beneficiary who is denied benefits under an ERISA plan may seek equitable restitution under § 1132(a)(3)(B) for a breach of fiduciary duty. Since Count IV seeks relief under Part IV of Title I of ERISA, which contains § 1132(a)(3)(B), we cannot hold that Plaintiff impermissibly requested individual relief under § 1132(a)(2). Accordingly, since Defendants[ ] may be entitled to relief under § 1132(a)(3)(B), we will not dismiss Count IV for failure to state a claim.

**\*3** 2006 WL 231595, at \*2 (D.N.J. Jan.30, 2006) ( *citing Great-West Life & Annuity Ins. v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)). Similarly, in this case, the court cannot conclude that the allegations made by Mrs. **Roarty** against the defendants could not support a remedy for Count II independent of (or in addition to)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 3

Slip Copy, 2007 WL 2248086 (D.Del.), 41 Employee Benefits Cas. 2848
**(Cite as: Slip Copy)**

whatever remedy Mrs. **Roarty** might receive under Count I. It may come to pass that the defendants breached no fiduciary duties that could lead to any recovery beyond that sought by Mrs. **Roarty** for the wrongful denial of benefits. It is possible, however, that other fiduciary duties owed under **ERISA**, such as the duty of loyalty, could lead to damages over and above those arising from wrongful denial of benefits. In either case, however, the court cannot make such a determination at this stage in the proceeding. Consequently, the defendants' motion to dismiss Count II of the complaint is denied.

### B. Count III: Breach of Contract

The defendants assert that Shipman's claim for breach of contract under state common law is preempted by **ERISA**. (D.I. 6 at 7.) Mrs. **Roarty** argues that dismissal of Count III is not appropriate at this time since the court has not yet determined whether the Tyco Plan is an employee welfare benefit plan within the meaning of **ERISA**. (D.I. 8 at 14.) The parties have both admitted, however, that the Tyco Plan is such a plan, and thus is subject to the provisions of **ERISA**. (See D.I. 1 ¶ 4; D.I. 11 at 1.) The existence of an employee welfare benefit plan that is subject to **ERISA** is a question of fact, which is "to be answered in light of all the surrounding facts and circumstances and from the point of view of a reasonable person." *Minnis v. Baldwin Bros. Inc.,* 150 Fed.Appx. 118, 119-20 (3d Cir.2005). Since the parties agree that the Tyco Plan is governed by ERISA, the court finds that this fact is not in contention.

ERISA includes a provision that expressly preempts state law. That clause provides: "[T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by **ERISA**. Furthermore, courts have recognized that the **ERISA** preemption clause was broadly drafted. *See Pryzbowski v. U.S. Healthcare, Inc.,* 245 F.3d 266, 277-78 (3d Cir.2001). Because Mrs. **Roarty's** breach on contract claim would depend on Delaware state contract law to enforce the terms of the employee welfare benefit plan, Mrs. **Roarty's** contract claim

would trigger the **ERISA** preemption clause. The motion to dismiss Count III therefore is granted.

### *ORDER*

For the reasons stated in the court's memorandum of this same date, IT IS HEREBY ORDERED that:

The defendants' Motion to Dismiss for Failure to State a Claim (D.I.5) is DENIED with respect to Count II of the complaint and GRANTED with respect to Count III of the complaint.

D.Del.,2007.
Roarty v. Tyco Intern. Ltd. Group Business Travel Acc. Ins. Plan
Slip Copy, 2007 WL 2248086 (D.Del.), 41 Employee Benefits Cas. 2848

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 231595 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Jackson v. **Chevron** Corp. Long-Term **Disability**
Organization, Inc.
D.N.J.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Tracy N. **JACKSON**, Plaintiff,
v.
**CHEVRON** CORPORATION LONG-TERM
**DISABILITY** ORGANIZATION, INC., a
Delaware Corporation, **Chevron** Corporation, a
Delaware Corporation, and Connecticut General
Life Insurance Company and Its Cigna Group
Insurance, John Does 1-10, and Mary Does 1-10,
Defendants.
**No. 05-CV-3590 (WJM).**

Jan. 30, 2006.

Robert Thomas Pickett, South Orange, NJ, for
Plaintiff.
Jeffrey S. Leonard, Budd Larner, Short Hill, NJ,
Frederick A. Brodie, Pillsbury Winthrop Shaw
Pittman LLP, New York, NY, for Defendants.

OPINION
MARTINI, U.S.D.J.:
**\*1** This matter comes before the Court on
Defendants motion to dismiss Plaintiff's Amended
Complaint pursuant to Fed.R.Civ.P. 12(b)(6). There
was no oral argument. Fed.R.Civ.P. 78. For the
following reasons, Defendants' motion to dismiss is
GRANTED as to Count I, but DENIED as to
Counts II-V.

I. Background

Plaintiff Tracy N. **Jackson** ("Jackson") worked as
a refinery process technician for Defendant
**Chevron** Corporation from October 29, 1990 to
February 24, 1994. (Amend.Compl.¶ 6). As a
full-time employee, **Jackson** was entitled to

long-term **disability** benefits under the **Chevron**
Corporation Long-Term **Disability** Plan (the "LTD
Plan"). (Amend.Compl.¶ 10). On or about March
28, 1994, Defendants determined that **Jackson** was
**disabled** and entitled to long-term **disability**
benefits.[FN1](Amend.Compl.¶ 12).

> FN1. The "Defendants" include **Chevron**
> Corporation, **Chevron** Corporation
> Long-Term **Disability** Plan, Inc.,
> Connecticut General Life Insurance
> Company, CIGNA Group Insurance and
> various unnamed individuals and corporate
> entities.

On July 19, 1999, Defendants notified **Jackson** that
she no longer fell within the definition of "total
**disability**" under the LTD Plan and, therefore, was
not entitled to benefits beyond July 22, 1999.
(Amend.Compl.¶ 13).**Jackson** appealed this
decision. (Amend.Compl.¶ 13). After Defendants
denied her appeal, she filed suit in this Court on
July 19, 2005. (*See* Amend. Compl. ¶ 16).

**Jackson's** Amended Complaint contains three
counts.[FN2]Count I alleges that Defendants
breached their ERISA fiduciary duties under 29
U.S.C. § 1132(a)(2) and requests $75,000.00 in
damages. (Amend.Compl.¶¶ 20, 21). Count II
alleges a claim for ERISA benefits under 29 U.S.C.
§§ 1132(a)(1)(B), 1132(a)(3). (Amend.Compl.¶¶
22). Count III also alleges a claim for ERISA
benefits under § 1132(a)(1)(B). (*See* Amend.
Compl. ¶¶ 28-32). Count IV seeks unspecified
damages for Defendants breach of their fiduciary
duties under "Part 4 of Title I of ERISA,"29 U.S.C.
§§ 1101-1114. (*See* Amend. Compl. ¶¶ 34-35).
Finally, Count V alleges that Defendants violated
29 U.S.C. §§ 1024(b), 1025(b) by failing to provide
claims information and materials requested by
Plaintiff on a timely basis. (Amend.Compl.¶ 37).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2006 WL 231595 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

FN2.**Jackson** amended her complaint on November 18, 2005.

Defendants filed a motion to dismiss **Jackson's** Amended Complaint. In their motion, Defendants argue that: (1) Counts I and IV must be dismissed because an individual plaintiff cannot obtain monetary damages based on an alleged breach of fiduciary duty under ERISA; (2) Counts I and IV are also untimely; (3) Counts II and III are also untimely; and (4) Count V fails to state a claim upon which relief can be granted.

### II. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court may dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell,* 688 F.2d 940, 941 (3d Cir.1982)

### III. Discussion

A. Count I Must be Dismissed Because an Individual Plaintiff Cannot State a Claim for Monetary Damages Under § 1132(a)(2).

**\*2** Defendants argue that Count I must be dismissed because an individual plaintiff cannot state a claim

for monetary damages under § 1132(a)(2) of ERISA.FN3Defendants are correct. It is well-established that where a plaintiff seeks to recover benefits allegedly owed to them in their individual capacities, their action is not authorized under § 1132(a)(2).*See Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144 (1985) ("[T]he entire text of [§ 1109] persuades us that Congress did not intend that section to authorize any relief *except for the plan itself.")* (emphasis added); *see also Hozier v. Midwest Fasteners Inc.,* 908 F.2d 155, 1162 n. 7 (3d Cir.1990) ("Because plaintiffs here seek to recover benefits allegedly owed to them in their individual capacities, their action is plainly not authorized by either § [1109] or § [1132](a)(2)."). Accordingly, Count I must be dismissed.

FN3.Section 1132(a)(2) provides:
A civil action may be brought ... by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.
29 U.S.C. § 1132(a)(2).Section 1109 provides, in relevant part:
Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach....
29 U.S.C. § 1109(a).

B. Count IV Must Not be Dismissed Because Individual Relief May be Available Under 29 U.S.C. § 1132(a)(3).

Defendants argue that Count IV must also be dismissed because it constitutes an individual claim for damages based upon an alleged breach of fiduciary duty under § 1132(a)(2). Count IV, however, does not specifically rely on § 1132(a)(2). Instead, it alleges that Defendants breached their fiduciary duties under "Part 4 of Title 1 of ERISA" ( *see* Amend. Compl. ¶ 34), which contains all of the provisions regarding fiduciary duties. *See*29 U.S.C. §§ 1101-1114. Furthermore, unlike Count I, Count IV does not request any monetary damages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**12**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 231595 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

The Supreme Court has held that a beneficiary who is denied benefits under an ERISA plan may seek equitable restitution under § 1132(a)(3)(B) for a breach of fiduciary duty.[FN4] *See Great-West Life & Annuity Ins. v. Knudson,* 534 U.S. 204, 213 (2002) (noting that equitable restitution is available to a plaintiff under § 1132(a)(3)(B)); *Michaels v. Breedlove,* No. 03-4891, 2004 U.S.App. LEXIS 25165, at *5-6 (3d Cir. Dec. 8, 2004) (same); *Fox v. Herzog,* No. 01-1827, 2005 U.S. Dist. LEXIS 36414, *9 (D.N.J. Dec. 27, 2005) (same). Since Count IV seeks relief under Part IV of Title 1 of ERISA, which contains § 1132(a)(3)(B), we cannot hold that Plaintiff impermissibly requested individual relief under § 1132(a)(2).[FN5] Accordingly, since Defendants' may be entitled to relief under § 1132(a)(3)(B), we will not dismiss Count IV for failure to state a claim.

> FN4. Section 1132(a)(3)(B) provides:
> A civil action may be brought ... by a participant, beneficiary, or fiduciary ... to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.
> 29 U.S.C. § 1132(a)(3)(B).

> FN5. Furthermore, that Jackson's complaint does not expressly request " equitable restitution" is not fatal to her claim. Her Amended Complaint specifically requests "[s]uch other and further relief under ERISA as this Court may deem appropriate under the circumstances (*See* Amend. Compl. ¶ 37 *et seq.*)."*See* Fed.R.Civ.P. 8(f) (mandating construction of pleadings to do " substantial justice")

C. Defendants' Motion to Dismiss Counts I and IV as Barred Under the Appropriate Statute of Limitations is Also Denied.

Defendants also moved to dismiss Counts I and IV as untimely. The statute of limitations for a breach of fiduciary duty claim is found in 29 U.S.C. § 1113 . Under this statute, a claim for a breach of fiduciary

duty must be brought:
(1) six years after ... the date of the last action which constituted a part of the breach or violation, ... [or]
(2) three years after the earliest date on which the plaintiff had *actual knowledge* of the breach or violation....

*3 29 U.S.C. § 1113(1)-(2) (emphasis added). Defendants argue that Jackson's breach of fiduciary duty claims are untimely under § 1113(2) because she possessed actual knowledge of such claims more than three years before she filed suit on July 19, 2005.

"Section 1113 sets a 'high standard' for barring claims against fiduciaries prior to the expiration of the six year limitations period and thus [courts] have interpreted the actual knowledge requirement ' stringently.' ' *Richard B. Roush, Inc. Profit Sharing Plan,* 311 F.3d 582, 587 (3d Cir.2002) (quoting *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1176 (3d Cir.1992)). A two-prong test is used to determine whether a plaintiff possesses "actual knowledge" under § 1113(2), requiring a "showing that plaintiffs knew not only of the events that occurred which constituted the breach or violation but also that those events supported a breach of fiduciary duty or violation under ERISA." *Int'l Union of Elec., Elec., Salaried, Mach. and Furniture Workers v. Murata Erie N. Am.,* 980 F .2d 889, 900 (3d Cir.1992); *see also Richard B. Roush, Inc. Profit Sharing Plan,* 311 F.3d at 585 (citing *Gluck,* 960 F.2d at 1177). Because the statute of limitations is an affirmative defense, the burden of proving that the statute of limitations bars Jackson's claims rests with Defendants. *Richard B. Roush, Inc. Profit Sharing Plan,* 311 F.3d at 585.

Since this matter was brought before the Court on a motion to dismiss, we are constrained in reviewing the record. Based upon **Jackson's** complaint, the exhibits attached to her complaint, and the documents referenced in her claims, we cannot discern what **Jackson** "knew and when" regarding Defendants' alleged breaches of fiduciary duty. *Gluck,* 960 F.2d at 1171. While it is clear that **Jackson** allegedly knew of the harmful consequences of Defendants' alleged breaches, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**13**

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 231595 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

allegedly suffered actual harm, it is unclear at this stage of the proceedings whether **Jackson** was aware that the facts supported a cause of action under ERISA. This question is more appropriate for a motion for summary judgment. As such, it would be premature for the Court to dismiss **Jackson's** breach of fiduciary duty claims as time-barred.

### C. Counts II and III Must Not be Dismissed as Untimely.

Defendants also argue that Counts II and III, which contain claims for ERISA benefits under 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3), are barred under the applicable statute of limitations. The statute of limitations for such claims is the relevant statute of limitations governing contract actions. *See Minnis v. Baldwin Bros.*, 150 Fed. Appx. 118, 120 (3d Cir.2005); *Syed v. Hercules Inc.*, 214 F.3d 155, 159 (3d Cir.2000). The parties dispute, though, which state statute of limitations controls. **Jackson** argues that New Jersey's six-year statute of limitations for contract actions applies, thus making her complaint timely. Defendants, however, argue that California's four-year statute of limitations for contract actions governs, thereby resulting in **Jackson's** complaint being untimely.

*4 Since the statute of limitations of a state other than the forum state is implicated in this case, federal choice of law principles govern which statute of limitations applies. *Gluck,* 960 F.2d at 1179. Federal courts have relied on the Restatement (Second) of Conflict of Laws (the "Restatement") as a source of federal common law choice of law principles. *Pfizer, Inc. v. Elan Pharm. Research Corp.,* 812 F.Supp. 1352 (D.Del.1993); *S.E.C. v. Infinity Group Co.,* 27 F.Supp.2d 559, 555 (E.D.Pa.1998).[FN6] Section 142(2) of the Restatement provides:

> FN6. The LTD Plan contains a provision stating that the contract is governed by California law. However, we note that " [c]hoice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express."*Gluck,* 960 F.2d

at 1179 (citations omitted). No mention, however, is made in the clause dictating the application of California's statute of limitations. Accordingly, the choice of law clause is not controlling.

The forum will apply its own statute of limitations permitting a claim unless:
(a) maintenance of the claim would serve no substantial interest of the forum; and
(b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Restatement (Second) of Conflict of Laws § 142(2). When determining whether one state has a "more significant relationship to the parties and the occurrence" than another, a court must review: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *See*Restatement (Second) of Conflict of Laws § 188(2).

We cannot undertake a review of these factors at this time. "A Court may grant a Rule 12(b)(6) motion based on statute of limitations grounds [only] if the complaint *on its face* shows noncompliance with the limitations period."*Viking Commc'ns, Inc. v. AT & T Corp.,* No. 05-1078, 2005 U.S. Dist. LEXIS 24175, at *20 (D .N.J. Oct. 14, 2005) (emphasis added); *see also Brody v. Hankin,* 145 Fed. Appx. 78, 771-72 (3d Cir.2005) (" '[I]f a statute of limitations 'bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of a complaint under Rule 12(b)(6)." ") (quoting *Ryocline Prods. v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir.1997) (citation omitted)); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 1 (3d Cir.1994) (noting that a complaint may be dismissed pursuant to Rule 12(b)(6) on statute of limitations grounds if the untimeliness of the complaint is apparent on its face). The Court clearly would have to view documents outside the complaint, including documents not mentioned in or attached to Jackson's complaint, to determine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**14**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 231595 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

whether California's or New Jersey's statute of limitation applies to this case. Undertaking such a review would be inappropriate on a motion to dismiss. *See Brody,* 145 Fed. Appx. at 772. Therefore, Defendants' motion to dismiss Counts II and III as untimely will be denied.

### D. Defendants Motion to Dismiss Count V is Denied.

Finally, Defendants argue that Count V, which alleges that Defendants violated § 1024(b) and § 1025(a) by "fail[ing] and refus[ing] to provide the claims information requested by Plaintiff on a timely basis," does not state a claim upon which relief may be granted. (Amend.Compl.¶ 37). In particular, Defendants argue that Jackson improperly pleaded these claims, since § 1024(b) and § 1025(a) require the participant or beneficiary to have requested those documents in writing. *See* 29 U.S.C. § 1024(b)(4) ("The administrator shall, *upon written request* of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report ....") (emphasis added); 29 U.S.C. § 1025(a) ( "Each administrator of an employee pension benefit plan shall furnish to any plan participant or beneficiary *who so requests in writing* a statement indicating ....") (emphasis added).

*5 Defendants' motion to dismiss Count V will be denied. Count V clearly alleges that Jackson " requested" the claims information stated under § 1024(b) and § 1025(a). Dismissing Count V based solely on the lack of the word "written" in her complaint would unduly exalt form over substance and run counter to the long-standing principle that " [c]overage under ERISA is construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs."*Colarusso v. Transcapital Fiscal Sys.,* 227 F.Supp.2d 243, 251 (D.N.J.2002).

### IV. Conclusion

For the foregoing reasons, Defendants motion to dismiss Count I is GRANTED, Defendants' motion

to dismiss Count II is DENIED, Defendants' motion to dismiss Count III is DENIED, Defendants' motion to dismiss Count IV is DENIED, and Defendants' motion to dismiss Count V is DENIED.

D.N.J.,2006.
Jackson v. Chevron Corp. Long-Term Disability Organization, Inc.
Not Reported in F.Supp.2d, 2006 WL 231595 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2473282 (E.D.Pa.), 34 Employee Benefits Cas. 1149
**(Cite as: Not Reported in F.Supp.2d)**

**H**Ranke v. Sanofi-Synthelabo, Inc.
E.D.Pa.,2004.

United States District Court,E.D. Pennsylvania.
Richard RANKE, et al, Plaintiffs,
v.
SANOFI-SYNTHELABO, INC., Sanofi-Synthelabo
Group Pension Plan, Eastman Kodak Co., and Kodak
Retirement Income Plan, Defendants.
**No. Civ.A. 04-1618.**

Nov. 3, 2004.

Jeffrey P. Hoyle, Media, PA, Stephen C. Kunkle,
West Chester, PA, for plaintiffs.
Richard G. Rosenblatt and Sharri Horowitz, Morgan
Lewis & Bockius LLP, Philadelphia, PA, for
defendants Sanofi-Synthelabo Inc. and Sanofi-
Synthelabo Group Pension Plan.
Karen M. Wahle, O'Melveny & Myers LLP,
Washington, DC, Thomas G. Collins, Buchanan
Ingersoll Prof Corp, Harrisburg, PA, for defendants
Eastman Kodak Company and Kodak Retirement
Income Plan.

*MEMORANDUM AND ORDER*
JOYNER, J.
**\*1** Via the motions now pending before this Court,
Defendants Eastman Kodak Co. and Kodak
Retirement Income Plan (the "Kodak Defendants")
and Defendants Sanofi-Synthelabo Inc. and Sanofi-
Synthelabo Group Pension Plan (the "Sanofi
Defendants") move to dismiss Plaintiffs' complaint
pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons
outlined below, the motions shall be granted in their
entirety.

*Facts*

Plaintiffs, currently employees of Sanofi-Synthelabo
Inc. (Sanofi), bring this ERISA action against the
Kodak and Sanofi Defendants in connection with
alleged misrepresentations regarding their pension
benefits.

In 1988, Plaintiffs were employed by Eastman Kodak
Co. (Kodak) and participated in the Kodak
Retirement Income Plan (KRIP). When Kodak began

the process of merging with Sterling Winthrop, Inc.
(Sterling), human resources personnel at both
companies assured Plaintiffs that their KRIP pension
entitlements would be kept whole upon transfer of
employment to Sterling. Plaintiffs were informed that
their total years of service at both Kodak and Sterling
would be used to determine vesting and early
retirement eligibility, and that their pensions under
both KRIP and the Sterling Plan would be calculated
using their final average salaries at Sterling. Based
upon these representations, Plaintiffs decided to
accept employment with Sterling in 1988.

In 1994, Plaintiffs were chosen to become employed
with Sanofi, which had acquired certain Sterling
assets pursuant to an asset purchase agreement.
Human resources personnel at Sanofi advised
Plaintiffs that their benefits would remain
undiminished for two years after becoming employed
with Sanofi, and that Plaintiffs would continue to
accrue years of service based upon their original
Kodak start dates. Sanofi advised Plaintiffs that they
would be informed of any benefit changes after the
two-year period. Based upon these representations,
Plaintiffs decided to accept employment with Sanofi
in 1994.

In 1996, Sanofi sent Plaintiffs a memorandum
indicating that the name of the Sanofi pension plan
would be changed to "Sanofi Group Pension Plan"
(SSGP), but that Plaintiffs' benefits would remain
unchanged. Plaintiffs have identified only two further
contacts regarding their pension plains until 2002. At
some point between 1995 and 2000, Kodak told some
Plaintiffs that the IRS "same desk rule" prohibited
them from combining their 401K savings or pension
plans. Between 1998 and 2000, Sanofi told some
Plaintiffs that discussions were underway regarding a
possible combination of the KRIP and SSGP
pensions into a single Sanofi pension of equal or
greater value.

In 2002, Plaintiffs received retirement estimate
calculations from Kodak indicating that their KRIP
pensions would be calculated based only on total
years of service with Kodak, and would be based on
Plaintiffs' final average salaries at Sterling in 1994.
Plaintiffs also learned from Sanofi that their SSGP
pension entitlements would be calculated based only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16

on total years of service at Sterling and Sanofi, and would not include Plaintiffs' years of service at Kodak.

*Discussion*

**\*2** In considering a motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6), a court must consider only those facts alleged in the complaint and accept all of the allegations as true. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3rd Cir.1994). A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief could be granted. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3rd Cir.1997).

*I. Count 1: Breach of ERISA Fiduciary Duty*

Plaintiffs bring this claim pursuant to § 502(a)(3) and § 409 of the Employee Retirement Income Security Act (ERISA), alleging that Defendants breached their fiduciary duties under ERISA § 404. *See* 29 U.S.C. 1132(a)(3); 29 U.S.C. 1109(a); 29 U.S.C. 1104. Specifically, Plaintiffs claim that the Kodak Defendants, in 1988 and 1994, and the Sanofi Defendants in 1994, misrepresented to Plaintiffs that their pension plans would not be adversely affected upon transfer of employment from Kodak to Sterling and, ultimately, to Sanofi. Plaintiffs further allege that Defendants failed to notify them that these representations were incorrect until 2002.

To make out a claim of breach of fiduciary duty under ERISA, a plaintiff must show: (1) that the company was acting in a fiduciary capacity; (2) a misrepresentation or failure to adequately inform plan participants and beneficiaries; (3) that the misrepresentation or failure to inform was material; (4) resulting harm to or detrimental reliance by employees. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. V. Skinner Engine Co.*, 188 F.3d 130, 148 (3rd Cir.1999).

*A. Pension Plans Not Subject to Fiduciary Duty Requirements*

As an initial matter, we find that Plaintiffs have failed to state a claim for breach of fiduciary duty with respect to Defendants Sanofi-Synthelabo Group Pension Plan and Kodak Retirement Income Plan. These entities cannot be liable as fiduciaries under ERISA § 409, which imposes personal liability on

any "person who is a fiduciary with respect to a plan." 29 U.S.C. 1109(a). The ERISA definition of "person" includes individuals, corporations, and other associations, but does not include employee benefit plans. 29 U.S.C. 1002(9); *See also Adams v. Koppers Co., Inc.*, 684 F.Supp. 399, 400-01 (W.D.Pa.1988) (dismissing ERISA § 510 claim against defendant retirement plan on the grounds that a plan cannot be a "person"); *Boucher v. Williams*, 13 F.Supp.2d 84, 93 (D.Me.1998) (holding that an employee health and welfare fund is not a "person" for the purposes of fiduciary duty liability under ERISA § 404).

*B. Plaintiff's Fiduciary Duty Claim is Time-Barred*

Defendants contend that Plaintiffs fail to state a claim for breach of fiduciary duty because this action, filed on April 13, 2004, is time-barred by 29 U.S.C. § 1113.[FN1] Defendants claim that the last act constituting a part of the alleged breach, and the latest date on which Defendants could have cured such breach, occurred earlier than April 13, 1998. We find that Plaintiffs' claim is time-barred under § 1113 because the Complaint identifies no breach of fiduciary duty or detrimental reliance occurring after April 13, 1998.

> [FN1.] No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part [Title I], or with respect to a violation of this part, after the earlier of-
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation. 29 U.S.C. § 1113

*1. Inapplicability of the "Fraud and Concealment" Provision*

**\*3** We note initially that the "fraud or concealment" provision of § 1113, which allows an action to be

commenced six years after the date of discovery of the breach, is inapplicable to this case. The Third Circuit has held that the "fraud or concealment" provision does not apply where the complaint merely "sounds in concealment," but only where there is evidence that the defendant took affirmative steps beyond the breach itself to hide its breach of fiduciary duty. *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 242 F.3d 497, 502-03 (3rd Cir.2001); *Kurz v. Philadelphia Elec. Co.,* 96 F.3d 1544, 1552 (3rd Cir.1996); *Holmes v. Pension Plan of Bethlehem Steel Corp.,* No. 98-1241, 1998 U.S. Dist. LEXIS 19490 at 12-14, 1998 WL 901545 (E.D.Pa.1998). In *Unisys,* the Third Circuit held that the "fraud or concealment" clause would generally be inapplicable if all the plaintiff could show was that "a counselor represented to him that he had guaranteed .... benefits or failed to give him accurate advice knowing that he believed he had such benefits," even if such misrepresentations were later repeated. *Unisys,* 242 F.3d at 503. The Third Circuit in *Unisys* ultimately denied the defendant's motion for summary judgment on this issue, finding that there were factual questions as to whether a retirement counselor's advice may have dissuaded some employees from consulting counsel and so arguably constituted active concealment. *Unisys,* 242 F.3d at 504-05.

In deciding this motion to dismiss, however, this Court must determine whether the allegations in the Complaint itself support a cause of action for breach of fiduciary duty, and must not consider any additional contentions or questions of fact raised outside the context of the initial pleading. *ALA, Inc.,* 29 F.3d at 859. While Plaintiffs' briefs allege a "pattern of continuing misrepresentations" by Defendants, their Complaint, even viewed in the most favorable light, does not allege that Defendants took any affirmative action to conceal the misrepresentations at the heart of this breach of fiduciary duty claim. Beyond Defendants' alleged breaches of fiduciary duty in 1988 and 1994, Plaintiffs have identified only three further actions taken by Defendants-Sanofi's 1996 name-change memorandum, Kodak's 1995-2000 representations regarding the IRS "same desk rule," and Sanofi's 1998-2000 representations about a possible Sanofi pension combining the KRIP and SSGP pensions. However, Plaintiffs do not contend that these actions in any way misrepresented Plaintiffs' pension entitlements or were intended to actively conceal Defendants' 1988 and 1994 breaches of fiduciary

duty.

Plaintiffs further allege that, during the "evolution of Plaintiffs' pension plan participation," Defendants failed to notify Plaintiffs that their pension entitlements would be adversely affected, and advised Plaintiffs that they would be kept whole if they decided to move on with their new employers. Complaint, ¶ 31. This allegation, if true, does not support a claim of ongoing affirmative misrepresentations sufficient to satisfy the requirements of § 1113, as it relates only to the alleged breaches of fiduciary duty in 1988 and 1994, at the time Plaintiffs were considering a transfer of employment. Indeed, Plaintiffs cite ¶ 31 as a representation made "when [Plaintiffs'] employment transferred from Sterling Winthrop to Sanofi" and "when [Plaintiffs'] employment transferred from Eastman Pharmaceuticals to Sterling Winthrop." Complaint, ¶ 41, 42.

**\*4** Because, under even the most favorable reading of the Complaint, Plaintiffs have not pled any affirmative acts of concealment beyond Defendants' initial alleged breaches of fiduciary duty, they may not rely on the "fraud or concealment" provision of § 1113 to defend the timeliness of this action.

### 2. Date of Last Action or Chance of Cure

Plaintiffs further contend that this action is timely pursuant to 29 U.S.C. § 1113(1) because it was filed within six years of Defendants' last action and Plaintiffs' detrimental reliance.

In *Unisys,* the Third Circuit held that a breach of fiduciary duty is completed, for the purposes of § 1113(1), no later than the date upon which the employee relied to his detriment on the fiduciary's misrepresentations.*Unisys,* 242 F.3d at 505-06. In that case, the last date of reliance and possible cure was found to be the date on which plaintiff employees decided to take voluntary retirement. However, the court left open the possibility that some retirees made other decisions in detrimental reliance after the date of retirement, and denied summary judgment until factual issues surrounding later instances of reliance were resolved. *Unisys,* 242 F.3d at 505-07. In the instant action, however, the only allegations of reliance made in the Complaint are that Plaintiffs "decided to accept employment with Sterling Winthrop" in 1988 and "decided to accept

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2473282 (E.D.Pa.), 34 Employee Benefits Cas. 1149
(Cite as: Not Reported in F.Supp.2d)

Page 4

employment with Sanofi" in 1994. Indeed, it is difficult to see what steps Defendants could have taken after Plaintiffs' transfer of employment to effectively cure the alleged misrepresentations upon which Plaintiffs relied.

The Complaint itself in no way reflects Plaintiffs' claims that they made "important financial and general life choices" (Plaintiffs' Response to Kodak Defendants' Motion to Dismiss, p. 20) after April 13, 1998 in detrimental reliance on Defendants' misrepresentations. Vague and unspecified allegations of detrimental reliance are insufficient to withstand a motion to dismiss an ERISA claim of breach of fiduciary duty. *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 387-89 (3 rd Cir.2003). Even reading the Complaint in its most favorable light, Plaintiffs have failed to show detrimental reliance or the possibility of cure within the 6-year statute of limitations set forth in § 1113(1).

Plaintiffs further contend that their action is within the in § 1113(1) statute of limitations because Defendants were under an ongoing duty to furnish accurate information regarding the plan, and breached this duty after April 13, 1998. While, under the common law of trusts, a fiduciary has a duty to disclose material information, this duty has never been used by this Court to extend the ERISA statute of limitations in cases alleging affirmative misrepresentations. *See, e.g.Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec.*, 93 F.3d 1171, 1180 (3rd Cir.1996) (finding that fiduciary duties under ERISA generally include a duty to inform, applicable where defendant is charged with failure to disclose information about an employee); *Pa. Fed'n, Bhd. of Maint. of Way Employees v. Norfolk Southern Corp. Thoroughbred Ret. Inv. Plan*, No. 02-9049, 2004 U.S. Dist. LEXIS 1987 at 17-18, 2004 WL 228685 (E.D.Pa.2004) (finding that, where plaintiffs do not allege fraud or misrepresentation, defendant's fiduciary duty under ERISA encompasses a duty to disclose material information); *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452-54 (3rd Cir.2000) (finding that fiduciary duty under ERISA includes an affirmative duty to speak when the fiduciary knows that silence might be harmful; holding limited to situations where plaintiff did not allege affirmative misrepresentations and plan service was broken through severance of employee).

*5 Indeed, this Court has explicitly rejected the doctrine of "continuing duty" under ERISA, finding that establishment of an ongoing duty to remedy breaches of fiduciary duty would in effect extend the § 1113(1) statute of limitations indefinitely. *Holmes*, 1998 U.S. Dist. LEXIS 19490 at 13; *see alsoInt'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. Murata Erie N.A., Inc.*, 980 F.2d 889, 899 (3rd Cir.1992) (holding that, where the initial breach of fiduciary duty was grounded in a plan amendment or benefits determination, subsequent transfers of assets claimed by the plaintiffs did not constitute a "continuing breach" for the purposes of extending the statute of limitations); *Henglein v. Colt Indus.*, 260 F.3d 201, 214 (3rd Cir.2001) (statute of limitations should begin to run upon outright repudiation of employee rights, not upon plaintiff's subsequent failure to pay benefits allegedly due to employees). We cannot permits Plaintiffs to "confuse[ ] the failure to remedy the alleged breach of an obligation with the commission of an alleged second breach, which, as an overt act of its own recommences the limitations period."*Kuhns v. Meridian Bancorp*, No. 92-4065, 1993 U.S. Dist. LEXIS 5121 at 49-50, 1993 WL 34786 (E.D.Pa.1993). Only if a subsequent independent act is of a different character than the original breach, results in a new injury to the plaintiff, or alters the status quo will it qualify as a continuing violation initiating a new statute of limitations period. *Kuhns*, 1993 U.S. Dist. LEXIS 5121 at 51; *Adelman v. Neurology Consultants*, 109 F.Supp.2d 400, 403-404 (E.D.Pa.2000); *McChesney v. Pension Plan of Bethlehem Steel Corp.*, No. 92-7457, 1994 U.S. Dist. LEXIS 3967 at 34-35, 1994 WL 114773 (E.D.Pa.1994) (holding that failure to remedy an initial breach of fiduciary duty does not qualify as a continuous violation recommencing the limitations period).

As discussed above, Plaintiffs have not pled any affirmative misrepresentations by Defendants beyond the alleged breaches of 1988 and 1994 and the implicit reaffirmation of 1996. Plaintiffs have not indicated that any acts and omissions allegedly taking place after April 13, 1998 were of a different character than the initial misrepresentations or resulted in any additional injury or change in status with respect to the initial violations. Even accepting all well-pleaded allegations in the Complaint as true, Plaintiffs' cause of action for breach of fiduciary duty is barred by § 1113.

C. *Plaintiffs Seek Unauthorized Relief*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2473282 (E.D.Pa.), 34 Employee Benefits Cas. 1149
(Cite as: Not Reported in F.Supp.2d)

While Plaintiffs may be able to amend their complaint to incorporate facts bringing this claim within the 6-year statute of limitations, the claim is legally deficient on other grounds. Plaintiffs' breach of fiduciary duty claim as currently pled seeks relief not falling within the scope of "appropriate equitable relief" authorized by ERISA § 502(a)(3).[FN2] 19 U.S.C. 1132(a)(3)(B).

> FN2. In their prayer for relief, Plaintiffs request that this Court:
> A. Declare, adjudge and decree that the [Defendants] have breached their fiduciary duties to plaintiffs and are obligated to provide normal and/or early retirement benefits to plaintiffs that are to be determined according to formulas and/or calculations that are not less favorable to these plaintiffs than the applicable formulas and/or calculations of such benefits that applied to these plaintiffs at the time that they transferred their employment from Kodak to Sterling Winthrop and, subsequently, to Sanofi;
> B. Declare, adjudge and decree that plaintiffs are entitled to retiree medical benefits on terms not less favorable than were available to them at retirement at the time that they transferred their employment from Kodak to Sterling Winthrop and, subsequently, to Sanofi.

*6 In determining whether relief sought under ERISA is legal or equitable, a court is required to examine the basis for the plaintiff's claim and the nature of the underlying remedies sought. _Great-West Life & Annuity Ins. Co. v. Knudson_, 534 U.S. 204, 213, 124 S.Ct. 708, 151 L.Ed.2d 635 (2002). Remedies traditionally viewed as equitable include injunction, mandamus, and restitution, but not compensatory or punitive damages. _Mertens v. Hewitt Assocs._, 508 U.S. 248, 255-56, 113 S.Ct. 2063, 124 L.Ed.2d 161 (U.S.1993). The Supreme Court's decision in _Great-West_ has served to further limit ERISA recovery by narrowly defining the scope of equitable relief under ERISA § 502(a)(3)."Almost invariably, .... suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal

duty."_Great-West_, 534 U.S. at 210 (quoting _Bowen v. Mass._, 487 U.S. 879, 918-19, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)). The Supreme Court in _Great-West_ identified a few instances where a judicial remedy requiring one party to pay money to another will not qualify as legal money damages. For example, specific performance of a contract to pay money, a traditionally legal remedy, may be available in equity if it is sought in connection with an injunction "to correct the method of calculating payments going forward," or where payment on the contract is necessary to "prevent future losses that [are] either incalculable or would be greater than the sum awarded."_Great-West_, 534 U.S. at 211-14. Restitution, in the form of a constructive trust or equitable lien, may be an appropriate equitable remedy where the action does not seek to impose personal liability on the defendant but rather to restore funds or property identified as belonging to the plaintiff and traceable to funds in the defendant's possession. _Great-West_, 534 U.S. at 211-14.

