## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY                                    :
                                                :
        Plaintiff,                      :
                                                :
      v.                                    :    C.A. No.  06-195 GMS
                                                :
TYCO INTERNATIONAL LTD. GROUP  :
BUSINESS TRAVEL ACCIDENT              :
INSURANCE PLAN, an employee            :
welfare benefit plan, and                       :
LIFE INSURANCE COMPANY OF          :
NORTH AMERICA, Plan Administrator,  :
                                                :
        Defendants.                     :

## **PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

Dated: December 10, 2007

## TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

THE ADMINISTRATIVE PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          A.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          B.    The Standard of Review In This Case . . . . . . . . . . . . . . . . . . . . . . . . 10

                 1.    Structural Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                 2.    Procedural Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          C.    LINA's Denial of BTA Benefits Was Unreasonable and Not Supported By Substantial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          D.    Defendants Breached Their Fiduciary Duty . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF CITATIONS

**Cases**

*Ackerman v. Warnaco, Inc.,*
    55 F.3d 117, 1995 U.S. App. LEXIS 10731 *21*22 (3d Cir. may 15, 1995) . . . . . . . . . 25

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 250 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Bill Gray Enterprises, Inc. Health and Welfare Plan v. Gourley,*
    2001 U.S. App. LEXIS 7922 (3d Cir. April 26, 2001) . . . . . . . . . . . . . . . . . . . . . 10,11

*Desvi, Ins. v. Continental Ins. Co.,*
    968 F.2d 307, 308 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101,115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Fischer v. Phila. Elec. Co.,*
    994 F.2d 130,135 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Freccia v. Conectiv,* 2004 U.S. Dist. LEXIS 23894
    (D. Del. Nov. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Koshiba v. Merck,* 2004 U.S. App. LEXIS 19164 (3d Cir. Sept. 13, 2004) . . . . . . . . . . . . . . . 14

*Local 56, United Food And Commercial Workers Union, et. al.v. Campbell Soup Company, et.*
    *al.* 898 F.Supp. 1118, 1140 (D.N.J. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Pinto v. Reliance Standard Life Insurance Company,*
    214 F.3d 377 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 17

*Post v. Hartford Insurance Company,*
    2007 U.S. App. LEXIS 21911 *17 (3d Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Tudor Dev. Group, Inc. v. U.S. Fidelity & guar. Co.,*
    968 F.2d 357, 359-60 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Unisys Retiree Medical Benefit "ERISA" Litigation,*
    58 F.3d 896, 1995 WL 380983 * at 6 (Unisys A) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Vanity Corp. v. Howe,*
    516 U.S. 489, 506 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Statutes**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 U.S.C. § 1022 (a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

29 U.S.C. § 1022 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## NATURE AND STAGE OF PROCEEDINGS

This action was filed on March 23, 2006 by Plaintiff, Kelly Roarty, against Defendants Tyco International Limited Group Business Travel Accident Insurance Plan ["Tyco Plan"] and Life Insurance Company of North America [LINA]. (D.I. # 1). In her Complaint, Plaintiff asserts three causes of action as a result of her husband's accidental death on August 8, 2004 and the Defendants' determination to deny insurance benefits. Count I alleges that Defendants have wrongly denied her benefits under the Tyco Plan, which is a plan protected by the Employee Retirement Income Security Act of 1974, as amended (hereinafter "ERISA") . Count II alleges that Defendant LINA breached its fiduciary duties owed to Plaintiff under ERISA. Count III was dismissed by Oder of the Court on August 2, 2007.

On August 31, 2006, this Court entered an Amended Scheduling Order, which set, inter alia, discovery to be completed by October 18, 2007 and trial to begin on April 21, 2008.

On October 24, 2007 Defendants filed a motion for a protective order limiting discovery and admissible evidence to the administrative record.

On  November 14, 2007, Plaintiff filed a response requesting that the motion be denied. Those motions are pending before the Court.

On November 19, 2007, Defendants filed a Motion For Summary Judgment along with an Opening Brief in support of their motion.

This is Plaintiff's response to Defendants' Motion For Summary Judgment, in which Plaintiff request the motion be denied.

1

## SUMMARY OF ARGUMENT

1.    Defendants are not entitled to judgment as a matter of law as there are genuine

factual issues of fact in dispute.


2.    The decision made was unreasonable and not supported by substantial evidence

and was therefore arbitrary and capricious.


3.    LINA breached its fiduciary duty.

## STATEMENT OF FACTS

Tyco International Ltd. (Tyco) is an international company that provides, *inter alia*, electronic security and fire protection solutions in over 100 countries. Its products and services are used towards safeguarding firefighters, preventing fires, deterring thefts and protecting people and property. Scott Instruments, a subdivision of Tyco, is one of the largest manufacturers of fixed and portable toxic and combustible gas, heat, and flame detectors in the world. (Defendants Answer ¶ 6).

In early 2004, Tyco contracted with a production plant in Pittsburgh, Pennsylvania (the Bacharach Plant) for production of sensor equipment. The sensors were to be delivered to Tyco on April 20, 2004 so that it could distribute them to its customers. See (AR0089-AR0098).

In late June 2004, one of Tyco's customers began complaining that the sensors that had been ordered from the Bacharach Plant were overdue. Although Tyco made repeated attempts, it was unable to obtain satisfactory answers from the Bacharach Plant about when the sensors would be available. In July 2004, the situation was brought to the attention of Bob Bierzynski, and it was agreed that Mr. Roarty would attempt to rectify the problem. Id..

By late July 2004, the delay was causing complaints to escalate, and other customers of Tyco, including the City of New York, began threatening to stop using Tyco's services. Id..

On July 30, 2004, Mr. Roarty advised by e-mail, his supervisor and others in senior management that he would "go into the Bacharach Plant and find out why the sensor is taking so long to build." See (AR0090). Mr. Roarty made arrangements to visit the Bacharach Plant the following week since he was beginning a vacation on July 30, 2004 and was going to be in Pittsburgh. Id..

3

In order to visit the Bacharach Plant, Mr. Roarty altered his vacation plans. <u>See</u> (AR0084-0098) Originally, Mr. Roarty was going to drive with his wife and family in one car and leave sometime during the week of August 2, 2004. <u>Id.</u> Instead, Mr. Roarty drove a separate car so that he could spend as much time as necessary at the Bacharach Plant dealing with this important business problem. <u>Id.</u> He departed earlier than planned, departing for Pittsburgh on August 2, 2004 so he would have time to deal with the issues at the Bacharach Plant. <u>Id.</u> Since he was traveling on business, Mr. Roarty brought with him his laptop, briefcase and cell phone. <u>Id.</u> Mr. Bierzynski was aware that Mr. Roarty intended to visit the Bacharach Plant, and agreed that Mr. Roarty was able to authorize his own business trip. (Bob Bierzynski Depo[1]. at 29,32).

A meeting was arranged at the Bacharach Plant for August 3, 2004. This meeting was scheduled for himself, another Tyco employee and the Regional Manager for Scott Instruments, and two members of management at the Bacharach Plant, in order to discuss delivery and production of the sensors. While Mr. Roarty was driving to Pittsburgh, the meeting was rescheduled for August 5, 2004. <u>Id.</u>

While Mr. Roarty was in Pittsburgh, awaiting the meeting an agreement was reached between Tyco and the Bacharach Plant, on August 4, 2004, which alleviated the need for Mr. Roarty to visit the plant , but he continued to work by making business phone calls. <u>Id.</u> After attending to some personal business Mr. Roarty resumed his travel home from his business trip. <u>See</u> (AR0084-0086).

On August 8, 2004, in the Commonwealth of Pennsylvania at approximately 3:48 p.m, while traveling home, the driver of a small sport truck failed to stop for a stop sign and collided

---

[1]Excerpts from Bob Bierzynski's Deposition are collectively located at Exhibit 1.

4

with Mr. Roarty's vehicle, forcing Mr. Roarty's vehicle about seventy feet from the point of impact. Mr. Roarty was pronounced dead at the scene of the collision. See (AR00104-113).

After Mr. Roarty's death, his wife, Plaintiff, made a claim under her husband's insurance coverage that covered Tyco employees who died accidentally while traveling on company business, this was known as the business travel accident or "BTA" plan. Mr. Bierzynski had told Plaintiff that Mr. Roarty would be covered under the companies BTA plan because employees were covered 24 hours/seven days a week. (Bierzynski depo. at 18-19). LINA denied Plaintiff's claim because they were informed by Tyco that Mr. Roarty was not on an authorized business trip. See (AR0115-117). However, through discovery it has become clear that Mr. Roarty was traveling to Pittsburgh on or about August 2, 2004 to conduct business at the Bacharach Plant on behalf of Tyco and that he needed no additional authorization. (Bierzynski depo at 29,32)

### THE ADMINISTRATIVE PROCESS

Defendant Tyco International Ltd. Business Travel Accident Insurance Plan ("The Tyco Plan") is an employee welfare benefit plan within the meaning of ERISA, which is provided by Tyco. As an employee of Tyco, Mr. Roarty was a participant in the Plan, which provided for a $500,000 accidental death benefit for its employees who die accidentally while traveling on business. Commonly known as "BTA" coverage. (Defendants' Answer ¶ 4).

Defendant LINA is the Plan's underwriting company and fiduciary. (Defendants' Answer ¶ 5). Claims under the Plan are administered through Cigna Group Insurance. Cigna Group Insurance claim services are provided exclusively by underwriting subsidiaries, *inter alia*, LINA. Id. Moreover, LINA funds the plan, which creates a conflict of interest.

The BTA plan provided in relevant part that:

5

[The Plan] will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

a)   away from your premises in his city of permanent assignment; and

b)   on business for you, and in the course of your business.
     All trips must be authorized by you. . . .

See AR0002

The insurance company (LINA) was selected to be the Plan fiduciary. In its role LINA delegated the authority to interpret the terms of the Plan documents, to decide eligibility and make related findings of fact. See AR00036.

As stated in Defendants' Opening Brief in support of their Motion for Summary Judgment, there are certain criteria that must have been met prior to receiving benefits under the BTA plan. First, Mr. Roarty had to be a Tyco employee which is undisputed. Second, Mr. Roarty must have been engaged in a trip or short stay away from Tyco, which he was when he began to travel to Pittsburgh to resolve the sensors issue. Third, he must have been traveling on business for Tyco and in the course of business. Mr. Roarty traveled to Pittsburgh for Tyco to resolve the sensors issue and was killed on his return home. Fourth, Tyco must have approved the trip. Ms. Roarty had been told that her application for benefits and her appeal were denied because Mr. Roarty was not on an approved business trip. However, through discovery it has become clear that Mr. Roarty was authorized to travel on business to Pittsburgh to resolve the sensors issue. (Bierzynski depo at 29, 32).

On September 3, 2004, as the named primary beneficiary in the Tyco Plan , Mrs. Roarty filed a claim for benefits, and provided the necessary information and documentation, which

6

included, a certified copy of Mr. Roarty's Death Certificate, the police crash report and a
newspaper article reporting the crash and death.

On December 17, 2004, LINA wrongfully denied Mrs. Roarty's claim alleging that Mr.
Roarty was not on an authorized business trip at the time of his death. LINA stated that, Nicole
Gibian, an employee in the Human Resources Department of Tyco, in Boca Raton, Florida,
provided it with a brief letter stating "Please use this letter as clarification that Mr. Roarty was
NOT on business travel at the time of the accident that caused his death." LINA did no further
investigation. See (AR0115-117).

On February 12, 2005 Plaintiff, the widow of Mr. Roarty and a beneficiary of the Plan
filed an appeal of the above denial. Plaintiff's appeal was denied without any additional bases,
other than they received verification that "Mr. Roarty was not on a business travel at the time of
the accident that caused his death." See (AR0066). However, the appeal denial letter confirms
that LINA did not consider, address or investigate Plaintiff's evidence in her appeal. LINA
simply summaries the facts stated in Plaintiff's appeal and reiterates Tyco's statement. Id. There
is no indication that LINA presented or questioned Tyco about the contrary information provided
by Plaintiff. The denial and position of Tyco, did not address Plaintiff's claim and further
misled her by suggesting they considered he information. The unsupported statement that he was
not on business travel "at the time of the accident that caused his death" did not focus on the
business reasons for the initial trip in his own car. LINA simply took Tyco's ambiguous one line
statement as dispositive.

Through discovery it has been learned that when LINA sought information regarding Mr.
Roarty's trip from Tyco they contacted the human resources department who contacted Mr.

7

Bierzynski to determine whether or not Mr. Roarty was on a business trip at the time. (Bierzynski depo at 33). However, at that time Mr. Bierzynski was not Mr. Roarty's supervisor. Id Additionally, Mr. Bierzynski stated in his deposition that Mr. Roarty would have been able to authorize his own business trip and that he was aware of Mr. Roarty's intended trip to the Bacharach Plant, but that he had no knowledge of what occurred during the trip. Id. at 8-9,28-29,32,37. Moreover, Mr. Bierzynski stated that there were no policies or procedures in place to determine the authorization of business trips or anything that defined a business trip. (Bierzynski depo at 9). Although there were no policies, procedures or clear definitions in place to determine or approve business trips Mr. Bierzynski stated that he concluded without any real authority that Mr. Roarty was not on a business trip at the time of his death simply because he had a pre-planned vacation at that time as well. (Bierzynski depo at 48-49). However, Mr. Bierzynski confirmed that he could receive reimbursement and would be covered under a business trip on a return trip home even if he engaged in personal business while away on the trip. Id. At 40.

On March 24, 2005, without any further investigation, and solely relying upon the Florida HR employee's incorrect and uncorroborated claim, LINA, acting through Cigna, denied Mrs. Roarty's appeal. See (AR0065-AR0067).

In Defendants' statement of facts they misconstrue Plaintiff's appeal and argument. It is undisputed that Mr. Roarty altered his vacation plans to resolve issues Tyco's was having with a sensors supplier issue with the sensors. Mr. Roarty departed to Pittsburgh earlier than expected to attend a meeting at the Bacharach Plant and he took a separate car as to not inconvenience his family because he did not know how long the business would take. See (AR0087-AR0088). Mr. Roarty left for Pittsburgh on August 2, 2004 in order to attend a meeting at the Bacharach Plant

on August 3, 2004 with Regis Wyse, The Regional Manager for Scott Instruments and Jim Elliot and Jim Flume from Bacharach to discuss delivery and production difficulties.  See (AR0088). While en route the meeting was postponed until August 4, 2004 due to personnel changes at Bacharach.  See (AR0088).  Therefore, is was reasonable and prudent for Mr. Roarty to continue to Pittsburgh for the meeting on August 4, 2004.  While in Pittsburgh awaiting the meeting Regis Wyse was able to reach an agreement with Bacharach which alleviated the need for a face to face meeting but did not relieve the need to continue to work on the matter with continued phone calls with Regis Wyse.  See AR0088.  Therefore, the only reasonable conclusion supported by substantial evidence is that when  Mr. Roarty was unfortunately killed he was on his way home from a business trip.

I.     **ARGUMENT**

A.     **Summary Judgment Standard**

The summary judgment standard is stringent.  Only when materials in the record show that the moving party is entitled to judgment as a matter of law should the Court grant summary judgment.  Fed. R. Civ. P. 56(c); Tudor Dev. Group, Inc. v. U.S. Fidelity & guar. Co.,968 F.2d 357, 359-60 (3d Cir. 1992).  The threshold issue is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonable be viewed in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  All doubts must be resolved in favor of the non-moving party. Desvi, Ins.  v. Continental Ins. Co., 968 F.2d 307, 308 (3d Cir. 1992).

Summary judgment should not be granted in favor of Defendants as there are a genuine issues of material fact including but not limited to whether Mr. Roarty was on a business trip

9

when he died and, therefore, whether Plaintiff is entitled to BTA benefits. The issue of whether or not Mr. Roarty was on a business trip on behalf of Tyco at the time of his death can only be resolved by a finder of fact, therefore, Defendants are not entitled to summary judgment. Anderson, 477 U.S. at 250.

**B.  The Standard of Review In This Case**

"The Supreme Court has instructed [Courts] to review the determinations of a plan administrator de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,115 (1989). Although, LINA as the administrator was given fiduciary discretion in accordance with the  Firestone Tire & Rubber Co. they failed to execute that discretionary standard and therefore the default de novo standard of review should apply. Moreover, "Whether terms in an ERISA Plan document are ambiguous is a question of law.  A term is 'ambiguous if it is subject to reasonable alternative interpretations.'"Bill Gray Enterprises, Inc. Health and Welfare Plan v. Gourley, 2001 U.S. App.. LEXIS 7922, at *26 (3d Cir. 2001). [I]f the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve any ambiguities in the plan document."Id.

The Plan covers the employee "for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling... away from your premises and on business for you and in the course of your business.  All such trips must be authorized by you." See(AR0002).  "Authorized" is not defined nor does  the definition of "covered accident" or "covered loss" require or state that the business trip must be authorized by the employer, Tyco. See (AR0014).  The definition of covered accident is ambiguous because it says that the accident

10

"is not otherwise excluded under the terms of this Policy." Id.  Additionally, "business trip" is

undefined and there is no guidance or policies set forth to assist in determining when a trip is

considered business.

There were no polices in place to determine and guide how trips would be classified.  The

lack of policies, procedures and definitions is what must force the Court to look at extrinsic

evidence to determine whether or not Mr. Roarty was on a business trip and therefore covered

under the policy.  Business trip is undefined and Mr. Bierzynski stated in his deposition that Mr.

Roarty was able to authorize his own business trip.  Without any definition, policies or

procedures in place there will always be ambiguity in the interpretation of the policy.  Bill Gray

Enterprises, Inc. Health and Welfare Plan, 2001 U.S. App.. LEXIS 7922, at *26.

However, if the Court does not find that a de novo standard of review does not apply the

case must be reviewed with heightened scrutiny because the benefit plan gives the administrator

and fiduciary discretionary authority to determine eligibility for benefits and  to construe the

terms of the plan. Firestone Tire & Rubber Co., 489 U.S. at 115.  The heightened scrutiny

standard applies "where the administrator's decision is potentially clouded by a conflict of

interest , such as where a plan administrator also funds the plan it administers," Freccia v.

Conectiv, 2004 U.S. Dist. LEXIS 23894, at *8 ( D. Del. 2004).  Even under that standard, which

is applicable to this case, since LINA had a conflict of interest in that it funded the plan and

administered the plan, Pinto v. Reliance Standard Life Insurance Company, 2000 U.S. App.

LEXIS 11983, at *3 ( 3d Cir. 2000), assuming arguendo that the de novo standard does not

apply, " the court...must 'look not only at the result-whether it is supported by reasons- but at the

process by which the result was achieved.'" Freccia, 2004 U.S. Dist. LEXIS 23894, at *11.

