## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**KELLY ROARTY,**

       **Plaintiff(s)**

   **v.**

**TYCO INTERNATIONAL, LTD.
GROUP BUSINESS TRAVEL
ACCIDENT INSURANCE PLAN and
LIFE INSURANCE COMPANY OF
NORTH AMERICA,**

      **Defendants.**

**Civil Action No:**

**06-0195-GMS**

## DEFENDANT TYCO INTERNATIONAL, LTD. GROUP BUSINESS TRAVEL ACCIDENT PLAN AND LIFE INSURANCE COMPANY OF NORTH AMERICA'S REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT

**MARGOLIS EDELSTEIN**
HERBERT MONDROS
Margolis Edelstein
750 South Madison Street, Suite 102
Wilmington, DE 19801
(302) 888-1112
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Dated: December 17, 2007

## <u>TABLE OF CONTENTS</u>

Page

I.    REPLY ARGUMENT……………………………………………… 3

    A.    Defendants are entitled to summary judgment on Plaintiff's claims.

        1.    Plaintiff's factual narrative omits undisputed facts that fatally undermine her claims.

    B.    Plaintiff's remaining arguments fail to demonstrate a basis why she is entitled to benefits.

        1.    Defendants discharged their fiduciary duty to investigate her claim.

        2.    Plaintiff has failed to demonstrate that she was materially misinformed with regard to her claim for benefits.

II.    CONCLUSION……………………………………………………. 6

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page**

*Foss v. Lucent Technologies, Inc.,* No. 03-CV-5017(DMC), 2006 WL 3437586 (D.N.J. 2006)    **9**
*Garber v. Provident Life Ins. Co.,* 181 F.3d 100 (6th Cir. 1999)                          **2**
*Unisys Corp. Ret. Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 901 (3d Cir.1995)            **9, 10**

**Statutes and Rules of Procedure**

29 U.S.C.A. § 1002(1)                                                                       **9, 10**

29 U.S.C.A. § 1002(23)                                                                      **9**

29 U.S.C.A. § 1054(g)                                                                       **9**
ERISA § 3(1)                                                                                **10**

# I.   REPLY ARGUMENTS

### A.   Defendants are entitled to summary judgment on Plaintiff's claims.

#### 1.   Plaintiff's factual narrative omits undisputed facts that fatally undermine her claims.

Defendants denied Plaintiff's claim for business travel accident death benefits because her husband had been on vacation when he died and never began the business trip that he had tentatively planned.  That decision was a reasonable one, based on all of the facts that were derived from a considerable amount of evidence.  Nothing in Plaintiff's Answering Brief presents a substantial challenge to this.  Trying to avoid summary judgment, Plaintiff instead takes a different position.  Plaintiff now contends that the real reason her husband traveled to Pittsburgh was for business.  Defendants suggest that Plaintiff's selective recasting of the facts presents a faulty narrative, is inconsistent with her prior statements, the undisputed facts and is a result-oriented change.

When Mr. Roarty advised his co-workers of his plans before going on vacation, he told them that that he would be in Pittsburgh on vacation the following week.  He did not declare business as the purpose of his trip.  On Friday, July 30, 2004, his last work day, Mr. Roarty told Tyco sales manager Lori Levangie and others:

> *I will be in Pittsburgh next week on vacation.*  Regis [Wyse] is going to set up a day for me to go into the Bacharach plant and find out why the sensor is taking so long to build.

See AR0090[1] (emphasis supplied) (Exhibit "A").  Mr. Roarty was only one of many persons working on the vendor parts issue, and Plaintiff's arguments that portray Mr. Roarty as a

---

[1] References to "AR____" are to the administrative record and the pertinent portions appear collectively in Exhibit "A".

great driving force in resolving the issue are overstated. The reality was that if Wyse could set up a meeting, Roarty had simply stated his availability to attend. There is no evidence that Mr. Roarty was actively involved in making a meeting happen. Driving to Pittsburgh on vacation on Monday, August 2, 2004, Mr. Roarty learned that a tentative meeting on Tuesday, August 3, 2004 had fallen through and been pushed back a day. While still on vacation on Tuesday, August 3, he learned that Wyse had solved the problem. No meeting would be scheduled, and there was no need for Mr. Roarty to go anywhere on business that week.

By underplaying the role of her husband's vacation and family wedding, Plaintiff is attempting to recast the factual narrative of her claim to resemble the facts akin to those that arose in *Garber v. Provident Life Ins. Co.*, 181 F.3d 100 (6th Cir. 1999). As Plaintiff now tells it, Mr. Roarty traveled to Pittsburgh solely for business. He stayed for the meeting. When it was cancelled, he stayed to attend to "some personal business." *See* Answering Brief, p. 4. That done, he came home. Recounted this way, Plaintiff's claim sounds much like the claim presented in *Garber*, where the insured had attended a business conference and was flying home. With his employer's knowledge and approval, he arranged to make a stop on the way to see family, where his plane crashed and he was killed. The cases that Plaintiff seeks in her argument to mimic are distinguished by the critical fact that in them, the insured had at some point been engaged in business travel. In this case, Mr. Roarty was never engaged in business travel.

Mr. Roarty's niece was to be married on Saturday, August 7, 2004 in Murrysville, PA, a suburb of Pittsburgh. *See* Exhibit "B". The Roartys left for Pittsburgh on Monday,

August 2, 2004 and returned the day after the wedding, Sunday, August 8, 2004.  Mr. Roarty died while driving home.  If Mr. Roarty went to Pittsburgh for business, why didn't he come home when any need for a business meeting ended on Tuesday, August 3, 2004?  If he had, Mr. Roarty could have been home that night.  Instead, Mr. Roarty stayed on vacation, engaged in purely personal pursuits, including attending the Saturday, August 7, 2004 wedding.

Plaintiff's statement that Mr. Roarty departed a day or two earlier than planned in case he might have to miss a day of vacation for a business trip is entirely inconsistent with Mr. Roarty's July 30, 2004 email to Lori Levangie.  Mr. Roarty told Levangie that he would be in Pittsburgh on vacation.   Even accepting Plaintiff's claim that Mr. Roarty left early, his reason to go to Pittsburgh had not changed, only the date of his departure.   Having arrived on vacation in Pittsburgh, if Regis Wyse was able to schedule a meeting, Mr. Roarty was close and ready to go.  However, there was no meeting and nowhere Mr. Roarty was needed to be that week on Tyco's business.

Furthermore, the fact Mr. Roarty may have brought his laptop computer, briefcase and cell phone for business reasons does not change the result.   Mr. Roarty brought these items to be prepared in case Wyse informed him that there would be a meeting going forward.  Being prepared for a potential business meeting is not the same thing as taking a business trip.  Just as it is clear there was no meeting, there is no evidence that Mr. Roarty actually used his laptop or ever opened his briefcase during his vacation.

If, as Plaintiff says, Mr. Roarty took business phone calls, there is evidence of only two.  On Monday, August 2, 2004, Mr. Roarty received a call to learn that the Tuesday

meeting had been postponed.  On Tuesday, August 3, 2004, he received a call that there would be no meeting at all.   If there were other calls, there is no evidence to suggest that they were other than short, infrequent and minor.  Moreover, the undisputed evidence is that he was free to ignore such calls if he wanted to – after all, he was on vacation.  *See* Deposition of Robert Bierzynski, p. 12-13 (pertinent portions of Mr. Bierzynski's deposition are reproduced at Exhibit "C").  It is quite a leap to contend that the mere fact that Plaintiff's husband took a couple of business calls would convert his vacation into a business trip.

Plaintiff's factual narrative is impeached by her husband's own statements and the factual record of the claim.  She invites the Court to share her unreasonable view of the facts, selectively emphasizing facts that favor her claim while simply ignoring those claims that make clear she is not entitled to Plan benefits.

On the other hand, Defendants carefully considered all evidence that Plaintiff offered as well as that of Tyco.  Finding no basis to believe that either lacked credibility, it accepted those facts and found them not in conflict.  Defendants concluded reasonably that Mr. Roarty intended to go to Pittsburgh on vacation and that he had only volunteered to go to a business meeting in the event that one would be scheduled.  In fact, there never was a meeting, and therefore there never was a business trip.   On these facts, Defendants determined that Plaintiff was ineligible for Plan benefits and ask the Court to affirm that decision as a reasonable one, supported by substantial evidence.

4

### B.    Plaintiff's remaining arguments fail to demonstrate a basis why she is entitled to benefits.

Defendants submit that they have clearly demonstrated that Plaintiff cannot establish the essential element of her claim that her husband was engaged in business travel when he died.   In other words, Plaintiff has not refuted the basis for Defendant's determination that her claim should be denied.   Nothing Plaintiff has presented as fact in opposition to summary judgment renders Defendants' claim decision either unreasonable or unsupported by substantial evidence.   To draw attention from this failure, Plaintiff has advanced straw men to suggest that a different investigation would necessarily reach her result and that she was not advised of Plan terms to her detriment.   On inspection, these arguments are meritless, and the Court should reject them.

### 1.    Defendants discharged their fiduciary duty to investigate her claim.

Despite Plaintiff's efforts to trump up a claim that there was a failure to investigate her claim, the facts show otherwise.   Equally, Plaintiff's attempt to confuse LINA's thorough investigation of her claim with its fiduciary authority to determine the merits of her claim has no basis in fact.   Plaintiff does not cite to a single material fact that would change the result that Defendants reached in considering her claim.   Rather, Plaintiff simply denies Tyco's multiple confirmations that Mr. Roarty had not been engaged in travel on its behalf when he died despite the fact that her husband had, before his death, acknowledged that he was traveling to Pittsburgh on vacation.

The BTA Plan explicitly grants LINA broad powers and responsibilities with regard to the handling of claims for benefits.   The BTA Plan provides:

> The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims, In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.  All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of the Plan to the full extent permitted by law.
>
> The Insurance Company has no fiduciary responsibility with respect to the administration of the Plan except as described above.  It is understood that the Insurance Company's sole liability to the Plan and to the Participants and Beneficiaries under the Plan shall be for the payment of benefits provided under this Policy.

*See* Exhibit "A" at AR0036.

As the Plan's claim fiduciary, LINA is specifically empowered to determine what the facts related to a claim are.  This duty clearly implies the duty to reasonably investigate the circumstances of a claim in order to secure information upon which findings of fact may be based.  With the facts in hand, LINA is empowered to interpret the Plan's terms and apply them to the facts to decide questions of eligibility for claims.

If the claim were to be paid, LINA would be the one to pay it pursuant to the insurance policy it had issued to the Plan.  During its investigation of Plaintiff's claim, LINA obtained information from both Plaintiff and Tyco.  Tyco had no financial interest in the outcome; moreover, Tyco would have had an interest in seeing a sympathetic claim paid, as would also Mr. Roarty's co-workers.  That neither Tyco nor a single co-worker supports Plaintiff's unreasonable reading of the facts is telling.

