# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KELLY ROARTY,                          :
                                       :
            Plaintiff                  :
                                       :        C.A. No.: 06-195 GMS
      v.                               :
                                       :
TYCO INTERNATIONAL, LTD.               :
GROUP BUSINESS TRAVEL                  :
ACCIDENT INSURANCE PLAN AND            :
LIFE INSURANCE COMPANY OF              :
NORTH AMERICA,                         :
                                       :
            Defendants.                :

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD R. WIER, JR. P.A.


/s/ Richard R. Wier, Jr.
_____
Richard R. Wier, Jr. # 716
Michele D. Allen # 4359
Richard R.Wier, Jr. P.A.
Two Mill Rd., Suite 200
Wilmington, DE 19806
302-888-3222
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **KELLY ROARTY,** | : | |
| | : | |
| **Plaintiff** | : | |
| v. | : | **C.A. No.: 06-195 GMS** |
| | : | |
| **TYCO INTERNATIONAL, LTD.** | : | |
| **GROUP BUSINESS TRAVEL** | : | |
| **ACCIDENT INSURANCE PLAN AND** | : | |
| **LIFE INSURANCE COMPANY OF** | : | |
| **NORTH AMERICA,** | : | |
| | : | |
| **Defendants.** | | |

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PROPOSED FINDINGS OF FACT

## I. MRS.ROARTY IS ENTITLED TO BENEFITS: MR. ROARTY WAS COVERED 24/7

### A. THE PLAN

1. Defendants' Plan, as provided by the SPD, covered Mr. Roarty 24/7 regardless of whether he was on business or vacation. Ex D6, D10.

2. The SPD dated September 2000 was provided to Mr.Roarty and covered him 24/7 because his salary was in excess of $75,000 a year D10 at page 110, Tr. 18.

3. Under the Plan, as stated in the SPD, Mr. Roarty was covered when he left on August 2nd, 2004 to go on a business trip.

4. Under the Defendant Plan, as a covered employee in the BTA, upon the event of Daniel Roarty's death in a manner covered by the BTA plan, his beneficiary would become entitled to a benefit of $500,000. Admitted Fact # 5.

5. Plaintiff Kelly Roarty is the widow of Daniel Roarty, and his beneficiary pursuant to

the BTA plan. Admitted Fact # 3.

6. On August 8, 2004 Daniel Roarty died as a result of a motor vehicle accident in Lancaster County, Pennsylvania while returning to his home in Newark, Delaware from Pittsburgh, PA. Admitted Fact # 4.

7. The SPD dated October 2003, D6, also covered Mr. Roarty 24/7 and stated that: "you are covered 24 hours a day, whether traveling or not, at home, at work, on vacation, while traveling anywhere in the world, or while on a leave of absence, subject to the exclusions and limitations of the plan", D6 at page122. Tr. 20-1.

## B. THE DEFENDANTS DID NOT NOTIFY OR PROPERLY DISCLOSE TO MR. ROARTY OR OTHER EMPLOYEES ANY CHANGE IN THE 24/7 COVERAGE.

8. Life Insurance Company of North America ( LINA or LINCA) underwrote the BTA plan's benefits and was claim fiduciary to the BTA plan within the meaning of 29 USC § 1002 (21)(A)(iii). Admitted Fact # 6.

9. LINA was the Plan Administrator and a fiduciary under the Plan and as such it had the "authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of the Plan to the full extent permitted by law", AR 036.

10. Defendant failed to provide notice in plain language to Mr. Roarty of any material modifications to the 24/7 coverage prior to his death on August 8, 2004.

11. A Summary of Material Modifications , D7, was never sent to or received by Mr.Roarty or other employees of Tyco.

12. Defendants provided the SPD which provided for coverage 24/7, D10, to Mr. Roarty

at work. Tr.17.  Mrs. Roarty received the SPD and filed it in the Roarty's filing cabinet since she was "responsible for doing all the billing and claim forms, anything that had to do with billing, paperwork",Id.

13. Based upon the SPD  it was Mrs. Roarty's understanding in August of 2004 that her husband "would be covered 24/7, irregardless of business or pleasure or anything, he was covered".Tr 18.

14.  Mrs Roarty never received any modification to the SPD or any updated summary plan description book from Tyco.Tr.19, Tr. 24.  In addition, she never received the 2003 SPD, D6, prior to trial, Tr. 19. :

Q.Was this ever provided to you and/or your husband by anyone prior to today, to your knowledge?

A. No. Tr. 20.

15. Bob Bierzynski " was the highest- ranking person at Scott Instruments at the time of [Mr. Roarty's] death". Tr.21.

16. Mr. Bierziynski did not know about the change in the SPD in August 2004 at the time of Mr.Roarty's death and he went to the hospital in Hershey on August 10th and told Mrs. Roarty that Mr.Roarty was covered for the BTA benefit: "That we were entitled to that, Dan was entitled to receive that". Tr. 22. Admitted Fact # 7.

17. Prior to going to Hershey to advise Mrs. Roarty of her benefits as a result of her husband's death, Mr. Bierzynski spoke with Lanny Tomberlin, the Human Relations director of Tyco assigned to Scott Instruments ,in order to determine whether Mr. Roarty was covered under the BTA policy and was told that he was covered. Tr. 21 , Admitted Fact # 8.

18. Lanny Tomberlin, The Tyco Human Relations Director assigned to Scott, was not

notified of or advised of any change or material modification to the Plan or the SPD. Prior to Mr.
Bierzynski's visit with Mrs. Roarty on August 10 or 11 he "told Bierzynski that Daniel Roarty's
death would be covered under the BTA plan because that plan covered employees 24 hours, 7
days a week", Admitted Fact # 9.

