**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KELLY ROARTY | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-0195-GMS |
| | : | |
| TYCO INTERNATIONAL LTD. GROUP | : | |
| BUSINESS TRAVEL ACCIDENT | : | |
| INSURANCE PLAN, an employee | : | |
| welfare benefit plan, and | : | |
| LIFE INSURANCE COMPANY OF | : | |
| NORTH AMERICA, Plan Administrator, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Defendants Tyco International Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America submit the instant proposed findings of fact and conclusions of law that demonstrate that the decision to deny Plaintiff's claim for business travel accident benefits was a reasonable one, supported by substantial evidence and should be affirmed by this Honorable Court as such.

**PROPOSED FINDINGS OF FACT**

**Parties and individuals**

1.      Tyco International, Ltd. ("Tyco") sponsors and maintains an employee welfare benefit plan (the "BTA Plan") providing covered employees with a death benefit pursuant to the terms of the Plan should they die an accidental death while engaged in business travel on Tyco's behalf.  AR 0001-0047.[1]

2.      Tyco has about 250,000 employees worldwide.  Trial Transcript ("TT") 93.

---
[1] Reference to Trial Exhibit One, which contains the Administrative Record, is in the form "AR____."

3.    While Tyco sponsors and maintains the BTA Plan for the benefit of its employees, it does not fund plan benefits or underwrite those benefits with insurance.  AR 0001-47; Trial Exhibits 6, 7 and 10.

4.    Life Insurance Company of North America ("LINA") underwrote the BTA Plan's benefits and was claim fiduciary to the plan.  AR 0001-0047.

5.    LINA is responsible to pay covered BTA claims, and the Tyco Benefit Plan is not.  AR 0001-47; Trial Exhibits 6, 7 and 10.

6.    Tyco acquired Scott Instruments ("Scott")  in late 2000 or early 2001.  TT 60.

7.    Daniel Roarty was employed by Scott as a Senior Product Manager and was a covered employee under the BTA Plan.  TT 5.

8.    Scott Instruments did not have a formal travel policy, plan or procedures.  TT 9.

9.    Bob Bierzynski was Daniel Roarty's co-worker at the Scott facility in Exton, Pennsylvania.  After the general manager of the facility was terminated, Mr. Roarty reported to Bierzynski on a dotted-line basis if he needed something.  TT. 52-53.

10.    Plaintiff Kelly Roarty is the widow of Daniel Roarty and his beneficiary under the BTA Plan.  Trial Exhibit AR 0053.

11.    Lanny Tomberlin was the Tyco Human Resources director assigned to the Scott facility in Exton in August 2004.  Exhibit D9, p. 19.

12.    Kathee Beauchesne is a Tyco employee responsible for the cash management of all U.S. health and welfare benefits.  Her department is responsible for the printing and distribution of the Tyco Benefit Plan's summary plan description ("SPD") and summaries of material modifications ("SMM").  T 71, 88.

13.    Brian Billeter is the accident claim manager of Life Insurance Company of North America ("LINA").  T 99.

**The BTA Plan**

14.    The BTA Plan provides in relevant part that:

> [The Plan] will pay the benefits described in the policy for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
>
>> a) away from your premises in his city of permanent assignment; and
>> b) on business for you, and in the course of your business.
>
> All trips must be authorized by you.
>
> This coverage does not include:
>
>> a) commuting between the person's home and place of work; or
>> b) during personal deviations made by the covered person.
>
> "Personal deviation" as used here, means an activity that is not reasonably related to your business, and not incidental to the business trip.
>
> This coverage will start at the actual start of a trip.  It does not matter whether the trip starts at the covered person's home, place of business, or other place.  The coverage will end when the covered person:
>
>> a) arrives at his home or place of work, which ever happens first; or
>> b) makes a personal deviation.
>
> AR 0002.

15.    The BTA Plan also states that:

> The Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has applied the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims.  In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.  All decisions made by the Insurance Company in this capacity shall be final and binding on participants and beneficiaries of the Plan to the full extent permitted by law.
>
> The Insurance Company has no fiduciary responsibility with respect to the administration of the Plan except as described above.  It is understood that the Insurance Company's sole liability to the Plan and to the Participants

and Beneficiaries under the Plan shall be for the payment of benefits provided under this Policy.

AR 0036.

16.    Eligibility for BTA benefits is premised on several mandatory elements: (1) the insured must be a Tyco employee covered under the Plan; (2) the insured must have been engaged in a trip or short stay away from Tyco's premises in his city of permanent assignment; (3) the insured must have been traveling on business for Tyco **and** in the course of Tyco's business; (4) Tyco must have approved the trip; and (5) the insured must be involved in a fatal accident while engaged in the business that Tyco approved.

AR 0002.

17.    Under the BTA Plan, Daniel Roarty's beneficiary would become entitled to a benefit of $500,000 upon the event of his death in a manner covered by the plan.  AR 0010.

**The SPD and Statements of Material Modifications**

18.    Ms. Beauchesne is familiar with the plan documents governing Tyco health and welfare plans. TT.71.

19.    Ms. Beauchesne identified the 2002 Tyco SPD and explained that it was printed and distributed in 2002 based on the code FYB2002 on the back cover.  TT 7; Trial Exhibit 6.

20.    The 2002 Tyco SPD replaced the 2000 Tyco SPD.  Trial Exhibit 10.

21.    The 2000 Tyco SPD had stated "[n]o person has the authority to make any verbal statements of any kind at any time that are legally binding for Tyco or any Tyco employer or alter the official plan documents and contracts maintained in conjunction with the plans" and that "Tyco reserves the right to amend, modify, terminate, or discontinue any or all of the plans described in this SPD at any time at its sole discretion."  Trial Exhibit D10, inside cover.

22. The 2002 SPD states that "[n]o person has the authority to make any verbal statements of any kind at any time that are legally binding for Tyco or any Tyco employer or alter the official plan documents and contracts maintained in conjunction with the plans." Trial Exhibit D6, inside cover.

