IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KELLY ROARTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-195 GMS |
| TYCO INTERNATIONAL LTD. GROUP | ) | |
| BUSINESS TRAVEL ACCIDENT | ) | |
| INSURANCE PLAN, and LIFE | ) | |
| INSURANCE COMPANY OF NORTH | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM**

**I.     INTRODUCTION**

Kelly Roarty ("Mrs. Roarty") brings this action against Tyco International, Ltd. Group Business Travel Accident Insurance Plan and Life Insurance Company of North America ("LICNA") (collectively, the "defendants"), pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Mrs. Roarty claims that the defendants wrongfully denied her benefits to which she was entitled under an employee benefits plan after her husband's death. Mrs. Roarty also claims that the defendants breached their fiduciary duties to her during their review and subsequent denial of her claim.

The court held a one-day bench trial on April 21, 2008. The parties have submitted briefing. (D.I. 60, 61.) The following are the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II.     FINDINGS OF FACT

### A.     Daniel Roarty's Accident

In 2004, Kelly Roarty and her husband, Daniel, lived in Newark, Delaware.  Daniel Roarty worked as a Senior Product Manager for Scott Instruments, a manufacturer of protective equipment and safety devices.  Scott Instruments is a subsidiary of Tyco International Ltd. ("Tyco"), a large international conglomerate employing approximately 250,000 people worldwide.

That year, Daniel and Kelly Roarty planned to vacation during the first week of August with their four children in Pittsburgh.  In July, Daniel Roarty learned that a Tyco supplier was struggling to manufacture certain sensors at the supplier's production plant, known as the Bacharach Plant, near Pittsburgh.  To address this problem, Daniel Roarty decided to meet with the suppliers at the Bacharach Plant, since he had already planned to travel to Pittsburgh that week.  Daniel Roarty made arrangements to do so, notifying Bob Bierzynski, a senior manager at Scott Instruments, of his plans and scheduling a meeting at the Bacharach Plant for Tuesday, August 3.  To attend the meeting, Daniel Roarty, driving separately from his wife, began his trip to Pennsylvania a few days earlier than his planned vacation.  He also brought materials that he would need to conduct business during the trip, such as his laptop, briefcase, and cell phone.

Over the next few days, Daniel Roarty and others at Tyco resolved the problem by telephone and email, and the in-person meeting was cancelled.  Nonetheless, Daniel Roarty continued to make business calls during his time away from home.  As previously planned, he also attended a family wedding with his wife and children.  On August 8, 2004, while returning

2

home, Daniel Roarty's car was struck by another automobile, and, tragically, Daniel Roarty was killed.

### B.     The Business Travel Accident Plan

Daniel Roarty participated in Scott Instruments' employee benefits plan, which included a Business Travel Accident Plan ("BTA Plan").  Daniel Roarty's wife, Mrs. Roarty, was his beneficiary.    The BTA Plan covered plan participants against accidental death or injury. According to the Summary Plan Description distributed by Scott Instruments in 2000 ("2000 SPD"), the amount and type of coverage depended on the employee's base annual earnings.  (Ex. 10 at 109-110.)  The pertinent chart provided that, for employees earning $75,000 or more, the covered amount was $500,000, and the type of coverage was "24 hours a day (business or pleasure)."  (Ex. 10 at 110.)  The 2000 SPD reiterated this full-time coverage in greater detail:

> If your base annual earnings are $75,000 or more, you are covered 24 hours a day, whether traveling or not, at home, at work, on vacation, while traveling anywhere in the world, or while on a leave of absence, subject to the exclusions and limitations of the plan.

(*Id.*)  Daniel Roarty's base annual earnings exceeded $75,000 at the time of his death.  Thus, under 2000 SPD terms, the BTA Plan covered Daniel Roarty 24 hours a day, whether he was traveling or not, and whether he was on business or not, in the amount of $500,000.