Courts applying _Great-West,_ however, are split over whether a plaintiff alleging breach of fiduciary duty under ERISA and requesting payment of benefits or reinstatement into a benefit plan is seeking a legal or an equitable remedy. _SeeTannenbaum v. UNUM Life Ins. Co._, No. 03-1410, 2004 U.S. Dist. LEXIS 5664 at 18-19, 2004 WL 1084658 (E.D.Pa.2004) (rejecting plaintiff's demand for restitution of benefits due under a plan and unpaid because of defendant's breach of fiduciary duty as a legal, rather than equitable remedy); _Weinreb v. Hospital for Joint Diseases Orthopaedic Institute_, 285 F.Supp.2d 382, 388 (S.D.N.Y.2003) (finding that a request for an injunction directing employer to enroll plaintiff in a benefits plan was a "thinly disguised attempt" to recover compensatory damages); _Caffey v. Unum Life Ins. Co._, 302 F.3d 576, 583-84 (6th Cir.2002) (rejecting plaintiff's claim for reinstatement of lost health benefits, although framed as a request for equitable restitution under ERISA § 502(a)(3), as not permitted after _Great-West_ );_compare with__Godshall v. Franklin Mint Co._, 285 F.Supp.2d 628, 634 (E.D.Pa.2003) (holding that because _Great-West_ does not bar a claim for "equitable restitution," plaintiffs were permitted to seek restitution, disgorgement, and an order enjoining defendants to identify and enroll in the ERISA plans all persons actually eligible to participate but misclassified by defendants); _Ross v. Rail Car Am. Group Disability Income Plan_, 285 F.3d 735, 740-41 (8th Cir2002) (holding that plaintiff alleging that plan amendments were void and seeking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

restoration of full benefits under original plan presented equitable claim under ERISA § 502(a)(3))

*7 We find that Plaintiffs' request for reinstatement of benefits calculated using formulas from prior to transfer of employment, while presented as an equitable "make-whole" remedy, is closer in nature to a legal remedy not contemplated by ERISA § 502(a)(3). Plaintiffs, while not alleging that they are in fact entitled to increased benefits under the terms of the current plans, claim that they are entitled to these benefits because they suffered harm from reliance on Defendants' misrepresentations. This form of relief appears to be within the scope of non-equitable money damages defined by the Supreme Court as "compensation for loss resulting from the defendant's breach of legal duty."*Great-West, 534 U.S. at 210* (citing *Bowen, 487 U.S. at 918-19).* As the requested remedy in this case would ultimately require Defendants to pay out a sum of money upon Plaintiffs' retirement, and as this remedy does not appear to fall within one of the few exceptions outlined in *Great-West,* we find that Plaintiffs' request for reinstatement of benefits is not within the scope of "appropriate equitable relief" authorized by ERISA § 502(a)(3).

*II. Count 4: Failure to Provide Plan Documents*

Count 4 must be dismissed, as Plaintiffs may not bring a civil cause of action under ERISA § 502(c) for the Sanofi Defendants' alleged failure to provide plan documents as required by § 503(2) and 29 C.F.R. 2560.503-1(h)(2)(iii).*See 29 U.S.C. 1132(c); 29 U.S.C. 1133(2).*

The provisions of § 502(c) impose penalties on plan administrators for violations of subchapter 1 of ERISA, 29 U.S.C. § 1101- § 1145. *Groves v. Modified Ret. Plan for Hourly Paid Employees of Johns Manville Corp. & Subsidiaries, 803 F.2d 109, 116-17* (3rd Cir.1986). The Third Circuit has expressly held that § 502(c) authorizes the imposition of sanctions against a plan administrator only for his own failures or refusals, not those of the plan. *Groves, 803 F.2d at 116.*[FN2] For these reasons, Plaintiffs cannot seek to impose § 502(c) penalties for violation of a regulation, 29 C.F.R. 2560.503-1(h)(2)(iii), especially one imposing requirements on plans rather than administrators. Likewise, Plaintiffs cannot seek § 502(c) penalties for violation of § 503(2), because this subsection (albeit within subchapter 1) imposes duties only on plans.

*See Groves, 803 F.2d at 116.*

> FN3. Plaintiffs suggest that the Supreme Court's recent decision in *Aetna Health Inc. v. Davila, 542 U.S. 200, ----, 124 S.Ct. 2488, 2502, 159 L.Ed.2d 312 (2004)* somehow "tied the implementing regulations of 29 C.F.R. 2560.503-1 to the 'full and fair review' requirements of ...29 U.S.C. 1133(2)," and contend that this link arguably supports a cause of action under § 502(c) for violations of a regulatory provision dealing with plan responsibilities. This Court refuses to accept such a strained reading of *Davila,* as that case dealt purely with ERISA preemption, and did not even address the scope of civil liability under § 502(c).

*III. Count 5: Attorney's Fees and Costs*

Count Five, requesting attorney's fees and costs pursuant to ERISA § 502(g)(1), must be dismissed because it fails to state an independent cause of action, but may properly be pled in Plaintiffs' Prayer for Relief. *See 29 U.S.C. 1132(g)(1).*

An appropriate order follows.

ORDER

AND NOW, this day of November, 2004, upon consideration of the Sanofi and Kodak Defendants' Motions to Dismiss and Strike Jury Demand (Docs. No. 5, 6, 8, 9) and all responses thereto (Docs. No. 12, 13, 18, 19), and it appearing to the Court that Plaintiffs agree to voluntary dismissal of Counts 2 and 3 and withdraw their demand for a jury trial, it is hereby ORDERED that the Motions are GRANTED as to all counts.

E.D.Pa.,2004.
Ranke v. Sanofi-Synthelabo, Inc.
Not Reported in F.Supp.2d, 2004 WL 2473282 (E.D.Pa.), 34 Employee Benefits Cas. 1149

END OF DOCUMENT

# EXHIBIT "B"

22

1

LIFE INSURANCE COMPANY
OF NORTH AMERICA
1601 CHESTNUT STREET,
PHILADELPHIA, PENNSYLVANIA, 19192
A STOCK INSURANCE COMPANY

ABL 661690
BLANKET ACCIDENT POLICY

### THIS IS AN ACCIDENT ONLY POLICY.
### IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS.
### THIS IS A LIMITED POLICY.
### READ IT CAREFULLY.

This is a contract between us, the Life Insurance Company of North America, and you:

**Name, Address And**   Tyco International Ltd.
**Nature of Business of**   One Tyco Park
**Policyholder:**   Exeter, NH 03833

Communications Equipment

**Policy Term**—This policy will go into effect on July 1, 2002, and will expire on July 1, 2005, at 12:01 a.m. standard time at your address. The policy anniversary will be July 1. Unless this policy is terminated by you or us (see General Provisions), this policy may be renewed for additional terms at the premium rates in effect at time of renewal.

**Scope Of Coverage**—In exchange for the payment of premiums (as set forth in Schedule III), we agree to pay benefits to all eligible persons (as defined in Schedule I):

a)   who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and

b)   who, as a direct result of the injuries, and from no other cause, suffer a covered loss (as defined in Description of Coverage).

This coverage is subject to the exclusions shown on a later page, and to all of the other terms of this policy.  **This is an accident only policy.  It does not pay benefits for loss caused by sickness.  Read your policy with care.**

This policy shall be governed by the laws of the state in which it is delivered.  As used in this policy, "he" and "his" includes "she" and "her."

**IN WITNESS WHEREOF,** we have signed this policy at Philadelphia, Pennsylvania.

Robert J. Upton, Secretary

Michael W. Bell, President

Countersigned _____

**PITTSBURGH**

**OCT 3 0 2002**

Group Life & Disability
Coverage Unit

LM-9359

AR0001

23

10

**BLANKET ACCIDENT POLICY**

---

Policyholder: Tyco International Ltd.

Schedule Date: July 1, 2002

Part of Policy No. ABL 661690

Applies To Classes: 1, 2 & 3

---

**SCHEDULE IV**
**HAZARDS INSURED AGAINST**

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a)      away from your premises in his city of permanent assignment; and
    b)      on business for you, and in the course of your business.

All such trips must be authorized by you.

This coverage does not include:

    a)      commuting between the covered person's home and place of work; or
    b)      during personal deviations made by the covered person.

"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:

    a)      arrives at his home or place of work, whichever happens first; or
    b)      makes a personal deviation.

If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**–This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.

A covered person will be presumed to have died, for purposes of this coverage, if:

    a)      he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be covered by the policy; and
    b)      his body is not found within a year of the accident.

**Aircraft Restrictions**–If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

    a)      he is riding as a passenger only, and not as a pilot or member of the crew; and
    b)      the aircraft has a valid certificate of airworthiness; and
    c)      the aircraft is flown by a pilot with a valid license; and
    d)      the aircraft is not being used for: (i) crop-dusting, spraying, or seeding; fire fighting; sky writing; sky diving or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**–We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates. An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2229]

AR0002

**24**

# Life Insurance Company of North America
## 1601 Chestnut Street, Philadelphia, Pennsylvania 19192-2235
### A Stock Insurance Company

## GROUP ACCIDENT POLICY

| | |
|---|---|
| **POLICYHOLDER:** | Trustee of the Group Insurance Trust for Employers in the Manufacturing Industry |
| **POLICY NUMBER:** | OK 826564 |
| **POLICY EFFECTIVE DATE:** | July 1, 2002 |
| **POLICY ANNIVERSARY DATE:** | January 1 |
| **STATE OF ISSUE:** | Delaware |

This Policy describes the terms and conditions of insurance. This Policy goes into effect subject to its applicable terms and conditions at 12:01 AM on the Policy Effective Date shown above at the Policyholder's address. The laws of the State of Issue shown above govern this Policy.

We and the Policyholder agree to all of the terms of this Policy.

**THIS IS A GROUP ACCIDENT ONLY INSURANCE POLICY.
IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS.**

**THIS IS A LIMITED POLICY.
PLEASE READ IT CAREFULLY.**

Robert J. Upton, Secretary

Michael W. Bell, President

Countersigned _____
Where Required By Law

AR0003

## TABLE OF CONTENTS

| SECTION | PAGE NUMBER |
|---|---|
| SCHEDULE OF AFFILIATES | 4 |
| SCHEDULE OF BENEFITS | 5 |
| GENERAL DEFINITIONS | 12 |
| ELIGIBILITY AND EFFECTIVE DATE PROVISIONS | 16 |
| COMMON EXCLUSIONS | 18 |
| CONVERSION PRIVILEGE | 19 |
| CLAIM PROVISIONS | 20 |
| ADMINISTRATIVE PROVISIONS | 22 |
| GENERAL PROVISIONS | 23 |
| ACCIDENTAL DEATH AND DISMEMBERMENT COVERAGE | 25 |
| EXPOSURE AND DISAPPEARANCE COVERAGE | 26 |
| NATIONAL GUARD AND ARMED FORCES RESERVE COVERAGE | 26 |
| OWNED AIRCRAFT COVERAGE | 26 |
| PILOT COVERAGE | 27 |
| WAR RISK COVERAGE | 27 |
| ACCIDENTAL BURN AND DISFIGUREMENT BENEFIT | 27 |
| BEREAVEMENT AND TRAUMA COUNSELING BENEFIT | 28 |
| CHILD CARE CENTER BENEFIT | 28 |
| COMMON ACCIDENT BENEFIT | 29 |
| ELDER SURVIVOR BENEFIT | 29 |
| HIV OCCUPATIONAL ACCIDENT BENEFIT | 29 |
| HOME ALTERATION AND VEHICLE MODIFICATION BENEFIT | 30 |
| HOSPITAL STAY BENEFIT | 30 |
| INCREASED DEPENDENT CHILD DISMEMBERMENT BENEFIT | 31 |
| PERMANENT TOTAL DISABILITY BENEFIT - For Employees Only | 31 |
| PERMANENT TOTAL DISABILITY BENEFIT - For Spouses Only | 31 |

GA-00-1000.00                         2

AR0004

26

REHABILITATION BENEFIT                          32

SEATBELT BENEFIT                                32

SPECIAL EDUCATION BENEFIT                        32

SPOUSE RETRAINING BENEFIT                         33

MODIFYING PROVISIONS AMENDMENT                    34

GA-00-1000.00                          3

AR0005

## SCHEDULE OF AFFILIATES

The following affiliates are covered under this Policy on the effective dates listed below.

| AFFILIATE NAME | LOCATION | EFFECTIVE DATE |
|---|---|---|
| A&B Products | Secaucus, NJ | July 1, 2002 |
| ADT | Boca Raton, FL | July 1, 2002 |
| AFC Cable | New Bedford, MA | July 1, 2002 |
| Allied Tube & Conduit | Harvey, IL | July 1, 2002 |
| Ansul – Tyco Suppression Systems | Marinette, WI | July 1, 2002 |
| Earth Tech | Long Beach, CA | July 1, 2002 |
| Ludlow Coated Products | Homer, LA | July 1, 2002 |
| M/A – Com | Harrisburg, PA | July 1, 2002 |
| Simplex/Grinnell | Houston, TX | July 1, 2002 |
| Sonitrol | Westlake, TX | July 1, 2002 |
| Tyco Capital | Livingston, NJ | July 1, 2002 |
| TyCom – Tyco Telecommunications | Morristown, NJ | July 1, 2002 |
| Tyco Electronics | Harrisburg, PA | July 1, 2002 |
| TEPG/Simplex | Westminster, MA | July 1, 2002 |
| Tyco Fire Products | Lansdale, PA | July 1, 2002 |
| Tyco Flow Control | Cranston, RI | July 1, 2002 |
| Tyco Healthcare | Mansfield, MA | July 1, 2002 |
| Tyco International (US) Inc. | Boca Raton, FL | July 1, 2002 |
| Tyco Plastics LP | Minneapolis, MN | July 1, 2002 |
| Tyco Electronics – Printed Circuit Group | Enfield, CT | July 1, 2002 |
| Tyco Thermal Controls | Houston, TX | July 1, 2002 |
| Tyco Valves & Controls | Houston, TX | July 1, 2002 |
| Unistrut | Wayne, MI | July 1, 2002 |

GA-00-1000.00

4

AR0006

2B

## SCHEDULE OF BENEFITS

*This Policy is intended to be read in its entirety. In order to understand all the conditions, exclusions and limitations applicable to its benefits, please read all the policy provisions carefully.*

The *Schedule of Benefits* provides a brief outline of the coverage and benefits provided by this Policy. Please read the *Description of Coverages and Benefits* Section for full details.

Subscriber:                                              Tyco International (US) Inc.

Effective Date of Subscriber Participation:              July 1, 2002

Minimum Subscriber Participation Requirements
                        Percentage                       20% of eligible Employees

Covered Classes:

Class 1         All active, part-time and full-time Employees of the Employer regularly working a minimum of 20 hours
                per week.

GA-00-1100.00                            5

AR0007

**29**

## SCHEDULE OF BENEFITS FOR CLASS 1

This *Schedule of Benefits* shows maximums, benefit periods and any limitations applicable to benefits provided in this Policy for each Covered Person unless otherwise indicated. Principal Sum, when referred to in this Schedule, means the Employee's Principal Sum in effect on the date of the Covered Accident causing the Covered Injury or Covered Loss unless otherwise specified.

**Eligibility Waiting Period**
The Eligibility Waiting Period is the period of time the Employee must be in a Covered Class to be eligible for coverage.

| | | |
|---|---|---|
| For Employees hired on or before the Policy Effective Date: | None | |
| For Employees hired after the Policy Effective Date: | The later of 31 days after the date of hire or the completion of any probationary period | |

**Time Period for Loss:**

Any Covered Loss must occur within:      *365 days of the Covered Accident*

### BASIC ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

| | |
|---|---|
| Employee Principal Sum: | 1 times Annual Compensation rounded to the next higher $1,000, if not already a multiple thereof |
| Maximum Benefit: | $1,000,000 |

### SCHEDULE OF COVERED LOSSES

| Covered Loss | Benefit |
|---|---|
| Loss of Life | 100% of the Principal Sum |
| Loss of Two or More Hands or Feet | 100% of the Principal Sum |
| Loss of Sight of Both Eyes | 100% of the Principal Sum |
| Loss of Speech and Hearing (in both ears) | 100% of the Principal Sum |
| Quadriplegia | 100% of the Principal Sum |
| Paraplegia | 50% of the Principal Sum |
| Hemiplegia | 50% of the Principal Sum |
| Coma | |
|     Monthly Benefit | 1% of the Principal Sum |
|     Number of Monthly Benefits | 11 |
|     Lump Sum Benefit | 100% of the Principal Sum |
|     When Payable | Beginning of the 12th month |
| Loss of One Hand or Foot | 50% of the Principal Sum |
| Loss of Sight in One Eye | 50% of the Principal Sum |
| Loss of Speech | 50% of the Principal Sum |
| Loss of Hearing (in both ears) | 50% of the Principal Sum |
| Loss of all Four Fingers of the Same Hand | 25% of the Principal Sum |
| Loss of Thumb and Index Finger of the Same Hand | 25% of the Principal Sum |

**Age Reductions**
A Covered Person's Principal Sum will be reduced to the percentage of his Principal Sum in effect on the date preceding the first reduction, as shown below.

| Age | Percentage of Benefit Amount |
|---|---|
| 65 | 65% |

AR0008

3b

## ADDITIONAL ACCIDENTAL DEATH AND DISMEMBERMENT COVERAGES

Accidental Death and Dismemberment benefits are provided under the following coverages. Any benefits payable under them are as shown in the *Schedule of Covered Losses* and are not paid in addition to any other Accidental Death and Dismemberment benefits.

| | |
|---|---|
| **EXPOSURE AND DISAPPEARANCE COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **NATIONAL GUARD AND ARMED FORCES RESERVE COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **OWNED AIRCRAFT COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **PILOT COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **WAR RISK COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |

## ADDITIONAL ACCIDENT BENEFITS

Any benefits payable under these *Additional Accident Benefits* shown below are paid in addition to any other Accidental Death and Dismemberment benefits payable.

**ACCIDENTAL BURN AND DISFIGUREMENT BENEFIT**
| | |
|---|---|
| 75-100% Body Disfigurement | 100% of the Principal Sum |
| 50-74% Body Disfigurement | 75% of the Principal Sum |
| 25-49% Body Disfigurement | 50% of the Principal Sum |
| Burn Classification | second degree |

**BEREAVEMENT AND TRAUMA COUNSELING BENEFIT**
| | |
|---|---|
| Benefit Amount | $150 per session |
| Maximum Number of Sessions | 10 sessions |
| Maximum Benefit Per Covered Accident | $1,500 |

**ELDER SURVIVOR BENEFIT**
| | |
|---|---|
| Lump Sum Benefit | 10% of the Principal Sum subject to a maximum of $50,000 |
| Default Benefit | $1,000 |

**HIV OCCUPATIONAL ACCIDENT** — 25% of the Principal Sum subject to a maximum of $100,000

**HOME ALTERATION AND VEHICLE MODIFICATION BENEFIT**
| | |
|---|---|
| Benefit | 10% of the Principal Sum subject to a maximum of $25,000 |

**HOSPITAL STAY BENEFIT**
| | |
|---|---|
| Benefit Amount | $100 per day |
| Maximum Benefit Period | 365 days per Hospital Stay per Covered Accident |
| Benefit Waiting Period | 7 days |

**PERMANENT TOTAL DISABILITY BENEFIT**
| | |
|---|---|
| Benefit Waiting Period | 12 months |
| Lump Sum Benefit | 100% of the Principal Sum |

GA-00-1100.00

7

AR0009

31

**REHABILITATION BENEFIT**
   Benefit per Covered Accident           5% of the Principal Sum, subject to a maximum of $10,000

**SEATBELT BENEFIT**
   Seatbelt Benefit           10% of the Principal Sum subject to a Maximum Benefit of $25,000

   Default Benefit           $1,000

**SPECIAL EDUCATION BENEFIT**
   Surviving Dependent Child Benefit           25% of the Principal Sum subject to a Maximum Benefit of $10,000

   Maximum Number of Annual Payments
   For Each Surviving Dependent Child           4
   Default Benefit           $1,000

**SPOUSE RETRAINING BENEFIT**           5% of the Principal Sum subject to a Maximum Benefit of $10,000

### VOLUNTARY ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

Employee Principal Sum:           Option 1: $50,000
          Option 2: 1, 2 or 3 times Annual Compensation rounded to the next higher $1,000, if not already a multiple thereof
          Maximum Benefit: $500,000

Spouse Principal Sum:           60% of the Employee's Principal Sum if no dependent children are covered; 50% of the Employee's Principal Sum if dependent children are covered
          Maximum Benefit: $250,000

Dependent Child Principal Sum:           20% of the Employee's Principal Sum if no spouse is covered; 10% of the Employee's Principal Sum if a spouse is covered
          Maximum Benefit: $60,000

### SCHEDULE OF COVERED LOSSES

| Covered Loss | Benefit |
| --- | --- |
| Loss of Life | 100% of the Principal Sum |
| Loss of Two or More Hands or Feet | 100% of the Principal Sum |
| Loss of Sight of Both Eyes | 100% of the Principal Sum |
| Loss of Speech and Hearing (in both ears) | 100% of the Principal Sum |
| Quadriplegia | 100% of the Principal Sum |
| Paraplegia | 50% of the Principal Sum |
| Hemiplegia | 50% of the Principal Sum |
| Coma | |
|    Monthly Benefit | 1% of the Principal Sum |
|    Number of Monthly Benefits | 11 |
|    Lump Sum Benefit | 100% of the Principal Sum |
|    When Payable | Beginning of the 12th month |
| Loss of One Hand or Foot | 50% of the Principal Sum |
| Loss of Sight in One Eye | 50% of the Principal Sum |
| Loss of Speech | 50% of the Principal Sum |
| Loss of Hearing (in both ears) | 50% of the Principal Sum |
| Loss of all Four Fingers of the Same Hand | 25% of the Principal Sum |
| Loss of Thumb and Index Finger of the Same Hand | 25% of the Principal Sum |

AR0010

32

**Age Reductions**

A Covered Person's Principal Sum will be reduced to the percentage of his Principal Sum in effect on the date preceding the first reduction, as shown below.

| Age | Percentage of Benefit Amount |
|---|---|
| 70 but less than 74 | 82.5% |
| 75 but less than 79 | 57.5% |
| 80 but less than 84 | 37.5% |
| 85 and over | 20% |

## ADDITIONAL ACCIDENTAL DEATH AND DISMEMBERMENT COVERAGES

Accidental Death and Dismemberment benefits are provided under the following coverages. Any benefits payable under them are as shown in the *Schedule of Covered Losses* and are not paid in addition to any other Accidental Death and Dismemberment benefits.

| | |
|---|---|
| **EXPOSURE AND DISAPPEARANCE COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **NATIONAL GUARD AND ARMED FORCES RESERVE COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **OWNED AIRCRAFT COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **PILOT COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |
| **WAR RISK COVERAGE** | Principal Sum multiplied by the percentage applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*. |

## ADDITIONAL ACCIDENT BENEFITS

Any benefits payable under these *Additional Accident Benefits* shown below are paid in addition to any other Accidental Death and Dismemberment benefits payable.

**ACCIDENTAL BURN AND DISFIGUREMENT BENEFIT**

| | |
|---|---|
| 75-100% Body Disfigurement | 100% of the Principal Sum |
| 50-74% Body Disfigurement | 75% of the Principal Sum |
| 25-49% Body Disfigurement | 50% of the Principal Sum |
| Burn Classification | second degree |

**BEREAVEMENT AND TRAUMA COUNSELING BENEFIT**

| | |
|---|---|
| Benefit Amount | $150 per session |
| Maximum Number of Sessions | 10 sessions |
| Maximum Benefit Per Covered Accident | $1,500 |

**CHILD CARE CENTER BENEFIT**

| | |
|---|---|
| Benefit Amount | 5% of the Employee's Principal Sum subject to a maximum of $10,000 per year |
| Maximum Benefit Period | not beyond age 13 for each surviving Dependent Child |

**COMMON ACCIDENT BENEFIT**

| | |
|---|---|
| Covered Spouse Benefit | up to 100% of the Employee's Principal Sum subject to a maximum of $500,000 |

GA-00-1100.00

9

AR0011

**33**

ELDER SURVIVOR BENEFIT
   Lump Sum Benefit                          10% of the Principal Sum subject to a maximum of $50,000
   Default Benefit                              $1,000

HIV OCCUPATIONAL ACCIDENT        25% of the Principal Sum subject to a maximum of $100,000

HOME ALTERATION AND VEHICLE
MODIFICATION BENEFIT
   Benefit                             10% of the Principal Sum subject to a maximum of $25,000

HOSPITAL STAY BENEFIT
   Benefit Amount                        $100 per day
   Maximum Benefit Period         365 days per Hospital Stay per Covered Accident
   Benefit Waiting Period           7 days

INCREASED DEPENDENT CHILD       100% multiplied by the percentage of the Child's
DISMEMBERMENT BENEFIT         Principal Sum applicable to the Covered Loss, as shown in the *Schedule of Covered Losses*

PERMANENT TOTAL DISABILITY BENEFIT – For Employees Only
   Benefit Waiting Period           12 months
   Lump Sum Benefit                 100% of the Principal Sum

PERMANENT TOTAL DISABILITY BENEFIT – For Spouses Only
   Benefit Waiting Period           12 months
   Total of Monthly Benefits         100% of the Principal Sum
   Monthly Benefit Payment        1% of the Principal Sum

REHABILITATION BENEFIT
   Benefit per Covered Accident     5% of the Principal Sum, subject to a maximum of $10,000

SEATBELT BENEFIT
   Seatbelt Benefit                 10% of the Principal Sum subject to a Maximum Benefit of $25,000

   Default Benefit                     $1,000

SPECIAL EDUCATION BENEFIT
   Surviving Dependent Child Benefit    25% of the Principal Sum subject to a Maximum Benefit of $10,000

   Maximum Number of Annual Payments
   For Each Surviving Dependent Child   4
   Default Benefit                     $1,000

SPOUSE RETRAINING BENEFIT       5% of the Principal Sum subject to a Maximum Benefit of $10,000

AR0012

34

**INITIAL PREMIUM RATES**

Premium Rate:

<u>Basic Insurance</u>
Employee Rate:   $0.015 per $1000
<u>Voluntary Insurance</u>
Employee Rate:   $0.012 per $1000
Family Rate:      $0.024 per $1000

Mode of Premium Payment:        Monthly

Contributions:                  The cost of the coverage is paid by the Subscriber and the Employee

Premium Due Dates:              The Policy Effective Date and the first day of each succeeding modal period

Premium rates are subject to change in accordance with the *Changes in Premium Rates* section contained in the *Administrative Provisions* section of this Policy.

GA-00-1100.00                                    11

AR0013

# GENERAL DEFINITIONS

Please note that certain words used in this Policy have specific meanings. The words defined below and capitalized within the text of this Policy have the meanings set forth below.

**Active Service**

An Employee will be considered in Active Service with his employer on any day that is either of the following:
1. one of the Employer's scheduled work days on which the Employee is performing his regular duties on a full-time basis, either at one of the Employer's usual places of business or at some other location to which the Employer's business requires the Employee to travel;
2. a scheduled holiday, vacation day or period of Employer-approved paid leave of absence, other than sick leave, only if the Employee was in Active Service on the preceding scheduled workday.

A person other than an Employee is considered in Active Service if he is none of the following:
1. an Inpatient in a Hospital or receiving Outpatient care for chemotherapy or radiation therapy;
2. confined at home under the care of Physician for Sickness or Injury;
3. Totally Disabled.

**Age**

A Covered Person's Age, for purposes of initial premium calculations, is his Age attained on the date coverage becomes effective for him under this Policy. Thereafter, it is his Age attained on his last birthday.

**Aircraft**

A vehicle which:
1. has a valid certificate of airworthiness; and
2. is being flown by a pilot with a valid license to operate the Aircraft.

**Annual Compensation**

An Employee's annual earnings for normal work established by the Subscriber for his job classification.

**Covered Accident**

A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
1. occurs while the Covered Person is insured under this Policy;
2. is not contributed to by disease, Sickness, mental or bodily infirmity;
3. is not otherwise excluded under the terms of this Policy.

**Covered Injury**

Any bodily harm that results directly and independently of all other causes from a Covered Accident.

**Covered Loss**

A loss that is all of the following:
1. the result, directly and independently of all other causes, of a Covered Accident;
2. one of the Covered Losses specified in the *Schedule of Covered Losses*;
3. suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits*.

**Covered Person**

An eligible person, as defined in the *Schedule of Benefits*, for whom an enrollment form has been accepted by Us and required premium has been paid when due and for whom coverage under this Policy remains in force. The term Covered Person shall include, where this Policy provides coverage, an eligible Spouse and eligible Dependent Children.

GA-00-1200.00                                  12

AR0014

36

**Dependent Child(ren)**

An Employee's unmarried child who meets the following requirements:
1. A child from live birth to 19 years old;
2. A child who is 19 or more years old but less than 23 years old, enrolled in a school as a full-time student and primarily supported by the Employee;
3. A child who is 19 or more years old, primarily supported by the Employee and incapable of self-sustaining employment by reason of mental or physical handicap. Proof of the child's condition and dependence must be submitted to Us within 31 days after the date the child ceases to qualify as a Dependent Child for the reasons listed above. During the next two years, We may, from time to time, require proof of the continuation of such condition and dependence. After that, We may require proof no more than once a year.

A child, for purposes of this provision, includes an Employee's:
1. Natural child;
2. Adopted child, beginning with any waiting period pending finalization of the child's adoption;
3. Stepchild who resides with the Employee;
4. Child for whom the Employee is legal guardian, as long as the child resides with the Employee and depends on the Employee for financial support. Financial support means that the Employee is eligible to claim the dependent for purposes of Federal and State income tax returns.

**Domestic Partner**

A person of the same or opposite sex who:
1. shares the covered Employee's permanent residence;
2. has resided with the covered Employee continuously for at least six months and is expected to reside with the covered Employee indefinitely;
3. is financially interdependent with the covered Employee in each of the following ways:
   a. by holding one or more credit or bank accounts, including a checking account, as joint owners;
   b. by owning or leasing their permanent residence as joint tenants;
4. has signed a Domestic Partner declaration with the covered Employee if the covered Employee resides in a jurisdiction which provides for a Domestic Partner declaration;
5. has not signed a Domestic Partner declaration with any other person within the last 12 months;
6. is no less than 18 to 70 years of age;
7. is not legally married to any other person;
8. is not a blood relative any closer than would prohibit legal marriage.

In addition to the above requirements, consent of either party due to the Domestic Partner relationship must not have been obtained by force, duress or fraud.

A covered Employee may insure a Domestic Partner if all of the following conditions are met:
1. the covered Employee has not been married to any person within the past 12 months;
2. the Domestic Partner is the only person meeting this Policy's definition of "Domestic Partner" with respect to the covered Employee;
3. The covered Employee and the Domestic Partner furnish a notarized affidavit or signed statement reflecting these requirements, and an agreement to notify Us if the requirements cease to be met, on a form acceptable to Us.

**Employee**

For eligibility purposes, an Employee of the Employer who is in one of the Covered Classes.

GA-00-1200.00                    13

AR0015

**37**

| | |
|---|---|
| **Employer** | The Subscriber and any affiliates, subsidiaries or divisions shown in the *Schedule of Covered Affiliates* and which are covered under this Policy on the date of issue or subsequently agreed to by Us. |
| **He, His, Him** | Refers to any individual, male or female. |
| **Hospital** | An institution that meets all of the following: |

1. it is licensed as a Hospital pursuant to applicable law;
2. it is primarily and continuously engaged in providing medical care and treatment to sick and injured persons;
3. it is managed under the supervision of a staff of medical doctors;
4. it provides 24-hour nursing services by or under the supervision of a graduate registered nurse (R.N.);
5. it has medical, diagnostic and treatment facilities, with major surgical facilities on its premises, or available on a prearranged basis;
6. it charges for its services.

The term Hospital does not include a clinic, facility, or unit of a Hospital for:
1. rehabilitation, convalescent, custodial, educational or nursing care;
2. the aged, drug addicts or alcoholics;
3. a Veteran's Administration Hospital or Federal Government Hospital unless the Covered Person incurs an expense.

| | |
|---|---|
| **Hospital Stay** | A confinement in a Hospital, ordered by a Physician, over a period of time when room and board and general nursing care are provided at a per diem charge made by the Hospital. The Hospital Stay must result directly and independently of all other causes from a Covered Accident. Separate Hospital Stays due to the same Covered Accident will be treated as one Hospital Stay unless separated by at least 90 days. |
| **Inpatient** | A Covered Person who is confined for at least one full day's Hospital room and board. The requirement that a person be charged for room and board does not apply to confinement in a Veteran's Administration Hospital or Federal Government Hospital and in such case, the term "Inpatient" shall mean a Covered Person who is required to be confined for a period of at least a full day as determined by the Hospital. |
| **Nurse** | A licensed graduate Registered Nurse (R.N.), a licensed practical Nurse (L.P.N.) or a licensed vocational Nurse (L.V.N.) and who is not: |

1. employed or retained by the Subscriber;
2. living in the Covered Person's household; or
3. a parent, sibling, spouse or child of the Covered Person.

| | |
|---|---|
| **Outpatient** | A Covered Person who receives treatment, services and supplies while not an Inpatient in a Hospital. |
| **Prior Plan** | The plan of insurance providing similar benefits, sponsored by the Employer in effect immediately prior to this Policy's Effective Date. |
| **Physician** | A licensed health care provider practicing within the scope of his license and rendering care and treatment to a Covered Person that is appropriate for the condition and locality and who is not: |

1. employed or retained by the Subscriber;
2. living in the Covered Person's household;
3. a parent, sibling, spouse or child of the Covered Person.

| | |
|---|---|
| **Sickness** | A physical or mental illness. |

GA-00-1200.00                              14

AR0016

**38**

| Spouse | The Employee's lawful spouse. |
| Subscriber | Any participating organization that subscribes to the trust to which this Policy is issued. |
| Terrorism or Terrorist Act | Any hostile or violent act carried out by a group of persons having political or military goals but not operating on behalf of a foreign state and whose purpose is to compel an act or omission by any other person or governmental entity. |

Totally Disabled or
Total Disability

Totally Disabled or Total Disability means either:
1. inability of the Covered Person who is currently employed to do any type of work for which he is or may become qualified by reason of education, training or experience; or
2. inability of the Covered Person who is not currently employed to perform all of the activities of daily living including eating, transferring, dressing, toileting, bathing, and continence, without human supervision or assistance.

We, Us, Our          Life Insurance Company of North America.

GA-00-1200.00                          15

AR0017

39

# ELIGIBILITY AND EFFECTIVE DATE PROVISIONS

**Subscriber Effective Date**
Accident Insurance Benefits become effective for each Subscriber in consideration of the Subscriber's application, Subscription Agreement and payment of the initial premium when due. Insurance coverage for the Subscriber becomes effective on the Effective Date of Subscriber Participation as long as the Minimum Participation Requirement shown in the *Schedule of Benefits* has been satisfied.

**Eligibility**
An Employee becomes eligible for insurance under this Policy on the date he meets all of the requirements of one of the Covered Classes and completes any Eligibility Waiting Period, as shown in the *Schedule of Benefits*. A Spouse and Dependent Children of an eligible Employee become eligible for any dependent insurance provided by this Policy on the later of the date the Employee becomes eligible and the date the Spouse or Dependent Child meets the applicable definition shown in the *Definitions* section of this Policy. No person may be eligible for insurance under this Policy as both an Employee and a Spouse or Dependent Child at the same time.