In determining the sliding scale approach the courts will first consider the evidence that the administrator acted with improper motive and second the court will review the merits of the decision and the evidence of impropriety to determine whether the administrator properly exercised its discretion.  <u>Post v. Hartford Insurance Company</u>, 2007 U.S. App. LEXIS 21911 *17 (3d Cir.)  If the court determines that the administrator acted improperly than it will determine the case on the merits itself.  <u>Id.</u>  In determining how to apply the heightened standard the court must consider both the structural and procedural factors.  <u>Id.</u>  "The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant."  <u>Id.</u>

1.    **Structural Factors**

When the structure of the plan gives it financial incentives to act against the claimant's interest a court will be reluctant to give the administrator deference.  <u>Id.</u> at 18.  A structural conflict arises when an administrator has an interest that is adverse to the claimant.  <u>Id.</u> at 19  In this case LINA was given the discretion to interpret the terms of the Plan documents, to decide questions of eligibility, for coverage or benefits under the Plan and to make any related findings of fact.  <u>See</u> AR0036.  The problem however is that LINA is also responsible for funding the claim.  Therefore, although LINA was delegated certain tasks specifically, to make any related findings of fact, they failed to perform its own investigation and relied solely on Tyco even though it had been given contrary information by Plaintiff.  The conflict arises because LINA had an interest in protecting their profit line by relying on the general denial of Tyco without any further investigation.  The courts will give more deference to administrators that have claims evaluated by independent sources, which LINA did not.  <u>Id.</u> at 20.  When a plan "is funded and

12

administered by an outside insurer", such as LINA, there is particular concern.  Id. at 21.

Defendants contend that this concern does not apply because while LINA underwrote the plan, it

did not control the factual process, but LINA did control and was delegated with the authority to

make the final determination on the claims benefits and failed to do so because it was in its

financial interest to not do its own investigation.  See (AR0036) of Defendants Memorandum.

     In this case LINA's interest in protecting its profit line caused it to solely rely on Tyco's

statement that Mr. Roarty was not on a business trip without its own independent investigation

because it would not have to pay the claim.  However, if LINA had conducted the proper

investigation and performed its delegated duties of making findings of fact, it would have

concluded that Mr. Roarty was on a business trip at that time and that as senior level

management he was able to authorize his own business trip.  (Bierzynski depo. at 8-9; AR0090,

AR0098).  As the administrator of the plan, LINA, had a duty when presented with contrary

information from Plaintiff to investigate whether or not Mr. Roarty was on a business trip at the

time.

### 2.    Procedural Factors

     "The procedural inquiry focuses on how the administrator treated the particular

claimant.".  Post, 2007 U.S. App. LEXIS 21911 at *17.  When considering procedural factors the

Court should focus on whether the administrator has given the Court reason to doubt its fiduciary

neutrality.  Id. at 26.  "Evidence that an administrator's decision was incorrect, coupled with

evidence it was biased, can add up to a conclusion that its decision was not the product of

reasoned discretion, but anti-claimant bias, in which case the decision should be reversed."

Pinto, 214 F.3d at 394.  As stated, supra, LINA did not act reasonable when it wholly delegated

its fiduciary duty of making factual determinations. Had LINA questioned Tyco with the information that Plaintiff provided it would have been provided with the information which is before the court that, Mr. Roarty was authorized to take a business trip. (Bierzynski depo. at 29,32) However, LINA decision not to further investigate was against the claimant's interest and in the best financial interest of LINA, because by wholly relying on the limited information from Tyco, LINA would not have to pay on the $500,000 claim owed to Plaintiff.

In this case, the administrator advised the Plaintiff that he was waiting for additional information from Tyco and Tyco advised him that it would obtain that information. The administrator not only did not obtain that information, he lied to the Plaintiff about the information he had received. He advised her that he was waiting for that information and then he went ahead and denied her claim without reviewing that information; falsely stating that he had received information from Tyco that confirmed he was not on a business trip and that the trip was not eligible for reimbursement. The Court's "heightened degree of scrutiny because of the financial conflict... allows [the court] to take notice of discrete factors suggesting that a conflict may have influenced the administrator's decision" such as selectively manipulating or considering the evidence to justify a denial. Pinto, 2000 U.S. App. LEXIS 11983, at *5. This demonstrated procedural irregularity, bias or unfairness in the review of this claim provides a basis for heightened review, Koshiba v. Merck, 2004 U.S. App. LEXIS 19164, at *1 (3d Cir. Sept. 13, 2004).

Moreover, there is a discrepancy as to whether or not the summary plan description for the business travel accident policy was ever updated. Initially, Mr. Bierzynski told Plaintiff that he was informed by Lannie Tomberlin, the human resources director, that Mr. Roarty would be

14

eligible to receive the BTA benefit because at the time it was his understanding that employees were covered 24 hours/seven days a week.  (Bierzynski depo. at 18,19).  However, Mr. Bierzynski was later informed that Mr. Roarty would not be covered under the BTA because it had been changed.  Id. at 22. Furthermore, Lannie Tomberlin, human resources director for Scott Heath and Safety notified corporate that the BTA was never updated in the summary plan description (SPD).  See AR0244. Therefore, it does not appear that there was any notification provided to Mr.  Roarty that the BTA had changed. Under the 24 hour/seven days a week plan Mr. Roarty was covered regardless of whether it was an "authorized" business trip.

The Plan provides that "the Plan Administrator...has appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.  All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law... The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above." See (AR0022).

In this case, LINA wholly delegated its fiduciary responsibilities to  Tyco in determining whether the accident which took Daniel Roarty's life was "authorized.".  LINA conducted no independent investigation and failed to consider any of the supporting evidence set forth Plaintiff's appeal.   In its initial denial of the claim it relied exclusively upon a statement from Tyco. "We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized

15

business trip at the time of his death as required by policy ABL 661690. We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating 'Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death." See (AR0116). LINA did not receive any basis for that position and all of the evidence submitted to it on the appeal established that he traveled in his own car for purposes of business. Therefore, Plaintiff has clearly shown that the Court should review this case with heightened review.

### C.     LINA's Denial Of BTA Benefits Was Unreasonable and Not Supported By Substantial Evidence.

The record is clear and undisputed that Tyco was having problems with the Bacharach plant and obtaining the correct amount of sensors. The e-mails, which Defendants were aware of clearly show the great difficulty Tyco was having in resolving the senors issue. See (AR0089-0098). Therefore, the record is undisputed that Mr. Roarty agreed to visit the plant and make every effort to resolve the issue even though he was scheduled to go on vacation. Id. Mr. Roarty altered his travel plans for his vacation by leaving on August 2, 2004 instead of the flexible date which had been set with his family. Id. Additionally, Mr. Roarty took a separate car than his family to ensure he would have unlimited time available to devote and spend resolving the issue with the Bacharach plant. Id. Mr. Roarty arranged a meeting at the Bacharach Plant for August 3, 2004. This meeting was scheduled for himself, another Tyco employee and the Regional Manager for Scott Instruments, and two members of management at the Bacharach Plant, in order to discuss delivery and production of the sensors. While Mr. Roarty was driving to Pittsburgh, the meeting was rescheduled for August 5, 2004. Id.

After Mr. Roarty arrived in Pittsburgh, an agreement was reached between Tyco and the Bacharach Plant, on August 4, 2004, on production dates, so the meeting was cancelled, however, Mr. Roarty continued to work by making business phone calls. Id. All of this information was provided to LINA. LINA disregarded the information and continued to rely on Tyco's unreasonable statement that Mr. Roarty was not on an authorized business trip instead of performing its due diligence and upholding its fiduciary duty to investigate. Had LINA inquired or further questioned Tyco specifically regarding the e-mails it would have reasonably concluded that Mr. Roarty was on an authorized business trip when he went to Pittsburgh. LINA, however failed to do any independent investigation because it was more beneficial for them to rely on the general unsupported statement of Tyco because then LINA would not have to pay any benefit. This is the inherent type of conflict that Pinto, 2000 U.S. App. LEXIS 11983 at *3, suggest should be reviewed with the most heighten standard. Due to the fact that LINA was tasked both with the authority to determine the eligibility and to pay the benefit, it's duty to investigate was conflicted. By solely relying on Tyco's unsupported statement LINA was able to avoid paying the $500,000 benefit rightfully due to Plaintiff.

Defendants focuses primarily on the fact that Mr. Roarty did not actually travel to the Bacharach plant in reaching its conclusion that Mr. Roarty was not on a business trip and therefore denying his benefits. However, Defendants focus is misplaced. Assuming that Mr. Roarty did not have a pre-planed vacation to Pittsburgh, he would have traveled to Pittsburgh on August 2, 2004 for a meeting with the Bacharach plant and while en route the meeting was cancelled but re-scheduled for August 4, 2004 and therefore because the meeting was still scheduled to take place Mr. Roarty continued on to Pittsburgh to attend the meeting and resolve

17

the issue. While in Pittsburgh awaiting the meeting the issue is resolved without having to visit the plant. Upon departing from Pittsburgh and returning home he is killed in a car accident. Under that scenario it is only logical that regardless of whether or not Mr. Roarty actually visited the plant that he clearly would have been covered for both his arriving and departing trip to Pittsburgh. Moreover, Mr. Bierzynski stated in his deposition that Mr. Roarty would have been covered even if he did not physically go to the plant as long as there was no vacation also planned. (Bierzynski depo at 39-40). Therefore, the fact that Mr. Roarty also had vacation plans while in Pittsburgh does not automatically require a denial of benefits as Defendants presumed.

The problem as stated previously is that there was no clear definition of "business travel". Therefore, it is clear that LINA acted arbitrary and capricious in reading and determining the policy to exclude coverage for Mr. Roarty's trip. In <u>Garber v. Provident Life Ins. Co.</u>, 181 F.3d 100 (6th Cir. 1999), the Court of Appeals held that the Defendant abused its discretion in determining that Plaintiff was not covered because the policy's language supported the reasonable conclusion that the decedent was "on business" at the time he died. The policy in <u>Garber</u>, was very similar to the one in this case. It stated in pertinent part:

> "Coverage will apply to any injury sustained by an Employee when on Business for the Policyholder during any bonafide trip.
>
> Coverage for such trip begins on the later of when an Employee leaves his or her place of residence or place of regular employment for the purpose of going on such trip.
>
> Coverage ends on the earlier of when an Employee returns to his or her place of residence or place of regular employment.
>
> . . .
>
> Definition

18

The term "when on Business for the Policyholder" means furthering the business of the policyholder. This does not include any injury sustained during the course of travel to and from work, leave of absence or vacation."

Id. The Court in Garber, held that the policy was poorly drafted any required great interpretation of which the Defendant wanted the Court to apply a very restrictive interpretation. Id. at 9. The Court held, "any interpretation of the policy that requires such a fine line to be drawn is not a reasonable interpretation." Id. at 11. Tyco's BTA policy in pertinent part states:

[The Plan] will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

a)    away from your premises in his city of permanent assignment; and

b)    on business for you, and in the course of your business.
       All trips must be authorized by you.

All such trips must be authorized by you.

See AR0002. Tyco's policy is even less defined as "business trip" is completely undefined and there are no written policies or procedures for guidance as to what is a business trip and what authorization is required. See (AR0002). Clearly, LINA did not make any attempt to resolve the ambiguity of what was a "business trip" which was raised by Plaintiff in her appeal. Therefore, any interpretation by LINA was arbitrary and unreasonable.

Defendants conclude that Plaintiff can not show that Mr. Roarty's departure was for the Tyco supplier or that Tyco directed Mr. Roarty to change his route as he traveled to Pittsburgh or that he departed from his home primarily to visit Tyco. However, Defendants conclusions are incorrect. Plaintiff has and did establish to LINA that Mr. Roarty departed from home earlier

19

than planned in order to attend a meeting on August 2, 2004 at the Bacharach plant for the

purpose of resolving the sensors issue.  See (AR0084-AR0098).  Those e-mails clearly show that

Mr. Roarty was taking responsibility for resolving the issues and decided to visit the plant to

make sure the problem was corrected all for the benefit of Tyco.  Defendants now raise an issue

that Mr. Roarty did not go to Pittsburgh primarily to visit the Tyco supplier and therefore he

should somehow not have been covered.  However, Defendants can not point to any portion of

the policy which states that the primary visit must be on behalf of Tyco.  Moreover, Defendants

statement of, "Put another way, had the Tyco supplier issue never arisen, Plaintiff and her

husband were still going to Pittsburgh." is irrelevant in determining whether Mr. Roarty was on

business.  While in fact the exact opposite holds true if in the alternative had Mr. Roarty not had

a wedding in Pittsburgh he still would have had to go in order to resolve the issue with the Tyco

supplier.  There is no doubt that had Mr. Roarty been on his way to the visit with the Tyco

supplier and the meeting was cancelled and the issue was resolved prior to actually visiting the

supplier Mr. Roarty would have been covered for any distance he traveled.

Defendants characterizes Mr. Roarty's trip as a mere intent to be on a business trip simply

because he did not physically visit the supplier.  Plaintiff, however, argues that Mr. Roarty had

more than a mere intention to be on a business trip he performed and executed his intention by

altering his vacation plans and leaving early and taking a separate vehicle from his family to

Pittsburgh.  There is only one reasonable conclusion and that is that when Mr. Roarty left his

home on August 2, 2004 his intention was to work.  He had arranged and had every intention of

visiting the Bacharach plant and attending a meeting on August 3, 2004.  The August 3, 2004

meeting was cancelled and re-scheduled for August 4, 2004. The issues with the Tyco supplier were resolved prior to Mr. Roarty having to physically visit the plant but that does not mean that he was not on a business trip. Therefore, the only reasonable conclusion can be that Mr. Roarty was on a business trip at the time of his death.

Defendants for the first time in their motion for summary judgment raise the issue that even if Mr. Roarty was on a business trip initially that the trip had concluded when he went to the wedding. However, there is no evidence in the record nor was this issue ever raised with Plaintiff that the claim was denied because of a personal deviation. Therefore, this issue should not be considered by the Court as it was not the reason or basis for denial and, therefore, Plaintiff was without recourse to file a proper appeal on that issue. Assuming <u>arguendo</u>, the Court must still hold that LINA's denial of claims was unreasonable and arbitrary because the policy as stated <u>supra</u>, is vague and ambiguous on the issue of personal deviation as well. The BTA section with respect to personal deviation states in pertinent part:

> "This coverage does not include:
> a) commuting between the covered person's home and place of work; or
> b) during personal deviations made by the covered person.
> "personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.
>
> This coverage will start a the actual start of the trip. . . . This coverage will end when the covered person:
> a) arrives at his home or place of work, whichever happens first; or
> b) makes a personal deviation."

<u>See</u> (AR0002).

Plaintiff does not dispute that once there is a personal deviation that the coverage would end

21

however once the employee began their return trip home that would be covered as it is equivalent to the return trip home from the business trip. See Garber, at 12. When the Court in Garber, gave an example of a personal deviation it stated that a business trip could be abandoned before returning home for example to go on a week's vacation "in which the vacation exclusion would cancel the business travel coverage, **at least until the employee resumed his travel home from the location at which he abandoned his business trip."** Garber, 181 F.3d 100 at *12.

LINA's conclusion that Mr. Roarty was not on business travel when he died was arbitrary and unreasonable. LINA failed to do a through investigation and wholly delegated its fact finding authority to Tyco. Once Plaintiff filed an appeal and provided supporting documentation that Mr. Roarty was on a business trip LINA failed to do any investigation other than simply relying on the same statement by Tyco. There was no incentive of LINA to further investigate or consider Plaintiff's documentation because they were satisfied with the response from Tyco because that allowed them to not pay on the claim. There is no evidence that LINA in any way made any attempt to interpret the ambiguities in the policy.

Plaintiffs respectfully request that the Court conclude that LINA's decision was unreasonable and not supported by reasonable evidence and that its failure to investigate was tainted with self-interest. Without any independent investigation, even though Plaintiff provided evidence which supported that Mr. Roarty was on an approved business trip, LINA denied the claim and wholly relied on a one line sentence from Tyco. Plaintiff submits that LINA actions were precipitated by its self-interest in not having to pay the claim. Therefore, Defendants motion for summary judgement should be denied.

**D.      Defendants Breached Their Fiduciary Duty.**

Defendants owed Plaintiff a fiduciary duty and breached that duty.  Section 404(a)(1) of

the Employee Retirement act provides that "a fiduciary shall discharge its duties with respect to

plan solely in the interest of the participants and beneficiaries." 29 U.S.C.S. § 1104(a)(1).  A

person under ERISA who exercises discretionary authority in managing or administering the plan

is a "fiduciary".  29 U.S.C.S. § 1002(21)(A). Clearly  LINA acted as a fiduciary in this case.  A

fiduciary in exercising it duties "may not materially mislead those to who the duties of loyalty

and prudence are owed." Fischer v. Phila. Elec. Co.,994 F.2d 130,135 (3d Cir.)  In accordance

with ERISA it is important for fiduciaries to inform plan participants and beneficiaries of

important specific information.  Local 56, United Food And Commercial Workers Union, et.

al.v. Campbell Soup Company, et. al. 898 F.Supp. 1118, 1140 (D.N.J. 1995).  The Third Circuit

has concluded that "where a plan administrator . . . fails to provide information when it knows

that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty

to [plan participants and beneficiaries]." Id.; citing In Re Unisys Retiree Medical Benefit

"ERISA" Litigation, 58 F.3d 896, 1995 WL 380983 * at 6 (Unisys A).

The fiduciary breach is based on the disclosure requirements in ERISA, 29 U.S.C. §

1102, 1021, and 1022.  Unisys A, at *5, which include that a "a summary plan description of

employee benefit plan is to be furnished to plan participants . . . which shall be sufficiently

accurate and comprehensive to reasonable apprise such participants and beneficiaries of their

rights and obligations under the plan." Id.; 29 U.S.C § 1022(a)(1).   Information that must be

included in a summary plan document are "the name and type of administration of the plan . . .

23

circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided . . . ." Id; 29 U.S.C § 1022(b). A summary plan description "must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries." Id. at 67; citing Unisys A, at *5. The summary plan documents provide essential tools for fiduciaries to use in order to communicate changes in the plan or inform the participants or beneficiaries of the status of the plan. Id.

Initially, Plaintiff was informed that she would be eligible to received the BTA by Bob Bierzynski, who was informed by Lanny Timberlin, because the BTA covered employees twenty four hours a day seven day a week. (Bierzynski depo at 18,19). However, Plaintiff was later informed that she would not be eligible for the BTA because there had been a change to the plan. Id. Even Lannie Tomberlin was unaware of the change and informed Felicia Johnson at Tyco to inform corporate that the SPD had not been updated and needed to be done. See (AR0244). Additionally, Mr. Bierzynski testified that he believed that the SPD was updated but the only reason that he believed that was because he had been told that the update notification was sent to him. (Bierzynski depo at 22-24). No copy of the e-mail updating the SPD has been furnished showing that Mr. Roarty or any other employee at Scott Health and Safety were aware of the change to the policy. Therefore, it is clear that when Mr. Roarty traveled to Pittsburgh on business he was under the impression that he was covered under the BTA policy and therefore would not have made any specific arrangements to ensure that his trip was covered.

Defendant LINA did not issue a revised SPD when the company altered the BTA

24

coverage from twenty four hours a day to exclusively on business travel. Therefore, Mr. Roarty would still have looked to the previous SPD, which would have stated that he was covered twenty four hours a day for travel as an employee. ERISA requires that a plan administrator issue a new SPD when there is a change to the circumstances relating to eligibility and termination of benefits. Local 56, United Food And Commercial Workers Union, et., 898 F.Supp. 1118 at 1143. The information regarding the change is coverage should have been articulated in a new SPD and the failure to do so was a breach of fiduciary duty. Had Defendants issued a new SPD, Mr. Roarty would have been aware of the new coverage and he would have taken additional steps to assure that his trip was covered.