Plaintiff's argument that LINA failed to investigate rests on the bare assertion that "all of the evidence [that she] submitted to [LINA] established that [Mr. Roarty] traveled in his own car for purposes of business." *See* Answering Brief at p. 11. As Defendant's arguments at summary judgment make clear, this simply is not so. Plaintiff selectively portrays the record evidence to bolster her unreasonable position. For example, Plaintiff cites Tyco employee Robert Bierzynski, who was the lead manager at Mr. Roarty's work site. Plaintiff omits that Mr. Bierzynski agrees that, to his understanding, Mr. Roarty had traveled to Pittsburgh to attend a wedding and for vacation, and that his travel to Pittsburgh was not related to Tyco's business and would not have been reimbursable. *See* Exhibit "C" at p. 42. Plaintiff also omits the sworn statements of Tyco Regional Sales Manager Lori Levangie and Human Resource Manager Lanny Tomberlin who agree with Bierzynski that Mr. Roarty's travel to Pittsburgh for vacation and to attend a wedding was not reimbursable as there had been no business trip. *See* Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories, pp. 4-5 (the pertinent portions of Defendants' Answers are attached hereto at Exhibit "D"). Weighing their interests, LINA was reasonable to conclude that Tyco's statement that Mr. Roarty had not been traveling on its business was credible.

Ultimately, Plaintiff's claim of faulty investigation fails because she points to no new fact nor any omitted or ignored evidence that would have the potential to change the result. The facts on which Plaintiff relies now – the change in departure date, the laptop, briefcase and cell phone that her husband may have brought, the failed attempts at a meeting – were fully known during her appeal and considered. Plaintiff's argument rests not with the thoroughness of LINA's investigation but with Tyco's response, which was under the

circumstances entirely a reasonable one. Defendants submit that the Court should reject Plaintiff's arguments in this regard and conclude that Defendants discharged their duty to investigate Plaintiff's claim.

> **2.     Plaintiff has failed to demonstrate that she was materially misinformed with regard to her claim for benefits.**

Plaintiff attempts to convert an honest error with regard to initial information about her husband's employee benefits made by Tyco personnel who were anxious to help into a material misrepresentation. Those honest errors were promptly corrected. Mr. Bierzynski testified that he wanted to know what benefits were available to Plaintiff because he was going to see her. *See* Exhibit "C", p. 19. The information he received was inaccurate and despite his best efforts and intentions, Mr. Bierzynski imparted incorrect information. Very shortly thereafter, Tyco Benefits Representative Felicia Johnson corrected the initial innocent mistake and provided Plaintiff with the accurate details of her entitlement to various benefits, including the BTA plan. See Exhibit "A" at AR 0216; Exhibit "D" at p. 3.

Plaintiff goes further and attempts to characterize the innocent mistakes of Tyco employees trying to help her as evidence of Plan provisions and changes to them of which she was never informed to her detriment. Plaintiff again cites to Bierzynski, who had been the bearer of incorrect information. Bierzynski testified that he sought to learn what Ms. Roarty's benefits might be because he was unfamiliar with Tyco's benefits. *See* Exhibit "C" at p. 19. His entire knowledge was based on what he learned from Tyco Human Resources at the time. *Id.* at 20. Within the next two weeks, Bierzynski was informed that the information provided to him about the BTA plan, and which he had provided to Plaintiff, had not been correct. Whether Bierzynski was supplied information about a prior and

superseded plan or simply misinformed is not material because as of July 1, 2002, the effective date of the LINA policy, entitlement to benefits was subject to the terms of the BTA plan as it then existed.

Plaintiff cannot claim entitlement to BTA benefits either as of the honest misstatement of Tyco employees or terms of some prior plan because employee welfare benefits are not subject to ERISA's anti-cutback rule. The anti-cutback rule prohibits elimination or reduction of accrued benefits. 29 U.S.C.A. § 1054(g). ERISA defines "accrued benefit" as an annual benefit, commencing at normal retirement age. 29 U.S.C.A. § 1002(23). Only pension benefits only can become accrued benefits. This distinction was thoroughly discussed in *Foss v. Lucent Technologies, Inc.,* No. 03-CV-5017(DMC), 2006 WL 3437586 (D.N.J. 2006) (copy attached as Exhibit E) and is helpful to resolve this issue.

> By definition, only pension benefits, not employee welfare benefits can be paid at normal retirement age in the form of an annual benefit; therefore, only pension benefits can be accrued. Stated generally, pension benefits are designed to provide retirement income to employees. *See Unisys Corp. Ret. Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 901 (3d Cir.1995) (citing 29 U.S.C. § 1002(1)). Thus, pension benefits are often paid upon retirement and may be paid in the form of an annual benefit. In contrast, employee welfare benefits are payments made in the event of "sickness, accident, disability, death or unemployment." 29 U.S.C.A. § 1002(1); see *Unisys,* 58 F.3d at 901 (explaining elements of an employee welfare plan). By definition alone, it is evident that employee welfare benefits do not satisfy the requirements of an accrued benefit because welfare benefits are not paid at normal retirement age but rather when a specified event, such as death, occurs.
>
> In this case, the death benefit, as defined by plan documents, satisfies the definition of an employee welfare benefit and is thus not an "accrued benefit" for purposes of the anti-cutback rule. The death benefit provided for payment to a plan participant's beneficiaries upon the plan participant's death and clearly is not paid at "normal retirement age." Employee welfare benefits are "maintained for the

purpose of providing for [plan participants] or their beneficiaries ... benefits in the event of death." ERISA § 3(1), 29 U.S.C. § 1002(1). Similarly, the death benefit provides for a plan participant's beneficiaries at the plan participant's death. Finally, according to the Plan documents, the death benefit is paid in a lump sum or installment payments equal to twelve months salary. The death benefit, according to the Plan documents, is not an annual benefit. Because the death benefit was not paid annually or at normal retirement age it does not satisfy the statutory definition of an accrued benefit and is not protected by the anti-cutback rule.

The benefit that Plaintiff seeks in this case is a lump sum payment of a death benefit and does not qualify for protection under the anti-cutback rule. As Plaintiff had no accrued entitlement, her sole recourse to benefits was those that Tyco, acting as plan sponsor, determined when it entered into the LINA policy that underwrote them. Further, it is well settled that erroneous statements with regard to entitlement to ERISA welfare benefits are insufficient to amend a Plan and permit a claimant to become entitled to benefits that the Plan does not offer. *Unisys*, 58 F.3d at 902 ("The written terms of the plan documents control and cannot be modified or superseded by the employer's oral undertakings.") Thus, Plaintiff's reliance on either argument to re-write the Plan's terms must fail and cannot serve as the basis for awarding her benefits. This is particularly so when there is no evidence that Plaintiff relied on inconsistent written plan terms or relied on oral misstatements to her detriment.

Plaintiff also attacks LINA's statement to her that it was waiting for written confirmation of Tyco's response to her appeal. On March 11, 2005, the LINA claims person handling her appeal advised that he was awaiting a second written confirmation from Tyco of its position. By March 25, 2005, that confirmation had not been received and relying on the four confirmations that LINA had already received, LINA denied Plaintiff's

appeal. Plaintiff fails to show however that LINA's decision not to wait for a second written confirmation and rely on Tyco's March 11 statement was material to the outcome of her claim. In the context of what Plaintiff knew, her claim that she was misled is unreasonable and not credible.

On September 15, 2004, Tyco benefits representative, Felicia Johnson told Plaintiff that she was ineligible for BTA benefits. *See* Exhibit "A" at AR0216. On September 16, 2004, Tyco benefits administrator Nicole Gibian advised Plaintiff of the same. *See* Exhibit "A" at AR0217. On December 15, 2004, Gibian wrote LINA to say: "Please take this letter as clarification that Mr. Roarty was NOT engaged on business travel at the time of the accident that caused his death." *See* Exhibit "A" at AR0130. On December 17, 2004, LINA wrote to Plaintiff to explain that her claim for BTA benefits had been denied based on the information received from Gibian. *See* Exhibit "A" at AR0115-20. On March 11, 2005, Johnson again confirmed that Plaintiff was not entitled to BTA benefits.

Here to, Plaintiff cannot argue that she was misled by LINA's statements or those of Tyco with regard to whether her husband had been traveling on business when he died. Those statements have been consistent throughout the handing of her claim that he was not, and Plaintiff has identified no act or failure to act, right lost or not asserted, as a result.

## II.    **CONCLUSION**

Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America respectfully submit that the Court should grant Defendants summary judgment as to all of Plaintiff's claims, dismiss her

Complaint with prejudice and award such attorney fees and costs of action and other relief as it deems appropriate.

**MARGOLIS EDELSTEIN**

*/s/ Herbert W. Mondros*

BY: _____

HERBERT MONDROS
Margolis Edelstein
750 South Madison Street, Suite 102
Wilmington, DE 19801
(302) 888-1112
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Attorneys for Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America

Dated: December 17, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**KELLY ROARTY,**

        Plaintiff(s)

    v.

**TYCO INTERNATIONAL, LTD.
GROUP BUSINESS TRAVEL
ACCIDENT INSURANCE PLAN and
LIFE INSURANCE COMPANY OF
NORTH AMERICA,**

        **Defendants.**

**Civil Action No:**

**06-0195-GMS**

## DEFENDANT TYCO INTERNATIONAL, LTD. GROUP BUSINESS TRAVEL ACCIDENT PLAN AND LIFE INSURANCE COMPANY OF NORTH AMERICA'S APPENDIX OF EXHIBITS IN SUPPORT OF THEIR REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT

**MARGOLIS EDELSTEIN**
HERBERT MONDROS
Margolis Edelstein
750 South Madison Street, Suite 102
Wilmington, DE 19806
(302) 888-1112
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Dated: December 17, 2007

# EXHIBIT "A"

2.  Under the *Claim Provisions* section, the following changes are made.

A.  The provision titled Proof of Loss is replaced with the following.

### Proof of Loss

Written or authorized electronic proof of loss satisfactory to Us must be given to Us at Our office, within 90 days of the loss for which claim is made. If (a) benefits are payable as periodic payments and (b) each payment is contingent upon continuing loss, then proof of loss must be submitted within 90 days after the termination of each period for which We are liable. If written or authorized electronic notice is not given within that time, no claim will be invalidated or reduced if it is shown that such notice was given as soon as reasonably possible.