19.  Although the Summary Modification D7 says that it is effective July 1, 2002 that
modification was never updated in the SPD as of April 11, 2005. AR244.  An April 11, 2005
email reflects a discussion with Mr. Tomberlin, the HR Director of Tyco, who stated that "the
changes for the BTA was [sic] never updated in the SPD but just to make a written correction
after the employee [ Mr. Roarty] died". AR 244.

20.  Mr. Tomberlin about two weeks after the accident told Mrs.Roarty that a mistake had
been made when she was told her husband was covered and that "there had been a change in the
policy that year, and it was sent via an e-mail, and that Dan would no longer be entitled to that
benefit". Tr.22.

21.  Mrs. Roarty asked Mr. Tomberlin for a copy of the e-mail announcing the
modification of the SPD but she never received it. Tr.22.  She was told that "they could not find
it". Tr.22.

22.  There is no evidence that any e-mail was sent advising Mr. Roarty or other
employees that the SPD had been amended to eliminate coverage for non-business related deaths.

23.  No notice of any material modification was sent to Mr. Roarty or employees within
210 days of the effective date- July 1, 2002- of the change.

24.  Mr. Roarty never received any such e-mail, Tr. 22-23. He never brought any such e-
mail home. Id. After his death, Mrs. Roarty went through his desk and did not find any such e-
mail. Id.

25. There was no summary of material modification to the SPD in any of Mr. Roarty's papers at work. Tr.23.

26. " Q. Now, did you or your husband ever receive any summary of material modification to the summary plan description that we have discussed?  A. No." Tr. 26.

27. Mrs. Roarty wrote on September 20th, 2004 to Tyco asking for copies of the BTA. Tr.24. She sent the letter to the address on the SPD but it was returned to her as "the addressee was no longer there". Tr. 24. On October 5th she wrote to Cigna asking for the BTA and never received a copy of the policy from Cigna { LINA}. Tr.25. AR 216, AR 221: October 5th 2004 e-mail from Felicia Johnson. Tr. 26. She testified on cross that she did not recall receiving the policy D 8, Tr. 35.

28. Even though Mr. Roarty was covered 24/7 under the SPD- which had not been updated at least through April, 2005, AR 244, during the process involving Mrs. Roarty's claim for the BTA death benefit no one from Tyco told her that her husband was covered under the aforesaid SPD' even while on vacation, Tr. 27-8.

29. Mrs. Roarty was shown the Summary of Material Modifications, which had only been produced in this litigation a week before trial, and she testified that neither she nor her husband had ever seen or received it. Tr.28

30. The Summary of Material Modification, D 7 was not written " in a manner calculated to be understood by the average plan participant", as required by 29 USC § 1022 (a). Tyco's own witness read the modification as limited to conveying only that there had been a change in the insurance carrier and the number of the policy, See Fact #40 infra. Mrs. Roarty read the summary for the first time at trial and was not able to understand it: " I'm not exactly sure what it's saying. She thought it did not cover if you were under alcohol or drugs but her husband was

not under such influence at the time of the accident, Tr.29.  She testified that the phrase "non-business activity' was "ambiguous", Tr. 29.

31.  Mr. Gerry Lafond, a co-worker of Mr. Roarty's, testified that he started with the predecessor to Tyco, Scott/Bachrach in April 2000. Tr.60 and was working there at the time of Mr. Roarty's death in  August 2004. Tr. 61.

32.  At the time Mr. Lafond joined the company in April 2000 it was a joint venture-51/49- between Scott Health & Safety and Bachrach Instrument Company in Pittsburgh. Tr. 60. Near the end of 2000 or early 2001 Tyco bought Scott Health & Safety and eventually bought out the Bachrach interest. Tr. 60.   Bachrach was retained as a contract manufacturer to Scott and one of the products it supplied to Tyco was the CE 130 sensors which were the subject of the business trip of Mr. Roarty in August 2004, Tr. 61, 63-5, AR 84-98 [ appeal with e-mails submitted by Mrs. Roarty relating to the trip].

33.  When Mr. Lafond joined the company in 2000 he testified that he received the September 2000 SPD from Tyco which was identified by Mrs. Roarty as the SPD she had received, Tr. 62-3, D10.

34.  The Defendants never provided any other SPD to Mr. Lafond and never provided any summary of material modifications to him from 2000 through Mr. Roarty's death in August 2004:

"Q. Let me show you a copy Mrs. Roarty [has ] identified, it's an exhibit which is a 2000, September 2000 SPD. Did you receive that from Tyco after they acquired Scott?

A. Yes, sir.

Q. Did you ever receive any e-mail changing the summary plan description?

A. No, sir.

Q. Did you ever receive any updated summary plan description?

A. No, sir.

Q. From the time of 2000- you were working there in 2000. Is that right?

A. Yes, sir.

Q. From that time until Mr. Roarty's death, did you ever receive any summary modification or material modification of your business travel accident plan?

A. None whatsoever". Tr. 63.

35.  Mr. Bob Bierzynski admitted that he told Mrs. Roarty shortly after Mr. Roarty's death, that her husband was covered under the BTA 24/7. D9 at 18,19.

36. Senior officials at Tyco also verified that the BTA plan covered Mr. Roarty since the plan covered him 24/7 because Mr. Bierzinski was told by Lanny Tomberlin the Tyco HR Director that Mr. Roarty was covered 24/7, D9 at 19.