23. The 2002 SPD states that "Tyco reserves the right to amend, modify, terminate, or discontinue any or all of the plans described in this SPD at any time at its sole discretion." Trial Exhibit D6, inside cover.

24. Tyco's fiscal year is October 1st to September 30th. TT 91.

25. The 2002 SPD advised Tyco employees that through July 1, 2002 the insurer underwriting BTA Plan benefits was the AIG Life Insurance Company and detailed the terms of the BTA Plan as set forth in the AIG policy. TT 89-92.

26. Tyco issued a Summary of Material Modifications with an effective date of July 1, 2002 to notify its employees that Tyco had changed the insurance carrier of the BTA Plan to CIGNA Group Insurance, and to inform employees of the new insurer's address, telephone number and policy number. TT 74; Trial Exhibit 7.

27. The 2002 SPD stated underneath the BTA benefits that it was "subject to change July 1, 2002". This was in effect the same announcement as the 2002 SMM. TT 92.

28. The Tyco Benefit Plan SPD captures all changes to all benefit plans that Tyco sponsors that have occurred since the last publication of an SPD. TT 90.

29. A Tyco employee reading the description of BTA benefits in the 2002 SPD to determine if they were covered would have been advised that the terms of the plan were subject to change. TT 96.

30. The LINA policy number is ABL661690, which became effective on July 1, 2002. TT 99; AR 0001.

31. One purpose of the SMM was to advise Tyco employees of changes made to the BTA Plan prior to the Tyco Benefit Plan's SPD next publication in 2007.  T 91.

32. Tyco distributes all SPDs and SMMs via mass-mailing through a fulfillment house.  TT 75.

33. Tyco used a mass-mailing company named Relizon, which is based in Maine, as its fulfillment house to distribute the 2002 SPD and SMM to all active Tyco employees.  TT 75.

34. Tyco provided Relizon with a mailing list of all active Tyco employees as compiled by Tyco Human Resources.  TT 75.

35. The Tyco mailing list is a compilation of the payroll addresses of all active Tyco employees.  TT 75-76.

36. The 2002 SPD and SMM were distributed in the fall of 2002 in time for annual enrollment for Tyco's 2003 benefit plan year, which coincides with Tyco's fiscal year. TT 91, 97-98.

37. Ms. Beauchesne confirmed with Relizon the mailing of the 2002 SPD and SMM had in fact been completed.  TT 83-87.

38. While not sure of a precise date, Ms. Beauchesne stated that SPDs and SMMs were mailed promptly and included information that the Tyco Benefit Plan wanted employees to have in time for the Plan's October 1, 2002 open enrollment date.  TT 91, 97-98.

39. Mr. Roarty was an active Tyco employee in 2002.  He maintained the same residence from 2000 through the date of his death.  TT 51.

40. Plaintiff admitted that she and Mr. Roarty received W-2 payroll tax forms that Tyco mailed to them at their residence.  TT 51.

41.    Bob Bierzynski, Mr. Roarty's co-worker, recalled receiving notice some time before 2004 that the terms of the BTA Plan had changed from 24-hours/7-days a week coverage to business-travel-only coverage.  Trial Exhibit 9, pp. 22-23.

42.    A new and updated SPD was printed in the fall of 2007 and captures all changes to Tyco's benefit plans from 2002 to that date.  TT 90.

**The facts/circumstances leading up to the accident and/or trip**

43.    In the fall of 2003, the Roartys were invited to the wedding of Daniel Roarty's niece, which was to be held in the Pittsburgh area on Saturday, August 7, 2004.  TT 6, 37.

44.    Mr. Roarty planned to vacation in Pittsburgh the week leading up to the prior to the family wedding.  TT 40.

45.    He planned to work until Friday, July 30, 2004 and return on Monday, August 9, 2004.  TT 40.

46.    In early 2004, Tyco contracted with a production plant (Bachrach Plant) in Pittsburgh, Pennsylvania for sensor equipment to be delivered to Tyco on April 20, 2004 for customer distribution.  AR 0054.

47.    In late June 2004, one of Tyco's customers complained that the sensors were overdue, and the Bachrach Plant did not provide a sufficient explanation for its lateness.  AR 0054.

48.    In July 2004, Mr. Bierzynski was made aware of the situation.  AR 0054.

49.    On or about July 30, 2004, Mr. Roarty advised Mr. Bierzynski and others that, as part of his vacation, he intended to take part of a day to visit the Bachrach Plant to discuss the issues.  AR 0055.

50.   He specifically wrote in a July 30, 2004 e-mail that "*I will be in Pittsburgh next week on vacation.  Regis [Wyse] is going to set up a day for me to go into the Bachrach plant and find out why the sensor is taking so long to build.*"  (emphasis added).  AR 0090.

51.   According to Plaintiff, the Roartys had been planning this vacation for approximately one year.  TT 6, 37.

52.   Mr. Wyse arranged a meeting for Mr. Roarty and Bachrach personnel for August 3, 2004.  TT 8.

53.   Mr. Roarty and his family departed Delaware on Monday, August 2, 2004 for Pittsburgh.  TT 8.

54.   However, Mr. Roarty learned while en route to Pittsburgh that the meeting had been cancelled and was tentatively rescheduled for Thursday, August 5, 2004.  TT 8.

55.   When they arrived at Pittsburgh, the Roartys stayed with Mr. Roarty's friends from high school.  TT 8.

56.   On Tuesday, August 3, Ms. Roarty recalls that they may have visited the museums in Pittsburgh.  Mr. Roarty joined his family for this.  TT 41-42.

57.   On Wednesday, August 4, Ms. Roarty believes that the family spent the day shopping.  TT42-43.

58.   On or before Wednesday, August 4, 2004, Scott Instruments and Bachrach resolved their issues.  The meeting for the next day was cancelled and Mr. Roarty had no other business reason to remain in Pittsburgh.  TT 41-44.