3

In early 2001, Tyco acquired Scott Instruments. In 2002, LICNA became the BTA Plan underwriter and designated plan fiduciary. As such, LICNA was granted the sole authority, in its discretion, to administer the BTA Plan. This authority included interpreting plan terms, deciding questions of eligibility, and making findings of fact relating to the BTA Plan.

In addition to changing underwriters, Tyco also modified the BTA Plan's terms to reduce the scope of coverage. While the previous BTA Plan had provided full-time coverage to employees earning at least $75,000 annually, the new BTA Plan covered all employees, regardless of salary, only during authorized business travel:

> We[1] will pay benefits … for any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay:
>
> a) away from your premises in his city of permanent assignment; and
>
> b) on business for you, and in the course of your business.
>
> All trips must be authorized by you.

(D.I. 8 at 10-11.) The BTA Plan as underwritten by LICNA became effective July 1, 2002.

The BTA Plan excluded from coverage (a) commuting between home and work, and (b) "personal deviations made by the covered person," with personal deviations defined as "an

---

[1] "We" refers to LICNA. "You" and "your" refer to Tyco.

activity not reasonably related to your business, and not incidental to the business trip." (*Id.*) Trip authorization was not defined. According to the plan's terms, coverage begins at the "actual start of the trip," regardless of "whether the trip starts at the covered person's home, place of work, or other place." (*Id.*) Coverage ends "when the covered person [a] arrives at his home or place of work, whichever happens first; or [b] makes a personal deviation." (*Id.*)

To reflect the change in insurance carriers, Tyco prepared a new summary plan description ("2002 SPD"). The 2002 SPD did not reflect the modification to the BTA Plan that eliminated full-time coverage for employees earning $75,000 or more per year. Instead, like the 2000 SPD, the 2002 SPD provided that the BTA Plan covered employees earning $75,000 or more "24 hours a day, whether traveling or not, at home, at work, on vacation . . . ." (Ex. D6 at 121.) While the 2002 SPD stated that the plan was "subject to change July 1, 2002," it indicated no particular change.

Tyco separately prepared a summary of material modifications that reflected the change in the BTA Plan's terms ("SMM"). (Ex. D7.) The SMM's effective date was July 1, 2002. In relevant part, the SMM stated that the BTA Plan would categorically no longer cover an employee engaged in non-business travel, regardless of the employee's annual salary:

> Effective for accidents on or after July 1, 2002, for any non-business activity, including personal travel, and for accidents which are the result of the employee being under the influence of alcohol or illegal drugs will no longer be covered.

5

(Ex. D7.)

###     C.     Tyco's Distribution Measures

Tyco presented evidence of how it distributed these summaries through a single witness, Kathee Beauchesne. Based in Tyco's corporate office, Beauchesne is responsible for the cash management of all Tyco health and welfare benefits in the United States. Beauchesne testified as to Tyco's general distribution practices. Tyco retains a private vendor to distribute its summaries of plan descriptions through mass mailings. In 2002, that vendor was a document distribution company called Relizon. Tyco would provide an address list derived from its payroll to the vendor, who would then prepare and distribute the material in question by mail. Beauchesne testified that, according to Tyco's general policy, the 2002 SPD would have been distributed in the fall of 2002. As for summaries of material modifications, Tyco's general policy was to distribute them at various times during a given year, also by mass mailings. Tyco would not send such notifications via email.

But did Tyco follow those general practices in this particular case? Beauchesne did not know. In particular, Beauchesne did not know whether the SMM and 2002 SPD were mailed by Relizon to Daniel Roarty or to others at Scott Instruments. Beauchesne did claim to have spoken the previous week, when she first learned of Mrs. Roarty's claim, to "someone" at Relizon about whether Relizon had in fact mailed out the 2002 SPD. Beauchesne did not identify this person's name, position, or basis of knowledge. According to Beauchesne, this "man on the phone" said that Relizon had mailed out the 2002 SPD, but that he could not confirm to whom Relizon had

6

sent it because Relizon no longer had the mailing list. Beauchesne herself never saw such a list, and Tyco adduced no list into evidence. Beauchesne did not address whether the unnamed Relizon employee had stated that the SMM was similarly mailed.