**Effective Date for Individuals**
Insurance becomes effective for an eligible Employee who applies and agrees to make required contributions within 31 days of eligibility on the latest of the following dates:
1.    the effective date of this Policy;
2.    the date the Employee becomes eligible;
3.    the date We receive the Employee's completed enrollment form and the required first premium, during his lifetime.

Insurance becomes effective for an Employee's eligible dependents if the Employee applies and agrees to make required contributions within 31 days of the date his dependents become eligible on the latest of the following dates:
1.    the effective date of this Policy;
2.    the date the Employee becomes eligible;
3.    the date the Employee's insurance becomes effective;
4.    the date the dependent meets the definition of Spouse or Dependent Child, as applicable;
5.    the date We receive a completed enrollment form for Spouse and Dependent Child coverage and the required first premium, during each dependent's lifetime.

Insurance becomes effective for a newborn Dependent Child automatically from the moment of the child's live birth. Insurance for that Dependent Child automatically ends 31 days later unless the Employee has a Spouse or other Dependent Children insured under this Policy or makes a request to cover the child and pays the required initial premium, during the child's lifetime.

## DEFERRED EFFECTIVE DATE
**Active Service**
The effective date of insurance will be deferred for any Employee or any eligible Spouse or Dependent Child who is not in Active Service on the date coverage would otherwise become effective. Coverage will become effective on the later of the date he returns to Active Service and the date coverage would otherwise have become effective.

**Effective Date of Changes**
Any increase or decrease in the amount of insurance for the Covered Person resulting from:
1.    a change in benefits provided by this Policy; or
2.    a change in the Employee's Covered Class will take effect on the date of such change.
Increases will take effect subject to any Active Service requirement.



AR0018

40

**TERMINATION OF INSURANCE**

The insurance on a Covered Person will end on the earliest date below:

1.    the date this Policy or insurance for a Covered Class is terminated;
2.    the next premium due date after the date the Covered Person is no longer in a Covered Class or satisfies eligibility requirements under this Policy;
3.    the last day of the last period for which premium is paid;
4.    the next premium due date after the Covered Person attains the maximum Age for insurance under this Policy, as shown in the *Schedule of Benefits*;
5.    with respect to a Spouse or Dependent Child, the date of the death of the covered Employee or the date of divorce from the covered Employee unless the Spouse elects to continue insurance, including insurance on Dependent Children.  See *Continuation of Insurance* section.

Termination will not affect a claim for a Covered Loss or Covered Injury that is the result, directly and independently of all other causes, of a Covered Accident that occurs while coverage was in effect.

**CONTINUATION OF INSURANCE**

We will continue insurance under this Policy for a Spouse and Dependent Children of a covered Employee who dies, without payment of premium for 12 months.  The Spouse and Dependent Children: (a) must have been insured under this Policy on the date the Employee died; and (b) must continue to meet all other requirements for eligibility.  Coverage continued under this provision will terminate on the earlier of the end of the 12 $^{th}$ month and the date the Spouse or any Dependent Children ceases to meet all other requirements for eligibility.

**Continuation for Family Medical Leave**

Insurance for an Employee and Covered Dependents may be continued until the earliest of the following dates if: (a) an Employee is on an Employer-approved family medical leave; and (b) required premium contributions are paid when due.

1.    for an Employer-approved family medical leave:  12 weeks in a consecutive 12-month period.

GA-00-1300.00                                    17

AR0019

41

## COMMON EXCLUSIONS

In addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the *Description of Benefits* Section:

1. intentionally self-inflicted Injury, suicide or any attempt thereat while sane or insane;
2. commission or attempt to commit a felony or an assault;
3. commission of or active participation in a riot, insurrection or Terrorist Act;
4. declared or undeclared war or act of war;
5. flight in, boarding or alighting from an Aircraft or any craft designed to fly above the Earth's surface:
   a. except as a fare-paying passenger on a regularly scheduled commercial airline or as a passenger in a non-scheduled, private Aircraft used for pleasure purposes with no commercial intent during the flight;
   b. being flown by the Covered Person or in which the Covered Person is a member of the crew;
   c. being used for:
      i. crop dusting, spraying or seeding, giving and receiving flying instruction, fire fighting, sky writing, sky diving or hang-gliding, pipeline or power line inspection, aerial photography or exploration, racing, endurance tests, stunt or acrobatic flying; or
      ii. any operation that requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on);
   d. designed for flight above or beyond the earth's atmosphere;
   e. that is an ultra-light or glider;
   f. being used for the purpose of parachuting or skydiving;
   g. being used by any military authority, except an Aircraft used by the Air Mobility Command or its foreign equivalent;
6. Sickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof, except for any bacterial infection resulting from an accidental external cut or wound or accidental ingestion of contaminated food;
7. a Covered Accident that occurs while on active duty service in the military, naval or air force of any country or international organization. Upon Our receipt of proof of service, We will refund any premium paid for this time. Reserve or National Guard active duty training is not excluded unless it extends beyond 31 days.

GA-00-1400.00                                    18

AR0020

42

## CONVERSION PRIVILEGE

1. If the Covered Person's insurance or any portion of it ends for a reason other than non-payment of premium, the Covered Person's Age or those reasons described in Paragraph 2 below, the Covered Person may have Us issue converted accident insurance on an individual policy or an individual certificate under a designated group policy. The Covered Person may not apply for an amount greater than his coverage under this Group Policy less the amount of any other group accident insurance for which he becomes eligible within 31 days after the date coverage under this Group Policy terminated. The policy or certificate will not contain disability or other additional benefits. The Covered Person need not show Us that he is insurable.

   The Covered Person must apply for the individual policy within 31 days after his coverage under this Group Policy ends and pay the required premium, based on Our table of rates for such policies, his Age and class of risk.

   The individual policy or certificate will take effect on the day following the date coverage under the Group Policy ended. If the Covered Person dies during this 31-day period as the result of an accident that would have been covered under this Group Policy, We will pay as a claim under this Group Policy the amount of insurance that the Covered Person was entitled to convert. It does not matter whether the Covered Person applied for the individual policy or certificate. If such policy or certificate is issued, it will be in exchange for any other benefits under this Group Policy.

2. If the Covered Person's insurance ends because this Group Policy is terminated or is amended to terminate insurance for the Covered Person's class, and he has been covered under this Group Policy for at least five years, the Covered Person may have Us issue an individual policy or certificate of accident insurance subject to the same terms, conditions and limitations listed above. However, the amount he may apply for will be limited to the lesser of the following:
   a. coverage under this Group Policy less any amount of group accident insurance for which he is eligible on the date this Group Policy is terminated or for which he became eligible within 31 days of such termination, or
   b. $10,000.

AR0021

43

## CLAIM PROVISIONS

**Notice of Claim**

Written or authorized electronic/telephonic notice of claim must be given to Us within 31 days after a Covered Loss occurs or begins or as soon as reasonably possible. If written or authorized electronic/telephonic notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written or authorized electronic/telephonic notice was given as soon as was reasonably possible. Notice can be given to Us at Our Home Office in Philadelphia, Pennsylvania, such other place as We may designate for the purpose, or to Our authorized agent. Notice should include the Subscriber's name and policy number and the Covered Person's name, address, policy and certificate number.

**Claim Forms**

We will send claim forms for filing proof of loss when We receive notice of a claim. If such forms are not sent within 15 days after We receive notice, the proof requirements will be met by submitting, within the time fixed in this Policy for filing proof of loss, written or authorized electronic proof of the nature and extent of the loss for which the claim is made.

**Claimant Cooperation Provision**

Failure of a claimant to cooperate with Us in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**Proof of Loss**

Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible. In any case, written or authorized electronic proof must be given not more than one year after the time it is otherwise required, except if proof is not given solely due to the lack of legal capacity.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

**Time of Payment of Claims**

We will pay benefits due under this Policy for any loss other than a loss for which this Policy provides any periodic payment immediately upon receipt of due written or authorized electronic proof of such loss. Subject to due written or authorized electronic proof of loss, all accrued benefits for loss for which this Policy provides periodic payment will be paid monthly unless otherwise specified in the benefits descriptions and any balance remaining unpaid at the termination of liability will be paid immediately upon receipt of proof satisfactory to Us.

**Payment of Claims**

All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

GA-00-1600.00                                    20

AR0022



**Payment of Claims to Foreign Employees**
The Subscriber may, in a fiduciary capacity, receive and hold any benefits payable to covered Employees whose place of employment is other than the United States of America.

We will not be responsible for the application or disposition by the Subscriber of any such benefits paid. Our payments to the Subscriber will constitute a full discharge of Our liability for those payments under this Policy.

**Physical Examination and Autopsy**
We, at Our own expense, have the right and opportunity to examine the Covered Person when and as often as We may reasonably require while a claim is pending and to make an autopsy in case of death where it is not forbidden by law.

**Legal Actions**
No action at law or in equity may be brought to recover under this Policy less than 60 days after written or authorized electronic proof of loss has been furnished as required by this Policy. No such action will be brought more than three years after the time such written proof of loss must be furnished.

**Beneficiary**
The beneficiary is the person or persons the Employee names or changes on a form executed by him and satisfactory to Us. This form may be in writing or by any electronic means agreed upon between Us and the Subscriber. Consent of the beneficiary is not required to affect any changes, unless the beneficiary has been designated as an irrevocable beneficiary, or to make any assignment of rights or benefits permitted by this Policy. Any Accidental Death Benefit payable at the death of the Employee's Spouse or Domestic Partner or Dependent Child will be paid to the Employee or to his estate.

A beneficiary designation or change will become effective on the date the Employee executes it. However, We will not be liable for any action taken or payment made before We record notice of the change at our Home Office.

If more than one person is named as beneficiary, the interests of each will be equal unless the Employee has specified otherwise. The share of any beneficiary who does not survive the Covered Person will pass equally to any surviving beneficiaries unless otherwise specified.

If there is no named beneficiary or surviving beneficiary, or if the Employee dies while benefits are payable to him, We may make direct payment to the first surviving class of the following classes of persons:
1. Spouse;
2. Child or Children;
3. Mother or father;
4. Sisters or brothers;
5. Estate of the Covered Person.

**Recovery of Overpayment**
If benefits are overpaid, We have the right to recover the amount overpaid by either of the following methods.
1. A request for lump sum payment of the overpaid amount.
2. A reduction of any amounts payable under this Policy.

If there is an overpayment due when the Covered Person dies, We may recover the overpayment from the Covered Person's estate.

AR0023



## ADMINISTRATIVE PROVISIONS

**Premiums**

All premium rates are expressed in, and all premiums are payable in, United States currency. The premiums for this Policy will be based on the rates set forth in the *Schedule of Benefits*, the plan and amounts of insurance in effect. If a Covered Person's insurance amounts are reduced due to age, premium will be based on the amounts of insurance in force on the day before the reduction took place.

**Changes in Premium Rates**

We may change the premium rates from time to time with at least 31 days advance written notice to the Subscriber. No change in rates will be made until 12 months after the Policy Effective Date. An increase in rates will not be made more often than once in a 12-month period. However, We reserve the right to change rates at any time if any of the following events take place:

1.  the terms of this Policy change;
2.  the terms of the Subscriber's participation change;
3.  a division, subsidiary, affiliated company or eligible class is added or deleted from this Policy;
4.  there is a change in the factors bearing on the risk assumed;
5.  any federal or state law or regulation is amended to the extent it affects Our benefit obligation.

**Payment of Premium**

The first premium is due on the Subscriber's effective date of participation under this Policy. Thereafter, premiums are due on the Premium Due Dates agreed upon between Us and the Subscriber. If any premium is not paid when due, the Subscriber's participation under this Policy will be terminated as of the Premium Due Date on which premium was not paid.

**Grace Period**

A Grace Period of 31 days will be granted to each Subscriber for payment of its required premiums under this Policy. A Subscriber's participation under this Policy will remain in effect during the Grace Period. The Subscriber is liable to Us for any unpaid premium for the time its participation under this Policy was in force.

A Grace Period of 31 days will be granted for payment of required premiums under this Policy. A Covered Person's insurance under this Policy will remain in force during the Grace Period. We will reduce any benefits payable for any claims incurred during the grace period by the amount of premium due. If no such claims are incurred and premium is not paid during the grace period, insurance will end on the last day of the period for which premiums were paid.

AR0024

46

## GENERAL PROVISIONS

**Entire Contract; Changes**
This Policy, including the endorsements, amendments and any attached papers constitutes the entire contract of insurance. No change in this Policy will be valid until approved by one of Our executive officers and endorsed on or attached to this Policy. No agent has authority to change this Policy or to waive any of its provisions.

**Subscriber Participation Under This Policy**
An organization may elect to participate under this Policy by submitting a signed Subscriber participation agreement to the Policyholder. No participation by an organization is in effect until approved by Us.

**Misstatement of Fact**
If the Covered Person has misstated any fact, all amounts payable under this Policy will be such as the premium paid would have purchased had such fact been correctly stated.

**Certificates**
Where required by law, We will provide a certificate of insurance for delivery to the Covered Person. Each certificate will list the benefits, conditions and limits of this Policy. It will state to whom benefits will be paid.

**30 Day Right To Examine Certificate**
If a Covered Person does not like the Certificate for any reason, it may be returned to Us within 30 days after receipt. We will return any premium that has been paid and the Certificate will be void as if it had never been issued.

**Multiple Certificates**
The Covered Person may have in force only one certificate at a time under this Policy. If at any time the Covered Person has been issued more than one certificate, then only the largest shall be in effect. We will refund premiums paid for the others for any period of time that more than one certificate was issued.

**Assignment**
We will be bound by an assignment of a Covered Person's insurance under this Policy only when the original assignment or a certified copy of the assignment, signed by the Covered Person and any irrevocable beneficiary, is filed with Us. The assignee may exercise all rights and receive all benefits assigned only while the assignment remains in effect and insurance under this Policy and the Covered Person's certificate remains in force.

**Incontestability**
1.   Of This Policy or Participation Under This Policy
All statements made by the Subscriber to obtain this Policy or to participate under this Policy are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, or to deny the validity of this Policy or of participation under this Policy unless a copy of the instrument containing the statement is, or has been, furnished to the Subscriber.

After two years from the Policy Effective Date, no such statement will cause this Policy to be contested except for fraud.

2.   Of A Covered Person's Insurance
All statements made by a Covered Person are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a copy of the instrument containing the statement is, or has been, furnished to the claimant.

After two years from the Covered Person's effective date of insurance, or from the effective date of increased benefits, no such statement will cause insurance or the increased benefits to be contested except for fraud or lack of eligibility for insurance.

In the event of death or incapacity, the beneficiary or representative shall be given a copy.

GA-00-1800.00                              23

AR0025



**Reporting Requirements**

The Subscriber or its authorized agent must report all of the following to Us by the premium due date:

1. the names of all persons insured on the Policy Effective Date;
2. the names of all persons who are insured after the Policy Effective Date;
3. the names of those persons whose insurance has terminated;
4. additional information required by Us.

**Policy Termination**

We may terminate coverage on or after the first anniversary of the policy effective date. The Subscriber may terminate coverage on any premium due date. Written or authorized electronic notice must be given at least 31 days prior to such premium due date.

Termination will not affect a claim for a Covered Loss that is the result, directly and independently of all other causes, of a Covered Accident that occurs while coverage was in effect.

**Reinstatement**

This Policy may be reinstated if it lapsed for nonpayment of premium. Requirements for reinstatement are written application of the Subscriber satisfactory to Us and payment of all overdue premiums. Any premium accepted in connection with a reinstatement will be applied to a period for which premium was not previously paid.

**Clerical Error**

A Covered Person's insurance will not be affected by error or delay in keeping records of insurance under this Policy. If such error or delay is found, We will adjust the premium fairly.

**Conformity with Statutes**

Any provisions in conflict with the requirements of any state or federal law that apply to this Policy are automatically changed to satisfy the minimum requirements of such laws.

**Policy Changes**

We may agree with the Subscriber to modify a plan of benefits without the Covered Person's consent.

**Workers' Compensation Insurance**

This Policy is not in place of and does not affect any requirements for coverage under any Workers' Compensation law.

**Examination of the Policy**

This Group Policy will be available for inspection at the Subscriber's office during regular business hours.

**Examination of Records**

We will be permitted to examine all of the Subscriber's records relating to this Group Policy. Examination may occur at any reasonable time while the Group Policy is in force; or it may occur:

1. at any time for two years after the expiration of this Group Policy; or, if later,
2. upon the final adjustment and settlement of all Group Policy claims.

The Subscriber is acting as an agent of the Covered Person for transactions relating to this insurance. The actions of the Subscriber will not be considered Our actions.


AR0026



## DESCRIPTION OF COVERAGES AND BENEFITS

This *Description of Coverages and Benefits* Section describes the Accident Coverages and Benefits provided by this Policy. Benefit amounts, benefit periods and any applicable aggregate and benefit maximums are shown in the *Schedule of Benefits*. Certain words capitalized in the text of these descriptions have special meanings within this Policy and are defined in the *General Definitions* section. Please read these and the *Common Exclusions* sections in order to understand all of the terms, conditions and limitations applicable to these coverages and benefits.

### ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

**Covered Loss**

We will pay the benefit for any one of the Covered Losses listed in the *Schedule of Benefits*, if the Covered Person suffers a Covered Loss resulting directly and independently of all other causes from a Covered Accident within the applicable time period specified in the *Schedule of Benefits*.

If the Covered Person sustains more than one Covered Loss as a result of the same Covered Accident, benefits will be paid for the Covered Loss for which the largest available benefit is payable. If the loss results in death, benefits will only be paid under the Loss of Life benefit provision. Any Loss of Life benefit will be reduced by any paid or payable Accidental Dismemberment benefit. However, if such Accidental Dismemberment benefit equals or exceeds the Loss of Life benefit, no additional benefit will be paid.

**Definitions**

**Loss of a Hand or Foot** means complete Severance through or above the wrist or ankle joint.

**Loss of Sight** means the total, permanent loss of all vision in one eye which is irrecoverable by natural, surgical or artificial means.

**Loss of Speech** means total and permanent loss of audible communication which is irrecoverable by natural, surgical or artificial means.

**Loss of Hearing** means total and permanent loss of ability to hear any sound in both ears which is irrecoverable by natural, surgical or artificial means.

**Loss of a Thumb and Index Finger of the Same Hand or Four Fingers of the Same Hand** means complete Severance through or above the metacarpophalangeal joints of the same hand (the joints between the fingers and the hand).

**Paralysis or Paralyzed** means total loss of use of a limb. A Physician must determine the loss of use to be complete and irreversible.

**Quadriplegia** means total Paralysis of both upper and both lower limbs.

**Hemiplegia** means total Paralysis of the upper and lower limbs on one side of the body.

**Paraplegia** means total Paralysis of both lower limbs or both upper limbs.

**Coma** means a profound state of unconsciousness which resulted directly and independently from all other causes from a Covered Accident, and from which the Covered Person is not likely to be aroused through powerful stimulation. This condition must be diagnosed and treated regularly by a Physician. Coma does not mean any state of unconsciousness intentionally induced during the course of treatment of a Covered Injury unless the state of unconsciousness results from the administration of anesthesia in preparation for surgical treatment of that Covered Accident.

25

AR0027

Severance means the complete and permanent separation and dismemberment of the part from the body.

Exclusions     The exclusions that apply to this benefit are in the *Common Exclusions* section.
GA-00-2100.00

### ADDITIONAL ACCIDENTAL DEATH AND DISMEMBERMENT COVERAGES

Accidental Death and Dismemberment benefits are provided under the following coverages. Any benefits payable under them are shown in the *Schedule of Covered Losses* and will not be paid in addition to any other Accidental Death and Dismemberment benefits payable.

### EXPOSURE AND DISAPPEARANCE COVERAGE

Benefits for Accidental Death and Dismemberment, as shown in the *Schedule of Covered Losses,* will be payable if a Covered Person suffers a Covered Loss which results directly and independently of all other causes from unavoidable exposure to the elements following a Covered Accident.

If the Covered Person disappears and is not found within one year from the date of the wrecking, sinking or disappearance of the conveyance in which the Covered Person was riding in the course of a trip which would otherwise be covered under this Policy, it will be presumed that the Covered Person's death resulted directly and independently of all other causes from a Covered Accident.

Exclusions     The exclusions that apply to this coverage are in the *Common Exclusions* Section.
GA-00-2202.00

### NATIONAL GUARD AND ARMED FORCES RESERVE COVERAGE

Benefits for Accidental Death and Dismemberment, as shown in the *Schedule of Covered Losses,* will be payable subject to the following conditions if the Covered Person suffers a Covered Loss resulting directly and independently of all other causes from a Covered Accident that occurs while the Covered Person is a member of the U.S. Military Reserve or National Guard.

While the Covered Person is a member of the U.S. Military Reserve or National Guard, coverage under this Policy will remain in force beyond the 31-day active duty training period and continue:
1.     during the Covered Person's initial training period;
2.     if the Covered Person is called to active duty for a domestic emergency.

Exclusions     The exclusions that apply to this coverage are in the *Common Exclusions* Section.
GA-00-2204.00

### OWNED AIRCRAFT COVERAGE

Benefits for Accidental Death and Dismemberment, as shown in the *Schedule of Covered Losses,* will be payable if the Covered Person suffers a Covered Loss that results directly and independently of all other causes from a Covered Accident that occurs during travel or flight in, including getting in or out of, any Aircraft that is owned, leased, operated or controlled by the Subscriber or any of its subsidiaries or affiliates. A record of eligible Aircraft will be maintained by the Subscriber and available for review by Us at any time during normal business hours. An Aircraft substituted for an eligible Aircraft will also be eligible if it has no greater seating capacity and the original Aircraft is withdrawn from normal use due to breakdown, repair, servicing, loss or destruction.

Exclusions     The exclusions that apply to this coverage are in the *Common Exclusions* Section.
GA-00-2205.00

26

AR0028

**PILOT COVERAGE**
Benefits for Accidental Death and Dismemberment, as shown in the *Schedule of Covered Losses,* will be payable if the Covered Person suffers a Covered Loss resulting directly and independently of all other causes from a Covered Accident that occurs while the Covered Person is flying as a licensed pilot or member of the crew of an Aircraft and meets all of the following requirements:

1.  has submitted a completed Pilot Data History form and been accepted for Pilot Coverage by Us;
2.  maintains the same level of qualification stated on the Pilot Data History form submitted to and approved by Us;
3.  completes and maintains a combined minimum of 200 hours of military, private or professional logged flight hours;
4.  is flying as a pilot or member of the crew of an Aircraft for which he is qualified and that is:
    (a)  on a list of eligible Aircraft maintained by the Subscriber, including a substitute Aircraft with no greater seating capacity while a listed Aircraft is withdrawn from normal use due to breakdown, repair, servicing, loss or destruction; or
    (b)  not owned, leased, operated or controlled by the Subscriber;
5.  is not giving or receiving flight instruction.

**Exclusions**    The exclusions that apply to this coverage are in the *Common Exclusions* Section.
GA-00-2206.00

**WAR RISK COVERAGE**
Benefits for Accidental Death and Dismemberment as shown in the *Schedule of Covered Losses,* will be payable, subject to the following conditions and exclusions, if a Covered Person suffers a Covered Loss that results directly and independently of all other causes from a Covered Accident that occurs during war or acts of war that occur worldwide excluding the United States and the insured's country of citizenship.

The Subscriber may cancel this war risk coverage at any time by sending written notice to Us at Our home office address. Coverage will be canceled upon receipt of notice or a date specified by the Subscriber.

We may cancel this coverage at any time by providing written notice to the Subscriber at least 10 days prior to termination of this coverage. Any unearned premium will be promptly returned to the Subscriber.

**Exclusions**    This benefit does not provide coverage when a Covered Loss occurs:
1.  in the United States and its territories and possessions; or
2.  in any nation of which the Covered Person is a citizen.

Other exclusions that apply to this coverage are in the *Common Exclusions* Section.
GA-00-2208.00

**ADDITIONAL ACCIDENT BENEFITS**
Accidental Death and Dismemberment benefits are provided under the following Additional Benefits. Any benefits payable under them will be paid in addition to any other Accidental Death and Dismemberment benefit payable.

**ACCIDENTAL BURN AND DISFIGUREMENT BENEFIT**
We will pay the benefit shown in the *Schedule of Benefits* if a Covered Person suffers a Covered Injury that leaves him Disfigured, and that Covered Injury resulted directly and independently of all other causes from a Covered Accident. The Disfigurement must satisfy all of the conditions below.

1.  reconstructive or cosmetic surgery is required to restore the Covered Person's physical abilities or correct Disfigurement, and must be performed within twelve months of the Covered Accident;
2.  a Physician must determine that the burn satisfies all of the following:
    a.  involves the minimum percentage shown in the *Schedule of Benefits;*
    b.  be classified as shown in the *Schedule of Benefits;* and
    c.  results in Disfigurement or loss of physical abilities.

27

AR0029

**Definitions**   For purposes of this benefit:
**Disfigurement or Disfigured** means spoiled or deformed appearance that can be corrected by means of reconstructive or cosmetic surgery.

**Exclusions**   The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2209.00

## BEREAVEMENT AND TRAUMA COUNSELING BENEFIT

We will pay counseling sessions, up to the Maximum Benefit Amount shown in the *Schedule of Benefits* and subject to the following conditions and exclusions, when the Covered Person or Immediate Family Member requires bereavement and trauma counseling because the Covered Person suffered a Covered Loss that resulted directly and independently of all other causes from a Covered Accident. Such counseling must meet all of the following conditions:

1. covered bereavement and trauma counseling expenses must be incurred within one year from the date of the Covered Accident causing the Covered Loss;
2. the expense is charged for a bereavement or trauma counseling session for the Covered Person or one or more of his Immediate Family Members;
3. counseling is provided under the care, supervision or order of a Physician;
4. a charge would have been made if no insurance existed.

**Definitions**   For purposes of this benefit:
**Immediate Family Member** means a person who is related to the Covered Person in any of the following ways: Spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister) or child (includes legally adopted child or stepchild).

**Exclusions**   Covered bereavement and trauma counseling benefits do not include any expense for which the Covered Person is entitled to benefits under any Workers' Compensation Act or similar law.

Other exclusions that apply to this benefit are in the *Common Exclusions* Section.

GA-00-2214.00

## CHILD CARE CENTER BENEFIT

We will pay benefits shown in the *Schedule of Benefits* for the care of each surviving Dependent Child in a Child Care Center if death of the covered Employee results directly and independently of all other causes from a Covered Accident and all of the following conditions are met:

1. coverage for his Dependent Children was in force on the date of the Covered Accident causing his death; and
2. one or more surviving Dependent Children is under Age 13 and:
   a. was enrolled in a Child Care Center on the date of the Covered Accident; or
   b. enrolls in a Child Care Center within 90 days from the date of the Covered Accident.

This benefit will be payable to the Surviving Spouse if the Spouse has custody of the child. If the Surviving Spouse does not have custody of the child, benefits will be paid to the child's legally appointed guardian. Payments will be made at the end of each 12 month period that begins after the date of the covered Employee's death. A claim must be submitted to Us at the end of each 12 month period. A 12 month period begins:

1. when the Dependent Child enters a Child Care Center for the first time, within the period specified in (2b) above, after the covered Employee's death; or
2. on the first of the month following the covered Employee's death, if the Dependent Child was enrolled in a Child Care Center before the covered Employee's death.

Each succeeding 12 month period begins on the day immediately following the last day of the preceding period. Pro rata payments will be made for periods of enrollment in a Child Care Center of less than 12 months.

28

AR0030

| Definitions | For purposes of this benefit: |
|---|---|

**Child Care Center** is a facility which:
1.     is licensed and run according to laws and regulations applicable to child care facilities; and
2.     provides care and supervision for children in a group setting on a regular, daily basis.

A Child Care Center does not include any of the following:
1.     a Hospital;
2.     the child's home;
3.     care provided during normal school hours while a child is attending grades one through twelve.

| Exclusions | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
|---|---|

GA-00-2222.00

## COMMON ACCIDENT BENEFIT

We will increase the Loss of Life benefit payable for the covered Spouse to 100% of the Employee's Principal Sum if both the Employee and the covered Spouse die directly and independently of all other causes from a Common Accident and are survived by one or more Dependent Children.

| Definition | For purposes of this benefit: |
|---|---|

**Common Accident** means the same Covered Accident or separate Covered Accidents that occur within the same 24-hour period.

| Exclusions | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
|---|---|

GA-00-2224.00

## ELDER SURVIVOR BENEFIT

We will pay benefits to a Surviving Elder Dependent if death of the Covered Person results directly and independently of all other causes from a Covered Accident. Lump sums will be in amounts specified in the *Schedule of Benefits*.

The lump sum benefit will be payable in one payment when We receive due proof of the death of the Covered Person.

Benefit amounts will be divided equally among all Surviving Elder Dependents. Benefits for any Surviving Elder Dependent will be paid until that Surviving Elder Dependent's death.

If there is no Surviving Elder Dependent eligible for this benefit within 365 days after the date of the Covered Person's death, We will pay a one-time default benefit to the Covered Person's beneficiary.

| Definition | For purposes of this benefit: |
|---|---|

**Surviving Elder Dependent** means a parent, parent-in-law, grandparent, grandparent-in-law, great-grandparent, great-grandparent-in-law (whether natural, step or adoptive) of a Covered Person who, on the date of his death, is primarily dependent on the Covered Person for support and maintenance and is eligible to be claimed as a dependent for Federal and State income tax purposes.

| Exclusions | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
|---|---|

GA-00-2228.00

## HIV OCCUPATIONAL ACCIDENT BENEFIT

We will pay the benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the covered Employee suffers a Covered Injury resulting, directly and independently of all other causes, from a Covered Accident. Such Covered Accident must occur during the performance of Occupational Duties and result in the covered Employee acquiring and testing positive for Human Immunodeficiency Virus (HIV) antibodies within one year of the Covered Injury.

AR0031

53

In order to receive this benefit, the covered Employee must satisfy all of the following:

1. submit a Workers' Compensation Injury report to the Subscriber within 48 hours of the Covered Accident that occurs during the performance of Occupational Duties;
2. test negative for Human Immunodeficiency Virus (HIV) antibodies within 48 hours of such Covered Accident;
3. test positive for Human Immunodeficiency Virus (HIV) antibodies in a subsequent Blood Test within one year of the date of the Covered Accident.

**Definitions**    For purposes of this benefit:

Occupational Duties means the performance of normal work duties on behalf of the Subscriber.

HIV means Human Immunodeficiency Virus, a virus that infects lymphocytes and other cells bearing the CD4 marker, the initial infection of which is known as acute retro viral syndrome.

Blood Test means a positive (reactive) Enzyme-linked Immunosorbent Assay (ELISA) test, confirmed by the Western Blot Test, or other tests that may be approved by the Centers for Disease Control and Prevention and accepted by Us.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2235.00

## HOME ALTERATION AND VEHICLE MODIFICATION BENEFIT

We will pay the Home Alteration and Vehicle Modification Benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the Covered Person suffers a Covered Loss, other than a Loss of Life, resulting directly and independently of all other causes from a Covered Accident.

This benefit will be payable if all of the following conditions are met:

1. prior to the date of the Covered Accident causing such Covered Loss, the Covered Person did not require the use of any adaptive devices or adaptation of residence and/or vehicle;
2. as a direct result of such Covered Loss, the Covered Person now requires such adaptive devices or adaptation of residence and/or vehicle to maintain an independent lifestyle;
3. the Covered Person requires home alteration or vehicle modification within one year of the date of the Covered Accident.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2236.00

## HOSPITAL STAY BENEFIT

We will pay the daily benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, if the Covered Person requires a Hospital Stay due to a Covered Loss resulting directly and independently of all other causes from a Covered Accident.

The Hospital Stay must meet all of the following:

1. be at the direction and under the care of a Physician;
2. begin within 30 days of the Covered Accident;
3. begin while the Covered Person's insurance is in effect.

The benefit will be paid for each day of a continuous Hospital Stay that continues after the end of the Benefit Waiting Period as shown in the *Schedule of Benefits*. Benefits will be paid retroactively to the first day of the Hospital Stay.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2237.00

## INCREASED DEPENDENT CHILD DISMEMBERMENT BENEFIT

We will pay an additional benefit if a covered Dependent Child sustains a Covered Loss resulting, directly and independently of all other causes, from a Covered Accident for which Accidental Dismemberment benefits are payable under this Policy.

30

AR0032

54

**REHABILITATION BENEFIT**

We will pay the Rehabilitation Benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the Covered Person requires rehabilitation after sustaining a Covered Loss resulting directly and independently of all other causes from a Covered Accident.

The Covered Person must require Rehabilitation within two years after the date of the Covered Loss.

**Definition**    For purposes of this benefit:

Rehabilitation means medical services, supplies, or treatment, or Hospital confinement (or part of a Hospital confinement) that satisfies all of the following conditions:

1.    are essential for physical rehabilitation required due to the Covered Person's Covered Loss;
2.    meet generally accepted standards of medical practice;
3.    are performed under the care, supervision or order of a Physician;
4.    prepare the Covered Person to return to his or any other occupation.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2248.00

**SEATBELT BENEFIT**

We will pay the benefit shown in the *Schedule of Benefits*, subject to the conditions and exclusions described below, when the Covered Person dies directly and independently of all other causes from a Covered Accident while wearing a seatbelt and operating or riding as a passenger in an Automobile.

Verification of proper use of the seatbelt at the time of the Covered Accident must be a part of an official police report of the Covered Accident or be certified, in writing, by the investigating officer(s) and submitted with the Covered Person's claim to Us.

If such certification or police report is not available or it is unclear whether the Covered Person was wearing a seatbelt, We will pay a default benefit shown in the *Schedule of Benefits* to the Covered Person's beneficiary..

In the case of a child, seatbelt means a child restraint, as required by state law and approved by the National Highway Traffic Safety Administration, properly secured and being used as recommended by its manufacturer for children of like Age and weight at the time of the Covered Accident.

**Definitions**    For purposes of this benefit:

Automobile means a self-propelled, private passenger motor vehicle with four or more wheels which is a type both designed and required to be licensed for use on the highway of any state or country. Automobile includes, but is not limited to, a sedan, station wagon, sport utility vehicle, or a motor vehicle of the pickup, van, camper, or motor-home type. Automobile does not include a mobile home or any motor vehicle which is used in mass or public transit.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2251.00

**SPECIAL EDUCATION BENEFIT**

We will pay the benefit, up to the Maximum Benefit shown in the *Schedule of Benefits*, for each qualifying Dependent Child who is insured under the covered Employee's certificate on the date he dies or has been Totally Disabled during the Benefit Waiting Period for Permanent Total Disability benefits. The Covered Person's death must result, directly and independently of all other causes from a Covered Accident for which an Accidental Death Benefit is payable under this Policy. This benefit is subject to the conditions and exclusions described below.

AR0033

A qualifying Dependent Child must:
1.  a.  be enrolled as a full-time student in an accredited school of higher learning beyond the 12th grade level on the date of the covered Employee's Covered Accident; or
    b.  be at the 12th grade level on the date of the covered Employee's Covered Accident and then enroll as a full-time student at an accredited school of higher learning within 365 days from the date of the Covered Accident and continue his education as a full-time student.
2.  continue his education as a full-time student in such accredited school of higher learning; and
3.  incur expenses for tuition, fees, books, room and board, transportation and any other costs payable directly to, or approved and certified by, such school.

Payments will be made to each qualifying Dependent Child or to the child's legal guardian, if the child is a minor at the end of each year for the number of years shown in the *Schedule of Benefits*. We must receive proof satisfactory to Us of the Dependent Child's enrollment and attendance within 31 days of the end of each year. The first year for which a Special Education Benefit is payable will begin on the first of the month following the date the covered Employee died or completed the Benefit Waiting Period for Permanent Total Disability benefits, if the surviving Dependent Child was enrolled on that date in an accredited school of higher learning beyond the 12th grade; otherwise on the date he enrolls in such school. Each succeeding year for which benefits are payable will begin on the date following the end of the preceding year.

If no Dependent Child qualifies for Special Education Benefits within 365 days of the covered Employee's death or completion of the Benefit Waiting Period for Permanent Total Disability benefits, We will pay the default benefit shown in the *Schedule of Benefits* to the covered Employee's beneficiary.

**Exclusions**     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2252.00

**SPOUSE RETRAINING BENEFIT**

We will pay expenses incurred, as described below, up to the Maximum Benefit shown in the *Schedule of Benefits*, to enable the covered Employee's Spouse to obtain occupational or educational training needed for employment if the covered Employee dies directly and independently of all other causes from a Covered Accident. A covered Spouse must have been insured under this Policy on the date of the covered Employee's death to be eligible for this benefit. This benefit is subject to the conditions and exclusions described below.