The Third Circuit has recognized that reporting and disclosure violations can have substantial harm when there is a dispute as to the validity of the plan alteration. Id. at 1142; citing Ackerman v. Warnaco, Inc., 55 F.3d 117, 1995 U.S. App. LEXIS 10731 *21*22 (3d Cir. may 15, 1995). Therefore, there is a possibility, which is recognized in this Circuit, that the plan amendment could be stricken as a remedy. Id. Plaintiff has been substantially harmed as a result of Defendants failure to appropriately update the SPD. The court in Local 56, United Food And Commercial Workers Union, et., 898 F.Supp. 1118 at 1143, reiterated the importance of the SPD when it held:

> "The disclosure requirements of ERISA are not empty suggestions for fiduciaries. They amount to specific guidelines imposed for the purpose of ensuring that plan participants can follow and gauge the availability and character of medical benefits plan, including the very structure of the benefit plan itself which may impact on participants' rights. Without adequate information, a participant cannot know or enforce his or her rights to benefits or anticipate alterations in benefits as were effected hee by Defendant . . ."

25

in determining that Plaintiff had stated a claim for breach of fiduciary duty. Id. Therefore, it is clear that Defendant LINA at a minimum breached its fiduciary duty when it failed to update the SPD and therefore Defendants motion for summary judgment should be denied.

Moreover, in the context of ERISA, a fiduciary's duty of loyalty requires that the fiduciary deal fairly and honestly with beneficiaries. Vanity Corp. v. Howe, 516 U.S. 489, 506 (1996). For all the reasons stated supra, Plaintiff has quite clearly articulated that Defendants did not deal with Plaintiff fairly or honestly. Defendant LINA improperly delegated its authority of investigation to Tyco. Although Defendants stated in their Opening Brief for Summary Judgment that LINA only sought information from Tyco, however, it is clear and undisputed in the record that LINA failed to perform any independent investigation and solely relied on a one line response from Tyco without requesting any supporting documentation even when confronted with contrary information from Plaintiff. That hardly is an investigation of fact, nor does LINA's procedure failrly and adequately deal with Plaintiff.

Defendants rely on the fact that Defendant LINA posed the same question to Defendant Tyco four times without alteration or question regarding the support for the response as an adequately fulfilling its fiduciary duty. Plaintiff submits that a mere rubber stamp of the same question and answer four consecutive times fails to meet the fiduciary duty imposed upon Defendants.

Defendants state that Plaintiff has failed to identify and material fact which LINA failed to seek, ignore or conceal from its investigation. Plaintiff submits that LINA failed to do any investigation and had it executed its authority and upheld its fiduciary duty it would have ascertained at a minimum that Mr. Roarty was on an authorized business trip when he intended

26

to visit the Bacharach plant. Initially, LINA sought information from Tyco benefits department, who then sought information from Bob Bierzynski, who told them that Mr. Roarty was not on a business trip. Moreover, Mr. Bierzynski stated in his deposition that Mr. Roarty would have been able to authorize his own business trip and that he was aware of Mr. Roarty's intended trip to the Bacharach Plant, and that he had no knowledge of what occurred during the trip. Id. at 8-9, 28-29, 32,37. Therefore, it is unclear why Bob Bierzynski concluded that Mr. Roarty was not on a business trip and when questioned he stated that it was solely because he was also scheduled for a pre-planned vacation. (Bierzynski depo at 48-49). Plaintiff, submits that it was and should not have been at the discretion of Mr. Bierzynski to determine the ultimate eligibility of Mr. Roarty without any questions or investigation or interpretations from LINA. Considering, Mr. Bierzynski stated in his deposition that he **may** have told human resources about Mr. Roarty's intent to visit the plant, but was not certain. (Bierzynski depo at 45). Plaintiff as raised material facts to support that Defendants' have breached their fiduciary duty to Plaintiff and therefore Defendants motion for summary judgment should be denied.

Moreover, Defendants further breached their fiduciary duty when they misled Plaintiff into believing they had considered additional information when they issued the appeal decision. On February 28, 2005 the LINA decision maker in an in-house e-mail (AR0079), stated that "we denied this claim originally as the employer stated that our insured was not on a business trip. However, the person who provided that statement to us is no longer employed with the group. I am attempting to reach another representative at the group to verify that they are comfortable with their original statement." See (AR0079). [Emphasis].

In response to that e-mail Robert Killmer, who handled the claim on behalf of LINA was

27

told that "the other test for 'travel' is whether or not this trip was eligible for expense reimbursement from his employer (including miles and lodging)."*Id*. LINA, did not address this issue and never asked Tyco whether Mr. Roarty's trip was eligible for reimbursement.

On March 1, 2005 the LINA representative, Robert Killmer, prepared an intra office telephone log stating that "<u>I called her [Felicia Johnson] to verify that Tyco continues to maintain that Daniel Roarty was not on a company authorized business trip at the time of the claimed accident. I reached her voice mail. She is out of the office until 3/3. I left a message for a return call</u>." <u>See</u> (AR0078).[Emphasis].

On March 11, 2005 Mr. Killmer prepared another telephone log stating that "She [Felicia Johnson] called me regarding my request for confirmation that Mr. Roarty was not on an approved business trip at the time of his automobile crash and death. She stated again that Mr. Roarty was not on business travel at that time. <u>However, she stated that she has contacted the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed. accident. She stated that I should expect to receive that letter within the next week or so</u>." <u>See</u> (AR0076). [Emphasis].

On that same day, Mr. Killmer wrote to Plaintiff and said that "Currently, I am awaiting some additional information from Tyco International regarding Daniel Roarty's status as of the date of the claimed accident that took his life. <u>Once I have the requested information, I will again review the information in your file and the applicable policy</u>." <u>See</u> (AR0075).[Emphasis].

LINA never received any other information from Tyco and did not receive any information from Tyco that was referenced in the March 11, 2205 telephone log or in the March

letter to Mrs. Roarty. Id., See also (AR0076).  LINA never received any information from Tyco as to whether the trip was eligible for reimbursement.

On March 24, 2005  LINA deliberately misled Mrs. Roarty when it denied her appeal. It had advised her that it was waiting for information from Tyco. See (AR0065).  It did not receive or inquire about that information. It did not receive, as Tyco said it would obtain, "another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident." See (AR0076). It did not receive any information from Tyco as to whether the trip was eligible for reimbursement.  It denied her claim, falsely stating: "Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel." See (AR0066). [Emphasis].  Plaintiff has raised material facts to support that Defendants have breached their fiduciary duty Plaintiff and therefore Defendants' motion for summary judgment should be denied.

29

## **CONCLUSION**

For the foregoing reasons and the authorities which support those reasons, Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America's Motion for Summary Judgment should be denied.

Respectfully submitted,

**RICHARD R. WIER, JR., P.A.**

/s/ Richard R. Wier, Jr.
Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

December 10, 2007

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KELLY ROARTY | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No.  06-195 GMS |
| | : | |
| TYCO INTERNATIONAL LTD. GROUP | : | |
| BUSINESS TRAVEL ACCIDENT | : | |
| INSURANCE PLAN, an employee | : | |
| welfare benefit plan, and | : | |
| LIFE INSURANCE COMPANY OF | : | |
| NORTH AMERICA, Plan Administrator, | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I certify that on this 13th day of November, 2007 that I caused the attached to be filed

with the Clerk of the Court by CM/ECF, which will send a copy to:

and that a copy was sent to:

Mark Stephenson, Esq.
Nelson Levine de Luca.& Horst LLC
Four Sentry Parkway, Suite 300
Blue Bell, PA 19422

Herbert Mondros, Esq.
Margolis Edelstein
750 South Madison Street
Suite 102
Wilmington, DE 19801

**RICHARD R. WIER, JR., P.A.**

/s/Richard R. Wier, Jr
Richard R. Wier, Jr. (#716)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY                                    :
                                                :
        Plaintiff,                            :
                                                :
    v.                                        :     C.A. No.  06-195 GMS
                                                :
TYCO INTERNATIONAL LTD. GROUP                   :
BUSINESS TRAVEL ACCIDENT                        :
INSURANCE PLAN, an employee                     :
welfare benefit plan, and                       :
LIFE INSURANCE COMPANY OF                       :
NORTH AMERICA, Plan Administrator,              :
                                                :
        Defendants.                           :


## APPENDIX
## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Robert W. Biersynski

Page 8

1    specific direct line reporting between myself and Dan

2    Roarty where he reported directly to me or me directly to

3    him.

4         Q.   Do you know who Mr. Roarty's reporting line

5    would have been to?

6         A.   The general manager of the location in Exton,

7    Pennsylvania.

8         Q.   And do you know the name of that person?

9         A.   There were various people in that position,

10   the last person being Neal Dovala.

11        Q.   I'm sorry, can you repeat for me when you were

12   named the general manager for Scott Health & Safety

13   products?

14        A.   I believe it was in February of 2000 -- I want

15   to get this right, so I'm thinking.  I believe it was in

16   February of 2006.

17        Q.   Okay.  And in August of 2004, what was your

18   title?

19        A.   Director --  I'm sorry -- yes, it was,

20   director of the R&D engineering group.

21        Q.   And at that time you don't recall having any

22   supervisory role over Dan Roarty?

23        A.   What was that time again, please?

24        Q.   I'm sorry.  August 2004.

Robert W. Biernynski

Page 9

1       A.    No.  No direct reporting, no.

2       Q.    And he would have reported to the general

3   manager in Exton; is that correct?

4       A.    That's correct.

5       Q.    So in August 2004, you and Dan Roarty were

6   peers?

7       A.    I hold a director position and Dan held a

8   management position.

9       Q.    Okay.

10       A.    I don't know in our corporate structure, you

11   know, where the differences were in those job titles.

12       Q.    In August 2004, there were no formal

13   procedures for business travel with Scott Health &

14   Safety; is that correct?

15       A.    None that I'm aware of.

16       Q.    So you did not have to receive written

17   approval before you went on a business trip?

18       A.    No.

19       Q.    No, you did not have to receive written

20   approval?

21       A.    No, I was not aware of any requirement that we

22   receive a written approval before going on a business

23   trip.

24       Q.    So Dan Roarty at that time, August of 2004,

Robert W. Bierzynski

Page 18

1          Q.    So you were aware of the business travel

2     accident policy at that time; is that correct?

3          A.    At the time that --

4                MR. STEPHENSON:  Objection.  Pardon me.

5     Is the question the terms of it or simply its existence?

6     BY MS. ALLEN:

7          Q.    Well, my question was, he said he didn't have

8     any knowledge of it until afterwards, and I'm asking him

9     --  let me actually rephrase.

10                Mr. Bierzynski, when you went to visit

11     Kelly Roarty at the hospital, you told her that Dan would

12     be covered under the business travel accident policy; is

13     that correct?

14          A.    Yes.

15          Q.    And do you recall when that was?

16          A.    I believe that was the Wednesday after his

17     death, the first Wednesday after.

18          Q.    And when you told her that, it was your

19     understanding that he was covered 24 hours/seven days a

20     week; correct?

21          A.    Yes.

22          Q.    And the reason that you were under that belief

23     is because that's what you understood the policy to say?

24          A.    It's what I was told.

Robert W. Biernynski

Page 19

1              MR. STEPHENSON:  Objection.  Assumes a

2     fact not in evidence.  Go ahead and answer.

3              THE WITNESS:  Yes.  It's what I was

4     told.

5     BY MS. ALLEN:

6          Q.    And who were you told that by?

7          A.    Lanny Tomberlin.

8          Q.    And when did you talk to Lanny Tomberlin about

9     this?

10         A.    It was earlier that same day.

11         Q.    And why did you have a conversation with Lanny

12    regarding that?

13         A.    I wanted to know what Dan's entitlements were,

14    knowing that I was going to be visiting with Kelly later

15    that day so that I could give that information to her.

16         Q.    And for the record, who is Lanny Tomberlin?

17         A.    At that time he was our human resources

18    director.

19         Q.    So you were informed in the beginning of

20    August 2004, by your HR director, that Mr. Roarty would

21    be covered under the business travel accident plan;

22    correct?

23         A.    Yes.

24         Q.    Okay.  Other than talking with Lanny

Robert W. Bieruynski

Page 22

1        A.    Yes.

2        Q.    What specifically did Lori tell you when she

3   contacted you with this information?

4        A.    I recall her telling me that a mistake was

5   made and that the plan had changed at a prior period of

6   time.

7        Q.    Did you inform her that the director of HR had

8   told you that Mr. Roarty would be covered?

9        A.    She was part of that conversation.

10       Q.    The initial conversation with Lanny; is that

11   correct?

12       A.    Yes.

13       Q.    Were you aware that there had been a change in

14   the business travel accident plan?

15       A.    At that time, yes.

16       Q.    Okay.  Let me rephrase that.  Before you spoke

17   with Lori Pence, were you aware of any change in the BTA

18   policy?

19       A.    No.

20       Q.    So you had not seen an updated summary plan

21   description referencing the BTA policy?

22       A.    I didn't recall it at that time, but I did

23   receive a notification, yes.

24       Q.    And when did you receive a notification?

Robert W. Biernynski

1          A.    I don't recall the specific period of time,

2     but it was, it had been quite some time before that in

3     2004.

4          Q.    What type of notification was it?

5          A.    It was an e-mail.

6          Q.    And do you still have a copy of that e-mail?

7          A.    I don't know.

8          Q.    And do you recall what the e-mail said, what

9     it referenced as the change in the plan?

10          A.    Not to the specifics, other than to the change

11     from 24/7 coverage to only business-related travel

12     coverage.

13          Q.    And have you looked at that e-mail in

14     preparation for today's deposition?

15          A.    No.

16          Q.    And did you recall that notification when you

17     spoke with Kelly Roarty at the hospital?

18          A.    No.

19          Q.    And when do you first recall receiving the

20     notification e-mail?

21          A.    When Lori told me that the policy was no

22     longer in effect, as we had stated it, because of the

23     change.  That's what reminded me that we had been told in

24     an e-mail.

Robert W. Bierzynski

Page 24

1        Q.    Did you remember that on your own or were you

2    told by Lori or somebody that you received notification

3    of this via e-mail?

4        A.    I was told.

5        Q.    You did not have an independent recollection

6    of this e-mail?

7        A.    No.

8        Q.    No, you did not have an independent

9    recollection?

10       A.    No, I did not have -- I did not recall it on

11   my own.

12       Q.    Okay.  Since you were told that -- and who

13   were you told that by?

14       A.    Lori Pence.

15       Q.    After you were told that by Lori Pence, did

16   anybody give you a copy of the e-mail?

17       A.    No, I don't recall anybody giving me a copy.

18       Q.    You were aware that in, let's see, July, the

19   very end of July 2004, you became aware that Dan Roarty

20   was going to travel to the Bachrach plant on business; is

21   that correct?

22              MR. STEPHENSON:  Objection.  There is no

23   foundation for that, Counsel.  You can answer.

24              THE WITNESS:  Yes.

Robert W. Bierzynski

Page 28

```
 1                   So proceed, and I don't want to give

 2    narrative objections but this had to happen now.  I

 3    apologize for that.

 4    BY MS. ALLEN:

 5        Q.   Mr. Bierzynski, you were aware that Mr. Roarty

 6    had intentions to visit the Bachrach plant sometime

 7    between August the 2nd and August the 4th, 2004, were you

 8    not?

 9        A.   I was aware of his intentions, yes.

10        Q.   You were aware of the fact that Regis Wyse set

11    up a meeting for Mr. Roarty to visit the Bachrach plant?

12                   MS. HUGHES:  I object to form, and I

13    object that I don't believe that was his prior testimony.

14                   MS. ALLEN:  He doesn't have to testify

15    to stuff that he already testified to.  That would be an

16    asked and answered objection.  He can testify

17    accordingly.  If he disagrees with the statement, he may

18    do so.

19                   (The reporter read from the record as

20    requested.)

21                   THE WITNESS:  No, I was never made aware

22    of any meeting being set up.

23    BY MS. ALLEN:

24        Q.   You were aware, though, that he had intentions
```

Robert W. Bierzynski

Page 29

1    to visit the Bachrach plant; correct?

2                    MR. STEPHENSON:  Asked and answered.

3    Objection.

4                    THE WITNESS:  Yes.

5    BY MS. ALLEN:

6        Q.   Can you repeat your answer?

7        A.   Yes, I was aware of the intention to visit.

8        Q.   Okay.  And Mr. Roarty did not require approval

9    to visit the Bachrach plant; correct?

10       A.   Correct.

11       Q.   You were aware that when Mr. Roarty began to

12   travel to Pittsburgh on August the 2nd, 2004, that he

13   took his own vehicle?

14       A.   I did not know what his travel arrangements or

15   his travel plans were.

16       Q.   Okay.

17       A.   I knew he was going there, but I didn't know

18   how.

19       Q.   Did you ever become aware of whether or not

20   Mr. Roarty visited the Bachrach plant?

21       A.   No.

22       Q.   After Mr. Roarty's death, were you contacted

23   by anyone regarding his trip?

24       A.   I mean, I was -- after Dan left to go, I was

Robert W. Bierzynski

Page 32

1      Q.   And you don't know the exact nature of his

2   trip and what he did and what was accomplished; is that

3   correct?

4      A.   I mean, in what context with the trip?  I knew

5   he had gone to a family reunion and gone to a wedding.

6      Q.   And you had also had information that he

7   intended to visit the Bachrach plant; correct?

8      A.   Yes.

9      Q.   Okay.  And that was an authorized trip to the

10   Bachrach plant?

11               MS. HUGHES:  I object to form.

12               MR. STEPHENSON:  Objection.  That again

13   assumes that the trip occurred.  You can answer the

14   question, Mr. Bierzynski.

15               THE WITNESS:  Yes.  He was authorized to

16   go to Bachrach.  There was no reason that he couldn't.

17   BY MS. ALLEN:

18      Q.   Okay.  And did you ever become aware of any

19   details of his trip, the business part of his trip?

20      A.   No.

21               MR. STEPHENSON:  Objection.  It assumes

22   there was a business part of his trip.  Go ahead and

23   answer the question.

24               THE WITNESS:  No.

Robert W. Biernynski

Page 33

1    BY MS. ALLEN:

2         Q.   Did you ever provide any information to HR as

3    to whether or not, what the specifics of the trip were,

4    other than the -- what the specifics were with respect to

5    the trip to the Bachrach plant?

6                        MS. HUGHES:   I object to form.

7                        THE WITNESS:   HR was told that Dan was

8    on vacation.   It was a wedding and a family reunion was

9    why he went to Pittsburgh with his family.

10   BY MS. ALLEN:

11        Q.   And who told HR that he was on vacation?

12        A.   I don't know specifically who would have told

13   HR.

14        Q.   Did you?

15        A.   I may have, I don't have a direct recollection

16   of making that statement, but I may have.

17        Q.   Do you recall whether or not you told HR that

18   you were aware that Mr. Roarty had intentions to visit

19   the Bachrach plant?

20        A.   Again, yeah, I may have told him that.

21        Q.   And who may you have told that to?

22        A.   Lanny Temberlin and Lori Pence.

23        Q.   And I apologize if I already asked you this,

24   Mr. Biernynski, but you were or were not aware that there

Robert W. Bierzynski

Page 37

1           MS. ALLEN:  Mr. Stephenson, I'm going to

2     have the court reporter read back that last question we

3     came to an agreement on.

4           MR. STEPHENSON:  Yes.  Not a problem.

5           (The reporter read from the record as

6     requested.)

7           THE WITNESS:  No, I was not aware that a

8     meeting had been scheduled.

9     BY MS. ALLEN:

10        Q.   Mr. Bierzynski, did you have any conversations

11     with Regis Wyse regarding Dan Roarty's intention to visit

12     the Bachrach plant?