The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

B.  The provision titled Payment of Claims is replaced with the following.

### Payment of Claims

All benefits will be paid in United States currency. Benefits for loss of life will be payable in accordance with the Beneficiary provision and these Claim Provisions. All other proceeds payable under this Policy, unless otherwise stated, will be payable to the covered Employee or to his estate.

If We are to pay benefits to the estate or to a person who is incapable of giving a valid release, We may pay up to an amount not exceeding $1,000 to a relative by blood or marriage whom We believe is equitably entitled. Any payment made by Us in good faith pursuant to this provision will fully discharge Us to the extent of such payment and release Us from all liability.

3.  Under the *General Provisions* section, the following changes are made.

A.  The provision titled Incontestability is replaced with the following.

### Incontestability

1.  Of This Policy or Participation Under This Policy

All statements made by the Subscriber to participate under this Policy are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, or to deny the validity of this Policy or of participation under this Policy unless a signed copy of the instrument containing the statement is, or has been, furnished to the Subscriber.

After two years from the Policy Effective Date, no such statement will cause this Policy to be contested except for fraud.

2.  Of A Covered Person's Insurance

All statements made by a Covered Person are considered representations and not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a signed copy of the instrument containing the statement is, or has been, furnished to the claimant.

AR0036

-----Original Message-----
From: Roarty, Daniel
Sent: Friday, July 30, 2004 3:35 PM
To: Levangie, Lori; Jim Hampson (E-mail)
Cc: Unruh, Ronald; Wyse, Regis; Smith, Trent; Bierzynski, Bob;
Karagianis, Georgia; DeMeritt, MaryAnne; Franco, John; Levangie, Lori;
Cherubin, Chris
Subject: RE: Hunts Point

Lori:
After receiving this e-mail I called Jim Hampson and determined that the
hottest fire is for NYC DEP to get 3 p/n 51-1861 sensors.  The reason they
were so upset is that they have three existing transmitters that they
couldn't get sensors for.  Getting three sensors is a whole lot easier than
coming up with seventy one (71).



Bacharach is telling us that maybe they will have some unknown qty of
sensors by the end of August.  Ron Unruh had the great idea of seeing if
this sensor is part of another product which we have in stock. Bryon Gordon
pulled up all the assemblies that use this part and I dug into the inventory
and came up with four (4) sensors.  Talk about a team effort! We have at
least another dozen sensors.  But not 71 as requested in your e-mail.
I will be in Pittsburgh next week on vacation.  Regis is going to set up a
day for me to go into the Bacharach plant and find out why the sensor is
taking so long to build.
I will let you know what I find.

Jim Hampson:
I have left you a phone message asking where these sensors should be sent
to.  The sensors are sitting on Chris Cherubin's desk.

Regards,
Dan Roarty

-----Original Message-----
From: Levangie, Lori
Sent: Friday, July 30, 2004 7:23 AM
To: Karagianis, Georgia; Bierzynski, Bob; Smith, Trent
Cc: Unruh, Ronald; Wyse, Regis; DeMeritt, MaryAnne; Franco, John;
Roarty, Daniel; Lori Levangie (E-mail)
Subject: RE: Hunts Point



Received another call from NYC DEP with another threat to throw us out of

**Marcy L. Miler**
**Accident Claim Specialist**
**Accident & Specialty Claims Department**

**CIGNA** Group Insurance
Life • Accident • Disability
PO Box 22328
Pittsburgh, PA 15222-0328
Telephone 1-800-238-2125
Facsimile 412-402-3316

December 17, 2004

Mrs. Kelly Roarty
319 Palomino Drive
Newark, DE  19711

| | |
|---|---|
| **Insured Name:** | **Daniel Roarty** |
| **Date of Birth:** | **04/05/1961** |
| **Policy Number:** | **ABL 661690** |
| **Underwriting Company:** | **Life Insurance Company of North America** |

Dear Mrs. Roarty:

I was sorry to learn about the death of your husband, Daniel Roarty. I've completed my review of your claim for Group Business Travel Accident insurance benefits and have determined that benefits are not payable. I'm writing to explain the outcome of the review.

In an effort to help you understand the basis of this decision, I have provided the applicable policy provisions. A copy of this policy provision is enclosed. In order to be eligible for benefits, a claim must satisfy all the policy provisions.

## Policy Provision

The Tyco International policy states:

> "**Scope of Coverage** - In exchange for the payments of premiums, we agree to pay benefits to all eligible persons:
>
> > a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and,
> > b) who, as a direct result of the injuries, and from no other cause, suffer a covered loss."
>
> **Schedule IV Hazards Insured Against**
> "We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
> > a) away from your premises in his city of permanent assignment; and
> > b) on business for you, and in the course of your business.
> All such trips must be authorized by you."

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

AR0115

**Evidence Evaluated**

I have reviewed the following documents and the file as a whole in making this determination:
- Group Business Travel Accident insurance policy, ABL 661690
- Proof of Loss claim form signed by Kelly Roarty on 09/03/04.
- Commonwealth of Pennsylvania Certificate of Death
- Police Crash Reporting Form
- Letter from Tyco Fire and Safety Human Resources dated 12/15/04.

**Summary**

According to the death certificate, Daniel Roarty died on 08/08/04 due to blunt force injuries sustained in a motor vehicle accident. On the Proof of Loss claim form, you indicated that "Vehicle accident at intersection of Rt. 896 and Bartville Rd. Driver of truck ran a stop sign and hit our van on L front side. Dan died and our 3 boys have broken bones."

The police incident report submitted with the claim confirms that the driver of a blue truck failed to stop at a stop sign and struck your minivan causing the injuries to Mr. Roarty and your children.

We contacted Tyco, Mr. Roarty's employer, to verify that he was on an authorized business trip at the time of his death as required by policy ABL 661690. We received a brief letter dated 12/15/04 from Nicole Gibian, Human Resources, stating "Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death."

Mrs. Roarty, I extend my condolences to you for the loss of your husband. Please understand that I must evaluate this claim based upon the information available in the file and the stipulations of the policy.

This is a Business Travel Accident insurance policy that provides benefits for losses which occur during the course of authorized business trips. Mr. Roarty's employer has clearly stated that he was not on an authorized trip at the time of the car accident and therefore, no benefits can be issued under policy ABL 661690.

**Appeal Rights**

This action is based on the information in our file. If you are not satisfied or do not agree with the reason(s) for the denial of your claim, you may appeal the decision to:

> CIGNA Group Insurance
> PO Box 22328
> Pittsburgh, PA 15222-0328
> Attn: Lynne George

The appeal must be in writing, submitted within 60 days of the date you receive this letter and must contain the following information:

- the reason for the appeal and/or disagreement,
- the insured's name and social security number, and

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

- Information needed to su      ort that Daniel Roarty was on an aut    rized business trip at the time of his death.

Nothing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein. Should you have any information which would prove contrary to our findings, please submit it to the undersigned. We would be pleased to review any objective information you would wish to submit.

You may request a review of this denial by writing to the Life Insurance Company of North America  representative signing this letter. The written request for a review must be sent within 60 days of receipt of this letter and state the reason why you feel your claim should not have been denied. Include any documentation (e.g. medical data) that you feel supports your claim. You may request copies of our claim file records relevant to the claim determination upon request and free of charge. Under normal circumstances, you will be notified of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request. You have a right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 if your claim is denied on appeal.

We encourage you to either contact the Tyco International's employee benefits department or review the insurance booklet, certificate or coverage information made available to you, to determine if you are eligible for additional benefits.

Mrs. Roarty, if you have any questions, please call me. You can reach me at our toll free number 1.800.238.2125 extension 3224 from 6:30 a.m. to 3:00 p.m. Eastern Time, Monday through Friday or email me at . If you call and get my voice mail, leave a message and your call will be returned within one business day.

Sincerely,

*Marcy L. Miler*

Marcy L. Miler

Enclosure

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

1

**LIFE INSURANCE COMPANY**
**OF NORTH AMERICA**
1601 Chestnut Street,
Philadelphia, Pennsylvania, 19192
A Stock Insurance Company

ABL 661690
**BLANKET ACCIDENT POLICY**

**THIS IS AN ACCIDENT ONLY POLICY.**
**IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS.**
**THIS IS A LIMITED POLICY.**
**READ IT CAREFULLY.**

This is a contract between us, the Life Insurance Company of North America, and you:

**Name, Address And**
**Nature of Business of**
**Policyholder:**

Tyco International Ltd.
One Tyco Park
Exeter, NH 03833

Communications Equipment

**Policy Term**--This policy will go into effect on <u>July 1, 2002</u>, and will expire on <u>July 1, 2005</u> , at 12:01 a.m. standard time at your address. The policy anniversary will be July 1. Unless this policy is terminated by you or us (see General Provisions), this policy may be renewed for additional terms at the premium rates in effect at time of renewal.

**Scope Of Coverage**--In exchange for the payment of premiums (as set forth in Schedule III), we agree to pay benefits to all eligible persons (as defined in Schedule I):

a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and

b) who, as a direct result of the injuries, and from no other cause, suffer a covered loss (as defined in Description of Coverage).

This coverage is subject to the exclusions shown on a later page, and to all of the other terms of this policy.   **This is an accident only policy.  It does not pay benefits for loss caused by sickness.  Read your policy with care.**

This policy shall be governed by the laws of the state in which it is delivered.  As used in this policy, "he" and "his" includes "she" and "her."

**IN WITNESS WHEREOF**, we have signed this policy at Philadelphia, Pennsylvania.

Robert J. Upton, Secretary

Michael W. Bell, President

Countersigned_____

**PITTSBURGH**

OCT 3 0 2002

Group Life & Disability
Coverage Unit

LM-9359

AR0118

### BLANKET ACCIDENT POLICY

Policyholder: Tyco International Ltd.                    Schedule Date: July 1, 2002

Part of Policy No. ABL 661690                           Applies To Classes: 1, 2 & 3

### SCHEDULE IV
### HAZARDS INSURED AGAINST

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a)     away from your premises in his city of permanent assignment; and

    b)     on business for you, and in the course of your business.

All such trips must be authorized by you.

This coverage does not include:

    a)     commuting between the covered person's home and place of work; or

    b)     during personal deviations made by the covered person.

"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip.  It does not matter whether the trip starts at the covered person's home, place of work, or other place.  This coverage will end when the covered person:

    a)     arrives at his home or place of work, whichever happens first; or

    b)     makes a personal deviation.

If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**—This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.

A covered person will be presumed to have died, for purposes of this coverage, if:

    a)     he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be covered by the policy; and

    b)     his body is not found within a year of the accident.

**Aircraft Restrictions**--If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

    a)     he is riding as a passenger only, and not as a pilot or member of the crew; and

    b)     the aircraft has a valid certificate of airworthiness; and

    c)     the aircraft is flown by a pilot with a valid license; and

    d)     the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**—We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates.  An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84                                                              [2229]

AR0119

**BLANKET ACCIDENT POLICY**

Policyholder: Tyco International Ltd.