37.  No e-mail or other notice changing the SPD was provided to Mr. Roarty or other employees at Tyco prior to Mr.Roarty's death since Mr. Tomberlin, Mr. Bierzynski, Mr. Lafond and Mr. Roarty never received such  notice and understood that Tyco employees such as Mr. Roarty were covered 24/7.

38.  After Mr. Roarty's death and after Mr. Bierzynski told Mrs.Roarty that the BTA was 24/7 coverage, he spoke with Lori Prince about two weeks later and was told that there had been a mistake and the plan had changed. D9 at 22.  However, Mr. Bierzynski admitted that he was unaware of any change, he did not get a copy of any e-mail changing the plan, he did not have any independent recollection of a change to the plan, and he relied on Lanny Tomberlin the Tyco Director of HR who advised him that the plan covered Mr. Roarty 24/7, D9 at 22, 24.

39. In April 2005, during the review of the claim for benefits by Mrs. Roarty, Defendant

admitted that it knew that the alleged changes to the SPD had not been made and not only kept that information hidden from Mrs. Roarty but also, more importantly, engaged in fraud and deceit by deciding to "just...make a written correction after the employee [ Mr. Roarty] died", AR 244.

40.  Ms. Kathee Beauchesne , a Tyco employee who worked in the Princeton, New Jersey office, testified that the 2002 SPD, D6, was printed in 2002 and distributed in the fall of 2002, Tr.72. She testified that a July 1, 2002 summary of material modifications, D 7, was for the purpose of notifying Tyco employees that Tyco had changed carriers, Tr. 74, 86. This does not advise the employees in clear language that the purpose was to eliminate substantial coverage. On the contrary, Ms. Beauchesne testified that the purpose of the summary of material modification, D7, "was that they changed carriers July 1, 2002, with a–who the new insurance carrier would be and the policy number", Tr. 89-90, 93.

41.  Ms. Beauchesne admitted that the SPD D6 was not hand-delivered to employees. Tr. 76. She admitted that she could not testify that it was sent to any employees including Mr. Roarty because she did not see any mailing list and had no personal knowledge it was sent. Tr.77, 84. She could not testify that there was any e-mail announcing any change to the SPD, Tr. 79.  In fact, she testified that the summary of material modifications would not have been distributed by e-mail, Tr.79.  She did not even know who the Director of HR, Lanny Tomberlin, was, Tr. 81.

42.  Ms. Beauchesne testified to a hearsay conversation with an unnamed person in the third party vendor in Maine that the SPD, D6, had been mailed but she could not verify or testify to whom it was sent, including Mr. Roarty, because "they no longer have the mailing list". Tr.83 . Ms. Beauchesne admitted that she did not see a list of the individuals to whom the SPD, D6, was sent. Tr. 84.

43. Ms. Beauchesne had no personal involvement in the summary of material modifications, D-7, and no witness from Tyco with direct knowledge was presented by Defendants, Tr.85.

44. The SPD was not amended to reflect the elimination of coverage for non-business accidents and that elimination was not set forth in the SPD D6, Tr. 88. "It wouldn't be printed specifically for that. There are many different plans that are covered under an SPD". Tr.88.

45. There is no admissible or direct evidence that the Summary, D7, was ever incorporated into the SPD or provided to Mr. Roarty or the other employees.

46. Ms. Beauchesne admitted that the reference in the SPD of 2002 to "subject to change July1, 2002" , p. 121 D6, was not notice as to what the terms of the modification were. Tr.94. The summary of material modifications could have been mailed any time even August 2004 or September 2004 and there is no evidence it was sent within 210 days of July 2002 to any employees, Tr. 97, 77.

47. Defendant produced no witness to explain why the summary of material modifications was not included in the SPD 2002, D6, while it had enough time to include reference to a change in that SPD at page 121, D6, Tr. 93. [Questions by the Court].

## C. MR. ROARTY WAS ON AUTHORIZED BUSINESS TRAVEL WHEN HE DIED AND IS ENTITLED TO BENEFITS UNDER THE AMENDED BTA.

48. Tyco International, Ltd sponsers and maintains an employee welfare benefit plan ( the BTA plan) within the meaning of 29 USC § 1002 (1) that provides covered employees with a death benefit pursuant to the terms of the Plan, should they die as the result of an accident while engaged in business travel on Tyco's behalf, Admitted Fact # 1.

49. Assuming arguendo that the Plan was amended to exclude 24/7 coverage, Mr. Roarty

was on a business trip pursuant to the Plan, D8 at page 10.

50. In August 2004, the Scott Facility where Daniel Roarty worked had no formal travel policy, plan or procedures. Admitted Fact # 17.  Mr. Bierzinski testified that there was no specific procedure or policy for business travel, D9 at 9,15,16.

51. Mr. Roarty in August 2004 was employed by Scott Instruments, a Tyco subsidiary, as Senior Product Manager and was a covered employee in the BTA Plan. Admitted Fact # 2.

52. There was no requirement that there be written approval before going on a business trip, D9 at 9.

53. In August 2004 Mr. Roarty was authorized to approve his own business travel. Admitted Fact # 19.  D9 at 9-10.  He did not need approval of any direct supervisor and Mr. Bierzynski was not his direct supervisor, Admitted Fact # 18, D9 at 17.  Mr. Roarty was authorized to approve his visit to the Bachrach Plant if required by his job to do so. Admitted Fact # 21, D9 at 32.  He did not require approval for himself to visit the Plant, D9 at 29,54.

54. At the end of July, Mr. Bierzynski was aware that Mr. Roarty was going to travel to the Bachrach plant on business, D9 at 24, 28-30, Admitted Fact # 20.