59.   While in Pittsburgh, Mr. Roarty made business related telephone calls and responded to business related email.  TT 43.

60.     Plaintiff admits that Mr. Roarty was not required to work through his vacations and was not required to answer business telephone calls and email while on vacation but did because he chose to.  TT 43.

61.     Plaintiff admits that, had Mr. Roarty left his computer home, there was no reason to believe that Tyco would have fired or reprimanded him.  T 43-44.

62.     Mr. Roarty never traveled from his vacation residence to the Bachrach plant.  TT 41-44.

63.     The next day, Thursday, August 5, the day after any chance of a business meeting had ended, the family went to Kennywood, a major amusement park in Pittsburgh.  Mr. Roarty joined his family at the amusement park.  TT 44.

64.     On Friday, August 6, the family prepared for the wedding and attended the rehearsal dinner.  Mr. Roarty attended the dinner.  TT 44-45.

65.     On Saturday, August 7, 2004, Mr. Roarty attended his niece's wedding.  TT 45.

66.     On August 8, 2004, Mr. Roarty began his return home from vacation.  AR 0056.

**The facts surrounding the accident**

67.     On August 8, 2008, Daniel Roarty died as the result of a motor vehicle accident in Lancaster County, Pennsylvania while returning to his home in Newark, Delaware from Pittsburgh, Pennsylvania.  Trial Exhibit 3, DEF 260.

**The facts after the accident**

68.     Mr. Bierzynski went to Hershey Medical Center to advise Plaintiff of the employee benefits that he had been informed would become due to her as the result of Mr. Roarty's death.  Trial Exhibit 9, p. 17.

69.     Prior to Mr. Bierzynski's visit, Mr. Tomberlin had informed him that Mr. Roarty's death was covered under the BTA Plan as it covered employees 24 hours a day, 7 days a week.  Trial Exhibit 9, p. 19.

70.     Mr. Bierzynski had no independent knowledge of the terms of the BTA Plan prior to his conversation with Mr. Tomberlin.  Trial Exhibit 9, p. 17-18.

71.     Plaintiff admits that Mr. Tomberlin contacted her about two weeks after Mr. Roarty's death to acknowledge that he had been in error when he said she would be entitled to Tyco BTA Plan benefits.  TT 22.

**Claims submission to the Tyco Benefits Center**

72.     The Tyco Benefits Center first began to deal with Plaintiff's claim on August 10, 2004.  Trial Exhibit 2, DEF 207.

73.     Kelly Roarty filed a claim for benefits on or about September 3, 2004 with supporting documents.  AR 0056.

74.     On September 15, 2004, Tyco benefits representative Felicia Johnson spoke with Ms. Roarty over the phone to discuss Ms. Roarty's questions.  Trial Exhibit 2, DEF 216.

75.  During that conversation, Ms. Roarty asked Ms. Johnson to send her a copy of the BTA policy.  Ms. Johnson informed her that she was not eligible for those benefits.  Trial Exhibit 2, DEF 216.

76.  Ms. Johnson advised Ms. Roarty on more than one occasion that Tyco had concluded that she was not eligible for BTA benefits because he had not been engaged in business travel when he died.  TT 47.

77.  The next day, Ms. Roarty spoke with Tyco benefits administrator Nicole Gibian, who also advised her that she was not eligible for BTA benefits.  TT 47-48.

78.  Tyco manager Bob Bierzynski informed Tyco Human Resources that Mr. Roarty had been going to Pittsburgh on vacation and may have mentioned that while on vacation Mr. Roarty had an intention to visit the Bachrach plant.  Trial Exhibit 9, p. 45.

79.   According to Bierzynski, only that portion of Mr. Roarty's trip taken to come and go to the Bachrach plan would have been considered a business trip, and his vacation travels would not be a business trip.  Trial Exhibit 9, p. 42.

80.  Bierzynski advised Tyco HR that Mr. Roarty was on vacation on the week before his death while he was in Pittsburgh.  Trial Exhibit 9, p. 45.

81.  On November 18, 2004, Ms. Johnson forwarded Ms. Roarty's claims to LINA.  AR 0056.

82.  Also on November 18, Ms. Johnson received the police report and newspaper clippings of the accident and contacted Tyco human resources representative Jennifer Napier to request a statement as to whether Mr. Roarty had been engaged in business travel at his death.  Trial Exhibit 2, DEF 224.

83.  Before LINA had received the claim, the Tyco benefits center had independently concluded that Mrs. Roarty was not entitled to BTA benefits because her husband was

not engaged in business travel when he died and had advised her of its conclusion on multiple occasions.  TT 47-49; Trial Exhibit 2, DEF 216, 217.

**LINA's investigation and claim determinations**

84.  On November 22, 2004, LINA received Ms. Roarty's claim.  AR 0142.

85.   LINA assigned the claim to Marcy Miller, a LINA claim accident specialist, who was responsible to claims submitted on behalf of Tyco employees and their beneficiaries.  TT 109.

86.  On November 24, 2004, Ms. Miller wrote to Plaintiff to acknowledge receipt of the claim.  AR 0142.

87.  On the same day, Ms. Miller advised Ms. Johnson that she would be handling the claim.  AR 0143.

88.  Ms. Miller requested a copy of Mr. Roarty's business travel itinerary from Ms. Johnson.  She also wrote an introductory letter to Plaintiff.  AR 0143.

89.  Ms. Miller also corrected Plaintiff's claim for $50,000 in BTA benefits to claim the $500,000 that was potentially due.  TT 100; AR 0143.

90.  Ms. Miller and Ms. Johnson thereafter engaged in a series of telephone conversations, e-mails and faxes to discuss the issues related to Plaintiff's claims.  AR 0131, 0134, 0136, 0139, 0141, 0143; Trial Exhibit 2, DEF 228, 229.