Mrs. Roarty testified that her husband received the 2000 SPD in 2000 at work, and that he brought the 2000 SPD home to Mrs. Roarty. Mrs. Roarty was responsible for financial and benefits matters in her household. She kept organized files of all such materials, including the 2000 SPD. But, according to Mrs. Roarty, she and Daniel Roarty never received the 2002 SPD or the SMM, in the mail or otherwise. Gerry Lafond, one of Daniel Roarty's coworkers at Scott Instruments, also testified that he received the 2000 SPD at work when he joined the company. But Lafond likewise denied ever receiving the 2002 SPD or the SMM. And because they never received these materials, Lafond and Mrs. Roarty did not know of the material changes to the BTA Plan until after Daniel Roarty's death.

Similarly, Bierzynski, the Scott Instruments senior manager, did not know of the changes to the BTA Plan at the time of Daniel Roarty's death. Bierzynski believed and specifically told Mrs. Roarty at the hospital immediately after the accident that the BTA Plan covered Daniel Roarty, and that she would be entitled to benefits. Indeed, that was what Lanny Tomberlin, the Tyco Human Resources Director responsible for Scott Instruments, had told Bierzynski just before Bierzynski went to the hospital to see Mrs. Roarty. It was not until a few weeks after Daniel Roarty's death that Tomberlin realized his error: that he had recited the policy as stated in the 2000 SPD, rather than as modified in 2002.[2]

---

[2] A subsequent internal email between Tyco human resources department employees quotes Tomberlin as stating, regarding Daniel Roarty's death and Mrs. Roarty's claim, that "the changes for the BTA was never updated in the

7

After listening to the witnesses and viewing their demeanor at trial, and after reviewing the record, the court finds Mrs. Roarty's testimony to be credible. Similarly, the court finds Lafond's testimony to be credible. On the other hand, the court finds that Beauchesne's testimony, particularly as to whether 2002 SPD and the SMM were actually mailed to Scott Instruments employees, is not credible. Accordingly, the court finds by a preponderance of the evidence that Tyco and Relizon never distributed, by mail or otherwise, the 2002 SPD or the SMM to Daniel Roarty, Lafond, or any other employee at Scott Instruments.[3]

### D.    LICNA's Denial of Mrs. Roarty's Claim

After Daniel Roarty's accident, Mrs. Roarty applied for benefits under the BTA Plan. Mrs. Roarty also requested a copy of the BTA Plan from Tyco as well as from LICNA. Neither Tyco nor LICNA sent her one. By letter of December 17, 2004, Marcy Miller, the LICNA accident claims specialist handling the matter, denied Mrs. Roarty's claim for benefits under the BTA Plan. (Ex. 1 at AR115-17.) Miller stated that the terms of the BTA Plan provided coverage only during authorized business trips. After determining that Daniel Roarty was not on an authorized business trip at the time of his death, Miller concluded that Mrs. Roarty was not eligible for benefits under the BTA Plan. (*Id.*)

After further contacts with Tyco and LICNA, Mrs. Roarty appealed LICNA's denial of her claim for benefits under the BTA Plan. On March 24, 2005, by letter from Brian Billeter, an

---

SPD but just to make a written correction after the employee died." (Ex. 2 at DEF 244.) The email also quotes Tomberlin as requesting "to speak to someone in corp. because of this issue regarding the spouse and the changes that were made in the policy." *Id.*

[3] The reason for Tyco's failure to distribute these materials to Scott Instrument's employees according to Beauchesne's description of Tyco's general practices – while perhaps due to recordkeeping errors related to Tyco's recently acquiring the company – is not apparent from the record.

accident claims manager not originally assigned to the matter, LICNA denied Mrs. Roarty's appeal.  (Ex. D1 at AR65-77.)  In the letter, Billeter reiterated that the BTA Plan's terms provided for coverage only during authorized business trips.  Under those terms, and based on his determination that Daniel Roarty was not on such a trip at the time of his death, Billeter concluded that Mrs. Roarty was not eligible for benefits under the terms of the BTA Plan.  (*Id.*)