This benefit will be payable if the covered Employee dies within one year of a Covered Accident and is survived by his Spouse who:
1.  enrolls, within three years after the covered Employee's death in any accredited school for the purpose of retraining or refreshing skills needed for employment; and
2.  incurs expenses payable directly to, or approved and certified by, such school.

**Exclusions**     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2254.00

33

AR0034



**Life Insurance Company of North America**
**1601 Chestnut Street**
**Philadelphia, Pennsylvania 19192-2235**

## MODIFYING PROVISIONS AMENDMENT

Subscriber:  Tyco International (US) Inc.                    Policy No.:  OK 826564

Amendment Effective Date:    July 1, 2002

This amendment is attached to and made part of the Policy specified above and the Certificates issued under it. Its provisions are intended to conform them to the laws of the state of New Hampshire and apply only to insureds under this Policy who reside in New Hampshire.

Subscriber and We hereby agree that the Policy and any Certificates delivered under the Group Policy are amended as follows:

1.   Under the *General Definitions* section, the following changes are made.

   A.   The definition of Covered Accident is replaced with the following.
   **Covered Accident**          A sudden, unforeseeable event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
   1.   occurs while the Covered Person is insured under this Policy;
   2.   is not contributed to by disease, Sickness, mental or bodily infirmity;
   3.   occurs while the Covered Person is insured under this Policy;
   4.   is not otherwise excluded under the terms of this Policy.

   B.   The definition of Hospital is replaced with the following.
   **Hospital**          An institution that meets all of the following:
   1.   it is operated pursuant to applicable law;
   2.   it is primarily and continuously engaged in providing medical care and treatment to sick and injured persons;
   3.   it is managed under the supervision of a staff of medical doctors;
   4.   it provides 24-hour nursing services by or under the supervision of a graduate registered nurse (R.N.);
   5.   it has medical, diagnostic and treatment facilities, with major surgical facilities on its premises, or available on a prearranged basis;
   6.   it charges for its services.

   The term Hospital does not include a clinic, facility, or unit of a Hospital for:
   1.   rehabilitation, convalescent, custodial, educational or nursing care;
   2.   the aged, drug addicts or alcoholics;
   3.   a Veteran's Administration Hospital or Federal Government Hospital unless the Covered Person incurs an expense.

   C.   The definition of Hospital Stay is replaced with the following.
   **Hospital Stay**          A confinement in a Hospital, ordered by a Physician, over a period of time when room and board and general nursing care are provided at a per diem charge made by the Hospital. The Hospital Stay must result directly and independently of all other causes from a Covered Accident. Separate Hospital Stays due to the same Covered Accident will be treated as one Hospital Stay unless separated by at least 180 days.

AR0035



2.  Under the *Claim Provisions* section, the following changes are made.

A.  The provision titled Proof of Loss is replaced with the following.

**Proof of Loss**
Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made.  If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable.  If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims.  In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.  All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above.  It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

B.  The provision titled Payment of Claims is replaced with the following.

**Payment of Claims**
All benefits will be paid in United States currency.  Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions.  All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay up to an amount not exceeding $1,000 to a relative by blood or marriage whom We believe is equitably entitled.  Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

3.  Under the *General Provisions* section, the following changes are made.

A.  The provision titled Incontestability is replaced with the following.

**Incontestability**
1.  Of This Policy or Participation Under This Policy
All statements made by the Subscriber to participate under this Policy are considered representations and not warranties.  No statement will be used to deny or reduce benefits or be used as a defense to a claim, or to deny to the validity of this Policy or of participation under this Policy unless a signed copy of the instrument containing the statement is, or has been, furnished to the Subscriber.

After two years from the Policy Effective Date, no such statement will cause this Policy to be contested except for fraud.

2.  Of A Covered Person's Insurance
All statements made by a Covered Person are considered representations and not warranties.  No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a signed copy of the instrument containing the statement is, or has been, furnished to the claimant.

GA-00-3000.30                                    35

AR0036

**58**

After two years from the Covered Person's effective date of insurance, or from the effective date of increased benefits, no such statement will cause insurance or the increased benefits to be contested except for fraud or lack of eligibility for insurance.

In the event of death or incapacity, the beneficiary or representative shall be given a copy.

B.  The provision titled Policy Termination is replaced with the following.

**Policy Termination**

The Subscriber may terminate coverage on any premium due date. We may terminate coverage on or after the first anniversary of the policy effective date if:

1.  there is a change in the factors bearing on the risk assumed;
2.  all policies in the state of delivery are terminated; or
3.  all policies providing this coverage are terminated.

Written or authorized electronic notice must be given at least 45 days prior to such premium due date. Failure by the Subscriber to pay premiums when due or within the grace period shall be deemed notice to Us to terminate coverage at the end of the period for which premium was paid.

Termination will not affect a claim for a Covered Loss that is the result, directly and independently of all other causes, of a Covered Accident that occurs while coverage was in effect.

Signed for the
Life Insurance Company of North America

*Michael W. Bell*

President

GA-00-3000.30                           36

AR0037

59

| Definitions | For purposes of this benefit: |
|---|---|
| | **Disfigurement or Disfigured** means spoiled or deformed appearance that can be corrected by means of reconstructive or cosmetic surgery. |

| Exclusions GA-00-2209.00 | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |

## BEREAVEMENT AND TRAUMA COUNSELING BENEFIT

We will pay counseling sessions, up to the Maximum Benefit Amount shown in the *Schedule of Benefits* and subject to the following conditions and exclusions, when the Covered Person or Immediate Family Member requires bereavement and trauma counseling because the Covered Person suffered a Covered Loss that resulted directly and independently of all other causes from a Covered Accident. Such counseling must meet all of the following conditions:

1. covered bereavement and trauma counseling expenses must be incurred within one year from the date of the Covered Accident causing the Covered Loss;
2. the expense is charged for a bereavement or trauma counseling session for the Covered Person or one or more of his Immediate Family Members;
3. counseling is provided under the care, supervision or order of a Physician;
4. a charge would have been made if no insurance existed.

| Definitions | For purposes of this benefit: |
|---|---|
| | **Immediate Family Member** means a person who is related to the Covered Person in any of the following ways:  Spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister) or child (includes legally adopted child or stepchild). |

| Exclusions | Covered bereavement and trauma counseling benefits do not include any expense for which the Covered Person is entitled to benefits under any Workers' Compensation Act or similar law. |
|---|---|
| GA-00-2214.00 | Other exclusions that apply to this benefit are in the *Common Exclusions* Section. |

## CHILD CARE CENTER BENEFIT

We will pay benefits shown in the *Schedule of Benefits* for the care of each surviving Dependent Child in a Child Care Center if death of the covered Employee results directly and independently of all other causes from a Covered Accident and all of the following conditions are met:

1. coverage for his Dependent Children was in force on the date of the Covered Accident causing his death; and
2. one or more surviving Dependent Children is under Age 13 and;
   a. was enrolled in a Child Care Center on the date of the Covered Accident; or
   b. enrolls in a Child Care Center within 90 days from the date of the Covered Accident.

This benefit will be payable to the Surviving Spouse if the Spouse has custody of the child. If the Surviving Spouse does not have custody of the child, benefits will be paid to the child's legally appointed guardian. Payments will be made at the end of each 12 month period that begins after the date of the covered Employee's death. A claim must be submitted to Us at the end of each 12 month period. A 12 month period begins:

1. when the Dependent Child enters a Child Care Center for the first time, within the period specified in (2b) above, after the covered Employee's death; or
2. on the first of the month following the covered Employee's death, if the Dependent Child was enrolled in a Child Care Center before the covered Employee's death.

Each succeeding 12 month period begins on the day immediately following the last day of the preceding period. Pro rata payments will be made for periods of enrollment in a Child Care Center of less than 12 months.

28

AR0038

60

Definitions

For purposes of this benefit:
*Child Care Center* is a facility which:
1. is licensed and run according to laws and regulations applicable to child care facilities; and
2. provides care and supervision for children in a group setting on a regular, daily basis.
A Child Care Center does not include any of the following:
1. a Hospital;
2. the child's home;
3. care provided during normal school hours while a child is attending grades one through twelve.

Exclusions
GA-00-2222.00

The exclusions that apply to this benefit are in the *Common Exclusions* Section.

## COMMON ACCIDENT BENEFIT

We will increase the Loss of Life benefit payable for the covered Spouse to 100% of the Employee's Principal Sum if both the Employee and the covered Spouse die directly and independently of all other causes from a Common Accident and are survived by one or more Dependent Children.

Definition

For purposes of this benefit:
*Common Accident* means the same Covered Accident or separate Covered Accidents that occur within the same 24-hour period.

Exclusions
GA-00-2224.00

The exclusions that apply to this benefit are in the *Common Exclusions* Section.

## ELDER SURVIVOR BENEFIT

We will pay benefits to a Surviving Elder Dependent if death of the Covered Person results directly and independently of all other causes from a Covered Accident. Lump sums will be in amounts specified in the *Schedule of Benefits*.

The lump sum benefit will be payable in one payment when We receive due proof of the death of the Covered Person.

Benefit amounts will be divided equally among all Surviving Elder Dependents. Benefits for any Surviving Elder Dependent will be paid until that Surviving Elder Dependent's death.

If there is no Surviving Elder Dependent eligible for this benefit within 365 days after the date of the Covered Person's death, We will pay a one-time default benefit to the Covered Person's beneficiary.

Definition

For purposes of this benefit:
Surviving Elder Dependent means a parent, parent-in-law, grandparent, grandparent-in-law, great-grandparent, great-grandparent-in-law (whether natural, step or adoptive) of a Covered Person who, on the date of his death, is primarily dependent on the Covered Person for support and maintenance and is eligible to be claimed as a dependent for Federal and State income tax purposes.

Exclusions
GA-00-2228.00

The exclusions that apply to this benefit are in the *Common Exclusions* Section.

## HIV OCCUPATIONAL ACCIDENT BENEFIT

We will pay the benefit shown in the *Schedule of Benefits,* subject to the following conditions and exclusions, when the covered Employee suffers a Covered Injury resulting, directly and independently of all other causes, from a Covered Accident. Such Covered Accident must occur during the performance of Occupational Duties and result in the covered Employee acquiring and testing positive for Human Immunodeficiency Virus (HIV) antibodies within one year of the Covered Injury.

29

AR0039

61

## REHABILITATION BENEFIT

We will pay the Rehabilitation Benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the Covered Person requires rehabilitation after sustaining a Covered Loss resulting directly and independently of all other causes from a Covered Accident.

The Covered Person must require Rehabilitation within two years after the date of the Covered Loss.

Definition     For purposes of this benefit:

Rehabilitation means medical services, supplies, or treatment, or Hospital confinement (or part of a Hospital confinement) that satisfies all of the following conditions:

1. are essential for physical rehabilitation required due to the Covered Person's Covered Loss;
2. meet generally accepted standards of medical practice;
3. are performed under the care, supervision or order of a Physician;
4. prepare the Covered Person to return to his or any other occupation.

Exclusions     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2248.00

## SEATBELT BENEFIT

We will pay the benefit shown in the *Schedule of Benefits*, subject to the conditions and exclusions described below, when the Covered Person dies directly and independently of all other causes from a Covered Accident while wearing a seatbelt and operating or riding as a passenger in an Automobile.

Verification of proper use of the seatbelt at the time of the Covered Accident must be a part of an official police report of the Covered Accident or be certified, in writing, by the investigating officer(s) and submitted with the Covered Person's claim to Us.

If such certification or police report is not available or it is unclear whether the Covered Person was wearing a seatbelt, We will pay a default benefit shown in the *Schedule of Benefits* to the Covered Person's beneficiary.

In the case of a child, seatbelt means a child restraint, as required by state law and approved by the National Highway Traffic Safety Administration, properly secured and being used as recommended by its manufacturer for children of like Age and weight at the time of the Covered Accident.

Definitions     For purposes of this benefit:

Automobile means a self-propelled, private passenger motor vehicle with four or more wheels which is a type both designed and required to be licensed for use on the highway of any state or country. Automobile includes, but is not limited to, a sedan, station wagon, sport utility vehicle, or a motor vehicle of the pickup, van, camper, or motor-home type. Automobile does not include a mobile home or any motor vehicle which is used in mass or public transit.

Exclusions     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2251.00

## SPECIAL EDUCATION BENEFIT

We will pay the benefit, up to the Maximum Benefit shown in the *Schedule of Benefits*, for each qualifying Dependent Child who is insured under the covered Employee's certificate on the date he dies or has been Totally Disabled during the Benefit Waiting Period for Permanent Total Disability benefits. The Covered Person's death must result, directly and independently of all other causes from a Covered Accident for which an Accidental Death Benefit is payable under this Policy. This benefit is subject to the conditions and exclusions described below.

32

AR0040

62

A qualifying Dependent Child must:

1.
   a.  be enrolled as a full-time student in an accredited school or higher learning beyond the 12th grade level on the date of the covered Employee's Covered Accident; or
   b.  be at the 12th grade level on the date of the covered Employee's Covered Accident and then enroll as a full-time student at an accredited school of higher learning within 365 days from the date of the Covered Accident and continue his education as a full-time student.

2.  continue his education as a full-time student in such accredited school of higher learning; and

3.  incur expenses for tuition, fees, books, room and board, transportation and any other costs payable directly to, or approved and certified by, such school.

Payments will be made to each qualifying Dependent Child or to the child's legal guardian, if the child is a minor at the end of each year for the number of years shown in the *Schedule of Benefits*. We must receive proof satisfactory to Us of the Dependent Child's enrollment and attendance within 31 days of the end of each year. The first year for which a Special Education Benefit is payable will begin on the first of the month following the date the covered Employee died or completed the Benefit Waiting Period for Permanent Total Disability benefits, if the surviving Dependent Child was enrolled on that date in an accredited school of higher learning beyond the 12th grade; otherwise on the date he enrolls in such school. Each succeeding year for which benefits are payable will begin on the date following the end of the preceding year.

If no Dependent Child qualifies for Special Education Benefits within 365 days of the covered Employee's death or completion of the Benefit Waiting Period for Permanent Total Disability benefits, We will pay the default benefit shown in the *Schedule of Benefits* to the covered Employee's beneficiary.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
**GA-00-2252.00**

## SPOUSE RETRAINING BENEFIT

We will pay expenses incurred, as described below, up to the Maximum Benefit shown in the *Schedule of Benefits*, to enable the covered Employee's Spouse to obtain occupational or educational training needed for employment if the covered Employee dies directly and independently of all other causes from a Covered Accident. A covered Spouse must have been insured under this Policy on the date of the covered Employee's death to be eligible for this benefit. This benefit is subject to the conditions and exclusions described below.

This benefit will be payable if the covered Employee dies within one year of a Covered Accident and is survived by his Spouse who:

1.  enrolls, within three years after the covered Employee's death in any accredited school for the purpose of retraining or refreshing skills needed for employment; and

2.  incurs expenses payable directly to, or approved and certified by, such school.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
**GA-00-2254.00**

33

AR0041

63

| Definitions | For purposes of this benefit: |
| --- | --- |
| | **Disfigurement** or **Disfigured** means spoiled or deformed appearance that can be corrected by means of reconstructive or cosmetic surgery. |

| Exclusions GA-00-2209.00 | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
| --- | --- |

## BEREAVEMENT AND TRAUMA COUNSELING BENEFIT

We will pay counseling sessions, up to the Maximum Benefit Amount shown in the *Schedule of Benefits* and subject to the following conditions and exclusions, when the Covered Person or Immediate Family Member requires bereavement and trauma counseling because the Covered Person suffered a Covered Loss that resulted directly and independently of all other causes from a Covered Accident. Such counseling must meet all of the following conditions:

1. covered bereavement and trauma counseling expenses must be incurred within one year from the date of the Covered Accident causing the Covered Loss;
2. the expense is charged for a bereavement or trauma counseling session for the Covered Person or one or more of his Immediate Family Members;
3. counseling is provided under the care, supervision or order of a Physician;
4. a charge would have been made if no insurance existed.

| Definitions | For purposes of this benefit: |
| --- | --- |
| | **Immediate Family Member** means a person who is related to the Covered Person in any of the following ways: Spouse, brother-in-law, sister-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister) or child (includes legally adopted child or stepchild). |

| Exclusions | Covered bereavement and trauma counseling benefits do not include any expense for which the Covered Person is entitled to benefits under any Workers' Compensation Act or similar law. |
| --- | --- |
| | Other exclusions that apply to this benefit are in the *Common Exclusions* Section. |

GA-00-2214.00

## CHILD CARE CENTER BENEFIT

We will pay benefits shown in the *Schedule of Benefits* for the care of each surviving Dependent Child in a Child Care Center if death of the covered Employee results directly and independently of all other causes from a Covered Accident and all of the following conditions are met:

1. coverage for his Dependent Children was in force on the date of the Covered Accident causing his death; and
2. one or more surviving Dependent Children is under Age 13 and:
   a. was enrolled in a Child Care Center on the date of the Covered Accident; or
   b. enrolls in a Child Care Center within 90 days from the date of the Covered Accident.

This benefit will be payable to the Surviving Spouse if the Spouse has custody of the child. If the Surviving Spouse does not have custody of the child, benefits will be paid to the child's legally appointed guardian. Payments will be made at the end of each 12 month period that begins after the date of the covered Employee's death. A claim must be submitted to Us at the end of each 12 month period. A 12 month period begins:

1. when the Dependent Child enters a Child Care Center for the first time, within the period specified in (2b) above, after the covered Employee's death; or
2. on the first of the month following the covered Employee's death, if the Dependent Child was enrolled in a Child Care Center before the covered Employee's death.

Each succeeding 12 month period begins on the day immediately following the last day of the preceding period. Pro rata payments will be made for periods of enrollment in a Child Care Center of less than 12 months.

28

AR0042

64

| Definitions | For purposes of this benefit: |
|---|---|

Child Care Center is a facility which:
1. is licensed and run according to laws and regulations applicable to child care facilities; and
2. provides care and supervision for children in a group setting on a regular, daily basis.

A Child Care Center does not include any of the following:
1. a Hospital;
2. the child's home;
3. care provided during normal school hours while a child is attending grades one through twelve.

| Exclusions | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
|---|---|
| GA-00-2222.00 | |

## COMMON ACCIDENT BENEFIT

We will increase the Loss of Life benefit payable for the covered Spouse to 100% of the Employee's Principal Sum if both the Employee and the covered Spouse die directly and independently of all other causes from a Common Accident and are survived by one or more Dependent Children.

| Definition | For purposes of this benefit: |
|---|---|

Common Accident means the same Covered Accident or separate Covered Accidents that occur within the same 24-hour period.

| Exclusions | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
|---|---|
| GA-00-2224.00 | |

## ELDER SURVIVOR BENEFIT

We will pay benefits to a Surviving Elder Dependent if death of the Covered Person results directly and independently of all other causes from a Covered Accident. Lump sums will be in amounts specified in the *Schedule of Benefits*.

The lump sum benefit will be payable in one payment when We receive due proof of the death of the Covered Person.

Benefit amounts will be divided equally among all Surviving Elder Dependents. Benefits for any Surviving Elder Dependent will be paid until that Surviving Elder Dependent's death.

If there is no Surviving Elder Dependent eligible for this benefit within 365 days after the date of the Covered Person's death, We will pay a one-time default benefit to the Covered Person's beneficiary.

| Definition | For purposes of this benefit: |
|---|---|

Surviving Elder Dependent means a parent, parent-in-law, grandparent, grandparent-in-law, great-grandparent, great-grandparent-in-law (whether natural, step or adoptive) of a Covered Person who, on the date of his death, is primarily dependent on the Covered Person for support and maintenance and is eligible to be claimed as a dependent for Federal and State income tax purposes.

| Exclusions | The exclusions that apply to this benefit are in the *Common Exclusions* Section. |
|---|---|
| GA-00-2228.00 | |

## HIV OCCUPATIONAL ACCIDENT BENEFIT

We will pay the benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the covered Employee suffers a Covered Injury resulting, directly and independently of all other causes, from a Covered Accident. Such Covered Accident must occur during the performance of Occupational Duties and result in the covered Employee acquiring and testing positive for Human Immunodeficiency Virus (HIV) antibodies within one year of the Covered Injury.

29

AR0043

In order to receive this benefit, the covered Employee must satisfy all of the following:
1. submit a Workers' Compensation Injury report to the Subscriber within 48 hours of the Covered Accident that occurs during the performance of Occupational Duties;
2. test negative for Human Immunodeficiency Virus (HIV) antibodies within 48 hours of such Covered Accident;
3. test positive for Human Immunodeficiency Virus (HIV) antibodies in a subsequent Blood Test within one year of the date of the Covered Accident.

**Definitions**    For purposes of this benefit:

Occupational Duties means the performance of normal work duties on behalf of the Subscriber.

HIV means Human Immunodeficiency Virus, a virus that infects lymphocytes and other cells bearing the CD4 marker, the initial infection of which is known as acute retro viral syndrome.

Blood Test means a positive (reactive) Enzyme-linked Immunosorbent Assay (ELISA) test, confirmed by the Western Blot Test, or other tests that may be approved by the Centers for Disease Control and Prevention and accepted by Us.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2235.00

## HOME ALTERATION AND VEHICLE MODIFICATION BENEFIT

We will pay the Home Alteration and Vehicle Modification Benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the Covered Person suffers a Covered Loss, other than a Loss of Life, resulting directly and independently of all other causes from a Covered Accident.

This benefit will be payable if all of the following conditions are met:
1. prior to the date of the Covered Accident causing such Covered Loss, the Covered Person did not require the use of any adaptive devices or adaptation of residence and/or vehicle;
2. as a direct result of such Covered Loss, the Covered Person now requires such adaptive devices or adaptation of residence and/or vehicle to maintain an independent lifestyle;
3. the Covered Person requires home alteration or vehicle modification within one year of the date of the Covered Accident.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2236.00

## HOSPITAL STAY BENEFIT

We will pay the daily benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, if the Covered Person requires a Hospital Stay due to a Covered Loss resulting directly and independently of all other causes from a Covered Accident.

The Hospital Stay must meet all of the following:
1. be at the direction and under the care of a Physician;
2. begin within 30 days of the Covered Accident;
3. begin while the Covered Person's insurance is in effect.

The benefit will be paid for each day of a continuous Hospital Stay that continues after the end of the Benefit Waiting Period as shown in the *Schedule of Benefits*. Benefits will be paid retroactively to the first day of the Hospital Stay.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2237.00

## INCREASED DEPENDENT CHILD DISMEMBERMENT BENEFIT

We will pay an additional benefit if a covered Dependent Child sustains a Covered Loss resulting, directly and independently of all other causes, from a Covered Accident for which Accidental Dismemberment benefits are payable under this Policy.

AR0044

66

If the covered Dependent Child sustains more than one Covered Loss as a result of the Covered Accident, the Increased Dependent Child Benefit will be calculated based on the Covered Loss for which the largest available Accidental Dismemberment Benefit is payable.

If the covered Dependent Child dies within 365 days of the same Covered Accident, the Loss of Life benefit under the Accidental Death and Dismemberment Benefit will not be reduced by the dismemberment benefit received under the Increased Dependent Child Dismemberment Benefit.

**Exclusions**     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2239.00

**PERMANENT TOTAL DISABILITY BENEFIT – For Employees Only**
We will pay Permanent Total Disability Benefits, as shown in the *Schedule of Benefits*, to a covered Employee whose Total Disability results, directly and independently of all other causes from, and within 180 days of, a Covered Accident. To qualify for benefits, the covered Employee must remain Totally Permanently Disabled during the Benefit Waiting Period shown in the *Schedule of Benefits* and at the end of the Benefit Waiting Period, must be expected to remain so disabled, as certified by a Physician, for the rest of his life.

We will pay a single lump sum benefit equal to the Lump Sum Benefit shown in the *Schedule of Benefits* less any Accidental Dismemberment benefit paid for the Covered Loss causing the Total Disability.

**Exclusions**     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2244.00

**PERMANENT TOTAL DISABILITY BENEFIT – For Spouses Only**
We will pay Permanent Total Disability Benefits, as shown in the *Schedule of Benefits*, to a covered Spouse whose Total Disability results, directly and independently of all other causes from, and within 180 days of, a Covered Accident. To qualify for benefits, the covered Spouse must remain Totally Permanently Disabled during the Benefit Waiting Period shown in the *Schedule of Benefits* and at the end of the Benefit Waiting Period, must be expected to remain so disabled, as certified by a Physician, for the rest of his life.

We will pay monthly benefits as shown in the *Schedule of Benefits* beginning at the end of the Benefit Waiting Period. Monthly benefit payments will be paid until the earliest of the following occurs:
1.  the covered Spouse fails to provide certification by a Physician that he is expected to remain Totally Disabled for the rest of his life; or
2.  the covered Spouse dies; or
3.  the total of all monthly benefits equals the Principal Sum less any Accidental Dismemberment benefits paid for Covered Losses sustained in the same Covered Accident.

If the covered Spouse dies before receiving the total of benefits specified in (3.) above, a single payment equal to the remaining payments that would have been paid will be made to his beneficiary.

**Exclusions**     The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2244.00

31

AR0045

**67**

**REHABILITATION BENEFIT**
We will pay the Rehabilitation Benefit shown in the *Schedule of Benefits*, subject to the following conditions and exclusions, when the Covered Person requires rehabilitation after sustaining a Covered Loss resulting directly and independently of all other causes from a Covered Accident.

The Covered Person must require Rehabilitation within two years after the date of the Covered Loss.

| Definition | For purposes of this benefit: |
|---|---|

Rehabilitation means medical services, supplies, or treatment, or Hospital confinement (or part of a Hospital confinement) that satisfies all of the following conditions:

1.  are essential for physical rehabilitation required due to the Covered Person's Covered Loss;
2.  meet generally accepted standards of medical practice;
3.  are performed under the care, supervision or order of a Physician;
4.  prepare the Covered Person to return to his or any other occupation.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2248.00

**SEATBELT BENEFIT**
We will pay the benefit shown in the *Schedule of Benefits*, subject to the conditions and exclusions described below, when the Covered Person dies directly and independently of all other causes from a Covered Accident while wearing a seatbelt and operating or riding as a passenger in an Automobile.

Verification of proper use of the seatbelt at the time of the Covered Accident must be a part of an official police report of the Covered Accident or be certified, in writing, by the investigating officer(s) and submitted with the Covered Person's claim to Us.

If such certification or police report is not available or it is unclear whether the Covered Person was wearing a seatbelt, We will pay a default benefit shown in the *Schedule of Benefits* to the Covered Person's beneficiary.

In the case of a child, seatbelt means a child restraint, as required by state law and approved by the National Highway Traffic Safety Administration, properly secured and being used as recommended by its manufacturer for children of like Age and weight at the time of the Covered Accident.

**Definitions**    For purposes of this benefit:
Automobile means a self-propelled, private passenger motor vehicle with four or more wheels which is a type both designed and required to be licensed for use on the highway of any state or country. Automobile includes, but is not limited to, a sedan, station wagon, sport utility vehicle, or a motor vehicle of the pickup, van, camper, or motor-home type. Automobile does not include a mobile home or any motor vehicle which is used in mass or public transit.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2251.00

**SPECIAL EDUCATION BENEFIT**
We will pay the benefit, up to the Maximum Benefit shown in the *Schedule of Benefits*, for each qualifying Dependent Child who is insured under the covered Employee's certificate on the date he dies or has been Totally Disabled during the Benefit Waiting Period for Permanent Total Disability benefits. The Covered Person's death must result, directly and independently of all other causes from a Covered Accident for which an Accidental Death Benefit is payable under this Policy. This benefit is subject to the conditions and exclusions described below.

32

AR0046

68

A qualifying Dependent Child must:

1.
    a.   be enrolled as a full-time student in an accredited school of higher learning beyond the 12th grade level on the date of the covered Employee's Covered Accident; or

    b.   be at the 12th grade level on the date of the covered Employee's Covered Accident and then enroll as a full-time student at an accredited school of higher learning within 365 days from the date of the Covered Accident and continue his education as a full-time student.

2.    continue his education as a full-time student in such accredited school of higher learning; and

3.    incur expenses for tuition, fees, books, room and board, transportation and any other costs payable directly to, or approved and certified by, such school.

Payments will be made to each qualifying Dependent Child or to the child's legal guardian, if the child is a minor at the end of each year for the number of years shown in the *Schedule of Benefits*. We must receive proof satisfactory to Us of the Dependent Child's enrollment and attendance within 31 days of the end of each year. The first year for which a Special Education Benefit is payable will begin on the first of the month following the date the covered Employee died or completed the Benefit Waiting Period for Permanent Total Disability benefits, if the surviving Dependent Child was enrolled on that date in an accredited school of higher learning beyond the 12th grade; otherwise on the date he enrolls in such school. Each succeeding year for which benefits are payable will begin on the date following the end of the preceding year.

If no Dependent Child qualifies for Special Education Benefits within 365 days of the covered Employee's death or completion of the Benefit Waiting Period for Permanent Total Disability benefits, We will pay the default benefit shown in the *Schedule of Benefits* to the covered Employee's beneficiary.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2252.00

## SPOUSE RETRAINING BENEFIT

We will pay expenses incurred, as described below, up to the Maximum Benefit shown in the *Schedule of Benefits*, to enable the covered Employee's Spouse to obtain occupational or educational training needed for employment if the covered Employee dies directly and independently of all other causes from a Covered Accident. A covered Spouse must have been insured under this Policy on the date of the covered Employee's death to be eligible for this benefit. This benefit is subject to the conditions and exclusions described below.

This benefit will be payable if the covered Employee dies within one year of a Covered Accident and is survived by his Spouse who:

1.    enrolls, within three years after the covered Employee's death in any accredited school for the purpose of retraining or refreshing skills needed for employment; and

2.    incurs expenses payable directly to, or approved and certified by, such school.

**Exclusions**    The exclusions that apply to this benefit are in the *Common Exclusions* Section.
GA-00-2254.00

AR0047

**69**

Brian Billeter
Accident Claims Manager
Accident & Specialty Claims Department

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

March 24, 2005

Kelly Roarty
319 Palomino Drive
Newark, DE 19711

**Insured Name:**          **Daniel R. Roarty**
**Date of Birth:**          **4/5/61**
**Policy Number:**          **ABL 661690**
**Underwriting Company:**   **Life Insurance Company of North America**

Dear Mrs. Roarty:

I am writing to you regarding the appeal of Mr. Roarty's Business Travel Accident benefits under the above captioned Life Insurance Company of North America (LINA) business travel accident insurance policy ("Policy"). I reviewed your letter of appeal of our initial claim denial, which was received in our office on February 15, 2005. After review of the additional information provided, we maintain our initial position that no accidental death benefits are due.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions. A copy of these policy provisions was enclosed with our initial denial letter dated December 17, 2004. In order to be eligible for benefits, you must satisfy the policy provisions as stated below.

**Policy Provision**

The Tyco, International policy states:

*"Scope of Coverage* – In exchange for the payment of premiums, we agree to pay benefits to all eligible persons:

   a)  who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
   b)  who, as a direct result of the injuries, and from no other cause, suffer a covered loss.

*Schedule IV Hazards Insured Against*

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

   a)  away from your premises in his city of permanent assignment, and
   b)  on business for you, and in the course of your business.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

All such trips must be authorized by you."

**Evidence Evaluated**

I have reviewed the claim file as a whole, including the following documents, in making this determination:

- Group/Association Proof of Loss form.
- Commonwealth of Pennsylvania Certificate of Death.
- Police Crash Reporting Form.
- Letter from Nicole Gibian, Human Resources, Tyco International.
- Telephone conversation with Felicia Johnson at Tyco International.
- Our initial denial letter dated December 17, 2004.
- Your letter of appeal received in our office February 15, 2005, along with e-mail chains from Tyco.
- Business Travel Accident policy ABL 661690, business travel accident benefits through Tyco International.

**Summary of Evidence**

According to the information reviewed, on August 8, 2004, Daniel Roarty died as a result of injuries suffered in a motor vehicle accident. The police incident report indicated that a driver of a truck failed to stop at a stop sign, and struck Mr. Roarty's minivan, causing injuries to Mr. Roarty and his three children, all of whom were in the minivan. Mr. Roarty was not at fault in this accident.

Tyco International has verified on several occasions that Mr. Roarty was not on business travel at the time of his death, through both a letter from Nicole Gibian and our telephone conversations with Felicia Johnson, both of whom are with Tyco International Human Resources. Based upon this assertion, Mr. Roarty's claim for Business Travel Accident Benefits was denied on December 17, 2004.

You have appealed our December 17, 2004 decision, asserting that Mr. Roarty was on business travel at the time of his death. Specifically, you have indicated that Mr. Roarty, as of August 2, 2004, was on his way to Pittsburgh from your home in Delaware for both a family vacation and to visit with a customer, Bacharach, regarding some difficulties that Tyco was having with Bacharach. You have further asserted that you took a separate automobile from Mr. Roarty so that he would have the ability to travel independently once he arrived in Pittsburgh for vacation, because he was unsure as to how much time would be required to resolve business issues with Bacharach.

When Mr. Roarty arrived in Pittsburgh he was unable to meet with Bacharach due to changes in their production personnel. However, issues with Bacharach were resolved during a series of telephone calls on August 3rd or 4th, 2004. During Mr. Roarty's return trip from Pittsburgh back to Delaware, he was involved in a fatal motor vehicle accident on August 8, 2004.

Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

## Summary

Based upon the information provided above, there is not sufficient support for finding that Mr. Roarty was engaged in business travel at the time of his accident. It appears that Mr. Roarty resolved the issues with Bacharach in a series of phone calls during August 3rd and 4th. There is no indication that Mr. Roarty traveled whatsoever with regard to the customer, Bacharach, and every indication that he was engaged in travel as part of his vacation. As the side trip to visit a customer had been cancelled, the only trip Mr. Roarty took related to his vacation, clearly not on the business of his employer. This policy pays benefits for loss which occurs while on an authorized business trip as indicated above. As Mr. Roarty was on vacation, and not on an authorized business trip, at the time of his death, no benefits are payable under policy ABL 661690.

Nothing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein. Please be advised that you have exhausted your administrative remedies under this policy. No further appeals will be considered.

We encourage you to either contact the Tyco International's employee benefits department or review the insurance booklet, certificate or coverage information made available to you, to determine if you are eligible for additional benefits.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3249 from 7:30 a.m. to 4:00 p.m. Eastern Time, Monday through Friday. If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Brian Billeter*

Brian Billeter

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

**72**

# *Interoffice Memo*



**CIGNA**

| | |
|---|---|
| **Date :** | March 21, 2005 |
| **To :** | Robert Killmer,  FCO Pittsburgh |
| **From :** | Marian A. Luongo, Esq., Group Litigation Dept. TL48G |
| **Telephone :** | 215-761-1981 |
| **Facsimile :** | 215-761-5512 |
| **Subject :** | Daniel Roarty-Tyco International |

**Attorney Client Communication**
**Privileged and Confidential**

You have inquired whether the Insured was engaged in a personal deviation and was therefore not covered under a group business accident policy, issued to his employer, when he was killed in a motor vehicle accident while on vacation. This policy is governed by ERISA. The Insured was a resident of Delaware, and we have looked primarily to the federal common law of ERISA as decided in the Third Circuit in considering this claim. The benefit amount is $500,000.

## Background

Tyco sponsors a program of employee benefits that includes a death benefit for its employees who die accidentally while traveling with Tyco's authorization and on its business. Daniel Roarty was a Tyco employee and participated in this benefit plan. The file materials indicate that Mr. Roarty apparently was a Senior Product Manager for Tyco. We note the February 12, 2005 letter from Kelly Roarty, the Insured's spouse, that outlines a narrative with regard to the Insured's August 2004 Newark, DE to Pittsburgh, PA trip, and return. For the purposes of the appeal, we take Ms. Roarty's narrative in its most favorable light.

Ms. Roarty advises that the Insured had traveled to Pittsburgh for vacation. We note her confirmation of this fact by the Insured's July 30, 2004 email, which she attached to her February 12th letter. In the July 30th email, among other things Mr. Roarty writes: "I will be in Pittsburgh next week on vacation." According to Ms. Roarty, the Insured drove to Pittsburgh separately so that he would be able to visit the customer site without inconveniencing his family. While en route, circumstances at the customer's site made a planned August 3, 2004 meeting became not feasible and the Insured resolved the issue by telephone over August 3 and 4, 2004. We assume that with the resolution of the problem, the Insured returned to his vacation. On or about August 8, 2004, the Insured was returning home from Pittsburgh when he was killed in a motor vehicle accident.