13        A.   Yes.

14        Q.   And what were those discussions?

15        A.   From what I can recall, Regis basically told

16     me the same thing that Dan had told me, that there was an

17     intention to go into Bachrach and have a meeting.

18        Q.   What about after Dan Roarty's death, did you

19     have any conversation with Regis regarding that trip?

20        A.   Yes.

21        Q.   And what were those conversations?

22        A.   I don't know that there was any new

23     information from our conversations, even after Dan's

24     passing talking with Regis, I don't recall anything about

Robert W. Bierzynski

Page 39

1    separate vehicle other than this family vehicle?

2        A.    No.

3        Q.    Were you aware that he took his laptop

4    computer with him?

5                MS. HUGHES:  I object to form.  You can

6    answer.

7                THE WITNESS:  I don't recall any

8    specifics with regard to laptops, as to where they go

9    when they leave the building.

10   BY MS. ALLEN:

11       Q.    If Mr. Roarty was leaving Scott Health &

12   Safety to travel to the Bachrach plant, that would be

13   considered a business travel?

14       A.    If he was going from Exton, Pennsylvania, to

15   Pittsburgh for the sole purpose of going to Bachrach,

16   yes, then that is a business trip.

17       Q.    And would you be able to be reimbursed from

18   Exton, Pennsylvania, to the Bachrach plant?

19       A.    Yes.

20       Q.    And return home?

21       A.    Yes.

22       Q.    And on route, if the meeting were cancelled,

23   you would still be covered?  You would still be

24   reimbursed?

Robert W. Bierzynski

Page 40

1        A.   Yes.

2        Q.   If you are traveling on business for Scott

3   Health & Safety, you are able to also have to take a side

4   trip and see your family, is that permitted?

5        A.   I think it depends on the details of the

6   business trip.

7        Q.   Can you give me an example as to when that

8   would not be permitted?

9        A.   Well, if I am in Houston at an ISA show, I

10  can't see my parents in Buffalo.

11       Q.   Understood.  If they are in the same close

12  proximity, that would be okay or permitted?

13       A.   Sure.  Yes.

14       Q.   Did you make any determinations or conclusions

15  to the HR department that Mr. Roarty was not on business

16  travel?

17       A.   Could you repeat that, please.

18            (The reporter read from the record as

19  requested.)

20            THE WITNESS:  Did I personally make that

21  conclusion?  Is that the question?

22  BY MS. ALLEN:

23       Q.   Yes.

24       A.   I don't recall making that specific statement

Robert W. Bierzynski

Page 45

1                MS. HUGHES:  Objection.  Calls for

2    speculation.

3                MR. STEPHENSON:  I will join in that

4    objection.

5                MS. HUGHES:  You can answer.

6                THE WITNESS:  Nobody I know would

7    interpret it a different way, the managers that I work

8    with.

9    BY MS. ALLEN:

10       Q.   You do not know what, if any, work Dan Roarty

11   did with respect to the issues with the Bachrach plant

12   while he was in Pittsburgh in the beginning of August

13   2004?

14       A.   That's correct, yeah, I don't know of anything

15   that he did with Bachrach.

16       Q.   Okay.  What did you say that you had told HR

17   regarding Mr. Roarty's trip to Pittsburgh, if anything?

18       A.   That it was a vacation, that I knew that he

19   was on vacation that week.  That when he left on that

20   Friday that he was on vacation until a week from Monday.

21       Q.   And you do or don't recall whether or not you

22   told him he also had intentions to visit the Bachrach

23   plant?

24       A.   I may have.

Robert W. Biernynski

Page 48

1    Pittsburgh prior to his death?

2         A.    I don't have any receipts or anything from a

3    trip to Pittsburgh.

4         Q.    Okay.  Have you ever traveled to the Bachrach

5    plant?

6         A.    Yes.

7         Q.    And have you been reimbursed for that mileage?

8         A.    I usually fly, I don't drive to Pittsburgh.

9         Q.    Generally reimbursed for the --

10        A.    Well, let me correct that.  I do believe I

11   drove out there while in Exton on one occasion.  I don't

12   recall if it was a personal vehicle.  I believe it may

13   have been a rental car, to keep the expenses lower.

14        Q.    And when you flew out from Pittsburgh and when

15   you drove from Exton, when did your business trip start?

16        A.    When I left my home or when I left the Exton

17   facility.

18        Q.    When you visited the plant those times, do you

19   recall whether or not you conducted any personal

20   business?

21        A.    No personal business.

22        Q.    And if Dan Foarty had not been, if he did not

23   have a scheduled vacation planned for that time and he

24   drove to the Bachrach plant with the intention of

Robert W. Bierzynski

Page 49

1   attending a meeting and drove back, you would consider

2   that business travel; correct?

3        A.   Yes.

4        Q.   Mr. Bierzynski, I don't know whether or not

5   you have a copy of -- did you have a copy of the

6   interrogatories that were answered in this case?

7        A.   No.

8        Q.   Interrogatories are questions that we sent to

9   the defendants in this case and they replied with answers

10  back.

11            Do you know whether or not you have

12  seen, have ever seen a copy of those?

13       A.   I don't recall.  I did have some documents at

14  one point --

15            MS. HUGHES:  I want to object, just to

16  the extent that this question, line of questioning delves

17  into any conversations or documents reviewed with

18  Mr. Christina.  Other than that, I'm sorry, go on.

19            MS. ALLEN:  Yes.

20       Q.   I don't want to know anything that you

21  discussed with the attorneys in this case, I just want to

22  know whether or not you saw either a draft or a final

23  product of answers that were then sent to us?

24            MR. STEPHENSON:  Counsel, may I point

**BLANKET ACCIDENT POLICY**

10

Policyholder: Tyco International Ltd.

Part of Policy No. ABL 661690

Schedule Date: July 1, 2002

Applies To Classes: 1, 2 & 3

## SCHEDULE IV
## HAZARDS INSURED AGAINST

### 24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

a) away from your premises in his city of permanent assignment; and
b) on business for you, and in the course of your business.

All such trips must be authorized by you.

This coverage does not include:

a) commuting between the covered person's home and place of work; or
b) during personal deviations made by the covered person.

"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:

a) arrives at his home or place of work, whichever happens first; or
b) makes a personal deviation.

If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**—This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.

A covered person will be presumed to have died, for purposes of this coverage, if:

a) he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be covered by the policy; and
b) his body is not found within a year of the accident.

**Aircraft Restrictions**—If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

a) he is riding as a passenger only, and not as a pilot or member of the crew; and
b) the aircraft has a valid certificate of airworthiness; and
c) the aircraft is flown by a pilot with a valid license; and
d) the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**—We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates. An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2225]

AR0002

# GENERAL DEFINITIONS

Please note that certain words used in this Policy have specific meanings. The words defined below and capitalized within the text of this Policy have the meanings set forth below.

**Active Service**

An Employee will be considered in Active Service with his employer on any day that is either of the following:
1. one of the Employer's scheduled work days on which the Employee is performing his regular duties on a full-time basis, either at one of the Employer's usual places of business or at some other location to which the Employer's business requires the Employee to travel;
2. a scheduled holiday, vacation day or period of Employer-approved paid leave of absence, other than sick leave, only if the Employee was in Active Service on the preceding scheduled workday.

A person other than an Employee is considered in Active Service if he is none of the following:
1. an Inpatient in a Hospital or receiving Outpatient care for chemotherapy or radiation therapy;
2. confined at home under the care of Physician for Sickness or Injury;
3. Totally Disabled.

**Age**

A Covered Person's Age, for purposes of initial premium calculations, is his Age attained on the date coverage becomes effective for him under this Policy. Thereafter, it is his Age attained on his last birthday.

**Aircraft**

A vehicle which:
1. has a valid certificate of airworthiness; and
2. is being flown by a pilot with a valid license to operate the Aircraft.

**Annual Compensation**

An Employee's annual earnings for normal work established by the Subscriber for his job classification.

**Covered Accident**

A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
1. occurs while the Covered Person is insured under this Policy;
2. is not contributed to by disease, Sickness, mental or bodily infirmity;
3. is not otherwise excluded under the terms of this Policy.

**Covered Injury**

Any bodily harm that results directly and independently of all other causes from a Covered Accident.

**Covered Loss**

A loss that is all of the following:
1. the result, directly and independently of all other causes, of a Covered Accident;
2. one of the Covered Losses specified in the *Schedule of Covered Losses*;
3. suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits*.

**Covered Person**

An eligible person, as defined in the *Schedule of Benefits*, for whom an enrollment form has been accepted by Us and required premium has been paid when due and for whom coverage under this Policy remains in force. The term Covered Person shall include, where this Policy provides coverage, an eligible Spouse and eligible Dependent Children.

GA-00-1200.00                                    12

AR0014

## CLAIM PROVISIONS

### Notice of Claim

Written or authorized electronic/telephonic notice of claim must be given to Us within 31 days after a Covered Loss occurs or begins or as soon as reasonably possible. If written or authorized electronic/telephonic notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written or authorized electronic/telephonic notice was given as soon as was reasonably possible. Notice can be given to Us at Our Home Office in Philadelphia, Pennsylvania, such other place as We may designate for the purpose, or to Our authorized agent. Notice should include the Subscriber's name and policy number and the Covered Person's name, address, policy and certificate number.

### Claim Forms

We will send claim forms for filing proof of loss when We receive notice of a claim. If such forms are not sent within 15 days after We receive notice, the proof requirements will be met by submitting, within the time fixed in this Policy for filing proof of loss, written or authorized electronic proof of the nature and extent of the loss for which the claim is made.

### Claimant Cooperation Provision

Failure of a claimant to cooperate with Us in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

### Proof of Loss

Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible. In any case, written or authorized electronic proof must be given not more than one year after the time it is otherwise required, except if proof is not given solely due to the lack of legal capacity.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

### Time of Payment of Claims

We will pay benefits due under this Policy for any loss other than a loss for which this Policy provides any periodic payment immediately upon receipt of due written or authorized electronic proof of such loss. Subject to due written or authorized electronic proof of loss, all accrued benefits for loss for which this Policy provides periodic payment will be paid monthly unless otherwise specified in the benefits descriptions and any balance remaining unpaid at the termination of liability will be paid immediately upon receipt of proof satisfactory to Us.

### Payment of Claims

All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

AR0022

2.  Under the *Claim Provisions* section, the following changes are made.

A.  The provision titled Proof of Loss is replaced with the following.

**Proof of Loss**

Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

B.  The provision titled Payment of Claims is replaced with the following.

**Payment of Claims**

All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay up to an amount not exceeding $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

3.  Under the *General Provisions* section, the following changes are made.

A.  The provision titled Incontestability is replaced with the following.

**Incontestability**

1.  Of This Policy or Participation Under This Policy

All statements made by the Subscriber to participate under this Policy are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, or to deny the validity of this Policy or of participation under this Policy unless a signed copy of the instrument containing the statement is, or has been, furnished to the Subscriber.

After two years from the Policy Effective Date, no such statement will cause this Policy to be contested except for fraud.

2.  Of A Covered Person's Insurance

All statements made by a Covered Person are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a signed copy of the instrument containing the statement is, or has been, furnished to the claimant.

GA-00-3000.30                                       35

AR0036

**Brian Billeter**
**Accident Claims Manager**
**Accident & Specialty Claims Department**

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

March 24, 2005

Kelly Roarty
319 Palomino Drive
Newark, DE 19711

| | |
|---|---|
| **Insured Name:** | **Daniel R. Roarty** |
| **Date of Birth:** | **4/5/61** |
| **Policy Number:** | **ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I am writing to you regarding the appeal of Mr. Roarty's Business Travel Accident benefits under the above captioned Life Insurance Company of North America (LINA) business travel accident insurance policy ("Policy"). I reviewed your letter of appeal of our initial claim denial, which was received in our office on February 15, 2005. After review of the additional information provided, we maintain our initial position that no accidental death benefits are due.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions. A copy of these policy provisions was enclosed with our initial denial letter dated December 17, 2004. In order to be eligible for benefits, you must satisfy the policy provisions as stated below.

**Policy Provision**

The Tyco, International policy states:

*"Scope of Coverage* – In exchange for the payment of premiums, we agree to pay benefits to all eligible persons:

    a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
    b) who, as a direct result of the injuries, and from no other cause, suffer a covered loss.

**Schedule IV  Hazards Insured Against**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a) away from your premises in his city of permanent assignment, and
    b) on business for you, and in the course of your business.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

All such trips must be authorized by you."

## Evidence Evaluated

I have reviewed the claim file as a whole, including the following documents, in making this determination:

- Group/Association Proof of Loss form.
- Commonwealth of Pennsylvania Certificate of Death.
- Police Crash Reporting Form.
- Letter from Nicole Gibian, Human Resources, Tyco International.
- Telephone conversation with Felicia Johnson at Tyco International.
- Our initial denial letter dated December 17, 2004.
- Your letter of appeal received in our office February 15, 2005, along with e-mail chains from Tyco.
- Business Travel Accident policy ABL 661690, business travel accident benefits through Tyco International.

## Summary of Evidence

According to the information reviewed, on August 8, 2004, Daniel Roarty died as a result of injuries suffered in a motor vehicle accident. The police incident report indicated that a driver of a truck failed to stop at a stop sign, and struck Mr. Roarty's minivan, causing injuries to Mr. Roarty and his three children, all of whom were in the minivan. Mr. Roarty was not at fault in this accident.

Tyco International has verified on several occasions that Mr. Roarty was not on business travel at the time of his death, through both a letter from Nicole Gibian and our telephone conversations with Felicia Johnson, both of whom are with Tyco International Human Resources. Based upon this assertion, Mr. Roarty's claim for Business Travel Accident Benefits was denied on December 17, 2004.

You have appealed our December 17, 2004 decision, asserting that Mr. Roarty was on business travel at the time of his death. Specifically, you have indicated that Mr. Roarty, as of August 2, 2004, was on his way to Pittsburgh from your home in Delaware for both a family vacation and to visit with a customer, Bacharach, regarding some difficulties that Tyco was having with Bacharach. You have further asserted that you took a separate automobile from Mr. Roarty so that he would have the ability to travel independently once he arrived in Pittsburgh for vacation, because he was unsure as to how much time would be required to resolve business issues with Bacharach.

When Mr. Roarty arrived in Pittsburgh he was unable to meet with Bacharach due to changes in their production personnel. However, issues with Bacharach were resolved during a series of telephone calls on August 3rd or 4th, 2004. During Mr. Roarty's return trip from Pittsburgh back to Delaware, he was involved in a fatal motor vehicle accident on August 8, 2004.

Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004. No expenses or accommodations appear to have been reimbursed to Mr. Roarty by Tyco for his travel.

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

## Summary

Based upon the information provided above, there is not sufficient support for finding that Mr. Roarty was engaged in business travel at the time of his accident. It appears that Mr. Roarty resolved the issues with Bacharach in a series of phone calls during August 3rd and 4th. There is no indication that Mr. Roarty traveled whatsoever with regard to the customer, Bacharach, and every indication that he was engaged in travel as part of his vacation. As the side trip to visit a customer had been cancelled, the only trip Mr. Roarty took related to his vacation, clearly not on the business of his employer. This policy pays benefits for loss which occurs while on an authorized business trip as indicated above. As Mr. Roarty was on vacation, and not on an authorized business trip, at the time of his death, no benefits are payable under policy ABL 661690.

Nothing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein. Please be advised that you have exhausted your administrative remedies under this policy. No further appeals will be considered.

We encourage you to either contact the Tyco International's employee benefits department or review the insurance booklet, certificate or coverage information made available to you, to determine if you are eligible for additional benefits.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3249 from 7:30 a.m. to 4:00 p.m. Eastern Time, Monday through Friday. If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Brian Billeter*

Brian Billeter

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

Robert Killmer
Technical Specialist
Life & Accident Claims Services

**CIGNA** Group Insurance
Life • Accident • Disability
1600 West Carson St. Suite 300
Pittsburgh, PA 15219-3419
Telephone 1-800-238-2125
Facsimile 412-402-3316

March 11, 2005

Kelly Roarty
319 Palomino Dr.
Newark, DE 19711

| | |
|---|---|
| **Insured Name:** | **Daniel R. Roarty** |
| **Date of Birth:** | **4/5/1961** |
| **Policy Number:** | **ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I am writing in regard to your appeal for Business Travel Accidental Death benefits for Daniel Roarty.

Currently, I am awaiting some additional information from Tyco International regarding Daniel Roarty's status as of the date of the claimed accident that took his life. Once I have the requested information, I will again review the information in your file and the applicable policy. If for any reason I cannot reach a decision on your claim within the next 30 days, I will write to you again to explain the delay.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3219 from 8:30 a.m. to 5:00 p.m. Eastern, Monday, Wednesday and Friday, or 6:30 a.m. to 3:00 p.m. Eastern Time, Tuesday and Thursday or email me at Robert.Killmer@CIGNA.com. If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Robert Killmer*

Robert Killmer

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.



**CIGNA** Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 11, 2005
Time: 12:44 PM

In / Out
Incoming: Felicia Johnson          Relationship to Insured: HR @ ER
Phone Number: 800-600-6641 ext. 3944

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

She called me regarding my request for confirmation that Mr. Roarty was not on an approved business trip at the time of his automobile crash and death. She stated again that Mr. Roarty was not on business travel at that time. However, she stated that she has contacted the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident. She stated that I should expect to receive that letter within the next week or so.



Robert Killmer

AR0076



**CIGNA** Group Insurance
Life • Accident • Disability

# CFS
# TELEPHONE LOG

Date: March 1, 2005
Time: 8:29 AM

In / Out
Outgoing: Felicia Johnson
ER

Relationship to Insured: HR @

Phone Number: 800-600-6641 ext. 3944

| Re: Daniel Roarty | Policyholder: Tyco |
|---|---|
| Phone#: | Policy #: ABL 661690 |

I called her to verify that Tyco continues to maintain that Daniel Roarty was not on a company authorized business trip at the time of the claimed accident. I reached her voice mail. She is out of the office until 3/3. I left a message for a return call.



Robert Killmer

**Killmer, Robert A (Bob)    250**

| | |
|---|---|
| **From:** | Berenbaum, Daniel R (Dan)    TL25D |
| **Sent:** | Monday, February 28, 2005 9:15 AM |
| **To:** | Killmer, Robert A (Bob)    250 |
| **Cc:** | Mitchell, Timothy S (Tim)    TL25D; Billeter, Brian W    250 |
| **Subject:** | RE: BTA Question  ABL 661690 |

Bob:

I agree with the initial claim decision. The claim did not occur while the employee was participating in business of the policyholder, rather his return trip from vacation. If these meetings took place, coverage would have only been extended while traveling to and from these meetings and not the entire course of his vacation.

The other test for "travel" is whether or not this trip was eligible for expense reimbursement from his employer (including miles and lodging).

**Dan Berenbaum**
AVP, Accident Underwriting
CIGNA Group Insurance
215-761-4080 (ph)
215-761-5070 (fax)
daniel.berenbaum@cigna.com

-----Original Message-----
**From:** Killmer, Robert A (Bob) 250
**Sent:** Monday, February 28, 2005 9:02 AM
**To:** Berenbaum, Daniel R (Dan) TL25D; Burk, Elizabeth 2134; Mitchell, Timothy S (Tim) TL25D
**Cc:** Billeter, Brian W 250
**Subject:** BTA Question ABL 661690
**Importance:** High

Hello,

I am hoping that one of you can assist me with a clarification on a BTA policy.