Schedule Date: July 1, 2002

Part of Policy No. ABL 661690

Applies To Classes: 1, 2 & 3

**SCHEDULE IV**
**HAZARDS INSURED AGAINST**

**24 HOUR COVERAGE WHILE TRAVELING ON BUSINESS AWAY FROM THE PREMISES OF THE POLICYHOLDER (Owned Aircraft Not Covered)**

We will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:

    a)      away from your premises in his city of permanent assignment; and

    b)      on business for you, and in the course of your business.

All such trips must be authorized by you.

This coverage does not include:

    a)      commuting between the covered person's home and place of work; or

    b)      during personal deviations made by the covered person.

"Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.

This coverage will start at the actual start of a trip. It does not matter whether the trip starts at the covered person's home, place of work, or other place. This coverage will end when the covered person:

    a)      arrives at his home or place of work, whichever happens first; or

    b)      makes a personal deviation.

If a covered person travels to another city, and is expected to remain there for more than 60 days, this shall be deemed a change in his city of permanent assignment.

**Exposure And Disappearance**–This coverage includes exposure to the elements, after the forced landing, stranding, sinking, or wrecking of a vehicle in which the covered person was traveling on business for you.

A covered person will be presumed to have died, for purposes of this coverage, if:

    a)      he is in a vehicle which disappears, sinks, or is stranded or wrecked, in the course of a trip which would be covered by the policy; and

    b)      his body is not found within a year of the accident.

**Aircraft Restrictions**–If the accident happens while a covered person is riding in, or getting on or off of, an aircraft, we will pay benefits, but only if:

    a)      he is riding as a passenger only, and not as a pilot or member of the crew; and

    b)      the aircraft has a valid certificate of airworthiness; and

    c)      the aircraft is flown by a pilot with a valid license; and

    d)      the aircraft is not being used for: (i) crop dusting, spraying, or seeding; fire fighting; sky writing; sky diving or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing, endurance tests, stunt or acrobatic flying; or (ii) any operation which requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on).

**Owned Aircraft Not Covered**–We will not pay benefits if the aircraft is owned, leased or controlled by you, or any of your subsidiaries or affiliates. An aircraft will be deemed to be "controlled" by you if you may use it as you wish for more than 10 straight days, or more than 15 days in any year.

Unless otherwise provided, we will pay benefits only once for any one covered loss, even if it was caused by more than one covered hazard.

LM-9D84

[2229]

AR0120



**Fire & Security**

Tyco Fire and Security
One Town Center Road
Boca Raton, FL 33486

Telephone: 561-988-3600
Fax: 561-988-3631

### Interoffice Memorandum

*This correspondence may contain confidential information intended for the use of the individual or entity to whom it is addressed. If the reader is no the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination of copying is strictly prohibited.*

| | |
|---|---|
| **Date** | 12/15/04 |
| **To** | Cigna |
| **From** | Nicole Gibian |
| **Subject** | Daniel Roarty |

Please use this letter as clarification that Mr. Roarty was NOT on business travel at the time of the accident that caused his death.    If you need additional information, please contact Felicia Johnson at the HRSC, 800-924-8518.

AR0130

9/15/2004 3:16:22 PM fjohnson
I called spouse w/ questions she had about the life ins.  Spouse advised for
the Cigna life policy the AD&D amount was not on the policy.  I advised to
complete the Cigna form and submit to me and I will write the amount for
the AD&D and fax her a copy.  Spouse also asked for the policy booklet.  I
stated she will have to request this from the carriers once the claim forms are
submitted.  Spouse wanted BTA policy and claim form.  I stated EE was not
eligible and per corp and not to submit the documentation.  Awaiting the
claim forms...

10

AR0216

9/16/2004 8:19:16 AM fjohnson
-Rec'd the following e-mail from Nicole:
Hi Felicia,

I spoke to Mrs. Roarty and told her we can send the BTA stuff to her but did
state that we don't normally send this out because the circumstance of Dans
death does not warrant BTA. She said she wants to try any way. So, go
ahead and send her the BTA forms. She has been made aware that they are
not eligible for benefit. Please paste this email in the case notes for future
reference if need be.

Thanks,

Nicole

11

AR0217

# EXHIBIT "B"

**People in the News**
Wednesday, November 12, 2003

Engagement, wedding, and anniversary announcements.

## Engagements

**Roarty-Leavitt**

David and Marsha Roarty of Murrysville are pleased to announce the engagement of their daughter, Allison Lee, to Michael Lee Leavitt, son of Joseph and Karen Leavitt of Emporium, Pa.

Allison is a 1998 graduate of Franklin Regional High School and a 2002 graduate of the University of Pittsburgh at Johnstown with a degree in management systems.

She is a systems specialist at the Office of the Budget, Commonwealth of Pennsylvania in Harrisburg.

Michael is a 1996 graduate of Cameron County High School and a 2001 graduate of the University of Pittsburgh at Johnstown with a degree in sociology.

- ADVERTISEMENT -

He is the south-central district manager for the Pennsylvania Institute for the Blind and Handicapped in Harrisburg.

An Aug. 7, 2004 wedding is planned.

**Curran-McCann**

Valery Leigh Curran of North Huntingdon and John Louis McCann of Irwin are pleased to announce their engagement.

Valery is the daughter of Lawrence and Margery (Timko) Curran of North Huntingdon. She is a 1995 graduate of Norwin High School and a 2001 graduate of Duquesne University where she received her doctor of pharmacy degree.

She is currently employed as a pharmacist at an independent retail pharmacy.

John is the son of Suzanne (Werner) Pressler of Duluth, Minn. and the late Jack McCann. He is the step-son of the Rev. John Pressler of Duluth.

He is a 1990 graduate of Norwin High School. John is employed as a supervisor of aviation security for U.S. Department of Homeland Security.

The couple is planning a fall 2004 ceremony.

# Wedding

### Teel-Sellers

Kimberly Teel and Robert Lee Sellers of Whitesboro, Texas were united in marriage on Aug. 9, 2003 at Whitesboro First Presbyterian Church.

Robert is the son of Mr. and Mrs. Robert R. Sellers of Penn Hills. He is a graduate of Penn Hills High School and is currently working at Nucon Steel in Denton, Texas.

Kimberly is the daughter of Mr. and Mrs. Rayford Teel of Sherman, Texas. She is a graduate of Denver City High School in Denver, Texas. She is a homemaker and mother.

The best man was Robert Betts.

The matron of honor was Linda Gress, sister of the groom.

The Rev. Tom Matthews officiated.

# Anniversaries

### Dilling

George E. and Nora R. (Lantzy) Dilling of Plum recently celebrated their 65th wedding anniversary with a family dinner.

They were married on Sept. 18, 1938.

The are parents of seven children, Peggy Walker of Burr Ridge, Ill.; Donna Bozarth of Wichita, Kan.; Rosemary Stock of Plum; Richard Dilling of Ecru, Miss.; Lois Matvey of Plum; Nancy O'Donnell of Orlando, Fla.; and the late Kenneth Dilling. The couple has 12 grandchildren and five great-grandchildren.

George is retired from the U.S. Postal Service and was a minister in the Church of the Brethren. Nora is a housewife and worked for the public library in Nanty-Glo, where they used to live.

### Reynolds

Bernard H. and Agnes M. (Reid) Reynolds of North Irwin celebrated their 50th wedding anniversary with family.

The couple was married on March 24, 1953 at the First United Methodist Church of Irwin.

They have one daughter, Vicki Lauffer of Leetsdale and her husband the Rev. Douglas Lauffer.

They have four grandchildren and one great-grandson.

Bernard is retired from Westinghouse and now serves as chief of police in North Irwin. Agnes is a housewife.

### Montrose

Russell and Sally (Boch) Montrose of Irwin celebrated their 50th wedding

anniversary.

The couple was married on Sept. 26, 1953 at Immaculate Conception in Irwin.

They celebrated the anniversary with friends and family, including the maid of honor.

The couple has four children, Patricia of Newport, Pa., Beverly of Pittsburgh, Kenneth of Cranberry, Kirk of Dillsburg, Pa. They also have nine grandchildren.

Russell is retired from sales for 7-Up Bottling. Sally is retired from ComTrol in Irwin.

**Sutherland**

Jim and Ruth Sutherland of Monroeville celebrated their 50th wedding anniversary on Sept. 12.

They celebrated the occasion with friends and family at their home, where they were presented with a memory book.

The couple was married in 1953.

They have three children, Ann Durst of Monroeville, Sally Morris of Fort Myers, Fla., and Jay of Corning, N.Y. They also have four grandchildren.

Jim is a retired electrical engineer from Westinghouse. Ruth is a homemaker.

Images and text copyright © 2004 by Gateway Newspapers. Reproduction or reuse prohibited without written consent.

# EXHIBIT "C"

Robert W. Bierzynski

Page 42

1    to go into Bachrach, then, yes, that would have been a

2    business trip from where he was.

3    BY MS. ALLEN:

4         Q.   And it would have been from Exton,

5    Pennsylvania, if he was leaving from Exton, Pennsylvania;

6    correct?

7         A.   No.

8         Q.   Okay.  Explain to me why not.

9         A.   If he was going to Pittsburgh on vacation and

10   while on vacation had an intention to go visit anyone in

11   the Pittsburgh area on business, then only that portion

12   of his trip would have been considered a business expense

13   from wherever he was staying in Pittsburgh.

14        Q.   Are you aware that Mr. Roarty left prior to

15   his scheduled vacation to attend the Bachrach plant?

16        A.   No, I'm not aware of that.

17        Q.   Okay.  If he left prior to his scheduled

18   vacation, then the business trip would begin in Exton,

19   Pennsylvania?

20        A.   No.

21        Q.   Okay.  Why do you say that?

22        A.   He left on a Saturday, that's not a business

23   day.  I don't even know when he left.  I'm assuming if he

24   left on a Saturday, that's not a business day.

Robert W. Bierzynski

Page 20

1    Tomberlin, did you have any independent knowledge of the

2    business travel accident plan in August 2004?

3         A.    No.

4         Q.    When you worked for Scott Health & Safety in

5    August 2004, something, but you travel at all on

6    business?

7         A.    Yes.

8         Q.    And was it your understanding that you would

9    be covered under a business travel accident plan?

10        A.    Yes.

11        Q.    And was it your understanding that you would

12   also be covered, regardless of whether or not you were on

13   business under the business travel accident plan?

14              MR. STEPHENSON:    Objection.    Could you

15   restate the question.