55. In early 2004 Tyco contracted with a production plant in Pittsburgy, Pennsylvania for the production of sensor equipment. The sensors were to be delivered to Tyco on April the 20th, 2004 so that it could distribute them to its customers. Admitted Fact # 22.

56. In late June, 2004, one of Tyco's customers began complaining that the sensors that had been ordered from the Bachrach Plant were overdue. Tyco was unable to obtain satisfactory answers as to the lateness from the Bachrach Plant regarding the sensors. Admitted Fact # 23.

57. In July, 2004 the situation was brought to the attention of Bob Bierzynski, Admitted Fact # 24.

58. Prior to July 2004 Mr. Roarty had planned to vacation in Pittsburgh in order to attend a family wedding, with his last work day being Friday, July 30, 2004 and returning Monday August 9, 2004. Admitted Fact # 25.

59.  On or about July 30, 2004 Mr. Roarty advised Bob Bierzynski and others in senior management positions for Scott Instruments that he intended to visit the Bachrach Plant to find out why it was taking so long to build the sensors. Admitted Fact # 26.

60.  Mr. Roarty told his Sales Manager and others that Regis Wyse was going to go set up a business meeting for him at the plant to resolve the problem with the sensors, Admitted Fact # 28.

61.  Regis Wyse, a Scott Instruments employee,  made arrangements for Mr. Roarty and himself to visit the Plant. Admitted Fact # 28.

62.  Regis Wyse arranged a meeting with Bachrach personnel for Mr. Roarty and himself to be held on Tuesday,August the 3rd, 2004. Admitted Fact # 30.

63.  Mr. Bierzynski was told by Regis that Mr. Roarty intended to go into the Bachrach Plant for a meeting, D9at 37.

64.  Mr and Mrs Roarty had planned to go out to Pittsburgh on August 3rd and to go with the family in one car. Tr. 6.

65.  Those plans changed when Mr. Roarty had to go out on business and visit the Bachrach Plant, Tr. 6, 8.

66.  As a result of Mr. Roarty's business trip, the Roartys left a day early on Monday August 2nd and changed to two cars so that Mr. Roarty would have a car to go to the business meeting. Tr. 7.  They went out early on the 2nd so that Mr. Roarty could go to the Bachrach Plant on Tuesday August 3rd. Tr. 8.

67. The Roarties went to stay with friends and he continued to work while with the friends by being on his cell and computer doing e-mails and calling Scott Instruments, Tr. 8.

68. The meeting that was scheduled for August 3rd was rescheduled for August 5th which was Thursday. Tr. 8, Admitted Fact # 30.

69. On August 4th, Scott Instruments and Bachrach management reached an agreement that resolved the sensor issue such that the August 5, 2004 meeting was cancelled without a new date. Admitted Fact # 31, Tr. 9.

70. Mr. Roarty continued to conduct business notwithstanding the cancellation of the meeting. Tr. 9.

71. On August 7th, the Roarties went to the wedding which was located only a half hour to 45 minutes from the Bachrach Plant, Tr. 10.

72. On Sunday August 8th, the Roarties returned to their home taking separate cars; unfortunately, on the way home, Mr. Roarty's vehicle, which contained his children, was struck by a truck that failed to stop at a stop sign, killing him and seriously injuring his children Admitted Fact # 34, Tr. 12-15, AR 148-159.

73. Mr. Roarty left Newark, Delaware on a business trip which was authorized and after the wedding he returned on that trip to return home. D8 page 10.

**D. DEFENDANTS  SELECTIVELY REJECTED EVIDENCE SUPPORTING A GRANT OF BENEFITS, MISLED PLAINTIFF AND FAILED TO INVESTIGATE THE FACTS.**

74. Defendant failed to investigate the claim and simply relied upon an uncorroborated e-mail from an unidentified person at Tyco's office in Boca Raton, Florida that "Mr. Roarty was NOT on business travel at the time of the accident", D 1 at AR 130. That statement was dated 12/15/04. Id.

75. The initial denial, D 1, AR115-117, dated December 17, 2004 was based solely upon that e-mail, AR 116.

76. Mrs Roarty filed an appeal , AR 84-98, on February 12, 2005 and set forth numerous facts which showed that Mr. Roarty left on a business trip and was killed on return from that trip.

77. The only "investigation" that was conducted to determine whether Mr. Roarty was on a business trip was a phone call from Felicia Johnson of Tyco, March 11, 2005 which stated that she was going to contact "the office where he worked and has asked that they fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident. She stated that I should expect to receive that letter within the next week or so". AR 76.

78 . LINA did not question any individuals at Scott or do any investigation into the process or procedure for authorizing business trips.

79. Had it conducted an investigation it would have learned that Mr. Roarty left Newark on August 2 for the purpose of conducting business and that he was authorized to make the trip. Thus the trip was "authorized", see facts discussed supra.

80. Mr. Killmer, the claims handler on this claim for LINA, on March 11, 2005 wrote Mrs. Roarty and told her that "I am waiting some additional information from Tyco International regarding Daniel Roarty's status as of the date of the claimed accident that took his life. Once I have the requested information, I will again review the information in your file and the applicable policy." AR 75. Mr. Killmer never inquired into the facts set forth in the appeal or sent those facts to Tyco for comment.

81. LINA denied her claim on March 24, 2005 without receiving the information from Tyco, which it said it was waiting for, and based solely on the conditional e-mail of March 11, 2005 AR 76. LINA did not disclose to Mrs. Roarty that it had not received that information, Tr.

128.