91.  For example, Ms. Johnson e-mailed Ms. Miller on December 6, 2004 to advise that Mr. Roarty's human resources representative would fax a letter if Mr. Roarty had been engaged in business travel when he died.  AR 0139.

92.  On December 14, Ms. Miller wrote to Plaintiff to advise that her claim for group accidental death benefits had been approved.  AR 0137-38.

93.     According the Mr. Billeter, in order to be eligible to receive group accidental death benefits, Plaintiff had to establish that Mr. Roarty had died accidentally and was enrolled in the Tyco accidental death plan.  Her claim form established these facts.  TT 101.

94.     In total, LINA paid Plaintiff the sum of $168,000 in various accidental death benefits.  T 102.

95.     On December 14, she also pursued Ms. Johnson again to inquire whether there had been any information to confirm Mr. Roarty had been engaged in business travel.  AR 0136.

96.     Ms. Johnson immediately referred the question to Ms. Gibian, explaining the urgency in confirming whether he had been engaged in business travel.  AR 0134.

97.     The next day, Ms. Gibian wrote to advise that "Mr. Roarty was NOT engaged on business travel at the time of the accident that caused his death."  AR 0130.

98.     Accordingly, on December 17, 2004, LINA denied the BTA benefits claim in a letter from Ms. Miller to Plaintiff, explaining why the benefits did not apply.  AR 0107.

99.     Specifically, Ms. Miller explained that Tyco had confirmed that Mr. Roarty had not been engaged in business travel at the time of the accident that caused his death.  AR 0115-117.

100.    Ms. Miller attached the pertinent provisions of LINA BTA policy No. ABL661690.  TT 107; AR 118-20.

**The Appeal**

101.    On February 12, 2005, Plaintiff appealed from the decision denying her BTA benefits. AR 0056.

102.    While Mrs. Roarty had in her possession a series of emails that related to the Bachrach sensor problem since September 2004, she did not provide them to Tyco or LINA prior

to her appeal despite the fact that Tyco benefits representatives had advised Plaintiff that she was not entitled to BTA.  TT 56-58.

103.  In her appeal letter, Plaintiff explained how Mr. Roarty had become involved in the issues at the Bachrach plant and how he had volunteered to visit the plant while in the area on vacation.  AR 0084-88.

104.  Plaintiff explained that she and her husband planned to leave for Pittsburgh on August 2, 2004 in case the Bachrach meeting scheduled for August 3rd occurred.  This was slightly in advance of their pre-planned departure.  TT 40-41; AR 0084-88.

105.  Plaintiff also explained that Mr. Roarty had used his cell phone and computer, making business related calls and checking email messages.  TT 8.

106.  Mr. Bierzynski, who was Mr. Roarty's *de facto* supervisor, testified that he received business related cell phone calls outside normal business hours and answered as he saw fit.  TT 12-13.

107.  Mr. Billeter received the appeal letter and assigned it for investigation, handling and further assignment to Robert Killmer, a LINA Technical Specialist.  TT 108.

108.  Mr. Billeter met with Mr. Killmer to discuss the appeal and to give him direction on how to proceed.  TT 108.

109.  Mr. Billeter advised Mr. Killmer to seek guidance from LINA's underwriting and legal departments, and also to go back to Tyco and verify that they were still of the opinion that Mr. Roarty was not engaged in business travel at the time of his death.  TT 108-09.

110.  Mr. Killmer contacted Ms. Johnson on March 1, 2005 to re-confirm that Mr. Roarty had not been traveling on business.  TT 109; AR0078.

111.  Ms. Johnson returned his call on March 11, 2005 and confirmed that Mr. Roarty had not been on business travel at the time of his death.  TT 109; AR0076.

112. Ms. Johnson also volunteered to secure a second written confirmation by Mr. Roarty's local management, which LINA could expect in a week or so. AR 0076.

113. On February 28, 2005, Mr. Killmer sought guidance from LINA's Accident Underwriting for their opinion of whether the LINA BTA policy would have provided coverage under the factual circumstances of Mr. Roarty's travel. TT 109; AR 0079.

114. Dan Berenbaum, Assistant Vice President for LINA's Accident Underwriting, wrote to indicate his agreement with the initial claim decision, concluding that Mr. Roarty had died while traveling on return from his vacation. Coverage would have existed only while traveling to and from the Bachrach meeting, had one occurred. AR 0079.

115. At the same time, Mr. Killmer sought advice of LINA in-house counsel in relation to Plaintiff's appeal. AR 0073-74.

116. On March 21, 2005, LINA in-house counsel provided an opinion in which counsel reviewed the facts of the claim as set forth in the administrative record, the terms of the LINA policy and concluded that Mr. Roarty had not been engaged in business travel under all of the circumstances of the claim. AR 068-71.

117. LINA uses a system of support called "Desk Buddies" in which everyone in the claim office had a buddy that they supported and who supported them when, for example, they were away from the office. TT 135.

118. Mr. Billeter was Mr. Killmer's desk buddy. TT 135.

119. On March 24, 2005, Mr. Killmer was on vacation and the claim office had recently received a legal opinion by LINA in-house counsel with regard to Plaintiff's claim. TT 121.

120.  Mr. Billeter reviewed the administrative record that LINA compiled with regard to Plaintiff's claim at least for a couple of hours and familiarized himself with the facts of the claim.  TT 103, 123; AR 0001-206.

121.  During his review, Mr. Billeter noted that Ms. Miller had followed up with Tyco to find out whether Mr. Roarty was considered to be on business at the time of his accident and to get some background information on what that business was.  TT 106.

122.  Mr. Billeter also noted in his review that Tyco had confirmed in writing that Mr. Roarty had not been engaged in business travel at the time of his death.  TT 106 AR 0130.

123.  Mr. Billeter reviewed the facts of the claim, Tyco's prior consistent statements that Mr. Roarty had not been traveling on business on its behalf when he died, and the guidance provided by LINA's underwriting and legal departments to conclude that Mr. Roarty had not been on business travel at the time of the accident.  TT 112-114.