## III.    CONCLUSIONS OF LAW

ERISA is a statutory scheme enacted by Congress to protect contractually defined benefits that an employer provides to its employees.  *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989).  The benefits at issue here – the BTA Plan benefits that Mrs. Roarty claims she is due – fall within ERISA's definition of an "employee welfare benefit." 29 U.S.C. § 1002(1)(A).  Mrs. Roarty brings this claim to recover the BTA Plan benefits pursuant to ERISA § 502(a)(1)(B).[4]

### A.  ERISA Disclosure Obligations

ERISA imposes certain disclosure obligations on employers to enable employees to learn their rights and obligations under a given benefits plan.  *Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83-84 (1995).  These obligations include furnishing a summary plan description to participants and beneficiaries.  29 U.S.C. §§ 1021(a), 1022, and 1024(b).  This summary plan description is the primary document on which participants rely to know their rights and

---

[4] ERISA empowers participants in, or beneficiaries of, an ERISA-governed plan to bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B).

9

obligations under a plan.[5] *Burstein v. Allegheny Health Educ.*, 334 F.3d 365, 378-79 (3d Cir. 2003) ("The ERISA provision governing summary plan descriptions expresses Congress's desire that the SPD be transparent, accurate, and comprehensive.") (citing 29 U.S.C. § 1022(a)); *Local 56, United Food and Comm. Workers Union v. Campbell's Soup Co.*, 898 F. Supp. 1118, 1130 (D.N.J. 1995).

Generally, an employer may modify or terminate employee welfare benefits without prior notice to employees, unless those benefits have accrued or vested. *Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. at 78. But the benefits do not vest absent an employer's explicit commitment to the contrary. *Unisys Corp. v. Ret. Med. Benefit "ERISA" Litig*, 58 F.3d 896, 901 (3d Cir. 1995). There was no such commitment in this case. Thus, Tyco was free to modify or terminate the terms of its BTA Plan without prior notice to its employees.

This freedom is subject to certain regulations. For example, ERISA requires plan administrators to notify plan participants of material modifications to employee welfare plans. 29 U.S.C. § 1024(b)(1); *Lettrich v. J.C. Penney Co., Inc.*, 213 F.3d 765, 769 (3d Cir. 2000). In particular, ERISA requires the employer to provide plan participants with a summary of material modifications to the employee benefit plan, written in a manner calculated to be understood by the average participant, within 120 days after the plan becomes subject to that modification. 29 U.S.C. §§ 1022(a), 1024(b)(1). Thus, Tyco had until October 28, 2002, to notify plan

---

[5] This accords with common sense, considering the difficulties that employees and beneficiaries face in gaining access to the plan documents themselves. *Burstein*, 334 F.3d at 379 (noting relative inaccessibility of the plan document). Here, for example, Mrs. Roarty was denied a copy of the plan document by both the employer and the plan administrator, even after her husband's death.

Case 1:06-cv-00195-GMS Document 62 Filed 09/15/08 Page 11 of 15 PageID #: 911

participants of the modifications to the BTA Plan's coverage.[6]

In addition, although ERISA does not require that employers provide actual notice of these changes, ERISA regulations do require an employer to "use measures reasonably calculated to ensure actual receipt" of the summary of material modifications or the summary plan description. 29 C.F.R. § 2520.104b-1(b)(1). ERISA does not require the employee's actual receipt of the summary; distribution by hand or first-class mailing is sufficient. *Id.* Here, Tyco failed to meet even these basic requirements. Having found that Tyco never distributed by mail or otherwise the 2002 SPD and SMM to employees at its Scott Instruments subsidiary, the court concludes that Tyco failed to use measures reasonably calculated to ensure Daniel Roarty's actual receipt of the 2002 SPD and the SMM.