On December 15, 2004, Tyco advised in writing that: "Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death."

## Policy Language

We have been provided only limited portions of business accident policy No. ABL 6616890, while receiving a full copy of group accident policy No. OK 826564. The business accident policy contains the following provisions:

March 21, 2005
Page 2

**THIS IS AN ACCIDENT ONLY POLICY.**
**IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS.**
**THIS IS A LIMITED POLICY.**
**READ IT CAREFULLY.**

**Scope of Coverage** – In exchange for the payment of premiums (as set forth in Schedule III), we agree to pay benefits to all eligible persons (as defined in Schedule I):
   a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
   b) who, as a direct result of the injuries, and no other cause, suffers a covered loss (as defined in the Description of Coverage).
This coverage is subject to the exclusions shown on a later page, and to all of the other terms of this policy. This is an accident only policy. It does not pay benefits for lass caused by sickness. Read your policy with care.

**SCHEDULE IV**
**HAZARDS INSURED AGAINST**

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for my accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
   a) away from your premises in his city of permanent assignment; and
   b) on business for you, and in the course of your business.
All such trips must be authorized by you.

*This coverage does not include:*
   a) commuting between the covered person's home and place of work; or
   b) during personal deviations made by the covered person.
"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:
   a) arrives at his home or place of work, whichever happens first; or
   b) makes a personal deviation.
If a covered person travels to another city, and is expected to remain there for mare than 60 days, this shall be deemed a change in his city of permanent assignment.

We do not have the General Provisions, including the claim provisions, for the business accident policy, and note the following provision of the group accident policy.

**CLAIM PROVISIONS**

March 21, 2005
Page 3

## Proof of Loss

... The Plan Administrator of the employer's employee welfare benefit plan (the Plan) as appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The [sic] Plan to the full extent permitted by law. ...

## <u>Analysis</u>

We begin our consideration of the legal issues presented by this claim by noting that the claim presents facts that are the inverse of those typical made against a business travel accident policy. Ordinarily, the insured is traveling on behalf of his employer and makes a side trip for personal reasons, often called a "personal diversion or deviation. At issue is whether the insured remains covered should he die while still in the midst of the side trip, or after he returns to his original travel path. This claim presents exactly the opposite.

The Insured had intended to travel to Pittsburgh from Newark, Delaware for purposes of a vacation before any perceived need to meet with the Western Pennsylvania-based customer arose. As his vacation neared, the Insured announced that he intended to meet with the customer while in Pittsburgh on his vacation. Here then, the side trip is the alleged business travel and the trip from Newark, Delaware to Pittsburgh and return was the original and principal travel path. We apply the Policy language quoted above to characterize the Newark-Pittsburgh trip as personal deviation and any trip to the customer site as a trip that potentially could have been business related.

In fact there never was a trip that might be characterized as a "business trip." Regardless whether Mr. Roarty intended a side trip from his vacation to meet with the customer, in fact the customer had no time to meet with him. Mr. Roarty resolved the issue in what appear to have been a series of telephone calls over August 3 and 4, 2004. There is no indication that Mr. Roarty traveled whatsoever with regard to the customer, and every indication that he was engaged in travel as part of his vacation. We note that he was killed in a motor vehicle accident near Lancaster, Pennsylvania on his return from his vacation. The side trip to see the customer having been cancelled, the only trip that Mr. Roarty took related to his vacation, clearly not on the business of his employer. In light of these facts, the employer's statement that it did not authorize Mr. Roarty's trip as part of its business makes ample sense.

Considering the somewhat unique factual setting, our research has disclosed no case directly on point but several that are helpful. In *McGrath v. Home Ins. Co.*, 813 F. Supp. 276 (D. Del. 1993), an ERISA case, the insured was killed by a truck when he was riding his bicycle in a charity fund raising event as part of his employer's corporate cycling team. The court noted numerous ways in which the employer took public and internal credit for this activity but noted that no one testified that anyone cycling for the employer considered himself to be on business travel. *Id.* at 279. No one asked for employer authorization to participate nor did the employer request anyone to do so. The court upheld the Policy's provisions as clear and unambiguous, concluding that there was no evidence that the insured was traveling "on assignment or at the direction of" his employer. Coupled with evidence that confirmed this, the court concluded that the insured's accidental death fell outside the scope of coverage.

March 21, 2005
Page 4

*Garber v. Provident Life and Accident Ins. Co.*, 1999 U.S. App. LEXIS 11280 (6th Cir. 1999), also an ERISA case, provides an example where coverage existed because the employer did authorize a personal deviation. The insured made a trip from California to Chicago on business. With his employer's approval, he routed his return through Pittsburgh and Akron-Canton in order to see his parents. The plane crashed while in flight from Chicago to Pittsburgh, and the insured was killed. The insurer declined coverage on the grounds that the insured was not engaged in business travel at the time of his death, making an argument that each section of the trip should separately be characterized by purpose and contending that the discrete portion of travel when the insured time was beyond the scope of coverage. The policy specifically excluded travel during "vacation."

The court concluded that the *Garber* insured's side trip was akin to a planned stop over at an airport between flights to meet friends, and could not constitute a vacation, considering its brevity. In an aside, the court agreed that if the insured would have abandoned his trip if he had stopped his travel for a week of skiing. At most, the court concluded, had the insured reached Canton (and his parents), his vacation might have begun, but it had not begun while he remained in transit.

We conclude from these cases that two factors are critical. First, the employer must have authorized (or at least not have refused to authorize) the travel in which the insured was engaged. Second, the employee must have intended that his trip be to the benefit of his employer – either in whole or in part. We take the position that the facts of this claim support neither factor. Mr. Roarty's employer states that it did not authorize him to travel to Pittsburgh or from there to the customer on its behalf. Next, after Mr. Roarty learned that there would be no trip to the customer, his only purpose to continue to Pittsburgh was his vacation. The conclusion that we reach is that he died while on vacation, an event not covered by the Policy.

We suggest therefore that the FCO consider denying the claim. If there are questions or we can be of other help, please let me know.

N. Biggs
K. Fortune
D. Mabilog

CC:



**CIGNA** Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 11, 2005
Time: 12:44 PM

In / Out
Incoming: Felicia Johnson          Relationship to Insured: HR @ ER
   Phone Number: 800-600-6641 ext. 3944

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

She called me regarding my request for confirmation that Mr. Roarty was not on an approved business trip at the time of his automobile crash and death. She stated again that Mr. Roarty was not on business travel at that time. However, she stated that she has contacted the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident. She stated that I should expect to receive that letter within the next week or so.



Robert Killmer



**CIGNA** Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 1, 2005
Time: 8:29 AM

In / Out
 Outgoing: Felicia Johnson                 Relationship to Insured: HR @
ER
   Phone Number: 800-600-6641 ext. 3944

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

I called her to verify that Tyco continues to maintain that Daniel Roarty was not on a company authorized business trip at the time of the claimed accident. I reached her voice mail. She is out of the office until 3/3. I left a message for a return call.



Robert Killmer

Roarty
319 Palomino Drive
Newark, DE 19711
302-292-8866
deroarty@msn.com
February 12, 2005

CIGNA Group Insurance
PO Box 22328
Pittsburgh, PA 15222-0328
Attn: Lynne George

RE: Policy Number:        ABL 661690
Underwriting Company:     Life Insurance Company of North America
Insured Name:             Daniel Roarty
Date of Birth:            04/05/1961
Date of Death:            08/08/04
Social Security Number:   189583764

PITTSBURGH

FEB 1 5 2005

GROUP LIFE & DISABILITY
BENEFITS OFFICE

Dear Ms. George:

Please be advised that this letter is to be considered an appeal to CIGNA's/TYCO's decision dated 12/17/04 denying my claim for the funds from the Business Travel Accident policy for my deceased husband, the insured, Daniel Roarty a TYCO/Scott Instruments employee.

Daniel Roarty was in fact returning from an authorized business trip when his vehicle was struck at an intersection, during which Dan sustained fatal blunt trauma injuries. Objective proof exists that a visit was required and authorized and details of the reason Dan's presence was required in Pittsburgh, also included is information indicating the immediacy of that need.

Please also be advised that efforts to reach Nicole Gibian, the Human Resources person who sent the letter to Cigna denying the claim based on the fact "Mr. Roarty was NOT on business travel," were unsuccessful. My sister-in-law, Janet Roarty, had hoped to reach her for clarification. Janet subsequently learned (02/07/05) that Nicole Gibian no longer worked for TYCO. And Nancy in Boca Raton, fielding Nicole's call, could not answer any of Janet's questions.

The following summarizes the basis for this appeal.

As the policy states, the policy applies if Dan was on a business trip and if that trip was "authorized." Below is a summary of documentation that describes the reasons Dan needed to travel to Pittsburgh. It is not clear why TYCO has stated that this was not an "authorized business trip," but it is likely that they were not aware of Dan's efforts at resolving a critical problem with Bacharach's sensor production.

AR0084



The first e-mail indicating there was a problem was dated June 29th, 2004 from Gabriel Farkas, PMP from AdvanTech Corporation asking Georgia Karagianis where his sensors are. (E-mail 1) (For ease of reference and to help eliminate confusion the e-mails have all been numbered and will be referred to by their number in this appeal).
E-mail (2) also dated June 29th details Georgia Karagianis response to her unhappy customer. E-mails 1 and 2 identify the problem the customer was having and Georgia Karagianis's immediate response. Tyco has an unhappy customer.

E-mail 3 indicates a partial solution to the problem.

E-mail 4 identifies that even though Georgia Karagianis has managed to find 7 sensors instead of the necessary 10, 7 sensors as TYCO customer Gabriel Farkas says in this e-mail "is almost identical to not having any because the job will not be completed and accepted by the owner." Not only has TYCO failed their customer; Advantech Corporation is now failing their customer.

E-mail 5 dated July 1, 2004 indicates that the sensors will not be ready until the end of July. Georgia Karagianis indicates to customer Gabriel Farkas that she is doing everything she can to remedy this problem and expedite shipment of the sensors.

E-mail 6 customer Gabriel Farkas tells Georgia Karagianis that it is nearly the end of July and he has no sensors.

E-mail 7 Lori Levangie tries to reassure both Georgia Karagianis and customer Gabriel Farkas that she is checking on the status of the delivery date for these sensors.

E-mail 8 dated July 28, 2004 indicates that customer George Farkas still has heard nothing and now it is four days later than e-mail 7.

E-mail 9, also dated July 28, 2004 indicates that Georgia Karagianis has been checking the status of these sensors with Lori Levangie daily and nothing has changed. The customer still does not have the sensors.

E-mail 10 customer Gabriel Farkas has reached his limit and suggests that Scott must not want their business or the New York City DEP's business by the poor way they have been treated.

E-mail 11 from Lori Levangie to National Sales Manager Trent Smith and Ron Unruh dated July 28th, 2004 indicates Lori Levangie has had no success in getting the sensors from Bacharach and is frustrated. The problem identified here is clearly with Bacharach.

E-mail 12 dated July 29, 2004 shows that now the National Sales Manager, Trent Smith is involved and he asks for a recap of the problem.

E-mail 13 dated July 29, 2004 recaps the problem with lack of sensors and Georgia Karagianis efforts at reaching the president of Bacharach. She also describes efforts to reach the Purchasing Agent and the Operations Manager. 351 pieces were owed to Scott

Instruments on 04/20/04. It is now July 29th and these sensors, 0051-1861 for CE130 have not arrived.

E-mail 14 dated July 29, 2004 Bob Bierzynski talks about implementing a more permanent but future solution for the spare sensors. He also mentions losing customers to competitors if they cannot offer a solution to the sensors problem. E-mail 14 is also significant because now Dan Roarty has been copied on the problem.

E-mail 15 dated July 29, 2004 from Georgia Karagianis details a request for a quote from a customer requesting 71 CE130 Transmitters

E-mail16 dated July 30, 2004 indicates that Lori Levangie has received yet another call from NYC DEP "threatening to throw us out," because they have not received the sensors.

E-mail 17 dated July 30,2004 shows that now Dan Roarty is involved. Dan has marshaled the forces of Ron Unruh and Bryon Gordon and through pulling the sensors out of other in stock items that use this same sensor and going through the other assemblies has managed to come up with about a dozen sensors. It also indicates that Dan had to make the decision as to where the greatest need for these sensors resided. The e-mail indicates Dan's appreciation for the team effort at temporarily solving this problem. And most importantly, the e-mail states "I will be in Pittsburgh next week on vacation. Regis (Wyse) is going to set up a day for me to go into the Bacharach plant and find out why the sensor is taking so long to build. I will let you know what I find." This all important e-mail was sent to: Lori Levangie, Jim Hampson and copied to Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob; Karagianis, Georgia; DeMeritt, Mary Anne; Franco, John; Levangie, Lori; Cherubin, Chris. Dan states his intention to visit Bacharach in Pittsburgh and has notified 10 people within the Scott Instruments/Scott Health and Safety/TYCO organization of his intent to visit Bacharach on his vacation.

E-mail 18 dated July 30, 2004 at 4:15 PM Dan e-mails Georgia Karagianis, Chris Cherubin and John Franco about his intent to visit Bacharach the following week. In this e-mail Dan is asking the sales reps to prioritize their customers needs. Dan states "We still need to come up with lots more and hopefully I can learn something next week when I go into Bacharach."

The purpose of recapping the e-mails in this appeal is to demonstrate:
1) A problem existed for Scott Instruments and they were in jeopardy of losing customers because of the shortage of sensors.
2) This problem had been going on since at least April of 2004 and was just getting worse.
3) Georgia Karagianis and Lori Levangie clearly tried to work this problem and got nowhere.
4) Repeated calls to the President of Bacharach and to the management team running the plant resulted in no satisfaction or resolution of the problem. **Phone calls were producing no results.**

81

5) When Dan was finally brought into the loop he immediately took action to solve the most critical customers problems first at least temporarily and then went immediately to work on the problem.

6) This problem was brought to Dan's attention by e-mail and at a very inconvenient time – right before Dan was taking a vacation.

7) Dan e-mailed or copied 10 people as to his intent to visit the Bacharach plant while he was in Pittsburgh on vacation. Several of these people, Bob Bierzynski, Ron Unruh and Trent Smith were in positions of authority and at levels higher than Dan's position in the company.

8) Not one of these people in authority who had been notified by Dan of his intent to go on site at Bacharach contacted Dan to indicate that his intended visit was not authorized.

9) Dan was a professional and felt a keen sense of responsibility to Scott Instruments and it's customers. He worked very creatively to temporarily solve the problem of the missing sensors. Ron Unruh, also senior management helped Dan locate additional sensors and knew of Dan's intent to visit Bacharach during his vacation.

10) Dan also took personal responsibility for the boxes of products that now were without sensors and could not be sold. On each box he put a note stating: "Missing sensor 51-1865. See Dan Roarty NYC DEP 07/30/04. Dan now has ownership of this problem.

11) In all this time no one had yet to successfully resolve the source of the problem that has threatened Scott Instruments and their customers. Once again **Phone calls had not been successful. A visit was required and since Dan now had ownership of this problem it was important that Dan visit Bacharach in Pittsburgh, PA.**

As mentioned in Dan's e-mails, he had intended to come to Pittsburgh for his vacation. When Dan left the office July 30, 2004, he went home for the start of his vacation. The intent of part of that vacation was to help me get the house ready to put on the market. TYCO had transferred Dan to Scott Health & Safety in Monroe, NC. We were scheduled to move there in 2 months. We had already purchased a home in Monroe, NC. The days were packed with trying to do house repairs and general maintenance around the house so that when we came back from our family wedding the house would be ready to go on the market. In fact, in our absence, the interior of our house was being painted. Our departure date was originally flexible because we were unclear as to how much time we would need to get the general maintenance done and the house set up for painting. Our plans changed when Dan came home and said he needed to be in Pittsburgh for a meeting with Bacharach. We had to leave for Pittsburgh, Monday, August 2, 2004 so that Dan could meet with Regis Wyse and together they would go to the Bacharach plant and try to resolve this production problem that had not been resolved over the phone or by e-mails. At this time, Dan and I decided to take two vehicles to Pittsburgh. Taking two vehicles would enable Dan to spend as much time as necessary at the Bacharach plant without stranding his family. He wasn't quite sure what would be involved but he wanted to be able to have a certain amount of travel independence so he could respond to Bacharach and Scott Instrument's needs.

**82**

A meeting was planned for August 3, 2004 with Dan, Regis Wyse, The Regional Manager for Scott Instruments and Jim Elliott and Jim Flume from Bacharach to discuss delivery and production difficulties.

While Dan was driving out to Pittsburgh, for the meeting, the Bacharach plant had a major shake up and changes in their production personnel so they could not meet Tuesday. Dan and Regis Wyse rescheduled to meet with Bacharach on Thursday 08/04/04. Sometime between August 3, 2004 and August 4th, Regis Wyse had spoken with Bacharach and had reached an agreement on production dates and so the face-to-face meeting was cancelled, but telephone calls between Regis and Dan continued.

As anyone who works in sales knows, there are many times when you present yourself at a client, potential customer's or supplier's door, only to learn that those people had been called away on other business. Your intentions hadn't changed. You would be frustrated at the waste of time the effort expended but nevertheless, the trip would still be considered a business trip. Through no fault of Dan's the face to face portion of the trip was cancelled. The reason for Dan's trip had not changed. And the entire time that Dan was in Pittsburgh he continued to make calls, take calls and answer his e-mails.

As Lanny Tomberlin, HR Manager for Scott Health and Safety, explained to me in a call I made to him in August 04 shortly after Dan's death, Senior Management is on call all the time regardless of vacation. Dan wasn't on a time clock. He would be expected to work what ever hours were required to "take care of business." Dan had in his possession during this "vacation" his laptop, his cell phone and his briefcase. Dan loved Scott Instruments and his work as Senior Product Manager. He was willing to sacrifice his vacation time and time with his family to help solve a production problem that left unresolved could result in a loss of business for Scott Instruments.

In order to make this business trip Dan had to drive from Newark, Delaware to Pittsburgh, PA and back again. He changed his personal plans to accommodate his business needs and he informed his management team and sales staff of his plan. Trent Smith, Bob Bierzynski and Ron Unruh were all aware of Dan's plans to visit Bacharach on his vacation. Dan was on an authorized business trip as proven by the content of the enclosed e-mails, his management team was aware of his plans and Dan was unfortunately killed on his way home from his business trip. He is covered by The Group Business Travel Accident Insurance policy and payment should be made accordingly.

Respectfully submitted,

Kelly J. Roarty
Wife of Daniel R. Roarty

> -----Original Message-----
> From: LaFond, Gerry
> Sent: Thursday, September 23, 2004 2:17 PM
> To: LaFond, Gerry
> Subject: FW: 51-1861 Paperwork Cleanup
> Importance: High
>
>
>
> -----Original Message-----
> From: Roarty, Daniel
> Sent: Friday, July 30, 2004 4:15 PM
> To: Karagianis, Georgia; Cherubin, Chris; Franco, John
> Cc: Roarty, Daniel
> Subject: 51-1861 Paperwork Cleanup
> Importance: High
>
> OK, we found some sensors to take care of Jim Hampson's emergency. We
> still need to come up with lots more and hopefully I can learn something
> next week when I go into Bacharach. In the meantime there are at least a
> dozen more sensors sitting in stock under p/n 9550-1065. So if we have
> some other emergencies we could use those. I bet there are a few more
> sensors lurking around. Georgia, should I send a note to the RSMs asking
> them if they have any really hot emergencies?
>
> In regard to the four sensors I took we have to close out the existing
> order that we had. I don't know the order #. Georgia, I am hoping you
> know that as I checked with Chris and he didn't know.
>
> John Franco:
> I took a sensor out of the following:
> 2ea p/n 9550-1065
> 1ea p/n 0051-8296
> 1 ea p/n 9550-8011
>
> On each box that I took a sensor out of I placed a note clearly stating:
> "Missing sensor 51-1865. See Dan Roarty  NYC DEP  7-30-04". We will
> need to replace those sensors.
>
>



-----Original Message-----
From: Roarty, Daniel
Sent: Friday, July 30, 2004 3:35 PM
To: Levangie, Lori; Jim Hampson (E-mail)
Cc: Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob;
Karagianis, Georgia; DeMeritt, MaryAnne; Franco, John; Levangie, Lori;
Cherubin, Chris
Subject: RE: Hunts Point


Lori:
After receiving this e-mail I called Jim Hampson and determined that the
hottest fire is for NYC DEP to get 3 p/n 51-1861 sensors. The reason they
were so upset is that they have three existing transmitters that they
couldn't get sensors for. Getting three sensors is a whole lot easier than
coming up with seventy one (71).
Bacharach is telling us that maybe they will have some unknown qty of



sensors by the end of August. Ron Unruh had the great idea of seeing if
this sensor is part of another product which we have in stock. Bryon Gordon
pulled up all the assemblies that use this part and I dug into the inventory
and came up with four (4) sensors. Talk about a team effort! We have at
least another dozen sensors. But not 71 as requested in your e-mail.
I will be in Pittsburgh next week on vacation. Regis is going to set up a
day for me to go into the Bacharach plant and find out why the sensor is
taking so long to build.
I will let you know what I find.

Jim Hampson:
I have left you a phone message asking where these sensors should be sent
to. The sensors are sitting on Chris Cherubin's desk.


Regards,
Dan Roarty

-----Original Message-----
From: Levangie, Lori
Sent: Friday, July 30, 2004 7:23 AM
To: Karagianis, Georgia; Bierzynski, Bob; Smith, Trent
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John;
Roarty, Daniel; Lori Levangie (E-mail)
Subject: RE: Hunts Point



Received another call from NYC DEP with another threat to throw us out of

there. They are now talking about returning our whole system - not that we would do that, but they are serious.

Lori Levangie
Northeast Regional Manager
Fixed Instruments Division
Tyco / Scott Instruments
Cell – 610-662-9477
Fax – 484-214-0137
www.scottinstruments.com

-----Original Message-----
From: Karagianis, Georgia
Sent: Thursday, July 29, 2004 12:47 PM
To: Bierzynski, Bob; Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John; Roarty, Daniel
Subject: RE: Hunts Point

Bob,



I received a call today from Jim at NETS for a quote on delivery time for 71 CE130 Transmitters with stand alone IS barriers.
At this point we have nothing to replace this product.   NIC II can not be operated IS.

Thanks
Georgia

-----Original Message-----
From: Bierzynski, Bob
Sent: Thursday, July 29, 2004 12:40 PM
To: Karagianis, Georgia; Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John; Roarty, Daniel
Subject: RE: Hunts Point



The 051-1861 is a 4 volt cat bead sensor for lel detection. Rather than continue to upset customers with late deliveries, etc. let's come up with a plan to upgrade these folks into Nic II's which can be supported for years to come. I suspect we have transmitters in the field that are out of service waiting for spare sensors. These customers will go to a competitor if we don't offer an alternative solution.

The CE130 product line is old and needs to be obsoleted. We have already delisted the equipment with CSA and can't be making margin on what we do sell occasionally.

I suggest our Monroe purchasing group address this part when they visit Pittsburgh in a few weeks to discuss last time buys. This p/n is a candidate for one more buy to cover us during a phase out.

Dan, can you advise EAU on this as a spare part ? And please advise what if any CE130 business is still hanging out there.

And I'll get on that damn engineering manager here to get the blind cat bead transmitter into production as it too is a viable solution to this ongoing problem.

Bob

-----Original Message-----
From: Karagianis, Georgia
Sent: Thursday, July 29, 2004 12:27 PM
To: Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Bierzynski, Bob; Franco, John
Subject: RE: Hunts Point



Trent,
0051-1861 is a sensor for a CE130. These parts are ordered by MaryAnne Demeritt in our purchasing department via Bacharach. The planner at Bacharach is Mike Palumbo, I spoke with Mike yesterday as well as Bob Peters who is the Production Engineer at Bacharach regarding our late deliveries. Bob advised that the earliest we can expect delivery of this part is end of August and could not confirm definite date or quantity. I then placed a call to Hermann Hinderhaeuser the President of Bacharach and left a voice message explaining the severity of the matter and asking him to call me back. He has yet to return my call. I called again this morning, left another message for Hermann and also spoke with Tony Nawrocki who is the Purchasing Manager. Tony assured me that Dave Toman the Operations Manager would return my call today.
They owe us 351 pieces and they were due here at Exton on 4/20/04.
This is just one part number and I deal with this type of situation all day everyday.
Any assistance you can provide would be greatly appreciated.
Thanks
Best Regards,

Georgia

-----Original Message-----
From: Smith, Trent
Sent: Thursday, July 29, 2004 10:56 AM
To: Levangie, Lori; Ron Unruh (E-mail); Karagianis, Georgia
Subject: RE: Hunts Point



Please educate me briefly on what Bacharach equipment this is for and who at
Scott places these orders and with whom at Bacharach.

Trent Smith
National Sales Manager
Scott Health & Safety
tresmith@tycoint.com
(p)704-291-8423

www.scotthealthsafety.com


-----Original Message-----
From: Levangie, Lori
Sent: Wednesday, July 28, 2004 9:32 AM
To: Trent Smith (E-mail); Ron Unruh (E-mail)
Subject: FW: Hunts Point
Importance: High


Hi Guys.



Bacharach is getting the best of us.  I have done everything I can, so has
Georgia, Marianne, etc.

Lori Levangie
Northeast Regional Manager
Fixed Instruments Division
Tyco / Scott Instruments
Cell - 610-662-9477
Fax - 484-214-0137
www.scottinstruments.com


-----Original Message-----
From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]

Sent: Wednesday, July 28, 2004 10:29 AM
To: Levangie, Lori; Karagianis, Georgia
Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
Subject: RE: Hunts Point
Importance: High


Lori,

I understand that they don't have the units in stock. What I don't
understand that they cannot make a commitment for a date when they will have
them. I also do not understand why this takes so long, this process started
in April, three months ago.

One cannot tell a customer forever to just be patient, eventually the
merchandise will arrive. At least AdvanTech's customers do not accept this.

I assume Scott is interested in doing further business with the New York
City DEP, this kind of customer service is not a very good way of assuring
that.

Thanks,

Gabriel Farkas, PMP
Project Manager
AdvanTech Corporation
27 Daniel Rd. West
Fairfield, NJ 07004
Phone: 973-808-8550 Extension 21
Fax:   973-808-2923


> -----Original Message-----
> From: Levangie, Lori [mailto:llevangie@tycoint.com]
> Sent: Wednesday, July 28, 2004 10:12 AM
> To: gabriel@advantechcorp.com; Levangie, Lori; Karagianis, Georgia
> Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
> Subject: RE: Hunts Point
>
>
> Hi Gabriel.
>
> I spoke to Georgia who has been inquiring daily.  Bacharach still does not
> have these in stock.  She and I are doing everything we can to
> "push" them.
> We sincerely regret any inconvenience.  We will keep checking.



```
>
>
> Lori Levangie
> Northeast Regional Manager
> Fixed Instruments Division
> Tyco / Scott Instruments
> Cell - 610-662-9477
> Fax - 484-214-0137
> www.scottinstruments.com
>
>
> -----Original Message-----
> From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> Sent: Wednesday, July 28, 2004 9:40 AM
> To: Levangie, Lori; Karagianis, Georgia
> Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
> Subject: RE: Hunts Point
>
>
> OK, four days later still ... checking ...., for how long?
>
> Gabriel Farkas, PMP
> Project Manager
> AdvanTech Corporation
> 27 Daniel Rd. West
> Fairfield, NJ 07004
> Phone: 973-808-8550 Extension 21
> Fax:   973-808-2923
>
>
> > -----Original Message-----
> > From: Levangie, Lori [mailto:llevangie@tycoint.com]
> > Sent: Saturday, July 24, 2004 10:12 AM
> > To: gabriel@advantechcorp.com; Karagianis, Georgia
> > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > Hampson
> > Subject: RE: Hunts Point
> >
> >
> > ....checking.....
> >
> > Lori Levangie
> > Northeast Regional Manager
> > Fixed Instruments Division
> > Tyco / Scott Instruments
> > Cell - 610-662-9477
```

(8)

(7)

\>\> Fax - 484-214-0137
\>\> www.scottinstruments.com
\>\>
\>\>
\>\> -----Original Message-----
\>\> From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
\>\> Sent: Thursday, July 22, 2004 8:03 AM
\>\> To: Karagianis, Georgia
\>\> Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
\>\> Hampson
\>\> Subject: RE: Hunts Point
\>\>
\>\>
\>\> Georgia,
\>\>
\>\> Any news on the last three sensors? July is almost over...
\>\>
\>\> Thank you,
\>\>
\>\> Gabriel Farkas, PMP
\>\> Project Manager
\>\> AdvanTech Corporation
\>\> 27 Daniel Rd. West
\>\> Fairfield, NJ 07004
\>\> Phone: 973-808-8550 Extension 21
\>\> Fax:   973-808-2923
\>\>
\>\>
\>\>\> -----Original Message-----
\>\>\> From: Karagianis, Georgia [mailto:GKaragianis@tycoint.com]
\>\>\> Sent: Thursday, July 01, 2004 10:12 AM
\>\>\> To: 'gabriel@advantechcorp.com'; Karagianis, Georgia
\>\>\> Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
\>\>\> Hampson
\>\>\> Subject: RE: Hunts Point
\>\>\>
\>\>\>
\>\>\> Gabriel,
\>\>\> Last I heard, end of July.
\>\>\> I am doing everything possible to obtain a better date.
\>\>\> Thanks
\>\>\> Georgia
\>\>\>
\>\>\> -----Original Message-----
\>\>\> From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
\>\>\> Sent: Thursday, July 01, 2004 9:37 AM

> > > To: Karagianis, Georgia
> > > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > > Hampson
> > > Subject: RE: Hunts Point
> > > Importance: High
> > >
> > >
> > > Georgia,
> > >
> > > Thank you for your help. However, if we don't have all the
> > > required sensors,
> > > the situation is almost identical to not having any, because
> > the job will
> > > not be completed and accepted by the owner.
> > >
> > > When do you expect to have the other three units?
> > >
> > > Thank you,
> > >
> > > Gabriel Farkas, PMP
> > > Project Manager
> > > AdvanTech Corporation
> > > 27 Daniel Rd. West
> > > Fairfield, NJ 07004
> > > Phone: 973-808-8550 Extension 21
> > > Fax:   973-808-2923
> > >
> > >
> > > > -----Original Message-----
> > > > From: Karagianis, Georgia [mailto:GKaragianis@tycoint.com]
> > > > Sent: Wednesday, June 30, 2004 5:51 PM
> > > > To: Karagianis, Georgia; 'gabriel@advantechcorp.com'
> > > > Cc: 'Gabe Hauer'; Levangie, Lori
> > > > Subject: RE: Hunts Point
> > > >
> > > >
> > > > Gabriel
> > > > I just received word that I will receive 7 on Friday, which I will
> > > > immediately ship.
> > > > The remaining 3 are still on back order and I will do my best to
> > > > expedite.
> > > > I apologize for any inconvenience this has caused.
> > > > Your patience is greatly appreciated.
> > > > Thanks
> > > > Best Regards
> > > > Georgia

AR0097

92

```
> > > >
> > > >
> > > > -----Original Message-----
> > > > From: Karagianis, Georgia
> > > > Sent: Tuesday, June 29, 2004 6:46 PM
> > > > To: 'gabriel@advantechcorp.com'
> > > > Cc: Gabe Hauer; Levangie, Lori
> > > > Subject: RE: Hunts Point
> > > >
> > > >
> > > > Gabriel,
> > > > I just spoke with our vendor, they are making every effort to
> > > > expedite your
> > > > request.
> > > > They will advise me of a delivery date tomorrow afternoon.
> > > > I will contact you as soon as I have a response.
> > > > I apologize for the delay and any inconvenience this has caused.
> > > > Your understanding is greatly appreciated.
> > > > Thank you,
> > > > Georgia
> > > >
> > > > -----Original Message-----
> > > > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > > > Sent: Tuesday, June 29, 2004 3:24 PM
> > > > To: Georgia Karagianis
> > > > Cc: Gabe Hauer
> > > > Subject: Hunts Point
> > > >
> > > >
> > > > Georgia,
> > > >
> > > > Any news on the sensor delivery?
> > > >
> > > > Thanks,
> > > >
> > > > Gabriel Farkas, PMP
> > > > Project Manager
> > > > AdvanTech Corporation
> > > > 27 Daniel Rd. West
> > > > Fairfield, NJ 07004
> > > > Phone: 973-808-8550 Extension 21
> > > > Fax:  973-808-2923
> > > >
> > >
> >
>
```

AUG-13-2004  10:06    AMICA MUTUAL INSURANCE CO              610 834 0237    P.02

**POLICE CRASH REPORTIN FORM**

Case Closed ☐ Yes ☑ No   Reportable Crash ☑ Yes ☐ No   Page **01**

AA 500 1

P0639922

Crash Number

## Police Agency Data

Incident Number: **3 0 1 1 - 1 0 3 1 7 0 4**   Police Agency: **6 8 5 0 1**   Patrol Zone: **0 0 3**

Agency Name: **PA STATE POLICE**   Precinct: **LANCASTER**   Investigation Date (MM-DD-YYYY): **0 8 - 0 8 - 2 0 0 4**

Dispatch Time (mil): **1 5 4 9**   Arrival Time (mil): **1 6 0 6**   Investigator: **TPR JOHN T. LYONS**   Badge Number: **0 6 9 2 5**

Reviewer: **6/h**   Badge Number: **5 4 4 1**   Approval Date (MM-DD-YYYY): **0 8 - 0 9 - 2 0 0 4**

## Crash Data

County: **3 6**   County Name: **LANCASTER**   Municipality: **8 0 1**   Municipality Name: **BART TWP**

Day of Week: ☑ Sun ☐ Thu ☐ Mon ☐ Fri ☐ Tue ☐ Sat ☐ Wed ☐ Unk

Crash Date (MM-DD-YYYY): **0 8 - 0 8 - 2 0 0 4**   Crash Time (mil): **1 5 4 8**   No of Units **0 1**   People **0 6**   Injured **0 6**   Killed **0 1**   *If > 00 complete Form F

Workzone (If Yes, Complete Form M, Section 29) ☐ Yes ☑ No   School Bus Related ☐ Yes ☑ No   School Zone Related ☐ Yes ☑ No   Notify PENNDOT Maintenance ☐ Yes ☑ No

## Use Type

Intersection Type: ☐ Midblock ☑ 4 Way Intersection ☐ "T" Intersection ☐ "Y" Intersection ☐ Traffic Circle/ Round About ☐ Multi-Leg Intersection ☐ Off Ramp ☐ On Ramp ☐ Railroad Crossing ☐ Crossover ☐ Other

*Special Location *See Overlay

## Principal Road

Route Number: **0 8 9 6**   Segment (Optional): **0 2**   Travel Lanes **2**   Speed Limit **4 5**

Orientation: ☐ North ☐ South ☐ East ☐ West ☐ Unknown

Street Name: **GEORGETOWN**   Street Ending: **R D**

House Number (if applicable): For Mid-block crashes only. Use postal House number and make sure Principal Roadway Street Name is filled in if using this option

Route Signing: ☐ Interstate (Not Turnpike) ☐ Turnpike (East/West) ☐ Turnpike Spur ☑ State Highway ☐ County Road ☐ Local Road or Street ☐ Private Road ☐ Other/ Unknown

## Intersecting Road

Route Number: **3 6 3**   Segment (Optional):   Travel Lanes **0 2**   Speed Limit **4 5**

Orientation: ☐ North ☐ South ☐ East ☐ West ☐ Unknown

Street Name: **BARTVILLE**   Street Ending: **R D**

Route Signing: ☐ Interstate (Not Turnpike) ☐ Turnpike (East/West) ☐ Turnpike Spur ☐ State Highway ☑ County Road ☐ Local Road or Street ☐ Private Road ☐ Other/ Unknown

## Distance From Landmark

Please Enter Information for BOTH Landmarks if Using This Option. Use for MM2 - Block Crashes

Landmark 1:
Intersecting Rt Num Or Mile Post | Or Segment Marker
Or Intersecting Street Name | St Ending
Ramp Use Only: ☐ North ☐ South ☐ East ☐ West
Feet | Or Miles

Landmark 2:
Intersecting Rt Num Or Mile Post | Or Segment Marker
Or Intersecting Street Name | St Ending
Ramp Use Only: ☐ North ☐ South ☐ East ☐ West
Distance From Crash Scene to Landmark 1 (For Crash between Landmark 1 and Landmark 2)