The short story of the case is as follows:

Our insured had a planned trip to Pittsburgh from his home in Delaware. However, his company was having difficulty with a supplier in Pittsburgh, so our insured, who was a member of senior management, took it upon himself to make an appointment with the supplier while he was here in Pittsburgh. The information that we have on file indicates that on two separate days while he was here on vacation, he also had appointments with the supplier. Although, I can't see that it would matter, both of the meetings were cancelled on a last minute basis.

The insured was returning home with his sons in his van. As they passed through Lancaster Pa, a truck ran a stop light and killed our insured.

The beneficiary spouse claims that as he had conducted some business on their planned vacation, that he should be covered under the BTA policy. She also maintains that as a senior manager that he always has his laptop and cell phone and is always on call.

We denied this claim originally as the employer stated that our insured was not on a business trip. However, the person who provided that statement to us is no longer employed with the group. I am attempting to reach another representative at the group to verify that they are comfortable with their original statement.

The policy contains the standard BTA Schedule 4. Personal deviations and commuting are not covered.

In my opinion, the fact that the insured attempted to attend two afternoon meetings during a week-long planned vacation, would not render the trip "business travel." Do you agree?

1

AR0079

Roarty
319 Palomino Drive
Newark, DE 19711
302-292-8866
deroarty@msn.com
February 12, 2005

CIGNA Group Insurance
PO Box 22328
Pittsburgh, PA 15222-0328
Attn: Lynne George

RE: Policy Number:          ABL 661690
Underwriting Company:   Life Insurance Company of North America
Insured Name:               Daniel Roarty
Date of Birth:               04/05/1961
Date of Death:              08/08/04
Social Security Number:   189583764

```
PITTSBURGH
FEB 1 5 2005
GROUP LIFE & DISABILITY
BENEFITS OFFICE
```

Dear Ms. George:

Please be advised that this letter is to be considered an appeal to CIGNA's/TYCO's decision dated 12/17/04 denying my claim for the funds from the Business Travel Accident policy for my deceased husband, the insured, Daniel Roarty a TYCO/Scott Instruments employee.

Daniel Roarty was in fact returning from an authorized business trip when his vehicle was struck at an intersection, during which Dan sustained fatal blunt trauma injuries. Objective proof exists that a visit was required and authorized and details of the reason Dan's presence was required in Pittsburgh, also included is information indicating the immediacy of that need.

Please also be advised that efforts to reach Nicole Gibian, the Human Resources person who sent the letter to Cigna denying the claim based on the fact "Mr. Roarty was NOT on business travel," were unsuccessful. My sister-in-law, Janet Roarty, had hoped to reach her for clarification. Janet subsequently learned (02/07/05) that Nicole Gibian no longer worked for TYCO. And Nancy in Boca Raton, fielding Nicole's call, could not answer any of Janet's questions.

The following summarizes the basis for this appeal.

As the policy states, the policy applies if Dan was on a business trip and if that trip was "authorized." Below is a summary of documentation that describes the reasons Dan needed to travel to Pittsburgh. It is not clear why TYCO has stated that this was not an "authorized business trip," but it is likely that they were not aware of Dan's efforts at resolving a critical problem with Bacharach's sensor production.

AR0084

The first e-mail indicating there was a problem was dated June 29th, 2004 from Gabriel Farkas, PMP from AdvanTech Corporation asking Georgia Karagianis where his sensors are. (E-mail 1) (For ease of reference and to help eliminate confusion the e-mails have all been numbered and will be referred to by their number in this appeal).
E-mail (2) also dated June 29th details Georgia Karagianis response to her unhappy customer. E-mails 1 and 2 identify the problem the customer was having and Georgia Karagianis's immediate response. Tyco has an unhappy customer.

E-mail 3 indicates a partial solution to the problem.

E-mail 4 identifies that even though Georgia Karagianis has managed to find 7 sensors instead of the necessary 10, 7 sensors as TYCO customer Gabriel Farkas says in this e-mail "is almost identical to not having any because the job will not be completed and accepted by the owner." Not only has TYCO failed their customer; Advantech Corporation is now failing their customer.

E-mail 5 dated July 1, 2004 indicates that the sensors will not be ready until the end of July. Georgia Karagianis indicates to customer Gabriel Farkas that she is doing everything she can to remedy this problem and expedite shipment of the sensors.

E-mail 6 customer Gabriel Farkas tells Georgia Karagianis that it is nearly the end of July and he has no sensors.

E-mail 7 Lori Levangie tries to reassure both Georgia Karagianis and customer Gabriel Farkas that she is checking on the status of the delivery date for these sensors.

E-mail 8 dated July 28, 2004 indicates that customer George Farkas still has heard nothing and now it is four days later than e-mail 7.

E-mail 9, also dated July 28, 2004 indicates that Georgia Karagianis has been checking the status of these sensors with Lori Levangie daily and nothing has changed. The customer still does not have the sensors.

E-mail 10 customer Gabriel Farkas has reached his limit and suggests that Scott must not want their business or the New York City DEP's business by the poor way they have been treated.

E-mail 11 from Lori Levangie to National Sales Manager Trent Smith and Ron Unruh dated July 28th, 2004 indicates Lori Levangie has had no success in getting the sensors from Bacharach and is frustrated. The problem identified here is clearly with Bacharach.

E-mail 12 dated July 29, 2004 shows that now the National Sales Manager, Trent Smith is involved and he asks for a recap of the problem.

E-mail 13 dated July 29, 2004 recaps the problem with lack of sensors and Georgia Karagianis efforts at reaching the president of Bacharach. She also describes efforts to reach the Purchasing Agent and the Operations Manager. 351 pieces were owed to Scott

Instruments on 04/20/04. It is now July 29th and these sensors, 0051-1861 for CE130 have not arrived.

E-mail 14 dated July 29, 2004 Bob Bierzynski talks about implementing a more permanent but future solution for the spare sensors. He also mentions losing customers to competitors if they cannot offer a solution to the sensors problem. E-mail 14 is also significant because now Dan Roarty has been copied on the problem.

E-mail 15 dated July 29, 2004 from Georgia Karagianis details a request for a quote from a customer requesting 71 CE130 Transmitters

E-mail 16 dated July 30, 2004 indicates that Lori Levangie has received yet another call from NYC DEP "threatening to throw us out," because they have not received the sensors.

E-mail 17 dated July 30, 2004 shows that now Dan Roarty is involved. Dan has marshaled the forces of Ron Unruh and Bryon Gordon and through pulling the sensors out of other in stock items that use this same sensor and going through the other assemblies has managed to come up with about a dozen sensors. It also indicates that Dan had to make the decision as to where the greatest need for these sensors resided. The e-mail indicates Dan's appreciation for the team effort at temporarily solving this problem. And most importantly, the e-mail states "I will be in Pittsburgh next week on vacation. Regis (Wyse) is going to set up a day for me to go into the Bacharach plant and find out why the sensor is taking so long to build. I will let you know what I find." This all important e-mail was sent to: Lori Levangie, Jim Hampson and copied to Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob; Karagianis, Georgia; DeMeritt, Mary Anne; Franco, John; Levangie, Lori; Cherubin, Chris. Dan states his intention to visit Bacharach in Pittsburgh and has notified 10 people within the Scott Instruments/Scott Health and Safety/TYCO organization of his intent to visit Bacharach on his vacation.

E-mail 18 dated July 30, 2004 at 4:15 PM Dan e-mails Georgia Karagianis, Chris Cherubin and John Franco about his intent to visit Bacharach the following week. In this e-mail Dan is asking the sales reps to prioritize their customers needs. Dan states "We still need to come up with lots more and hopefully I can learn something next week when I go into Bacharach."

The purpose of recapping the e-mails in this appeal is to demonstrate:
1) A problem existed for Scott Instruments and they were in jeopardy of losing customers because of the shortage of sensors.
2) This problem had been going on since at least April of 2004 and was just getting worse.
3) Georgia Karagianis and Lori Levangie clearly tried to work this problem and got nowhere.
4) Repeated calls to the President of Bacharach and to the management team running the plant resulted in no satisfaction or resolution of the problem. **Phone calls were producing no results.**

5) When Dan was finally brought into the loop he immediately took action to solve the most critical customers problems first at least temporarily and then went immediately to work on the problem.

6) This problem was brought to Dan's attention by e-mail and at a very inconvenient time – right before Dan was taking a vacation.

7) Dan e-mailed or copied 10 people as to his intent to visit the Bacharach plant while he was in Pittsburgh on vacation. Several of these people, Bob Bierzynski, Ron Unruh and Trent Smith were in positions of authority and at levels higher than Dan's position in the company.

8) Not one of these people in authority who had been notified by Dan of his intent to go on site at Bacharach contacted Dan to indicate that his intended visit was not authorized.

9) Dan was a professional and felt a keen sense of responsibility to Scott Instruments and it's customers. He worked very creatively to temporarily solve the problem of the missing sensors. Ron Unruh, also senior management helped Dan locate additional sensors and knew of Dan's intent to visit Bacharach during his vacation.

10) Dan also took personal responsibility for the boxes of products that now were without sensors and could not be sold. On each box he put a note stating: "Missing sensor 51-1865. See Dan Roarty NYC DEP 07/30/04. Dan now has ownership of this problem.

11) In all this time no one had yet to successfully resolve the source of the problem that has threatened Scott Instruments and their customers. Once again **Phone calls had not been successful. A visit was required and since Dan now had ownership of this problem it was important that Dan visit Bacharach in Pittsburgh, PA.**

As mentioned in Dan's e-mails, he had intended to come to Pittsburgh for his vacation. When Dan left the office July 30, 2004, he went home for the start of his vacation. The intent of part of that vacation was to help me get the house ready to put on the market. TYCO had transferred Dan to Scott Health & Safety in Monroe, NC. We were scheduled to move there in 2 months. We had already purchased a home in Monroe, NC. The days were packed with trying to do house repairs and general maintenance around the house so that when we came back from our family wedding the house would be ready to go on the market. In fact, in our absence, the interior of our house was being painted. Our departure date was originally flexible because we were unclear as to how much time we would need to get the general maintenance done and the house set up for painting. Our plans changed when Dan came home and said he needed to be in Pittsburgh for a meeting with Bacharach. We had to leave for Pittsburgh, Monday, August 2, 2004 so that Dan could meet with Regis Wyse and together they would go to the Bacharach plant and try to resolve this production problem that had not been resolved over the phone or by e-mails. At this time, Dan and I decided to take two vehicles to Pittsburgh. Taking two vehicles would enable Dan to spend as much time as necessary at the Bacharach plant without stranding his family. He wasn't quite sure what would be involved but he wanted to be able to have a certain amount of travel independence so he could respond to Bacharach and Scott Instrument's needs.

AR0087

A meeting was planned for August 3, 2004 with Dan, Regis Wyse, The Regional Manager for Scott Instruments and Jim Elliott and Jim Flume from Bacharach to discuss delivery and production difficulties.

While Dan was driving out to Pittsburgh, for the meeting, the Bacharach plant had a major shake up and changes in their production personnel so they could not meet Tuesday. Dan and Regis Wyse rescheduled to meet with Bacharach on Thursday 08/04/04. Sometime between August 3, 2004 and August 4th, Regis Wyse had spoken with Bacharach and had reached an agreement on production dates and so the face-to-face meeting was cancelled, but telephone calls between Regis and Dan continued.

As anyone who works in sales knows, there are many times when you present yourself at a client, potential customer's or supplier's door, only to learn that those people had been called away on other business. Your intentions hadn't changed. You would be frustrated at the waste of time the effort expended but nevertheless, the trip would still be considered a business trip. Through no fault of Dan's the face to face portion of the trip was cancelled. The reason for Dan's trip had not changed. And the entire time that Dan was in Pittsburgh he continued to make calls, take calls and answer his e-mails.

As Lanny Tomberlin, HR Manager for Scott Health and Safety, explained to me in a call I made to him in August 04 shortly after Dan's death, Senior Management is on call all the time regardless of vacation. Dan wasn't on a time clock. He would be expected to work what ever hours were required to "take care of business." Dan had in his possession during this "vacation" his laptop, his cell phone and his briefcase. Dan loved Scott Instruments and his work as Senior Product Manager. He was willing to sacrifice his vacation time and time with his family to help solve a production problem that left unresolved could result in a loss of business for Scott Instruments.

In order to make this business trip Dan had to drive from Newark, Delaware to Pittsburgh, PA and back again. He changed his personal plans to accommodate his business needs and he informed his management team and sales staff of his plan. Trent Smith, Bob Bierzynski and Ron Unruh were all aware of Dan's plans to visit Bacharach on his vacation. Dan was on an authorized business trip as proven by the content of the enclosed e-mails, his management team was aware of his plans and Dan was unfortunately killed on his way home from his business trip. He is covered by The Group Business Travel Accident Insurance policy and payment should be made accordingly.

Respectfully submitted,

Kelly J. Roarty
Wife of Daniel R. Roarty

> -----Original Message-----
> From: LaFond, Gerry
> Sent: Thursday, September 23, 2004 2:17 PM
> To: LaFond, Gerry
> Subject: FW: 51-1861 Paperwork Cleanup
> Importance: High
>
>
>
> -----Original Message-----
> From: Roarty, Daniel
> Sent: Friday, July 30, 2004 4:15 PM
> To: Karagianis, Georgia; Cherubin, Chris; Franco, John
> Cc: Roarty, Daniel
> Subject: 51-1861 Paperwork Cleanup
> Importance: High
>
> OK, we found some sensors to take care of Jim Hampson's emergency. We
> still need to come up with lots more and hopefully I can learn something
> next week when I go into Bacharach. In the meantime there are at least a
> dozen more sensors sitting in stock under p/n 9550-1065. So if we have
> some other emergencies we could use those. I bet there are a few more
> sensors lurking around. Georgia, should I send a note to the RSMs asking
> them if they have any really hot emergencies?
>
> In regard to the four sensors I took we have to close out the existing
> order that we had. I don't know the order #. Georgia, I am hoping you
> know that as I checked with Chris and he didn't know.
>
> John Franco:
> I took a sensor out of the following:
> 2ea p/n 9550-1065
> 1ea p/n 0051-8296
> 1 ea p/n 9550-8011
>
> On each box that I took a sensor out of I placed a note clearly stating:
> "Missing sensor 51-1865. See Dan Roarty  NYC DEP  7-30-04". We will
> need to replace those sensors.
>
>

AR0089

-----Original Message-----
From: Roarty, Daniel
Sent: Friday, July 30, 2004 3:35 PM
To: Levangie, Lori; Jim Hampson (E-mail)
Cc: Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob;
Karagianis, Georgia; DeMeritt, MaryAnne; Franco, John; Levangie, Lori;
Cherubin, Chris
Subject: RE: Hunts Point

Lori:
After receiving this e-mail I called Jim Hampson and determined that the
hottest fire is for NYC DEP to get 3 p/n 51-1861 sensors. The reason they
were so upset is that they have three existing transmitters that they
couldn't get sensors for. Getting three sensors is a whole lot easier than
coming up with seventy one (71).
Bacharach is telling us that maybe they will have some unknown qty of
sensors by the end of August. Ron Unruh had the great idea of seeing if
this sensor is part of another product which we have in stock. Bryon Gordon
pulled up all the assemblies that use this part and I dug into the inventory
and came up with four (4) sensors. Talk about a team effort! We have at
least another dozen sensors. But not 71 as requested in your e-mail.
I will be in Pittsburgh next week on vacation. Regis is going to set up a
day for me to go into the Bacharach plant and find out why the sensor is
taking so long to build.
I will let you know what I find.



Jim Hampson:
I have left you a phone message asking where these sensors should be sent
to. The sensors are sitting on Chris Cherubin's desk.

Regards,
Dan Roarty

-----Original Message-----
From: Levangie, Lori
Sent: Friday, July 30, 2004 7:23 AM
To: Karagianis, Georgia; Bierzynski, Bob; Smith, Trent
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John;
Roarty, Daniel; Lori Levangie (E-mail)
Subject: RE: Hunts Point



Received another call from NYC DEP with another threat to throw us out of



AR0090

there. They are now talking about returning our whole system - not that we
would do that, but they are serious.

Lori Levangie
Northeast Regional Manager
Fixed Instruments Division
Tyco / Scott Instruments
Cell - 610-662-9477
Fax - 484-214-0137
www.scottinstruments.com

-----Original Message-----
From: Karagianis, Georgia
Sent: Thursday, July 29, 2004 12:47 PM
To: Bierzynski, Bob; Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John;
Roarty, Daniel
Subject: RE: Hunts Point

Bob,

 I received a call today from Jim at NETS for a quote on delivery time for 71
CE130 Transmitters with stand alone IS barriers.
At this point we have nothing to replace this product.   NIC II can not be
operated IS.

Thanks
Georgia

-----Original Message-----
From: Bierzynski, Bob
Sent: Thursday, July 29, 2004 12:40 PM
To: Karagianis, Georgia; Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John;
Roarty, Daniel
Subject: RE: Hunts Point

 The 051-1861 is a 4 volt cat bead sensor for lel detection. Rather than
continue to upset customers with late deliveries, etc. let's come up with a
plan to upgrade these folks into Nic II's which can be supported for years
to come. I suspect we have transmitters in the field that are out of service
waiting for spare sensors. These customers will go to a competitor if we
don't offer an alternative solution.

AR0091

The CE130 product line is old and needs to be obsoleted. We have already delisted the equipment with CSA and can't be making margin on what we do sell occasionally.

I suggest our Monroe purchasing group address this part when they visit Pittsburgh in a few weeks to discuss last time buys. This p/n is a candidate for one more buy to cover us during a phase out.

Dan, can you advise EAU on this as a spare part ? And please advise what if any CE130 business is still hanging out there.

And I'll get on that damn engineering manager here to get the blind cat bead transmitter into production as it too is a viable solution to this ongoing problem.

Bob

-----Original Message-----
From: Karagianis, Georgia
Sent: Thursday, July 29, 2004 12:27 PM
To: Smith, Trent; Levangie, Lori
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Bierzynski, Bob; Franco, John
Subject: RE: Hunts Point

Trent,

0051-1861 is a sensor for a CE130.  These parts are ordered by MaryAnne Demeritt in our purchasing department via Bacharach.  The planner at Bacharach is Mike Palumbo, I spoke with Mike yesterday as well as Bob Peters who is the Production Engineer at Bacharach regarding our late deliveries. Bob advised that the earliest we can expect delivery of this part is end of August and could not confirm definite date or quantity.  I then placed a call to Hermann Hinderhaeuser the President of Bacharach and left a voice message explaining the severity of the matter and asking him to call me back.  He has yet to return my call.  I called again this morning, left another message for Hermann and also spoke with Tony Nawrocki who is the Purchasing Manager.  Tony assured me that Dave Toman the Operations Manager would return my call today.
They owe us 351 pieces and they were due here at Exton on 4/20/04.
This is just one part number and I deal with this type of situation all day everyday.
Any assistance you can provide would be greatly appreciated.
Thanks
Best Regards,

Georgia

----Original Message----
From: Smith, Trent
Sent: Thursday, July 29, 2004 10:56 AM
To: Levangie, Lori; Ron Unruh (E-mail); Karagianis, Georgia
Subject: RE: Hunts Point



Please educate me briefly on what Bacharach equipment this is for and who at Scott places these orders and with whom at Bacharach.