16   BY MS. ALLEN:

17        Q.    Was it also, in August 2004, your

18   understanding that regardless of whether or not you were

19   on business, you would also be covered under your

20   company's business travel accident plan?

21        A.    I'm sorry, could you repeat that.

22              (The reporter read from the record as

23   requested.)

24              THE WITNESS:    No.

Robert W. Bierzynski

Page 19

1                    MR. STEPHENSON:  Objection.  Assumes a

2    fact not in evidence.  Go ahead and answer.

3                    THE WITNESS:  Yes.  It's what I was

4    told.

5    BY MS. ALLEN:

6          Q.    And who were you told that by?

7          A.    Lanny Tomberlin.

8          Q.    And when did you talk to Lanny Tomberlin about

9    this?

10         A.    It was earlier that same day.

11         Q.    And why did you have a conversation with Lanny

12   regarding that?

13         A.    I wanted to know what Dan's entitlements were,

14   knowing that I was going to be visiting with Kelly later

15   that day so that I could give that information to her.

16         Q.    And for the record, who is Lanny Tomberlin?

17         A.    At that time he was our human resources

18   director.

19         Q.    So you were informed in the beginning of

20   August 2004, by your HR director, that Mr. Roarty would

21   be covered under the business travel accident plan;

22   correct?

23         A.    Yes.

24         Q.    Okay.  Other than talking with Lanny

Robert W. Bierzynski

Page 13

1        A.      Sometimes yes, sometimes no.

2        Q.      How would your reimbursement work for business

3    travel?

4        A.      We would fill out an expense report and turn

5    it in for approval.

6        Q.      And who would you submit your report to?

7        A.      My reports would go to the person that I

8    directly reported to.

9        Q.      And who was that?

10        A.      At what time?

11        Q.      I'm sorry, August 2004.

12        A.      John McStravick.

13        Q.      And do you know who would sign off on

14    Mr. Roarty's business expense travels in August 2004?

15        A.      It could have been myself or it could have

16    been the accounting manager or it could have been John

17    McStravick.

18        Q.      Do you recall signing off on any of Dan

19    Roarty's business travel expenses at any time while you

20    were employed by Scott Health & Safety?

21        A.      I don't have a recollection of that.

22        Q.      Okay.  Do you know whether or not Mr. Roarty

23    had the ability to sign off on other people's expenses

24    for travel?

Robert W. Bierzynski

Page 12

1                    MS. ALLEN:  Yes.

2                    MR. STEPHENSON:  Was that your

3    understanding when you answered the question,

4    Mr. Bierzynski?

5                    THE WITNESS:  Yes.  A laptop.

6    BY MS. ALLEN:

7          Q.    Do you know whether or not Mr. Roarty was

8    issued one?

9          A.    I don't know if his was issued by the company.

10         Q.    Do you remember him having a laptop computer?

11         A.    Yes, I do.

12         Q.    And did you ever take your laptop computer

13   home?

14         A.    Yes.

15         Q.    And what about a cellular phone, were you

16   issued one of those through your company?

17         A.    Yes.

18         Q.    And were you called on that phone outside

19   normal business hours?

20         A.    Yes.

21         Q.    What would be your normal business hours?

22         A.    8 a.m. to 5 p.m., Monday through Friday.

23         Q.    And would you answer calls that you received

24   after those hours from Scott Health & Safety?

# EXHIBIT "D"

return. Mr. Roarty's return travel from his vacation would have been personal travel and not undertaken on behalf of Tyco's business, and would not have been reimbursable.

Mr. Bierzynski concludes that Mr. Roarty was not engaged in business travel on behalf of Tyco at the time of his death.

**b. Brian Billeter** – Mr. Billeter is a Group Claims Specialist in LINA's Accident and Specialty Claims Department. Mr. Billeter is Mr. Killmer's supervisor and participated in the handling of the Roarty claim to the extent that he signed the March 24, 2005 letter from LINA that advised Plaintiff that her appeal had been denied.

**c. Nicole Gibian.** Ms. Gibian is a former benefits administrator for Tyco Fire and Security. In that position, she was tasked to contact Scott Human Resources to determine whether Mr. Roarty was engaged in business travel for Tyco when he died. As the result of her contact with either Bob Bierzynski or Lanny Tomberlin, she prepared the December 15, 2004 memo addressed to CIGNA, which speaks for itself and which she forwarded to Felicia Johnson.

**d. Felicia Johnson.** Ms. Johnson was formerly employed by Tyco in its Benefits call center as a employee service representative. In this capacity, she answered calls from Tyco employees and their beneficiaries with regard to their benefits and provided them necessary assistance. As part of her duties, Ms. Johnson made notes of her telephone contacts with Ms. Roarty and others in dealing with the Roarty BTA claim. These notes have been produced with this answer, and speak for themselves. These notes accurately record Ms. Johnson's involvement in this matter.

**e. Robert Killmer.** Mr. Killmer is a Technical Specialist in LINA's Accident and Specialty Claims Department. Mr. Killmer was responsible for responding to Plaintiff's appeal

from LINA's initial denial of her claim. Mr. Killmer prepared the March 24, 2005 letter that advised Plaintiff that her appeal had been denied, and the basis for the decision. *See* AR0065-67. The information that Mr. Killmer had when he determined the claim should be denied on appeal is contained in the Administrative Record.

 **f.  Lori Levangie.**  Ms. Levangie is employed by Scott as a regional sales manager. She is aware of the customer complaints that are detailed in the emails that appear at AR0089-98, which speak for themselves. Ms. Levangie has no knowledge of the details of Mr. Roarty's travel to Pittsburgh other than that he was traveling on vacation and that he planned to visit the Bacharach plant during his vacation. Ms. Levangie would agree with Mr. Bierzynski that insofar as Mr. Roarty traveled to Pittsburgh to attend a wedding and for vacation, his travel to Pittsburgh was not related to Tyco's business and would not have been reimbursable.; that had Mr. Roarty taken time from his vacation to visit the Bachrach plant, he would have been engaged in Tyco business and Tyco would have reimbursed his expenses incurred in traveling to the Bachrach plant from his vacation residence, and his return; and that Mr. Roarty's return travel from his vacation would have been personal travel and not undertaken on behalf of Tyco's business, and would not have been reimbursable.

 **g.  Marion Luongo.**  Ms. Luongo was former corporate counsel to LINA and responsible for providing legal advice to Robert Killmer with regard to the determination of Plaintiff's appeal from the initial claim denial. This advice appears at AR0068-71, and speaks for itself.

 **h.  Marcy Miller.**  Ms. Miller is employed as an Accident Claim Specialist in LINA's Accident and Specialty Claims Department. She was responsible for the handling and initial determination of Plaintiff's claim. Ms. Miller prepared the December 17, 2004 letter to

Plaintiff that informed her of the basis for LINA's denial of the claim. *See* AR 0099-101. The information that Ms. Miller had when she determined the claim should be denied is contained in the Administrative Record.

      **i. Trent Smith.** Mr. Smith is employed by Tyco and at the time of Mr. Roarty's death, was Scott's National Sales Manager. Mr. Smith received the emails that appear at AR0091-93. Mr. Smith was generally aware of the problems associated with failure to secure necessary parts from Bacharach. He has no specific information with regard to Mr. Roarty's vacation travel or his intended visit to the Bacharach plant.

      **j. Lanny Tomberlin.** Mr. Tomberlin is the former Tyco Human Resource manager responsible for Scott and the Exton facility. Mr. Tomberlin was not aware of the circumstances of Mr. Roarty's trip prior to his death. Mr. Tomberlin spoke with Plaintiff shortly after Mr. Roarty's death. Mr. Tomberlin apologized to Plaintiff for initial confusion by Tyco benefits personnel who had advised that the benefit would be changed, and later were forced to correct that statement to advise that eligibility to receive the benefit depended on whether Mr. Roarty had been engaged in business travel when he died. Mr. Tomberlin advised Felicia Johnson that Mr. Roarty was not engaged in business travel at the time of his death.

      **k. Ronald Unruh.** Mr. Smith was employed by Tyco at the time of Mr. Roarty's death as a manager. Mr. Unruh received those emails with regard to the Bacharach sensor problem that were directed to him. *See* AR0089-98. Mr. Smith was generally aware of the problems associated with failure to secure necessary parts from Bacharach. He has no specific information with regard to Mr. Roarty's vacation travel or his intended visit to the Bacharach plant.

# EXHIBIT "E"



Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
**(Cite as: Not Reported in F.Supp.2d)**

Foss v. Lucent Technologies Inc.
D.N.J.,2006.

United States District Court,D. New Jersey.
Edward FOSS, on behalf of himself: and all others
similarly situated, Sarah Conder, Vincent R. Lucas,
Individually and on behalf of all others similarly
situated, Arthur Berendt, and Robert B. Howard,
Plaintiffs,
v.
LUCENT TECHNOLOGIES INC.; Lucent
Retirement Income Plan; and Lucent Technologies,
Inc. Employee Benefits Committee, Defendants.
**Civil Action No. 03-CV-5017(DMC).**

Nov. 27, 2006.

Arthur Penn, Pellettieri, Rabstein and Altman, Mount
Holly, NJ, Kimberly M. Litman, Joseph G. Sauder,
Chimicles & Tikellis LLP, Haverford, PA, Scott M.
Lempert, Sandals & Associates, P.C., Philadelphia,
PA, for Plaintiffs.
Theodore D. Aden, Joseph D. Guarino, Epstein
Becker & Green, P.C., Newark, NJ, for Defendants.

**OPINION**
DENNIS M. CAVANAUGH, U.S.D.J.
**\*1** This matter comes before the Court upon motion
by Defendants Lucent Technologies, Inc., Lucent
Retirement Income Plan, Lucent Technologies Inc.
Employee Benefits Committee, and AT & T
Corporation pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure and for Summary Judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure, directed to the Consolidated Amended
Complaint ("Complaint"), filed on or about
November 10, 2005. Oral argument was heard on this
matter on November 9, 2006. After carefully
considering the submissions of the parties, and based
upon the following, it is the finding of this Court that
Defendants' motion to dismiss or for summary
judgment is granted.

**I. BACKGROUND**

In 1996, AT & T created a spin-off, Lucent
Technologies. As part of the creation of the spin-off,
several AT & T retirees were transferred to the
Lucent retirement plan. This class action consists of a
class of AT & T retirees and their beneficiaries who,
prior to February 2003, were eligible to receive a
death benefit under the Lucent Retirement Income
Plan if certain subsequent conditions were met.
Plaintiffs were AT & T retirees who commenced
retirement before the Lucent spin-off. Specifically,
they are members of a class of former AT & T plan
participants who were transferred to the Lucent plan
with the spin-off. Plaintiffs seek relief pursuant to the
Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. §§ 1001-1465, claiming "a
right to have a death benefit paid to their spouse or
other dependents in an amount equal to one year's
salary."Complaint ¶ 1. The disputed Pensioner Death
Benefit ("death benefit") was one of many benefits
included in the Lucent Retirement Income Plan,
successor in interest to the AT & T Management
Pension Plan. Lucent's elimination of the death
benefit from the defined benefit plan and subsequent
refusal to pay Plaintiffs the death benefit gave rise to
this litigation.