82.  The denial came from Brian Billeter who was not the person familiar with the claim or the person with whom Mrs.Roarty had been corresponding. The individual assigned to the claim was Robert Killmer, Tr. 108.

83.  Mr. Billeter testified that he took Mr. Killmer's file from his desk while he was on vacation, knew that LINA had not received any further information from Tyco and denied the claim with no further investigation. Tr.111-112. He testified that he denied the claim without any further investigation or information, which had been requested, because he wanted to "be fair" to Mrs. Roarty. Tr. 117,118.

84.  Mr. Billeter concluded that Mr. Roarty <u>was</u> on a business trip when he left for Pittsburgh that Monday morning August 2, 2004. <u>"I would say that on Monday morning, when he left for Pittsburgh, there was a business reason to go to Pittsburgh. There was an anticipated meeting with one of his vendors. So when he leaves on Monday morning, despite the fact that he also has a personal vacatio that he is taking, one could reasonably say that he was on a business trip as of Monday morning". Tr 114, 130.  "So we can agree that this was an authorized business trip at the outset?  At the outset, yes", Tr.131.</u> [Emphasis].

85.  LINA through Mr. Billeter never told Mrs. Roarty that it was LINA's reasonable conclusion that her husband was on a business trip when he left for Pittsburgh. The denial letter does not mention this conclusion.

86.  Mr. Billeter also testified that Mr. Roarty continued on the business trip from August 2 through August 4th until he learned that the meeting had been cancelled, Tr. 115.  LINA does not mention this to Mrs. Roarty nor does it do any investigation as to whether his return from the trip- even after a brief deviation- was back on business.

87.  LINA's sworn answers to Plaintiff's Interrogatory states that Mr. Billeter's involvement in the handling of the claim was limited "to the extent he signed the March 24[th], 2005 [denial] letter", Tr.116.

88.  LINA failed to disclose to Mrs. Roarty ,when it denied her appeal, that it had not received the letter from Tyco that it had told her it was waiting for. Tr 119, 128. LINA did not contact Tyco to inquire about the letter it was waiting for,  it did not ask anyone at Tyco to fax it, it did not communicate with Mr, Tomberlin or anyone else at Tyco to obtain their position on the issue Tr. 129.

89.  Mr. Billeter testified that he took Mrs Roarty's file because Mr. Killmer was on vacation for two or three days but he could recall when during that two or three days he reviewed the file. Tr. 119-20.

90.  Mr. Billeter testified that he reviewed 30 to 50 files of Mr. Killmer during that couple of days, Tr.120. He then testified that "I probably didn't review all 30 to 50 files. Just the ones on which we recently received something", Tr. 135.

91.  Mr. Billeter said that he did not wait for Mr. Killmer to return or for the information from Tyco because he had received a legal opinion, Tr. 121.  He admitted that he never provided that legal opinion to Mrs.Roarty in denying her claim and he never mentioned that opinion in the denial letter, Tr. 121, 128.

92.  Mr. Billeter did not talk to anyone at Tyco or anyone else who could assist in determining whether Mr. Roarty was on business Tr. 122-3

93.  Mr. Billeter testified that he did not tell Mrs. Roarty that her husband was on a business trip and then on a personal deviation, Tr. 123.

94. LINA's conclusion that Mr. Roarty was on a personal deviation as a basis for denying

the claim was never included in the denial letter. Tr. 124.

95. Mr. Billeter then testified that the fact Mr. Roarty was on a personal deviation "had nothing to do with the denial". Tr.125.

96. LINA admits that after the personal deviation was over and Mr. Roarty was returning from the business trip then coverage would begin: Tr. 125. Mr. Billeter however testified that there was no business trip since it ended before he went to the wedding. Tr. 126 . However, there was no basis for that conclusion and no questions of Tyco were asked as to whether such was the case under their policies or procedures.

97. In addition, LINA misled Mrs. Roarty by stating a reason for the denial of her claim was "no expenses or accommodations appear to have been reimbursed to Mr. Roarty byTyco for his travel", D 1, AR 66.

98. There was no basis in the record or evidence from Tyco to support the statement that because there had been no reimbursement from Tyco he was not on a business trip. This statement in the denial letter as a basis for the denial was "the first time that was ever mentioned to" Mrs. Roarty. Tr. 127.

99. In point of fact, had LINA done any investigation it would have learned that Tyco did reimburse employees for business trips where personal deviations were part of the trip either during the business trip or on either end of the business trip, Tr. 61-2, 69.

100. LINA manufactured this basis for the denial because Mr. Billeter testified that he believed that there had been a discussion with Tyco about the reimbursement issue and admitted on cross that there was nothing in the record to reflect any such conversation, T. 127. In addition, his testimony was that he based his denial of the claim and the reasons for the denial on the record and there was nothing in that record regarding this issue. As such, Mrs. Roarty was

misled by the misrepresentation that the reason her claim was denied was that the trip would not have qualified for reimbursement. She was never given the opportunity to respond to that new reason.

## CONCLUSIONS OF LAW

1. Because " the Plan delegates authority and discretion to LICNA with respect to administration of the Plan..the court therefore reviews the LICNA's decision for abuse of discretion", Memo Op p. 8.

2. "A heightened level of arbitrary and capricious review is appropriate in this case." Memo Op. p.9.

3. "Under the heightened arbitrary and capricious standard, however, the court need not give complete deference to the administrator's decision to deny benefits...the court, therefore, must ' look not only at the result, - whether it is supported by reasons- but at the process by which the result was achieved" Freccia v. Conectiv, 379 F. Supp.2d 620,625 ( D. Del. 2004). The court may consider all evidence available to Conectiv during the appeals process, Id.