124.  Mr. Billeter considered the following factors to be important in reaching his conclusion:

   a.  Tyco confirmed that Mr. Roarty had not been engaged in business travel on its behalf when he died.  TT 112.

   b.  The Roartys had already planned to travel to Pittsburgh for vacation and a wedding at the same time as the proposed business trip.  TT 112-13.

   c.  The Roartys had planned to spend Saturday, July 31 and August 1, 2004, working on their house before they left for Pittsburgh.  TT 113.

   d.  The vendor meeting, if it had ever happened, would have taken up only a small portion of his time.  TT 113.

   e.  It was reasonable to believe that Mr. Roarty left for Pittsburgh on business travel for a business meeting and personal reasons.  TT 113.

f.  On Monday, Mr. Roarty found out that the meeting was being rescheduled for Thursday and by Wednesday knew that there would be no business meeting at all. TT 113.

g.  When the meeting was cancelled or on before August 4, Mr. Roarty had no business reason to remain in Pittsburgh but did remain there until August 8. TT 113.

h.  The only reason Mr. Roarty remained in Pittsburgh after that date was the same reason as he had previously planned – vacation and to attend a wedding. TT 113.

i.  If Mr. Roarty had wished to maintain BTA coverage while he traveled, he would have had to return home. TT 113.

j.  Much of this information had been supplied by Mrs. Roarty. TT 113-14

k.  Tyco had provided the information that Mr. Roarty had not been engaged in business travel when he died, both in writing and in conversation with LINA. TT 114.

125.  Under the terms of the Tyco BTA Plan and the LINA policy, a business trip does not have to have a return leg, and can be open-ended. TT 126.

126.  Mr. Billeter concluded that to the extent Mr. Roarty can be said to have traveled to Pittsburgh in part on business, his business trip was an open-ended one that did not have a return portion because he continued to stay after any business reason ended, solely for personal reasons. TT 126.

127.  Mr. Billeter reviewed the telephone log of Mr. Killmer's March 11, 2005 telephone conversation with Ms. Johnson in which she stated "again that Mr. Roarty was not on business travel" and had asked that [the office where he worked] fax another statement to confirm the fact that he was on a personal vacation at the time of the claimed accident." AR 0076.

128. Mr. Billeter understood Ms. Johnson to be promising a letter that would say, as the prior Tyco letter had said, that Mr. Roarty had not been engaged in business travel when he died. TT 133; AR 0076; AR 0130.

129. Mr. Billeter testified that he believed that the second confirming letter promised by Tyco on March 11th would have served to strengthen LINA's defenses to Plaintiff's claim. TT 133.

130. Regardless, Mr. Billeter did not wait for the promised second written confirmation from Tyco and prepared a letter to Plaintiff that advised her that her appeal had been denied. TT 133-134.

131. Mr. Billeter believed that in doing so, he was acting in Plaintiff's interests and not LINA's by not unduly delaying a response to her appeal. TT 133.

132. LINA explained its decision: "Felicia Johnson from Tyco verified once more, on March 11, 2005, that Mr. Roarty was not considered to be on business travel from Tyco International at the time of his motor vehicle accident, on August 8, 2004." AR 0066.

133. Mr. Billeter elected not to delay the claim further only to await receipt of a duplicative written confirmation of this statement. TT 133-134.

134. On or about April 7, 2005 Tomberlin re-confirmed to Ms. Johnson in a telephone conversation that Mr. Roarty was not on business travel when he died. Trial Exhibit 2, DEF 242-244.

135. In total, Tyco representatives confirmed to Plaintiff and/or LINA on at least five separate occasions, orally and in writing, that Mr. Roarty had not been engaged in business travel on its behalf when he died. Trial Exhibit 2, DEF 216, 217; AR 0076, 0130, 0139.

136.    No one from Tyco or LINA ever expressed to Plaintiff that they did not believe her
        narrative of the facts or to challenge the accuracy of her presentation of her claim in her
        appeal.  TT 46.

## PROPOSED CONCLUSIONS OF LAW

### STANDARD OF REVIEW

1.      The parties agree, and this Honorable Court has previously found, that the Tyco BTA
        Plan delegates authority and discretion to LINA with respect to administration of the
        Plan.  *Roarty v. Tyco Intern. Ltd. Group Business Travel Accident Insurance Plan*, No. 06-195
        (GMS), 2008 WL 794278, *5 (D. Del. 2008).

2.      When an ERISA benefit plan confers discretionary authority upon an administrator or
        fiduciary, the Court reviews the fiduciary's claim decision under an arbitrary and
        capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Mitchell
        v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir. 1997) (stating that plans providing for
        the delegation of discretion "are to be afforded deference").

3.      The deferential standard of arbitrary and capricious is tantamount to an "abuse of
        discretion standard."  *Cord v. Reliance Standard Life Ins. Co.*, 362 F. Supp.2d 480, 484 (D.
        Del. 2005) (citing *Nazay v. Miller*, 949 F.2d 1323, 1336 (3d Cir. 1991)).

4.  "Under this deferential standard of review, the court may overturn the decision only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Roarty v. Tyco Intern. Ltd. Group Business Travel Accident Insurance Plan*, No. 06-195 (GMS), 2008 WL 794278 (D. Del. 2008) (citing *Abnathya v. Hoffman-LaRoche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993)).

5.  The court may not overturn the administrator's decision unless it is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. *Cord*, 362 F. Supp.2d at 484 (citing *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000)).

6.  As such, a reviewing court "is not free to substitute its own judgment for that of the defendant's in determining eligibility for plan benefits." *Id.* (citing *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993)).

7.  When an insurance company acts as both administrator and funder, a conflict of interest arises such that the arbitrary and capricious standard will be applied with heightened scrutiny. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000).