### B. Because There Is A Clear Conflict, The Terms of the SPD Govern

"[W]here a summary plan description conflicts with the plan language, it is the summary plan description that will control." *Burstein v. Allegheny Health Educ.*, 334 F.3d at 378; *Hooven et al. v. Exxon Mobil Corp.*, 465 F.3d 566, 577 (3d Cir. 2006) (citing *Burstein*) ("[W]here an SPD in effect when the plaintiffs' benefits vest . . . clearly contradicts the plan, the terms of the SPD can be held to control for purposes of a claim for plan benefits pursuant to ERISA § 502(a)(1)(B)."). In this case, Daniel Roarty's benefits vested upon his death. The BTA Plan effective July 1, 2002, covered Daniel Roarty only if he was on an authorized business trip when he died. (Ex. D8.) In stark contrast, the 2000 SPD, the summary plan description in effect at the

---

[6] October 28, 2002, is 120 days after July 1, 2002, the date that the BTA Plan's new policy terms became effective. (Ex. D8.)

11

time of his death, provided for coverage regardless of travel and regardless of business purpose.[7]
Accordingly, the court holds that the terms of the 2000 SPD control for the purposes of Mrs.
Roarty's claim.

## C. LICNA Abused Its Discretion in Denying Coverage

Applying these terms, the court concludes that Daniel Roarty was "covered 24 hours a
day, whether traveling or not, at home, at work, on vacation, while traveling anywhere in the
world . . . ." (Ex. D10 at 110; *cf.* Ex. D6 at 122.) LICNA's denial was based on Daniel Roarty
being covered only during authorized business trips. As such, under a heightened arbitrary and
capricious standard of review,[8] the court holds that LICNA's denial was an abuse of discretion
because it was erroneous as a matter of law. *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40,
45 (3d Cir. 1993) (internal citations omitted).

The court will therefore overturn LICNA's denial. Under the terms applicable in this
case, Daniel Roarty was covered at the time of his death. Mrs. Roarty as his beneficiary was
thus entitled to full benefits under the BTA Plan. Under ERISA § 502(a)(1)(B), Mrs. Roarty
may recover the $500,000 due to her under the BTA Plan.[9]

---

[7] The SMM was ineffective because it was never distributed, by mail or otherwise, to Scott Instruments employees.
The 2002 SPD was similarly ineffective. And even if the 2002 SPD had been reasonably distributed, it would not
matter. The relevant terms of the 2000 SPD and the 2002 SPD are the same. While the 2002 SPD indicates it is
subject to change, the specific change is not provided.

[8] *Roarty v. Tyco Int'l*, C.A. No. 06-195, 2008 U.S. Dist. LEXIS 24018, at *10-13 (D. Del. March 26, 2008).

[9] Because the above findings and conclusions, the court need not address whether LICNA breached its fiduciary
duties to Mrs. Roarty or otherwise abused its discretion in denying her claim.

12

## IV.    CONCLUSION

For the reasons stated above, the court will grant judgment in favor of the plaintiff.

Dated: September 12, 2008

CHIEF, UNITED STATES DISTRICT JUDGE

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KELLY ROARTY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | )   Civil Action No. 06-195 GMS |
| TYCO INTERNATIONAL LTD. GROUP | ) |
| BUSINESS TRAVEL ACCIDENT | ) |
| INSURANCE PLAN, and LIFE | ) |
| INSURANCE COMPANY OF NORTH | ) |
| AMERICA, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1.  Judgment is entered in favor of the plaintiff, Kelly Roarty, and against the defendants in the amount of $500,000; and

2.  The plaintiff is entitled to her reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). The plaintiff shall submit, within fifteen (15) days of the date of this Order, a petition for counsel fees together with an affidavit detailing the number of hours devoted to this action and the hourly rate requested. Such petition shall also provide evidence supporting the reasonableness of the requested fees. The defendants shall have fifteen

(15) days from the date of this submission to file objections, if any, to the plaintiff's petition.

Dated: September 12, 2008                    CHIEF, UNITED STATES DISTRICT JUDGE