## GPS

Latitude: Degrees **3 9** Minutes **5 4** Seconds **1 7 . 1 1**   Longitude: — Degrees **7 6** Minutes **0 1** Seconds **5 4 . 2 8**

## TCD

Traffic Control Device:
☑ Not Applicable ☐ Yield Sign ☐ Police Officer or Flagman
☐ Flashing Traffic Signal ☐ Traffic Signal ☐ Active RR Crossing Controls ☐ Other Type TCD
☐ Flashing Traffic Signal ☐ Stop Sign ☐ Passive RR Crossing Controls ☐ Unknown

TCD Functioning:
☐ No Controls ☐ Device Functioning Improperly ☐ Emergency Preemptive Signal
☐ Device Not Functioning ☑ Device Functioning Properly ☐ Unknown

## Lane Closure

Lane Closed (If "Not Applicable", skip rest of the Lane Closure section): ☐ Not Applicable ☐ Partially ☑ Fully ☐ Unknown

Lane Closure Direction: ☐ North ☐ East ☐ North and South ☑ All (N,S,E,W) ☐ South ☐ West ☐ East and West

Traffic Detoured: Yes ☑ No ☐ Unknown ☐

Exit Time Closed: ☐ < 30 Min. ☐ 30-60 Min. ☑ 1-3 hrs ☐ 3-6 hrs ☐ 6-9 hrs ☐ > 9 hours ☐ Unknown

FORM H AA SP.  10/03

AR0104

**94**

AUG-13-2004  10:06    AT    MUTUAL INSURANCE CO                610 834 0237    P.03

**COMMONWEALTH OF PENNSYLVANIA**
**POLICE CRASH REPORTING FORM**

Crash Number

AA 500 2    Police Use Only `SP 1031704`    Page: `02`    P0639922

| | | |
|---|---|---|
| **Type Unit** | ◉ Motor Vehicle in Transport ○ Hit & Run Vehicle ○ Illegally Parked ○ Legally Parked ○ Non - Motorized ○ Pedestrian ○ Pedestrian on Skates, in Wheelchair, etc. ○ Disabled From Previous Crash ○ Train ○ Phantom Vehicle | **Commercial Vehicle** ○ Yes ◉ No (If "Yes", Complete Form C) |

(If "Pedestrian" or "Pedestrian on Skates, in Wheelchair, etc", Complete Form M, Section 2B)

**Unit No** `01`  **First Name** `FRANKLIN`  **MI** `B`  **Date of Birth (MM-DD-YYYY)** `01` `19` `1964`

**Delete?** ○  **Last Name** `HUMBERT`  **Telephone Number** `(717) 599-6107`

**Address / City / State** `4 VINEYARD ROAD, CHRISTIANA, PA`  **Zip** `17509`

**Driver License Number** `20411987`  **State** `PA`  **Class** `B`

**Alcohol/Drugs Suspected**
◉ No  ○ Illegal Drugs  ○ Medication
○ Alcohol  ○ Alcohol and Drugs  ○ Unknown

**Driver or Pedestrian Physical Condition**
◉ Apparently Normal  ○ Illegal Drug Use  ○ Fatigue  ○ Medication
○ Had Been Drinking  ○ Sick  ○ Asleep  ○ Unknown

**Alcohol Test Type**
◉ Test Not Given  ○ Breath  ○ Other
○ Blood  ○ Urine  ○ Unknown if Test Given

**Primary Vehicle Code Violation** `STOP SIGN AND YIELD SIGN`  **Charged?** ○ Yes ◉ No

**Alcohol Test Results** `0`  ○ Test Refused  ○ Test Given, Contaminated Results  ○ Unknown Results

**Driver Presence** `1`  1=Driver Operated Vehicle  2=No Driver  3=Driver Fled Scene  4=Hit and Run  9=Unknown

**Owner/Driver** `01`  00=Not Applicable  01=Private Vehicle Owned/Leased by Driver  02=Private Vehicle Not Owned/Leased by Driver  03=Rented Vehicle  04=State Police Vehicle  05=PENNDOT Vehicle  06=Other State Gov Veh  05=Municipal Police Veh  06=Other Municipal Government Vehicle  09=Federal Gov Veh  98=Other  99=Unknown

**Same as Driver** ◉  **Owner First Name**  **Owner Last Name or Business Name (If Pedestrian, skip this Section)**

**Address / City / State / Zip**

**VIN** `1B7GG2N5WS5H8842`  **Vehicle Make** `DODGE`  **Make Code** `07`  **Model Year** `1988`  **Vehicle Model** `DAKOTA SPORT` (see overlay)

**License Plate** `YGD5284`  **Reg. State** `PA`  **Est. Speed** `045`  **Vehicle Towed** ◉ Yes ○ No  **Towed By** `LEWIS TOWING`

**Insurance** ◉ Yes ○ No ○ Unknown  **Insurance Company** `TRAVELERS INS`  **Policy No** `947239593 101 1`

**Trailing Unit**  **No. of Trailing Units:**  **Type Unit**  1=Towing Pass. Veh  2=Towing Truck  3=Towing Utility Trailer  4=Mobile/Modular Home  5=Camper  6=Full Trailer  7=Semi-Trailer  8=Other  9=Unknown  **Tag No**  **Tag Year**  **Tag St**

**Direction of Travel** `W`  **Vehicle Position** `01`  **Movement** `01`  **See Overlay**  **Special Usage** `00`  00=Not Applicable  01=Fire Vat  02=Ambulance  03=Police  08=Other Emergency Vehicle  11=Pupi Transport  12=Commercial Passenger Carrier  13=Taxi  21=Tractor Trailer  22=Twin Trailer  23=Triple Trailer  31=Modified Veh

**Vehicle Color** `01`  01=Blue  02=Red  03=White  04=Green  05=Black  06=Yellow  07=Silver  08=Gold  09=Brown  10=Orange  11=Purple  12=Other  99=Unknown

**Vehicle Type** `01`  01=Automobile  02=Motorcycle  03=Bus  04=Small Truck  (If "02", Complete Form M, Section 26)  05=Large Truck  06=SUV  07=Van  10=Snowmobile  11=Farm Equip  12=Construction Equip  13=ATV  (If "20" or "21", Complete Form M, Section 27)  20=Unicycle, Bicycle, Tricycle  21=Other Pedacycle  22=Horse & Buggy  23=Horse & Rider  24=Train  25=Trolley  98=Other  99=Unknown  88=Other Type Spec Veh  99=Unk Type Spec Veh

**Initial Impact Point** `12`  00=Non-Collision  01-12=Clock Points  13=Top  14=Undercarriage  15=Towed Unit  99=Unknown

**Damage Indicator**  0=None  1=Minor  2=Functional  3=Disabling  9=Unknown

**Gradient**  1=Level  2=Uphill  3=Downhill  4=Bottom of Hill  5=Top of Hill  9=Unknown

**Road Alignment** `1`  1=Straight  2=Curved  9=Unknown

AR0105

95

AUG-13-2004  10:07    At    MUTUAL INSURANCE CO    610 834 0237    P.04

# COMMONWEALTH OF PENNSYLVANIA
## POLICE CRASH REPORTING FORM

AA 500 2

Police Use Only: 33-103704

Page: 05

P0639922

Crash Number

**10 Unit Info**

Type / Unit:
- ● Motor Vehicle in Transport
- ○ Hit & Run Vehicle
- ○ Illegally Parked
- ○ Legally Parked
- ○ Non – Motorized
- ○ Pedestrian
- ○ Pedestrian on Skates, in Wheelchair, etc
- ○ Disabled From Previous Crash
- ○ Train
- ○ Phantom Vehicle

(If "Pedestrian" or "Pedestrian on Skates, in Wheelchair, etc", Complete Form M, Section 28)

Commercial Vehicle: ○ Yes  ● No
(If Yes, Complete Form Q)

**Vehicle Driver / Pedestrian Information**

Unit No: 09
First Name: DANIEL   MI: R
Date of Birth (MM-DD-YYYY): 04 05 1961

Delete?
Last Name: ROARTY
Telephone Number: (302) 048-8806

Address / City / State: 319 PALOMINO ROAD HUNTERS RIDGE, NEWARK, DELAWARE
Zip: 19711

Driver License Number: C40662
State: DE   Class: D

**11** Alcohol/Drugs Suspected:
- ● No
- ○ Illegal Drugs
- ○ Medication
- ○ Alcohol
- ○ Alcohol and Drugs
- ○ Unknown

Driver or Pedestrian Physical Condition:
- ● Apparently Normal
- ○ Illegal Drug Use
- ○ Fatigue
- ○ Medication
- ○ Had Been Drinking
- ○ Sick
- ○ Asleep
- ○ Unknown

Alcohol Test Type:
- ● Test Not Given
- ○ Breath
- ○ Other
- ○ Blood
- ○ Urine
- ○ Unknown if Test Given

Primary Vehicle Code Violation: NO VIOLATIONS NOTED
Charged? ○ Yes  ● No

Alcohol Test Results: 0.
- ○ Test Refused
- ○ Test Given, Contaminated Results
- ○ Unknown Results

Driver Presence: 1=Driver Operated Vehicle  2=No Driver  3=Driver Fled Scene  4=Hit and Run  9=Unknown

Owner/Driver: 01
00=Not Applicable  01=Private Vehicle Owned/Leased by Driver  02=Private Vehicle Not Owned/Leased by Driver  03=State Govt Vehicle  04=State Police Vehicle  05=PENNDOT Vehicle  06=Other State Gov Veh  07=Municipal Police Veh  08=Other Municipal Government Vehicle  97=Federal Gov Veh  98=Other  99=Unknown

**12 Vehicle Information**

Same as Driver: ●
Owner First Name:
Owner Last Name or Business Name (If Pedestrian, skip this Section):

Address / City / State / Zip:

Vehicle Make: DODGE   *Make Code: 07

VIN: 1B4GH54R6NX268771
Model Year: 1992
Vehicle Model: CARAVAN (see overlay)

License Plate: PC8107Y
Reg. State: DE   Est. Speed: 999
Vehicle Towed: ● Yes  ○ No
Towed By: LEWS TWING

Insurance: ○ Yes  ○ No  ○ Unknown
Insurance Company: AMICA MUTUAL INS.
Policy No: 940907-9UDR

Trailing Unit:
No. of Trailing Units:
Type Unit: 1=Towing Pass. Veh  2=Towing Truck  3=Towing Utility Trailer  4=Mobile/Modular Home  5=Camper  6=Full Trailer  7=Semi-Trailer  8=Other  9=Unknown
Tag No:   Tag Year:   Tag St:

Direction of Travel: S
*Vehicle Position: 01
*Movement: 01
*See Overlay

Special Usage: 00
00=Not Applicable  01=Farm Veh  02=Ambulance  03=Police  08=Other Emergency Vehicle  11=Pupil Transport  12=Commercial Passenger Carrier  13=Taxi  21=Tractor Trailer  22=Twin Trailer  23=Triple Trailer  31=Modified Veh

Vehicle Color: 04
06=Yellow  07=Silver  08=Gold  09=Brown  10=Orange  11=Purple  12=Other  99=Unknown
01=Blue  02=Red  03=White  04=Green  05=Black

Vehicle Type: 07
01=Automobile  02=Motorcycle  03=Bus  04=Small Truck  05=Large Truck  06=SUV  07=Van  10=Snowmobile  11=Farm Equip  12=Construction Equip  13=ATV  18=Other Type Spec Veh  19=Unk. Type Spec Veh  20=Unicycle, Bicycle Tricycle  21=Other Pedalcycle  22=Horse & Buggy  23=Horse & Rider  24=Train  25=Trolley  98=Other  99=Unknown
(If "02", Complete Form M, Section 26)
(If "20" or "21", Complete Form M, Section 27)

Initial Impact Point: 1
00=Non-Collision  01-12=Clock Points  13=Top  14=Undercarriage  15=Towed Unit  06=Unknown

Damage Indicator: 3
0=None  1=Minor  2=Functional  3=Disabling  9=Unknown

Gradient: 3
1=Level  2=Uphill  3=Downhill  4=Bottom of Hill  5=Top of Hill  9=Unknown

Road Alignment: 1
1=Straight  2=Curved  9=Unknown

AR0106

96

AUG-13-2004  10:07      A      MUTUAL INSURANCE CO                    610 834 0237      P.05

# COMMONWEALTH OF PENNSYLVANIA
## POLICE CRASH REPORTING FORM

Page

AA 500 3      Police Use Only  SDI-103170H      04

Crash Number

# P0639922

## People Information

**Person Type**
A  1=Driver
2=Passenger
7=Pedestrian
8=Other
9=Unknown

**Sex**
B  F =Female
M =Male
U =Unknown

**Injury Severity**
C  0=Not Injured
1=Killed
2=Major Injury
3=Moderate
Injury
4=Minor Injury
8=Injury, Unk
Severity
9=Unknown if
Injury

**Seat Position**
D  00=Not A Passenger/Occupant
01=Driver - All Vehicles
02=Front Seat Middle Position
03=Front Seat Right Side
04=Second Row - Left Side Or
Motorcycle Passenger
05=Second Row - Middle Position
06=Second Row - Right Side
07=Third Row Or Greater -
Left Side
08=Third Row Or Greater -
Middle Position
09=Third Row Or Greater -
Right Side
10=Sleeper Section of Truckcab
11=In Other Enclosed
Passenger Or Cargo Area
12=In Open Area
(Back Of Pickup, Etc.)
13=Trailing Unit
14=Riding On Vehicle Exterior
15=Bus Passenger
98=Other
99=Unknown

**Safety Equipment One:**
E  00=None Used / Not Applicable
01=Shoulder Belt Used
02=Lap Belt Used
03=Lap And Shoulder Belt Used
04=Child Safety Seat Used
05=Motorcycle Helmet Used
06=Bicycle Helmet Used
11=Safety Belt Used Improperly
12=Child Safety Seat Used Improperly
12=Helmet Used Improperly
90=Restraint Used, Type Unknown
99=Unknown

**Safety Equipment Two:**
F  00=None Used / Not Applicable
01=Front Air Bag Deployed (For This Seat)
02=Side Air Bag Deployed (For This Seat)
03=Other Type Air Bag Deployed
04=Multiple Air Bags Deployed
05=Motorcycle Eye Protection
09=Bicyclist Wearing Elbow/Knee/Pads
10=Air Bag Not Deployed, Switch On
11=Air Bag Not Deployed, Switch Off
12=Air Bag Not Deployed,
Unk Switch Setting
13=Air Bag Removed (Prior To Crash)
19=Unknown If Air Bag Deployed
99=Unknown

**Ejection:**
G  0=Not Applicable
1=Not Ejected
2=Totally Ejected
3=Partially Ejected
9=Unknown

**Ejection Path:**
H  0=Not Ejected / Not Applicable
1=Through Side Door Opening
2=Through Side Window
3=Through Windshield
4=Through Back Door
5=Through Back Door Tailgate Opening
6=Through Roof Opening (Sunroof /
Convertible Top Down)
7=Through Roof Opening (Convertible
Top Up)
9=Unknown

**Extrication:**
I  0=Not Applicable
1=Not Extricated
2=Extricated By Mechanical Means
3=Freed By Non - Mechanical Means
8=Other
9=Unknown

---

13  EMS Agency: OXXT FIRE COMPANY      Medical Facility: LANCASTER GENERAL HOSPITAL / HERSHEY MEDICAL CENTER

| 14 | Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 01 | 01 | | 01-29-1964 | 1 | M | 4 | 01 | 63 | 04 | 0 | 0 | 0 |

Name / Address / Phone
☑ Same as Operator      EMS Transport ☑ Yes ○ No

| | Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02 | 02 | | 04-05-1961 | 1 | M | 0 | 01 | 63 | 04 | 1 | 0 | 2 |

Name / Address / Phone
☑ Same as Operator      EMS Transport ○ Yes ○ No

| | Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02 | 03 | | 03-05-1991 | 2 | F | 4 | 09 | 99 | 04 | 0 | 0 | 2 |

Name / Address / Phone
☐ Same as Operator   JESSICA KLARTY, 319 PALOMINO DRIVE NEWARK DE 19711 (302)242-8866      EMS Transport ☑ Yes ○ No

| | Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02 | 04 | | 01-20-1995 | 2 | M | 2 | 06 | 99 | 04 | 0 | 0 | 2 |

Name / Address / Phone
☐ Same as Operator   KEENAN KLARTY, 319 PALOMINO DRIVE NEWARK DE 19711 (302)242-8866      EMS Transport ☑ Yes ○ No

| | Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02 | 05 | | 01-21-1989 | 2 | M | 2 | 03 | 03 | 04 | 0 | 0 | |

Name / Address / Phone
☐ Same as Operator   JOSHUA KLARTY, 319 PALOMINO DRIVE NEWARK DE 19711 (302)242-8866      EMS Transport ☑ Yes ○ No

| | Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 02 | 06 | | 11-21-1993 | 2 | M | 2 | 04 | 99 | 04 | 0 | 0 | 2 |

Name / Address / Phone
☐ Same as Operator   MATTHEW KLARTY, 319 PALOMINO DRIVE NEWARK DE 19711 (302)242-8866      EMS Transport ☑ Yes ○ No

AR0107

**97**

AUG-13-2004  10:08    A... MUTUAL INSURANCE CO    610 834 0237    P.06



**COMMONWEALTH OF P...SYLVANIA**
**POLICE CRASH REPORTING FORM**    Page

AA 500 4    Police Use Only | 501-103114 |    | 0 5 |    **P0639922**    Crash Number

## General Crash Information (if more than 2 Units only complete one)

**15**

| | | | | | |
|---|---|---|---|---|---|
| **Crash Description** | H | 0=Non-Collision | 2=Head On | 4=Angle | 6=Sideswipe (Opposite Direction) | 8=Hit Pedestrian |
| | | 1=Rear End | 3=Rear to Rear (Backing) | 5=Sideswipe (Same Direction) | 7=Hit Fixed Object | 9=Other/Unknown |
| **Relation to Roadway** | 1 | 1=On Travel Lanes | 3=Median | 5=Outside Trafficway | 7=Gore (Ramp Intersection) | |
| | | 2=Shoulder | 4=Roadside | 6=In Parking Lane | 9=Unknown | |
| **Illumination** | 1 | 1=Daylight | 3=Dark - Street Lights | 5=Dawn | 8=Other | |
| | | 2=Dark - No Street Lights | 4=Dusk | 6=Dark - Unknown Roadway Lighting | | |
| **Weather Conditions** | 1 | 1=No Adverse Conditions | 3=Sleet (Hail) | 5=Fog | 7=Sleet & Fog | 9=Unknown |
| | | 2=Rain | 4=Snow | 6=Rain & Snow | 8=Other | |
| **Road Surface Conditions** | 0 | 0=Dry | 2=Sand, Mud, Dirt, Oil | 4=Slush | 6=Ice Patches | 8=Other |
| | | 1=Wet | 3=Snow Covered | 5=Ice | 7=Water - Standing or Moving | |

## Unit/Event Information

**16**

**Unit No** | 0 1 |  Harm Event | L/R | Most? | Utility Pole Number
1. | 0 2 |
2. |
Please Put Events in Sequential Order 3.
4.

**Unit No** | 0 2 |  Harm Event | L/R | Most? | Utility Pole Number
1. | 0 2 |
2.
Please Put Events in Sequential Order 3.
4.

**Harmful Events (Harm Event)**
01=Hit Unit 1
02=Hit Unit 2
03=Hit Unit 3
04=Hit Unit 4
05=Hit Unit 5
06=Hit Other Traffic Unit
07=Hit Deer
08=Hit Other Animal
09=Collision With Other Non Fixed Object
11=Struck By Unit 1
12=Struck By Unit 2
13=Struck By Unit 3
14=Struck By Unit 4
15=Struck By Unit 5
19=Struck By Other Traffic Unit
21=Hit Tree Or Shrubbery
22=Hit Embankment
23=Hit Utility Pole
24=Hit Traffic Sign
25=Hit Guard Rail
26=Hit Guard Rail End
27=Hit Curb
28=Hit Concrete Or Longitudinal Barrier
29=Hit Ditch

30=Hit Fence Or Wall
31=Hit Building
32=Hit Culvert
33=Hit Bridge Pier Or Abutment
34=Hit Parapet End
35=Hit Bridge Rail
36=Hit Boulder Or Obstacle On Roadway
37=Hit Impact Attenuator
38=Hit Fire Hydrant
39=Hit Roadway Equipment
41=Hit Mail Box
41=Hit Traffic Island
42=Hit Snow Bank
43=Hit Temporary Construction Barrier
48=Hit Other Fixed Object
49=Hit Unknown Fixed Object
50=Overturn/Roll Over
51=Struck By Thrown Or Falling Object
52=Pot Holes Or Other Pavement Irregularities
53=Jacknife
54=Fire in Vehicle
58=Other Non-Collision
99=Unknown Harmful Event

## Contributing Information

**First Harmful Event in the Crash**
Unit No | 0 1 | Harm Event | 0 2 | Most | Unit No | Harm Event
Do not repeat this information on multiple pages

**Driver Action (D)**
00=No Contributing Action
01=Driver Was Distracted
02=Driving Using Hand Held Phone
03=Driving Using Hands Free Phone
04=Making Illegal U-Turn
05=Improper/Careless Turning
06=Turning From Wrong Lane
07=Proceeding W/O Clearance After Stop
08=Running Stop Sign
09=Running Red Light
10=Failure To Respond To Other Traffic Control Device
11=Tailgating
12=Sudden Slowing/Stopping
13=Illegally Stopped On Road
14=Careless Passing Or Lane Change
15=Passing In No Passing Zone
16=Driving The Wrong Way On 1-Way Street
17=Careless Or Illegal Backing On Roadway
18=Driving On The Wrong Side Of Road
19=Making Improper Entrance To Highway
20=Making Improper Exit From Highway
21=Careless Parking/Unparking
22=Over/Under Compensation At Curve
23=Speeding
24=Driving Too Fast For Conditions
25=Failure To Maintain Proper Speed
26=Driver Fleeing Police (Pol Chase)
27=Driver Inexperienced
28=Failure To Use Specialized Equip
32=Affected By Physical Condition
98=Other Improper Driving Actions
99=Unknown

**Environmental / Roadway Potential Factors (E/R)**
1. | 0 0 | 2. | 3.
00=None
01=Windy Conditions
02=Sudden Weather Conditions
03=Other Weather Conditions
04=Deer In Roadway
05=Obstacle On Roadway
06=Other Animal In Roadway
07=Glare
08=Work Zone Related
11=Slippery Road Conditions (Ice/Snow)
12=Substance On Road
13=Potholes
14=Broken Or Cracked Pavement
15=TCD Obstructed
16=Soft Shoulder Or Shoulder Drop Off
28=Other Roadway Factor
98=Other Environmental Factor
99=Unknown

**Possible Vehicle Failures (V)**
00=None
01=Tires
02=Brake System
03=Steering System
04=Suspension
05=Power Train
06=Exhaust
07=Headlights
08=Signal Lights
09=Other Lights
10=Horn
11=Mirrors
12=Wipers
13=Driver Seating/Control
14=Body, Doors, Hood, Etc
15=Trailer Hitch
16=Wheels
17=Airbags
18=Trailer Overloaded
19=Unsecure/Shifted Trailer Load
20=Improper Towing
21=Obstructed Windshield
99=Unknown

Unit No | 0 1 | 0 0 |
Unit No | 0 2 | 0 0 |

Unit No | 0 1 | 0 8 | | | 3. | | 4.
Unit No | 0 2 | | | 3. | | 4.

**Pedestrian Action (P)**
00=None
01=Entering Or Crossing At Specified Location
02=Walking, Running, Jogging, Or Playing
03=Working
04=Pushing Vehicle
05=Approaching Or Leaving Vehicle
06=Working On Vehicle
07=Standing
98=Other
99=Unknown

Unit No | 0 1 | | Unit No | 0 2 | |

**Indicated Prime Factor**
Do not repeat this information on multiple pages
Unit No | 0 1 | Factor Code | 0 8 |
E/R | V | D | P
If E/R is the Prime Factor Type, leave Unit No blank

AR0108
98

AUG-13-2004  10:09    A    MUTUAL INSURANCE CO                610 834 0237    P.07

# COMMONWEALTH OF PENNSYLVANIA
## POLICE CRASH REPORTING FORM

**AA 500 F**    Police Use Only: SSI-103TCH    Page: 06    ○ New    ● Change/Continuation    Crash Number: P 0 6 3 9 9 2 2

---

**Road Surface Type**
- ○ Concrete
- ● Blacktop
- ○ Brick or Block
- ○ Slag, Gravel or Stone
- ○ Dirt
- ○ Other
- ○ Unknown

**Special Jurisdiction**
- ● No Special Jurisdiction
- ○ National Park
- ○ Military
- ○ Indian Reservation
- ○ College/University Campus
- ○ Other Federal Sites
- ○ Other
- ○ Unknown

---

Please complete Unit Information for **each** unit involved in a **fatal** crash. Do not repeat the information in the fields above on multiple pages.

## Unit Information

**Unit No** 01

**Driver Restrictions Compliance**
- ○ No Restrictions/ Not Applicable
- ○ Restrictions Complied With
- ○ Restrictions Not Complied With
- ○ Compliance Unknown
- ○ Not a Pennsylvania Driver
- ○ Unknown Compliance

**Driver Endorsement Compliance**
- ○ None Required
- ○ Required - Complied With
- ○ Required - Non Compliance
- ○ Required - Compliance Unknown
- ○ Not a Pennsylvania Driver
- ○ Unknown Compliance

**Driver License Compliance**
- ○ Not Licensed
- ○ Not Required for Vehicle Class
- ○ No Valid License for Class
- ● Valid License for Class
- ○ Unk. if CDL or CDL Required
- ○ Not a Pennsylvania Driver
- ○ Unknown

**Drug Test Type**
- ○ None
- ● Blood
- ○ Urine
- ○ Other
- ○ Unknown if Test Given

**Drug Test Results - (Up to Four Results)**
0 = No Test Given
1 = No Drug Reported
2 = Marijuana
3 = Cocaine
4 = Opiates
5 = Amphetamines
6 = PCP
8 = Other
9 = Unknown Test Results

▷ [ 9 ] [ ] [ ] [ ]

**Principle Impact Point**
- ○ Non-Collision
- ○ Top
- ○ Undercarriage
- ○ Towed Unit
- ○ Unknown

(clock diagram 01-12)

**Avoidance Maneuver**
- ○ No Avoidance Maneuver
- ○ Braking - Skid Marks Evident
- ○ Braking - No Skid Marks, Driver Stated
- ○ Braking - Other Evidence
- ○ Steering - Evidence or Driver Stated
- ○ Steering and Braking Evidence or Stated
- ○ Other Avoidance Maneuver
- ○ Inconclusive
- ○ Unknown

**Under Ride Indicator**
- ○ No Underride or Override
- ○ Underride, No Compartment Intrusion
- ○ Underride, Compartment Intrusion
- ○ Underride, Compartment Intrusion Unknown
- ○ Override, Other Vehicle
- ○ Unknown if Underride or Override

**Emergency Use**
- ● Not in Emergency Use
- ○ Lights Flashing
- ○ Siren Sounding
- ○ Both Lights and Siren
- ○ Unknown

---

**Unit No** 02

**Driver Restrictions Compliance**
- ● No Restrictions/ Not Applicable
- ○ Restrictions Complied With
- ○ Restrictions Not Complied With
- ○ Compliance Unknown
- ○ Not a Pennsylvania Driver
- ○ Unknown Compliance

**Driver Endorsement Compliance**
- ● None Required
- ○ Required - Complied With
- ○ Required - Non Compliance
- ○ Required - Compliance Unknown
- ○ Not a Pennsylvania Driver
- ○ Unknown Compliance

**Driver License Compliance**
- ○ Not Licensed
- ○ Not Required for Vehicle Class
- ○ No Valid License for Class
- ○ Valid License for Class
- ○ Unk. if CDL or CDL Required
- ○ Not a Pennsylvania Driver
- ○ Unknown

**Drug Test Type**
- ● None
- ○ Blood
- ○ Urine
- ○ Other
- ○ Unknown if Test Given

**Drug Test Results - (Up to Four Results)**
0 = No Test Given
1 = No Drug Reported
2 = Marijuana
3 = Cocaine
4 = Opiates
5 = Amphetamines
6 = PCP
8 = Other
9 = Unknown Test Results

▷ [ 0 ] [ ] [ ] [ ]

**Principle Impact Point**
- ○ Non-Collision
- ○ Top
- ○ Undercarriage
- ○ Towed Unit
- ○ Unknown

(clock diagram 01-12)

**Avoidance Maneuver**
- ○ No Avoidance Maneuver
- ○ Braking - Skid Marks Evident
- ○ Braking - No Skid Marks, Driver Stated
- ○ Braking - Other Evidence
- ○ Steering - Evidence or Driver Stated
- ○ Steering and Braking Evidence or Stated
- ○ Other Avoidance Maneuver
- ○ Inconclusive
- ○ Unknown

**Under Ride Indicator**
- ○ No Underride or Override
- ○ Underride, No Compartment Intrusion
- ○ Underride, Compartment Intrusion
- ○ Underride, Compartment Intrusion Unknown
- ○ Override, Other Vehicle
- ○ Unknown if Underride or Override

**Emergency Use**
- ● Not in Emergency Use
- ○ Lights Flashing
- ○ Siren Sounding
- ○ Both Lights and Siren
- ○ Unknown

FORM - AA 500F (1/02)

AR0109

99

AUG-13-2004  10:09      AT    MUTUAL INSURANCE CO                    610 834 0237     P.08

**COMMONWEALTH OF PENNSYLVANIA**
**POLICE CRASH REPORTING FORM**

Page
[07]

Crash Number

AA 500 5    Police Use Only  SJ- 103170H

P 0639922



| Witness Name | Address | | Phone |
|---|---|---|---|
| 1 STEPHEN PYE | 300 CLEARFIELD DRIVE, LINCOLN UNIVERSITY PA 19950 | | (610) 869-3442 |
| 2 DAVID HARNISH | 1573 GEORGETOWN RD, CHRISTIANA PA 17516 | | (717) 509-7526 |

Narrative and additional witnesses:          Accident Investigation Notification Issued? ☑ no    Property Damage ☐

ADDITIONAL WITNESSES:

3. JOHN HINKEL,  1464 SANDTOWN RD, FELTON DE 19943    (302) 284-3440

4. GARY LAWTON,  512 LISBETH RD, NEWARK DE 19713    (302) 369-8630

IT SHOULD BE NOTED THAT NO CELLULAR TELEPHONE WERE PRESENT IN UNIT #1 OR UNIT #2, AT THE TIME OF THE CRASH.

SR856 IS AN ASPHALT ROADWAY, WITH A MODERATE ELEVATION. THE ROADWAY IS DIVIDED BY SOLID YELLOW LINES AND IS DESIGNATED AS AN NORTH TO SOUTH ROADWAY.  IT SHOULD BE NOTED THAT AT THE TIME OF THE CRASH, TRAFFIC WAS NOTED TO BE MODERATE.

THIS CRASH OCCURRED AS UNIT #1 WAS TRAVELING WEST ON BARTVILLE ROAD, AS UNIT #1 APPROACHED THE INTERSECTION OF BARTVILLE ROAD AT GEORGETOWN ROAD (SR856W). OPERATOR #1 FAILED TO STOP AT A STOP SIGN, PROCEEDING INTO THE INTERSECTION WHERE UNIT #1'S FRONT END STRUCK UNIT #2'S LEFT FRONT AS UNIT #2 WAS TRAVELING SOUTH ON SR856W. AFTER IMPACT UNIT #1 WAS SPUN IN A COUNTER CLOCKWISE DIRECTION, COMING TO REST

AR0110

100

AUG-13-2004  10:10       AT    1 MUTUAL INSURANCE CO                    610 834 0237        P.09

**COMMONWEALTH OF PENNSYLVANIA**
**POLICE CRASH REPORTING FORM**

Page  |  ○ New
**AA 500 N**    JF13704    |  0 8  |  ● Change/ Continuation    P O L 6 3 9 9 2 0

Crash Number

**Narrative and additional witnesses:**

22

FACING EAST APPROX. 20 FEET FROM POINT OF IMPACT. UNIT #2 TRAVELED IN A SOUTH WEST DIRECTION COMING TO REST FACING SOUTH IN A CORNFIELD APPROX. 70 FEET FROM POINT OF IMPACT.

PHYSICAL EVIDENCE NOTED AT THE SCENE: GOUGE MARKS INDICATING POINT OF IMPACT LOCATED IN THE SOUTHBOUND LANE OF SR0896.

ADDITIONAL MEASUREMENTS TO BE SUPPLEMENTED BY CPL. WARD AND TPR. GABRYLUK II. COLLISION ACCIDENT RECONSTRUCTION SPECIALIST.

ON 08/08/04 AT 1610 HRS WITNESS PYE WAS INTERVIEWED AT THE SCENE AND HE STATED: WE WERE TRAVELING SOUTH ON ROUTE 896. THE BLUE PICK-UP TRUCK CAME FROM BARTVILLE ROAD RAN THROUGH THE STOP SIGN AND HIT THE VAN, THAT WAS A COUPLE OF CARS INFRONT OF ME.

ON 08/08/04 AT 1610 HRS, WITNESS HARNISH WAS INTERVIEWED AT THE SCENE AND HE STATED: I WAS WALKING DOWN THE ROAD SOUTH ON 896 WHEN I SAW THE BLUE TRUCK COME FLYING THROUGH THE INTERSECTION AND THATS WHEN THEY HIT.

ON 08/08/04 AT 1615 HRS, WITNESS HINKEL WAS INTERVIEWED AT THE SCENE AND HE STATED: I WAS RIGHT BEHIND THE MINIVAN TRAVELING SOUTH ON ROUTE 896. WE WERE GOING THE SPEED LIMIT WHEN ALL OF A SUDDEN THE BLUE TRUCK CAME THROUGH THE STOP SIGN AND HIT THE VAN. I HAD TO SWERVE TO AVOID HITTING THEM.

ON 08/08/04 AT 1620 HRS. WITNESS LAWTON WAS INTERVIEWED AT THE SCENE AND HE STATED: I DIDN'T SEE WHAT HAPPENED. I JUST WALKED UP AND NOTICED THE DRIVER OF THE BLUE PICK-UP TRUCK THROWING SOME BOTTLES (POSSIBLY BEER BOTTLES) INTO THE CORN FIELD. I THEN SAW HIM PICK UP SOME OTHER BOTTLES AND PUT THEM BACK IN THE TRUCK.

IT SHOULD BE NOTED THAT NO BEER BOTTLES OR ANY OTHER ALCOHOLIC BEVERAGE BOTTLES WERE NOTED AT THE SCENE.

(MKYE)

AR0111

AUG-13-2004 10:10    AT   MUTUAL INSURANCE CO    610 834 0237    P.10

HAT    COMMONWEALTH OF P   SYLVANIA
POLICE CRASH REPORTING FORM

AA 500 N    Police Identity [50-103-1704]    Page [09]    New ☐    Change/ Continuation ☐    Crash Number [P|0|6|3|9|9|0|2]

Narrative and additional witnesses:

22    On 08/08/04 at 1605 Hrs, Operator # 1 was interviewed at the scene and he stated "I was coming home from my in-laws house in New Jersey. I guess I just missed the stop sign and blew into the intersection and hit them."

Photographs were taken at the scene by CPL Michael Witmer, Troop J Lancaster Patrol Section Supervisor.

Daniel Klarty was pronounced dead at the scene by Senior Deputy Coroner Charles S. McWilliams at 1709 Hrs on 08/08/04.

On 08/08/04 Assistant District Attorney Todd Brown was notified.

Additional assistance was provided at the scene by CPL Michael Witmer (Patrol Unit Supervisor), TPR Kurt Potter, PSP Lancaster, TPR Christopher Day, Criminal Investigation Unit, PSP Lancaster and CPL Ward and TPR Gabrylik Collision Accident Reconstruction Specialist.

Atglen Fire Company assisted.
Union Fire Company assisted.
Quarryville Fire Company assisted.
Parkesburg, Gordonville, Christiana and Willow Street Ambulance assisted.
Star Care assisted.
Lewis Towing assisted in remove both units from the scene.

SP-1605 Form was issued to all parties involved.

On 08/08/04 a clean message of the vehicle traffic fatality was sent. (Refer to attached copy) File 3. in accordance with the Pennsylvania State Police Regulations FR 6-4.