Trent Smith
National Sales Manager
Scott Health & Safety
tresmith@tycount.com
(p)704-291-8423

www.scotthealthsafety.com

----Original Message----
From: Levangie, Lori
Sent: Wednesday, July 28, 2004 9:32 AM
To: Trent Smith (E-mail); Ron Unruh (E-mail)
Subject: FW: Hunts Point
Importance: High



Hi Guys.

Bacharach is getting the best of us. I have done everything I can, so has Georgia, Marianne, etc.

Lori Levangie
Northeast Regional Manager
Fixed Instruments Division
Tyco / Scott Instruments
Cell - 610-662-9477
Fax - 484-214-0137
www.scottinstruments.com

-----Original Message-----
From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]

Sent: Wednesday, July 28, 2004 10:29 AM
To: Levangie, Lori; Karagianis, Georgia
Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
Subject: RE: Hunts Point
Importance: High

Lori,

I understand that they don't have the units in stock. What I don't understand that they cannot make a commitment for a date when they will have them. I also do not understand why this takes so long, this process started in April, three months ago.



One cannot tell a customer forever to just be patient, eventually the merchandise will arrive. At least AdvanTech's customers do not accept this.

I assume Scott is interested in doing further business with the New York City DEP, this kind of customer service is not a very good way of assuring that.

Thanks,

Gabriel Farkas, PMP
Project Manager
AdvanTech Corporation
27 Daniel Rd. West
Fairfield, NJ 07004
Phone: 973-808-8550 Extension 21
Fax:   973-808-2923


> -----Original Message-----
> From: Levangie, Lori [mailto:llevangie@tycoint.com]
> Sent: Wednesday, July 28, 2004 10:12 AM
> To: gabriel@advantechcorp.com; Levangie, Lori; Karagianis, Georgia
> Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
> Subject: RE: Hunts Point
>
>
> Hi Gabriel.
>

> I spoke to Georgia who has been inquiring daily.  Bacharach still does not
> have these in stock.  She and I are doing everything we can to
> "push" them.
> We sincerely regret any inconvenience.  We will keep checking.

AR0094

> >
> >
> Lori Levangie
> Northeast Regional Manager
> Fixed Instruments Division
> Tyco / Scott Instruments
> Cell - 610-662-9477
> Fax - 484-214-0137
> www.scottinstruments.com
> >
> >
> -----Original Message-----
> From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> Sent: Wednesday, July 28, 2004 9:40 AM
> To: Levangie, Lori; Karagianis, Georgia
> Cc: Gennady Farberov; 'Gabe Hauer'; Joe Stelmack; Jim Hampson
> Subject: RE: Hunts Point
> >
> >
> OK, four days later still ... checking ...., for how long?
> >
> Gabriel Farkas, PMP
> Project Manager
> AdvanTech Corporation
> 27 Daniel Rd. West
> Fairfield, NJ 07004
> Phone: 973-808-8550 Extension 21
> Fax:  973-808-2923
> >
> >
> > -----Original Message-----
> > From: Levangie, Lori [mailto:llevangie@tycoint.com]
> > Sent: Saturday, July 24, 2004 10:12 AM
> > To: gabriel@advantechcorp.com; Karagianis, Georgia
> > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > Hampson
> > Subject: RE: Hunts Point
> >
> >
> > ....checking.....
> >
> > Lori Levangie
> > Northeast Regional Manager
> > Fixed Instruments Division
> > Tyco / Scott Instruments
> > Cell - 610-662-9477

AR0095

> > Fax – 484-214-0137
> > www.scottinstruments.com
> >
> >
> > -----Original Message-----
> > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > Sent: Thursday, July 22, 2004 8:03 AM
> > To: Karagianis, Georgia
> > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > Hampson
> > Subject: RE: Hunts Point
> >
> >

**⑥**

> > Georgia,
> >
> > Any news on the last three sensors? July is almost over...
> >
> > Thank you,
> >
> > Gabriel Farkas, PMP
> > Project Manager
> > AdvanTech Corporation
> > 27 Daniel Rd. West
> > Fairfield, NJ 07004
> > Phone: 973-808-8550 Extension 21
> > Fax:   973-808-2923
> >
> >
> > > -----Original Message-----
> > > From: Karagianis, Georgia [mailto:GKaragianis@tycoint.com]
> > > Sent: Thursday, July 01, 2004 10:12 AM
> > > To: gabriel@advantechcorp.com; Karagianis, Georgia
> > > Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
> > > Hampson
> > > Subject: RE: Hunts Point
> > >
> > >
> > > Gabriel,

**⑤**

> > > Last I heard, end of July.
> > > I am doing everything possible to obtain a better date.
> > > Thanks
> > > Georgia
> > >
> > > -----Original Message-----
> > > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > > Sent: Thursday, July 01, 2004 9:37 AM

AR0096

\> \> \> To: Karagianis, Georgia
\> \> \> Cc: Gennady Farberov; 'Gabe Hauer'; Levangie, Lori; Joe Stelmack; Jim
\> \> \> Hampson
\> \> \> Subject: RE: Hunts Point
\> \> \> Importance: High
\> \> \>
\> \> \>
\> \> \> Georgia,
\> \> \>
\> \> \> Thank you for your help. However, if we don't have all the
\> \> required sensors,
\> \> \> the situation is almost identical to not having any, because
\> \> the job will
\> \> \> not be completed and accepted by the owner.
\> \> \>
\> \> \> When do you expect to have the other three units?
\> \> \>
\> \> \> Thank you,
\> \> \>
\> \> \> Gabriel Farkas, PMP
\> \> \> Project Manager
\> \> \> AdvanTech Corporation
\> \> \> 27 Daniel Rd. West
\> \> \> Fairfield, NJ 07004
\> \> \> Phone: 973-808-8550 Extension 21
\> \> \> Fax:   973-808-2923
\> \> \>
\> \> \>
\> \> \> \> -----Original Message-----
\> \> \> \> From: Karagianis, Georgia [mailto:GKaragianis@tycoint.com]
\> \> \> \> Sent: Wednesday, June 30, 2004 5:51 PM
\> \> \> \> To: Karagianis, Georgia; 'gabriel@advantechcorp.com'
\> \> \> \> Cc: 'Gabe Hauer'; Levangie, Lori
\> \> \> \> Subject: RE: Hunts Point
\> \> \> \>
\> \> \> \>
\> \> \> \> Gabriel
\> \> \> \> I just received word that I will receive 7 on Friday, which I will
\> \> \> \> immediately ship.
\> \> \> \> The remaining 3 are still on back order and I will do my best to
\> \> \> \> expedite.
\> \> \> \> I apologize for any inconvenience this has caused.
\> \> \> \> Your patience is greatly appreciated.
\> \> \> \> Thanks
\> \> \> \> Best Regards
\> \> \> \> Georgia

```
> > > >
> > > >
> > > > -----Original Message-----
> > > > From: Karagianis, Georgia
> > > > Sent: Tuesday, June 29, 2004 6:46 PM
> > > > To: 'gabriel@advantechcorp.com'
> > > > Cc: Gabe Hauer; Levangie, Lori
> > > > Subject: RE: Hunts Point
> > > >
> > > >
> > > > Gabriel,
> > > > I just spoke with our vendor, they are making every effort to
> > > > expedite your
> > > > request.
> > > > They will advise me of a delivery date tomorrow afternoon.
> > > > I will contact you as soon as I have a response.
> > > > I apologize for the delay and any inconvenience this has caused.
> > > > Your understanding is greatly appreciated.
> > > > Thank you,
> > > > Georgia
> > > >
> > > > -----Original Message-----
> > > > From: Gabriel Farkas [mailto:gabriel@advantechcorp.com]
> > > > Sent: Tuesday, June 29, 2004 3:24 PM
> > > > To: Georgia Karagianis
> > > > Cc: Gabe Hauer
> > > > Subject: Hunts Point
> > > >
> > > >
> > > > Georgia,
> > > >
> > > > Any news on the sensor delivery?
> > > >
> > > > Thanks,
> > > >
> > > > Gabriel Farkas, PMP
> > > > Project Manager
> > > > AdvanTech Corporation
> > > > 27 Daniel Rd. West
> > > > Fairfield, NJ 07004
> > > > Phone: 973-808-8550 Extension 21
> > > > Fax:   973-808-2923
> > > >
> > >
> >
>
```

②

①

AR0098

AUG-13-2004  10:06    AMICA MUTUAL INSURANCE CO        610 834 0237    P.02

## POLICE CRASH REPORTIN  RM

**AA 500 1**

Case Closed: ☐ Yes  ☑ No    Reportable Crash: ☑ Yes  ☐ No    Page: **0** **1**

Crash Number: **P0639922**

### Police Agency Data

**Incident Number** L01-1031704
**Police Agency** 68001
**Patrol Zone** 003

**Agency Name** PA STATE POLICE
**Precinct** LANCASTER
**Investigation Date (MM-DD-YYYY)** 08-08-2004

**Dispatch Time (mil)** 1549  **Arrival Time (mil)** 1606  **Investigator** TPR JOHN T LYONS
**Badge Number** 06925

**Reviewer** 6M  **Badge Number** 5441  **Approval Date (MM-DD-YYYY)** 08-09-2004

### Crash Data

**County** 36  **County Name** LANCASTER  **Municipality** 001  **Municipality Name** BART TWP

**Day of Week:** ☐ Sun ☐ Thu ☐ Mon ☐ Fri ☑ Tue ☐ Sat ☐ Wed ☐ Unk

**Crash Date (MM-DD-YYYY)** 08-08-2004  **Crash Time (mil)** 1548  **No of Units** 08  **People** 06  **Injured** 06  **Killed** 01  *If > 00 complete Form F

**Workzone** (If Yes, Complete Form M, Section 29): ☐ Yes ☑ No    **School Bus Related** ☐ Yes ☑ No    **School Zone Related** ☐ Yes ☑ No    **Notify PENNDOT Maintenance** ☐ Yes ☑ No

### Use Type

**Intersection Type:** ☑ 4 Way Intersection  ☐ "Y" Intersection  ☐ Multi-Leg Intersection  ☐ Off Ramp  ☐ Railroad Crossing
☐ Midblock  ☐ "T" Intersection  ☐ Traffic Circle/Round About  ☐ On Ramp  ☐ Crossover  ☐ Other

*Special Location * See Overlay

### Principal Road

**Route Number** 0896  **Segment (Optional)** **Travel Lanes** 02  **Speed Limit** 45

**Street Name** GEORGETOWN  **Street Ending** RD

**Orientation:** ☐ North ☐ South ☑ East ☐ West ☐ Unknown

**House Number (If applicable)** — For Mid-block crashes only. Use partial House Number and make sure Principal Roadway Street Name is filled in if using this option

**Route Signing:** ☐ Interstate (Not Turnpike) ☐ Turnpike (East/West) ☐ Turnpike Spur ☑ State Highway ☐ County Road ☐ Local Road or Street ☐ Private Road ☐ Other/Unknown

### Intersecting Road

**Route Number** 363  **Segment (Optional)** **Travel Lanes** 02  **Speed Limit** 45

**Street Name** BARTVILLE  **Street Ending** RD

**Orientation:** ☐ North ☐ South ☑ East ☐ West ☐ Unknown

**Route Signing:** ☐ Interstate (Not Turnpike) ☐ Turnpike (East/West) ☐ Turnpike Spur ☐ State Highway ☑ County Road ☐ Local Road or Street ☐ Private Road ☐ Other/Unknown

### Distance From Landmark

Please Enter Information for BOTH Landmarks if Using This Option. Use For Mid-Block Crashes.

**Landmark 1**
Intersecting Rt Num Or Mile Post —  Or Segment Marker —
Or Intersecting Street Name —  St Ending —
Ramp Use Only: ☐ North ☐ South ☐ East ☐ West
Feet — Or Miles —

**Landmark 2**
Intersecting Rt Num Or Mile Post —  Or Segment Marker —
Or Intersecting Street Name —  St Ending —
Ramp Use Only: ☐ North ☐ South ☐ East ☐ West
Distance From Crash Scene to Landmark 1 (For Crash between Landmark 1 and Landmark 2) —

### GPS

**Latitude:** Degrees 39  Minutes 54  Seconds 17.1
**Longitude:** Degrees 76  Minutes 01  Seconds 54.28

### TCD

**Traffic Control Device:** ☐ Not Applicable ☐ Traffic Signal ☐ Yield Sign ☐ Police Officer or Flagman
☐ Flashing Traffic Signal ☑ Stop Sign ☐ Active RR Crossing Controls ☐ Other Type TCD
☐ Passive RR Crossing Controls ☐ Unknown

**TCD Functioning:** ☐ No Controls ☐ Device Functioning Improperly ☐ Emergency Preemptive Signal
☐ Device Not Functioning ☑ Device Functioning Properly ☐ Unknown

### Lane Closure

**Lane Closed** (If "Not Applicable", skip rest of the Lane Closure section):
☐ Not Applicable ☐ Partially ☑ Fully ☐ Unknown

**Lane Closure Direction:** ☐ North ☐ East ☐ North and South (N.S.E.W.) ☐ South ☐ West ☐ East and West (All)

**Traffic Detoured:** ☐ Yes ☑ No ☐ Unknown

**Est. Time Closed:** ☐ < 30 Min. ☐ 30-60 Min. ☑ 1-3 hrs ☐ 3-6 hrs ☐ 6-9 hrs ☐ > 9 hours ☐ Unknown

FORM

AR0104

AUG-13-2004  10:06    A    MUTUAL INSURANCE CO            610 834 0037    P.03

# COMMONWEALTH OF PENNSYLVANIA
## POLICE CRASH REPORTING FORM

AA 500 2   Police Use Only: 1031704   Page: 02

Crash Number

**P0639922**

| Type Unit | ● Motor Vehicle in Transport ○ Pedestrian | ○ Hit & Run Vehicle ○ Pedestrian on Skates, in Wheelchair, etc (If "Pedestrian" or "Pedestrian on Skates, in Wheelchair, etc", Complete Form M, Section 28) | ○ Illegally Parked ○ Disabled From Previous Crash | ○ Legally Parked ○ Train | ○ Non - Motorized ○ Phantom Vehicle | Commercial Vehicle ○ Yes ● No (If Yes: Complete Form I) |
|---|---|---|---|---|---|---|

**Unit No** 01
**First Name** F R A N K L I N
**MI** B
**Date of Birth (MM-DD-YYYY)** 01 29 1964

**Delete?**
**Last Name** H U M B L E T
**Telephone Number** (717) 509-6107

**Address / City / State** N VINEYARD ROAD, CHESTNUL, PA
**Zip** 17509

**Driver License Number** 2 0 4 1 1 9 0 7
**State** PA
**Class** B

### Alcohol/Drugs Suspected
● No
○ Alcohol
○ Illegal Drugs
○ Alcohol and Drugs
○ Medication
○ Unknown

### Driver or Pedestrian Physical Condition
● Apparently Normal
○ Had Been Drinking
○ Illegal Drug Use
○ Sick
○ Fatigue
○ Asleep
○ Medication
○ Unknown

### Alcohol Test Type
○ Test Not Given
○ Blood
○ Breath
○ Urine
○ Other
○ Unknown if Test Given

**Primary Vehicle Code Violation** STOP SIGN AND YEILD SIGN
**Charged?** ○ Yes ● No

### Alcohol Test Results
0 . 0 0
○ Test Refused
○ Test Given, Contaminated Results
● Unknown Results

**Driver Presence** 1
1=Driver Operated Vehicle
2=No Driver
3=Driver Fled Scene
4=Hit and Run
9=Unknown

| Owner/Driver | 00=Not Applicable | 04=State Police Vehicle | 07=Municipal Police Veh | 09=Federal Gov Veh |
|---|---|---|---|---|
| 01 | 01=Private Vehicle Owned/ Leased by Driver | 02=Private Vehicle Not Owned/Leased by Driver | 05=PENNDOT Vehicle | 98=Other |
| | 03=Rented Vehicle | 06=Other State Gov Veh | 08=Other Municipal Government Vehicle | 99=Unknown |

**Same as Driver** ●
**Owner First Name**
**Owner Last Name or Business Name (if Pedestrian, skip this Section)**

**Address / City / State / Zip**

**Vehicle Make** DODGE
**Make Code** 07

**VIN** 1 B 7 G G 2 3 Y 5 W S 5 H 8 8 4 0
**Model Year** 1988
**Vehicle Model** DAKOTA SPORT (see overlay)

**License Plate** Y G D 5 2 8 4
**Reg. State** PA
**Est. Speed** 045
**Vehicle Towed** ● Yes ○ No
**Towed By** LEWIS TOWING

**Insurance** ○ Yes ○ No ○ Unknown
**Insurance Company** TRAVELERS INS
**Policy No** 947239593  101  1

**Trailing Unit**
**No. of Trailing Units** 0
**Type Unit**
1=Towing Pass. Veh
2=Towing Truck
3=Towing Utility Trailer
4=Mobile/Modular Home
5=Camper
6=Full Trailer
7=Semi-Trailer
8=Other
9=Unknown
**Tag No**
**Tag Year**
**Tag St**

**Direction of Travel** W
**Vehicle Position** 01
**Movement** 01
**See Overlay**
**Special Usage** 00

### Vehicle Color
01
06=Yellow
07=Silver
08=Gold
09=Brown
10=Orange
11=Purple
12=Other
99=Unknown
01=Blue
02=Red
03=White
04=Green
05=Black

### Vehicle Type
01
01=Automobile
02=Motorcycle
03=Bus
04=Small Truck
(If "02", Complete Form M, Section 26)
(If "20" or "21", Complete Form M, Section 27)
05=Large Truck
06=SUV
07=Van
10=Snowmobile
11=Farm Equip
12=Construction Equip
13=ATV
18=Other Type Spec Veh
19=Unk. Type Spec Veh
20=Unicycle, Bicycle, Tricycle
21=Other Pedacycle
22=Horse & Buggy
23=Horse & Rider
24=Trolley
25=Trolley
98=Other
99=Unknown

### Special Usage
00=Not Applicable
01=Fire Veh
02=Ambulance
03=Police
08=Other: Emergency Vehicle
11=Pup' Transport
12=Commercial: Passenger Carrier
13=Taxi
21=Tractor Trailer
22=Twin Trailer
23=Tricle Trailer
31=Modified Veh
99=Unknown

**Initial Impact Point** 12
00=Non-Collision
01-12=Clock Points
13=Top
14=Undercarriage
15=Towed Veh
98=Unknown

**Damage Indicator** 3
0=None
1=Minor
2=Functional
3=Disabling
9=Unknown

**Gradient** 1
1=Level
2=Uphill
3=Downhill
4=Bottom of Hill
5=Top of Hill
9=Unknown

**Road Alignment** 1
1=Straight
2=Curved

AR0105

AUG-13-2004 10:07 A MUTUAL INSURANCE CO    610 834 0237    P.04

## COMMONWEALTH OF PENNSYLVANIA
### POLICE CRASH REPORTING FORM

AA 500 2    Police Dept: 03-103704    Page: 03    P0639922    Crash Number

**Type Unit**
- ● Motor Vehicle in Transport
- ○ Hit & Run Vehicle
- ○ Illegally Parked
- ○ Legally Parked
- ○ Non - Motorized
- ○ Pedestrian
- ○ Pedestrian on Skates, in Wheelchair, etc.
- ○ Disabled From Previous Crash
- ○ Train
- ○ Phantom Vehicle

(If "Pedestrian" or "Pedestrian on Skates, in Wheelchair, etc", Complete Form M, Section 28)