**A. The AT & T Plan**

AT & T maintained a defined pension plan, known as
the AT & T Management Pension Plan (the "AT & T
Plan"). Complaint ¶ 15. The AT & T Plan, like the
subsequently created Lucent Plan is a defined benefit
plan. Stated generally, a defined benefit plan
typically "consists of a general pool of assets rather
than individual dedicated accounts. Such a plan, 'as
its name implies, is one where the employee, upon
retirement', is entitled to a fixed periodic
payment."_Hughes Aircraft Co. v. Jacobson_, 525 U.S.
432, 439 (1999) (citing _Comm'r v. Keystone Consol._
_Indus., Inc.,_ 508 U.S. 152, 154 (1993)). Among other
benefits, the AT & T Plan provided for a death
benefit to be paid to a retired plan participant's spouse
or other dependent relatives upon the plan
participant's death.

**B. The Lucent Plan**

When Lucent was created it assumed AT & T's
responsibilities under the AT & T Plan. To
memorialize this transfer of obligations and
liabilities, AT & T and Lucent entered into an
Employee Benefits Agreement ("EBA"). Under the
EBA, Lucent assumed and agreed to pay AT & T's

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
**(Cite as: Not Reported in F.Supp.2d)**

benefit obligations to certain former employees. Assets were transferred from the AT & T Management Pension Plan on the condition that Lucent would assume the responsibility of such payments to certain AT & T retirees. Complaint ¶ 38. Thereafter Lucent established a defined benefit pension plan, the Lucent Technologies Inc. Management Plan (the "Lucent Plan"), that mirrored the provisions of the AT & T Plan. Like the AT & T Plan, the Lucent Plan also included a death benefit. The death benefit was payable to a retiree's qualified mandatory beneficiary or beneficiaries in an amount equal to twelve months pay at retirement. Complaint ¶ 41. Beneficiaries eligible to receive the benefit at the plan participant's death included the participant's spouse at the time of death, dependent children up to age 23 (and older children in specified circumstances) or dependent parents living with or near the retiree. AT & T Plan, Art. 5; Lucent Plan, Art 5.

### C. *Administration of the Plan*

**\*2** Lucent Technologies Inc. Employee Benefits Committee ("the Committee") is among the named Defendants in this case. The Committee acts as the plan administrator and is thereby vested with discretionary authority to administer the plan and make changes to it. AT & T Plan Sec. 3. 1, 3.2(e)(ii), and 3.3; Lucent Plan, Sec 3.1, 3.2(e)(ii), and 3.3. Both the AT & T Plan and the successor Lucent Plan contained "reservation of rights" clauses. AT & T Plan, Sec. 10.1; Lucent Plan, Sec. 10.1. These provisions authorized the Committee to make changes in the benefit offerings or to terminate the plan entirely, provided the action did not affect an Employee's right to vested benefits.

### D. *Elimination of the Death Benefit*

As of January 1, 2000, the death benefit under the Lucent Plan was maintained only for plan participants who retired prior to January 1, 1998. Later, on or about January 2, 2003, Lucent sent letters to all retirees informing them that it was eliminating the death benefit for management employees who retired on or after January 1, 1998. Complaint ¶ 53.

### E. *Plaintiffs' Claim to the Death Benefit*

As stated above, the plaintiffs in this case were all AT & T retirees whose benefits were transferred under the Lucent Plan, with the exception of Plaintiff Conder. Unlike the other Plaintiffs, Plaintiff Conder's late husband, Joseph Conder, was also alive as of February 1, 2003, but has since died. All other plaintiffs were also alive on February 1, 2003 when the death benefit was eliminated. Under the amended Lucent Plan neither Plaintiff Conder's heirs nor the other Plaintiffs' future heirs are eligible to receive the death benefit.

## II. *DISCUSSION*

### A. *Plaintiffs' Claims*

Plaintiffs claim a right to receive the death benefit and/or damages and equitable relief under the following three theories: (1) breach of fiduciary duty; (2) violation of ERISA's anti-cutback rule; and (3) breach of unilateral contract pursuant to federal common law. In Count I of the Complaint, Plaintiffs seek money damages on the grounds that the Committee's elimination of the death benefit was in violation of the fiduciary duties it owes under ERISA. In Count II, Plaintiffs contend that the death benefit was protected by ERISA's anti-cutback rule as either a pension benefit or, alternatively, a welfarebenefit. In Count III, Plaintiffs claim that pursuant to federal common law, elimination of the death benefit constituted a breach of unilateral contract. Specifically, in Count III, Plaintiffs argue that the pension plan constituted a contract, accepted by Plaintiffs through performance and that the death benefitsvested upon Plaintiffs' performance. Lastly, in Count IV, Plaintiffs seek equitable relief based on Defendants' alleged breach of fiduciary duty.

### B. *12(b)(6) Dismissal*

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all allegations in the complaint must be taken as true and must be viewed in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir.1998). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
(Cite as: Not Reported in F.Supp.2d)

F.2d 1192, 1196 (3d Cir.1993). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

### C. *Rule 56 Summary Judgment*

**\*3** Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 (1986). The moving party bears the burden of showing that there is no genuine issue of fact and it must prevail as a matter of law, or that the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden. *Celotex,* 477 U.S. at 331. If either showing is made then the burden shifts to the non-moving party, who must demonstrate facts which support each element for which he bears the burden and must establish the existence of genuine issues of material fact.*Id.* The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to support a jury verdict in his favor.*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

### III. *ANALYSIS*

Defendants' motion to dismiss or for summary judgment raises the following five issues. First, the Court must determine whether the Plan terms are ambiguous. If the terms are ambiguous then the Court may look to extrinsic evidence to ascertain the meaning of the Plan's terms. Second, the Court must determine whether the challenged actions are subject to **ERISA's** fiduciary provisions. Third, whether the **benefit** is properly classified as a pension **benefit,** or alternatively, as an employee **welfarebenefit.** Fourth, whether the death **benefit** was **vested** and thereby could not be eliminated pursuant to **ERISA's** anti-cutback provision. Finally, whether this Court may grant relief based on federal common law in light of the Supreme Court's holding in *Hughes Aircraft,* 525 U.S. 432.

### A. *Ambiguity of Plan Terms*

The extent to which this Court may consider extrinsic evidence hinges on whether or not this Court determines that the Lucent Plan's terms are ambiguous. The question of whether an ERISA plan's terms are ambiguous is one of law. *Bill Gray Ent., Inc. Employee Health & Welfare Plan v. Gourley,* 248 F.3d 206, 218 (3d Cir.2001). Furthermore, a plan term is "ambiguous if it is subject to reasonable alternative interpretations. *Taylor v. Cont'l Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1232 (3d Cir.1991). Only if the plan terms are ambiguous is it appropriate for the court to "consider such [extrinsic] evidence when no ambiguity exists."*Bill Gray,* 248 F.3d at 218, (quoting *Epright v. Envtl. Res. Mgmt. Inc. Health & Welfare Plan,* 81 F.3d 335, 339 (3d Cir.1996)).

Defendants argue that the relevant Plan terms are not ambiguous. On this basis, Defendants contend that the Court should not consider any extrinsic evidence in interpreting the Plan terms. Plaintiffs counter that provisions in the Plan documents are ambiguous and cite to various extrinsic evidence, including non-Plan documents as well as the subjective expectations and actions of individual Plaintiffs. Specifically, Plaintiffs refer to the fact that "[p]articipants perceived Pension Death Benefits as pension benefits, and their availability influenced the decisions participants made about the form in which they should receive their service pension."

**\*4** From a review of the Plan's terms, this Court finds that the Plan Documents are not ambiguous. The same definition of the death benefit is included in the AT & T and Lucent Plans. The Plan language defining the death benefit and employees' eligibility clearly states who is eligible and when the death benefit was to be paid.[FN1]Here, the language is not ambiguous because it is not "subject to reasonable alternative interpretations." *Taylor,* 933 F.2d at 1232. Thus, this Court must "enforce the Plan as written unless [it] can find a provision of ERISA that contains a contrary directive."*Dade v. N. Am. Philips Corp.,* 68 F.3d 1558, 1561 (3d Cir.1995).

FN1.*See* Pl.Ex. 13 at D-001907; Pl Ex. 14 at D-010406; Pl.Ex. 16 at D-010487; Pl.Ex. 19 at D-002258.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
(Cite as: Not Reported in F.Supp.2d)

**B. Nonfiduciary Nature of Plan Administrator's Actions**

Plaintiffs challenge two of Defendants' decisions: (1) AT & T's decision to spin-off Lucent and transfer AT & T's pension obligations to Lucent; and (2) Lucent's decision to amend the Lucent Plan to eliminate the death benefit. The classification of these decisions as fiduciary or nonfiduciary under ERISA is important because if they are nonfiduciary decisions then Defendants were within their proper discretion to make these decisions and Plaintiffs are not entitled to the equitable relief they seek for Defendants' alleged breach of fiduciary duties owed. Defendants assert that these decisions are nonfiduciary decisions and as such cannot be challenged under ERISA. Plaintiffs argue that Lucent and the Committee are and were fiduciaries of the Lucent Plan and that elimination of the death benefit constituted a breach of the fiduciary obligations owed by Defendants. However, Plaintiffs' reasoning is flawed. The fact that Defendants are fiduciaries does not compel the conclusion that they were acting in their fiduciary capacity when they amended the Plan. While plan sponsors owe certain fiduciary duties under ERISA, they are also vested with the authority to take actions in a nonfiduciary capacity.

AT & T's decision to spin-off Lucent and transfer pension assets to Lucent was a nonfiduciary decision. ERISA's fiduciary requirements do not apply to strictly business decisions that do not violate a specific ERISA provision or otherwise strip an individual of an already vested benefit. The Supreme Court noted that " 'only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration,' does a person become a fiduciary under § 3(21)(A)."*Lockheed Corp. v. Spink,* 517 U.S. 882, 890 (1996) (citing *Siskind v. Sperry Retirement Program, Unisys,* 47 F.3d 498, 505 (1995)).*See also Blaw Knox Ret. Income Plan v. White Consol. Ind, Inc.,* 998 F.2d 1185, 1189 (3d Cir.1993) (holding that employer's transfer of pension plans to a subsidiary was a "corporate business decision outside the scope of ERISA's protective rules," to which "no fiduciary duties apply.") Therefore, AT & T's decision to spin-off Lucent and transfer its pension funds and obligations under the plan to Lucent was not a plan management or administrative decision. Rather, this decision was strictly a business decision and not a decision made by AT & T in its fiduciary capacity.