4. Under the heightened arbitrary and capricious standard of review, "the court need not accept the decision if the administrator uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits, and rejects the evidence that supports the granting of benefits", Id.

5. Under the process LINA used a self-serving approach to the evidence and selectively relied upon the evidence that supported a denial of benefits.  For example, it ignored the evidence that showed Mr. Roarty left on a business trip when he left on August 2, 2004.  It did not even discuss or address the e-mails that were attached to the appeal and established that Mr. Roarty was on a business trip when he left in his own car to go to the Bachrach Plant.  LINA conceded

for the first time at trial that Mr. Roarty was on a business trip when he left on August 2, 2004.
Tr, 114, 130-1. That concession was based upon the evidence set forth in the appeal and yet
LINA did nothing to investigate whether he was on an authorized trip other than to rely upon two
unverified e-mails which did not come from Mr. Roarty's place of work and which was to be
verified by managers at that place of work. That verification was never received by LINA. LINA
never disclosed to Mrs. Roarty that it had determined that Mr. Roarty left on a business trip on
August 2, 2004.

      6. The terms of the Plan are ambiguous because "trip authorization is not defined", Mem.
Op. p 2. "Whether terms in an ERISA Plan document are ambiguous is a question of law. A
term is 'ambiguous if it is subject to reasonable alternative interpretations'", Bill Gray
Enterprises, Inc. Health and Welfare Plan v. Gourley, 2001 U.S.App. LEXIS 7922, at * 26 ( 3d
Cir. 2001). "[I]f the plan language leads to two reasonable interpretations, courts may look to
extrinsic evidence to resolve any ambiguities in the plan document", Id. The terms of the Plan
were ambiguous and were subject to alternative interpretations. The evidence was that Mr.
Roarty could authorize his own trips and there were no policies or procedures in place at the
plant to govern authorization of business trips. Clearly, the trip that Mr. Roarty left on was for
purposes of business and he continued to engage in business for the majority of the trip,i.e.,
August 2 through August 4th. He went to the wedding which was incidental to his trip and ended
the personal deviation- which was a short distance from the plant- on August 7th and was
returning from his business trip when he was killed. He could have submitted reimbursements for
the business portion of the trip and Tyco would have reimbursed him for the trip out, the
expenses during August 2-4 and for the trip back. Mr. Lafonde obtained such reimbursements
and Tyco did not end the business trip if there was a personal deviation. It reimbursed employees

such as Mr. Lafonde for the return after the end of the deviation.  The denial ignored the extrinsic evidence that Tyco would reimburse employees for such trips even if there was a personal deviation in the middle of the trip.

7.  A claim for the benefits under section 502 (a)(1)(B), 29 USC § 1132 (a)(1)(B), is based upon the SPD when the SPD is in conflict with the plan document. As the evidence showed, the SPD was never amended to exclude the 24/7 coverage under the plan. Where there is a conflict, the SPD prevails and the SPD provided for coverage 24/7. Burstein v. Retirement Account Plan, 334 F. 3d 365 ( 3d Cir. 2003).

8. 29 USC § 1022 requires the summary of material modifications be sent to Mr. Roarty and written in average man language.  29 USC §1024 (b) requires disclosure to Mr. Roarty and defendants breached fiduciary duties by not providing such  notice, Leyda v. AlliedSignal, Inc. 322 F.3d 199 (2 Cir 2003); Baker v. Lukens Steel 793 F.2d 509 (3 Cir. 1986).

9 A claim for ERISA plan benefits under ERISA  § 502 (a)(1)(B) are contractual in nature and "in enforcing an SPD's terms, a participant does not need to plead reliance or prejudice, since the claim for plan benefits under ERISA  § 502 (a)(1)(B)[29 USC §1132 (a)(1)(B)] is contractual" Burstein M.D. v. Kasperbauer et. al. 334 F.3d 365, 382 (3d Cir. 2003).

10. "We join several other Circuits in ruling that when a summary plan description under ERISA conflicts with the complete, detailed ERISA plan document, a plan participant may nevertheless state a claim for plan benefits based upon terms contained in the summary plan description", Id 368.

11 Section 1132, supra provides that a plan participant my bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan'" Id. 372.

12. In <u>Burstein</u> the claim was, <u>inter alia</u>, that the Trustees "breached their fiduciary duties to Burstein in violation of ERISA §404(a), 29 USC §1104(a), by representing 'through the Plan Brochure, the SPD and or verbal communications', that if the Plan was terminated, all participants would automatically become vested and entitled to benefits", 373.

13. In this case, defendants breached their fiduciary duties under 502(a)(3)(B) 29 USC § 1132 by materially misrepresenting that Mr. Roarty was covered 24/7 upon which he detrimentally relied. The evidence is that no notice of any amendment to that coverage or to the SPD was provided to Mr.Roarty or even theTyco's HR Director, Lanny Tomberlin, who believed that Mr. Roarty was covered 24/7.

14. "To allege and prove a breach of fiduciary duty for misrepresentations, a plaintiff must establish each of the following elements: (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that representation; and (4) detrimental reliance by the plaintiff on the misrepresentation. <u>Daniels v. Thomas & Betts Corp.</u>, 263 F.3d 66, 73 (3d Cir. 2001)", <u>Burstein at</u> 384.