8.  The burden to show that this modified standard of review is warranted is on the claimant. *Marciniak v. Prudential Financial Ins. Co. of Am.*, 184 Fed. Appx. 266, 268 (3d Cir. 2006) (citing *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp.2d 612, 617 (E.D. Pa. 2003)).

9.  "[U]nless specific evidence of bias or bad-faith has been submitted . . . the [plans] are reviewed under the traditional arbitrary and capricious standard." *Bill Gray Enterprises, Inc. Employee Health & Welfare Plan v. Gourley*, 248 F.3d 206, 216 (3d Cir. 2001) (citing *Pinto*, 214 F.3d at 383).

10.    Even when a court modifies the arbitrary and capricious standard, the amount of heightened scrutiny is measured on a sliding scale. *See Pinto*, 214 F.3d at 379.

11.    The degree of deference depends "on the apparent seriousness of the conflict" and will be decreased to "neutralize any untoward influence resulting from the conflict." *Id.* at 391 (citing *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80, 87 (4th Cir. 1993)).

12.    When insurer conflict of interest is merely trivial, only a minimal increase in scrutiny is appropriate. *Post v. Hartford Ins. Co.*, 501 F.3d 154 (3d Cir. 2007) (citing *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 254-55 (3d Cir. 2004)).

13.    Regardless of which form of the arbitrary and capricious standard is employed by the Court, it is "limited to the evidence that was before the administrator when [it] made the decision being reviewed." *Freccia v. Conectiv*, 379 F. Supp 620 (D. Del. 2004) (citing *O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F. Supp2d 303, 309 (D.N.J. 2000) (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997)); *Russell v. Paul Revere Life Ins. Co.*, 148 F. Supp.2d 392, 405 (D. Del. 2001)).

14.    The Tyco Benefit Plan had no financial stake in the outcome of Plaintiff's claim, and as a result, was not conflicted in its decision-making process.

15.    Plaintiff has offered no evidence to demonstrate that Tyco acted under a conflict of interest in its investigation of her claim or its ultimate decision that Mr. Roarty was not traveling on its business when he died.

16.    The Court reviews the Tyco Benefit Plan's decision under an arbitrary and capricious standard without heightened scrutiny due to the absence of conflict.

17.    The Tyco Benefit Plan's conclusion that Mr. Roarty was not traveling on its business when he died was a reasonable one, and is supported by substantial evidence.

## TYCO'S RIGHT TO AMEND ERISA WELFARE BENEFITS

18. Death and accident benefits, as defined by the Tyco SPD and the LINA policy, satisfy the definition of an "employee welfare benefit." 29 U.S.C. § 1002(1)(A).

19. An ERISA employer is generally free to modify or terminate a welfare benefit without prior notice to employees. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co.*, 188 F.3d 130, 137 (3d Cir.1999).

20. "[A]n employer's decision to amend or terminate an employee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administration." *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1162 (3d Cir. 1990).

21. ERISA welfare benefits do not accrue, nor do plan participants become vested in such benefits, without an express employer commitment to do so. *Unisys Corp. Ret. Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 901 (3d Cir. 1995).

22. Because the vesting of welfare benefit plans constitutes a commitment beyond what ERISA mandates, an employer's commitment to vest such welfare benefits shall not be inferred lightly and must be stated in clear and express language. *See Skinner*, supra, 188 F.3d at 139 (citing *In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 902 (3d Cir.1995)).

23. It is the plan participant's burden to prove by a preponderance of the evidence that the employer intended that a welfare benefits vest. *See Skinner*, supra, 188 F.3d at 138-39.

24. Plaintiff has produced no evidence that Tyco made a commitment to vest BTA benefits.

25. There is a complete lack of clear and express language to suggest such a commitment is contained in the Tyco Benefit Plan's documents.

26.    To the contrary, in its 2000 and 2002 SPDs, Tyco reserved the right to "amend, modify, terminate, or discontinue any or all of the plans described in this SPD at any time at its sole discretion."

27.    Tyco was free to amend or modify the terms of its BTA Plan in July 1, 2002 without prior notice to employees.

**TYCO'S COMPLIANCE WITH ERISA DISCLOSURE REQUIREMENTS**

28.    An ERISA benefit plan administrator has a duty to provide an SPD to its participants, setting forth information including the name and type of benefit plan, the plan's requirements with respect to eligibility for participation and benefits, and circumstances that may result in disqualification, ineligibility, or denial or loss of benefits."  29 U.S.C. §1021(a), 1022, 1024(b).

29.    An ERISA benefit plan administrator is required to furnish each participant a copy of the SPD within 90 days after they become a plan participant.  29 U.S.C. §1024(b)(1)(A).

30.    Tyco complied with its obligation to provide Mr. Roarty with a copy of the Tyco Benefit Plan SPD by giving him one at work shortly after he was hired.  TT 15, 63.

31.    An ERISA benefit plan administrator is required to furnish each participant an updated summary plan description every fifth year after the plan becomes subject to ERISA, which integrates all plan amendments made within the prior five-year period.  29 U.S.C. §1024(b)(1).

32.    The Tyco Benefit Plan published and distributed SPDs in 2000, 2002 and 2007, which satisfied its disclosure obligations under Section 1024(b)(1).

33.    ERISA requires that a summary description of material modifications to an employee benefit plan must be provided to all plan participants not later than 210 days after the end of the plan year.  29 U.S.C. §§1022(a), 1024(b)(1); 29 C.F.R. §2520.104b-3(a).

23

34.  The regulations promulgated under ERISA with regard to publication of SPDs and SMMs only require that the plan administrator use whatever means are "reasonably calculated to ensure the actual receipt of the material," which specifically includes sending the material by U.S. mail.  29 C.F.R. § 2520.104(b)-1(b)(1).

35.  ERISA does not require that the plan establish actual notice in order to satisfy its burden.  *Williams v. Plumbers & Steamfitters Local 60,* 48 F.3d 923, 926 (5th Cir. 1995); *Campbell v. Emery Air Freight Corp.*, No. 93-6568, 1995 WL 286722, *1 (E.D. Pa. 1995).