PDFRM 8 AA-530R (12/03)

AR0112

102

This is to certify that the information here ~iven is correctly copied from an original ~ificate of death duly filed with me as Local Registrar. The original certificate w. .e forwarded to the State Vital Records c .ce for permanent filing.

**WARNING: It is illegal to duplicate this copy by photostat or photograph.**

Fee for this certificate, $2.00

*Nancy E. Bachman*
Local Registrar  36-340

P 10680757
No.

8-11-04
Date

30/   H105.144 Rev. 1.91

TYPE/PRINT IN PERMANENT BLACK INK

**COMMONWEALTH OF PENNSYLVANIA • DEPARTMENT OF HEALTH • VITAL RECORDS**
**CERTIFICATE OF DEATH**
(Coroner)

NAME OF DECEDENT (First, Middle, Last): DANIEL R. ROARTY

SEX: Male

SOCIAL SECURITY NUMBER: 189 - 58 - 3764

DATE OF DEATH (Month, Day, Year): AUGUST 8, 2004

AGE (Last Birthday): 43 Yrs.

DATE OF BIRTH (Month, Day, Year): Apr 5, 1961

BIRTHPLACE (City and State or Foreign Country): Pittsburgh, PA

PLACE OF DEATH (Check only one — see instructions on other side): OTHER — ROADWAY (Specify)

COUNTY OF DEATH: Lancaster  36

CITY, BORO, TWP OF DEATH: Bart Twp.

FACILITY NAME (if not institution, give street and number): Rt 896 & Bartville Road

RACE — American Indian, Black, White, etc.: White

DECEDENT'S USUAL OCCUPATION: Engineer

KIND OF BUSINESS/INDUSTRY: Instrumentation

MARITAL STATUS — Married

SURVIVING SPOUSE (if wife, give maiden name): Kelly Ziegler

DECEDENT'S MAILING ADDRESS (Street, City/Town, State, Zip Code): 319 Palomino Drive Newark, PA 19711

DECEDENT'S ACTUAL RESIDENCE: State: Delaware  County: New Castle  City/Town: Newark

FATHER'S NAME (First, Middle, Last): Joseph D. Roarty

MOTHER'S NAME (First, Middle, Maiden Surname): Mary Joy Clapp

INFORMANT'S NAME (TypePrint): Kelly Roarty

INFORMANT'S MAILING ADDRESS (Street, City/Town, State, Zip Code): 319 Palomino Dr., Newark, DE 19711

METHOD OF DISPOSITION: Removal from State

PLACE OF DISPOSITION - Name of Cemetery, Crematory or Other Place: Hockessin Crematory

LOCATION - City/Town, State, Zip Code: Hockessin, DE

DATE OF DISPOSITION (Month, Day, Year): August 12, 2004

NAME AND ADDRESS OF FACILITY: Young Funeral Home, Lancaster, PA 17602

LICENSE NUMBER: 018135L

TIME OF DEATH: 5:29 PM

DATE PRONOUNCED DEAD (Month, Day, Year): AUGUST 8, 2004

WAS CASE REFERRED TO MEDICAL EXAMINER/CORONER?: Yes

27. PART I. Enter the diseases, injuries or complications which caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock or heart failure.

IMMEDIATE CAUSE (Final disease or condition resulting in death): Multiple Traumatic Injuries

WAS AN AUTOPSY PERFORMED?: Yes [X] No

MANNER OF DEATH: Accident [X]

DATE OF INJURY (Month, Day, Year): AUGUST 8, 2004

TIME OF INJURY: 3:40 PM

INJURY AT WORK?: No

DESCRIBE HOW INJURY OCCURRED: VEHICLE ACCIDENT AT INTERSECTION

PLACE OF INJURY - At home, farm, street, factory, office building, etc.: Rt 896 AND BARTVILLE RD. BART TWP., PA

CERTIFIER (Check only one)

*PRONOUNCING AND CERTIFYING PHYSICIAN: Jennifer Hopkins Dep. Coroner

DATE SIGNED: AUGUST 8, 2004

*MEDICAL EXAMINER/CORONER: On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.

NAME AND ADDRESS OF PERSON WHO COMPLETED CAUSE OF DEATH: JENNIFER HOPKINS 131 E. FREDERICK STREET LANCASTER, PA 17602

REGISTRAR'S SIGNATURE AND NUMBER: *Nancy E. Bachman*  B6-340

DATE FILED (Month, Day, Year): 8-11-04

NAME OF DECEDENT: DANIEL ROWAN ROARTY

AR0113

103

**Marcy L. Miler**
**Accident Claim Specialist**
**Accident & Specialty Claims Department**

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

December 17, 2004

Mrs. Kelly Roarty
319 Palomino Drive
Newark, DE 19711

| | |
|---|---|
| **Insured Name:** | **Daniel Roarty** |
| **Date of Birth:** | **04/05/1961** |
| **Policy Number:** | **ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I was sorry to learn about the death of your husband, Daniel Roarty. I've completed my review of your claim for Group Business Travel Accident insurance benefits and have determined that benefits are not payable. I'm writing to explain the outcome of the review.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions. A copy of this policy provision is enclosed. In order to be eligible for benefits, a claim must satisfy all the policy provisions.

## Policy Provision

The Tyco International policy states:

"**Scope of Coverage** - In exchange for the payments of premiums, we agree to pay benefits to all eligible persons:

a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and,
b) who, as a direct result of the injuries, and from no other cause, suffer a covered loss."

**Schedule IV Hazards Insured Against**
"We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

a) away from your premises in his city of permanent assignment; and
b) on business for you, and in the course of your business.
All such trips must be authorized by you."

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

AR0115

*104*

**Evidence Evaluated**

I have reviewed the following documents and the file as a whole in making this determination:
- Group Business Travel Accident insurance policy, ABL 661690.
- Proof of Loss claim form signed by Kelly Roarty on 09/03/04.
- Commonwealth of Pennsylvania Certificate of Death
- Police Crash Reporting Form
- Letter from Tyco Fire and Safety Human Resources dated 12/15/04.

**Summary**

According to the death certificate, Daniel Roarty died on 08/08/04 due to blunt force injuries sustained in a motor vehicle accident.   On the Proof of Loss claim form, you indicated that "Vehicle accident at intersection of Rt. 896 and Bartville Rd.  Driver of truck ran a stop sign and hit our van on L front side.  Dan died and our 3 boys have broken bones."

The police incident report submitted with the claim confirms that the driver of a blue truck failed to stop at a stop sign and struck your minivan causing the injuries to Mr. Roarty and your children.

We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized business trip at the time of his death as required by policy ABL 661690.  We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating "Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death."

Mrs. Roarty, I extend my condolences to you for the loss of your husband.  Please understand that I must evaluate this claim based upon the information available in the file and the stipulations of the policy.

This is a Business Travel Accident insurance policy that provides benefits for losses which occur during the course of authorized business trips.   Mr. Roarty's employer has clearly stated that he was not on an authorized trip at the time of the car accident and therefore, no benefits can be issued under policy ABL 661690.

**Appeal Rights**

This action is based on the information in our file.  If you are not satisfied or do not agree with the reason(s) for the denial of your claim, you may appeal the decision to:

> CIGNA Group Insurance
> PO Box 22328
> Pittsburgh, PA  15222-0328
> Attn: Lynne George

The appeal must be in writing, submitted within 60 days of the date you receive this letter and must contain the following information:

- the reason for the appeal and/or disagreement,
- the insured's name and social security number, and

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

- Information needed to su      ort that Daniel Roarty was on an au⁺  rized business trip at the time of his death.

Nothing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein. Should you have any information which would prove contrary to our findings, please submit it to the undersigned. We would be pleased to review any objective information you would wish to submit.

You may request a review of this denial by writing to the Life Insurance Company of North America  representative signing this letter. The written request for a review must be sent within 60 days of receipt of this letter and state the reason why you feel your claim should not have been denied. Include any documentation (e.g. medical data) that you feel supports your claim. You may request copies of our claim file records relevant to the claim determination upon request and free of charge. Under normal circumstances, you will be notified of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request. You have a right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 if your claim is denied on appeal.

We encourage you to either contact the Tyco International's employee benefits department or review the insurance booklet, certificate or coverage information made available to you, to determine if you are eligible for additional benefits.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3224 from 6:30 a.m. to 3:00 p.m. Eastern Time, Monday through Friday or email me at . If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Marcy L. Miler*

Marcy L. Miler

Enclosure

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

1

**LIFE INSURANCE COMPANY**
**OF NORTH AMERICA**
1601 CHESTNUT STREET,
PHILADELPHIA, PENNSYLVANIA, 19192
A STOCK INSURANCE COMPANY

**ABL 661690**
**BLANKET ACCIDENT POLICY**

### THIS IS AN ACCIDENT ONLY POLICY.
### IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS.
### THIS IS A LIMITED POLICY.
### READ IT CAREFULLY.

This is a contract between us, the Life Insurance Company of North America, and you:

| | |
|---|---|
| **Name, Address And** | Tyco International Ltd. |
| **Nature of Business of** | One Tyco Park |
| **Policyholder:** | Exeter, NH  03833 |
| | |
| | Communications Equipment |

**Policy Term**—This policy will go into effect on July 1, 2002, and will expire on July 1, 2005 , at 12:01 a.m. standard time at your address. The policy anniversary will be July 1.  Unless this policy is terminated by you or us (see General Provisions), this policy may be renewed for additional terms at the premium rates in effect at time of renewal.

**Scope Of Coverage**—In exchange for the payment of premiums (as set forth in Schedule III), we agree to pay benefits to all eligible persons (as defined in Schedule I):

    a)    who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and

    b)    who, as a direct result of the injuries, and from no other cause, suffer a covered loss (as defined in Description of Coverage).

This coverage is subject to the exclusions shown on a later page, and to all of the other terms of this policy.   **This is an accident only policy.  It does not pay benefits for loss caused by sickness.  Read your policy with care.**

This policy shall be governed by the laws of the state in which it is delivered.  As used in this policy, "he" and "his" includes "she" and "her."

**IN WITNESS WHEREOF,** we have signed this policy at Philadelphia, Pennsylvania.

*Robert J. Upton*

Robert J. Upton, Secretary

*Michael W. Bell*

Michael W. Bell, President

Countersigned _____

## PITTSBURGH

### OCT 3 0 2002

Group Life & Disability
Coverage Unit

LM-9359

AR0118

107

10

BLANKET ACCIDENT POLICY

Policyholder: Tyco International Ltd.

Schedule Date: July 1, 2002

Part of Policy No. ABL 661690

Applies To Classes:  1, 2 & 3

### SCHEDULE IV
### HAZARDS INSURED AGAINST

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a)     away from your premises in his city of permanent assignment; and

    b)     on business for you, and in the course of your business.

All such trips must be authorized by you.

This coverage does not include:

    a)     commuting between the covered person's home and place of work; or

    b)     during personal deviations made by the covered person.

"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip.  It does not matter whether the trip starts at the covered person's home, place of work, or other place.  This coverage will end when the covered person:

    a)     arrives at his home or place of work, whichever happens first; or

    b)     makes a personal deviation.

If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**–This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.

A covered person will be presumed to have died, for purposes of this coverage, if:

    a)     he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be covered by the policy; and

    b)     his body is not found within a year of the accident.

**Aircraft Restrictions**--If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

    a)     he is riding as a passenger only, and not as a pilot or member of the crew; and

    b)     the aircraft has a valid certificate of airworthiness; and

    c)     the aircraft is flown by a pilot with a valid license; and

    d)     the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**–We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates.  An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2229]

10

**BLANKET ACCIDENT POLICY**

Policyholder: Tyco International Ltd.

Part of Policy No. ABL 661690

Schedule Date: July 1, 2002

Applies To Classes: 1, 2 & 3

**SCHEDULE IV**
**HAZARDS INSURED AGAINST**

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a)     away from your premises in his city of permanent assignment; and
    b)     on business for you, and in the course of your business.

All such trips must be authorized by you.

This coverage does not include:

    a)     commuting between the covered person's home and place of work; or
    b)     during personal deviations made by the covered person.

"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:

    a)     arrives at his home or place of work, whichever happens first; or
    b)     makes a personal deviation.

If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**--This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.

A covered person will be presumed to have died, for purposes of this coverage, if:

    a)     he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be covered by the policy; and
    b)     his body is not found within a year of the accident.

**Aircraft Restrictions**--If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

    a)     he is riding as a passenger only, and not as a pilot or member of the crew; and
    b)     the aircraft has a valid certificate of airworthiness; and
    c)     the aircraft is flown by a pilot with a valid license; and
    d)     the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**--We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates. An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2229]

AR0120

*109*



*Fire &*
*Security*

1,..6 Fire and Security
One Town Center Road
Boca Raton, FL 33486

Telephone: 561-988-3600
Fax: 561-988-3631

### Interoffice Memorandum

*This correspondence may contain confidential information intended for the use of the individual or entity to whom it is addressed. If the reader is no the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination of copying is strictly prohibited.*

| | |
|---|---|
| *Date* | 12/15/04 |
| To | Cigna |
| From | Nicole Gibian |
| Subject | Daniel Roarty |

Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death.    If you need additional information, please contact Felicia Johnson at the HRSC, 800-924-8518.

AR0130

*110*

## Miller, Marcy L 250

**From:** Miller, Marcy L 250
**Sent:** Tuesday, December 14, 2004 10:13 AM
**To:** 'Johnson, Felicia'
**Subject:** RE: BTA - Roarty

Felicia,

Thank you for checking into this. I paid the AD&D claim today, so just the BTA is pending.

**Marcy L. Miller**
Accident Claim Specialist
CIGNA Group Insurance
PH: 800.238.2125 ext. 3224
FX: 412.402.3316
E-Mail: Marcy.Miller@cigna.com

-----Original Message-----
**From:** Johnson, Felicia [mailto:feljohnson@adt.com]
**Sent:** Tuesday, December 14, 2004 9:51 AM
**To:** Gibian, Nicole
**Cc:** Gallman, Audrey Y
**Subject:** RE: BTA - Roarty

Please have HR Jennifer Napier contact me regarding this account this is one of numerous of times on this one account I have been waiting or requested information. I have not received the fax from Jennifer for Cigna's request. If there is no proof that the employee was on business travel she needs a letter. The spouse is very frustrated on the time frame for the status on her claim.

Felicia Johnson
ADT/Tyco
HRSC Benefits Specialist/Life Claims Coordinator
800-600-6641 ext. 3944
Fax 904-620-7952
-----Original Message-----
**From:** Miller, Marcy L 250 [mailto:Marcy.Miller@CIGNA.com]
**Sent:** Tuesday, December 14, 2004 9:05 AM
**To:** Johnson, Felicia
**Subject:** BTA - Roarty

Hi Felicia,

I am just following up on some information for Daniel Roarty's BTA claim. Has Mr. Roarty's manager or HR Department provided you with confirmation that he was on a work trip at the time of his death? The last e-mail you sent said the HR Dept was going to fax you something.

Thanks,

12/14/2004

AR0134

**Marcy L. Miller**
Accident Claim Specialist
CIGNA Group Insurance
PH: 800.238.2125 ext. 3224
FX: 412.402.3316
E-Mail: Marcy.Miller@cigna.com

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute.
Use and distribution limited solely to authorized personnel.*

*(c) Copyright 2004 by CIGNA*

------------------------------------------------------------------------CONFIDENTIALITY NOTICE: If you have
received this e-mail in error, please immediately notify the sender by e-mail at the address shown. This e-mail
transmission may contain confidential information. This information is intended only for the use of the individual
(s) or entity to whom it is intended even if addressed incorrectly. Please delete it from your files if you are not the
intended recipient. Thank you for your compliance. Copyright (c) 2004 CIGNA

12/14/2004

**Miller, Marcy L    250**

| | |
|---|---|
| **From:** | Miller, Marcy L    250 |
| **Sent:** | Tuesday, December 14, 2004 9:05 AM |
| **To:** | 'Johnson, Felicia' |
| **Subject:** | BTA - Roarty |

Hi Felicia,

I am just following up on some information for Daniel Roarty's BTA claim.  Has Mr. Roarty's manager or HR Department provided you with confirmation that he was on a work trip at the time of his death?   The last e-mail you sent said the HR Dept was going to fax you something.

Thanks,

**Marcy L. Miller**
**Accident Claim Specialist**
**CIGNA Group Insurance**
**PH: 800.238.2125 ext. 3224**
**FX: 412.402.3316**
**E-Mail: Marcy.Miller@cigna.com**

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel.*
*(c) Copyright 2004 by CIGNA*

1

AR0136

113

Marcy L. Miller
Accident Claim Specialist
Accident and Specialty Claims Department



**CIGNA** Group Insurance
Life • Accident • Disability
P.O. Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

December 14, 2004

Mrs. Kelly Roarty
319 Palomino Drive
Newark, DE 19711

| | |
|---|---|
| **Insured Name:** | **Daniel Roarty** |
| **Date of Birth:** | **04/05/1961** |
| **Policy Number:** | **OK 826564 - ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I'm sorry to learn about the death of your husband, Daniel Roarty. I have approved your claim for Group Accidental Death Insurance for $92,400.00. I hope the insurance will be helpful to you during this difficult time. The calculation of your benefit is below:

| | | |
|---|---|---|
| Accident Benefit | | $84,000.00 |
| Seatbelt Benefit | + | 8,400.00 (10% of Principal) |
| Total Amount of Deposit | | $92,400.00 |

* Please note, we are continuing to review the Business Travel Accident claim filed under policy ABL 661690. We are currently in need of some additional information from Tyco. I expect to have this claim resolved shortly.

Mrs. Roarty, we know you have a lot on your mind and may wish to wait for a while before making any major financial decisions. That's why we've deposited your insurance proceeds into a CIGNAssurance® account in your name. The account is free, and earns an attractive rate of interest comparable to a money market checking account. You may keep your money in this account for as long as you like.

Within five to ten business days, you will receive **two** separate mailings from CIGNA. One envelope will contain your CIGNAssurance® Program welcome kit, and will include:

- Your *Certificate of Confirmation,* which shows the claim payment amount deposited into your account and the current interest being credited. Your balance and earned interest are fully guaranteed by the Life Insurance Company of North America, a CIGNA company. Your CIGNAssurance® account is not a bank deposit and is not insured by the Federal Deposit Insurance Corporation or any federal agency.
- A supply of personalized drafts to give you access to your money, immediately. You may write an unlimited number of drafts, in any amount, at any time.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

AR0137

- *Where to go from here,* a brochure that explains some services available at no charge to you that might help you through this difficult time, including bereavement counseling, financial assistance services, and legal assistance services.
- *Looking ahead,* a booklet that you might find useful as you address estate settlement issues that may be unfamiliar to you.

The other envelope will contain a CIGNAssurance® Account Information Request Form, which you will need to **sign** and **return** to us immediately in the postage paid return envelope. We need this form to verify your name, address and social security number, and also to have your signature in our files.

Mrs. Roarty, if you have any questions about the CIGNAssurance® Program, please call the customer service area toll-free at **1.800.570.3778** from 8:00 a.m. to 6:00 p.m. Eastern Time, Monday through Friday. Program representatives can answer your questions, or arrange for bereavement counseling, financial assistance services, or legal assistance services.

We extend our deepest sympathy to you on your recent loss, and we are pleased to make this extra service available to help you during this time.

Sincerely,

*Marcy L. Miller*

Marcy L. Miller

c: Tyco International

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

AR0138

**Miller, Marcy L 250**

**From:**    Johnson, Felicia [feljohnson@adt.com]
**Sent:**    Monday, December 06, 2004 8:48 AM
**To:**       Miller, Marcy L 250
**Subject:** RE: New Claim - Roarty

BTA-$500,000
AD&D-1x annually salary
Personal Accident Insurance

I spoke with the deceased local Human Resources and they will fax me a letter if the team member was on business the date of death.  Thank you.


Felicia Johnson
ADT/Tyco
HRSC Benefits Specialist/Life Claims Coordinator
800-600-6641 ext. 3944
Fax 904-620-7952

> -----Original Message-----
> **From:** Miller, Marcy L 250 [mailto:Marcy.Miller@CIGNA.com]
> **Sent:** Wednesday, November 24, 2004 1:06 PM
> **To:** Johnson, Felicia
> **Subject:** New Claim - Roarty
> **Importance:** High
>
>
> Hello Felicia,
>
> I received a new Accidental Death claim for Daniel Roarty, DOB 4/5/61.  The claim shows that you are filing for Basic and Voluntary AD&D along with BTA.  Can you please have Mr. Roarty's manager provide me with his itinerary for the day of his death?  According to the BTA policy, the Insured has to be on company business or a business trip to be considered for benefits.
>
> Also, you have $50,000 being claimed for the BTA benefit, but our policy shows the BTA under policy ABL 661690 has a flat benefit of $500,000.  Can you please double check you policy items?
>
> Thank,
> Marcy
>
> **Marcy L. Miller**
> Accident Claim Specialist
> CIGNA Group Insurance
> PH: 800.238.2125 ext. 3224
> FX: 412.402.3316
> E-Mail: Marcy.Miller@cigna.com

12/08/2004

**116**

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel.*

*(c) Copyright 2004 by CIGNA*

--------------------------------------------------------------------------CONFIDENTIALITY NOTICE: If you have received this e-mail in error, please immediately notify the sender by e-mail at the address shown. This e-mail transmission may contain confidential information. This information is intended only for the use of the individual(s) or entity to whom it is intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank you for your compliance. Copyright (c) 2004 CIGNA

12/08/2004

AR0140

117

**Marcy L. Miller**
Accident Claims Specialist



**CIGNA** GROUP INSURANCE
Life, Accident, Disability

# AD&D Telephone Log

Date:  11/29/04
Time:  9:00 am

Outgoing:  Felicia Johnson - Tyco HR
  Phone Number:

| Re: Daniel Roarty | Acct: |
|---|---|
| DOB: | Policy #: |

   Left message to f/u on my e-mail from 11/24.  Also asked that Ms. Johnson forward a copy of the Insured elections forms.

AR0141

Marcy L. Miller
Accident Claim Specialist
Accident & Specialty Claims Department

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

November 24, 2004

Mrs. Kelly Roarty
319 Palomino Drive
Newark, DE 19711

| | |
|---|---|
| **Insured Name:** | **Daniel Roarty** |
| **Date of Birth:** | **04/05/1961** |
| **Policy Number:** | **OK 826564** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

Thank you for sending the Group Accidental Death insurance claim for Daniel Roarty, for benefits that you have through Tyco International. I am sorry to learn about his death.

I am the Accident Specialist who will be reviewing your claim. Should I need additional information from you to continue my review, I will contact you.

If you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3224 from 6:30 a.m. to 3:00 p.m. Eastern Time, Monday through Friday. If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Marcy L. Miller*

Marcy L. Miller

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

**Miller, Marcy L    250**

| | |
|---|---|
| **From:** | Miller, Marcy L    250 |
| **Sent:** | Wednesday, November 24, 2004 1:06 PM |
| **To:** | 'Johnson, Felicia' |
| **Subject:** | New Claim - Roarty |

**Importance:**    High

Hello Felicia,

I received a new Accidental Death claim for Daniel Roarty, DOB 4/5/61.  The claim shows that you are filing for Basic and Voluntary AD&D along with BTA.  Can you please have Mr. Roarty's manager provide me with his itinerary for the day of his death?  According to the BTA policy, the Insured has to be on company business or a business trip to be considered for benefits.

Also, you have $50,000 being claimed for the BTA benefit, but our policy shows the BTA under policy ABL 661690 has a flat benefit of $500,000.  Can you please double check you policy items?

Thank,
Marcy

Marcy L. Miller
Accident Claim Specialist
CIGNA Group Insurance
PH: 800.238.2125 ext. 3224
FX: 412.402.3316
E-Mail: Marcy.Miller@cigna.com

*Confidential, unpublished property of CIGNA. Do not duplicate or distribute. Use and distribution limited solely to authorized personnel.*
*(c) Copyright 2004 by CIGNA*

1

120

Any person who knowingly and with int... to defraud any insurance company or o... person: (1) Files an application for insurance or statement of claim containing any materially false information; or (2) conceals for the purpose of misleading, information concerning any material fact, commits a fraudulent insurance act. For residents of the following states, please see the last page: **Colorado, District of Columbia, Florida, Maryland, New Jersey, New York, Pennsylvania, Oregon or Virginia.**

## INSTRUCTIONS FOR FILING A CLAIM

THIS FORM IS FOR LIFE INSURANCE OR ACCIDENTAL DEATH PROCEEDS ONLY.
COMPLETE THE FORM ACCORDING TO THE INSTRUCTIONS, TO AVOID DELAY OR RETURN OF THE FORM.

To The Employer/
Administrator:   A. Submit completed form to your assigned Claim Office with a certified Death Certificate and Beneficiary Designation.
B. If there is no designated Beneficiary, the Preference Beneficiary's Affidavit section must be completed and notarized.

## SECTION TO BE COMPLETED BY THE EMPLOYER / ADMINISTRATOR

Name of Employee/Insured (Last Name) Koorty (First Name) Daniel (Middle Initial) R.   Date of Birth 4/5/61   Social Security No. 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   Sex ☑ M ☐ F

Address (Street) 319 Palomino Drive   (City) Newark   (State) DE   (Zip Code) 19711

Insured's Marital Status
☐ Single   ☑ Married   ☐ Widow/Widower   ☐ Separated   ☐ Divorced

Policy Number(s) OK8Z6564   Division HZN03/1BS   Occupation Sr Proj. Mgr.   Was insurance issued on the basis of a statement of physical condition? (If yes, attach copy) ☐ Yes ☐ No

Please check the appropriate blocks regarding the insured's employment status.
☑ Active   ☐ Exempt   ☑ Management   ☐ Supervisory   ☐ Union Local # _____   ☑ Salaried   ☑ Full-time   Hrs./Wk. 40
☐ Retired   ☑ Non-Exempt   ☐ Non-Management   ☐ Non-Supervisory   ☐ Non-Union   ☐ Hourly   ☐ Part-time

Basic Annual Earnings 83,241.60   Date of Last Change in Earnings 1/1/04   Date of Last Increase in Benefits 1/1/04   Amount of Insurance Basic 84,000   84,000   Suppl 50,000 AD&D

Date Hired/Member of Assoc. 1/31/1994   Effective Date of Insurance 1/1/03   Date Last Worked 8/6/04   Date of Death 8/8/04   Premium Paid Through Date 8/6/04

Percentage of Insured's Contribution Toward Premium   Insured's Contributions Were Made on ☐ Pre-tax or ☑ Post-tax Basis   Has an assignment been taken? (If so please attach.) ☐ Yes ☑ No

Was the above Considered an Employee/Association Member until the Date of Death? If Not, Please Explain

yes

Was Coverage Still in Effect Through the Date of Death? If Not, Please Explain

yes

PITTSBURGH
NOV 22 2004
GROUP LIFE & DISABILITY BENEFITS OFFICE

## EMPLOYER'S/ADMINISTRATOR'S CERTIFICATION

Name of Employer/Association ADT/Tyco   Division   E-Mail Address feljohnson@adt.com

Address (Street) P.O. Box 550587   City Jacksonville   (State) FL   (Zip) 32255-0587   Telephone Number 800-600-6011 x3744

This is to certify that the facts as indicated on this form are true to the best of my knowledge and belief.

Signature Felicia Joh   Title Life Claims Coord.   Date 8/11/04

## TO BE COMPLETED IF CLAIM IS FOR DEPENDENT BENEFITS

Name of Dependent (Last Name) (First Name) (Middle Initial)   Date of Birth   Social Security No.   Sex ☐ M ☐ F

Relationship to Employee/Association Member   Amount of Dependent Insurance   Dependent's Occupation

Is Child
☐ Full-time student
☐ Part-time student   Name & Address of School (Street) (City) (State) (Zip Code)

Was the Dependent Totally Disabled? ☐ Yes ☐ No   If yes, Date Disability Began   Was Dependent Receiving Social Security or other Disability Benefits? ☐ Yes ☐ No

LMS-612420d

Page 2 of 5

AR0144

121

## TO BE COMPLETED IF CLAIM IS FOR ACCIDENTAL DEATH BENEFITS

| Where and How Did the Accident Happen?  Please Describe in Detail | Date and Time of Accident |
|---|---|
| vehicle accident at intersection of Rt 896 and Bartville RD. Driver of truck, ran w stop sign and hit our van on @front side. Dan died and our 3 boys have broken bones. | 8/8/04 3:48am |

## SECTION TO BE COMPLETED BY THE BENEFICIARY

| Name of Beneficiary *(Last Name)* *(First Name)* *(Middle Initial)* | Date of Birth | Social Security No. | Sex |
|---|---|---|---|
| Rearty    Kelly    J | 1-12-62 | 013 44 7803 | ☐ M ☒ F |

| Address *(Street)* *(City)* | *(State)* | *(Zip Code)* |
|---|---|---|
| 319 Palomino DR  Newark  DE | | 19711 |

| Relationship to Deceased | Daytime Telephone Number | E-Mail Address |
|---|---|---|
| wife | 302 292 6866 | j.rearty@msn.com |

Name and Address of Legal Guardian if Beneficiary is A Minor

| Did the Deceased Have Other Insurance Coverage? ☒ Yes ☐ No | Type of Insurance |
|---|---|

Policy Number(s)  206835 — Hartford

Identify Insurance Carrier(s)  AM JA

During the past 3 years, did the deceased use any form of tobacco product?
☒ Yes ☐ No   rare cigar 1-2x/yr

Please List Any Hospital, Clinics or Physicians That Treated the Deceased During the Past 5 Years.

| Name | Complete Address | Treatment Period |
|---|---|---|
| Ax Wright DC | 5307 Limestone RD ste 100 Wilmington, DE 19808 | |

I certify that the foregoing information is true, correct and complete to the best of my knowledge.

Beneficiary Signature  *Kelly J Rearty*    Date  9..-04

## Authorization to Release Information

I authorize any Health Care Provider, Insurance Company, Employer, Person or Organization to release any information regarding medical, dental, mental, alcohol or drug abuse history, treatment or benefits payable, including disability or employment related information, to any CIGNA Company, the Plan Administrator or their employees and authorized agents for the purpose of validating and determining benefits payable. This data may be extracted for use in audit or statistical purposes.  I understand that I or my authorized representative will receive a copy of this authorization upon request.

This authorization, or a photostatic copy of the original, shall be valid from the date signed for the duration of the claim.

My authorized representative or I may revoke this authorization at any time as it applies to further disclosures by writing the Insurance Company. Prompt notice of revocation will then be given to all persons to whom the Insurance Company has disclosed protected health information in reliance to the original authorization as may be required or permitted by law.  A valid authorization or court order for information does not waive other privacy rights.

| Name of Deceased | Signature of Personal Representative or Next of Kin | Date Signed |
|---|---|---|
| Daniel K. Rearty | Kelly J Rearty | |

## Resource Manager Program

If your insurance benefit is $5,000 or more, CIGNA will automatically* open a free, interest-bearing account in your name. This account, called the CIGNA Resource Manager is a safe, secure place to keep your proceeds while you decide how to best use them. A personal checkbook will be mailed to you, once your claim has been approved. You can take all or part of the money out of the account simply by writing a check for $250.00 or more. Any amount that remains in the account will continue to earn interest at competitive rates. Both your principal and any interest you earn are completely guaranteed by Connecticut General Life Insurance Company, a CIGNA Company. The establishment of a CIGNA Resource Manager account substitutes this guarantee for the obligation from the insurance company providing the life insurance or accidental death coverage. Checks are cleared through a draft account at State Street Bank. This account is not insured by the Federal Deposit Insurance Corporation or any federal agency. If your insurance benefit is less than $5,000, CIGNA will send you a check for the total benefit amount.

**\*Residents of the state of Arkansas, Kansas, Nevada, or North Carolina, you may elect to participate in the CIGNA Resource Manager Program by checking the box below and signing your name.**

☐ Please put my insurance proceed directly into the CIGNA Resource Manager Account.

Signature  _____    Date  _____

The issuance of this blank is not an admission of the existence of any insurance nor does it recognize the validity of any claim and is without prejudice to the company's legal rights in the premises.

Page 3 of 5

8/10/2004 3:02:04 PM dmontgomery
HR Jennifer Napier called in stating ee past away in a car accident this
weekend and she wants to verify the ee's life insurance and PFAI. I advised
ee is not eligible for the supp life insurance becuase EOI not approved. I
advise ee has basic life insurance and PFAI 1x his salary. I advised HR to
tell spouse to call in so we can process claim for basic life, PFAI, and BTA.

1

AR0207

**123**

9/15/2004 3:16:22 PM fjohnson
I called spouse w/ questions she had about the life ins. Spouse advised for the Cigna life policy the AD&D amount was not on the policy. I advised to complete the Cigna form and submit to me and I will write the amount for the AD&D and fax her a copy. Spouse also asked for the policy booklet. I stated she will have to request this from the carriers once the claim forms are submitted. Spouse wanted BTA policy and claim form. I stated EE was not eligible and per corp and not to submit the documentation. Awaiting the claim forms...

10

AR0216

124

9/16/2004 8:19:16 AM fjohnson
-Rec'd the following e-mail from Nicole:
Hi Felicia,

I spoke to Mrs. Roarty and told her we can send the BTA stuff to her but did
state that we don't normally send this out because the circumstance of Dans
death does not warrant BTA. She said she wants to try any way. So, go
ahead and send her the BTA forms. She has been made aware that they are
not eligible for benefit. Please paste this email in the case notes for future
reference if need be.

Thanks,

Nicole

11

AR0217

125

9/22/2004 9:49:28 AM fjohnson
-I called and left a message for Jennifer Napier for the requested
documentation that the ins carrier requested for the BTA.

14

126

11/18/2004 9:34:46 AM fjohnson
-I rec'd documents of police report, newspaper clipping, W2 and the death
certificate.
-I called 704-291-8349 and left a message for Jennifer Napier for statement
if EE was working at the time of the accident. Documentation requested by
Cigna.

18

AR0224

127

11/19/2004 12:39:06 PM fjohnson
-Copied file.
-Mailed to Cigna and Hartford. Tracking #'s H-6594 1513 2879/C-6594
1513 2868

20

AR0226

128

3/3/2005 4:12:21 PM fjohnson
Bob Kelmer from Cigna GUL 800-238-2125 ext. 3219 called for an Appeal
that was placed by the spouse beneficiary. Cigna needs proof or statement
that EE was not on BTA when the accidental death occured. I called and left
him a message today I will research and contact him back.

31

AR0237

129

# EXHIBIT "C"

*130*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY                                          :
                                                      :
          Plaintiff,                                  :
                                                      :
     v.                                               :          C.A. No.  06-195 GMS
                                                      :
TYCO INTERNATIONAL LTD. GROUP                         :
BUSINESS TRAVEL ACCIDENT                              :
INSURANCE PLAN, an employee                           :
welfare benefit plan, and                             :
LIFE INSURANCE COMPANY OF                             :
NORTH AMERICA, Plan Administrator,                    :
                                                      :
          Defendants.                                 :

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' RE-FILED MOTION FOR PROTECTIVE ORDER TO LIMIT DISCOVERY AND ADMISSIBLE EVIDENCE TO THE ADMINISTRATIVE RECORD

                         Richard R. Wier, Jr. (#716)
                         Michele D. Allen (#4359)
                         RICHARD R. WIER, JR., P.A.
                         Two Mill Road, Suite 200
                         Wilmington, DE 19806
                         (302)888-3222

Dated: November 13, 2007

131

# TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    THE MOTION FOR A PROTECTIVE ORDER IS WITHOUT
        MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    DEFENDANTS MOTION TO PROHIBIT AND LIMIT
            DISCOVERY IS MOOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.    DE NOVO REVIEW IS THE APPROPRIATE STANDARD OF
            REVIEW AND EVIDENCE OUTSIDE THE ADMINISTRATIVE
            RECORD IS RELEVANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    UNDER A HEIGHTENED ARBITRARY AND CAPRICIOUS
            STANDARD DISCOVERY IS PERMITTED . . . . . . . . . . . . . . . . . 14

            1.    Structural Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            2.    Procedural Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**132**

# TABLE OF CITATIONS

**Cases**

*Bill Gray Enterprises, Inc. Health and Welfare Plan v. Gourley,*
2001 U.S. App. LEXIS 7922 (3d Cir. April 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dinote v. United of Omaha,* 1991 U.S. Dist. LEXIS 14429
(E.D. Pa. July 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Firestone Tire & Rubber Co. v. Bruch,*
        489 U.S. 101,115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,14

*Freccia v. Conectiv,* 2004 U.S. Dist. LEXIS 23894
        (D. Del. Nov. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Koshiba v. Merck,* 2004 U.S. App. LEXIS 19164 (3d Cir. Sept. 13, 2004) . . . . . . . . . . . . . . 17

*Pinto v. Reliance Standard Life Insurance Company,*
        214 F.3d 377 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,18,19

*Post v. Hartford Insurance Company,*
        2007 U.S. App. LEXIS 21911 *17 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,18

*133*

which was a qualification for benefits under the Plan. *See* (AR0002).