**Commercial Vehicle**
○ Yes ● No
(If Yes, Complete Form C)

**Unit No** 09
**First Name** DANIEL
**MI** R
**Date of Birth (MM-DD-YYYY)** 04 05 1961

**Delete?**
**Last Name** MOARTY
**Telephone Number** (302) 048-8866

**Address / City / State** 319 PALOMINO ROAD HUNTERS RIDGE, NEWARK, DELAWARE   **Zip** 19711

**Driver License Number** 640660   **State** DE   **Class** D

**Alcohol/Drugs Suspected**
- ● No
- ○ Alcohol
- ○ Illegal Drugs
- ○ Alcohol and Drugs
- ○ Medication
- ○ Unknown

**Driver or Pedestrian Physical Condition**
- ● Apparently Normal
- ○ Illegal Drug Use
- ○ Fatigue
- ○ Medication
- ○ Had Been Drinking
- ○ Sick
- ○ Asleep
- ○ Unknown

**Alcohol Test Type**
- ● Test Not Given
- ○ Blood
- ○ Breath
- ○ Urine
- ○ Other
- ○ Unknown w/ Test Given

**Primary Vehicle Code Violation** NO VIOLATIONS NOTED
**Charged?** ○ Yes ● No

**Alcohol Test Results** 0.
- ○ Test Refused
- ○ Test Given, Contaminated Results
- ○ Unknown Results

**Driver Presence** 1
1=Driver Operated Vehicle
2=No Driver
3=Driver Fled Scene
4=Hit and Run
9=Unknown

**Owner/Driver** 01
- 00=Not Applicable
- 01=Private Vehicle Owned/Leased by Driver
- 02=Private Vehicle Not Owned/Leased by Driver
- 03=Rented Vehicle
- 04=Other State Gov Veh
- 05=PENNDOT Vehicle
- 06=Other State Gov Veh
- 07=Municipal Police Veh
- 08=Other Municipal Government Vehicle
- 09=Federal Gov Veh
- 98=Other
- 99=Unknown

**Same as Driver** ○
**Owner First Name**
**Owner Last Name or Business Name (If Pedestrian, skip this Section)**

**Address / City / State / Zip**

**Vehicle Make** DODGE   **Make Code** 07

**VIN** 1B4GH54R4NX268771   **Model Year** 1992   **Vehicle Model** CARAVAN   (see overlay)

**License Plate** PC81074   **Reg. State** DE   **Est. Speed** 999   **Vehicle Towed** ● Yes ○ No   **Towed By** LELJO TWINS

**Insurance** ● Yes ○ No ○ Unknown   **Insurance Company** AMICA MUTUAL INS.   **Policy No** 940907-20DR

**Trailing Unit**   **No. of Trailing Units** 0   **Type Unit**
1=Towing Pass. Veh
2=Towing Truck
3=Towing Utility Trailer
4=Mobile/Modular Home
5=Camper
6=Full Trailer
7=Semi-Trailer
8=Other
9=Unknown
**Tag No**   **Tag Year**   **Tag St**

**Direction of Travel** 3   **Vehicle Position** 01   **Movement** 01   **See Overlay**

**Special Usage** 00
- 06=Not Applicable
- 01=Fire Veh
- 02=Ambulance
- 03=Police
- 06=Other Emergency Vehicle
- 11=Pupil Transport
- 12=Commercial Passenger Carrier
- 13=Taxi
- 21=Tractor Trailer
- 22=Twin Trailer
- 23=Triple Trailer
- 31=Modified Veh
- 99=Unknown

**Vehicle Color** 04
- 06=Yellow
- 07=Silver
- 08=Gold
- 09=Brown
- 10=Orange
- 11=Purple
- 12=Other
- 99=Unknown
- 01=Blue
- 02=Red
- 03=White
- 04=Green
- 05=Black

**Vehicle Type** 01
- 01=Automobile
- 02=Motorcycle
- 03=Bus
- 04=Small Truck
(If "02", Complete Form M, Section 26)
(If "20" or "21", Complete Form M, Section 27)
- 05=Large Truck
- 06=SUV
- 07=Van
- 10=Snowmobile
- 11=Farm Equip
- 12=Construction Equip
- 13=ATV
- 18=Other Type Spec Veh
- 19=Unk. Type Spec Veh
- 20=Unicycle, Bicycle Tricycle
- 21=Other Pedalcycle
- 22=Horse & Buggy
- 23=Horse & Rider
- 24=Train
- 25=Trolley
- 98=Other
- 99=Unknown

**Initial Impact Point** 11
- 00=Non-Collision
- 01-12=Clock Points
- 13=Top

**Damage Indicator**
- 0=None
- 1=Minor
- 9=Unknown
- 2=Functional
- 7=Disabling
- 14=Undercarriage
- 15=Towed Unit
- 98=Unknown

**Gradient** 3
- 1=Level
- 2=Uphill
- 3=Downhill
- 4=Bottom of Hill
- 5=Top of Hill
- 9=Unknown

**Road Alignment** 1
- 1=Straight
- 2=Curved
- 9=Unknown

AR0106

P. APP. 0046

AUG-13-2004 10:07    A[ ] MUTUAL INSURANCE CO    610 834 0237    P.05

**COMMONWEALTH OF PENNSYLVANIA**
**POLICE CRASH REPORTING FORM**

AA 500 3

Police Use Only: SD1-1031704

Page: 04

Crash Number: **P0639922**

## People Information

**A. Person Type:**
1=Driver
2=Passenger
7=Pedestrian
8=Other
9=Unknown

**B. Sex:**
F =Female
M =Male
U =Unknown

**C. Injury Severity:**
0=Not Injured
1=Killed
2=Major Injury
3=Moderate Injury
4=Minor Injury
8=Injury, Unk Severity
9=Unknown if Injury

**D. Seat Position:**
00=Not A Passenger/Occupant
01=Driver - All Vehicles
02=Front Seat Middle Position
03=Front Seat Right Side
04=Second Row - Left Side Or Motorcycle Passenger
05=Second Row - Middle Position
06=Second Row - Right Side
07=Third Row Or Greater - Left Side
08=Third Row Or Greater - Middle Position
09=Third Row Or Greater - Right Side
10=Sleeper Section of Truckcab
11=In Other Enclosed Passenger Or Cargo Area
12=In Open Area (Back Of Pickup, Etc.)
13=Trailing Unit
14=Riding On Vehicle Exterior
15=Bus Passenger
98=Other
99=Unknown

**E. Safety Equipment One:**
00=None Used / Not Applicable
01=Shoulder Belt Used
02=Lap Belt Used
03=Lap And Shoulder Belt Used
04=Child Safety Seat Used
05=Motorcycle Helmet Used
06=Bicycle Helmet Used
07=Safety Belt Used Improperly
11=Child Safety Seat Used Improperly
12=Helmet Used Improperly
90=Restraint Used, Type Unknown
99=Unknown

**F. Safety Equipment Two:**
00=None Used / Not Applicable
01=Front Air Bag Deployed (For This Seat)
02=Side Air Bag Deployed (For This Seat)
03=Other Type Air Bag Deployed
04=Multiple Air Bags Deployed
06=Motorcycle Eye Protection
08=Bicyclist Wearing Elbow/Knee/Pads
10=Air Bag Not Deployed, Switch On
11=Air Bag Not Deployed, Switch Off
12=Air Bag Not Deployed, Unk Switch Setting
13=Air Bag Removed (Prior To Crash)
19=Unknown If Air Bag Deployed
99=Unknown

**G. Ejection:**
0=Not Applicable
1=Not Ejected
2=Totally Ejected
3=Partially Ejected
9=Unknown

**H. Ejection Path:**
0=Not Ejected / Not Applicable
1=Through Side Door Opening
2=Through Side Window
3=Through Windshield
4=Through Back Door
5=Through Back Door Tailgate Opening
6=Through Roof Opening (Sunroof / Convertible Top Down)
7=Through Roof Opening (Convertible Top Up)
9=Unknown

**I. Extrication:**
0=Not Applicable
1=Not Extricated
2=Extricated By Mechanical Means
3=Freed By Non - Mechanical Means
8=Other
9=Unknown

---

**13. EMS Agency:** DEVT FIRE COMPANY    **Medical Facility:** LANCASTER GENERAL HOSPITAL / HERSHEY MEDICAL CENTER

---

**14.** Unit No: 01  Person No: 01  Delete?: ○  Date of Birth (MM-DD-YYYY): 01-29-1964  A: 1  B: M  C: 0  D: 0  E: 63  F: 0  G: 0  H: 0  I: 
Name / Address / Phone: ■ Same as Operator
EMS Transport: ●Yes ○No

Unit No: 02  Person No: 02  Delete?: ○  Date of Birth (MM-DD-YYYY): 04-05-1961  A: 1  B: M  C: 0  D: 0  E: 63  F: 04  G: 0  H: 2  I: 
Name / Address / Phone: ■ Same as Operator
EMS Transport: ○Yes ●No

Unit No: 02  Person No: 03  Delete?: ○  Date of Birth (MM-DD-YYYY): 03-05-1991  A: 2  B: F  C: 0  D: 99  E: 04  F: 0  G: 2  H: I: 
Name / Address / Phone: ☐ Same as Operator: JESSICA KLARTY, 319 PALOMINO DRIVE NEWARK DE 19711 (302) 242-8866
EMS Transport: ○Yes ●No

Unit No: 02  Person No: 04  Delete?: ○  Date of Birth (MM-DD-YYYY): 01-20-1995  A: 2  B: M  C: 2  D: 06  E: 99  F: 04  G: 0  H: 2  I: 
Name / Address / Phone: ☐ Same as Operator: KEENAN KLARTY 319 PALOMINO DRIVE NEWARK DE 19711 (302) 242-8866
EMS Transport: ●Yes ○No

Unit No: 02  Person No: 05  Delete?: ○  Date of Birth (MM-DD-YYYY): 01-21-1989  A: 2  B: M  C: 2  D: 03  E: 03  F: 04  G: 0  H: I: 
Name / Address / Phone: ☐ Same as Operator: JOSHUA KLARTY 319 PALOMINO DRIVE NEWARK DE 19711 (302) 242-8866
EMS Transport: ○Yes ○No

Unit No: 02  Person No: 06  Delete?: ○  Date of Birth (MM-DD-YYYY): 11-07-1993  A: 2  B: M  C: 2  D: 99  E: 04  F: 0  G: 2  H: I: 
Name / Address / Phone: ☐ Same as Operator: MATTHEW KLARTY 319 PALOMINO DRIVE NEWARK DE 19711 (302) 242-8866
EMS Transport: ○Yes ○No

AR0107

AUG-13-2004  10:08    AF  2 MUTUAL INSURANCE CO    610 834 0237    P.06

**COMMONWEALTH OF PENNSYLVANIA**
**POLICE CRASH REPORTING FORM**

AA 500 4    Police Use Only: 591-103170H    Page: 05

**P0639922**    Crash Number

## General Crash Information

| Crash Description | H | 0=Non-Collision | 2=Head On | 4=Angle | 6=Sideswipe (Opposite Direction) | 8=Hit Pedestrian |
| | | 1=Rear End | 3=Rear to Rear (Backing) | 5=Sideswipe (Same Direction) | 7=Hit Fixed Object | 9=Other/Unknown |
| Relation to Roadway | 1 | 1=On Travel Lanes | 3=Median | 5=Outside Trafficway | 7=Gore (Ramp Intersection) | |
| | | 2=Shoulder | 4=Roadside | 6=In Parking Lane | 8=Unknown | |
| Illumination | 1 | 1=Daylight | 3=Dark - Street Lights | 5=Dawn | 8=Other | |
| | | 2=Dark - No Street Lights | 4=Dusk | 6=Dark - Unknown Roadway Lighting | | |
| Weather Conditions | 1 | 1=No Adverse Conditions | 3=Sleet (Hail) | 5=Fog | 7=Sleet & Fog | 9=Unknown |
| | | 2=Rain | 4=Snow | 6=Rain & Fog | 8=Other | |
| Road Surface Conditions | 0 | 0=Dry | 2=Sand, Mud, Dirt. | 4=Slush | 6=Ice Patches | 8=Other |
| | | 1=Wet | 3=Snow Covered | 5=Ice | 7=Water - Standing Or Moving | |

## Unit(s) Event Information

**Harmful Events (Harm Event)**

01=Hit Unit 1
02=Hit Unit 2
03=Hit Unit 3
04=Hit Unit 4
05=Hit Unit 5
06=Hit Other Traffic Unit
07=Hit Deer
08=Hit Other Animal
09=Collision With Other Non Fixed Object
11=Struck By Unit 1
12=Struck By Unit 2
13=Struck By Unit 3
14=Struck By Unit 4
15=Struck By Unit 5
16=Struck By Other Traffic Unit
21=Hit Tree Or Shrubbery
22=Hit Embankment
23=Hit Utility Pole
24=Hit Traffic Sign
25=Hit Guard Rail
26=Hit Guard Rail End
27=Hit Curb
28=Hit Concrete Or Ornamental Barrier
29=Hit Ditch
30=Hit Fence Or Wall
31=Hit Building
32=Hit Culvert
33=Hit Bridge Pier Or Abutment
34=Hit Parapet End
35=Hit Bridge Rail
36=Hit Boulder Or Obstacle On Roadway
37=Hit Impact Attenuator
38=Hit Fire Hydrant
39=Hit Roadway Equipment
40=Hit Mail Box
41=Hit Traffic Island
42=Hit Snow Bank
43=Hit Temporary Construction Barrier
48=Hit Other Fixed Object
49=Hit Unknown Fixed Object
50=Overturn/Roll Over
51=Struck By Thrown Or Falling Object
52=Pot Holes Or Other Pavement Irregularities
53=Jackknife
54=Fire In Vehicle
58=Other Non-Collision
99=Unknown Harmful Event

Unit No 01 — Harm Event / L/R / Most? / Utility Pole Number — 02 [Most?]
Please Put Events in Sequential Order

Unit No 02 — Harm Event / L/R / Most? / Utility Pole Number
Please Put Events in Sequential Order

| First Harmful Event in the Crash | Unit No 01 | Harm Event 02 | Most Harmful Event in the Crash | Unit No 01 | Harm Event 02 |

## Contributing Information

**Driver Action (D)**

00=No Contributing Action
01=Driver Was Distracted
02=Driving Using Hand Held Phone
03=Driving Using Hands Free Phone
04=Making Illegal U-Turn
05=Improper/Careless Turning
06=Turning From Wrong Lane
07=Proceeding W/O Clearance After Stop
08=Running Stop Sign
09=Running Red Light
10=Failure To Respond To Other Traffic Control Device
11=Tailgating
12=Sudden Slowing/Stopping
13=Illegally Stopped On Road
14=Careless Passing Or Lane Change
15=Passing In No Passing Zone
16=Driving Wrong Way On 1-Way Street
17=Careless Or Illegal Backing On Roadway
18=Driving On The Wrong Side Of Road
19=Making Improper Entrance To Highway
20=Making Improper Exit From Highway
21=Careless Parking/Unparking
22=Over/Under Compensation At Curve
23=Speeding
24=Driving Too Fast For Conditions
25=Failure To Maintain Proper Speed
26=Driver Fleeing Police (Po. Chase)
27=Driver Inexperienced
28=Failure To Use Specialized Equip
92=Affected By Physical Condition
99=Improper Driving Actions

Unit No 01 — 08 — 2 / 3 / 4
Unit No 02 — / 2 / 3 / 4

**Environmental / Roadway Potential Factors (E/R)** — 1

00=None
01=Windy Conditions
02=Sudden Weather Conditions
03=Other Weather Conditions
04=Deer In Roadway
05=Obstacle On Roadway
06=Other Animal In Roadway
07=Glare
08=Work Zone Related
11=Slippery Road Conditions (Ice/Snow)
12=Substance On Roadway
13=Potholes
14=Broken Or Cracked Pavement
15=TCD Obstructed
16=Soft Shoulder Or Shoulder Drop Off
28=Other Roadway Factor
29=Other Environmental Factor
99=Unknown

**Possible Vehicle Failures (V)**

00=None
C1=Tires
C2=Brake System
C3=Steering System
C4=Suspension
C5=Power Train
06=Exhaust
07=Headlights
08=Signal Lights
09=Other Lights
10=Horn
11=Mirrors
12=Wipers
13=Driver Seating/Control
14=Body, Doors, Hood, Etc
15=Trailer Hitch
16=Wheels
17=Airbags
18=Trailer Overloaded
19=Unsecure/Shifted Trailer Load
20=Improper Towing
21=Obstructed Windshield
99=Unknown

Unit No 01 — / 1 / 2
Unit No 01 — / 1 / 2

**Pedestrian Action (P)**

00=None
01=Entering Or Crossing At Specified Location
02=Walking, Running, Jogging, Or Playing
03=Working
04=Pushing Vehicle
05=Approaching Or Leaving Vehicle
06=Working On Vehicle
07=Standing
98=Other
99=Unknown

Unit No 01 — / / Unit No 08 — / /

**Indicated Prime Factor**

E/R / V / D / P

Unit No 01 — Factor Code 08

If E/R is the Prime Factor type, leave Unit No. blank

AR0108

AUG-13-2004  10:09      A    1 MUTUAL INSURANCE CO        610 834 8237    P.07

## COMMONWEALTH OF PENNSYLVANIA
## POLICE CRASH REPORTING FORM

**AA 500 F**

Police Use Only: 501-1031704

Page: 06

☐ New
☐ Change/Continuation

Crash Number: P1063992

| | | |
|---|---|---|
| **Road Surface Type** | | |
| ☐ Concrete | ☐ Brick or Block | ☐ Dirt |
| ☑ Blacktop | ☐ Slag, Gravel or Stone | ☐ Other |
| | | ☐ Unknown |

**Special Jurisdiction**
- ☑ No Special Jurisdiction
- ☐ National Park
- ☐ Military
- ☐ Indian Reservation
- ☐ College/University Campus
- ☐ Other Federal Sites
- ☐ Other
- ☐ Unknown

Please complete Unit Information for each unit involved in a fatal crash. Do not repeat the information in the fields above on multiple pages.