So long as AT & T complied with ERISA Section 208 [FN2], AT & T did not breach any of its fiduciary obligations by spinning-off Lucent and transferring pension assets to Lucent. See *29 U.S.C.A. § 1058.*

> FN2. Section 208 of ERISA requires that any merger or consolidation of a pension plan provides each plan participant with a benefit equal or greater than the benefit he would have received prior to the merger

**\*5** Lucent's decision to amend the plan is also a nonfiduciary decision. The Supreme Court has repeatedly held that "employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans."*Hughes Aircraft,* 525 U.S. at 443, (quoting *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78 (1995)). Furthermore, when employers undertake such action "they do not act as fiduciaries, but are analogous to the settlors of a trust."*Hughes Aircraft,* 525 U.S. at 443. Thus, an employer may amend either a pension or welfare benefit plan without being bound to a fiduciary standard of care. See *id.;* see also *Spink,* 517 U.S. at 980. Based on these holdings, the Third Circuit has concluded that "[w]hen an employer makes decisions about the *design* of a welfare plan ... it functions as an employer and not as an administrator and thus it is not acting as a fiduciary. Accordingly, an employer can create a plan that furthers its business interests, and it can act according to these interests in amending or terminating the plan."*Noorily v. Thomas & Betts Corp.,* 188 F.3d 153, 168 (3d Cir.1999) (emphasis in original) (internal citations omitted); *see also Lettrich v. J.C. Penney Co., Inc.,* 90 Fed. Appx. 604, 614 (3d Cir.2004). Here, Lucent's decision to eliminate the death benefit was a decision about the design of the plan, not plan administration. The mere fact that Lucent amended its plan does not breach any fiduciary duties under ERISA; rather, only an amendment that violates a specific provision of ERISA triggers ERISA's fiduciary provisions. See *Bennett v. Conrail Matched Savings Plan Admin. Comm'ee,* 168 F.3d 671, 679 (3d Cir.1999).

Plaintiffs argue that Defendants, as plan sponsor, breached their fiduciary duties because they acted in violation of the plan itself in amending the plan to approve a reversion of assets to the employer. In their brief Plaintiffs cite to *Delgrosso v. Spang and Co.,* to support their argument that actions taken that contradict an express provision of the plan constitute

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
(Cite as: Not Reported in F.Supp.2d)

a breach of fiduciary duties. 769 F.2d 928 (3d Cir.1985). This argument is unpersuasive because Delgrosso can be distinguished from this case in at least two major ways: (1) all contributions in that case were made under a defined contribution plan; and (2) unlike the reservation of rights clause contained in the plan in this case, the plan in Delgrosso contained a clause prohibiting reversion of contributions. Id. at 930. Because Defendants' decisions to spin-off Lucent and amend the Lucent Plan were nonfiduciary decisions, Plaintiffs' claims for money damages and equitable relief based on breach of fiduciary duty is denied.

Taking the facts in the light most favorable to Plaintiffs, it is evident that dismissal as to Plaintiffs' Count I is appropriate because the facts alleged do not constitute a breach of any fiduciary duties owed by Defendants.

### C. Classification of Death Benefit as a Pension Benefit or Welfare Benefit

*6 This Court must decide whether the death benefit is properly classified as a pension benefit or an employee welfare benefit. While ERISA offers protection to both pension benefits and employee welfare benefits, there are different provisions for modifying these benefits as well as different rules as to when such benefits vest. Classification of the death benefit is critical to the disposition of Defendants' motions because the death benefit is protected by ERISA's anti-cutback rule only if (1) it is an accrued pension benefit; or (2) it is a vested employee welfare benefit.

ERISA's anti-cutback rule prohibits elimination or reduction of accrued benefits. Notably, the rule, codified in ERISA Section 204(g), protects only accrued benefits. 29 U.S.C.A. § 1054. Thus, if the AT & T/Lucent Plan death benefit was an accrued benefit then Lucent violated ERISA by eliminating it.

ERISA Section 3(23)(A) defines "accrued benefit" in the case of a defined benefit plan as an annual benefit, commencing at normal retirement age. 29 U.S.C.A. § 1002(23). Pursuant to this definition, pension benefits and not employee welfare benefits may qualify as accrued benefits. The respective statutory definitions of pension benefits and employee welfare benefits make clear that only

pension benefits could potentially qualify as accrued benefits for purposes of the anti-cutback rule.

By definition, only pension benefits, not employee welfare benefits can be paid at normal retirement age in the form of an annual benefit; therefore, only pension benefits can be accrued. Stated generally, pension benefits are designed to provide retirement income to employees. See Unisys Corp. Ret. Med. Benefit "ERISA" Litig., 58 F.3d 896, 901 (3d Cir.1995) (citing 29 U.S.C. § 1002(1)). Thus, pension benefits are often paid upon retirement and may be paid in the form of an annual benefit. In contrast, employee welfare benefits are payments made in the event of "sickness, accident, disability, death or unemployment." 29 U.S.C.A. § 1002(1); see Unisys. 58 F.3d at 901 (explaining elements of an employee welfare plan). By definition alone, it is evident that employee welfare benefits do not satisfy the requirements of an accrued benefit because welfare benefits are not paid at normal retirement age but rather when a specified event, such as death, occurs.

In this case, the death benefit, as defined by plan documents, satisfies the definition of an employee welfare benefit and is thus not an "accrued benefit" for purposes of the anti-cutback rule. The death benefit provided for payment to a plan participant's beneficiaries upon the plan participant's death and clearly is not paid at "normal retirement age." Employee welfare benefits, are "maintained for the purpose of providing for [plan participants] or their beneficiaries benefits in the event of death." ERISA § 3(1), 29 U.S.C. § 1002(1). Similarly, the death benefit provides for a plan participant's beneficiaries at the plan participant's death. Finally, according to the Plan documents, the death benefit is paid in a lump sum or installment payments equal to twelve months salary. The death benefit, according to the Plan documents, is not an annual benefit. Because the death benefit was not paid annually or at normal retirement age it does not satisfy the statutory definition of an accrued benefit and is not protected by the anti-cutback rule.

*7 Plaintiff argues unpersuasively that the death benefit is a pension benefit because it was funded from surplus pension assets. This assertion is incorrect and not supported by any case law or statutory text. ERISA does not require that welfare benefits be funded by non-pension assets.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
**(Cite as: Not Reported in F.Supp.2d)**

Rather, some courts have held that employee **welfarebenefits** are often part of a comprehensive pension plan. *See Rombach v. Nestle USA, Inc.,* 211 F.3d 190, 193-93 (2d Cir.2000) (citing *McBarron v. S & T Indus.,* 771 F.2d 94, 97 (6th Cir.1985)). The Court's role in classifying the death benefit is to look at the nature of the benefit as defined by the Plan terms. *See Oatway v. Am. Int'l Group,* 325 F.3d 184, 188-89 (3d Cir.2003) (classifying benefits by what purpose they are designed to serve). This classification should not be made by evaluating how the plan is funded or how Plaintiffs subjectively perceived the benefit. Looking at the Plan documents and the purpose served by the death benefit, it is apparent that it is not protected by the anti-cutback rule.

Plaintiff also argues that the death benefit is protected by the anti-cutback rule because it is a retirement-type subsidy. In 1984 Congress enacted the Retirement Equity Act ("REA"), modifying ERISA Section 204(g) to include retirement-type subsidies within the definition of "accrued benefits." The legislative history of this change reveals that Congress was concerned with protecting the pension and retirement benefits of individuals who retired early. *See Bellas v. CBS, Inc.,* 221 F.3d 517, 523, 525 (3d Cir.2000). Additionally, the Senate Report addressing the reason for the change to ERISA Section 204(g) stated that certain benefits, including a death benefit, were not intended to be considered retirement-type subsidies. *See*S. Rep. No, 98-575, 98th Cong., 2d Sess., at 30 (1983) *reprinted in* 1984 U.S.C.C.A.N. 2547, 2574; *see also Bellas,* 221 F.3d at 526.

Furthermore, the death benefit does not satisfy the definition of retirement-type subsidy as provided by the Third Circuit. Congress intended for retirement-type subsidy to be defined in Treasury Department regulations; however, no such regulations have been set forth. *See id. at* 524;29 U.S.C. § 1054(g)(2)(A). Nevertheless, the Third Circuit has defined retirement-type subsidy as "the excess in value of a benefit over the actuarial equivalent of the normal retirement."*Bellas,* 221 F.2d at 525;*see also Ashenbaugh v. Crucible Inc., 1975 Salaried Ret. Plan,* 854 F.2d 1516, 1521 n. 6 (3d Cir.1998); *Dade,* 68 F.3d at 1562 n. 1. In *Bellas,* the Third Circuit explained how the retirement-type subsidy is calculated:
[t]he value of the early retirement benefit is calculated by first determining the amount that would

be payable to the participant at normal retirement age, given the participant's service and compensation as of the date of *early* retirement. This value is then reduced by a factor reflecting that benefit payments will begin earlier than was contemplated and, therefore, are likely to continue for a longer period of time.

*8 221 F.2d at 525 (emphasis in the original) (internal citations omitted). Adhering to the Third Circuit's definition of retirement-type subsidy, the death benefit is protected by the anti-cutback rule as a retirement-type subsidy only if it is calculated in this way. In looking to the plain language of the Lucent Plan, it is evident that the death benefit is not a retirement-type subsidy because it is not calculated in the manner stated above; but rather, was a payment equivalent to the plan participant's final twelve months of compensation. Pl.Ex. 2 at D000304. In no way was the death **benefit** intended to provide a **benefit** to employees who retired early. Instead, the death **benefit** primarily assisted a plan participant's beneficiary upon the retiree's death.

### D. *Vesting of Death Benefit*

Having classified the death **benefit** as an employee **welfarebenefit,** the next inquiry is whether this **benefit** had vested when Lucent eliminated it. Once an employee **welfarebenefitvests** it may not be eliminated without violating **ERISA's** anti-cutback rule. *See Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 512 (1981); *DiGiacomo v. Teamsters Pension Trust Fund of Philadelphia and Vicinity,* 420 F.3d 220, 223 (3d Cir.2005). Plaintiff contends that the **benefit** was **vested** when Lucent eliminated it. Specifically, Plaintiff argues that this **vesting** occurred: (1) when plan participants became eligible for retirement with a service pension according to the language in the summary plan document (SPD); or, alternatively (2) when Lucent transferred excess pension assets to pay for post-retirement medical **benefits.** As explained below, Plaintiffs' assertions about the time for **vesting** are incorrect because the **vesting** of employee **welfarebenefits** must be clear on the face of the plan documents and here, the plan documents do not indicate that **vesting** occurred upon either of these events.