15.The misrepresentation as to coverage and the misrepresentations in the denial letter breach the fiduciary duties of the fiduciaries. The Plan Administrator is a fiduciary "for purposes of.. communicating with plan participants'' <u>Id</u> 385. The elements are "'proof of fiduciary status, misrepresentations, company knowledge of the confusion and resulting harm to the employees'", <u>Id</u> citing to <u>In re Unisys Corp. Retiree Medical Ben. ERISA</u> <u>Litigation</u>, 57F.3d 1255 (3d Cir 1995), <u>cert den</u>. 517 US 1103, 116 Sct 1316.; see also <u>Daniels v.Thomas & Betts Corp</u>. 263 F.3d 475 ( 3d Cir. 2000).

16. In this case, LINA is the Plan Administrator and TYCO is the plan sponsor. It is stipulated that LINA was a claim fiduciary within the meaning of 29 USC 1102 (21)(A)(iii) # 7.

In its opinion this Court stated at page 10: "It is not disputed that LICNA, as plan administrator exercising discretionary authority, is a fiduciary, and that LINA owed a fiduciary duty to Mrs. Roarty as a beneficiary of the plan", Op pg 10. "'<u>An employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a fiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and the beneficiary acted thereupon to his or her detriment</u>" Burstein 387 citing to <u>Adams v. Freedom Forge Corp.</u>, 204F.3d 475 (3d Cir 2000).

17.  In this case, the representation that Mr. Roarty was covered 24/7 was the SPD and that entitles him to plan benefits under 29 USC § 1132 (a)(1)(B); § 502 (a)(1)(B).  It was never changed pursuant to § 1022 or § 1024. <u>Burstein, supra.</u>

18. If the SPD was changed to eliminate the 24/7 coverage then it was misrepresented that he was covered on his trip and Mrs Roarty and Mr. Roarty considered him covered Tr.18.. Since there were no policies or procedures in place for documenting authorization and since Mr.Roarty was able to self-authorize his trip, Defendants misled the Roarties who relied upon those procedures and that ability in undertaking the trip to Pittsburgh.

19.  LINA misled and misrepresented the status and basis for the denial of her claims because it told her that it was waiting for information from Tyco and then denied her claim leaving her to believe that it had received that information.  In addition, it had the obligation to investigate the facts to determine whether Mr. Roarty was covered and it failed to do so. It misrepresented to the plan beneficiary that it had investigated whether he was covered and failed to disclose that it learned as late as April 2005 that the SPD had not been updated.  It also breached its fiduciary obligations by misrepresenting a basis for the denial of coverage- no reimbursement for the expenses of the trip- when it knew that that basis was never provided to it

during the investigation, was never set forth in the investigative record and was, in any event, false since expenses would have been reimbursed particularly when LINA conceded that Mr. Roarty had left on an authorized business trip. Tr. 114, 130-1.

20.  In <u>Local 56, United Food and Commercial Workers Union v. Campbell Soup</u> 898 F.Supp 1118 (D.NJ. 1995) the Court held that "where a plan administrator ..fails to provide information when it knows that it's failure to do so might cause harm, the plan administrator has breached its fiduciary duty to [plan participants and beneficiaries]'" 1140.  "A breach of fiduciary claim is based on the statutory disclosure requirements set forth in ERISA, 29 USC §§ 1102, 1021, and 1022.  "These statutes require that 'every benefit plan be established and maintained pursuant to a written instrument'" 1140.  "'A summary plan description of employee benefit plan is to be furnished to plan participants...which shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan'", 29 USC § 1022(a)(1), 1140. shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan'", 29 USC § 1022(a)(1). 1140.  <u>"Of course, a summary plan description 'must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries'"</u> citing to <u>Unisys and 29 CFR § 2520-102-2(b)</u>(1987) at 1141.

21. In addition, the evidence is that the summary of material modifications was not sent to the beneficiaries within 210 days of July 1, 2002.  The court in <u>Local 56,</u> quotes from the statute and says with respect to modifications: "It also requires plan administrators to issue a new SPD: [following a] modification or change described in § 1022 (a)(1) of this title, a summary description of such modification or change shall be furnished <u>not later than 210 days after the end of the plan year in which the change is adopted to each participant and to each beneficiary who is</u>

receiving benefits under the plan", 1141.   The evidence is that the SPD as of April 2005 had not

been updated. AR 244.

    22. In Baker v. Lukens Steel Company 793 F.2d 509 (3d Cir. 1986), the Special

Retirement Benefit was eliminated on December 15, 1982 effective January 1, 1983.  Lukens

admitted it did not notify former employees prior to their intended termination.  "ERISA requires

that the plan sponsor provide notice of any 'material modification' of the plan 'not later than 210

days after the end of the plan year in which the change is adopted to each participant "29 USC §

1022 (a)(1), 1024 (b)(1).

    23. "The disclosure requirements of ERISA are not empty suggestions for fiduciaries.

They amount to specific guidelines imposed for the purpose of ensuring that plan participants can

follow and gauge the availability and character of medical benefits plans, including the very

structure of the benefit plan itself which may impact on participants' rights.  Without adequate

information, a participant cannot know or enforce his or her rights to benefits or anticipate

alteration in benefits as were effected here by Defendant Company", Local 56 at 1143.