36.  ERISA does not require a benefit plan administrator to verify receipt of an SPD or SMM that the plan publishes.  *Aiello v. Midwest Operating Engineers Health & Welfare Fund,* 1993 WL 81437, *3 (N.D.Ill. 1993)

37.  Plaintiff's contention of non-receipt is immaterial as an amendment of a welfare benefit plan is valid despite a beneficiary's lack of personal notice, except in extraordinary circumstances.  *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 328 (5th Cir. 1992).

38.  A procedural defect in notice of the amendment of a welfare plan does not give rise to a substantive remedy, except in the extraordinary circumstances where "the employer has acted in bad faith" or "has actively concealed a change in a benefit plan, and the covered employees have been substantially harmed by the employer's actions."  *Lettrich v. J.C. Penney Company*, 90 Fed. Appx. 604 (3d Cir. 2004) (Non-precedential).

39.  Other federal courts have adopted a "mailbox rule" in cases of alleged inadequate notice under COBRA to allow a rebuttable presumption that a properly addressed and mailed document is received by an addressee.  *Custer v. Murphy Oil USA, Inc.,* No. 05-0739, 1995 WL 1968916, *3 (E.D.La. 1995) (citing *Schikore v. BankAmerica Supp. Retirement Plan,* 269

F.3d 956, 961-2 (9th Cir. 2001) and *DeSimone v. Siena College*, No. 90-1058, 1991 U.S. Dist. LEXIS 5529, *7-8 (N.D.N.Y. 1991).

40.    Mere denial of receipt is insufficient to overcome the presumption created under the mailbox rule. *Id.*

41.    Tyco used means "reasonably calculated to ensure the actual receipt of the 2002 SPD and SMM when it retained a commercial mass-mailing firm to mail copies to all active employees, using the same addresses used to send those employees payroll information.

42.    Plaintiff admits that she had received payroll related documents such as Mr. Roarty's W-2 tax form in the mail at her home, leading to the conclusion that Tyco used the correct address when it mailed the 2002 SPD and SMM to Mr. Roarty.

43.    Defendants are entitled to a rebuttable presumption under the mailbox rule that Plaintiff received the 2002 SPD and SMM.

44.    Plaintiff has failed to establish any procedural defect in the notice provided to her by the Tyco Benefit Plan that would afford her a substantive remedy, and Plaintiff is bound by the terms of the 2002 SMM and the LINA policy.

45.    Plaintiff has offered no evidence that the Tyco Benefit Plan or Tyco acted in bad faith in their dealings with her.

46.    Plaintiff's sole difference with the Tyco Benefit Plan and Tyco is that its representatives disagreed with her contention that Mr. Roarty was engaged in business travel on Tyco's behalf when he died. This evidence is insufficient to establish as an extraordinary circumstance bad faith on the Tyco Benefit Plan's or Tyco's part.

47.    Plaintiff has failed to establish that the Tyco Benefit Plan or Tyco actively concealed a change in the BTA Plan.

48.   It is undisputed that Tyco distributed the 2002 SPD and SMM.   Plaintiff's sole contention is that she received neither one.   Mr. Roarty's *de facto* supervisor, Robert Bierznski recalled that he had received notice of the changes to the BTA Plan.   Under these facts, Plaintiff cannot establish that the Tyco Benefit Plan or Tyco made any attempt to actively conceal the fact of the BTA Plan amendment or its terms.

49.   As a result, Plaintiff's claim is determined by the written terms of the Tyco BTA Plan as set forth in the LINA policy.  29 U.S.C. § 1102(a)(1)

## LINA's Claim Decision Was A Reasonable One and Based On Substantial Evidence

50.   Prior to LINA's receipt of Plaintiff's claim, the Tyco Benefit Plan itself investigated whether Mr. Roarty had been engaged in business travel when he died, concluding that he had not been.

51.   When LINA received the claim, it contacted the Tyco Benefit Plan to confirm its determination that Mr. Roarty was covered under the plan and had died in an accident.

52.   Upon the Tyco Benefit Plan's confirmation that Mr. Roarty had died in an accident while covered, LINA promptly paid $168,000 in group accidental death benefits.

53.   LINA had also asked the Tyco Benefit Plan to confirm whether Mr. Roarty had been engaged in business travel when he died so that LINA could determine whether BTA benefits were also payable.

54.   On multiple occasions, at least one of them in writing, the Tyco Benefit Plan reported to LINA that Mr. Roarty had not been engaged in business travel when he died.

55.   Both Mr. Bierzynski and Mr. Tomberlin, respectively Mr. Roarty's *de facto* supervisor and his Human Resources representative, advised the Tyco Benefit Plan at various points in time that Mr. Roarty had not been engaged in business travel during the Pittsburgh trip.

26

56.     LINA relied on the Tyco Benefit Plan's investigations and conclusion that Mr. Roarty

was not engaged in business travel when he died.

57.     LINA considered as significant factors in its decision that:

a.  Tyco confirmed that Mr. Roarty had not been engaged in business travel on its

behalf when he died.  TT 112.

b.  The Roartys had already planned to travel to Pittsburgh for vacation and a wedding

at the same time as the proposed business trip.  TT 112-13.

c.  The Roartys had planned to spend Saturday, July 31 and August 1, 2004, working on

their house before they left for Pittsburgh.  TT 113.

d.  The vendor meeting, if it had ever happened, would have taken up only a small

portion of his time.  TT 113.

e.  It was reasonable to believe that Mr. Roarty left for Pittsburgh on business travel for

a business meeting and personal reasons.  TT 113.

f.  On Monday, Mr. Roarty found out that the meeting was being rescheduled for

Thursday and by Wednesday knew that there would be no business meeting at all.