"The Supreme Court has instructed [Courts] to review the determinations of a plan administrator de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,115 (1989). Although, LINA as the administrator was given fiduciary discretion in accordance with the Firestone Tire & Rubber Co. standard and therefore the default de novo standard of review should apply.

"Whether terms in an ERISA Plan document are ambiguous is a question of law. A term is 'ambiguous if it is subject to reasonable alternative interpretations.'"*Bill Gray Enterprises, Inc. Health and Welfare Plan v. Gourley*, 2001 U.S. App.. LEXIS 7922, at *26 (3d Cir. 2001). [I]f the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve any ambiguities in the plan document."*Id.*

The Plan covers the employee "for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling... away from your premises and on business for you and in the course of your business. All such trips must be authorized by you." *See* Exhibit B (AR0002). It does not cover "personal deviations"...which "means an activity that is not reasonably related to your business, and not incidental to the business trip." *Id.*

"Authorized" is not defined nor does the definition of "covered accident" or "covered loss" require or state that the business trip must be authorized by the employer, Tyco. *See* (AR0014). The definition of covered accident is ambiguous because it says that the accident "is not otherwise excluded under the terms of this Policy." *Id.*

The Plan provides that "the Plan Administrator...has appointed the Insurance Company as

10

**134**

the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law... The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above." *See* (AR0022).

In this case, LINA delegated its fiduciary responsibilities to Tyco in determining whether the accident which took Daniel Roarty's life was "authorized." In its initial denial of the claim it relied exclusively upon a statement from Tyco. "We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized business trip at the time of his death as required by policy ABL 661690. We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating 'Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death." *See* (AR0116). LINA did not receive any basis for that position and all of the evidence submitted to it on the appeal established that he traveled in his own car for purposes of business. Indeed, LINA failed to follow up on the statement in that December 15, 2004 "Interoffice Memorandum: that "If you need additional information, please contact Felicia Johnson at the HRSC, 800-924-8518." *See* (AR0130). As stated <u>supra</u>, through discovery it has been learned the human resources department sought confirmation from Mr. Bierzynski who at the time was not Mr. Roarty's supervisor, regarding whether or not Mr. Roarty was on a business trip. (Bierzynski depo at 33). Moreover, Mr. Bierzynski stated in his

11

135

# EXHIBIT "D"

**136**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KELLY ROARTY,

              Plaintiff(s)

        v.

TYCO INTERNATIONAL, LTD. GROUP
BUSINESS TRAVEL ACCIDENT
INSURANCE PLAN AND LIFE
INSURANCE COMPANY OF NORTH
AMERICA,

              Defendants.

Civil Action No: 06-0195-GMS

## ANSWERS AND OBJECTIONS OF DEFENDANT, TYCO INTERNATIONAL, LTD. TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America, (hereinafter, "Tyco"), through his undersigned counsel, hereby answers and objects to Plaintiffs' Interrogatories addressed to Defendant as follows:

1.    Identify each person who has knowledge of the facts relating to the litigation. For each, also state with particularity the facts for which each has knowledge, including the specific paragraphs of the complaint. Identify each document recording, referring or relating to your answer.

ANSWER: Defendants identify the following persons:

**a. Bob Bierzynski.** Mr. Bierzynzki is employed by Scott Health & Safety, 4320 Goldmine Road, Monroe, NC 28110, a Tyco subsidiary. Mr. Bierzynski should be contacted through Thomas Christina, Esquire, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 300

**137**

North Main Street (20601) Post Office Box 2757, Greenville, SC 29602, (864) 271-1300, (864) 235-4754 (Fax).

During the time period of April through August 2004, Mr. Bierzynski was acting General Manager of Scott's Exton, Pennsylvania facility. Mr. Bierzynski was also Senior Director of Engineering. Mr. Roarty was Senior Product Manager and reported to Mr. Bierzynski. Mr. Bierzynski recalls the difficulties that his facility had in obtaining CE130 sensors from supplier Bachrach. Mr. Bierzynski is aware that Scott had been acquired by Tyco from Bachrach, and that Bachrach was contracted to supply Scott with parts, including the CE130 sensor, but had not reliably done so.

Mr. Bierzynski recalls sending the email that appears at AR0091-92 on July 29, 2004, which speaks for itself. Mr. Bierzynski recalls that Mr. Roarty advised that he planned to travel to Pittsburgh for vacation and to attend a family wedding. While there, Mr. Roarty would visit the Bachrach plant to find out what the difficulty was in supplying the CE130 sensor. Informally, Mr. Bierzynski agreed that Mr. Roarty could visit the Bachrach plant for that purpose.

Regis Wyse was the Scott applications engineer assigned to Bachrach and responsible to schedule any visit to Bachrach that Mr. Roarty would make. Mr. Bierzynski does not recall the specific details of Mr. Roarty's trip.

Mr. Bierzynski has advised that insofar as Mr. Roarty traveled to Pittsburgh to attend a wedding and for vacation, his travel to Pittsburgh was not related to Tyco's business and would not have been reimbursable. Had Mr. Roarty taken time from his vacation to visit the Bachrach plant, he would have been engaged in Tyco business and Tyco would have reimbursed his expenses incurred in traveling to the Bachrach plant from his vacation residence, and his

**138**

return.   Mr. Roarty's return travel from his vacation would have been personal travel and not undertaken on behalf of Tyco's business, and would not have been reimbursable.

Mr. Bierzynski concludes that Mr. Roarty was not engaged in business travel on behalf of Tyco at the time of his death.

**b.  Brian Billeter** – Mr. Billeter is a Group Claims Specialist in LINA's Accident and Specialty Claims Department. Mr. Billeter is Mr. Killmer's supervisor and participated in the handling of the Roarty claim to the extent that he signed the March 24, 2005 letter from LINA that advised Plaintiff that her appeal had been denied.

**c.  Nicole Gibian.** Ms. Gibian is a former benefits administrator for Tyco Fire and Security. In that position, she was tasked to contact Scott Human Resources to determine whether Mr. Roarty was engaged in business travel for Tyco when he died. As the result of her contact with either Bob Bierzynski or Lanny Tomberlin, she prepared the December 15, 2004 memo addressed to CIGNA, which speaks for itself and which she forwarded to Felicia Johnson.

**d.  Felicia Johnson.** Ms. Johnson was formerly employed by Tyco in its Benefits call center as a employee service representative. In this capacity, she answered calls from Tyco employees and their beneficiaries with regard to their benefits and provided them necessary assistance. As part of her duties, Ms. Johnson made notes of her telephone contacts with Ms. Roarty and others in dealing with the Roarty BTA claim. These notes have been produced with this answer, and speak for themselves. These notes accurately record Ms. Johnson's involvement in this matter.

**e.  Robert Killmer.** Mr. Killmer is a Technical Specialist in LINA's Accident and Specialty Claims Department. Mr. Killmer was responsible for responding to Plaintiff's appeal

*139*

from LINA's initial denial of her claim. Mr. Killmer prepared the March 24, 2005 letter that advised Plaintiff that her appeal had been denied, and the basis for the decision. *See* AR0065-67. The information that Mr. Killmer had when he determined the claim should be denied on appeal is contained in the Administrative Record.

      **f. Lori Levangie.** Ms. Levangie is employed by Scott as a regional sales manager. She is aware of the customer complaints that are detailed in the emails that appear at AR0089-98, which speak for themselves. Ms. Levangie has no knowledge of the details of Mr. Roarty's travel to Pittsburgh other than that he was traveling on vacation and that he planned to visit the Bacharach plant during his vacation. Ms. Levangie would agree with Mr. Bierzynski that insofar as Mr. Roarty traveled to Pittsburgh to attend a wedding and for vacation, his travel to Pittsburgh was not related to Tyco's business and would not have been reimbursable.; that had Mr. Roarty taken time from his vacation to visit the Bachrach plant, he would have been engaged in Tyco business and Tyco would have reimbursed his expenses incurred in traveling to the Bachrach plant from his vacation residence, and his return; and that Mr. Roarty's return travel from his vacation would have been personal travel and not undertaken on behalf of Tyco's business, and would not have been reimbursable.

      **g. Marion Luongo.** Ms. Luongo was former corporate counsel to LINA and responsible for providing legal advice to Robert Killmer with regard to the determination of Plaintiff's appeal from the initial claim denial. This advice appears at AR0068-71, and speaks for itself.

      **h. Marcy Miller.** Ms. Miller is employed as an Accident Claim Specialist in LINA's Accident and Specialty Claims Department. She was responsible for the handling and initial determination of Plaintiff's claim. Ms. Miller prepared the December 17, 2004 letter to

140

Plaintiff that informed her of the basis for LINA's denial of the claim. *See* AR 0099-101. The information that Ms. Miller had when she determined the claim should be denied is contained in the Administrative Record.

  **i.  Trent Smith.**  Mr. Smith is employed by Tyco and at the time of Mr. Roarty's death, was Scott's National Sales Manager. Mr. Smith received the emails that appear at AR0091-93. Mr. Smith was generally aware of the problems associated with failure to secure necessary parts from Bacharach.  He has no specific information with regard to Mr. Roarty's vacation travel or his intended visit to the Bacharach plant.

  **j.  Lanny Tomberlin.**  Mr. Tomberlin is the former Tyco Human Resource manager responsible for Scott and the Exton facility.  Mr. Tomberlin was not aware of the circumstances of Mr. Roarty's trip prior to his death. Mr. Tomberlin spoke with Plaintiff shortly after Mr. Roarty's death.  Mr. Tomberlin apologized to Plaintiff for initial confusion by Tyco benefits personnel who had advised that the benefit would be changed, and later were forced to correct that statement to advise that eligibility to receive the benefit depended on whether Mr. Roarty had been engaged in business travel when he died.  Mr. Tomberlin advised Felicia Johnson that Mr. Roarty was not engaged in business travel at the time of his death.

  **k.  Ronald Unruh.**  Mr. Smith was employed by Tyco at the time of Mr. Roarty's death as a manager.  Mr. Unruh received those emails with regard to the Bacharach sensor problem that were directed to him. *See* AR0089-98. Mr. Smith was generally aware of the problems associated with failure to secure necessary parts from Bacharach.   He has no specific information with regard to Mr. Roarty's vacation travel or his intended visit to the Bacharach plant.

**141**

1.    **Regis Wyse**. Mr. Wyse is believed to be the person who made the advance arrangements for Mr. Roarty cancelled August 3 and 4, 2004 visits to the Bacharach plant. Mr. Wyse has been unavailable after surgery for interview in order to respond to these interrogatories. Defendants have been advised as of Tuesday, April 17, 2007 that Mr. Wyse has died and determined that he died on Saturday, April 14, 2007.

2.    For each expert whom you expect to testify as a witness at the trial: State the name and address of each such expert and state:

      **a.**    The subject matter on which the expert is expected to testify;

      **b.**    The substance of the facts and opinions to which the expert is expected to testify;

      **c.**    A summary of the grounds for each opinion of the expert;

      **d.**    The specialty of the expert;

      **e.**    The date of any report prepared by the expert relating to the opinion;

      **f.**    All facts or documents provided to the expert

      **g.**    All cases in which the expert has testified in the past ten years;

Identify each document recording, referring or relating to your answer.

ANSWER: Defendants do not currently expect to present expert opinion evidence to the Court. Defendants reserve the right to amend this response in regard of further information that they main obtained, directly or from Plaintiff through discovery, or if Plaintiff designates an expert.

3.    Identify each person, excluding your counsel, that you have communicated with at any time regarding the facts, subject matter or allegations made in this lawsuit including each person at Tyco regarding the trip the decedent was on and the authorization for the trip. For

142

each, state the date and time of the communication, the substance of the communication, the manner, verbal or written, and identify all persons present. Identify each document recording, referring or relating to your answer.

ANSWER: Defendants have communicated with the following persons:

a. **Bob Bierzynski**. Defendants interviewed Mr. Bierzynski on March 21, 2007 by telephone. Mark Stephenson, Esquire and Thomas Christina, Esquire were, in addition to Mr. Bierzynski, the sole persons present on the call. A summary of the substance of these communications is provided in Answer No. 1(a).

b. **Brian Billeter**. Defendants interviewed Mr. Billeter on or about April 17, 2007. In-house counsel for LINA and Mr. Billeter were present. A summary of the substance of these communications is provided in Answer No. 1(b).

c. **Nicole Gibian**. Defendants interviewed Ms. Gibian on March 21, 2007. Mark Stephenson, Esquire and Thomas Christina, Esquire were, in addition to Ms. Gibian, the sole persons present during the interview. A summary of the substance of these communications is provided in Answer No. 1(c).

d. **Felicia Johnson**. Defendants interviewed Felicia Johnson on March 15 and April 11, 2007. Mark Stephenson, Esquire and Thomas Christina, Esquire were, in addition to Ms. Johnson, the sole persons present. A summary of the substance of these communications is provided in Answer No. 1(d). Ms. Johnson indicated that she created notes to Tyco's file in regard of the Roarty claim that reflected her activity as a call center representative. She indicated also that Tyco maintained a file with regard to the Roarty claim. The call center notes are produced at AR0207 to AR0244. The Tyco claim file is produced at AR0001 to AR0206.

**143**

e.    **Robert Killmer.**  Defendants interviewed Mr. Killmer on or about April 17, 2007.  In-house counsel for LINA and Mr. Killmer were present.  A summary of the substance of these communications is provided in Answer No. 1(3).

f.    **Trent Smith.**  Defendants interviewed Mr. Smith on April 3, 2007 by telephone.  Mark Stephenson, Esquire and Thomas Christina, Esquire were, in addition to Mr. Smith, the sole persons present on the call.  A summary of the substance of these communications is provided in Answer No. 1(j).

g.    **Lanny Tomberlin.**  Defendants interviewed Mr. Tomberlin on March 13 and April 11, 2007 by telephone.   Thomas Christina, Esquire and Mr. Tomberlin were the sole persons present on the call.  A summary of the substance of these communications is provided in Answer No. 1(i).

h.    **Ronald Unruh.**  Defendants interviewed Mr. Unruh on March 23, 2007 by telephone.  Mark Stephenson, Esquire and Thomas Christina, Esquire were, in addition to Mr. Unruh, the sole persons present on the call.  A summary of the substance of these communications is provided in Answer No. 1(k).

i.    **Regis Wyse.**  See Answer No. 1(l).

4.    Have you, your agents, representatives or attorneys, obtained (or attempted to obtain from any person, who is not a party to this case, any document, including but not limited to any statement (signed or unsigned), concerning the allegations in this case including any claim for the benefits under the accident policy and a review, investigation and/or denial of the claim? If your answer is in the affirmative, identify each such person and each such document and from whom it was obtained and when it was obtained.

8

**144**

ANSWER: Yes. As the result of interviews, Defendants have obtained documents from Tyco that contain notes in regard of the Roarty claim made by Felicia Johnson as part of her job as well as the file maintained by Tyco benefits department with regard to the Tyco claim. These documents have previously been produced.

5. Identify all documents in your possession, custody or control, or of which you are aware, which refer to, reflect or evidence any notes, diaries or other information maintained by you with respect to any of the events or claims involved in this lawsuit or on which you will rely in the defense of this lawsuit?

ANSWER: Defendants have produced all such documents. See the Administrative Record, Felicia Johnson's call center notes and the internal Tyco claim file, which speak for themselves.

6. Identify each person who was aware of the decedent's plan and/or intent to travel to Pittsburgh and/or visit Bacharach and state the facts of which they were aware and their involvement in approving, denying, acquiescing in his plan and/or intent.

ANSWER: See Answer No. 1.

7. Identify each person who was questioned and/or who provided information as to whether decedent's trip was authorized, acquiesced, denied and/or approved including, Felicia Johnson's contact(s) as set forth in the CFS Telephone Log (AR0076). For each, state the date and time of the communication, the substance of the communication, the manner, i.e., verbal or written, and identify all persons present. Identify each document recording, referring or relating to your answer.

ANSWER: See Answer No. 1.

145

8.    State the additional information from Tyco International that Mr. Killmer states he was waiting for, AR0075, and state whether he received such information and identify each person or document he received, reviewed or communicated with in connection with such information. Identify each document that records, reflects or refers to your answer.

ANSWER: See Answer No. 1.

9.    State who Felicia Johnson contacted as referenced in AR0076 and state whether she received and/or Robert Killmer received and/or anyone else received any fax or letter as referenced in that document. Identify each person and document that records, reflects or refers to your answer.

ANSWER: See Answer No. 1.

10.    State the factual basis for each of your affirmative defenses that you have asserted. Identify each document that records, reflects or refers to your answer.

ANSWER: Defendant provides the following answers, which are tentative. Defendants reserve the right to supplement these answers.

a.    Regarding Defendant's first affirmative defense, Plaintiff fails to state a claim upon which she can recover because she fails to identify any travel on behalf of Tyco's business during which Mr. Roarty died. In fact, during the entire vacation time period, Mr. Roarty traveled only for reasons of a pre-planned vacation and attendance at a wedding.

b.    Defendant's second affirmative defense presents a legal defense to Plaintiff's demand to recover damages for violation of ERISA, which the Act does not provide.

c.    Regarding Defendants' third affirmative defense, Plaintiff has failed to satisfy a necessary, written term of the Plan in order to recover the properly denied benefit. Specifically, Plaintiff has failed to show that her covered spouse died while engaged in business

**146**

travel for his employer.   Plaintiff admits that Mr. Roarty left his home in Delaware on August 2, 2004 to travel to Pittsburgh for vacation and to attend a wedding.   *See* AR0087.   Plaintiff admits that a potential meeting with Bachrach was set for August 3, 2004, after Mr. Roarty's arrival in Pittsburgh.   *See* AR0088.   Plaintiff admits that Mr. Roarty and Regis Wyse rescheduled the August 3 trip to August 4.   *Id.*   Plaintiff finally admits that Regis Wyse resolved the reasons for the visit to Bacharach and that the visit was cancelled without Mr. Roarty deviating from his vacation at all.   *Id.*   Mr. Roarty died in an automobile accident while driving home from his vacation, having attended the wedding he had planned to attend, and never having taken time from his vacation to travel and meet with Bacharach staff.

        **d.**   Defendants have not yet determined facts with regard to this affirmative defense and reserve the right to do so pending the outcome of the Court's determination of the scope of discovery in this case.

        **e.**   Regarding Defendants' fifth affirmative defense, Mr. Roarty was not engaged in business travel for his employer when he died.   LINA relied on the written representations of his employer that such was the case.   Moreover, the uncontested facts fully support the information that the employer has supplied.   LINA based its decision on the information provided by the employer, who has no financial interest in the outcome and presumably would be more likely to favor its employee.   LINA's decision was therefore made without regard to its own financial interest in determining whether Plaintiff was eligible for benefits and based on the facts presented by Mr. Roarty's employer. This is equally true of Tyco, who would have approved Mr. Roarty to travel on its behalf to visit the Bacharach plant if necessary.   In fact no such visit was necessary nor did one occur, such that at no time did Mr.

11

**147**

Roarty begin and end a trip to engage in business on Tyco's behalf, and at all times he traveled in furtherance of his vacation and to attend a wedding.

11.     Identify each policy, practice, custom, procedure or other process (process) which was in place, formal or informal, for the authorization of trips for business while the decedent was employed there and identify whether and how Mr. Roarty deviated from such process and/or complied with such process in connection with his trip to Pittsburgh. Identify each document that records, reflects or refers to your answer.

ANSWER:   The Scott facility in Exton had its own travel policy.  Defendants have not been able to locate a copy of this policy to date and will continue to investigate to determine if one exists.

12.     State the factual basis for the state in the March 21, 2005 interoffice memo from Marian Luongo AR0068 et seq., at page 4 AR0071 that "Mr. Roarty's employer states that it did not authorize him to travel to Pittsburgh or from there to the customer on its behalf." For each, identify each person providing the factual basis or any part thereof, the substance of the facts known or provided by such person and identify each document recording, referring or relating to your answer.

ANSWER:   *See* AR0076, AR0130.

13.     Identify the information received, and/or requested by Marcy Miller in response to her email to Felicia Johnson AR0139 including any itinerary for the trip to Pittsburgh. State the persons that were involved in the investigation, the persons interviews [sic], the substance of all interviews and identify each document recording, referring or relating to your answer.

12

**148**

ANSWER: See Ms. Johnson's call center notes (AR0207-244), which detail the information that she received. *See* AR001-206 re information that LINA received as part of its Administrative Record.

14.    Identify each person employed by Tyco who has been reimbursed for a business trip, which included any vacation and each document referring, relating or recording your answer.

OBJECTION: Defendants objects to the Interrogatory as vague in its reference to "Tyco." Tyco International, Inc. is not a party to this litigation, and is not obliged to respond to this interrogatory. Moreover, in 2006, in its annual report to shareholders Tyco reported 238,200 employees, of which 86,900 are employed in the United States. As framed, the Interrogatory requires Defendants to scour what very likely are millions of pages of expense returns that may or may not indicate whether the employee was engaged in mixed vacation and business travel. Defendants would be required to interview all employees who submitted business expense forms to inquire if they had been also engaged in vacation travel. Moreover, the Interrogatory is unrestricted in scope of time, and presumably covers a period of years before, during and after 2004, multiplying the number of documents to be reviewed and person interviewed.

ANSWER: By way of further answer and without waiving these objections, Defendants have made reasonable investigation in order to respond to this interrogatory by interviewing Mr. Roarty's supervisor, co-workers and human resources representative. In each case, these Tyco employees have made clear that Tyco will reimburse only for employee travel that is undertaken in furtherance of its business interests. It will not reimburse for travel that was undertaken for personal reasons and not for the business of Tyco. Hypothetically, if a Tyco

13

**149**

employee were to engage in a vacation and divert to business travel during that vacation, only the business travel portion would be appropriately submitted to Tyco for reimbursement. *See generally* Answer No. 1.

15.     Identify each person and each document that was communicated with, received and/or reviewed by Robert Kilmer in response to his contact with Mr. Roarty's employer as stated in referral identified as AR0073. Identify each document recording, referring or relating to your answer.

ANSWER:    Mr. Killmer has no specific, present recollection of such communications, other than that which is recorded in the Administrative Record.

16.     Identify the "requested information" referred to by Robert Killmer in his March 11, 2005 letter to Kelly Roarty AR0075 and state whether he received and/or reviewed that requested information. Identify each document recording, relating or referring to your answer.

ANSWER: Mr. Killmer contacted Tyco to make a final request for confirmation of Tyco's prior statements that Mr. Roarty had not been engaged in business travel on its behalf when he died. All information that Mr. Killmer received is contained in the Administrative Record.

17.     Identify the "additional information" that Mr. Killmer referred to in his March 24, 2005 letter to Kelly Roarty AR0065 which he said that he reviewed. State what information Mr. Killmer had and utilized as a basis for denying the claim on March 24, 2005 that he did not have on March 11, 2005. Identify each document recording, referring or relating to your answer.

ANSWER: The Interrogatory mis-identifies the person who signed the March 24th letter. Brian Billeter, not Robert Killmer, signed the letter in Mr. Killmer's absence. Mr.

14



Killmer prepared the letter in consideration of the information contained in the Administrative Record. All information that he received with regard to the claim is contained in the Administrative Record.

18.    Identify the employer and last known address and phone number for Felicia Johnson, Nicole Gibian, Robert Killmer, Regis Wyse, Ronald Unruh, Lori Levangie, other recipients of Mr. Roarty's July 30, 2005 email AR0090 and of each employee of Tyco who was contact on the issue of whether Mr. Roarty was on a business trip. Identify each document recording, referring to recording [sic] your answer.

ANSWER: Defendants identify the following:

a.    **Felicia Johnson.** 2675 S.W. 13th Street, Fort Lauderdale, FL 33312, (954) 376-2926.

b.    **Nicole Gibian.** C/o 10427 N.W. 9th Street, Coral Springs, FL 33071, (954) 328-7485.

c.    **Robert Killmer.** Cigna Group Insurance, P.O. Box 22328, Pittsburgh, PA 15222-0328. Mr. Killmer may be contacted through counsel.

d.    **Brian Billeter.** Cigna Group Insurance, P.O. Box 22328, Pittsburgh, PA 15222-0328. Mr. Billeter may be contacted through counsel.

e.    **Regis Wyse.** See Answer 1(k).

f.    **Ronald Unruh.** Scott Health & Safety, 4320 Goldmine Road, Monroe, NC 28110; Telephone number: (704) 291-8300. Mr. Unruh may be contacted through counsel.

g.    **Lorie Levangie.** Scott Health & Safety, 4320 Goldmine Road, Monroe, NC 28110; Telephone number: (704) 291-8300. Ms. Levangie may be contacted through counsel.



      h.    **Jim Hampson.** Defendants do not presently know of this person's last known address and will continue to attempt to discovery same.

      i.    **Trent Smith.** Scott Health & Safety, 4320 Goldmine Road, Monroe, NC 28110; Telephone number: (704) 291-8300. Mr. Smith may be contacted through counsel.

      j.    **Bob Bierzynski.** Scott Health & Safety, 4320 Goldmine Road, Monroe, NC 28110; Telephone number: (704) 291-8300. Mr. Bierzynski may be contacted through counsel.

      k.    **Georgia Karagianis.** Defendants do not presently know of this person's last known address and will continue to attempt to discovery same.

      l.    **Mary Anne DeMeritt.** Defendants do not presently know of this person's last known address and will continue to attempt to discovery same.

      m.    **John Franco.** Defendants do not presently know of this person's last known address and will continue to attempt to discovery same.

      n.    **Chris Cherubin.** Defendants do not presently know of this person's last known address and will continue to attempt to discovery same.

    19.    Identify each person(s) at Bachrach that was communicated with regarding a visit by Mr. Roarty and each person that Regis Wyse (sic) communicated with as referenced in the July 30, 2005 e-mail by Mr. Roarty AR0090. Identify each document recording, referring or relating to your answer.

    ANSWER: See Answer No. 1(k).

    20.    State whether any request for reimbursement was made for Mr. Roarty's trip to Pittsburgh and identify each policy or document recording, referring or relating to the [sic] Tyco's requirements for such reimbursement.



ANSWER: Defendants are aware of no such request for reimbursement. The Exton facility had its own travel policy. Defendants have not been able to locate a copy of this policy to date and will continue to investigate to determine if one exists.

21.    State each fact obtained by or known by you that supports the claim for death benefits and/or supports the claim that decedent's trip was authorized. Identify each document and person who has knowledge of or contains any such fact(s) aware of each such instance.

OBJECTION: Defendants object to the Interrogatory to the extent that it requires them to reach a legal conclusion that the requested statements of fact are those that support Plaintiff's claims.

ANSWER: Without characterizing whether the following statements of fact support Plaintiff's claims, Defendant states the following to be controlling facts, and identifies the persons with knowledge of those facts:

- Daniel Roarty was employed by Scott. Plaintiff, Bierzynski, Johnson, Gibian, Karagianis, Levangie, Smith, Tomberlin, Unruh, Wyse.

- Tyco sponsored an employee benefit plan that provided a business travel accident benefit to Scott employees. Plaintiff, Bierzynski, Johnson, Killmer, Gibian, Karagianis, Levangie, Miller, Smith, Tomberlin, Unruh, Wyse.

- Daniel Roarty participated in the Tyco BTA benefit plan. Plaintiff, Bierzynski, Johnson, Killmer, Gibian, Karagianis, Levangie, Miller, Smith, Tomberlin, Unruh, Wyse.

- Daniel Roarty died in an automobile accident. Plaintiff, Bierzynski, Johnson, Killmer, Gibian, Karagianis, Levangie, Miller, Smith, Tomberlin, Unruh, Wyse.

153

- At all times during his trip from his home to Pittsburgh and his return, Daniel Roarty traveled for purposes of his vacation and to attend a wedding. Plaintiff, Bierzynski, Johnson, Killmer, Gibian, Miller, Tomberlin, Wyse.

- At no time did Mr. Roarty divert from his planned vacation and wedding travel and travel on behalf of his employer. Plaintiff, Bierzynski, Johnson, Killmer, Gibian, Miller, Tomberlin, Wyse.

Defendants identify the Administrative Record, the call center notes and the Tyco claim file generally as supportive, which document speak for themselves.

**NELSON LEVINE de LUCA & HORST, LLC**

BY: _____

MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

and

HERBERT MONDROS (#2407)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
hmondros@margolisedelstein.com

Attorneys for Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America

Dated: <u>August 23, 2007</u>

*154*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KELLY ROARTY,

         Plaintiff(s)

    v.

TYCO INTERNATIONAL, LTD. GROUP
BUSINESS TRAVEL ACCIDENT
INSURANCE PLAN AND LIFE
INSURANCE COMPANY OF NORTH
AMERICA,

        Defendants.

Civil Action No: 06-0195-GMS

## CERTIFICATE OF SERVICE

I, Mark Stephenson, Esquire, hereby certify that a true and correct copy of Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories was served on August 23, 2007 upon counsel listed below by United States Mail, postage prepaid.

        Michele D. Allen, Esquire
        Richard R. Wier, Jr., P.A.
        Two Mill Road, Suite 200
        Wilmington, DE 19806

        **NELSON LEVINE de LUCA & HORST, LLC**

    **BY:** _____
        MARK STEPHENSON, ESQUIRE
        ATTORNEYS FOR DEFENDANTS

Date: __August 23, 2007__



# EXHIBIT "E"

156

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KELLY ROARTY,         )
                             )
       Plaintiff,    )
                             )  Civil Action No.
v.                  )  06-195 GMS
                             )
TYCO INTERNATIONAL,  )
LTD., GROUP BUSINESS )
TRAVEL ACCIDENT     )
INSURANCE PLAN AND   )
LIFE INSURANCE      )
COMPANY OF NORTH    )
AMERICA,           )
                             )
       Defendants.   )


     A deposition of ROBERT W. BIERZYNSKI was taken pursuant to notice before Ellen Corbett Hannum, Registered Merit Reporter, in the offices of Corbett & Wilcox, 230 N. Market Street, Wilmington, Delaware, on Monday, October 15, 2007, beginning at approximately 1:00 p.m., there being present:

APPEARANCES:

                 MICHELE D. ALLEN, ESQ.
                 Richard R. Wier, Jr., P.A.
                   Two Mill Road, Suite 200
                   Wilmington, Delaware  19806
                 For the Plaintiff

CORBETT & WILCOX
Registered Professional Reporters
The Parcels Building - 230 N. Market Street
Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated with Wilcox & Fetzer,
Court Reporters

157

Robert W. Bierzynski

Page 2

```
 1   APPEARANCES (CONTINUED):

 2

 3                    MARK C. STEPHENSON, ESQ.
                      Nelson, Levine, deLuca & Horst, LLC
 4                      Four Sentry Parkway, Suite 300
                        Blue Bell, PA  19422
 5                    For the Defendants

 6

 7                    KELLY S. HUGHES, ESQ.
                      Ogletree Deakins
                        201 South College Street
 8                      Suite 2300
                        Charlotte, NC 28244
 9                    For the Witness

10                       -  -  -  -

11       ROBERT W. BIERZYNSKI, having first been duly sworn

12   according to law, was examined and testified as follows:

13                        EXAMINATION

14   BY MS. ALLEN:

15       Q.   Mr. Bierzynski, my name is Michelle Allen.

16   I'm going to be taking your deposition today.  I

17   represent Kelly Roarty in this matter.

18                   Have you had your deposition taken

19   before?

20       A.   Yes.

21       Q.   And in what matter?

22       A.   Oh, it was in a lawsuit, a number of years

23   ago.

24       Q.   And what was your role?  Were you a witness, a
```

158

Robert W. Bierzynski

Page 12

1                    MS. ALLEN:  Yes.

2                    MR. STEPHENSON:  Was that your

3      understanding when you answered the question,

4      Mr. Bierzynski?

5                    THE WITNESS:  Yes.  A laptop.

6      BY MS. ALLEN:

7          Q.    Do you know whether or not Mr. Roarty was

8      issued one?

9          A.    I don't know if his was issued by the company.

10         Q.    Do you remember him having a laptop computer?

11         A.    Yes, I do.

12         Q.    And did you ever take your laptop computer

13     home?

14         A.    Yes.

15         Q.    And what about a cellular phone, were you

16     issued one of those through your company?

17         A.    Yes.

18         Q.    And were you called on that phone outside

19     normal business hours?

20         A.    Yes.

21         Q.    What would be your normal business hours?

22         A.    8 a.m. to 5 p.m., Monday through Friday.

23         Q.    And would you answer calls that you received

24     after those hours from Scott Health & Safety?

159

Robert W. Bierzynski

Page 42

1    to go into Bachrach, then, yes, that would have been a

2    business trip from where he was.

3    BY MS. ALLEN:

4         Q.    And it would have been from Exton,

5    Pennsylvania, if he was leaving from Exton, Pennsylvania;

6    correct?

7         A.    No.

8         Q.    Okay.  Explain to me why not.

9         A.    If he was going to Pittsburgh on vacation and

10   while on vacation had an intention to go visit anyone in

11   the Pittsburgh area on business, then only that portion

12   of his trip would have been considered a business expense

13   from wherever he was staying in Pittsburgh.

14        Q.    Are you aware that Mr. Roarty left prior to

15   his scheduled vacation to attend the Bachrach plant?

16        A.    No, I'm not aware of that.

17        Q.    Okay.  If he left prior to his scheduled

18   vacation, then the business trip would begin in Exton,

19   Pennsylvania?

20        A.    No.

21        Q.    Okay.  Why do you say that?

22        A.    He left on a Saturday, that's not a business

23   day.  I don't even know when he left.  I'm assuming if he

24   left on a Saturday, that's not a business day.

160

Robert W. Bierzynski

Page 47

1      Q.    Have you spoken to anybody at the Bachrach

2    plant regarding Dan's proposed trip there or intended

3    trip?

4      A.    No.

5      Q.    And I'm sorry, I think I interrupted you last

6    time.  Other than yourself, do you know who else had

7    input on making a determination whether or not Dan Roarty

8    was on a business trip?

9      A.    I believe I said that Lanny Tomberlin and Lori

10   Pence.

11     Q.    Anybody else who would have had input on that?

12     A.    No one I can recall, no.

13     Q.    Did you offer to fill out expense reports for

14   Dan Roarty after he had died?

15     A.    Yes, I believe I did.  There was one specific

16   expense report.

17     Q.    And what was that in relation to?

18     A.    It was -- I'm not specifically sure of this,

19   but I believe it may have been a trade show that he had

20   attended.

21     Q.    And do you know where he attended that trade

22   show?

23     A.    No, I don't recall the specifics.

24     Q.    And any receipts or expenses for his trip to

162

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY,

        Plaintiff(s)

    v.

TYCO INTERNATIONAL, LTD.
GROUP BUSINESS TRAVEL
ACCIDENT INSURANCE PLAN and
LIFE INSURANCE COMPANY OF
NORTH AMERICA,

        Defendants.

Civil Action No:

06-0195-GMS

## DECLARATION OF REBECCA KRUPIAK

I, Rebecca Krupiak, do hereby declare, pursuant to 28 U.S.C. §1746, upon my personal knowledge, information and belief, that:

1.    I am employed by the law firm of Nelson Levine deLuca & Horst, LLC, Four Sentry Parkway, Suite 300, Blue Bell, PA 19422 as a paralegal. I am authorized to make this declaration with regard to the above captioned matter.

2.    I am familiar with the documents that appear as exhibits to Defendants' Opening Brief in Support of Summary Judgment.

3.    I certify that Exhibit "B" is comprised genuine, accurate and complete copies of selected pages taken from the administrative record as compiled by Life Insurance Company of North America and benefit center notes compiled by Tyco

with regard to the business travel accident claim made by Plaintiff that is the subject of this lawsuit.

    4.    I certify that Exhibit "E" is comprised of genuine, accurate and complete copies of selected pages of the Deposition or Robert Bierzynski, taken October 15, 2007.

    5.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 17, 2007                    *Rebecca Krupiak*
                                                  REBECCA KRUPIAK