### Unit No 01

**Driver Restrictions Compliance**
- ☑ Restrictions Complied With
- ☐ Restrictions Not Complied With
- ☐ Compliance Unknown
- ☐ No Restrictions/ Not Applicable
- ☐ Not a Pennsylvania Driver
- ☐ Unknown Compliance

**Driver Endorsement Compliance**
- ☑ Required - Complied With
- ☐ Required - Non Compliance
- ☐ Required - Compliance Unknown
- ☐ None Required
- ☐ Not a Pennsylvania Driver
- ☐ Unknown Compliance

**Driver License Compliance**
- ☐ Not Required for Vehicle Class
- ☐ No Valid License for Class
- ☑ Valid License for Class
- ☐ Not Licensed
- ☐ Unk if CDL or CDL required
- ☐ Not a Pennsylvania Driver
- ☐ Unknown

**Drug Test Type**
- ☐ None
- ☐ Blood
- ☐ Urine
- ☐ Other
- ☐ Unknown if Test Given

**Drug Test Results - (Up to Four Results)**
0 = No Test Given
1 = No Drug Reported
2 = Marijuana
3 = Cocaine
4 = Opiates
5 = Amphetamines
6 = PCP
8 = Other
9 = Unknown Test Results

[ 9 ] [ ]
[ ] [ ]

**Principle Impact Point**
- ☐ Non-Collision
- ☐ Top
- ☐ Undercarriage
- ☐ Towed Unit
- ☐ Unknown

(clock diagram 01-12)

**Avoidance Maneuver**
- ☑ No Avoidance Maneuver
- ☐ Braking - Skid Marks Evident
- ☐ Braking - No Skid Marks, Driver Stated
- ☐ Braking - Other Evidence
- ☐ Steering - Evidence or Driver Stated
- ☐ Steering and Braking Evidence or Stated
- ☐ Other Avoidance Maneuver
- ☐ Inconclusive
- ☐ Unknown

**Under Ride Indicator**
- ☑ No Underride or Override
- ☐ Underride, Compartment Intrusion
- ☐ Underride, No Compartment Intrusion
- ☐ Underride, Compartment Intrusion Unknown
- ☐ Override, Other Vehicle
- ☐ Unknown if Underride or Override

**Emergency Use**
- ☑ Not in Emergency Use
- ☐ Lights Flashing
- ☐ Siren Sounding
- ☐ Both Lights and Siren
- ☐ Unknown

---

### Unit No 02

**Driver Restrictions Compliance**
- ☐ Restrictions Complied With
- ☐ Restrictions Not Complied With
- ☐ Compliance Unknown
- ☑ No Restrictions/ Not Applicable
- ☐ Not a Pennsylvania Driver
- ☐ Unknown Compliance

**Driver Endorsement Compliance**
- ☐ Required - Complied With
- ☐ Required - Non Compliance
- ☐ Required - Compliance Unknown
- ☑ None Required
- ☐ Not a Pennsylvania Driver
- ☐ Unknown Compliance

**Driver License Compliance**
- ☐ Not Required for Vehicle Class
- ☐ No Valid License for Class
- ☑ Valid License for Class
- ☐ Not Licensed
- ☐ Unk if CDL or CDL required
- ☐ Not a Pennsylvania Driver
- ☐ Unknown

**Drug Test Type**
- ☑ None
- ☐ Blood
- ☐ Urine
- ☐ Other
- ☐ Unknown if Test Given

**Drug Test Results - (Up to Four Results)**
0 = No Test Given
1 = No Drug Reported
2 = Marijuana
3 = Cocaine
4 = Opiates
5 = Amphetamines
6 = PCP
8 = Other
9 = Unknown Test Results

[ 0 ] [ ]
[ ] [ ]

**Principle Impact Point**
- ☐ Non-Collision
- ☐ Top
- ☐ Undercarriage
- ☐ Towed Unit
- ☐ Unknown

(clock diagram 01-12)

**Avoidance Maneuver**
- ☑ No Avoidance Maneuver
- ☐ Braking - Skid Marks Evident
- ☐ Braking - No Skid Marks, Driver Stated
- ☐ Braking - Other Evidence
- ☐ Steering - Evidence or Driver Stated
- ☐ Steering and Braking Evidence or Stated
- ☐ Other Avoidance Maneuver
- ☐ Inconclusive
- ☐ Unknown

**Under Ride Indicator**
- ☑ No Underride or Override
- ☐ Underride, Compartment Intrusion
- ☐ Underride, No Compartment Intrusion
- ☐ Underride, Compartment Intrusion Unknown
- ☐ Override, Other Vehicle
- ☐ Unknown if Underride or Override

**Emergency Use**
- ☑ Not in Emergency Use
- ☐ Lights Flashing
- ☐ Siren Sounding
- ☐ Both Lights and Siren
- ☐ Unknown

AR0109

AUG-13-2004 10:09    A...    MUTUAL INSURANCE CO    610 834 0237    P.08

**COMMONWEALTH OF PE...SYLVANIA**
**POLICE CRASH REPORTING FORM**

AA 500 5    Police Use Only: 5C1-1031704    Page: 07    Crash Number: P0639922



| Witness Name | Address | Phone |
|---|---|---|
| 1 STEPHEN HYE | 320 CLEARFIELD DRIVE, LINCOLN UNIVERSITY PA 19450 | (610) 869-3442 |
| 2 DAVID HARNISH | 1573 GEORGETOWN RD, CHRISTIANA PA 17509 | (717) 509-7596 |

Narrative and additional witnesses:    Accident Investigation Notification Issued? ☑    Property Damage ☐

ADDITIONAL WITNESSES:
3. JOHN HINKEL, 10101 SANDTOWN RD, FELTON DE 19943    (302) 284-3440
4. GARY LAWTON, 512 LISBETH RD, NEWARK, DE 19713    (302) 369-8630

IT SHOULD BE NOTED THAT NO CELLULAR TELEPHONE WERE PRESENT IN UNIT #1 OR UNIT #2, AT THE TIME OF THE CRASH.

SR0896 IS AN ASPHALT ROADWAY WITH A MODERATE ELEVATION. THE ROADWAY IS DIVIDED BY SOLID YELLOW LINES AND IS DESIGNATED AS AN NORTH TO SOUTH ROADWAY. IT SHOULD BE NOTED THAT AT THE TIME OF THE CRASH, TRAFFIC WAS NOTED TO BE MODERATE.

THIS CRASH OCCURRED AS UNIT #1 WAS TRAVELING WEST ON BARTVILLE ROAD, AS UNIT #1 APPROACHED THE INTERSECTION OF BARTVILLE ROAD AT GEORGETOWN ROAD (SR0896). OPERATOR #1 FAILED TO STOP AT A STOP SIGN. PROCEEDING INTO THE INTERSECTION WHERE UNIT #1'S FRONT END STRUCK UNIT #2'S LEFT FRONT AS UNIT #2 WAS TRAVELING SOUTH ON SR0896. AFTER IMPACT UNIT #1 WAS SPUN IN A COUNTER CLOCKWISE DIRECTION, COMING TO REST

AR0110

AUG-13-2004 10:10    A    1 MUTUAL INSURANCE CO    610 834 0237    P.09

THAT COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 N    Police Incident _____    Page 08    ○ New    ○ Change/Continuation    Crash Number P06399_20

**Narrative and additional witnesses:**

FACING EAST APPROX 20 FEET FROM POINT OF IMPACT. UNIT #2 TRAVELED IN A SOUTH WEST DIRECTION COMING TO REST FACING SOUTH IN A CORNFIELD APPROX 70 FEET FROM POINT OF IMPACT.

PHYSICAL EVIDENCE NOTED AT THE SCENE: GOUGE MARKS INDICATING POINT OF IMPACT LOCATED IN THE SOUTHBOUND LANE OF SR0896.

ADDITIONAL MEASUREMENTS TO BE SUPPLEMENTED BY CPL WARD AND TPR GABRYLUK II. COLLISION ACCIDENT RECONSTRUCTION SPECIALIST.

ON 08/08/04 AT 1610 HRS WITNESS RYE WAS INTERVIEWED AT THE SCENE AND HE STATED "WE WERE TRAVELING SOUTH ON ROUTE 896. THE BLUE PICK-UP TRUCK CAME FROM BARTVILLE ROAD RAN THROUGH THE STOP SIGN AND HIT THE VAN, THAT WAS A COUPLE OF CARS INFRONT OF ME.

ON 08/08/04 AT 1610 HRS, WITNESS HARNISH WAS INTERVIEWED AT THE SCENE AND HE STATED" I WAS WALKING DOWN THE ROAD. SOUTH ON 896. WHEN I SAW THE BLUE TRUCK COME FLYING THROUGH THE INTERSECTION AND THATS WHEN THEY HIT.

ON 08/08/04 AT 1615 HRS, WITNESS HINKEL WAS INTERVIEWED AT THE SCENE AND HE STATED" I WAS RIGHT BEHIND THE MINIVAN TRAVELING SOUTH ON ROUTE 896. WE WERE GOING THE SPEED LIMIT WHEN ALL OF A SUDDEN THE BLUE TRUCK CAME THROUGH THE STOP SIGN AND HIT THE VAN. I HAD TO SWERVE TO AVOID HITTING THEM.

ON 08/08/04 AT 1620 HRS. WITNESS LAWTON WAS INTERVIEWED AT THE SCENE AND HE STATED" I DIDN'T SEE WHAT HAPPENED. I JUST WALKED UP AND NOTICED THE DRIVER OF THE BLUE PICK-UP TRUCK THROWING SOME BOTTLES (POSSIBLY BEER BOTTLES) INTO THE CORN FIELD. I THEN SAW HIM PICK UP SOME OTHER BOTTLES AND PUT THEM BACK IN THE TRUCK.

IT SHOULD BE NOTED THAT NO BEER BOTTLES OR ANY OTHER ALCOHOLIC BEVERAGE BOTTLES WERE NOTED AT THE SCENE.

(MORE)

AR0111

AUG-13-2004  10:10    A?    MUTUAL INSURANCE CO                610 854 0237    P.10
~ ~HAT    COMMONWEALTH OF M  SYLVANIA
POLICE CRASH REPORTING FORM                    Page            New                        Crash Number
AA 500 N    Police Identity  JSI-103170Y        09         Change/Continuation   P 0 6 3 9 9 2 2

**Narrative and additional witnesses:**

22

On 08/03/04 at 1625 HRS. Operator #1 was interviewed at the scene and he stated "I was coming home from my in-laws house in New Jersey. I guess I just missed the stop sign and blew into the intersection and hit them."

Photographs were taken at the scene by Cpl Michael Witmer, Troop J Lancaster. Patrol section supervisor.

Daniel Klarty was pronounced dead at the scene by senior deputy coroner Charles S. McWilliams at 1709 HRS on 08/03/04.

On 08/03/04 Assistant District Attorney Todd Brown was notified.

Additional assistance was provided at the scene by Cpl. Michael Witmer (Patrol Unit Supervisor), Tpr Kurt Bitler, PSP Lancaster. Tpr Christopher Daly, Criminal Investigation Unit, PSP Lancaster and Cpl Ward and Tpr Gabrych Collision Accident Reconstruction Specialist.

Kaert Fire Company Assisted.
Union Fire Company Assisted.
Slarryville Fire Company Assisted.
Parkesburg, Gordonville, Christiana and William Street Ambulance Assisted.
Sky Care Assisted.
Lews Twin Assisted to remove both units from the scene.

SPT-LS15 Form was issued to all parties involved.

On 08/03/04 a clean message of the vehicle traffic fatality was sent. (refer to attached copy) File 3 in accordance with the Pennsylvania State Police regulations FR 6-4.

PDF4m : AA-530(4) (2/02)

AR0112

This is to certify that the information here given is correctly copied from an original certificate of death duly filed with me as Local Registrar. The original certificate will be forwarded to the State Vital Records office for permanent filing.

**WARNING: It is illegal to duplicate this copy by photostat or photograph.**

Fee for this certificate, $2.00

Local Registrar *Nancy E. Bachman* 36-340

P 10680757
No.

8-11-04
Date

H185.144 Rev. 1/81

COMMONWEALTH OF PENNSYLVANIA • DEPARTMENT OF HEALTH • VITAL RECORDS
CERTIFICATE OF DEATH
(Coroner)

TYPE/PRINT IN PERMANENT BLACK INK

NAME OF DECEDENT (First, Middle, Last): DANIEL R. ROARTY

AGE (Last Birthday): 43 YRS.

DATE OF BIRTH (Month, Day, Year): APR. 5, 1961

BIRTHPLACE (City and State or Foreign Country): Pittsburgh, PA

SEX: Male

SOCIAL SECURITY NUMBER: 189 - 58 - 3764

DATE OF DEATH (Month, Day, Year): AUGUST 8, 2004

PLACE OF DEATH: ROADWAY

COUNTY OF DEATH: Lancaster 36

CITY, BORO, TWNP OF DEATH: Bart Twp.

KIND OF BUSINESS/INDUSTRY: Rt 896 & Bartville Road

DECEDENT'S USUAL OCCUPATION: Engineer

DECEDENT'S EDUCATION: 4

KIND OF BUSINESS/INDUSTRY: Instrumentation

MARITAL STATUS: Married

SURVIVING SPOUSE: Kelly Ziegler

WAS DECEDENT OF HISPANIC ORIGIN?: 

RACE: White

DECEDENT'S MAILING ADDRESS: 319 Palomino Drive Newark, DE 19711

DECEDENT'S ACTUAL RESIDENCE - STATE: Delaware

COUNTY: New Castle

CITY: Newark

FATHER'S NAME (First, Middle, Last): Joseph D. Roarty

INFORMANT'S NAME: Kelly Roarty

MOTHER'S NAME (First, Middle, Maiden Surname): Mary Joy Clapp

INFORMANT'S MAILING ADDRESS: 319 Palomino Dr., Newark, DE 19711

METHOD OF DISPOSITION: Cremation ☒ Removal from State ☒

DATE OF DISPOSITION (Month, Day, Year): August 12, 2004

NAME OF CEMETERY/CREMATORY: Hockessin Crematory

LOCATION: Hockessin, DE

SIGNATURE OF FUNERAL SERVICE LICENSEE OR PERSON ACTING AS SUCH: 

LICENSE NUMBER: 0181351

NAME AND ADDRESS OF FACILITY: Young Funeral Home, Lancaster, PA 17602

TIME OF DEATH: 5:25 PM

DATE PRONOUNCED DEAD (Month, Day, Year): AUGUST 8, 2004

WAS CASE REFERRED TO MEDICAL EXAMINER/CORONER?: Yes

PART I. Enter the diseases, injuries or complications which caused the death:

IMMEDIATE CAUSE (Final disease or condition resulting in death): Multiple Traumatic Injuries

WAS AN AUTOPSY PERFORMED?: No

WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH?: No

MANNER OF DEATH: Accident ☒

DATE OF INJURY (Month, Day, Year): AUGUST 8, 2004

TIME OF INJURY: 3:40 PM

INJURY AT WORK?: Yes

DESCRIBE HOW INJURY OCCURRED: VEHICLE ACCIDENT AT INTERSECTION

PLACE OF INJURY: RT 896 AND BARTVILLE RD., BART TWP., PA

LOCATION: Bart Twp., PA

CERTIFIER: MEDICAL EXAMINER/CORONER

SIGNATURE AND TITLE OF CERTIFIER: Chandler Hopkins Deputy Coroner

LICENSE NUMBER: JENNIFER MEEKERS

DATE SIGNED: AUGUST 8, 2004

NAME AND ADDRESS OF PERSON WHO COMPLETED CAUSE OF DEATH: 131 E. FREDERICK STREET LANCASTER, PA 17602

REGISTRAR'S SIGNATURE: Nancy E. Bachman   B 36340

DATE FILED (Month, Day, Year): 8-11-04

AR0113

Marcy L. Miller
Accident Claim Specialist
Accident & Specialty Claims Department

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

December 17, 2004

Mrs. Kelly Roarty
319 Palomino Drive
Newark, DE  19711

| | |
|---|---|
| **Insured Name:** | **Daniel Roarty** |
| **Date of Birth:** | **04/05/1961** |
| **Policy Number:** | **ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I was sorry to learn about the death of your husband, Daniel Roarty.  I've completed my review of your claim for Group Business Travel Accident insurance benefits and have determined that benefits are not payable.  I'm writing to explain the outcome of the review.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions.  A copy of this policy provision is enclosed.  In order to be eligible for benefits, a claim must satisfy all the policy provisions.

**Policy Provision**

The Tyco International policy states:

> **"Scope of Coverage** - In exchange for the payments of premiums, we agree to pay benefits to all eligible persons:
>
> > a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and,
> > b) who, as a direct result of the injuries, and from no other cause, suffer a covered loss."

> **Schedule IV Hazards Insured Against**
> "We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
> > a) away from your premises in his city of permanent assignment; and
> > b) on business for you, and in the course of your business.
> All such trips must be authorized by you."

CIGNA Group insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

## Evidence Evaluated

I have reviewed the following documents and the file as a whole in making this determination:
- Group Business Travel Accident insurance policy, ABL 661690
- Proof of Loss claim form signed by Kelly Roarty on 09/03/04.
- Commonwealth of Pennsylvania Certificate of Death
- Police Crash Reporting Form
- Letter from Tyco Fire and Safety Human Resources dated 12/15/04.

## Summary

According to the death certificate, Daniel Roarty died on 08/08/04 due to blunt force injuries sustained in a motor vehicle accident.   On the Proof of Loss claim form, you indicated that "Vehicle accident at intersection of Rt. 896 and Bartville Rd.  Driver of truck ran a stop sign and hit our van on L front side.  Dan died and our 3 boys have broken bones."

The police incident report submitted with the claim confirms that the driver of a blue truck failed to stop at a stop sign and struck your minivan causing the injuries to Mr. Roarty and your children.

We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized business trip at the time of his death as required by policy ABL 661690.  We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating "Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death."

Mrs. Roarty, I extend my condolences to you for the loss of your husband.  Please understand that I must evaluate this claim based upon the information available in the file and the stipulations of the policy.

This is a Business Travel Accident insurance policy that provides benefits for losses which occur during the course of authorized business trips.   Mr. Roarty's employer has clearly stated that he was not on an authorized trip at the time of the car accident and therefore, no benefits can be issued under policy ABL 661690.

## Appeal Rights

This action is based on the information in our file.  If you are not satisfied or do not agree with the reason(s) for the denial of your claim, you may appeal the decision to:

> CIGNA Group Insurance
> PO Box 22328
> Pittsburgh, PA  15222-0328
> Attn: Lynne George

The appeal must be in writing, submitted within 60 days of the date you receive this letter and must contain the following information:

- the reason for the appeal and/or disagreement,
- the insured's name and social security number, and

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

- Information needed to su    ort that Daniel Roarty was on an au*  rized business trip at the time of his death.

Nothing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein. Should you have any information which would prove contrary to our findings, please submit it to the undersigned. We would be pleased to review any objective information you would wish to submit.

You may request a review of this denial by writing to the Life Insurance Company of North America representative signing this letter. The written request for a review must be sent within 60 days of receipt of this letter and state the reason why you feel your claim should not have been denied. Include any documentation (e.g. medical data) that you feel supports your claim. You may request copies of our claim file records relevant to the claim determination upon request and free of charge. Under normal circumstances, you will be notified of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request. You have a right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 if your claim is denied on appeal.

We encourage you to either contact the Tyco International's employee benefits department or review the insurance booklet, certificate or coverage information made available to you, to determine if you are eligible for additional benefits.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3224 from 6:30 a.m. to 3:00 p.m. Eastern Time, Monday through Friday or email me at . If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Marcy L. Miler*

Marcy L. Miler

Enclosure

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

AR0117

4/11/2005 1:05:07 PM fjohnson
Felicia,

Please contact the employee's local HR and their manager to find out if Mr.
Roarty was traveling for the company at the time of his death. If he was, we
need proof in the way of documentation from his manager and an account of
his activity.

Was his death before the change to the BTA policy?:

The following change applies to the Business Travel Accident plan only.
Effective for accidents on or after July 1, 2002, for any non-business
activity, including personal travel, and for accidents which are the result of
the employee being under the influence of alcohol or illegal drugs will no
longer be covered.

Please keep me posted on this.

Thanks!  Christina

To C.Olson:

I have spoken to Lannie Tobelin w/ Scott Health and Safety last week he
was the manger at the time (704-291-8352) he would like to speak to
someone in corp. because of this issue regarding the spouse and the changes
that were made in the policy. He stated this employee was not on BTA at
the time of the accident and the changes for the BTA was never updated in
the SPD but just to make a written correction after the employee died.
Nicole Gibian contacted me and sent me the e-mail I will forward to you.

FJohnson

4728257.1

38

AR0244