The Third Circuit has repeatedly noted that "**ERISA** does not require automatic **vesting** of **welfarebenefit** plans."Unisys, 58 F.3d at 901. *See also Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 95 (3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
(Cite as: Not Reported in F.Supp.2d)

Cir.1992); _Smith v. Hartford Ins. Group,_ 6 F.3d 131, 136 (3d Cir.1994). These cases have summarized the congressional reasoning for no automatic vesting: "[t]o require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income."_Hozier v. Midwest Fasteners, Inc.,_ 908 F.2d 1155, 1160 (3d Cir.1990). Courts, including the Third Circuit, have followed Congress' lead and respected the "need for flexibility with respect to an employer's right to change medical" and other welfare benefit plans. _Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co.,_ 188 F.3d 130, 138 (3d Cir.1999). Thus, a plan participant's right to an employee welfare benefit vests only according to the terms of the plan. _See Unisys,_ 58 F.3d at 902.

*9 In order for an employee welfare benefit to vest, the conditions for vesting must be clear on the face of the plan. Thus, to determine when an employee welfare benefit vests, the Court must "examine the plan documents." _Unisys,_ 58 F.3d at 902. The Third Circuit has reasoned that since employee welfare benefits are "[e]xtra-ERISA commitments" the vesting language "must be found in the plan documents and stated in clear and express language."_Id._ Furthermore, the "plan participant bears the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to be vested."_Id._ Thus, in this case, Plaintiffs bear the burden of proving that the death benefit vested according to clear and express language contained in the Lucent Plan.

### 1. _Vesting of Benefit According to Plan Documents_

Plaintiffs direct the Court's attention to several documents published by AT & T and Lucent that allegedly set forth the vesting guidelines for the death benefit. First, Plaintiffs claim that AT & T prioritized benefits under the plan and in doing so established the death benefit as vesting upon an employee's eligibility for retirement. According to Plaintiffs' argument, ERISA Section 4044 required AT & T to prioritize the benefits. 29 U.S.C. § 1344(a). Such prioritization of benefits pursuant to Section 4044 does not create vesting rights; but rather "insurance" upon termination of a plan. _See Mead Corp. v. Tilley,_ 490 U.S. 714, 723 (1989) (holding that ERISA Section 4044 does not create new entitlements but only "insurance for benefits created" in Title I); _see also Ashenbaugh,_ 854 F.2d at

1528. Therefore, Defendants' act of categorizing the death benefit as a Category Two benefit has no bearing on when a plan participant's entitlement to the death benefit vested. Furthermore, because the Plan itself was not terminated, Section 4044 offers Plaintiffs no protection.

Next, Plaintiffs' argue that language in the Summary Plan Description ("SPD") demonstrates that the death benefit vested upon a plan participant's eligibility for retirement. Plaintiffs are correct that if there is a conflict in the language contained in a SPD and the plan documents then the SPD controls. _Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. and Research Found.,_ 334 F.3d 365, 378 (3d Cir.2003). However, the language in the AT & T and Lucent SPDs does not "clear[ly] and express[ly]" indicate that the death benefit vested upon eligibility for retirement._Unisys,_ 58 F.3d at 902. Rather, the language Plaintiffs cite merely defines the death benefit and states who is eligible.[FN3] Furthermore, other provisions in the SPD make clear that plan participants did not have a vested right to the death benefit upon retirement because the occurrence of subsequent events could serve as grounds for Lucent to deny payment of the benefit. For example, the SPD contained in Exhibit 14 states that "[n]o Death Benefits, however, may be payable in the event a suit for damages or other legal action is brought against the Company outside the provisions of this Plan on account of the death of an employee."Pl.Ex. 14 at D010406. While this exclusion is not applicable in this case, it shows that Plaintiffs' right to the death benefit was not vested upon retirement, but it could be stripped away if Plaintiffs engaged in particular conduct, namely, filing suit against Lucent. Additionally, the SPD language makes clear that the benefit will be paid only if a qualified beneficiary survives the plan participant.[FN4] The presence of these conditions on plan participants' eligibility for the death benefit underscore the fact that there was no automatic vesting language and, further, that employees' entitlement to the death benefit did not vest upon retirement. The benefit only vested when the plan participant died and was survived by qualified beneficiaries.

FN3. The SPD published by AT & T, contained in Exhibit 13, states that "[a] benefit equal to one year's pay at retirement will be paid to the qualified beneficiary of an employee who retires with a Service or Disability Pension."Pl.Ex. 13 at D001907.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
**(Cite as: Not Reported in F.Supp.2d)**

Contrary to Plaintiff's contentions, this language does not define when vesting occurs. *See also* Pl.Ex. 16 at D010487; Pl.Ex. 19 at D002258-259.

FN4."If there is no beneficiary who qualifies for a mandatory payment, payment of a Death Benefit to other dependent relatives may be authorized by the Employee Benefits Committee."Pl.Ex. 14 at D010406.

**\*10** Finally, Plaintiffs' argue that their right to the death benefit vested pursuant to clear language contained in the Employee Benefits Agreement ("EBA"). First, it is not clear that the EBA is even a Plan document. Plaintiffs ask this Court to follow the Fifth Circuit's example, citing *Halliburton Company Benefits Committee v. Graves.* 463 F.3d 360 (5th Cir.2006) for the proposition that a merger agreement may amend the terms of an employee benefits plan. Regardless of whether the EBA amended the terms of the employee benefits plan, the clause in the EBA stating that Lucent assumed AT & T's liabilities with regards to transferred retirees does not contain clear and express vesting language. Pl.Ex. 11 at D001436. Neither this language nor any other language cited by Plaintiffs clearly and expressly states the vesting requirements for the death benefit. Therefore, the death benefit did not become vested pursuant to any of these documents.

### 2. *Vesting of Benefit by Transfer of Funds*

Plaintiffs also argue that the death benefit vested when Lucent transferred excess pension assets pursuant to I.R.C. Section 420. Specifically, Plaintiff cites language in the Lucent Plan: "[a]ccrued pension benefits for Participants and beneficiaries become nonforfeitable."Pl.Ex. 12 at D001692. This language is not grounds for concluding that the death benefit vested. First, this is not clear and express language of vesting as is required by controlling precedent. *Unisys.* 58 F.3d at 902. Second, as discussed above, the death benefit is not accrued under the statutory definition because it is not an annual benefit paid at normal retirement age. Therefore, Lucent's transfer of excess pension assets did not cause the death benefit to vest.

Based on Plaintiffs' complaint and the plan documents, it is apparent that dismissal is appropriate as to Plaintiffs' Count II. This Court may consider the plan documents in dismissing Count II pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs' claims are based on those documents.*Pension Benefit Guar. Corp.,* 998 F.2d at 1196. It is clear on the face of these documents that the death benefit was not vested and its elimination did not violate ERISA's anti-cutback rule.

### E. *Contract Claims Based on Federal Common Law*

Arguing that the pension plan is a unilateral contract, Plaintiffs seek relief pursuant to federal common law. Plaintiffs claim that the pension plan is an offer which the employee accepts by performance, binding the employer to the contract's terms. Under this theory, the death benefits would vest upon an employee's performance.

Plaintiffs' unilateral contract theory is unavailing for several reasons. First, the Supreme Court recently ruled that it is inappropriate for the courts to employ federal common law to supplement ERISA. Most recently, in *Hughes Aircraft,* the Supreme Court held that because ERISA " 'is a comprehensive and reticulated statute and is enormously complex and detailed' it should not be supplemented by extratextual remedies, such as the common-law doctrines advocated by respondents."525 U.S. at 447 (citing *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 361 (1980) and *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 262 (1993) (internal citations omitted)). Just this year, the Third Circuit reiterated this point in *Hooven v. Exxon Mobil Corporation,* Nos. 04-3773, 05-1610, 2006 WL 2988116.\*5 (3d Cir. Oct. 20, 2006), noting that "[a]lthough we occasionally employ unilateral contract concepts in ERISA cases, we do so only where 'the asserted unilateral contract is based on the explicit promises in the ERISA plan documents themselves.'Unilateral contract principles may not operate to create extra-ERISA causes of action for plan benefits."Thus, as stated above, no relief pursuant to unilateral contract principles is available in this case because there are no explicit, non-revocable promises to the death benefit contained in the ERISA plan documents.

**\*11** Secondly, the majority of cases cited by Plaintiffs are from other circuits and involved top hat plans, not welfare benefits like the case here.FN5 Unlike typical pension and employee welfare benefit plans, top-hat plans are designed to compensate highly paid employees. Thus, some courts have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

carved out an exception for top-hat plans, reasoning that because they are more akin to unilateral contracts, federal common law contract principles are applicable. See *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir.2001). Therefore, the cases cited by Plaintiffs to support the unilateral contract theory of relief are distinguishable from the facts here and thereby unpersuasive.

> FN5. Plaintiffs' reliance on *Burch v. Firestone Tire and Rubber Co* ., 838 F.2d 134, 145-47 (3d Cir.1987) and *Amatuzio v. Gandalf Sys. Corp.*, 994 F.Supp. 253, 266 (D.N.J.1998) to show that the Third Circuit and the District of New Jersey have applied unilateral contract principles to employee welfare plans is unpersuasive. Both of these plans involve severance plans, relating to length of service and a form of wages. Such a benefit is distinct from the death benefit at issue here.

Finally, even if the Court applies federal common law contract principles and construes the plan as a unilateral contract, it is still subject to the Plan's reservation of rights clause. Plaintiffs may have accepted the Plan's terms by performance; however, they accepted all the Plan's terms, including the clause reserving Defendants' right to alter plan benefits in the future. Therefore, Defendants were merely exercising their rights under the contract that Plaintiffs accepted and agreed to.

Dismissal is appropriate as to Plaintiffs' Count IV because no relief can be granted upon the face of Plaintiffs' complaint due to the fact that federal common law unilateral contract principles may not be grounds for relief on pension and retirement plans that fall within the ambit of ERISA.

## IV. *CONCLUSION*

For the reasons stated above, it is the decision of the this Court that Defendants' motion to dismiss is granted. Additionally, Plaintiffs' motion to substitute a party is rendered moot and is thereby denied. An appropriate Order accompanies this Opinion.

D.N.J.,2006.
Foss v. Lucent Technologies Inc.
Not Reported in F.Supp.2d, 2006 WL 3437586 (D.N.J.), 39 Employee Benefits Cas. 1811

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.