    24.  "The Third Circuit has emphatically stated in a very recent decision, the failure of

Plaintiffs' breach of contract claim due to the unambiguous language in the plan documents does

not foreclose the retirees' claims for relief based on a breach of fiduciary duty. In Re Unisys

Retiree Medical Benefit 'ERISA' Litigation, 58 F.3d 896, 1995 WL 380983 *10 at n. 13...Indeed

under Unisys A, such an action may be maintained pursuant to 502 (a)(3)(B) of ERISA, 29 USC

§ 1132 (a)(3)(B). The statutorily defined role of the fiduciary requires that a 'fiduciary shall

discharge his duties with respect to a plan solely in the interest of the participants and

beneficiaries'", 29 USC § 1104 (a)(1). Pursuant to ERISA fiduciaries must strive to inform plan

participants and beneficiaries of important specific information...As a result, the Circuit has held

that as a fiduciary exercised these duties it 'may not materially mislead those to whom the duties

of loyalty and prudence...are owed...For instance, a fiduciary 'may not make affirmative material

misrepresentations to plan participants about changes to employee benefit plans'", <u>Fischer,</u> 994

F.2d at 135. Similarly, the court held in <u>Bixler v. Central Pa. Teamsters Health and Welfare</u>

<u>Fund,</u> 12 F.3d 1292, 1300 ( 3rd Cir. 1994), the duty to inform 'entails not only a negative duty to

misinform, but also an affirmative duty to inform when the trustee knows that silence might be

harmful'. See also <u>Curcio v. John Hancock Mutual Life Insurance Co.</u>, 33 F.3d 226 (3d Cir.

1994).  Thus,   the Circuit has concluded that 'where a plan administrator...fails to provide

information when it knows that its failure to do so might cause harm, the plan administrator has

breached its fiduciary duty to [plan participants and beneficiaries]", <u>Local 56</u> at 1140.

     25.  The SPD and the denial letters all contained misinformation which harmed the

beneficiaries and plan participants. "Without adequate information, a participant cannot know or

enforce his or her rights to benefits or anticipate alterations in benefits..." Supra, 1143

     26."This may be a case where a substantive remedy should be available for violation of

ERISA's reporting and disclosure requirements, See <u>Ackerman v. Warnaco, Inc.,</u> 55 F.3d 117

(3d. Cir. 1995) 1143.

     27. In <u>Sereboff v. Mid Atlantic Medical Services, Inc.</u>, 2006 U.S. LEXIS 3954, *14 (U.S.

2006) the Court held that "ERISA provides for equitable remedies to enforce plan terms, so the

fact that the action involves a breach of contract can hardly be enough to prove relief is not

equitable; that would make § 502(a)(3)(B)(ii) an empty promise.  This Court in <u>Knudson</u> did not

reject Great-West's suit out of hand because it alleged a breach of contract and sought money,

but because Great-West did not seek to recover a particular fund from the defendant." <u>See</u> <u>id</u> at

*14.  In <u>Sereboff</u>, unlike those found in <u>Great-West,</u> the funds that were sought were in the

defendant's possession, and not held in trust, equitable restitution is a remedy available under §502(a) (3) (B).

28. Plaintiff's request for "such other and further relief, legal or equitable, as may be just and appropriate" entitles her to recover other equitable relief that may be appropriate for Defendant's breach of its fiduciary duties in addition to equitable restitution, i.e., the removal of the current fiduciary, specific performance of the plan, an accounting for profits or a constructive trust. See Skretvedt v. E.I. duPont de Nemours, 372 F.3d 193 (3d Cir. 2004).

29. The Supreme Court has held that a beneficiary who is denied benefits under an ERISA plan may seek equitable restitution under § 1132(a)(3)(B) for a breach of fiduciary duty. See Great-West Life & Annuity Ins. v. Knudson, 534 U.S. 204, 213, 122 S. Ct. 708, 151 L.Ed. 2d 635 (2002)(noting that equitable restitution is available to a plaintiff under § 1132(a)(3)(B)); Michaels v. Breedlove, 2004 U.S. App. LEXIS 25165, at *5-6 (3d Cir. 2004)(same); Fox v. Herzog, 2005 U.S. Dist. LEXIS 36414, *9 (D.N.J. 2005)(same).

30. Attorneys fees and prejudgment interest are recoverable under 29 USC § 1132 (g)(1), Ursic v. Bethlehem Mines, 719 F.2d 670 (3d Cir. 1983); Monkelis v. Mobay Chemical, 827 F.2d 935, 937 ( 3d Cir. 1987), Anthius v. Colt Indus. Operating Corp., 971 F.2d 999 (3d Cir 1992). "Awarding prejudgment interest is intended to serve at least two purposes: to compensate prevailing parties for the true costs of money damages incurred, and, where liability and the amount of damages are fairly certain, to promote settlement and deter attempts to benefit from the inherent delays of litigation. Thus prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable" Anthius at 1010. Attorneys' fees are also awarded and should be awarded in this case: the Defendants' culpability is significant since they did not disclose the changes to the SPD and made

misrepresentations to the Plaintiff, while failing to conduct any meaningful investigation; they have the ability to pay such an award; they and others will be deterred from such conduct; Plaintiff has taken great costs and effort to resolve a serious ERISA issue; and Plaintiff has been without her money and money for her children for almost four years and the relative merits of her claim clearly outweigh the merits of the Defendants' position.

## CONCLUSION

Based on the facts and the law which supports those facts, Plaintiff prays for an Order granting judgment in her favor and , _inter alia_, awarding her the $500,000 of Plan benefits together with attorneys' fees, pre and post judgment interest and costs and such other and further relief as may be appropriate under the circumstances.

Respectfully submitted,

/s/ Richard R. Wier, Jr.

_____
Richard R. Wier, Jr. # 716
Michele D. Allen # 4359
Richard R.Wier, Jr. P.A.
Two Mill Rd., Suite 200
Wilmington, DE 19806
302-888-3222
*Attorneys for Plaintiff*

Dated: June 20, 2008