TT 113.

g.  When the meeting was cancelled on or before August 4, Mr. Roarty had no business

reason to remain in Pittsburgh but did until August 8.  TT 113.

h.  The only reason that Mr. Roarty remained in Pittsburgh after that date was the same

reason as he had previously planned – vacation and to attend a wedding.  TT 113.

i.  If Mr. Roarty had wished to maintain BTA coverage while he traveled, he would

have had to return home.  TT 113.

j.  Much of this information had been supplied by Mrs. Roarty.  TT 113-14

58.   LINA's decision to deny Plaintiff's claim for BTA benefits was a reasonable one that was supported by substantial evidence.

59.   Moreover, the cases dealing with BTA benefits did not provide definitive guidance as they involved instances where the insured was in the midst of a business trip and died in an accident while engaged in some minor personal activity.

60.   For example, in Garber v. Provident Life Ins. Co., 181 F.3d 100, 1999 WL 357812  (6th Cir. 1999) (Table), the insured had attended an extended business conference.  On his return, with his employer's approval he routed his flight home to briefly visit his parents but died in a plane crash.

61.   Equally, Plaintiff can not successfully argue that Mr. Roarty was engaged in business travel because he made business calls on his cell phone and checked his email on a computer while on vacation in Pittsburgh trip.

62.   Plaintiff concedes that Mr. Roarty was not required by his employer to do so but chose to take time from his vacation in this manner.

63.   His de facto supervisor Mr. Bierzynski testified that he was free to decline to answer business calls outside Tyco's normal business hours.  TT 12-13.

64.   A much more direct requirement that the employee must accept such calls has been found necessary before an ERISA beneficiary is entitled to BTA benefits.  See, e.g., Lifson v. INA Life Insurance Co. of New York, 333 F.3d 349 (2d Cir. 2003) (employee required to work on call from her home, to carry a pager, answer calls within 20 to 30 minutes and rated on how promptly she responded).

65.   Were the Court to accept Plaintiff's argument, a covered employee would be able to invoke coverage under the BTA plan simply by making a few calls to the office or to customers each day.  The Court takes note of the prevalence of devices such as

Blackberrys and similar means of communication that allow users to access email and make telephone calls, regardless of their location or what else they might be doing. If the Court were to accept Plaintiff's contention that mere use of such devices transforms a vacation into a business trip, there would be no meaningful distinction between the terms of Tyco's group accidental death plan, which does not require business travel, and its BTA Plan, which does. This is far removed from the intent of the BTA Plan, which provides benefits to Tyco employees who die while engaged in travel on Tyco's behalf – not those on vacation.

66. Finally, any potential conflict that might attach to LINA's determination of whether Mr. Roarty was engaged in business travel is negated by the fact that the unconflicted Tyco Benefit Plan's reached the identical conclusion.

67. The Court notes that LINA acted promptly and responsibly in handling the claim. For instance, LINA promptly noted that Plaintiff's claim was made for only $50,000 when she was potentially entitled to $500,000, and fixed the problem on its own initiative. Further, LINA did not rely simply on one report from the Tyco Benefit Plan but repeatedly asked for the Plan to re-confirm. Also, Tyco and LINA reasonably accepted Plaintiff's account of Mr. Roarty's travel, as she understood it, in their determination of the claim.

68. Finally, the Court notes that LINA declined to wait for a fifth confirmation from the Tyco Benefit Plan that Mr. Roarty had not been traveling on business when he died – a letter that could have served only to buttress LINA's denial – in light of its previous four confirmations, both written and oral. LINA instead promptly advised Plaintiff of its conclusion.

69.     Considering LINA's good faith in the handling of the claim and the Tyco Benefit Plan's

unconflicted investigation and conclusion on the critical issue of Plaintiff's claim, the

Court holds that only minimally heightened scrutiny is required under these facts.

70.     The Court finds under all of the facts that LINA's decision that Plaintiff is not entitled

to Tyco BTA Plan benefits is a reasonable one and is supported by substantial evidence.

71.     Therefore, the Court enters judgment in favor of Defendants and against Plaintiff, and

dismisses the Complaint with prejudice.

**CONCLUSION**

Defendants respectfully request that the adopted the foregoing proposed findings of fact and conclusions of law and enter judgment in Defendants' favor and against Plaintiff. Defendants also request that the Court dismiss the Complaint with prejudice and award Defendants such other relief as the Court may deem appropriate.

**MARGOLIS EDELSTEIN**

BY: **/s    *Herbert W. Mondros***

HERBERT W. MONDROS
Delaware Bar No. 3308
750 Shipyard Drive, Suite 102
Wilmington, DE 19806
(302) 888-1112
hmondros@margolisedelstein.com

and

**NELSON LEVINE de LUCA & HORST, LLC**
MARK STEPHENSON, ESQUIRE
Four Sentry Parkway – Suite 300
Blue Bell, PA 19422
(610) 862-6575
mstephenson@nldhlaw.com

Attorneys for Defendants Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America

Dated: June 20, 2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**KELLY ROARTY**
         Plaintiff
     v.

**TYCO INTERNATIONAL, LTD.
GROUP BUSINESS TRAVEL
ACCIDENT INSURANCE PLAN AND
LIFE INSURANCE COMPANY OF
NORTH AMERICA**
         Defendants.

**Civil Action No:  06-0195-GMS**

## CERTIFICATE OF SERVICE

I, Herbert Mondros, Esquire, hereby certify that I caused the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law to be electronically filed today with the Clerk of Court using the Court's CM/ECF system, which will send a Notice of Electronic Filing to Richard R. Wier, Jr., Esquire, Two Mill Road, Suite 200, Wilmington, DE 19806.

A true and correct, courtesy copy of Defendants' Reply has also been served today upon Mr. Wier by United States Mail, postage prepaid.

**MARGOLIS EDELSTEIN**

**BY:**     _____/s *Herbert W. Mondros*_____
HERBERT W. MONDROS, ESQUIRE
Delaware Bar No. 3308
ATTORNEYS FOR DEFENDANTS

**DATE: JUNE 20, 2008**